Gilmur R. Murray (SBN 111856)
gmurray@murrayhowardlaw.com
Derek G. Howard (SBN 118082)
dhoward@murrayhowardlaw.com
**MURRAY & HOWARD, LLP**
436 14th Street, Suite 1413
Oakland, California 94612
Telephone:     (510) 444-2660
Facsimile:     (510) 444-2522

Joseph W. Cotchett (SBN 36324)
jcotchett@cpmlegal.com
Niall P. McCarthy (SBN 160175)
nmccarthy@cpmlegal.com
Laura Schlichtmann (SBN 169699)
lschlichtmann@cpmlegal.com
**COTCHETT, PITRE & MCCARTHY**
840 Malcolm Road, Suite 200
Burlingame, California 94010
Telephone:     (650) 697-6000
Facsimile:     (650) 697-0577

*Attorneys for Plaintiffs and the Classes*

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ELLEN STOODY-BROSER , an Individual, Individually and on Behalf of All Others Similarly Situated,<br><br>                Plaintiffs,<br><br>        v.<br><br>BANK OF AMERICA, N.A., and BANK OF AMERICA CORPORATION<br><br>                Defendants. | Case No. 08-2705<br><br>**REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS; DECLARATION OF COUNSEL**<br><br>Date:     October 31, 2008<br>Time:     9:00a.m.<br>Place:    Courtroom 2, 17th Floor<br><br>Complaint Filed:  May 29, 2008<br><br>Honorable Jeffrey S. White |

**REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS; DECLARATION OF COUNSEL**
**Case No. 08-2705**

I.    **INTRODUCTION**

Plaintiffs respectfully request that the Court take judicial notice of the documents attached as Exhibits 1-17 listed below.  Plaintiff makes this request pursuant to Federal Rule of Evidence 201.

Judicial notice of each of the documents listed below is proper.  Rule 201 of the Federal Rules of Evidence permits the Court to take judicial notice of facts "not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." Fed. R. Ev. 201.  Each of the attached documents meets this requirement.

II.    **ARGUMENT**

A.    **Judicial Notice of Documents Filed in Federal Courts Attached Hereto as Exhibits 1-16 is Proper.**

"Judicial notice may be taken of documents filed in any federal or state court[]" because their existence is not susceptible to reasonable dispute.  *See Robert E. Jones et al*., RUTTER GROUP PRACTICE GUIDE: FEDERAL CIVIL TRIALS AND EVIDENCE, § 8:875 (2007).  This includes both records filed previously in the current litigation as well as in recorded in other proceedings.  See, e.g., *United States ex. rel. Robinson Rancheria Citizens Council v. Borneo, Inc.,* 971 F.2d 244, 248 (9th Cir. 1992) ("[W]e may take notice of proceedings in other courts, both within and without the federal judicial system, if those proceedings have a direct relation to matters at issue.").  Judicial notice of the following documents filed in federal courts attached as Exhibits 1-14 is therefore proper:

Exhibit 1:  is a true and correct copy of the case docket for *Luleff v. Bank of America, N.A. et al*. (S.D.N.Y., Case No. 06-cv-1435 JGK) (available at: http://ecf.nysd.uscourts.gov/cgi-bin/login.pl.)

Exhibit 2: is a true and correct copy of the Memorandum of Law in Support of Defendants Bank of America, N.A. and Bank of America Corporation's Motion to Dismiss filed on October 2, 2007 in the *Luleff* action (Docket No. 53, available at: http://ecf.nysd.uscourts.gov/cgi-bin/login.pl.)

Exhibit 3: is a true and correct copy of the Second Amended Complaint filed on September 21, 2007 in the *Luleff* case (Docket No. 51, available at: http://ecf.nysd.uscourts.gov/cgi-bin/login.pl.)

MURRAY & HOWARD, LLP
436 14th Street, Suite 1413
Oakland, CA  94612
Tel. (510) 444-2660
Fax (510) 444-2522

**REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS; DECLARATION OF COUNSEL
Case No. 08-2705**

1       Exhibit 4:  is a true and correct copy of the *Luleff* September 7, 2007 hearing transcript on the

2   Defendant Bank of America, N.A.'s Motion to Dismiss Plaintiffs' Amended Complaint.

3       Exhibit 5:  are true and correct copies of the two complaints filed in *Siepel et al. v. Bank of*

4   *America, N.A. et al*. (E.D. Mo., Case No. 05-2393 CAS).  The original Complaint was filed on

5   December 28, 2005 (Docket Nos. 1 and 45, available at: http://pacer.login.uscourts.gov/cgi-

6   bin/login.pl.)  The Amended Complaint (E.D. Mo., Case No. 05-2393 RWS) was filed on April 13,

7   2006.  In the Amended Complaint Plaintiffs removed their Claim of Breach of Contract and added

8   three federal claims for: violations of The 1940 Act (15 U.S.C. § 80B-6); violations of The

9   Exchange Act (§10b(5)), and The Securities Act (§§ 11 and 12). The Amended Complaint was

10  dismissed on December 27, 2006 (Dismissal Memorandum and Order, Docket No. 104, available at:

11  http://pacer.login.uscourts.gov/cgi-bin/login.pl.)

12      Exhibit 6:  are true and correct copies of the two complaints filed in *Rabin et al. v. JPMorgan*

13  *Chase Bank, N.A.,* (N.D. Ill., Case No. 06-5452 WJH).  The original Complaint was filed on October

14  6, 2006.  The Amended Complaint was filed on February 20, 2007.  (Docket Nos. 1 and 32,

15  available at: http://ecf.ilnd.uscourts.gov/cgi-bin/login.pl.)

16      Exhibit 7:  is a true and correct copy of the August 3, 2007 Memorandum and Order

17  dismissing the Amended Complaint in the *Rabin* case.  (Dismissal Memorandum and Order, Docket

18  No. 62, available at: http://ecf.ilnd.uscourts.gov/cgi-bin/login.pl.)  The Court stated that in the

19  Amended Complaint, Plaintiffs "maintain[ed] that the breach of fiduciary duty and unjust

20  enrichment claims were merely ancillary to and not predicated upon material misrepresentations or

21  omissions" (pg. 11.)  The Court held, however, that attempts to "disguise what amounts to securities

22  fraud claims for breach of fiduciary duty under state law claims is not enough to evade preclusion of

23  those claims under SLUSA."  *Id.* at 11.  The Court also held that misrepresentations and omissions

24  of material facts relating to the purchase of mutual fund shares were "the heart of the Amended

25  Complaint."  *Id.*

26      Exhibit 8:  are true and correct copies of the two complaints filed in *Segal v. Fifth Third*

27  *Bank, et al*. (S.D. OH, Case No. 07-348 SSB-TSH). The original Complaint was filed on May 1,

28

MURRAY & HOWARD, LLP
436 14th Street, Suite 1413
Oakland, CA 94612
Tel. (510) 444-2660
Fax (510) 444-2522

**REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF PLAINTIFF'S MEMORANDUM OF POINTS AND
AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS; DECLARATION OF
COUNSEL
Case No. 08-2705**

2007. The Amended Complaint was filed on October 17, 2007 (Docket Nos. 1 and 17, available at: http://ecf.ohsd.uscourts.gov/cgi-bin/login.pl.). A comparison between the two complaints shows that plaintiffs removed most of the direct allegations of "misrepresentations," "omissions," and "schemes."

Exhibit 9: is a true and correct copy of the March 25, 2008 Dismissal Order in the *Segal* action. (Dismissal Order, Docket No. 30, available at: http://ecf.ohsd.uscourts.gov/cgi-bin/login.pl). The Court stated that, "A review of the 92 paragraphs pertaining to the amended complaint's class claims leads to the inescapable conclusion that Plaintiff's action was premised on central factual allegations: that Fifth Third misrepresented or failed to disclose material facts, and/or engaged in manipulative or deceptive course of conduct, when Fifth Third invested Plaintiffs' fiduciary funds into the Bank's proprietary mutual funds. That allegation is clearly the gravamen of Plaintiff's state law claims." The Order also states that "the fact that Plaintiffs avoided using the words 'misrepresentation' and 'omission' does not control the result. It was clear to the Court that it should disregard the particular labels or titles Plaintiffs may affix to their claims when determining if SLUSA precluded those claims." (pgs. 7-8.)

Exhibit 10: are true and correct copies of the three complaints filed in *Kutten v. Bank of America, et al*. ("Kutten I") (E.D. Mo. Case No. 04-0244 PAM). The original Complaint was filed on February 27, 2004. The Amended Complaint was filed on April 2, 2004. The Second Amended Complaint was filed on June 29, 2005. (Docket Nos. 1, 3, and 127, available at: http://pacer.login.uscourts.gov/cgi-bin/login.pl.)

Exhibit 11: is a true and correct copy of the May 26, 2006 Memorandum and Order dismissing the Second Amended Complaint in the *Kutten I* action. (Dismissal Memorandum and Order, Docket No. 322, available at: http://pacer.login.uscourts.gov/cgi-bin/login.pl.) The Court dismissed the Second Amended Complaint for lack of subject matter jurisdiction, holding that Plaintiffs Arnold, Kutten and Scharff did not set forth a "scintilla of evidence" of any damage to prove the requisite amount in controversy" (pgs. 4, 8.)

Exhibit 12: are true and correct copies of the two complaints filed in *Kutten v. Bank of America et al.* ("Kutten II") (E.D. Mo. Case No. 06-937 PAM). The original Complaint was filed on

**REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS; DECLARATION OF COUNSEL**
**Case No. 08-2705**

June 16, 2006, less than one month after Kutten I was dismissed.  The Amended Complaint was filed on October 26, 2006. (Docket Nos. 1 and 23, available at: http://pacer.login.uscourts.gov/cgi-bin/login.pl).  A review of the Amended Complaint shows that Plaintiffs removed the federal securities claims and deleted most of the language from the original complaint that directly referenced disclosures, deceptive practices, misrepresentations or omissions made by defendants. The Amended Complaint also included a paragraph that specifically argued why the Amended Complaint was not preempted by SLUSA (pg. 3, ¶ 3).

Exhibit 13:  is a true and correct copy of the August 29, 2007 Memorandum and Order dismissing the Amended Complaint. (Dismissal Memorandum and Order, Docket No. 58, available at:  http://pacer.login.uscourts.gov/cgi-bin/login.pl).  The Court held that SLUSA preempted all state law class claims asserted in this action.  However, the Court also concluded that Kutten established diversity jurisdiction over her individual claims (pg. 21).

Exhibit 14:  is a true and correct copy of Defendant Bank of America, N.A. and Bank of America Corporation's Memorandum of Law in Support of Motion to Continue Stay of Discovery filed in *Kutten II* (Docket No. 28, available at: http://pacer.login.uscourts.gov/cgi-bin/login.pl.)  In that motion, the Bank of America stated that "in the 'new' initial complaint, Plaintiffs added numerous securities claims based on the same underlying allegations of *Kutten I*.  Counts I through III of the complaint allege violations of various sections of the Securities Act of 1933.  Counts IV and V assert violations of the Exchange Act of 1934 and Court VI alleges violations of the Investment Advisers Act of 1940.  Counts VII through XV are state law claims, which are subject to preemption under Securities Litigation Uniform Standards Act of 1998 ('SLUSA') because they are based upon allegations of an untrue statement or omission of a material fact made in connection with the purchase or sale of a covered security." (pg. 2.)

///

///

///

///

///

---

**REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS; DECLARATION OF COUNSEL**
**Case No. 08-2705**

**B.    Judicial Notice of the Published Federal Deposit Insurance Corporation ("FDIC") Trust Examination Manual, Comptroller of the Currency Handbook, and the Board of Governors Federal Reserve System, Supervision and Regulation SR 99-7 Attached Hereto Is Proper**.

Federal courts may take judicial notice of guidelines, manuals, and rules of federal and state governmental agencies*. See Lockyer v. County of Santa Cruz*, 2006 WL 3086706, at *3 n.3 (N.D. Cal. Oct. 30, 2006) (granting judicial notice of US DOJ checklist for polling places, available on US DOJ website); *Kothmann Enters., Inc. v. Trinity Industries, Inc.,* 455 F. Supp. 2d 608, 929 (S.D. Tex. 2006) (taking judicial notice of USPTO Manual on Patent Examining Procedure); *Driebel v. City of Milwaukee*, 298 F.3d 622, 631 n.2 (7th Cir. 2002) (taking judicial notice of a police department manual containing rules and regulations promulgated by the chief of police); *Gleave v. Graham*, 954 F. Supp. 599, 605 (W.D.N.Y. 1997) (taking judicial notice of Bureau of Prisons' office internal agency guidelines).

The Comptroller of the Currency Handbook ("OCC"), FDIC Trust Examination Manual, and the Board of Governors Federal Reserve Supervision and Regulation, SR 99-7, attached here to as Exhibits 15-17, are also published on official governmental websites.  Numerous courts have held judicial notice is appropriate of facts found on official government web pages. *See Lockyer,* 2006 WL 3086706, at *3 n.3 (taking judicial notice of US DOJ checklist for polling places, available on US DOJ's web site); *Reece v. U.S.,* 119 F.3d 1462, 1468 n.10 (11th Cir. 1997) (taking judicial notice of the fact of "devastating impact" upon communities of drug methamphetamine, as provided on the Drug Enforcement Administration and National Institute's web site); *Wallace v. Federal Emergency Management Agency*, 2001 WL 125316, at *2 (N.D. Cal. Jan. 26, 2001) (taking judicial notice of various publications available on the Federal Emergency Management Agency's web site); *In re Agribiotech Securities Litigation,* 2000 WL 1277603, at *4-*5 (D. Nev. Mar. 2, 2000) (taking judicial notice of public filings available on the Securities and Exchange Commission's web site, holding "in this new technological age, official government or company documents may be judicially noticed insofar as they are available via the worldwide web"); *McLaughlin v. Volkswagen of America,* 2000 WL 1793071, at *3 n.3(E.D. Pa. Dec. 6, 2000) (taking judicial notice of automobile recall described on National Highway Transportation Safety Administration's web site);

MURRAY & HOWARD, LLP
436 14th Street, Suite 1413
Oakland, CA. 94612
Tel. (510) 444-2660
Fax (510) 444-2522

REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS; DECLARATION OF COUNSEL
Case No. 08-2705

*Modesto Irrigation Dist. v. Pacific Gas & Elec. Co.,* 61 F. Supp. 2d 1058, 1066 (N.D. Cal. 1999) (taking judicial notice of documents submitted to Federal Regulatory Commission because they were available on agency's web site).

For both these reasons, the following manuals and booklets attached hereto as Exhibits 15-17 published on official government websites, are "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned," (Fed. R. Ev. 201) and are therefore appropriate for judicial notice:

Exhibit 15:  is a true and correct copy of selected portions of the Comptrollers of the Currency Administrator of National Banks Handbook, Conflicts of Interest, published in June 2000, (pgs. i-9; 43-45) (available at the OCC's web site: http://www.occ.treas.gov/handbook/conflict.pdf).

Exhibit 16: is a true and correct copy of the Board of Governors of the Federal Reserve System, Division of Banking Supervision and Regulations, SR 99-7, dated March 26, 1999 (available at the Board of Governors Federal Reserve System's web site: http://www.federalreserve.gov/BOARDDOCS/srletters/1999/SR9907.HTM).

Exhibit 17:  is a true and correct copy of selected portions of the FDIC Trust Examination Manual, Section 7-Complaince-Pooled Investment Vehicles (subsections K and L) (available at: http://www.fdic.gov/regulations/examinations/trustmanual/index.html)

## III.      DECLARATION IN SUPPORT OF REQUEST FOR JUDICIAL NOTICE

I, Derek G. Howard, declare as follows:

1.      I am an attorney duly admitted to practice law in the State of California. I am a partner with the law firm Murray & Howard, LLP, and am one of the counsel of record for the Plaintiff in this class action.

2.      I have personal knowledge of the facts set forth below, and if called upon to testify, I could and would competently testify to them.

3.      I make this declaration in support of the Request for Judicial Notice in Support of Plaintiff's Opposition to Defendants' Motion to Dismiss the Complaint.

4.      As to all of the exhibits identified above in section II, except Exhibit 4, our firm downloaded and printed the document from its respective official website, as also indicated in

**REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS; DECLARATION OF COUNSEL**
**Case No. 08-2705**

section II.  Exhibit 4 attached to the Request for Judicial Notice is a copy of the transcript in the case *Luleff v. Bank of America et. al.*  (S.D. N.Y. Case No. 06-cv-1435 JGK).  To our knowledge this is not an electronically available document.  I received a copy of this document from Plaintiff's counsel.  I did not attend the hearing but do believe it is a true and accurate copy of the September 7, 2007 transcript in that case.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed at Oakland, California, on September 5, 2008.

By:  /s/_____
                    Derek G. Howard

## IV.      CONCLUSION

For the forgoing reasons, judicial notice of all of the documents attached hereto is proper.

Dated:     September 5, 2008                    Respectfully submitted,

**MURRAY & HOWARD LLP**

**COTCHETT, PITRE & MCCARTHY**

By      /s/_____
                Derek G. Howard
                Attorneys for Plaintiff and the Class

MURRAY & HOWARD, LLP
436 14th Street, Suite 1413
Oakland, CA 94612
Tel. (510) 444-2660
Fax (510) 444-2522

**REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS; DECLARATION OF COUNSEL**
**Case No. 08-2705**

CLOSED, ECF

## U.S. District Court
## United States District Court for the Southern District of New York (Foley Square)
## CIVIL DOCKET FOR CASE #: 1:06-cv-01435-JGK

Luleff v. Bank of America, N.A. et al
Assigned to: Judge John G. Koeltl
Related Case: 1:08-cv-04964-JGK
Cause: 28:1331 Fed. Question: Breach of Contract

Date Filed: 02/22/2006
Date Terminated: 07/22/2008
Jury Demand: Plaintiff
Nature of Suit: 190 Contract: Other
Jurisdiction: Federal Question

| Date Filed | # | Docket Text |
|---|---|---|
| 02/22/2006 | 1 | COMPLAINT against Bank of America, N.A., Columbia Funds Series Trust, William P. Carmichael, Bank of America Corporation. (Filing Fee $ 250.00, Receipt Number 570763) Document filed by Dawne Luleff.(es, ) Additional attachment(s) added on 9/21/2006 (mbe, ). (Entered: 02/23/2006) |
| 02/22/2006 | | SUMMONS ISSUED as to Bank of America, N.A., Columbia Funds Series Trust, William P. Carmichael, Bank of America Corporation. (es, ) (Entered: 02/23/2006) |
| 02/22/2006 | | Magistrate Judge Frank Maas is so designated. (es, ) (Entered: 02/23/2006) |
| 02/22/2006 | | Case Designated ECF. (es, ) (Entered: 02/23/2006) |
| 03/01/2006 | | ***NOTE TO ATTORNEY TO E-MAIL PDF. Note to Attorney Daniel Cobrinik for noncompliance with Section (3) of the S.D.N.Y. 3rd Amended Instructions For Filing An Electronic Case or Appeal and Section 1(d) of the S.D.N.Y. Procedures For Electronic Case Filing. E-MAIL the PDF for Document 1 Complaint to: case_openings@nysd.uscourts.gov. (laq, ) (Entered: 03/01/2006) |
| 03/06/2006 | 2 | CERTIFICATE OF SERVICE of Summons and Complaint. Bank of America, N.A. served on 2/23/2006, answer due 3/15/2006; Bank of America Corporation served on 2/23/2006, answer due 3/15/2006. Service was accepted by Yontae Grahams. Document filed by Dawne Luleff. (Cobrinik, Daniel) (Entered: 03/06/2006) |
| 03/13/2006 | 3 | FILING ERROR - ELECTRONIC FOR NON-ECF DOCUMENT - MOTION for Extension of Time to File Answer (STIPULATION AND ORDER). Document filed by Bank of America Corporation. (Winograd, Michael) Modified on 3/13/2006 (kg). (Entered: 03/13/2006) |
| 03/13/2006 | | ***NOTE TO ATTORNEY TO RE-FILE DOCUMENT - NON-ECF DOCUMENT ERROR. Note to Attorney Michael S. Winograd to E-MAIL pdf copy to orders_and_judgments@nysd.uscourts.gov Document No. 3 Stipulation and Order. This document is not filed via ECF. (kg) (Entered: 03/13/2006) |
| 03/23/2006 | 4 | MOTION to Stay. Document filed by Bank of America, N.A., Bank of America Corporation. (Attachments: # 1 Affidavit of Andrew Messite in Support of Motion for Stay# 2 Exhibit A - |

| | | |
|---|---|---|
| | | Part 1# <u>3</u> Exhibit A - Part 2# <u>4</u> Exhibit B# <u>5</u> Exhibit C - Part 1# <u>6</u> Exhibit C - Part 2# <u>7</u> Exhibit D - Part 1# <u>8</u> Exhibit D - Part 2# <u>9</u> Exhibit D - Part 3# <u>10</u> Errata E# <u>11</u> Exhibit F# <u>12</u> Exhibit G# <u>13</u> Errata H - Part 1# <u>14</u> Exhibit H - Part 2# <u>15</u> Errata H - Part 3# <u>16</u> Exhibit H - Part 4# <u>17</u> Exhibit H - Part - 5# <u>18</u> Exhibit I - Part 1# <u>19</u> Exhibit I - Part 2# <u>20</u> Exhibit I - Part 3# <u>21</u> Errata I - Part 4# <u>22</u> Exhibit J# <u>23</u> Exhibit K - Part 1# <u>24</u> Exhibit K - Part 2# <u>25</u> Errata K - Part 3# <u>26</u> Exhibit K - Part 4# <u>27</u> Exhibit K - Part 5# <u>28</u> Exhibit K - Part 6# <u>29</u> Exhibit K - Part 7# <u>30</u> Exhibit L - Part 1# <u>31</u> Exhibit L - Part 2# <u>32</u> Errata L - Part 3# <u>33</u> Exhibit M# <u>34</u> Exhibit N# <u>35</u> Exhibit O - Part 1# <u>36</u> Exhibit O - Part 2# <u>37</u> Exhibit P# <u>38</u> Errata Q# <u>39</u> Exhibit R - Part 1# <u>40</u> Exhibit R - Part 2# <u>41</u> Exhibit R - Part 3# <u>42</u> Exhibit R - Part 4# <u>43</u> Exhibit R - Part 5# <u>44</u> Exhibit S# <u>45</u> Errata T# <u>46</u> Exhibit U# <u>47</u> Exhibit V# <u>48</u> Exhibit W# <u>49</u> Exhibit X)(Messite, Andrew) (Entered: 03/23/2006) |
| 03/23/2006 | <u>5</u> | FILING ERROR - ELECTRONIC FILING FOR NON-ECF DOCUMENT - MOTION for Oral Argument (LETTER). Document filed by Bank of America, N.A., Bank of America Corporation. (Messite, Andrew) Modified on 3/24/2006 (kg). (Entered: 03/23/2006) |
| 03/23/2006 | <u>6</u> | FILING ERROR - DUPLICATE DOCKET ENTRY - (SEE DOCUMENT #4) - MOTION to Stay *Proceedings*. Document filed by Bank of America, N.A., Bank of America Corporation. (Attachments: # <u>1</u> Affidavit of Andrew Messite - Exhibits to be filed in hard copy pursuant to letter request to court)(Messite, Andrew) Modified on 3/29/2006 (gf, ). (Entered: 03/23/2006) |
| 03/23/2006 | <u>7</u> | MEMORANDUM OF LAW in Support re: <u>4</u> MOTION to Stay. *Proceedings*. Document filed by Bank of America, N.A., Bank of America Corporation. (Attachments: # <u>1</u> Andrew Messite Certificate of Service)(Messite, Andrew) (Entered: 03/23/2006) |
| 03/24/2006 | | ***NOTE TO ATTORNEY TO RE-FILE DOCUMENT - NON-ECF DOCUMENT ERROR. Note to Attorney Andrew B. Messite to MANUALLY RE-FILE Document No. <u>5</u> Letter. This document is not filed via ECF. (kg) (Entered: 03/24/2006) |
| 03/24/2006 | <u>8</u> | NOTICE OF APPEARANCE by Andrew Brooks Messite on behalf of Bank of America, N.A., Bank of America Corporation (Attachments: # <u>1</u> Messite Certificate of Service)(Messite, Andrew) (Entered: 03/24/2006) |
| 04/04/2006 | <u>9</u> | STIPULATION AND ORDER: all references to and allegations of market-timing or late-trading are hereby withdrawn from the complaint as further set forth in said Order. Upon approval of this stipulation by this Court, so long as plaintiff complies with the provisions herein, the Bank of America defendants will not further seek transfer of this action by the MDL Panel to the USDC-District of Maryland to be part of MDL-1586. (Signed by Judge John G. Koeltl on 4/3/06) (db, ) (Entered: 04/05/2006) |
| 04/06/2006 | <u>10</u> | MEMORANDUM OF LAW in Support re: <u>4</u> MOTION to Stay. *Proceedings*. Document filed by Bank of America, N.A., Bank of America Corporation. (Attachments: # <u>1</u> Andrew B. Messite Certificate of Service)(Messite, Andrew) (Entered: 04/06/2006) |
| 04/06/2006 | 11 | MOTION for Mary J. Hackett to Appear Pro Hac Vice. Document filed by Bank of America, N.A., Bank of America Corporation. (cd, ) (Entered: 04/07/2006) |
| 04/11/2006 | <u>12</u> | AFFIDAVIT OF SERVICE of Summons and Complaint. William P. Carmichael served on 3/28/2006, answer due 4/17/2006. Service was accepted by John Lynch. Document filed by Dawne Luleff. (Cobrinik, Daniel) (Entered: 04/11/2006) |
| 04/12/2006 | <u>16</u> | MOTION for an order, admitting Gregory B. Jordan and Sharon L. Rusnak to Appear Pro Hac Vice. Document filed by Bank of America, N.A., Bank of America Corporation. Affidavit(s) of |

| | | Andrew B. Messite, Gregory B. Jordan and Sharon L. Rusnak in support attached. (sac, ) (Entered: 04/26/2006) |
|---|---|---|
| 04/13/2006 | 13 | MEMORANDUM OF LAW in Opposition re: 4 MOTION to Stay.. Document filed by Dawne Luleff. (Cobrinik, Daniel) (Entered: 04/13/2006) |
| 04/18/2006 | 14 | ORDER: This action is stayed pending a decision by the multidistrict litigation panel on whether to transfer this action. The parties shall report by letter to the Court when a decision has been reached, or by June 16, 2006 if no decision has been reached by then. (Signed by Judge John G. Koeltl on 4/17/06) (js, ) (Entered: 04/18/2006) |
| 04/26/2006 | | ***REJECTION OF ATTEMPTED PAPER FILING IN ECF CASE. The following document (s) Notice of Motion, was rejected by the Clerk's Office and must be FILED ELECTRONICALLY on the Court's ECF System. (mbe, ) (Entered: 04/26/2006) |
| 04/26/2006 | 15 | NOTICE OF APPEARANCE by Tim A. O'Brien on behalf of Columbia Funds Series Trust, William P. Carmichael (O'Brien, Tim) (Entered: 04/26/2006) |
| 04/26/2006 | | ***DELETED REJECTION NOTICE. The notice was incorrectly filed in this case. (rag, ) (Entered: 04/26/2006) |
| 04/26/2006 | 17 | MOTION for an order, admitting Stephen M. Colangelo to Appear Pro Hac Vice. Document filed by Columbia Funds Series Trust, William P. Carmichael. Affidavit of Tim A. O'Brien in support attached. (sac, ) (Entered: 04/27/2006) |
| 06/07/2006 | 18 | MEMO ENDORSEMENT on re: 17 MOTION for Stephen M. Colangelo to Appear Pro Hac Vice filed by Columbia Funds Series Trust, William P. Carmichael. APPLICATION GRANTED. SO ORDERED. (Signed by Judge John G. Koeltl on 6/7/06) (kco, ) (Entered: 06/13/2006) |
| 06/07/2006 | 19 | MEMO ENDORSEMENT on re: 16 MOTION for Gregory B. Jordan and Sharon L. Rusnak to Appear Pro Hac Vice filed by Bank of America Corporation, Bank of America, N.A. APPLICATION GRANTED. SO ORDERED. (Signed by Judge John G. Koeltl on 6/7/06) (kco, ) (Entered: 06/13/2006) |
| 06/13/2006 | | Transmission to Attorney Admissions Clerk. Transmitted re: 18 Memo Endorsement, to the Attorney Admissions Clerk for updating of Attorney Information. (kco, ) (Entered: 06/13/2006) |
| 06/13/2006 | | Transmission to Attorney Admissions Clerk. Transmitted re: 19 Memo Endorsement, to the Attorney Admissions Clerk for updating of Attorney Information. (kco, ) (Entered: 06/13/2006) |
| 06/16/2006 | 20 | STATUS REPORT. *Letter* Document filed by Bank of America, N.A., Bank of America Corporation. (Attachments: # 1 Order# 2 Kutten Dismissal Decision)(Messite, Andrew) (Entered: 06/16/2006) |
| 06/16/2006 | 21 | TRANSCRIPT of proceedings held on 4/17/06 before Judge John G. Koeltl. (tro, ) (Entered: 06/16/2006) |
| 06/19/2006 | | CASHIERS OFFICE REMARK on 18 Memo Endorsement in the amount of $25.00, paid on 06/15/2006, Receipt Number 582358. (jd, ) (Entered: 06/19/2006) |
| 06/27/2006 | 22 | ORDER: This Court's order dated 4/17/2006 staying this action pending the decision of the Judicial Panel on Multidistrict Litigation is therefore vacated. The parties are directed to appear for a conference on 7/12/2006 at 4:30 p.m. to discuss the status of the case. (Signed by Judge John G. Koeltl on 6/26/2006) (lb, ) (Entered: 06/27/2006) |

| | | |
|---|---|---|
| 06/27/2006 | 23 | CERTIFIED TRUE COPY OF MDL ORDER FROM THE MDL PANEL DENYING TRANSFER....that the motion, pursuant to 28 U.S.C. 1407(c), for transfer of the action to the United States District Court - Eastern District of Missouri, be, and the same hereby is denied. (Signed by Judge John G. Koeltl on 06/20/2006) (jeh, ) Additional attachment(s) added on 6/28/2006 (jeh, ). (Entered: 06/28/2006) |
| 07/07/2006 | 24 | STIPULATION AND ORDER that the time for defts to respond to plntf's complaint is extended to 7/28/06. (Signed by Judge John G. Koeltl on 7/10/06) (cd, ) (Entered: 07/11/2006) |
| 07/07/2006 | | Set Answer Due Date purs. to 24 Stipulation and Order as to Bank of America, N.A. answer due on 7/28/2006; Columbia Funds Series Trust answer due on 7/28/2006; William P. Carmichael answer due on 7/28/2006; Bank of America Corporation answer due on 7/28/2006. (cd, ) (Entered: 07/11/2006) |
| 07/28/2006 | 25 | MOTION to Dismiss *Notice of Motion*. Document filed by Columbia Funds Series Trust, William P. Carmichael. Responses due by 9/8/2006 (O'Brien, Tim) (Entered: 07/28/2006) |
| 07/28/2006 | 26 | FILING ERROR - WRONG DOCUMENT TYPE SELECTED FROM MENU - MOTION to Dismiss (Memorandum in Support of Motion to Dismiss Complaint). Document filed by Columbia Funds Series Trust, William P. Carmichael. Responses due by 9/8/2006 (O'Brien, Tim) Modified on 7/31/2006 (kg). (Entered: 07/28/2006) |
| 07/28/2006 | 27 | MOTION to Dismiss *Plaintiff's Complaint*. Document filed by Bank of America, N.A., Bank of America Corporation. (Attachments: # 1 Affidavit of Andrew Messite in Support of Motion to Dismiss# 2 Exhibit 1 to Affidavit# 3 Exhibit 2 to Affidavit# 4 Exhibit 3 to Affidavit# 5 Exhibit 4 to Affidavit# 6 Exhibit 5 to Affidavit# 7 Exhibit 6 to Affidavit# 8 Exhibit 7 to Affidavit# 9 Exhibit 8 to Affidavit)(Messite, Andrew) (Entered: 07/28/2006) |
| 07/28/2006 | 28 | MEMORANDUM OF LAW in Support re: 27 MOTION to Dismiss *Plaintiff's Complaint*.. Document filed by Bank of America, N.A., Bank of America Corporation. (Attachments: # 1) (Messite, Andrew) (Entered: 07/28/2006) |
| 07/28/2006 | 29 | FILING ERROR - WRONG DOCUMENT TYPE SELECTED FROM MENU - MOTION to Dismiss (Declaration of Tim O'Brien). Document filed by Columbia Funds Series Trust, William P. Carmichael. Responses due by 9/8/2006 (Attachments: # 1 Exhibit Exhibit 1- part 1# 2 Exhibit Exhibit 1- part 2# 3 Exhibit Exhibit 2# 4 Exhibit Exhibit 3- part 1# 5 Exhibit Exhibit 3- part 2# 6 Exhibit Exhibit 3- part 3# 7 Exhibit Exhibit 3- part 4# 8 Exhibit Exhibit 3- part 5# 9 Exhibit Exhibit 3- part 6# 10 Exhibit Exhibit 3- part 7# 11 Exhibit Exhibit 4- part 1# 12 Exhibit Exhibit 4- part 2# 13 Exhibit Exhibit 4- part 3# 14 Exhibit Exhibit 4- part 4# 15 Exhibit Exhibit 4- part 5# 16 Exhibit Exhibit 4- part 6# 17 Exhibit Exhibit 4- part 7# 18 Exhibit Exhibit 5# 19 Exhibit Exhibit 6)(O'Brien, Tim) Modified on 7/31/2006 (kg, ). (Entered: 07/28/2006) |
| 07/31/2006 | | ***NOTE TO ATTORNEY TO RE-FILE DOCUMENT - DOCUMENT TYPE ERROR. Note to Attorney Tim A. O'Brien to RE-FILE Document 26 MOTION to Dismiss (Memorandum in Support of Motion to Dismiss Complaint). Use the document type Memorandum of Law in Support of Motion found under the document list Responses and Replies. (kg) (Entered: 07/31/2006) |
| 07/31/2006 | | ***NOTE TO ATTORNEY TO RE-FILE DOCUMENT - DOCUMENT TYPE ERROR. Note to Attorney Tim A. O'Brien to RE-FILE Document 29 MOTION to Dismiss (Declaration of Tim O'Brien). Use the document type Declaration in support of motion found under the document list Responses and Replies. (kg) (Entered: 07/31/2006) |

| 07/31/2006 | 30 | MEMORANDUM OF LAW in Support re: 25 MOTION to Dismiss *Notice of Motion*.. Document filed by Columbia Funds Series Trust, William P. Carmichael. (O'Brien, Tim) (Entered: 07/31/2006) |
|---|---|---|
| 07/31/2006 | 31 | DECLARATION of Tim O'Brien in Support re: 25 MOTION to Dismiss *Notice of Motion*.. Document filed by Columbia Funds Series Trust, William P. Carmichael. (Attachments: # 1 Exhibit 1- part 1# 2 Exhibit 1- part 2# 3 Exhibit 2# 4 Exhibit 3- part 1# 5 Exhibit 3- part 2# 6 Exhibit 3- part 3# 7 Exhibit 3- part 4# 8 Exhibit 3- part 5# 9 Exhibit 3- part 6# 10 Exhibit 3- part 7# 11 Exhibit 4- part 1# 12 Exhibit 4- part 2# 13 Exhibit 4- part 3# 14 Errata 4- part 4# 15 Exhibit 4- part 5# 16 Exhibit 4- part 6# 17 Exhibit 4- part 7# 18 Exhibit 5# 19 Exhibit 6) (O'Brien, Tim) (Entered: 07/31/2006) |
| 09/01/2006 | 32 | NOTICE of Notice That Motion to DIsmiss is Moot. Document filed by Dawne Luleff. (Cobrinik, Daniel) (Entered: 09/01/2006) |
| 09/05/2006 | 33 | AMENDED COMPLAINT against Bank of America, N.A., Columbia Funds Series Trust, William P. Carmichael, Bank of America Corporation.Document filed by Dawne Luleff.(jmi, ) Additional attachment(s) added on 9/18/2006 (ae, ). (Entered: 09/06/2006) |
| 09/11/2006 | 34 | ORDER granting 11 Motion for Mary J. Hackett to Appear Pro Hac Vice . (Signed by Judge John G. Koeltl on 9/11/06) (dle, ) (Entered: 09/12/2006) |
| 09/11/2006 | | Transmission to Attorney Admissions Clerk. Transmitted re: 34 Order on Motion to Appear Pro Hac Vice, to the Attorney Admissions Clerk for updating of Attorney Information. (dle, ) (Entered: 09/12/2006) |
| 10/06/2006 | 35 | MOTION to Dismiss *Plaintiff's Amended Complaint*. Document filed by Bank of America, N.A., Bank of America Corporation. (Attachments: # 1 Affidavit of Andrew B. Messite# 2 Exhibit) (Messite, Andrew) (Entered: 10/06/2006) |
| 10/06/2006 | 36 | MEMORANDUM OF LAW in Support re: 35 MOTION to Dismiss *Plaintiff's Amended Complaint*.. Document filed by Bank of America, N.A., Bank of America Corporation. (Messite, Andrew) (Entered: 10/06/2006) |
| 10/06/2006 | 37 | CERTIFICATE OF SERVICE. Document filed by Bank of America, N.A., Bank of America Corporation. (Messite, Andrew) (Entered: 10/06/2006) |
| 10/06/2006 | 38 | MOTION to Dismiss *Amended Complaint*. Document filed by Columbia Funds Series Trust, William P. Carmichael. (O'Brien, Tim) (Entered: 10/06/2006) |
| 10/06/2006 | 39 | MEMORANDUM OF LAW in Support re: 38 MOTION to Dismiss *Amended Complaint*.. Document filed by Columbia Funds Series Trust, William P. Carmichael. (O'Brien, Tim) (Entered: 10/06/2006) |
| 10/06/2006 | 40 | DECLARATION of Tim O'Brien in Support re: 38 MOTION to Dismiss *Amended Complaint*.. Document filed by Columbia Funds Series Trust, William P. Carmichael. (Attachments: # 1 Exhibit 1# 2 Exhibit 2# 3 Exhibit 3 part 1# 4 Exhibit 3 part 2# 5 Exhibit 3 part 3# 6 Exhibit 3 part 4# 7 Exhibit 3 part 5# 8 Exhibit 3 part 6# 9 Exhibit 3 part 7# 10 Exhibit 3 part 8# 11 Exhibit 4 part 1# 12 Exhibit 4 part 2# 13 Exhibit 4 part 3# 14 Exhibit 4 part 4# 15 Exhibit 4 part 5# 16 Exhibit 4 part 6# 17 Exhibit 4 part 7# 18 Exhibit 4 part 8)(O'Brien, Tim) (Entered: 10/06/2006) |
| 11/03/2006 | 41 | MEMORANDUM OF LAW in Opposition re: 35 MOTION to Dismiss *Plaintiff's Amended Complaint*.. Document filed by Dawne Luleff. (Cobrinik, Daniel) (Entered: 11/03/2006) |

| 11/03/2006 | 42 | DECLARATION of Daniel Cobrinik in Opposition re: <u>35</u> MOTION to Dismiss *Plaintiff's Amended Complaint..* Document filed by Dawne Luleff. (Attachments: # <u>1</u> # <u>2</u> # <u>3</u>)(Cobrinik, Daniel) (Entered: 11/03/2006) |
|---|---|---|
| 11/03/2006 | 43 | DECLARATION of Daniel Cobrinik in Opposition re: <u>35</u> MOTION to Dismiss *Plaintiff's Amended Complaint..* Document filed by Dawne Luleff. (Cobrinik, Daniel) (Entered: 11/03/2006) |
| 11/20/2006 | 44 | REPLY MEMORANDUM OF LAW in Support re: <u>35</u> MOTION to Dismiss *Plaintiff's Amended Complaint..* Document filed by Bank of America, N.A., Bank of America Corporation. (Attachments: # <u>1</u> Certificate of Service)(Messite, Andrew) (Entered: 11/20/2006) |
| 11/20/2006 | 45 | REPLY MEMORANDUM OF LAW in Support re: <u>35</u> MOTION to Dismiss *Plaintiff's Amended Complaint..* Document filed by Bank of America, N.A., Bank of America Corporation. (Attachments: # <u>1</u> A. Messite Certificate of Service)(Messite, Andrew) (Entered: 11/20/2006) |
| 12/28/2006 | 46 | FIRST MOTION for Attachment Letter to Court *Re Pending Motion to Dismiss.* Document filed by Dawne Luleff. (Attachments: # <u>1</u> Supplement Letter plus subsequent decision in Siepel v. Bank of America case)(Cobrinik, Daniel) (Entered: 12/28/2006) |
| 01/11/2007 | 47 | ORDER; the Clerk is isntructed to close the following motions: terminating <u>25</u> Motion to Dismiss, terminating <u>27</u> Motion to Dismiss, terminating <u>46</u> Motion to Attach and terminating <u>4</u> Motion to Stay. Two motions to dismiss the Plaitniff's Amended Complaint filed 10/6/06 shall remain pending before the Court. (Signed by Judge John G. Koeltl on 1/11/07) (sac, ) (Entered: 01/11/2007) |
| 01/17/2007 | 48 | STIPULATION AND ORDER OF DISMISSAL that the action is dismissed against defts Columbia Funds and William P. Carmichael, without prejudice, and with each side bearing their own costs and fees. (Signed by Judge John G. Koeltl on 1/16/07) (cd) (Entered: 01/18/2007) |
| 09/20/2007 | 49 | CERTIFICATE of Counsel by Daniel Cobrinik on behalf of Dawne Luleff. (Cobrinik, Daniel) (Entered: 09/20/2007) |
| 09/21/2007 | 51 | SECOND AMENDED COMPLAINT amending <u>33</u> Amended Complaint against Bank of America, N.A., Bank of America Corporation. Document filed by Dawne Luleff. Related document: <u>33</u> Amended Complaint filed by Dawne Luleff. (jco) (Entered: 09/27/2007) |
| 09/25/2007 | 50 | ORDER denying <u>35</u> Motion to Dismiss; denying <u>38</u> Motion to Dismiss. For the reasons stated on the record on September 13, 2007, the plaintiff may file an amended Complaint. Consequently, the defendant Bank of American's motion to dismiss (Docket No. 35) is denied without prejudice as moot. The motion to dismiss by Columbia Funds and William Carmichael (Docket No. 38) is denied without prejudice as moot in view of the Stipulation dismissing the action against those defendants (Docket No 48). The Clerk is directed to remove items Number 35 and Number 38 on the docket sheet from the Court's pending motion list. SO ORDERED. (Signed by Judge John G. Koeltl on 9/24/2007) (jmi) (Entered: 09/26/2007) |
| 10/02/2007 | 52 | MOTION to Dismiss *Plaintiff's Second Amended Complaint.* Document filed by Bank of America, N.A., Bank of America Corporation.(Messite, Andrew) (Entered: 10/02/2007) |
| 10/02/2007 | 53 | MEMORANDUM OF LAW in Support re: <u>52</u> MOTION to Dismiss *Plaintiff's Second Amended Complaint..* Document filed by Bank of America, N.A., Bank of America Corporation. (Attachments: # <u>1</u> Kopf Unreported Case# <u>2</u> AmFunds Unreported Case# <u>3</u> Williams Unreported Case# <u>4</u> US Mortgage Unreported Case# <u>5</u> Textainer Unreported Case# <u>6</u> Spencer Unreported Case# <u>7</u> Rabin Unreported Case# <u>8</u> Pew Unreported Case# <u>9</u> McCullagh Unreported Case# 10 |

| | | |
|---|---|---|
| | | Kutten Unreported Case# <u>11</u> Kingdom Unreported Case# <u>12</u> Indiana Unreported Case# <u>13</u> Hughes Unreported Case# <u>14</u> Horattas Unreported Case# <u>15</u> Dommert Unreported Case# <u>16</u> Brooks Unreported Case# <u>17</u> Broadhead Unreported Case# <u>18</u> Beckett Unreported Cases) (Messite, Andrew) (Entered: 10/02/2007) |
| 10/02/2007 | <u>54</u> | CERTIFICATE OF SERVICE of Notice of Motion to Dismiss Plaintiff's Second Amended Complaint with Attached Affidavit and Memorandum of Law in Support of Motion served on Daniel Cobrinik on 10/2/07. Document filed by Bank of America, N.A., Bank of America Corporation. (Messite, Andrew) (Entered: 10/02/2007) |
| 10/18/2007 | <u>55</u> | STIPULATION AND ORDER, by and between the undersigned counsel for Plaintiff Dawn Luleff and Defendants Bank of America, N.A. and Bank of America Corporation that Plaintiff shall submit her answer to Defendants' motion to dismiss the Complaint on or before October 30, 2007, and Defendant shall submit any reply on this motion on or before November 20, 2007. Responses due by 10/30/2007, Replies due by 11/20/2007. (Signed by Judge John G. Koeltl on 10/11/2007) (jmi) (Entered: 10/19/2007) |
| 10/26/2007 | <u>56</u> | MEMORANDUM OF LAW in Opposition re: <u>52</u> MOTION to Dismiss *Plaintiff's Second Amended Complaint*.. Document filed by Dawne Luleff. (Cobrinik, Daniel) (Entered: 10/26/2007) |
| 10/26/2007 | <u>57</u> | AFFIRMATION of Daniel Cobrinik in Opposition re: <u>52</u> MOTION to Dismiss *Plaintiff's Second Amended Complaint*.. Document filed by Dawne Luleff. (Attachments: # <u>1</u> Exhibit Exhibit 1: Federal Reserve Letter# <u>2</u> Exhibit Exhibit 2: Federal Reserve Letter# <u>3</u> Exhibit Exhibit 3: Gregory Jordan Article)(Cobrinik, Daniel) (Entered: 10/26/2007) |
| 11/06/2007 | 58 | TRANSCRIPT of proceedings held on 09/07/07 before Judge John G. Koeltl. (es) (Entered: 11/06/2007) |
| 11/06/2007 | 59 | TRANSCRIPT of proceedings held on September 7, 2007 before Judge John F. Keenan. (djc) (Entered: 11/06/2007) |
| 11/15/2007 | <u>60</u> | STIPULATION AND ORDER by and between the undersigned counsel for plaintiff and defendants shall submit any reply papers on the pending Motion to Dismiss on or before December 3, 2007. No argument has been scheduled on the Motion as yet and no other deadlines in the case would be impacted by this extension. Replies due by 12/3/2007. So ordered. (Signed by Judge John G. Koeltl on 11/13/2007) (jmi) (Entered: 11/16/2007) |
| 11/15/2007 | <u>61</u> | STIPULATION AND ORDER: that Bank of America shall submit any reply papers on the pending Motion to Dismiss on or before December 3, 2007. No argument has been scheduled on the Motion as yet and no other deadlines in the case would be impacted by this extension. Replies due by 12/3/2007. So ordered. (Signed by Judge John G. Koeltl on 11/15/07) (js) Modified on 11/20/2007 (kkc). (Entered: 11/16/2007) |
| 12/03/2007 | <u>62</u> | REPLY MEMORANDUM OF LAW in Support re: <u>52</u> MOTION to Dismiss *Plaintiff's Second Amended Complaint*.. Document filed by Bank of America, N.A., Bank of America Corporation. (Attachments: # <u>1</u> Unreported Case - 1, # <u>2</u> Unreported Case - 2, # <u>3</u> Unreported Case - 3) (Messite, Andrew) (Entered: 12/03/2007) |
| 02/05/2008 | <u>63</u> | NOTICE OF CHANGE OF ADDRESS by Daniel Cobrinik on behalf of Dawne Luleff. New Address: Daniel Cobrinik, P.C., 475 Park Avenue South, 19th Floor, New York, NY, USA 10016, (212) 725-6888. (Cobrinik, Daniel) (Entered: 02/05/2008) |
| 02/14/2008 | 64 | ORDER ADMITTING ATTORNEY PRO HAC VICE. Attorney Gregory B. Jordan for Bank of |

| | | |
|---|---|---|
| | | America, N.A. and Bank of America Corporation, Sharon Lee Rusnak for Bank of America, N.A. and Bank of America Corporation admitted Pro Hac Vice. (Signed by Judge John G. Koeltl on 4/27/2006) (jmi) (Entered: 02/15/2008) |
| 06/16/2008 | 65 | MOTION to Consolidate Cases 08-04964 , 06-01435. Document filed by Douglas Wayne Martinez.(Brower, David) (Entered: 06/16/2008) |
| 06/16/2008 | 66 | MEMORANDUM OF LAW in Support re: 65 MOTION to Consolidate Cases 08-04964 , 06-01435.. Document filed by Douglas Wayne Martinez. (Brower, David) (Entered: 06/16/2008) |
| 06/30/2008 | 67 | RESPONSE in Opposition re: 65 MOTION to Consolidate Cases 08-04964 , 06-01435.. Document filed by Bank of America, N.A., Bank of America Corporation. (Attachments: # 1 Unreported Case)(Messite, Andrew) (Entered: 06/30/2008) |
| 06/30/2008 | 68 | CERTIFICATE OF SERVICE of Defendants Response in Opposition to the Motion served on Daniel Cobrinik, Esq. and David A.P. Brower, Esq. on 6/30/08. Document filed by Bank of America, N.A., Bank of America Corporation. (Messite, Andrew) (Entered: 06/30/2008) |
| 07/02/2008 | 69 | ORDER: The parties should advise the Court of the status of this case by 7/3/08. ( Status Report due by 7/3/2008.) (Signed by Judge John G. Koeltl on 7/1/08) (tro) (Entered: 07/02/2008) |
| 07/11/2008 | 70 | REPLY MEMORANDUM OF LAW in Support re: 65 MOTION to Consolidate Cases 08-04964 , 06-01435.. Document filed by Douglas Wayne Martinez. (Brower, David) (Entered: 07/11/2008) |
| 07/11/2008 | 71 | DECLARATION of David A.P. Brower in Support re: 65 MOTION to Consolidate Cases 08-04964 , 06-01435.. Document filed by Douglas Wayne Martinez. (Attachments: # 1 Exhibit Declaration Exhibits)(Brower, David) (Entered: 07/11/2008) |
| 07/15/2008 | 72 | ORDER: By July 21, 2008, the parties should submit a letter brief to the Court addressing whether Federal Rule of Civil Procedure 26(e) requires notice to the putative class members of the proposed voluntary dismissal of the class claims. (Signed by Judge John G. Koeltl on 7/14/2008) (jfe) (Entered: 07/15/2008) |
| 07/21/2008 | 73 | STIPULATION AND ORDER OF DISMISSAL WITH PREJUDICE AS TO INDIVIDUAL CLAIMS AND WITHOUT PREJUDICE AS TO PUTATIVE CLASS CLAIMS; that as to the claims brought by Dawne Luleff, individually and on behalf of her minor daughter Desire Cobble, those claims against Defendants are Dismissed with prejudice in their entirety. 2. As to the putative class members other than Dawne Luleff and Desire Cobble, those putative class claims against Defendants are dismissed without prejudice. 3. This Stipulation and Order can be executed via facsimile. 4. This matter shall be marked closed by the Clerk. (Signed by Judge John G. Koeltl on 7/21/08) (pl) (Entered: 07/22/2008) |
| 07/22/2008 | 74 | ORDER: The Clerk is directed to close defendant's 52 Motion to Dismiss. (Signed by Judge John G. Koeltl on 7/22/08) (db) (Entered: 07/22/2008) |
| 07/22/2008 | 75 | ORDER: Plaintiff's Motion to Consolidate is DENIED WITHOUT PREJUDICE AS MOOT. The Clerk is directed to close Docket No. 65 in 06cv1435, and Docket No. 2 in 08-4964. (Signed by Judge John G. Koeltl on 7/22/08) (db) (Entered: 07/22/2008) |

| PACER Service Center |
|---|
| Transaction Receipt |

| 09/04/2008 12:48:52 | | | |
|---|---|---|---|
| **PACER Login:** | mh0715 | **Client Code:** | Stoody |
| **Description:** | Docket Report | **Search Criteria:** | 1:06-cv-01435-JGK |
| **Billable Pages:** | 7 | **Cost:** | 0.56 |

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------------------x

DAWNE LULEFF, on behalf of her minor daughter :
DESIRE COBBLE and all others similarly situated, :
                                      :         No. 06-CV-1435 (JGK)

                    Plaintiff, :
                                        :

            v. :
                                         :

BANK OF AMERICA, N.A.; COLUMBIA :
FUNDS SERIES TRUST f/k/a NATIONS FUNDS :
TRUST; WILLIAM P. CARMICHAEL; and :
BANK OF AMERICA CORPORATION, :
                                        :

                   Defendants. :

-----------------------------------------------------------------------x

# MEMORANDUM OF LAW IN SUPPORT OF
## DEFENDANTS BANK OF AMERICA, N.A. AND BANK
## OF AMERICA CORPORATION'S MOTION TO DISMISS

REED SMITH LLP

599 Lexington Avenue

New York, New York 10022

(212) 521-5400


435 Sixth Avenue

Pittsburgh, PA 15219

(412) 288-3131

Attorneys for Defendants

Bank of America, N.A. and

Bank of America Corporation

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ................................................................................................1

II.   BACKGROUND ................................................................................................1

III.  ARGUMENT .....................................................................................................6

    A.   SLUSA Compels Dismissal of Plaintiff's Claims .....................................6

        1.   The Second Amended Complaint is a Failed Attempt at
           Artful Pleading ...............................................................................8

        2.   The Plaintiff's Claims Fall Within the Purview of SLUSA
           And Must Be Dismissed ................................................................13

            a.   Plaintiff Continues to Plead Concealment. .......................13

            b.   Plaintiff's Claims that the Bank Charged Excessive Fees
               in Connection with the Investments Are Preempted Under
               SLUSA ..............................................................................14

            c.   Plaintiff Has Pled a Scheme and Deceptive Device
               Bringing Her Claims Within the Ambit of SLUSA ............17

    B.   If this Court Does Not Exercise Subject Matter Jurisdiction
       under SLUSA, then the Second Amended Complaint Must be
       Dismissed for Lack of Subject Matter Jurisdiction...................................19

        1.   The Court Lacks Subject Matter Jurisdiction Under CAFA Because
           Plaintiff's Class Claims Concern a Covered Security .................20

        2.   The Court Lacks Subject Matter Jurisdiction Because Plaintiff's
           Class Claims Arise from Fiduciary Duties and Obligations
           Relating to a Security....................................................................21

IV.  CONCLUSION..................................................................................................23

## Table of Authorities

**Page(s)**

**Cases**

Andrews v. Metro North Commuter Railroad Co., 882 F.2d 705 (2d Cir. 1989) ...................... 12

Araujo v. John Hancock Life Ins. Co., 206 F. Supp.2d 377 (E.D.N.Y. 2002) ........................ 8, 13

Beckett v. Mellon Investor Servs., LLC, No. 06-5245, 2006 WL 3249189
    (W.D. Wash. Nov. 8, 2006) ................................................................................. 14, 15

Behlen v. Merrill Lynch, 311 F.3d 1087 (11th Cir. 2002)................................................. 7, 8, 14, 15

Bradfisch v. Templeton Funds, Inc., 179 Fed. Appx. 973 (7th Cir. 2006) .................................... 16

Broadhead Limited Partnership v. Goldman Sachs & Co.,
    No. 06-009, 2007 WL 951623 (E.D. Tex. March 26, 2007) ............................................ 14, 15

Brooks v. Washovia Bank, No. 06-00955, 2007 U.S. Dist. LEXIS 68079
    (E.D. Pa. Sept. 14, 2007) ........................................................................................ 4

Dommert v. Raymond James Financial Services, Inc.,
    No. 06-cv-102, 2007 WL 1018234 (E.D. Tex. March 29, 2007) ....................................... 10, 15

Dudek v. Prudential Sec., Inc., 295 F.3d 875 (8th Cir. 2002) ...................................... 8, 13, 14, 15

Estate of Vail v. First of America Trust Co.,
    722 N.E. 2d 248 (Ill. App. Ct. 1999) ......................................................................... 2

Felton v. Morgan Stanley Dean Witter & Co.,
    429 F.Supp.2d 684 (S.D.N.Y. 2006) ................................................................. 7, 8, 9, 10, 14

Fisher v. Kanas, 487 F.Supp.2d 270 (E.D.N.Y. 2007) ................................................. 16

Gilman v. BHC Securities, Inc., 104 F.3d 1418 (2d Cir. 1997) ...................................... 19

Horattas v. Citigroup Financial Markets Inc.,
    No. 07-CV-122, 2007 WL 2702704 (W.D. Mich. Sept. 12, 2007) ................................... 16, 17

Hughes v. LaSalle Bank, N.A., 419 F. Supp. 2d 605 (S.D.N.Y. 2006)...................................... 2, 3

Hughes v. LaSalle Bank, No. 02-civ-6384, 2006 WL 1982983 (S.D.N.Y. July 14, 2006).......... 13

Indiana State Dist. Council of Laborers & HOD Carriers Pension Fund v. Renal Care Group,
    Inc., No. Civ. 3:05-0451, 2005 WL 2000658 (M. D. Tenn. Aug. 18, 2005)............................ 22

In re Am. Funds Fees Litig., No. 04-5593, 2005 U.S. Dist. LEXIS 41884
    (C.D. Cal. Dec. 16, 2005) ......................................................................... 16

In re Edward Jones Holders Litigation, 453 F.Supp.2d 1210 (C.D. Ca. 2006) ..................... 18, 19

In re Estate of Kopf, No. O.C. 71 of 2001 (Warren Cty. Orph. Ct. Dec. 31, 2001),
    aff'd, 850 A.2d 20 (Pa. Super. Ct. 2004)........................................................ 2

In re Franklin Mut. Funds Fee Litig., 388 F. Supp.2d 451 (D.N.J. 2005) ................................... 18

In re Lutheran Bhd. Variable Ins. Prods. Co. Sales Practices Litig.,
    105 F.Supp.2d 1037 (D. Minn. 2000)........................................................ 7

In re Salomon Smith Barney Mutual Fund Fees Litig.,
    441 F. Supp. 2d 579 (S.D.N.Y. 2006) ...................................................... 15

In re Textainer P'ship Sec. Litig., No. 05-0969, 2005 U.S. Dist. LEXIS 26711
    (S.D.N.Y. 2006)................................................................................ 20, 22

Kingdom 5-KR-41, Ltd. v. Star Cruises PLC, No. 01-2946, 2004 WL 444554
    (S.D.N.Y. March 10, 2004) ...................................................................... 8, 9

Kutten v. Bank of America, No. 06-0937, U.S. Dist. LEXIS 63897 (E.D. Mo. Aug. 29, 2007) .. 4,
    9, 10, 17

Lander v. Hartford Life & Annuity Ins. Co., 251 F.3d 101 (2d Cir. 2001) ...................................... 6

McCullagh v. Merrill Lynch & Co., No. 01-7322, 2004 WL 744484 (S.D.N.Y. April 7, 2004). 13

Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Dabit, 547 U.S. 71 (2006) .............................. 6, 16

Myers v. Seneca Niagara Casino, 488 F. Supp. 2d 166 (N.D.N.Y. 2006)................................... 19

Pauduano & Weintraub LLP v. Wachovia Securities, 185 F.Supp.2d 330 (S.D.N.Y. 2002)....... 19

Pew v. Cardarelli, No. 05-1317, 2006 U.S. Dist. LEXIS 89025
    (N.D.N.Y. Dec. 6, 2006)................................................................. 20, 21, 22

Press v. Quick & Reilly, Inc., 218 F.3d 121 (2d Cir. 2000) ........................................................ 7

Prof'l Management Assocs, Inc. Employees' Profit Sharing Plan v. KPMG LLP,
    335 F.3d 800 (8th Cir. 2003) ...................................................................... 12, 14

Rabin v. JP Morgan Chase Bank, N.A., No. 06-5452, 2007 U.S. Dist. LEXIS 57437
    (N.D. Ill. Aug. 3, 2007)........................................................................ 4, 17

Rowinski v. Salomon Smith Barney, 398 F.3d 294 (3d Cir. 2005)............................................... 14

Siepel v. Bank of America, N.A., 239 F.R.D. 558 (E.D. Mo. 2006),
  recon. of dismissal denied, 2007 WL 679645 (E.D. Mo. March 1, 2007) ................ 3, 4, 13, 17

Sofonia v. Principal Life Ins. Co., 378 F.Supp. 2d 1124 (S.D. Iowa 2005) ................................... 7

Sofonia v. Principal Life Ins. Co., 465 F.3d 873 (8th Cir. 2006) ............................................. 7

Spencer v. Wachovia Bank, N.A., No. 05-81016, 2006 U.S. Dist. LEXIS 52374
  (S.D. Fla. May 10, 2006) ............................................................................... 4 , 17

Sulton v. Wright, 265 F. Supp.2d. 292 (S.D.N.Y. 2003) ...................................................... 12

U.S. Mortgage, Inc. v. Saxton, No. 04-17494, 2007 U.S. App. LEXIS 16830
  (9th Cir. July 13, 2007) ................................................................................ 16

Williams v. Texas Commerce Trust Co., No. 05-1070, 2006 U.S. Dist. LEXIS 39743 ............. 22

Wynn v. AC Rochester, 273 F.3d 153 (2d Cir. 2001) ....................................................... 19

**Statutes**

15 U.S.C. §77b(a)(1)................................................................................................ 21

15 U.S.C. §77p(b).................................................................................................. 7

15 U.S.C. §77p(f)(3)............................................................................................... 7

15 U.S.C. §77r(b)(1)(A)............................................................................................ 21

15 U.S.C. §77r(b)(2).............................................................................................. 21

15 U.S.C. §77z-1 .................................................................................................. 6

15 U.S.C. §78bb(f)(1).............................................................................................. 7

15 U.S.C. §78bb(f)(5)(B).......................................................................................... 7

15 U.S.C. §78bb(f)(5)(E)...................................................................................... 7, 21

15 U.S.C. §78j(b)................................................................................................... 6

15 U.S.C. §78p(f)(3)............................................................................................... 21

15 U.S.C. §78u-4 .................................................................................................. 6

26 U.S.C. §584(a)(1).............................................................................................. 2

28 U.S.C. §1332(d)(2) ............................................................................................ 19

28 U.S.C. §1332(d)(9)(A) ............................................................................................ 20

28 U.S.C. §1332(d)(9)(A)-(C) .................................................................................... 20

28 U.S.C. §1332(d)(9)(C) ...................................................................................... 20, 21

28 U.S.C. §1367 ............................................................................................................ 19

Mo. Ann. Stat. § 362.550 ............................................................................................... 2

## Other Authorities

J. Langbein, Questioning the Trust Law Duty of Loyalty:  Sole Interest or Best Interest?,
    114 Yale L.J. 929, 972-73 ...................................................................................... 2, 3

Rule 10b-5 (17 C.F.R. §240.10b-5) ............................................................................... 6

## I.    INTRODUCTION

As with the two previous versions of Plaintiff's complaints, the Second Amended Complaint alleges that Defendants Bank of America, N.A. (the "Bank") and Bank of America Corporation engaged in an unlawful and fraudulent scheme when the Bank invested some of Plaintiff's trust assets in its affiliated mutual funds.  Plaintiff presses these claims even though the state law in nearly every state (including her home state of Missouri) permits the investments. Apart from this lack of substantive merit, however, her claims remain preempted under the Securities Litigation Uniform Standards Act ("SLUSA") and must be dismissed.  Plaintiff continues to assert the very same scheme and allegations, trying only to excise language that triggers SLUSA preemption.  This sort of artful pleading does not, however, avoid SLUSA's preemptive bar.

In the event this Court concludes that it does not have subject matter jurisdiction under SLUSA, then this Court should dismiss this case because it otherwise lacks subject matter jurisdiction to hear this matter.  Plaintiff's only basis for original federal jurisdiction is under the Class Action Fairness Act ("CAFA").  Plaintiff's claims, however, fall within two exceptions to CAFA jurisdiction.  Claims concerning only a "covered security" or the rights and duties (including breach of fiduciary duty) concerning a security are exempted from CAFA's jurisdictional reach.  This case plainly concerns only investments in a covered security, and Plaintiff insists that her case involves a "simple" breach of fiduciary duty.  Accordingly, CAFA does not provide a basis for subject matter jurisdiction.  Because no other basis for jurisdiction is pleaded or exists, dismissal for lack of subject matter jurisdiction is warranted.

## II.    BACKGROUND

Plaintiff Dawne Luleff is the legal guardian and co-trustee for a trust (the "Luleff Trust") created for her minor daughter, Desire Cobble, in November, 2001.  See Second Amended Complaint ¶¶12-13.  Along with Plaintiff, the Bank served as co-trustee on the Luleff Trust until 2004.  See id. at ¶15.

At the core of Plaintiff's claims are allegations that the Bank did something unlawful when it invested some of the Luleff Trust's assets in the Bank's affiliated mutual funds, Columbia Funds.[1] Yet, Missouri law, similar to the laws of nearly every other state, specifically authorizes a trustee to invest trust assets in affiliated mutual fund investments and to collect both the trustee and mutual fund fees. See Mo. Ann. Stat. § 362.550 (11) ("a bank . . . when acting as a trustee . . . may invest and reinvest [trust] assets . . . notwithstanding that such bank . . . provides services to the investment company or trust… and receives reasonable remuneration for such services").[2]

This statutory authorization exists, moreover, for the benefit of trust customers. Prior to 1996, common trust funds ("CTFs") were prevalent investment vehicles that banks created to pool assets to diversify the investments of personal trusts. Under federal law, a "common trust fund" includes a fund maintained by a bank exclusively for the collective investment of moneys as a trustee. See 26 U.S.C. § 584(a)(1). "CTF" investments, however, are limited in a number of ways. J. Langbein, Questioning the Trust Law Duty of Loyalty: Sole Interest or Best Interest?,

---

[1]    Although not implicated in this motion, as co-trustee, Plaintiff had the same investment authority and fiduciary obligations as the Bank and authorized the investments in the Bank's affiliated mutual funds. See Luleff Authorization, November 9, 2001 (Exhibit 1, Messite Affidavit). Defendants are not, however, moving to dismiss based upon this consent and ratification ground. See Hughes v. LaSalle Bank, N.A., 419 F. Supp. 2d 605 (S.D.N.Y. 2006) (dismissing similar claims brought by same counsel based upon consent and ratification).

[2]    Several courts, including this one, have confirmed that the investment of trust assets in affiliated mutual funds is permissible. See, e.g., Hughes, 419 F. Supp.2d at 619 (holding that the trustee did not engage in self-dealing where its investments in affiliated mutual were authorized by law); Estate of Vail v. First of America Trust Co., 722 N.E.2d 248, 251-252 (Ill. App. Ct. 1999) (executor of an estate did not act improperly by investing in an affiliated fund, noting that the law allows investments in affiliated mutual funds); In re Estate of Kopf, No. O.C. 71 of 2001, slip. op. at *5-6 (Warren Cty. Orph. Ct. Dec. 31, 2001) (no breach of fiduciary duty because state law authorizes investments in affiliated mutual funds), aff'd, 850 A.2d 20 (Pa. Super. Ct. 2004). Despite the authorization for the investments and collection of trustee and mutual fund fees, Plaintiff conceded previously that she is only seeking recovery of the fees paid because her investments did not suffer a loss. Plaintiff's Memorandum of Law in Opposition to Bank of America's Motion to Dismiss the Amended Complaint at 5 ("She was damaged when the Desire Trust paid these fees and expenses.").

114 Yale L.J. 929, 972-73 (March 2005). For example, many CTFs permit buying and selling shares of a CTF only once a month after the valuation of the fund has been completed. Units or shares of CTFs cannot be transferred in kind when a trust closes, again in contrast to mutual funds. This point can be critical if, at the time the trust is to terminate, selling the CTF units is not advantageous because it will trigger considerable capital gains tax consequences. See id. at n. 231 (providing a summary of the advantages of mutual funds over CTFs).

In light of these limitations, the financial services industry generally concluded that "[m]utual funds have significant advantages over common trust funds, and in 1996 Congress facilitated the spread of mutual funds for trust investing by allowing tax-free conversion of existing common trust funds to mutual funds." See id. at 973. In light of these advantages, the vast majority of states, including Missouri, amended their laws to permit a trustee to invest trust assets in affiliated mutual funds. These statutes contained varying requirements as to fees, notices, and disclosures. See id. at 973-74. Consistent with these authorizations, many major banks, including the Bank, exchanged the assets held in some CTFs for shares of affiliated mutual funds, as Plaintiff alleges in the Second Amended Complaint.

Despite the relevant state law, Plaintiff continues to press her "self-dealing" allegations. There is nothing novel here. Plaintiff's counsel, along with attorney Richard Greenfield, first asserted these same allegations five years ago in Hughes v. LaSalle Bank, 02 Civ. 6384 (S.D.NY). Finding, as here, that the plaintiffs ratified the investments, Judge Mukasey dismissed that action. Hughes, 419 F.Supp.2d 605. After the filing of Hughes, Mr. Greenfield filed seven similar actions against Bank of America, including two pending in Missouri. See Siepel v. Bank of America, N.A., 239 F.R.D. 558, 564 (E.D. Mo. 2006) (detailing the various actions and holding that "[t]he record provides ample evidence that Plaintiffs are forum shopping"), recon. of dismissal denied, 2007 WL 679645 (E.D. Mo. March 1, 2007). In February, 2006, Plaintiff's

counsel then filed this case, the eighth action, also on behalf of a Missouri resident, seeking to represent the very same putative class as in the previously filed cases.[3]

In her original Complaint, Plaintiff alleged that Defendants engaged in unlawful and fraudulent conduct by investing her trust assets in the Bank's affiliated mutual funds, Columbia Funds. See Complaint ¶¶38-42, 57. This Complaint purported to bring a putative class action on behalf of all beneficiaries, owners, or principals of trusts for which the Bank acted as trustee. See id. ¶51. Plaintiff alleged that the Bank had a policy to invest trust assets in its affiliated funds to the detriment of Plaintiff. Id. ¶¶22-27. She expressly claimed that the purported policies were not disclosed and that the Bank fraudulently induced her into giving consent to the investments. Id. ¶¶44-50 (devoting an entire section of the Complaint to "Defendants' Failure to Make Full and Fair Disclosures" and repeatedly alleging non-disclosures and omissions concerning all aspects of the mutual fund investments). Based on these allegations, she asserted various state law claims.

After Defendants filed a motion to dismiss raising SLUSA preemption, Plaintiff filed an Amended Complaint again alleging that Defendants engaged in an unlawful and fraudulent scheme to invest trust assets in the Bank's affiliated mutual funds. See Amended Complaint ¶¶47-56, 64. Plaintiff attempted to avoid SLUSA preemption by excising from her allegations several references to misrepresentations and omissions. However, the Amended Complaint still repeatedly alleged non-disclosures and omissions concerning all aspects of the mutual fund

---

3    This is the final remaining action against Bank of America pressing class claims. All prior actions have been dismissed, with the sixth and seventh actions being dismissed based upon SLUSA preemption. See Siepel, 239 F.R.D. at 562-63; Kutten v. Bank of America, No. 06-0937, 2007 U.S. Dist. LEXIS 63897, at **8-23 (E.D. Mo. Aug. 29, 2007). Similar claims against Wachovia Bank and JPMorgan Chase Bank also have been dismissed. Rabin v. JPMorgan Chase Bank, N.A., No. 06-5452, 2007 U.S. Dist. LEXIS 57437, at **14-21 (N.D. Il. Aug. 3, 2007) (finding SLUSA preemption); Spencer v. Wachovia Bank, N.A., No. 05-81016, 2006 U.S. Dist. LEXIS 52374, at **6-26 (S.D. Fla. May 10, 2006) (finding SLUSA preemption); Brooks v. Wachovia Bank, No. 06-00955, 2007 U.S. Dist. LEXIS 68079 (E.D.Pa. Sept. 14, 2007).

investments, including alleged misstatements and omissions in the mutual fund prospectuses and other disclosure documents. <u>See</u> <u>id.</u> ¶37 ("The Bank never fully disclosed to plaintiff … its conflicts of interest …); ¶49 ("In order to disguise the Bank's 'double dipping' [regarding fees in connection with purchases of affiliated mutual funds]"); and ¶50 (information provided by the Bank in connection with expenses for affiliated mutual funds was "deceptive").

Defendants again moved to dismiss citing SLUSA preemption. <u>See</u> Docket No. 36. On September 7, 2007, this Court heard an oral argument where Plaintiff's counsel conceded that the Amended Complaint alleged misrepresentations and omissions. <u>See</u> September 7, 2007 Transcript at 18-19. The Court gave Plaintiff leave to amend. <u>See</u> <u>id.</u> at 22-24. Plaintiff has now filed her Second Amended Complaint but the factual underpinning for this complaint remains the same as the prior ones: a putative class action lawsuit asserting state law claims, alleging a fraudulent scheme pursuant to which the Bank invested Plaintiff's trust assets in its affiliated mutual funds. <u>See</u> <u>Second Amended Complaint</u> ¶¶25-38. In this round, Plaintiff did not change the underlying basis of her claims. Rather, she simply omitted words such as "failed to disclose" and "conceal." Further, the facts as alleged in her original and Amended Complaints have not changed. The various relationships, policies, purported conflicts of interest, alleged double dipping and self-dealing either were or were not disclosed in the prospectuses, letters and authorizations Plaintiff received and/or signed. Once again, she simply has deleted these allegations from her latest complaint. <u>See</u> <u>id.</u> ¶¶ 28-29.

Nevertheless, Plaintiff still pleads at length that the Bank's "Mutual Fund Policy" was a deceptive device because it "was intended to, and did, promote the Bank's interest in reducing its own internal expenses for maintaining and administering fiduciary accounts while, at the same time, increasing its fee and other income at the expense of Desire and other fiduciary account beneficiaries." <u>Id.</u> ¶¶ 28-29, 36, 43, 44, 46. And, unable to avoid disclosure issues (because that truly is at the core of Plaintiff's claims), she still pleads that the Bank failed to document its actions and did not make that information available – that is, ***it did not disclose that information***

– to beneficiaries. Id. ¶32(vi) (emphasis added). Further, she continues to allege that the Bank failed to "offer" her additional services for the additional fees – again, raising an issue with what the Bank said and provided to her in connection with the mutual fund investments. Id. ¶34.

## III.   ARGUMENT

### A.   SLUSA Compels Dismissal of Plaintiff's Claims

More than a decade ago, Congress became concerned that the class action device was being misused in securities cases. These concerns prompted Congress to enact the Private Securities Litigation Reform Act of 1995 (the "1995 Reform Act"), codified at 15 U.S.C. §§ 77z-1 and 78u-4. Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Dabit, 547 U.S. 71, 81 (2006). The 1995 Reform Act imposes, among other things, heightened pleading requirements and discovery stays in actions brought pursuant to Section 10(b) of the Securities Exchange Act of 1934 (15 U.S.C. § 78j(b)) and Rule 10b-5 (17 C.F.R. § 240.10b-5). 547 U.S. at 81-82.

The 1995 Reform Act, however, produced certain "unintended consequence[s]" for securities class actions nationwide. Dabit, 547 U.S. at 82. "Rather than face the obstacles set in their path by the Reform Act, plaintiffs and their representatives began bringing class actions under state law, often in state court." Id. To forestall this end run around federal securities laws, Congress enacted SLUSA. Id. SLUSA embodies a rule of "complete preemption" that compels the dismissal of class actions asserting state law theories of liability that arise in connection with the purchase or sale of covered securities. See Lander v. Hartford Life & Annuity Ins. Co., 251 F.3d 101, 107-08 (2d Cir. 2001).

In keeping with express federal policy, SLUSA preemption does not turn on the label attached to, or the specific elements of, the causes of action alleged in a particular complaint. SLUSA preemption instead applies whenever the statute's four-part test is satisfied. That is, with very limited, express exceptions not relevant here, SLUSA preemption applies any time the lawsuit: (1) is a "covered class action"; (2) asserts a claim based on state law; (3) involves a

"covered security"; and (4) alleges that the defendant misrepresented or omitted a material fact or employed any manipulative or deceptive device "in connection with the purchase or sale of such security." Behlen v. Merrill Lynch, 311 F.3d 1087, 1092 (11th Cir. 2002); see also Sofonia v. Principal Life Ins. Co., 465 F.3d 873, 876-77 (8th Cir. 2006); Felton v. Morgan Stanley Dean Witter & Co., 429 F.Supp.2d 684, 690-691 (S.D.N.Y. 2006) (citing Dabit, 126 S. Ct. at 1511-12). In addition to a misprepresentation, SLUSA also preempts claims where the defendant allegedly used or employed any manipulative device or contrivance in connection with the purchase or sale of a covered security. 15 U.S.C. § 77p(b); 15 U.S.C. § 78bb(f)(1).

Under SLUSA, a "covered class action" is a lawsuit in which damages are sought on behalf of more than 50 people. 15 U.S.C. §78bb(f)(5)(B). A "covered security" is one traded nationally and listed on a regulated national exchange. 15 U.S.C. § 78bb(f)(5)(E). Plaintiff has previously conceded that her Amended Complaint asserted a class action on behalf of more than 50 people based on state law and nothing in the Second Amended Complaint compels a different conclusion.[4] As with the Amended Complaint, the only disputes relating to SLUSA's application here turn on whether the Second Amended Complaint includes (1) allegations of false statements or omissions of material facts or use of a deceptive device (2) "in connection with" the purchase or sale of a covered security. Plainly, it does.

The disclosure of fees associated with mutual fund investments is an area comprehensively regulated by federal securities laws. See Press v. Quick & Reilly, Inc., 218 F.3d 121, 131-32 (2d Cir. 2000)(dismissing federal securities claims challenging disclosures about fees associated with money market mutual funds). Moreover, trustees like the Bank and (in some circumstances others,

---

[4]    See Plaintiff's Memorandum of Law in Opposition to Bank of America's Motion to Dismiss the Amended Complaint at 14 (arguing that only the last two elements for SLUSA preemption are not met here). There also can be no dispute that shares of Nations Funds are "covered" securities. See 15 U.S.C. §§ 77p(f)(3), 77r(b); Sofonia v. Principal Life Ins. Co., 378 F.Supp.2d 1124, 1128-29 (S.D. Iowa 2005) (definition of a covered security); In re Lutheran Bhd. Variable Ins. Prods. Co. Sales Practices Litig., 105 F.Supp.2d 1037, 1040 (D.Minn. 2000) (same).

like Plaintiff, who serve as co-trustees) regularly buy and sell securities, such as mutual funds, on behalf of trusts. A state law-based class action challenging the purchase and sale of those securities is precisely the type of action which SLUSA is intended to preempt.

Plaintiff's earlier complaints unquestionably were preempted by SLUSA. Plaintiff's artful pleading and amendments do not change this result. The crux of Plaintiff's claims remains misrepresentation and omission in connection with the purchase of a security. Further, her focus on the Bank's decisions and policies allegedly adopted to defraud customers by charging higher fees in connection with the purchase of mutual funds triggers yet another avenue for SLUSA preemption.

### 1.     The Second Amended Complaint is a Failed Attempt at Artful Pleading

Controlling case law forecloses a plaintiff from amending a complaint to "plead around" SLUSA by making the same allegations, but excising all references to misrepresentation and omission. See Behlen, 311 F.3d at 1095 (despite plaintiff amending complaint to remove allegations of misrepresentation and omission, SLUSA still applied); Dudek v. Prudential Sec., Inc., 295 F.3d 875, 879-80 (8th Cir. 2002) (although plaintiff amended complaint to delete allegations of fraud, misrepresentation and omission, SLUSA still applied); Araujo v. John Hancock Life Ins. Co., 206 F. Supp.2d 377, 384 (E.D. N.Y. 2002) ("The plaintiff argues that he may avoid SLUSA by omitting the allegations of fraud in the amended complaint. The Court disagrees.").

"Courts in this circuit have consistently rejected plaintiffs' attempts through artful pleading to avoid the clear precepts of SLUSA and its preemption of state law securities claims for damages." Kingdom 5-KR-41, Ltd. v. Star Cruises PLC, No. 01-2946, 2004 WL 444554, at *3 (S.D.N.Y. March 10, 2004). Where a plaintiff attempts to conceal claims based on the misrepresentation or omission using state law labels, courts have disregarded these labels and dismissed the claims as preempted by SLUSA. See Felton, 429 F.Supp.2d at 694; Kingdom,

2004 WL 444554, at *3; <u>Kutten</u>, 2007 U.S. Dist. LEXIS 63897, at *10-11 and cases cited therein.

    <u>Felton</u> is particularly instructive.  There, the plaintiffs, a putative class of brokerage customers, first alleged that Morgan Stanley did not provide objective research advice in connection with their investments.  This first complaint included allegations of non-disclosure as the basis for its state law claims.  SLUSA accordingly applied.  In their Amended Complaint, the plaintiffs repled the same allegations, but framed them only as a breach of contract, which they argued fell outside of SLUSA's preemptive reach.  429 F.Supp.2d at 692.  The district court disagreed.  While the plaintiffs may have attempted to plead around SLUSA, the application of SLUSA preemption invokes the well-pleaded complaint rule:

> Ordinarily, a plaintiff is the master of his complaint, and whether or not a federal claim exists must be decided based on the face of the complaint's allegations. However, an exception to this "well-pleaded complaint" rule exists where federal law completely preempts a given field, and, in enacting SLUSA, "'Congress could not have spoken more clearly' about its intention 'to completely preempt the field of certain types of securities class actions by essentially converting a state law claim into a federal claim and creating federal jurisdiction and venue for specified types of state securities fraud claims.'" *Dabit I, 395 F.3d at 33* (vacated in part on other grounds)  (quoting *Spielman, 332 F.3d at 123*). As a result, "when SLUSA's conditions have been satisfied, the plaintiff has necessarily invoked federal question jurisdiction, even though he [or she] did not wish to, and the court must dismiss for failure to state a claim because SLUSA has preempted the state law basis for the claim." *Id. at 33-34* (internal quotation marks and citation omitted; alteration in original).

429 F. Supp. at 692.

    The well-pleaded complaint rule, moreover, applies a different lens when considering the legal import of a complaint's revised allegations.  As the <u>Felton</u> Court further observed, a court must consider and resolve whether the plaintiff has engaged in artful pleading:

> "Under SLUSA, then, we must look beyond the face of the complaint to analyze the substance of the allegations made." *Id. at 34* (citing *Spielman* and *Dudek v. Prudential Secs., Inc., 295 F.3d 875, 879 (8th Cir. 2002)* (where complete preemption applies, "plaintiff may not avoid federal question jurisdiction and the preemption of state law claims by artfully concealing the federal question in an otherwise well-pleaded complaint under state law")); *see also Xpedior Creditor Trust v. Credit Suisse First Boston (USA) Inc., 341 F. Supp. 2d 258, 265 (S.D.N.Y.*

> *2004)* ("After *Spielman*, it is now clear that courts must probe the plaintiff's pleading to determine whether SLUSA preemption applies."); *Bowlus v. Alexander & Alexander Servs., Inc., 659 F. Supp. 914, 918 (S.D.N.Y. 1987)* (in a case involving removal on the basis of a federal question under *28 U.S.C. § 1441(b)*, "a federal court may look behind the complaint to preclude a plaintiff from defeating federal question jurisdiction through 'artful pleading,' that is, by disguising a federal claim as a claim arising under state law").
>
>     While facially the Amended Complaint alleges a common law claim for breach of contract, the question is whether plaintiffs are engaging in artful pleading to disguise substantive allegations that Morgan Stanley engaged in "[a] misrepresentation or omission of a material fact in connection with the purchase or sale of a covered security," as those words are used in SLUSA, *15 U.S.C. § 78bb(f)(1)*. I conclude without difficulty that Plaintiffs' claim is a securities fraud wolf dressed up in a breach of contract sheep's clothing.

429 F. Supp. at 692-93 (footnotes omitted); <u>see</u> <u>also</u> <u>Kutten</u>, 2007 U.S. Dist. LEXIS 63897, at **11-12 (addressing same claims raised herein and rejecting argument that SLUSA did not apply because breach of fiduciary duty claims were "ancillary" to the purchase of the mutual fund shares); <u>Dommert v. Raymond James Financial Services, Inc.</u>, No. 06-cv-102, 2007 WL 1018234, at **7-8 (E.D. Tex. March 29, 2007) (finding SLUSA preemption despite plaintiff's assertions that she was not bringing claims based upon misrepresentations and omissions in connection with the securities at issue).

The <u>Felton</u> Court also concluded that artful pleading was involved and the revised complaint must be dismissed. Fundamental to its reasoning was its finding that despite the attempted amendment, the same scheme essentially was under attack from the first complaint to the second. As the Court in <u>Felton</u> stated, this is a "quintessential example of a fraudulent omission of a material fact under the federal securities laws. . . . Stripped to its essentials, the Amended Complaint alleges that Morgan Stanley breached its contracts with Plaintiffs *by engaging in a fraudulent scheme*. To regard the Amended Complaint as alleging nothing more than common law breaches of contract would reward artful pleading in a manner that the law does not permit." <u>Felton,</u> 429 F.Supp. at 693 (emphasis in original).

Plaintiff here has engaged in the same sort of artful pleading when the pervious versions of the present complaint are considered. Plaintiff's allegations of a fraudulent scheme remains intact, as was true in <u>Felton</u>. For example, both the Amended Complaint and Second Amended

Complaint contend that Defendants "double dipped" by charging improper fees – both the trustee and affiliated mutual fund fee (notwithstanding that the law permits both fees), with no commensurate benefit to Plaintiff and putative class members.  Cf. Amended Complaint ¶48 with Second Amended Complaint ¶26.  While the Amended Complaint expressly alleges that the Bank *concealed* this information, in the Second Amended Complaint, plaintiffs allege that the Bank *knew* this information, leaving out the inevitable conclusion that they failed to so advise plaintiffs.  After all, what is the point of pleading that the Bank knew certain information, except to claim inevitably that it did not disclose that information.

| Plaintiff's Amended Complaint | Plaintiff's Second Amended Complaint |
|---|---|
| 49.    In order to *disguise* the Bank's "double dipping" (i.e. charging fees for serving as a corporate fiduciary and charging fees through the Columbia Funds), a portion of the fees and expenses charged to the Columbia Funds were "credited" against the fees charged by the Bank for acting as a fiduciary. | 28.    The Bank and BAC *knew* at all times that the Bank's Mutual Fund Policy would enrich the Bank at Desire's expense and the expense of other fiduciary account beneficiaries.  The Bank and BAC also *knew* that the Bank's Mutual Fund Policy conferred no corresponding benefits to Desire and other fiduciary account beneficiaries. |
| 50.    However, these so-called "credits" were *deceptive* and were insufficient to cover the increased investment-related expenses charged to the Bank's fiduciary accounts, which expenses could have either been minimized by using alternative, non-proprietary mutual funds or in-house investment pools such as Common Trust Funds, which incurred no fees or expenses.<br><br>52.    Even after the Bank applied its "credits" against its direct fees, *it was impossible for plaintiff to ascertain the true cost of owning Columbia Funds shares in the Cobble Trust.*<br>(emphasis added) | 29.    The Bank's Mutual Fund Policy was intended to, and did, promote the Bank's interest in reducing its own internal expenses for maintaining and administering fiduciary accounts while, at the same time, increasing its fee and other income at the expense of Desire and other fiduciary account beneficiaries, in violation of the Bank's fiduciary obligations to Desire and other fiduciary account beneficiaries. |

The allegations in Plaintiff's previous complaints constitute admissions in the context of this motion.  See Andrews v. Metro North Commuter Railroad Co., 882 F.2d 705, 707 (2d Cir. 1989) ("The amendment of a pleading does not make it any the less an admission of the party."); Sulton v. Wright, 265 F. Supp.2d 292, 295 (S.D. N.Y. 2003) ("Admissions in earlier complaints remain binding when a plaintiff files subsequent pleadings . . . [a]s such, the Court may consider them on a motion to dismiss under Rule 12(b)(6)."). Further, when filing an amended complaint, "[a] party . . . cannot advance one version of the facts in [his] pleadings, conclude that [his] interests would be better served by a different version, and amend [his] pleadings to incorporate that version, safe in the belief that the trier of fact will never learn of the change in stories." Andrews, 882 F.2d at 707 (citations omitted).

A plaintiff should not be allowed to plead securities fraud, as plaintiffs clearly did in their Complaint and Amended Complaint, and then omit admissions pertinent to the claims in a later amendment to try to avoid the federal standards to plead a securities fraud claim.  This is precisely what the 1995 Reform Act and SLUSA were intended to prevent.  Stated differently, Plaintiff is now trying to plead around SLUSA by telling only half the story.  She leaves out the implicit consequences of the Bank's allegedly unlawful "decision," including her admissions in the first Complaints, which she will inevitably argue to a jury – that the Bank never told her the information it knew.  Plaintiff's implicit allegations may be considered in the SLUSA preemption analysis.  Prof'l Mgmt. Assocs., Inc. Employees' Profit Sharing Plan v. KPMG LLP, 335 F.3d 800, 802 (8th Cir. 2003) (applying SLUSA preemption to implicit allegations of misrepresentations and omissions in connection with securities purchases).

This Court previously recognized that the allegations in the Amended Complaint triggered SLUSA preemption.  Plaintiff now has done nothing more than reword the allegations and excise misrepresentation and omission "buzz words" in the Second Amended Complaint.

Plaintiff's artful pleading should not be countenanced.[5]  The gravamen of these allegations – that Defendants failed to provide promised services and that Defendants knowingly concealed improper fees as to the mutual fund investments – is the same.  See, e.g., Dudek, 295 F.3d at 879-80 (court determined plaintiff engaged in artful pleading by comparing complaint to previous version of complaint filed in New York District Court); Araujo, 206 F. Supp.2d at 385 (court determined plaintiff engaged in artful pleading because crux of amended complaint and original complaint was same).  Having been given three attempts to amend here, Plaintiff's Second Amended Complaint should be dismissed with prejudice.  See McCullagh v. Merrill Lynch & Co., No. 01-7322, 2004 WL 744484, at *2 (S.D. N.Y. April 7, 2004) (denying motion for reconsideration and affirming dismissal with prejudice because plaintiff could not allege claims that would escape SLUSA preemption).

## 2.    The Plaintiff's Claims Fall Within the Purview of SLUSA and Must be Dismissed

### a.    *Plaintiff Continues to Plead Concealment*

In addition to the artful pleading described above, the Second Amended Complaint on its face triggers SLUSA preemption.  Plaintiff continues to allege that Defendants maintained a policy of only investing in the Bank's affiliated mutual funds as a means to charge excessive and improper fees and to reduce the Bank's internal expenses.  See Second Amended Complaint ¶¶25-29.  Plaintiff contends that Defendants failed to establish investment policies and procedures, failed to document transactions, failed to make documents relating to transactions available, and failed to review investment accounts to ensure the appropriateness of the mutual

---

5    See also Hughes v. LaSalle Bank, No. 02-Civ-6384, 2006 WL 1982983, at *6 (S.D.N.Y. July 14, 2006) ("Pleading is not an interactive game in which plaintiffs file a complaint and then volley it over a rhetorical net with the court until a viable complaint emerges.  Plaintiffs have the responsibility to plead their case adequately, without defendants' or the court's assistance."); Siepel, 239 F.R.D. at 564, 571 (denying further amendment as futile and unjust given plaintiffs' "shilly-shallying" efforts with amendments).

fund investments. See id. ¶32(v)-(vii). She also repeatedly claims that the Bank's purported "Mutual Funds Policy" created inherent conflicts of interest. See, e.g., id. ¶3.

At the heart of all of these allegations is the Bank's alleged failure to disclose the allegedly unlawful practices and conflicts. Without such omissions, these allegations would be of no moment as a basis for Plaintiff's state law claims. These allegations are, moreover, incorporated into each of Plaintiff's state law claims. This renders her entire complaint subject to dismissal. See Rowinski v. Salomon Smith Barney, 398 F.3d 294, 300 (3d Cir. 2005) (finding SLUSA preemption when alleged omissions and misrepresentations were incorporated into every claim); Prof'l Management Assocs., Inc. Employees' Profit Sharing Plan, 335 F.3d at 803 (same); Felton, 429 F. Supp. 2d at 687; Broadhead Limited Partnership v. Goldman Sachs & Co., No. 06-009, 2007 WL 951623, at **4-5 (E.D. Tex. March 26, 2007).

### b.    *Plaintiff's Claims that the Bank Charged Excessive Fees in Connection with the Investments Are Preempted Under SLUSA*

Plaintiff also continues to allege that Defendants charged excessive and improper fees. See Second Amended Complaint ¶45 ("All members of the Class were subjected to increased and/or unnecessary fees and expenses[.]"). Indeed, Plaintiff's claim of excessive fees, passed on via the mutual fund investments, is pervasive. See id. ¶¶ 23-24, 26, 28-29, 32, 36-37.[6] Numerous courts have rejected plaintiffs' arguments that a claim for excessive fees in connection with the purchase or sale of a security does not involve a claim of misrepresentation or omission, triggering SLUSA preemption. Behlen, 311 F.3d at 1094; Dudek, 295 F.3d at 878-79 (8th Cir. 2002); Beckett v. Mellon Investor Servs., LLC, No. 06-5245, 2006 WL 3249189, at **2-3 (W.D. Wash. Nov. 8, 2006) (rejecting plaintiff's attempt to avoid SLUSA by excising out all claims of misrepresentation and finding that plaintiffs' claim that defendant charged excessive fees was

---

6    Plaintiff conceded previously that the only relief she is seeking in this action is recovery of the purported excessive fees. Plaintiff's Memorandum of Law in Opposition to Bank of America's Motion to Dismiss the Amended Complaint at 5.

preempted by SLUSA even where the complaint contained "no explicit reference to any fraudulent activity such as a misrepresentation or omission of material fact"); In re Salomon Smith Barney Mutual Fund Fees Litig., 441 F. Supp. 2d 579, 603-04 (S.D. N.Y. 2006) (finding plaintiff's attempt to distinguish between misrepresentations and omissions connected with the purchase of securities with an assessment of purportedly improper fees unavailing); Dommert, 2007 WL 1018234, at *11 (finding SLUSA preemption where plaintiff alleged claims for undisclosed conflicts of interest and excessive fees).

In Dudek, for example, the plaintiffs alleged that annuities were improper investments because of excessive fees. 295 F.3d at 877; see also Behlen, 311 F.3d at 1094 (summarizing Dudek decision). They then argued that their claims were not preempted by SLUSA because "they were based upon the defendants excessive fees rather than misconduct 'in connection with' the sale of securities." Behlen, 311 F.3d at 1094 (citing Dudek, 295 F.3d at 878). The Dudek Court, however, rejected the argument that the plaintiffs were not alleging fraud, misrepresentation, or an omission of material fact. The court instead found that the gravamen of the plaintiffs' complaint "involved an untrue statement or substantive omission of a material fact in connection with the purchase or sale of a covered security." Behlen, 311 F.3d at 1094 (quoting Dudek, 295 F.3d at 879 (internal quotation marks omitted));[7] see also Beckett, 2006 WL 3249189, at * 4 ("Claims that investment advisors breached fiduciary duties in charging unauthorized fees have been held to necessarily coincide with the sale or purchase of securities and are based in part on material omissions or the misrepresentations concerning the fees," even where plaintiff does not plead omission or misrepresentation).

---

[7]    Similarly, in Behlen, the plaintiff complained that she was sold shares that generated higher fees. 311 F.3d at 1089-90. Just as Plaintiff claims here with respect to the Bank's alleged "Mutual Fund Policy," the reason the plaintiff in Behlen claimed she was sold the shares in question was to generate the higher fees. Id. "Thus, the fees and commission were not merely incidental to the sale of the securities, but were an integral part of the transaction" bringing the transaction within the scope of SLUSA. Broadhead Limited Partnership, 2007 WL 951623, at *4 (summarizing and citing to Behlen).

This broad construction of SLUSA's preemptive reach – aimed at the essence of a complaint's allegations – comports fully with the broad reading the Supreme Court mandated for SLUSA in <u>Dabit</u>. There, the Supreme Court affirmed that SLUSA's "in connection with" requirement is to be interpreted broadly and flexibly to prohibit any deceptive practices "***touching***" the purchase or sale of a security. <u>See Dabit</u>, 547 U.S. at 85-86. The Supreme Court further held that "it is enough that the fraud alleged 'coincide' with a securities transaction— whether by the plaintiff or by someone else." <u>Id.</u> at 85. <u>See also</u> <u>U.S. Mortgage, Inc. v. Saxton</u>, No. 04-17494, 2007 U.S. App. LEXIS 16830, at *26 (9th Cir. July 13, 2007); <u>Fisher v. Kanas</u>, 487 F.Supp.2d 270 (E.D.N.Y. 2007) (finding SLUSA preemption and confirming that the "'well-recognized presumption that Congress envisioned a broad construction' for the SLUSA") (quoting <u>Dabit</u>, 126 S.Ct. at 1513-14); <u>In re Am. Funds Fees Litig.</u>, No. 04-5593, 2005 U.S. Dist. LEXIS 41884 (C.D. Cal. Dec. 16, 2005) (dismissing state law claims due to their "inextricable interrelationship" with the purchase or sale of securities.)

The broad preemptive reach of SLUSA in this precise context recently was confirmed in <u>Horattas v. Citigroup Financial Markets Inc.</u>, No. 07-CV-122, 2007 WL 2702704 (W.D. Mich. Sept. 12, 2007). In <u>Horattas</u>, defendants were charged with mismanaging two trust accounts by selling mutual funds and other covered securities held in the trusts and misappropriating trust assets. The Court held that given the broad reading of "in connection with" in <u>Dabit</u>, SLUSA encompassed the claims. <u>Id.</u> at **27-30.[8]

---

[8]    The "presence of allegations of negligent management of the securities or imprudent investment of the trust funds cannot help [a plaintiff] escape the broad preemptive bar of SLUSA[.]" <u>Horattas</u>, 2007 WL 2702704, at *9; <u>see also</u> <u>Bradfisch v. Templeton Funds, Inc.</u>, 179 Fed. Appx. 973, 973 (7th Cir. 2006) ("Although the plaintiffs maintain that <u>Dabit</u> does not control because (in their view) the defendant funds have been negligently managed, they have not sought relief through derivative litigation and therefore cannot take advantage of the exception for that kind of suit in the Securities Litigation Uniform Standards Act of 1998."). Such allegations still meet SLUSA's "in connection with requirement" under <u>Dabit</u>. <u>See Horattas</u>, 2007 WL 2702704, at *9.

In addition, three other courts have addressed allegations similar to those made here and have held that SLUSA preemption applies. Kutten, 2007 U.S. Dist. LEXIS 63897, at **8-23; Rabin, 2007 U.S. Dist. LEXIS 57437, at **14-21; Siepel, 239 F.R.D. at 567-570; Spencer, 2006 U.S. Dist. LEXIS 52374, at **6-26. Each of these cases involved state law claims of breach of fiduciary duty and unjust enrichment linked to a scheme of alleged "double dipping," undisclosed conflicts and excessive fees in connection with the bank/trustee's investment of trust assets in affiliated mutual funds. In each case, the courts, relying on Dabit, found SLUSA's "in connection with requirement" was met because the alleged schemes coincided with the investment of trust assets in affiliated mutual funds. See Kutten, 2007 WL 2485001 at **4-9; Rabin, 2007 U.S. Dist. LEXIS 57437, at **21-22; Siepel, 239 F.R.D. at 568-69; Spencer, 2006 U.S. Dist. LEXIS 52374, at *20. Plaintiffs here allege the same state law claims based upon the same alleged scheme. Following Dabit and other relevant cases, this Court should find that the "in connection with" requirement is satisfied here.

### c.    *Plaintiff Has Pled a Scheme and Deceptive Device Bringing Her Claims Within the Ambit of SLUSA*

Plaintiff's focus on the Bank's alleged decision and "Mutual Fund Policy" triggers yet another avenue for SLUSA preemption – based upon use of a fraudulent scheme or deceptive device. As Plaintiff alleges, this purported policy "enabled" the Bank to perpetrate the alleged fraud – by allegedly making one-sided investment decisions and overcharging its trust customers with the mutual fund investments. See Second Amended Complaint ¶¶2, 25-26, 29, 43-44. She further alleges that in 1997 the Bank made a business decision to implement this scheme to increase its fees via Columbia Funds mutual fund investments. Id. ¶25. Following this decision, the Bank then moved assets from CTFs to its affiliated funds all as part of his alleged scheme to increase fees. Id. According to Plaintiffs, the implementation of this scheme and policy:

> ➤ "*enabled*" Defendants to enrich themselves by double dipping (id. ¶26);
> ➤ "*created* an inherent conflict of interest which pitted the interest of the Bank and its parent Bank of America Corp. ("BAS") in maximizing fees. . . ." (id. ¶3);

- 17 -

> ➤ "*ensured* that in every instance, the fiduciary's financial interests trumped the beneficiaries' interests. . . ." (<u>id.</u> ¶4); and,

> ➤ "*was intended to*, and did, promote the Bank's interest in reducing its own internal expenses for maintaining and administering fiduciary accounts while, at the same time, increasing its fee and other income at the expense of Desire[Cobble] . . . ." (<u>id.</u> ¶29).

(Emphasis added).

As Plaintiff thereafter alleges, the purported Policy drove the Bank's conduct with respect to the mutual funds, keeping from her, as she claims, the true nature of the investments, the decisions and the costs. The lack of clear information led her to be "fraudulently induced" to consent to the investments. <u>Complaint</u> ¶47. While "fraudulent consent" is excised, the Second Amended Complaint includes the same "Policy" as the linchpin of its purported deceptive scheme.

Even to the extent the "Policy" is not a deceptive device, the purported "business decision" to implement the alleged Policy to increase fees to the detriment of plaintiffs is simply another artful way to plead a fraudulent scheme giving rise to SLUSA preemption. As the court held in <u>Edward Jones</u>, "although precise allegations are 'artfully' absent, it is virtually axiomatic that, had Plaintiff and the other Class members received 'unbiased' investment advice, they would have sold their Preferred Fund shares . . . . Thus, the Court concludes that the conduct which forms the basis for Defendant's alleged illegal scheme falls within the ambit of SLUSA." <u>In re Edward Jones Holders Litigation</u>, 453 F.Supp.2d 1210, 1215 (C.D. Ca. 2006); <u>see also</u> <u>In re Franklin Mut. Funds Fee Litig.</u>, 388 F. Supp.2d 451 (D.N.J. 2005) (holding that SLUSA preempted state law claims premised upon a fraudulent scheme). Similarly, Plaintiff without question pleads that Defendants engaged in a "scheme," just using less inflammatory language than in her original Complaint. As in <u>Edward Jones</u>, and as noted above, the import of these allegations is that but for this undisclosed scheme or policy, Plaintiff would not have consented to the investments. Accordingly, her class claims are preempted by SLUSA.

**B.** **If this Court Does Not Exercise Subject Matter Jurisdiction Under SLUSA, then the Second Amended Complaint Must be Dismissed for Lack of Subject Matter Jurisdiction**

Federal courts are courts of limited jurisdiction. See Wynn v. AC Rochester, 273 F.3d 153, 157 (2d. Cir. 2001). "A case is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it[.]" Myers v. Seneca Niagara Casino, 488 F. Supp. 2d 166, 169 (N.D. N.Y. 2006). The plaintiff bears the burden of proving that subject matter jurisdiction exists. See id.

The Second Amended Complaint alleges federal jurisdiction under 28 U.S.C. §1332(d), the Class Action Fairness Act ("CAFA").[9]  See Second Amended Complaint ¶13.  CAFA generally confers federal courts with original subject matter jurisdiction over class actions with a proposed class of at least 100 members, where the amount in controversy exceeds $5 million, and where any member of a class of plaintiffs is a citizen of a different state from any defendant. See 28 U.S.C. §1332(d)(2).  Although the overarching goal of CAFA was to expand federal jurisdiction over most class actions, CAFA specifically exempts class actions that involve a claim solely concerning a covered security:

(9)    Paragraph (2) shall not apply to any class action that solely involves a claim –

---

[9]    The Second Amended Complaint also alleges supplemental jurisdiction under 28 U.S.C. §1367.  Supplemental jurisdiction is not implicated here, however, because the Court does not have original jurisdiction over any of Plaintiff's claims.  Furthermore, Plaintiff may not invoke diversity jurisdiction pursuant to 28 U.S.C. §1332, as she has not pled and she indeed cannot meet the $75,000 amount in controversy requirement.  It is well established that "each of several plaintiffs asserting separate and distinct claims must satisfy the jurisdictional-amount requirement if his claim is to survive a motion to dismiss." Gilman v. BHC Securities, Inc., 104 F.3d 1418, 1422 (2d Cir. 1997) (quoting Snyder v. Harris, 394 U.S. 332 (1969)).  While Plaintiff has alleged that the putative class has suffered at least $5 million in damages as a whole, she has not alleged that she, nor any member of the class, has suffered $75,000 individually.  See Second Amended Complaint ¶8.  Therefore, this Court does not have jurisdiction over this matter pursuant to 28 U.S.C. §1332.  See, e.g., Pauduano & Weintraub LLP v. Wachovia Securities, 185 F.Supp.2d 330 (S.D.N.Y. 2002) (remanding matter to state court where plaintiff did not meet amount in controversy requirement).

(A) concerning a covered security as defined under 16(f)(3) of the
Securities Act of 1933 and section 28(f)(5)(e) of the Securities
Exchange Act of 1934;

*********

(C) that relates to the rights, duties (including fiduciary duties), and
obligations relating to or created by any security as defined under
section 2(a)(1) of the Securities Act of 1933.

See 28 U.S.C. §1332(d)(9)(A) & (C). CAFA's exceptions are applicable here and, therefore,

"carve out" Plaintiff's claims from this Court's jurisdiction.

### 1.    The Court Lacks Subject Matter Jurisdiction under CAFA Because Plaintiff's Class Claims Concern a Covered Security.

Section 1332(d)(9)(A) of CAFA divests this Court of subject matter jurisdiction over

Plaintiff's class claims because those claims solely concern a "covered security."

Section 1332(d)(9)(A) exempts from CAFA those class actions involving claims concerning

securities that are nationally traded or listed on national exchanges, while SLUSA requires

dismissal of state law claims involving nationally traded securities. See Pew v. Cardarelli, No. 05-

1317, 2006 U.S. Dist. LEXIS 89025, at *19 n. 9 (N.D. N.Y. Dec. 6, 2006). Thus, the purpose and

effect of Section 1332(d)(9)(A) is to prevent CAFA from disturbing the impact of SLUSA. See

id.; see also In re Textainer P'ship Sec. Litig., No. 05-0969, 2005 U.S. Dist. LEXIS 26711, at

**14-15 (N.D. Cal. July 27, 2005) ("The purpose of the [CAFA] exceptions is to avoid disturbing

in any way the federal vs. state court jurisdictional lines already drawn in the securities litigation

class action context by the enactment of [SLUSA]."). However, CAFA's exception is even

broader than SLUSA, excepting all claims solely concerning a "covered security" from CAFA's

jurisdictional reach.

There is no dispute that the Bank's affiliated mutual funds, Columbia Funds mutual

funds, satisfy the definition of a "covered security"[10] under Section 1332(d)(9)(A) because

---

10    A "covered security" under 28 U.S.C. § 1332(d)(9)(A) incorporates the definition from
the Securities Act of 1933 and the Securities Exchange Act of 1934. See 15 U.S.C. §
Continued on following page

Columbia Funds are listed on a national exchange and are issued by a registered investment company. See infra at n.4 & 10. Further, Plaintiff's class allegations focus solely on the investments in Columbia Funds mutual funds. See Second Amended Complaint ¶¶ 55-56, 59-61, 63-64.

### 2. The Court Lacks Subject Matter Jurisdiction Because Plaintiff's Class Claims Arise From Fiduciary Duties and Obligations Relating to a Security

Section 1332(d)(9)(C) also divests this Court of subject matter jurisdiction because Plaintiff's class claims relate "to the rights, duties (including fiduciary duties) and obligations relating to or created by any security as defined under Section 2(a)(1) of the Securities Act of 1933." Here, again, there can be no dispute that the Bank's affiliated mutual funds, Columbia Funds mutual funds, is a security as broadly defined in Section 2(a)(1). Under 15 U.S.C. §77b(a)(1), the term "security" means "any note, stock, treasury stock, security future, bond, debenture, evidence of indebtedness . . . or, in general, any interest or instrument commonly known as a "security." Congress defined the term "security" to be "sufficiently broad to encompass virtually any instrument that might be sold as an investment." Pew, 2006 U.S. Dist. LEXIS 89025, at *14 n. 3.

There is also no dispute that Plaintiff's claims relate to "rights, duties (including fiduciary duties) and obligations" relating to or created by Columbia Funds. Plaintiff's claims for breach of fiduciary duty, aiding and abetting and unjust enrichment all related to Plaintiff's alleged

---

Continued from previous page
78p(f)(3) and 15 U.S.C. § 78bb(f)(5)(E). In turn, 15 U.S.C. § 78bb(f)(5)(E) states that "the term 'covered security' means a security that satisfies the standards for a covered security specified in paragraph (1) or (2) of section 18(b) of the Securities Act of 1933 [15 U.S.C. § 77r(b)]. Section 77r(b)(1)(A) defines a "covered security" as one "listed, or authorized for listing, on the New York Stock Exchange or the American Stock Exchange, or listed, or authorized for listing . . . ." Section 77r(b)(2) also defines a "covered security" as one "issued by an investment company that is registered, or that has filed a registration statement, under the Investment Company Act of 1940." There is no dispute that the Bank's affiliated mutual funds, Columbia Funds mutual funds, meet this definition of covered security.

rights, and Defendants' alleged obligations, created by or relating to the investment of the Luleff Trust's assets in Columbia Funds mutual funds.  See Second Amended Complaint ¶¶ 55-56, 59-61, 63-64, 66-67.  Courts have broadly interpreted the "rights, duties (including fiduciary duties) and obligations" language from Section 1332(d)(9)(C) to include any type of claim that relates to a covered security, and Plaintiff's claims fall within that broad definition.  See Williams v. Texas Commerce Trust Co., No. 05-1070, 2006 U.S. Dist. LEXIS 39743, at *15 (W.D. Mo. June 15, 2006) (exception applied to state law claims for breach of fiduciary duty, breach of contract, negligence, equitable restitution, accounting, constructive trust and conspiracy arising from a trust indenture); Pew, 2006 U.S. Dist. LEXIS 89025, at *15 (exception applied when the "essence of plaintiffs' claim is that defendants engaged in deceptive acts and practices by misrepresenting and concealing the true nature of the investment"); Indiana State Dist. Council of Laborers & HOD Carriers Pension Fund v. Renal Care Group, Inc., No. Civ. 3:05-0451, 2005 WL 2000658 (M.D. Tenn. Aug. 18, 2005) (exception applied to state law breach of fiduciary duty and self-dealing claims in connection with corporate merger); In re Textainer , 2005 U.S. Dist. LEXIS 26711, at *24 (exception applied because plaintiff's claims involved "fiduciary duties relating to or created by or pursuant to" limited partnership interests which were securities).

## IV.    **CONCLUSION**

Despite Plaintiff's artful pleading, her claims continue to be preempted under SLUSA. Alternatively, if the Court does not exercise jurisdiction over this matter pursuant to SLUSA and dismiss the claims, then the Court should dismiss this case for lack of subject matter jurisdiction because Plaintiff's claims clearly fall with CAFA's jurisdictional exceptions. Accordingly, this Court should grant Defendants' Motion to Dismiss.

Dated:  October 2, 2007

REED SMITH LLP

By: *Andrew B. Messite*

Andrew B. Messite (ABM-3748)
599 Lexington Avenue, 29th Floor
New York, NY  10022
Telephone:  212.521.5400
Facsimile:  212.521.5450

and

Gregory B. Jordan
Mary J. Hackett
Sharon L. Rusnak
435 Sixth Avenue
Pittsburgh, PA 15219
Telephone:  412.288.3131
Facsimile:  412.288.3063

Attorneys for Defendants
Bank of America, N.A. and
Bank of America Corporation

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------------x
DAWNE LULEFF on behalf of her minor daughter
DESIRE COBBLE and all others similarly situated,

                         Case No. 06-CV-1435 (JGK)

                Plaintiff,

         -against-                JURY TRIAL DEMANDED

BANK OF AMERICA, N.A. and
BANK OF AMERICA CORPORATION,         CLASS ACTION

                Defendants.
----------------------------------------------------------------x

## SECOND AMENDED COMPLAINT

      Plaintiff Dawne Luleff ("Luleff"), on behalf of her minor daughter Desire Cobble

("Desire") and for all other persons similarly situated, alleges the following on

information and belief:

Preliminary Statement

      1.     Plaintiff brings this Class Action on behalf of her minor daughter and all

others similarly situated, (1) as beneficiaries of fiduciary accounts where (2) defendant

Bank of America N.A. (the "Bank") serves or served as corporate fiduciary, and (3) the

corpus of such fiduciary accounts (or any portion thereof) were invested in the Bank's

proprietary mutual funds (the "Columbia Funds" formerly known as the "Nations

Funds"), managed by the Bank's controlled affiliate, Columbia Funds Series Trust f/k/a/

Nations Funds Trust ("Columbia").

      2.     This Complaint alleges that the Bank breached its fiduciary obligations to

plaintiff and members of the putative Class by adopting and implementing a self dealing

corporate policy (the Bank's "Mutual Funds Policy") of investing fiduciary accounts in

its proprietary mutual funds (the "Columbia Funds") without regard to the investment

1

performance of those funds, the expense ratios of those funds, the availability of more suitable investment vehicles, the particular needs of the beneficiaries of the Bank's fiduciary accounts or other factors relating to the best interests of the beneficiaries of such accounts.

3.     The Bank's Mutual Funds Policy created an inherent conflict of interest which pitted the interest of the Bank and its parent Bank of America Corp. ("BAC") in maximizing fees and maximizing investment in their proprietary Columbia Funds against the interests of Desire and other fiduciary account beneficiaries in having an independent fiduciary to make investment decisions based solely upon their interests in minimizing fees and expenses and maximizing investment performance.

4.     The Bank's Mutual Funds Policy ensured that in every instance, the fiduciary's financial interests trumped the beneficiaries' interests. The Bank's proprietary Columbia Funds maximized fee income and reduced corporate expenses for the Bank and BAC, but imposed unnecessary costs on fiduciary account beneficiaries and deprived them of any hope that investment decisions for their accounts would be made on the basis of the historic investment performance and favorable fee ratios of available investment vehicles. In short, defendants used fiduciary assets to enrich themselves at the expense of Desire and other fiduciary account beneficiaries.

5.     This Complaint also alleges that BAC aided and abetted the Bank in breaching its fiduciary duty to Desire and other members of the Class.

6.     No claims are asserted herein pursuant to the federal securities laws or any other comparable theory of liability under state and/or common law The only claims asserted by plaintiff are those expressly set forth herein.

2

7.    All members of the putative Class were adversely affected by defendants' breach of their fiduciary and contractual obligations.

Jurisdiction and Venue

The substantive claims asserted herein arise under common law.

8.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1711, the Class Action Fairness Act of 2005, and 28 U.S.C. § 1367.  The amount in controversy exceeds $5,000,000 exclusive of interest and costs and there is diversity of citizenship between plaintiff and each of the defendants.

9.    This Court has personal jurisdiction over defendants because each of them conducted business in the Southern District of New York on a regular and continuous basis during the time period of the wrongdoing alleged herein, continuing up to today.

10.    The Bank has multiple branches in this District.

11.    Venue is proper in this District as many of the acts and practices complained of occurred here.  Further, many witnesses to defendants' wrongful acts reside in or did business within this District, and many members of the Class reside in this District.

The Parties

12.    Desire is a minor, and is the beneficiary of The Desire Cobble Supplemental Needs Trust established by Trust Agreement dated November 8, 2001 ("Cobble Trust"), a copy of which is attached hereto as Exhibit "A".

13.    Luleff is co-trustee of the Cobble Trust.  Luleff is a resident of the City of St. Louis, in the State of Missouri.

14.    The Bank is a federally chartered bank domiciled in North Carolina, and is a wholly owned subsidiary of BAC also domiciled in North Carolina.

15.    Defendant Bank was a co- trustee of the Cobble Trust until April 1, 2004 when it was removed by Order of the Circuit Court for the City of St. Louis.

16.    At all relevant times, the Bank made investment decisions for Desire's trust and for other accounts in which it served as a fiduciary or co-fiduciary.

17.    Pursuant to defendants' policy, when the Bank used mutual funds as an investment vehicle for fiduciary accounts, the Bank invested fiduciary assets, including all of those in Desire's trust, in defendants' proprietary mutual funds, formerly known as the Nations Funds and now known as the Columbia Funds. (the "Columbia Funds").

18.    At no time did plaintiff or Desire personally purchase, sell or hold Columbia Funds and all investments in the Cobble Trust were controlled and directed by the Bank.

19.    Defendant BAC is a Delaware holding company domiciled in North Carolina.  It owns the shares of numerous subsidiaries including those of defendant Bank.

20.    At all relevant times, BAC controlled the business activities of the Bank.

21.    The Columbia Funds are nominally operated by Columbia and its Board of Trustees.

The Bank's and BAC's Relationship to the Columbia Funds

22.    Even though no more than 60% of Columbia's Board is supposed to be an "interested" person, in fact all Columbia Board members were elected and controlled by the Bank and BAC.  Columbia has operated as an *alter ego* of the Bank, BAC and their respective subsidiaries responsible for asset management.

23.     At all relevant times, subsidiaries of defendants BAC and the Bank charged (and continue to charge) substantial fees and expenses to the Columbia Funds for their purported services.

24.     The cost of these fees and expenses is passed on to accounts in which assets are invested in the Columbia Funds, including the Cobble Trust and other fiduciary accounts.  As a result, the Bank received fiduciary fees and the fees and expenses derived indirectly from BAC's proprietary funds as well as other benefits derived therefrom.

Factual Allegations

25.     Starting in or about 1997, the Bank made a business decision – which it implemented on a nation-wide basis -- to invest all fiduciary accounts in its proprietary Columbia Funds whenever possible(i.e.,  the "Bank's Mutual Fund Policy"). Following this business decision, the Bank divested billions of dollars from fiduciary account investments in fee and expense free Common Trust Funds and other investment vehicles, and reinvested the proceeds in its proprietary Columbia Funds,

26.     The Bank's Mutual Fund Policy enabled the Bank and BAC to enrich themselves at Desire's expense and the expense of other fiduciary account beneficiaries, by "double dipping" fees from those accounts.  The Bank charged fiduciary fees for maintaining the fiduciary account for the Cobble Trust (the "Fiduciary  Fees"), and other affiliated entities charged investment advisory and administrative fees for managing the Columbia Funds (the "Columbia Internal Fees"), which were the exclusive investment vehicle for the Cobble Trust.  The Columbia Internal Fees were ultimately passed along to and paid by Desire and other fiduciary account beneficiaries, in the form of expense ratios and reduced investment returns.

27.    Desire and the other beneficiaries of the Bank's fiduciary accounts received no benefit in exchange for the increased cost resulting from the Bank's Mutual Funds Policy.

28.    The Bank and BAC knew at all times that the Bank's Mutual Fund Policy would enrich the Bank at Desire's expense and the expense of other fiduciary account beneficiaries.  The Bank and BAC also knew that the Bank's Mutual Fund  Policy conferred no corresponding benefits to Desire and other fiduciary account beneficiaries.

29.    The Bank's Mutual Fund  Policy was intended to, and did, promote the Bank's interest in reducing its own internal expenses for maintaining and administering fiduciary accounts while, at the same time, increasing its fee and other income at the expense of Desire and other fiduciary account beneficiaries, in violation of the Bank's fiduciary obligations to Desire and other fiduciary account beneficiaries.

32.    The Bank  breached its fiduciary obligations to plaintiff, Desire and members of the Class in the following respects.  The Bank

> (i)    failed to consider any non-proprietary mutual funds, common trust funds (i.e., fee and expense free in-house pools of assets, similar to mutual funds) or other investment vehicles for investment of Desire's trust account and other fiduciary accounts and used the Columbia Funds as the sole investment vehicle for fiduciary accounts whenever possible;

> (ii)    invested assets in fiduciary accounts in Columbia funds without proven investment track records or reasonable fee structures;

> (iii)    refused to divest those proprietary mutual funds which substantially underperformed comparable investment vehicles;

> (iv)    improperly used its voting rights as the record holder of Columbia Funds shares held for fiduciary accounts to select and elect Trustees of Columbia that were under its control and/or influence.

(v)    failed to establish written investment policies and adopt procedures for periodic review and comparison with other available funds; failed to establish an arm's length process for evaluating the prudence of investing fiduciary accounts in proprietary and bank advised mutual funds rather than in non-proprietary alternative investments. Additionally, the Bank failed to conduct on-going comparisons of proprietary funds to peer group performance.

(vi)    failed to document management's actions with respect to transactions involving real or potential conflicts of interests, including the prudence of such transactions and to make such documentation be readily available.

(vii)    failed to annually review accounts on an individual basis to insure that the proprietary mutual fund continue to be an appropriate investment for the account.

33.    Because of the benefits that it and BAC received from the Columbia Policy, the Bank regularly refused to consider non-proprietary investments for fiduciary accounts. Indeed, in a letter from Bank Vice President Thomas W. Chulick dated October 1, 1999 to the Hon. Mary Ann Medler, a federal Magistrate Judge in St. Louis, and a Co-Trustee and a beneficiary of her Mother's trusts for which the Bank was corporate Trustee, the Bank reiterated its policy to only invest in its proprietary funds: "The [Investment Review] Committee [of the Bank] reiterated that the use of outside mutual funds in fiduciary accounts is in violation of our corporate policy". A copy of this letter is attached hereto and incorporated herein as Exhibit "B".

34.    The Bank never offered Desire and other fiduciary account beneficiaries an increase in services commensurate with the increased fees which they were charged as a result of the Bank's Mutual Fund Policy. In fact, the Bank's fiduciary services declined as a result of the Bank's abdication of its traditional fiduciary activities and the creation of "Call Centers" located in distant locales from the beneficiaries and accessible only by an 800 number.

35.    In violation of its fiduciary responsibilities, the Bank performed no objective analysis to determine whether the Columbia Funds were optimal investments for the fiduciary accounts of the Cobble Trust, or for any other fiduciary accounts.

36.    Rather, the decision to invest the assets of the Cobble Trust and other fiduciary accounts in the Columbia Funds was intended to maximize the Bank's direct and indirect fee income and other benefits - not to find the most suitable investments for the Cobble Trust and other fiduciary accounts.

37.    The Bank and its subsidiaries unjustly reaped millions of dollars in purported money management, investment advisory, administrative and other fees as a result of its investment of assets in fiduciary accounts, including that of the Cobble Trust, in shares of Columbia Funds, in addition to trustee fees and other fiduciary fees charged to plaintiff and the members of the Class.

Class Action Allegations

38.    Plaintiff brings this action on behalf of Desire Cobble and all other beneficiaries of the Bank's fiduciary accounts similarly situated pursuant to Rule 23(b)(3) of the Federal Rules of Civil Procedure as a class action. The Class herein is defined as: all beneficiaries of trusts or other fiduciary accounts for which the Bank acted as a fiduciary, and where the assets of the fiduciary account were invested in Columbia Funds mutual funds at any time from September 8, 1998 to the present (the "Class" and "Class Period").

39.    Plaintiff seeks, *inter alia:* (i) an accounting for all damages caused by defendants to the Cobble Trust and the members of the Class and the extent of the unjust enrichment of the defendants from their wrongful activities, as well as repayment of such

8

unjust enrichment and the earnings thereupon; (ii) money damages to be paid by the defendants; (iii) injunctive relief providing for the possible removal of the Bank as fiduciary for all fiduciary accounts in which members of the Class are currently beneficiaries; (iv) for relief incident and subordinate thereto, including substantial punitive damages as a result of defendants' egregious self-dealing.

Numerosity

40.    The Bank serves as a corporate fiduciary (i.e., trustee, guardian, executor, etc.) for many thousands of fiduciary accounts affected by the wrongdoing described herein.  At relevant times hereto, it served as a Trustee for the Cobble Trust.

41.    The exact number of members of the Class is not known by plaintiff, but is within the sole knowledge of the Bank.  However, the members of the Class are so numerous as to make a class action appropriate with such Class being composed of many thousands of members.

42.    The members of the Class are located in most or all fifty states, and in numerous foreign countries.

Common Issues of Law and Fact Predominate

43.    The Bank's decision to invest the assets of the Cobble Trust in the Bank's proprietary mutual funds was made pursuant to a corporate policy (i.e., the Columbia Policy) which affected all fiduciary accounts in a uniform manner, and was not made on an individual basis.

44.    The Bank's refusal to divest those Columbia Funds which performed poorly was also made pursuant to the Bank's Mutual Funds Policy, and was not made on an individual basis.

9

45.    All members of the Class were subjected to increased and/or unnecessary fees and expenses and all members of the Class were adversely affected by the diminution of services resulting from the Bank's Mutual Fund Policy.

46.    There are common questions of law and fact that relate to and affect the rights of each member of the Class including, *inter alia:*

(i)    whether the Bank's business decision to invest assets of its fiduciary accounts in shares of the Columbia Funds was motivated by the best interests of the Class members or by the defendants' desire to generate management, investment advisory and other fees for themselves, their affiliates and subsidiaries, to lower the Bank's expenses of managing fiduciary assets and to generate unjustly other benefits for all the defendants by, *inter alia*, "bulking-up" the assets invested in the defendants' proprietary funds;

(ii)    whether the Bank breached fiduciary and contractual duties to the Cobble Trust and the members of the Class, and whether BAC participated in and/or aided and abetted such breaches of duty;

(iii)    whether the Bank breached its fiduciary duties to all members of the Class by making investment decisions for the fiduciary accounts of plaintiff and the Class based upon defendants' own interests rather than the interests of the beneficiaries of such fiduciary accounts;

(iv)    Whether the Bank's refusal to divest underperforming and/or high-expense Columbia Funds from its fiduciary accounts was motivated by the best interests of Class members or by its own financial interests;

(v)    Whether the Bank's refusal to divest underperforming and/or high-expense Columbia Funds from its fiduciary accounts was a breach of its fiduciary duty to plaintiff and other members of the Class; and

(vi)    What remedies are appropriate compensation for the damages caused to plaintiff and each member of the Class.

47.    The relief sought is common to the entire Class including, *inter alia:*

(i)    a declaratory judgment that the Bank violated its fiduciary duties as Trustee (or other similar fiduciary role) with respect to the affected fiduciary accounts and whether BAC participated therein and/or aided and abetted the Bank in doing so;

(ii)    payment by the defendants of compensatory damages caused by their commission of and/or aiding and abetting breaches of fiduciary and contractual duties, together with substantial punitive damages; and

(iii)    an injunction preventing the Bank from opposing petitions by fiduciary account beneficiaries to replace it as corporate fiduciary.

Typicality and Predominance of Plaintiff's Claims

48.    The interests of plaintiff and each member of the Class have been adversely affected by the wrongdoing of the defendants as described herein.

49.    The assets of Cobble Trust, like all other fiduciary accounts of members of the Class, were invested in the Columbia Funds, pursuant to the Mutual Funds Policy of the Bank and its senior officers.

50.    Plaintiff's claims are common to all members of the Class and predominate over any individual claims they have against the defendants.

51.    Plaintiff's claims are typical of the claims of all members of the Class. Her claims are based on the same fundamental factual allegations and legal theories as the claims of all other members of the Class.

Plaintiff Will Fairly and Adequately Represent the Class

52.    Plaintiff can and will fairly and adequately protect the interests of the Class and its members.

53.    Plaintiff's attorney is experienced and capable of prosecuting complex litigation such as this case. Plaintiff's attorney will actively conduct and be responsible for the prosecution of this litigation and the expenses thereof.

Count I:  Breach of Fiduciary Duty Against the Bank: Investment in Columbia Funds

54.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

55.    Defendants' wholesale decision to invest fiduciary account assets in shares of the Columbia Funds without regard for the interests of fiduciary account beneficiaries was a breach of the Bank's fiduciary duty to Desire and the members of the Class.

56.    As a result of this breach of fiduciary obligations, Desire and the other members of the Class have been damaged in an amount to be determined at trial.

Count II:  Breach of Fiduciary Duty Against the Bank: Failure to Divest Columbia Funds

57.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein. This Count is asserted against all defendants.

58.    The Bank had a fiduciary obligation to monitor the Cobble Trust and to divest any assets which became inappropriate for the Cobble Trust, whether by virtue of substantial underperformance or otherwise.

59.    Some of the proprietary Columbia Funds substantially underperformed comparable investments and/or had excessive expense ratios rendering them inappropriate to retain them as investments for plaintiff's account.

60.    Notwithstanding the aforementioned sub-par investment performance and/or excessive expense ratios, the Bank retained the investments in the Columbia Funds, and failed to seek out more productive investment vehicles.

61.    By virtue of the Bank's breach of its fiduciary obligation to divest underproductive and/or excessively expensive Columbia Funds, Desire and members of the Class have been damaged in an amount to be determined at trial.

Count III: Aiding and Abetting Breach of Fiduciary Duty Against BAC

62.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

63.     BAC participated in the Bank's business decision to invest fiduciary accounts in shares of the Columbia Funds without regard for the best interests of fiduciary account beneficiaries.  In addition, BAC participated in the decision to keep such fiduciary accounts invested in shares of the Columbia Funds  even when a prudent investor would have divested those Columbia Funds due to poor performance and/or excessive expense ratios.  BAC actively participated in the decision to grow its proprietary mutual funds complex, the Columbia Funds, by force selling the funds to the Bank's fiduciary accounts and employing the accounts as a primary distribution channel for the Columbia Funds. In order to accomplish its objectives, BAC aided and abetted the Bank's breaches of its fiduciary obligations to the Cobble Trust and other members of the Class and actively participated in the wrongdoing alleged herein.

64.     By virtue of BAC's aiding and abetting the Bank's breach of fiduciary duties to the plaintiff, Desire and others similarly situated, Desire and members of the Class were damaged in an amount to be determined at trial.

<u>Count IV:  Unjust Enrichment Against the Bank and BAC</u>

65.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

66.     By their investment of fiduciary assets in the Columbia Funds to the exclusion of all other investment vehicles, and their subsequent refusal to divest those Columbia Funds which performed poorly and/or had inordinately high expenses, the Bank and BAC were unjustly enriched at the expense of Desire and other Class members.

67.    Defendants have retained and invested the proceeds of the foregoing unjust enrichment and realized additional profits thereupon, all of which should be returned to the fiduciary accounts from which they were derived and/or their beneficiaries.

Prayer for Relief

WHEREFORE, plaintiff respectfully requests on behalf of her daughter Desire and on behalf of all members of the Class:

(a)    certification of this action as a class action and appointment of plaintiff and her counsel to represent the Class;

(b)    entry of judgment and an award of damages on plaintiff's claims for breach of fiduciary duty in favor of plaintiff individually and as representative of the Class;

(c)    entry of judgment enjoining the Bank from opposing any petition filed by any member of the Class seeking the removal of the Bank as corporate fiduciary and requiring the Bank to pay for all legal fees and expenses incident thereto including its own;

(d)    entry of judgment compelling the defendants to account for their unjust enrichment and disgorging the amount thereof (and the profits earned thereupon) to the fiduciary accounts affected by the wrongdoing described herein and/or their beneficiaries, as appropriate;

(e)    pre-judgment and post-judgment interest at the maximum rate allowable by law;

(f)    reasonable attorney's fees and reimbursement of the reasonable costs and expenses of prosecuting this litigation and distributing the recovery to members of the Class; and

(g)    such other or additional relief as this Court deems appropriate.

Jury Demand

Plaintiff hereby demands a trial by jury.

September    , 2007

Daniel Cobrinik (DC 6406)
2 Grand Central Tower
140 East 45th Street - 25th Floor
New York, New York 10017
(212) 725-6888
Counsel for Plaintiff and the Class

797rlulm

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   DAWNE LULEFF,

 4              Plaintiff ,

 5          v.                              06 Civ. 1435 (JGK)

 6   BANK OF AMERICA, N.A., et al.,
                                            Argument on Motion
 7              Defendants.

 8   ------------------------------x

 9                                          New York, N.Y.
                                            September 7, 2007
10                                          4:30 p.m.

11   Before:

12              HON. JOHN G. KOELTL

13                                          District Judge

14

15          APPEARANCES

16

17   DANIEL COBRINIK, ESQ.
     Attorney for Plaintiffs
18          2 Grand Central tower
            140 East 45th Street, 25th floor
19          New York, New York  10017
            (212) 725-6888
20

21   REED SMITH LLP
     Attorneys for Defendants
22          599 Lexington Avenue
            New York, New York  10022
23          (212) 521-5400
     BY:  MARY J. HACKETT, ESQ.
24          ANDREW B. MESSITE, ESQ.

25
```

797rlulm                                                                    2

```
 1              (Case called)

 2              THE CLERK:  All parties please state who they are for

 3    the record.

 4              MR. COBRINIK:  Daniel Cobrinik for the plaintiff on

 5    behalf of her daughter Desiree and all those similarly

 6    situated.

 7              MS. HACKETT:  Mary Hackett.  I'm here with my

 8    colleague Andrew Messite.  We represent the remaining

 9    defendants Bank of America Corporation and Bank of America,

10    N.A.

11              THE COURT:  This is a motion to dismiss by the

12    defendant.  I'll listen to argument.  I've read the papers.

13              MS. HACKETT:  Good afternoon, your Honor.  As I

14    indicated, my colleague Andrew Messite and I represent the

15    remaining defendants.  The other defendants were dismissed by

16    stipulation about a year ago.

17              This is the last of nine cases, your Honor.  All of

18    the other eight cases have been dismissed on motions to

19    dismiss.  I won't belabor the history at all, but we started,

20    very briefly, in 2001 with the Hughes v. LaSalle decision.  Mr.

21    Cobrinik filed that case with Mr. Greenfield, alleging exactly

22    the allegations we have here, that they challenged a trustee's

23    conduct, in that case LaSalle investing trust assets in

24    affiliated mutual funds.

25              The issue they faced in that case, which is also
```

797rlulm

1   present here, is the law authorizes that conduct, as Judge

2   Mukasey noted in his dismissal decision.  That case was

3   dismissed in 2006 based upon various state law defenses:

4   Consent, ratification, statute of limitations.

5          Between the filing and dismissal of that case is when

6   the seven other cases were filed, from 2002 to 2006.  They were

7   filed by Mr. Greenfield, and then the last case, the Luleff

8   case, was filed by Mr. Cobrinik.  They all assert the same

9   causes of action, all challenging investments in trust assets

10  in affiliated mutual funds.

11         Four of the cases more recently dismissed follow a

12  United States Supreme Court decision rendered in 2006 in the

13  case of Dabit v. Merrill Lynch.  In all of those cases

14  following Dabit, the courts found that the very same state law

15  causes of action were preempted under the Securities Litigation

16  Uniform Standards Act.

17         Your Honor, we provided, and I hope you have a booklet

18  of, all of those cases and many more confirming the broad scope

19  of SLUSA preemption.  We sent that booklet over on Tuesday.  If

20  the Court did not receive a copy, we have another copy.

21         THE COURT:  I have it.

22         MS. HACKETT:  Thank you.  Although our brief, your

23  Honor, sets forth many grounds for dismissal, I'm not going to

24  review all of those, particularly given the fact that I

25  understand you have read all the papers.  We are really here

797rlulm

```
1    today to ask you to follow the decisions in Siepel and Kutten

2    and the many other decisions on point to dismiss these class

3    claims based upon SLUSA preemption.

4              There are three ways, your Honor, that you could do

5    that.  The first we offered in our brief is the first-filed

6    rule.  The plaintiffs, as we have noted and quoted, have

7    repeatedly stated that the claims are substantively identical

8    to Kutten and Siepel.

9              THE COURT:  That's no longer a basis for dismissing

10   this case.  There is no previously filed case which is

11   currently pending, so I can't dismiss this case in favor of

12   another case.

13             MS. HACKETT:  Actually, your Honor, I looked at that

14   issue.  I could not find any cases that provide that dismissal

15   of the first case moots the first-filed rule.

16             THE COURT:  It really makes no sense.  The first-filed

17   rule is a rule that essentially says if there's another case

18   pending between the same parties which was earlier filed, then

19   the second case can either be stayed or dismissed to allow the

20   first case to go forward so that the claims can be decided.

21             It makes no sense when there is no longer any other

22   case to say, OK, there was another case pending but it's not

23   pending anymore but dismiss this case anyway, unless you could

24   make the argument that the first-filed case was somehow

25   collateral estoppel or res judicata on this case.
```

```
 1              MS. HACKETT:  Exactly.

 2              THE COURT:  Not a claim which is made on these papers

 3     nor could it be.  This is a motion to dismiss.

 4              MS. HACKETT:  You're exactly right, your Honor.  Two

 5     points to respond.  One is the whole policy of the first-filed

 6     rule is to save judicial resources.  The only point I would say

 7     is that if we don't follow that rule, then you are put to the

 8     task of having to decide the issues.  I accept that.

 9              THE COURT:  Hold on.  You say you acknowledge that

10     this case really can't be disposed of, can't be dismissed on

11     the basis of the first-filed rule, but it reflects a good

12     policy.  Well, the first-file rule does reflect a good policy,

13     I think we can all agree with that.

14              MS. HACKETT:  I should be more precise, your Honor.

15              THE COURT:  Do you think I could dismiss this case

16     under the first-filed rule in favor of another action that's no

17     longer pending?

18              MS. HACKETT:  Your Honor, for the reason you stated in

19     the case of Devon v. Transportation Communications, the court

20     did exactly that in this circuit.  It's in the Southern

21     District of New York, a 1997 decision.  What the court held is

22     given the dismissal, the dismissal decision is res judicata.

23     That's exactly the point that you raised.

24              THE COURT:  Res judicata is an affirmative defense

25     that has to be pleaded and proved.
```

797rlulm                                                                    6

 1                MS. HACKETT:  Your Honor, I accept that.  I won't beat

 2    a dead horse.

 3                The second argument --

 4          THE COURT:  Wait a moment.  You really just can't

 5    throw out arguments and give what you really can't believe is a

 6    basis in law for me to dismiss the case in the hope that I

 7    dismiss the case and that somehow, even though the dismissal

 8    would be wrong as a matter of law, maybe you could either

 9    resolve the case before that decision would be, as it should

10    be, reversed.

11                MS. HACKETT:  Your Honor, I understand exactly what

12    you're saying.  I apologize to you in that I was trying to take

13    your lead that you don't think my argument will be successful.

14    But I adamantly believe that you could dismiss based on the

15    first-filed rule.  I believe where we have eight cases filed,

16    if there's any case where that rule should be applied, it's

17    this one.

18                These plaintiffs have put courts in Florida, Missouri,

19    Minnesota, and Chicago through exactly the same cases, exactly

20    the same classes, exactly the same causes of action.  The

21    policy and rationale of the first-filed rule is save judicial

22    resources, don't waste the parties' time, don't waste the

23    court's time.

24                Here, where we have repeated concessions that the

25    classes are the same, that the causes of action are the same, I

1    do not think, nor could I find any cases, that the first-filed

2    rule doesn't apply because the court dismissed the first case.

3    These were filed almost simultaneously, Kutten, Siepel, and

4    Luleff, Siepel right before, then Luleff, then Kutten.  We have

5    had the courts do their job marching through the motions and

6    entering dismissals.

7              THE COURT:  That's what we do.  We try very hard to do

8    our job.

9              MS. HACKETT:  Exactly.  But it shouldn't be that

10   parties can come repeatedly to different courts, as Judge

11   Magnuson held in Siepel, and forum shop and require you to

12   continually have to go through this analysis.

13             I do believe the first-filed rule should still apply

14   here.  But in all deference to your Honor I can tell that that

15   argument was not succeeding.  I apologize if you believe I

16   asserted an argument that I thought really didn't have merit.

17   I believe that it does, but I accept your view.

18             There is another reason, your Honor, why you should

19   find SLUSA preemption here apart from the first-filed rule:

20   Just follow the reasoning in Siepel and Kutten and Raven and

21   Spencer, again because of the concessions we have here.  They

22   have conceded same causes of action, same class, and for the

23   same reasons you should follow that and dismiss.  Indeed, in

24   those cases the courts reject the very same arguments that

25   plaintiffs press here.

797rlulm                                                                              8

1          Finally, your Honor, another option is do what four

2    courts have done before:  Conduct the SLUSA preemption analysis

3    beginning with Dabit and look at the four requirements.  We

4    clearly have state law claims, we clearly have a putative class

5    action, we have claims of misrepresentation and omission, and

6    we have that made in connection with the purchase of a

7    security.

8          THE COURT:  The plaintiff says that these are not

9    claims of misrepresentation and omission.

10          MS. HACKETT:  They do, your Honor.  This is precisely

11    what Judge Magnuson addressed in the Kutten decision issued

12    just last week.  In Kutten, just like here, filed almost the

13    same time, amended almost the same time, they faced a motion to

14    dismiss for SLUSA preemption.  In both cases these plaintiffs

15    and their counsel tried to excise out the misrepresentation and

16    omission claims.  But here, your Honor, they are still there.

17    There are numerous responses at this point.

18          If you look at paragraph 33 -- this absolutely tracks

19    page 9 in the Kutten decision where Judge Magnuson walks

20    through the claims.  As he walks through those claims, we have

21    exactly the same here, your Honor.  At the bottom of page 9 of

22    the Kutten decision where he notes that plaintiff's effort to

23    distinguish this case from Siepel is unavailing.

24          Siepel is nearly identical to this case.  As in this

25    case, current and former trust beneficiaries asserted various

1    state law claims based on the same purportedly wrongful

2    conduct.  He quotes that or he goes on to cite to it, the

3    transfer of fiduciary account assets in proprietary mutual

4    funds without considering other alternatives pled in paragraph

5    46 of the amended complaint here.

6            THE COURT:  I'm looking at paragraph 33.

7            MS. HACKETT:  I'm sorry, your Honor.  I was quoting

8    out of 9.  But at paragraph 33, just as Judge Magnuson cites,

9    there are promises they note there that were not kept.  That's

10   exactly what the judge notes in the Kutten opinion as well,

11   misrepresentations that the defendant provided individualized

12   account services.  We have the same claim here, promises of

13   individual account services were not provided.

14           Paragraph 37 of the amended complaint, where they

15   expressly allege that the defendants failed to disclose the

16   conflicts of interest; paragraph 49 of the amended complaint,

17   where they allege that the bank disguised the double-dipping,

18   the bank disguised the fees that it charged; paragraph 50,

19   where they allege the bank provided deceptive information;

20   these track precisely the claims in Kutten, your Honor.

21           THE COURT:  Is that it?

22           MS. HACKETT:  Those are the specific points.  But in

23   addition, your Honor, the case law, and in the Kutten decision

24   again because Judge Magnuson faced an amended complaint --

25           THE COURT:  Hold on a second.

797rlulm

```
 1              MS. HACKETT:  Sure.

 2              THE COURT:  There is no question, right, that if the

 3    complaint did not allege a claim for misrepresentations or

 4    omissions, the complaint would survive SLUSA preemption?

 5              MS. HACKETT:  I don't agree with your Honor.  May I

 6    explain why?

 7              THE COURT:  Sure.  It was a question.

 8              MS. HACKETT:  Because the SLUSA principles is an

 9    exception to the well-pleaded complaint rule.  As numerous

10    courts have held, including the Behlen decision from the

11    Eleventh Circuit and the Beckett v. Mellon Investors case from

12    the State of Washington in 2006, you have to look at the

13    gravamen of the complaint.  You have to look at the claims pled

14    and whether or not the plaintiffs are indeed trying to skirt

15    SLUSA.

16              Beckett is a very good example.  In Beckett the

17    plaintiffs alleged that they were charged excessive fees, and

18    they amended trying to avoid SLUSA.  There the court said the

19    gravamen here is that you didn't tell the people about the

20    fees.  It is misrepresentation and omission.  Under those

21    circumstances it is preempted by SLUSA.

22              THE COURT:  The plaintiff says, our complaint is not

23    attempting to allege misrepresentations or omissions, and if

24    you think that it is, Judge, give us another opportunity to

25    make it clear that we are not relying on misrepresentations or
```

797rlu1m                                                                11

1    omissions.   At least give us the opportunity to amend the

2    complaint.

3              Why shouldn't I let the plaintiff meet that challenge?

4         MS. HACKETT:   A number of reasons, your Honor.   First,

5    because of the points that I just stated, because the gravamen

6    of the complaint here is challenging what we told them, what we

7    were doing with their investments, did we tell them about

8    conflicts and fees.

9              THE COURT:   But if the plaintiff says that the gist of

10   their complaint is not to do that and they are not going to

11   rely at all on misrepresentations or omissions but only a claim

12   of breach of fiduciary duty, why shouldn't I at least see how

13   that complaint reads before I dismiss the action in the face of

14   a request for an amendment.

15        MS. HACKETT:   Number of reasons, your Honor.   An

16   amendment should be denied where it's futile, where it's

17   prejudicial, or where justice so requires.   Your Honor, I

18   submit we can meet all of those.   Here, the tactic of trying to

19   plead around SLUSA is not a condoned practice.   That's exactly

20   what the Behlen court held from the Eleventh Circuit:   Where

21   the gravamen of the complaint challenges conduct and

22   disclosures in connection with the purchase of securities, it's

23   preempted.

24             THE COURT:   I'm sorry.   Where it challenges?

25        MS. HACKETT:   Challenges our disclosures and our

1 statements or our failure to make statements and our conduct in

2 connection with the purchase of securities, it's preempted.

3       THE COURT:  Whoa.  Where it challenges conduct, not

4 misrepresentations or omissions but charges simply conduct in

5 connection with the purchase or sale of securities?

6       MS. HACKETT:  Your Honor, here they have tried to

7 challenge all.  I absolutely concede that one of the elements

8 for SLUSA preemption is you must have misrepresentations and

9 omissions in connection with the purchase of securities.  But

10 in Beckett, in Beckett, every reference to omission and

11 misrepresentation was removed, every reference.  There the

12 court held, citing Bowinski from the Third Circuit, and they

13 could have cited Behlen from the Eleventh Circuit, that the

14 gravamen, we all see what it is, we're not going to play games

15 with pleadings and let you try to plead around SLUSA.  That's

16 exactly what Judge Mukasey said to these very same plaintiff's

17 counsel in Hughes.  It's not a game.

18       This, your Honor, is the 23rd complaint Bank of

19 America has responded to.

20       THE COURT:  In this case this is the proposed second

21 amended complaint that the plaintiff is asking for, right?

22       MS. HACKETT:  Yes, your Honor, it is.

23       THE COURT:  I have not yet dismissed the complaint.

24 The plaintiff has filed a second amended complaint, but there

25 has been no decision from me.  Correct me if I'm wrong.

1          MS. HACKETT:  There has been no decision here, your

2     Honor.  But as referenced in the Siepel decision, forum

3     shopping and gamesmanship with pleadings should not be

4     tolerated.  I appreciate the distinction here that Mr.

5     Greenfield is not on the papers.  I appreciate that the 23 have

6     not been filed here.  But I do not think that the Court can

7     cast a blind eye to what these defendants have been through.

8     This case was filed to obtain an MDL.  That request was denied.

9     I do think that the Court cannot look at this case in a vacuum.

10          THE COURT:  So we are left with this appendage, not an

11     MDL, just this case that's before me, where there has been a

12     request to file an amended complaint, no decision so far

13     dismissing the complaint, a plaintiff who says if this

14     complaint isn't good enough, give me another opportunity.

15          MS. HACKETT:  Your Honor, may I address another

16     argument in opposition to amendment?

17          THE COURT:  Sure.

18          MS. HACKETT:  The reason I submit, your Honor, that

19     these cases evolved asserting misrepresentation and omission

20     for so long is that the state law of Missouri permits the bank

21     to do exactly what it did here.  They can call itself-dealing

22     and they can call it double-dipping, but under Missouri law the

23     bank was allowed to invest the trust assets in its affiliated

24     mutual funds and it was allowed to accept its trust fee and the

25     mutual fund fee.

797rlulm

```
 1            THE COURT:  Why, then, would the best procedural
 2   posture not be to allow the plaintiff to amend to make it
 3   absolutely clear that the plaintiff was not relying on any
 4   misrepresentations or omissions such as those in paragraphs 33,
 5   37, 49 to 50, and you make a motion to dismiss the amended
 6   complaint that the plaintiff asks to file on the grounds that
 7   without material misrepresentations or omissions there is no
 8   viable claim because the actions were perfectly consistent as a
 9   matter of law with what the bank was allowed to do?
10            MS. HACKETT:  Your Honor, we have done that.  They
11   filed the complaint, we moved to dismiss based upon SLUSA
12   preemption.  They took their swing and tried to excise out.
13   They even claim in their brief, we have excised it all out,
14   this is not a claim about misrepresentation and omission.
15            I am bound, the defendants are bound, by what's in the
16   amended complaint.  So are the plaintiffs.  They had that
17   opportunity.  They tried to do that.  And they recognize, I
18   submit, your Honor, that if they don't keep in the
19   misrepresentations and omissions, they face a significant
20   hurdle under state law.
21            Your Honor, you could grant that motion yet again.
22   Although not specifically asked for in a motion by the
23   plaintiffs, there's a reference in their brief please let us
24   amend again.  But we have been there.  We have done that.  They
25   had that opportunity, and we have done that many times before.
```

797rlulm

1          THE COURT:  But not many times before in this case.

2          MS. HACKETT:  I agree, your Honor, I do agree.  You

3   are correct.

4          THE COURT:  The fact that this Court or other courts

5   act in a careful and prudent manner shouldn't be a cause of

6   frustration for a defendant.  If the defendant thought that the

7   plaintiff were truly abusive, there are remedies under the

8   rules.  But the standards for applying those remedies are quite

9   high, and for good reason.  There is nothing in the law that

10  says you have to rush to the end result.

11         You say, we've been sued many times.  Well, in this

12  particular case the Court has not yet decided the first motion

13  to dismiss.  You're quite confident that if the plaintiff were

14  to amend its complaint, that that amended complaint properly

15  scrubbed would not survive a motion to dismiss.  If that's

16  right, then the case would be over at that point.

17         But you want to rush that process in various ways.

18  You want to say, oh, well, this is the last case, so dismiss on

19  the first-filed rule in favor of another case that's not

20  pending, or dismiss the case because they cannot replead in

21  such a way that gets them out of the state law defense, which

22  is not really fully briefed, because the complaint still

23  includes other things which the plaintiff says the plaintiff

24  can take out.

25         MS. HACKETT:  Your Honor, you are absolutely correct.

797rlulm

1    I am not pressing for rush to judgment.  Forgive me if I

2    express some of my client's desire to stop paying me fees.

3    It's been five years and it's been court to court.  I do

4    appreciate that, your Honor.

5           THE COURT:  In deference to the numerous other cases

6    that you have defended, you could offer to turn off the meter.

7           MS. HACKETT:  Not if Andrew and I would like to

8    continue to be employed.

9           THE COURT:  If you have successfully gotten the

10   dismissal of 22 other cases, perhaps your client wants to

11   continue to pay you.

12          MS. HACKETT:  I appreciate that.

13          THE COURT:  And you have made every effort to stop it

14   here.

15          MS. HACKETT:  I have.  Thank you, your Honor.  But I

16   do, your Honor, believe where they have been given that

17   opportunity once already in this case, how many times are we

18   going to go through that?  You can see from the face of this

19   complaint, even if you took those out under Beckett and

20   Behlen -- and this is what the judge found in Siepel, it's

21   exactly what he found.  There he had a new complaint before

22   him, a proposed amended complaint.  Here we have the offer to

23   take it out.

24          THE COURT:  How do I know how successfully the

25   plaintiff will scrub the complaint?

797rlulm

1    MS. HACKETT:  But even if they do, your Honor, still

2   the gravamen of this case is challenging fees, challenging

3   policies, challenging conflicts, and what we told them in

4   breach of fiduciary duty.  That is the gravamen, just like

5   under Beckett, where the court said, OK, you've taken every

6   misrepresentation and omission out, that doesn't permit you to

7   try to get around SLUSA.  And that's what they are asking to do

8   and that's expressly what the Beckett court rejected.

9       So, your Honor, I submit, based on futility and

10   because we have been there, their request to amend again should

11   be denied.  Thank you.

12       MR. COBRINIK:  Good afternoon, your Honor.  There is

13   another decision that they didn't give you in the great big

14   appendix of cases.  Three weeks ago Judge Haight decided a case

15   called LaSalle v. Bank of Cyprus.  I'll give you the cite for

16   it.  It's 2007 U.S. Dist. LEXIS 60142 decided August 15th.

17       In that case he actually dismissed the claim both on

18   SLUSA grounds and also on forum non conveniens grounds.  It

19   arose out of a bump-and-dump scheme.  But he said a couple of

20   very interesting things that apply to this case that show where

21   this case is different from the cases cited by Bank of America.

22       The first thing he said basically is that mere

23   allegations of fraud or misrepresentation in a complaint don't

24   mean that you automatically get to dismiss the complaint on

25   SLUSA grounds.  Those allegations of misrepresentation and

7797fluim

 1   fraud have got to be integral to your cause of action, to your

 2   claim.

 3            The second thing he says is that in this district,

 4   even after Dabit and after all these cases, the law is still if

 5   you want to dismiss on SLUSA grounds you've got to show that

 6   the claim is really a fraud claim.

 7            Taking out all the fraud claims in our complaint, what

 8   do we have?  We have a bank which is a fiduciary for a child.

 9   The bank decides at some point, you know what, we want to make

10   more fees, it's not going to benefit the child, it's going to

11   benefit us, so we're going to put this child's fiduciary

12   account into our own proprietary mutual funds and we're going

13   to generate fees for ourselves.  No allegations of fraud, no

14   allegations of misrepresentation.

15            THE COURT:  But there are.

16            MR. COBRINIK:  I'm saying if you take them out.

17            THE COURT:  But they're not taken out in this

18   complaint.

19            MR. COBRINIK:  No, not in this complaint.

20            THE COURT:  Do you really want me to decide the case

21   based on this complaint and determine whether this complaint

22   should be dismissed on the grounds of SLUSA without the

23   opportunity to replead or do you want the opportunity to

24   replead and file a complaint without allegations of

25   misrepresentation and omission?

797rlulm

1            MR. COBRINIK:  We are happy to replead.  We would like

2    to replead.

3            I think, though, just to show you what would be in a

4    repleaded complaint, you have a fiduciary who makes a decision

5    that's in its own best interest, not in the best interests of

6    the child who it's entrusted to take care of the finances for,

7    and no representations of fraud or misrepresentation are

8    necessary to sustain that claim.

9            THE COURT:  The defendant says, if that's all the

10   claim is, they think that eventually that claim would be

11   dismissed.

12           MR. COBRINIK:  I would disagree with that.  What

13   Missouri law does and what the law of every state does -- there

14   used to be a blanket proscription barring bankers from

15   investing fiduciary accounts in their own proprietary mutual

16   funds.  The Missouri law lifts that blanket proscription.

17           It does not give carte blanche to a bank to decide we

18   don't care what's in the best interests of our charges, we as

19   fiduciary are going to do what's in the best interest of the

20   bank.  That's the issue.  I would submit to you that Missouri

21   law, not being carte blanche to do that, there is not going to

22   be a dismissal on the basis of that Missouri law.

23           THE COURT:  You want an opportunity to replead to make

24   it clear that you are not relying on misrepresentations or

25   omissions?

797rlulm

 1          MR. COBRINIK:  Correct.

 2          THE COURT:  OK.  Go ahead.

 3          MR. COBRINIK:  There are a lot of cases cited by the

 4   bank to the Court.  I would suggest to you that in each of

 5   those cases, all of them, what the case ultimately comes down

 6   to is there is a claim ultimately here for misrepresentation.

 7   Our case is different, and our case is different because we are

 8   dealing with a child.  It doesn't matter.  You can make all the

 9   accurate representations or inaccurate representations you

10   want.  We have a pure breach of fiduciary claim here.  That's

11   the difference.  I would leave it at that, your Honor.

12          THE COURT:  Yes?

13          MS. HACKETT:  Your Honor, the only point I would offer

14   in rebuttal to your Honor is if you review the Kutten decision,

15   that's exactly the argument that the plaintiffs raised in

16   Kutten.  There, like here, they took a swing to try to get all

17   the alleged misrepresentations and omissions out of that case,

18   and they argued exactly as they do in the brief here.  The

19   plaintiffs argue Kutten, it's quoted in Judge Magnuson's

20   decision.

21          This is a simple breach of fiduciary claim, any

22   alleged misrepresentations and omissions, if there are any, are

23   ancillary.  Judge Magnuson addressed that squarely and again

24   noted that gamesmanship of the pleadings in trying to get

25   around SLUSA is not tolerated.

797rlulm

1    He had an excellent discussion on the well-pleaded

2   complaint rule, where the court is required to look at the

3   gravamen of the complaint, and concluded that that argument in

4   the context of these claims, the same claims the plaintiffs

5   conceded are asserted here, are preempted under SLUSA.

6    Therefore, again, your Honor, I submit that argument

7   has no merit and that any amendment based on Judge Magnuson's

8   decision in Kutten would be futile.  Thank you.

9    MR. COBRINIK:  If I could respond to that?

10    THE COURT:  Yes.

11    MR. COBRINIK:  The decision in Kutten refers to part

12   of the oral argument where in that case counsel said part of

13   the breach of fiduciary duty here is that the bank was not

14   straight with beneficiaries of trust accounts.  In the scenario

15   that I just gave you, what our claim really is here -- I never

16   said the bank wasn't straight with anyone.  They could have

17   told us the exact honest truth.  It's not what they said, it's

18   what they did.  What they did is they took the fiduciary

19   account of a child and used that account to generate fees for

20   themselves, for itself.  That's it.

21    THE COURT:  I'm prepared to decide.

22    The defendants moved to dismiss on several grounds.

23   One of their principal arguments is that the plaintiff's claims

24   are barred as preempted by the Securities Litigation Uniform

25   Standards Act, otherwise known as SLUSA.

797rlulm

1          SLUSA provides that a state law claim must be

2     dismissed as completely preempted if (1) the lawsuit is a

3     covered class action, (2) the claim is based upon state law,

4     (3) the claim concerns a covered security, and (4) the

5     plaintiff alleges either a misrepresentation or omission of a

6     material fact or a manipulative or deceptive device or

7     contrivance that is "in connection with the purchase or sale of

8     a covered security."   15 U.S.C. section 77p(b), 78bb(f)(1).

9          The plaintiff disputes only the fourth criterion,

10    arguing in part that her claims are not based on

11    misrepresentations or omissions by the defendants but rather on

12    a "simple breach of fiduciary duty" and are therefore not

13    preempted.   In the alternative, the plaintiff asks leave to

14    amend her complaint.

15         SLUSA preemption applies when the substance of state

16    law claims involve misrepresentations or omissions that

17    coincide with the purchase or sale of securities without regard

18    to artful pleading.  Norman v. Salomon Smith Barney, Inc., 350

19    F.Supp.2d 382, 386 (S.D.N.Y. 2004); see Merrill, Lynch, Pierce,

20    Fenner & Smith v. Dabit, 125 S.Ct. 1503, 1513 (2006).

21         The plaintiff's amended complaint contains factual

22    allegations of misrepresentations and omissions by the

23    defendants in connection with the purchase or sale of covered

24    securities.  For example, the plaintiff alleges nondisclosure

25    of conflicts of interest and deceptive practices through the

797rlulm                                                                        23

1    use of credits.   See amended complaint paragraphs 33, 37, and

2    49 to 50.

3            However, SLUSA has "broad but not unlimited scope."

4    Spielman v. Merrill, Lynch, Pierce, Fenner & Smith, Inc., 332

5    F.3d 116, 123 (2d Cir. 2003).   Fiduciary duty and other state

6    law claims that do not expressly or impliedly rely on an

7    allegation of misrepresentation or omission or deceptive device

8    are not preempted under SLUSA.

9            See Norman, 350 F.Supp.2d at 385-88, (holding that

10   breach of fiduciary duty and breach of contract claims were not

11   preempted under SLUSA where the complaint alleged no allegation

12   of fraud, misrepresentation, or omission); see also Webster v.

13   New York Life Assurance and Annuity Corporation, 386 F.Supp.2d

14   438, 440-42 (S.D.N.Y. 2006); Paru v. Mutual of America Life

15   Insurance, 2006 WL 129282, at *3-*5 (S.D.N.Y. May 11, 2006);

16   Xpedior Creditor Trust v. Credit Suisse First Boston (USA) Inc,

17   341 F.Supp.2d 258, 261, 264-270 (S.D.N.Y. 2004) (finding SLUSA

18   preemption applies to explicit claims of fraud and

19   misrepresentation and other state law claims that "sound in

20   fraud" and declining to dismiss claims alleged).

21           The defendant asserts that if the misrepresentations

22   and omissions are omitted from the complaint, then the

23   complaint will be subject to dismissal, but the plaintiff

24   should be given the opportunity to amend to eliminate any

25   claims of misrepresentation and omission on which the plaintiff

1    claims it is not relying, and the defendant should be then

2    given the opportunity to move to dismiss what is left in an

3    amended complaint.

4            Federal Rule of Civil Procedure 15(a) provides that

5    after a responsive pleading has been filed, a party may amend

6    its pleading only by leave of court or by written consent of

7    the adverse party.  Federal Rule of Procedure 15(a).  Rule

8    15(a) provides that leave to amend the pleading shall be

9    "freely given when justice requires.  Id.; see also Foman v.

10   Davis, 371 U.S. 178, 182 (1962); Nerney v. Valente & Sons

11   Repair Shop, 66 F.3d 25, 28 (2d Cir. 1995).

12           The plaintiff asserts that if her complaint is read to

13   include claims of misrepresentations or omissions, she should

14   be given an opportunity to amend her complaint to make it clear

15   that she is not in fact alleging any misrepresentations or

16   omissions.

17           Based on the foregoing, the plaintiff should be given

18   an opportunity to amend the complaint to include only those

19   claims that do not rely on allegations of misrepresentations or

20   omissions by the defendants which the plaintiff says she is not

21   relying on.  The plaintiff's motion to file an amended

22   complaint is therefore granted.  Therefore, the defendants'

23   motion to dismiss the current amended complaint is denied

24   without prejudice as moot.

25           The defendants can raise any claim or defense against

797rlulm                                                                                  25

1    the plaintiff's newly filed amended complaint.   The plaintiff

2    should file any new amended complaint within 15 days.   The

3    defendants should answer or move against any such amended

4    complaint 15 days within receipt of the second amended

5    complaint.

6            So ordered.

7            Good afternoon all.

8            (Adjourned)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MISSOURI
# EASTERN DIVISION

**FILED**

DEC 2 8 2005

U. S. DISTRICT COURT
**EASTERN DISTRICT OF MO**
**ST. LOUIS**

GEORGE SIEPEL; PHYLLIS SIEPEL;
H. CRAIG WILLIAMS; ELINOR TAMA
WILLIAMS; CONSTANCE ELAINE
WILLIAMS; DONNA N. REINKE;
ROBERT COHEN; CARL M. PAGE
and all others similarly situated,

**4  05CV02393CAS**

Plaintiffs,

v.

BANK OF AMERICA, N.A.;
COLUMBIA FUNDS SERIES TRUST
f/k/a/ NATIONS FUNDS TRUST;
and BANK OF
AMERICA CORPORATION,

Defendants.

Case No.

JURY TRIAL DEMANDED

CLASS ACTION

## COMPLAINT

COMES NOW plaintiffs George Siepel, Phyllis Siepel, H. Craig Williams, Elinor Tama

Williams, Constance Elaine Williams, Donna N. Reinke, Robert Cohen and Carl M. Page, on

behalf of themselves, and for all other members of the Class hereinafter described, by and

through counsel, seek damages from the defendants and injunctive relief and state and allege as

follows:

## BACKGROUND

1.    Defendant Bank of America, N.A. (the "Bank") and its parent, defendant Bank of

America Corporation ("BAC") are multi-national behemoths which have acquired financial

institutions throughout the country, including, within this District, the former Boatmen's Trust

Company and its affiliated entities. In connection therewith, it engages in highly sophisticated

"asset gathering" pursuant to which it seeks to and does attract relatively wealthy people to its so-

called "Private Bank" the purposes of which are, *inter alia*, to seek such persons' designation of the Bank as Trustee, Personal Representative of estates and other roles as a corporate fiduciary.

2. In carrying out such "asset gathering," the Bank prominently and falsely advertises its promise and holds itself out to persons such as plaintiffs and the members of the Class who do business with its "Private Bank":

## **BANK OF AMERICA [LOGO] HIGHER STANDARDS**

### THE PRIVATE BANK

**Managing today's complex wealth.**

**Balancing growth, risk, taxes**

**and grandchildren.**

As your financial resources increase, perhaps you need more financial resources to manage them. The Private Bank of Bank of America has greater depth and breadth of wealth management expertise – across the financial spectrum – than any other private bank. Equally important, we bring this expertise together, creating more integrated solutions to your complex needs. And we provide these customized recommendations based on the extraordinary strength and stability of Bank of America.

It's no wonder we've been entrusted to manage, protect and pass on wealth for more than 150 years.

*The Private Bank is dedicated to serving affluent families and individuals with complex wealth management needs. Our experienced advisors customize unique and comprehensive solutions for each individual, integrating world-class investment management, trusts, credit and*

2

*bank services. We welcome the opportunity to work with you. We invite you to call Caroline Grace at 800.863.9500 or visit www.bankofamerica.com/privatebank.* [Emphasis in original].

3. In fact, despite numerous substantially similar promises in the form of advertising, marketing pieces and direct representations to those who established fiduciary accounts with the Bank (and the beneficiaries thereof), as described herein, those promises have been and are being uniformly ignored or deliberately broken. In the context of their numerous acquisitions of other financial institutions to create a nationwide "wealth management" business, Messrs. McColl, Hance and Lewis centralized the functions of the Acquired Banks into the Bank's own template, forcing more and more fiduciary accounts to be "serviced" by Call Centers and as many of such accounts' assets into the Bank's proprietary mutual funds, the Nations Funds. In the course of carrying out their "master plan," they and their confederates at the helm of NFT sacrificed the interests of the beneficiaries of the affected fiduciary accounts in favor of the defendants' "bottom line" as described herein.

## ACQUISITIONS OF OTHER FINANCIAL INSTITUTIONS

4. Over the course of the last 15 years, the Bank and BAC have made numerous acquisitions of other financial institutions throughout the United States, many of which acquisitions were driven by their former Chairman and Chief Executive Officer, Hugh L. McColl, Jr. assisted by his subordinates, Kenneth Lewis, current Chairman and Chief Executive Officer and James H. Hance, Jr., former Vice Chairman and Chief Financial Officer, whom Mr. Lewis described as "one of the key architects of [BAC and the Bank] as it has grown to be one of the largest financial service providers in the world."

5. A press release issued by the Bank on July 28, 2000, shortly after it had put into operation a corporate-wide plan to eliminate many of the investment-related and other services to

3

beneficiaries of fiduciary accounts as described herein, explained, in part, how Messrs. McColl.

Lewis, Hance and their subordinates were going to carry out this plan, including the elimination

of those personnel who provided services to fiduciary account beneficiaries while at the same

time increasing the fees paid by them:

> As part of these initiatives, the company will eliminate between 9,000 and
> 10,000 positions mostly during the next 12 months, in order to reallocate
> resources. The principal focus of these reductions will be in middle and
> senior management and positions eliminated as a result of process
> improvements. These reductions will take place across the company's
> franchise. The company now employs about 150,000 people.
>
> "We have been saying for some time that our days of growth by merger
> and acquisition are behind us," said Chairman and Chief Executive Officer
> Hugh L. McColl, Jr. "For the most part, our merger transition work also is
> behind us. We have successfully built a company with unlimited potential.
> To date, despite our many successes in individual businesses, we have not
> made the degree of progress we would like toward realizing that potential.
> We've assembled the right parts, but after years of additions, our resulting
> structure is neither as efficient, nor as effective as it needs to be. We're
> going to fix it in order to take advantage of our revenue opportunities."
>
>        *   *   *
>
> Lewis also announced steps to boost productivity. First, he said, the
> company intends to eliminate management layers, giving top executives
> more direct responsibility for customer service. Second, it will overhaul
> processes and organizational structures to simplify and expedite banking
> transactions for customers and deliver financial solutions that lead to
> profitable relationships. These changes, which are still being designed,
> could affect everything from credit underwriting procedures to call center
> technology and are heavily weighted toward enhancing revenue growth.
>
>        *   *   *
>
> Vice Chairman and Chief Financial Officer James H. Hance, Jr. said the
> company plans to take a charge of $300-350 million after-tax in the third
> quarter, primarily to cover severance costs related to the initiatives
> announced today. Productivity gains are expected to pay for severance and
> other related costs in approximately one year. Hance added that a
> substantial portion of these savings will be earmarked for reinvestment.

4

6.    Mr. Hance also emphasized what the acquisitions of other financial institutions

was intended to accomplish for BAC and the Bank. In a November 19, 1998 speech in St. Louis,

he said:

> We also are diversifying our revenue stream away from dependence on
> gathering deposits and lending them and toward fee income. The latter is
> now about 40 percent of our total revenues, and our goal is to push fees to
> more than half of revenues in a short period of time.
>
>                     *    *    *
>
> The leverage as you increase the assets of a fund is significant.
>
>                     *    *    *
>
> **The most obvious advantage of scale is cost. Perhaps the best
> advantage is the exploding world of mutual funds. As the second
> largest player among banks, we have achieved significant scale. The
> leverage as you increase the assets of a fund is significant. After all,
> one money manager can manage $5 million or $50. So as you get
> bigger, you get much, much more profitable.**
> [Emphasis added]

7.    On April 17, 1998, the San Francisco Business Times noted with respect to the

acquisition/consolidation strategy of Mr. McColl:

> With the acquisition of BankAmerica, NationsBank, CEO Hugh McColl Jr. has
> finally realized his manifest destiny, a decade-long quest to build a coast-to-coast
> bank.
>
>                     *    *    *
>
> Those familiar with McColl's style can already see the early signs that the former
> Marine's typical acquisition strategy is under way. The folksy, Southern charm of
> McColl and his troops belies a finely tuned merger machine in which an acquired
> institution's culture and identity are efficiently blended into NationsBank. The
> Charlotte bank has digested more than 70 deals since 1980. With that level of
> experience, the bank is not likely to repeat the customer service problems that
> arose from another San Francisco merger, Wells Fargo's purchase of First
> Interstate Bank."

8. During a speech he delivered in Charlotte on May 26, 2004, Mr. Lewis, in

explaining how BAC and the Bank could justify the high-cost acquisitions of other banks in

financial terms said:

> In deliberating the wisdom of [their most recent] merger, much of the
> discussion outside the company has focused on expense savings and
> efficiencies. That's understandable- the history of mergers in our industry
> has been all about expense leverage. I believe expense savings and
> efficiency in this merger are critical, but only as a starting point.
>
> Mr. Lewis' explanation of how BAC and the Bank could squeeze
> "savings and efficiencies" from BAC's then most recent acquisition was
> reinforced in the business media several months later in April 2004 by
> David Pauly, writing for Bloomberg News:
>
> In October, [BAC] CEO Kenneth Lewis announced the $48.1 billion
> takeover of Fleet Boston Financial Corp.-thereby infuriating Bank of
> America shareholders who said Lewis had committed himself to managing
> the company's myriad acquisitions of the past.
>
> *   *   *
>
> Lewis offered Fleet Boston stockholders a premium of 43% above the
> market price. A lot of jobs will have to go to make up for the excessive
> payment.

## JURISDICTION AND VENUE

9. This Class Action is brought by plaintiffs on their own behalf and on behalf of all

other members of the Class defined below, arising out of, *inter alia*, breaches of fiduciary and

contractual duties owed by the defendants Bank of America, N.A. (the "Bank") , the Bank's

parent, Bank of America Corporation ("BAC") and Columbia Funds Series Trust f/k/a Nations

Funds Trust ("NFT"), controlled by the Bank and BAC to certain beneficiaries of fiduciary

accounts for which the Bank serves and/or served as fiduciary. In addition, certain claims are

asserted by plaintiffs against the Bank on behalf of Sub-Classes as defined below. Unless the

6

context indicates otherwise, the term "Class" includes members of the Sub-Classes and their respective representatives.

10.    The substantive claims asserted herein arise under and pursuant to state statutes and common law.

11.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1711, the Class Action Fairness Act of 2005, and 28 U.S.C. § 1367. The amount in controversy exceeds $5,000,000 exclusive of interest and costs and there is diversity of citizenship between and each of the defendants. Significant conduct of the defendants as described herein occurred within the State of Missouri and the Eastern District of Missouri, the principal office of the so-called "Private Bank" of defendant Bank. Further, each of the defendants presently conducts and/or has conducted business within and/or can be found and/or conducted significant business operations within this District during the time period of the wrongdoing alleged herein. Each of the defendants had continuous and systemic contacts with this District by reason of, *inter alia*, their common scheme, plan and conspiracy set forth below, to foist upon the fiduciary accounts of plaintiff and all members of the Class shares of the proprietary mutual funds of defendants including, in particular, those of defendant NFT, which funds were known as "Nations Funds" and are presently in the process of being re-named "Columbia Funds". Accordingly, this Court has personal jurisdiction over the defendants pursuant to §506.500 R.S.Mo.

12.    Venue is proper in this District as many of the acts and practices complained of herein had their origin in and/or occurred in substantial part in this District. Further, many of the most significant witnesses to the wrongdoing referred to herein are found in and/or did business within this District and will only be available for trial purposes in this District. Plaintiff Cohen resides in

7

this District, as do large numbers of the members of the Class. In addition, a substantial amount of

documents relevant to this dispute are located in this District. Further, pending in this District is

*Kutten et al v. Bank of America, et al*, Case No. 4:04-cv-244 ("*Kutten* case") in which many of the

claims of the Class herein have previously been asserted and are presently pending.

13.    In connection with the acts alleged in this Complaint, defendants, directly or

indirectly, used the means and instrumentalities of interstate commerce, including, but not

limited to, the mails, interstate telephone communications and the facilities of the national

securities markets. Each of the defendants, directly and/or through agents, affiliates and/or

independent contractors distributed Nations Funds prospectuses within and otherwise marketed

Nations Funds shares to members of the Class residing in this District, all of which conduct

originated within and or outside the State of Missouri.

## THE PARTIES

14    (a)    Plaintiff Donna N. Reinke is a citizen of the State of Washington and is a

beneficiary of the Estate of Margaret Spencer, who died on September 11, 2001. ("Spencer

Estate" or the "Estate") The Bank, together with two individuals, Neil MacKinnon and William

Morris, were the Co-Executors of the Spencer Estate, the assets of which were invested until

December 2003, when the remaining cash was distributed to plaintiff Reinke and the other

beneficiaries of the Estate. Although the physical administration of the Estate was carried out in

the State of Washington and it was probated by a Washington probate court (the Superior Court),

the weight of the conduct giving rise to plaintiff Reinke's claims as asserted herein; i.e. the

appropriateness of investing fiduciary assets in shares of the Bank's proprietary mutual funds,

was in this District, which was the focal point for the wrongdoing alleged herein. Although

plaintiff Reinke signed a Receipt and Waiver of Notice of Filing  Declaration of Completion of

8

Probate on March 6, 2004, she was induced to do so by the filing of a false and misleading Declaration of Completion of Probate which, *inter alia*, concealed from plaintiff Reinke and the Superior Court that the Bank, as Personal Representative, had engaged in self-dealing; that it had purchased shares of the Nations Funds knowing that alternative investments could have been purchased for the Estate with higher investment yields with comparable safety; that the prospectuses distributed to plaintiff Reinke in connection with the Nations Funds were false and misleading in material respects as set forth below and did not adequately disclose to her "the true direct and indirect expenses charged by Nations Funds"; that the *Kutten* case had been commenced, as had other claims been asserted by other beneficiaries of the Bank's fiduciary accounts; and certain of the other facts set forth below which had impacted negatively upon the assets in the Spencer Estate account. Thus, plaintiff Reinke's acknowledged receipt of "all to which she is entitled from the Personal Representative" was induced fraudulently. As such, the discharge of the Personal Representatives is and was a nullity, as were all other similar releases and discharges obtained by the bank from beneficiaries of fiduciary accounts.

(b)    Plaintiff Robert Cohen is a citizen of the State of Missouri and is a beneficiary of an Individual Retirement Account (the "IRA") over which account the Bank has investment authority as a corporate fiduciary.

(c)    Plaintiffs H.Craig, Elinor Tama and Constance Elaine Williams (the "Williams Plaintiffs") are citizens of the States of Florida and Pennsylvania and are siblings who were beneficiaries of trusts set up by their father, Heberton F. Williams ("H.F.Williams") pursuant to the terms of the Last Will and Testament of H.F.Williams. The Bank, as the successor-in-interest to the original Trustee, was the principal Trustee of the Trusts established pursuant thereto (the "Williams Trusts"). The original Trustee bank was First National Bank and

9

Trust Company of Jupiter/Tequesta which, in turn, was acquired by and merged into First Marine Bank & Trust Company which, in turn, was acquired by and merged into Barnett Banks Trust Company, N.A. which, in turn, was acquired by and merged into Nations Bank, N.A., now known as Bank of America, N.A. following the acquisition of Bank of America National Association by and merger into Nations Bank, N.A. At the outset, H.F. Williams wife, Jean, was the Co-Trustee with the Bank. The Williams Plaintiffs commenced a class action against the Bank and BAC in the Circuit Court of Palm Beach County in December 2002, Case Number 02-15454. BAC was dismissed as a defendant by the Court therein and such dismissal is the subject of an appeal. As such, the Williams Plaintiffs do not assert claims against BAC in this action. The remaining claims against the Bank were voluntarily dismissed by the Williams Plaintiffs in November 2005.

(d)     Plaintiffs George and Phyllis Siepel are citizens of the State of Illinois who are beneficiaries of the William J. Benstein and Agnes V. Benstein Residuary Trust ("Benstein Trust"), an Iowa trust of which United Central Bank of Des Moines, N.A., a corporate predecessor of the Bank, was Trustee.

(e)     Plaintiff Carl M. Page is a citizen of the State of Oregon who is a beneficiary of the Janet P. Wilson Trust, a New Mexico trust of which the Bank is Trustee through a Call Center.

15.     Defendant BAC is a Delaware holding company which owns the shares of numerous subsidiaries including those of defendant Bank which, over the last decade, has acquired numerous other banks and financial institutions and merged them into it at the direction of, *inter alia*, their respective Chief Executive Officers, Hugh McColl, Jr. and Kenneth Lewis. Although the Bank and BAC now have their principal places of business in Charlotte, NC, they

10

do conduct substantial business within this District in many locations through the Bank's "Private Bank" and through other business operations.

16.     Defendant NFT, is a Delaware statutory trust and is a controlled affiliate of the other defendants. Defendant NFT is nominally controlled by a Board of Trustees pursuant to Delaware statutory law and the provisions of the Investment Company Act of 1940. According to defendant NFT, it is governed by a Board of Trustees, a majority of which have nominally been "dis-interested" and elected by its shareholders and/or appointed by the very same Board of Trustees who have effectively "marched" to the Bank's orders. Additionally, defendant NFT states that the "shareholders of [NFT] are the various persons and entities that own the shares of the mutual funds in the Nations Funds family"; i.e. the fiduciary accounts which are or were the subject of this litigation and the beneficiaries thereof, plaintiffs and members of the Class, among others. Notwithstanding their beneficial ownership of the shares which would otherwise control the election of defendant NFT's Board of Trustees, upon information and belief, the Bank has taken for itself such voting rights and uses them to, *inter alia*, retain its domination and control over defendant NFT, the identity of its Board of Trustees (including the nominally independent members thereof), the selection of investment advisors to the Nations Funds, the Nations Funds themselves and otherwise. The Bank, upon information and belief, either holds in its capacity as a fiduciary or otherwise, sufficient numbers of the shares of the various Nations Funds that it is a "control person" of the NFT as such term is defined under the federal securities laws. The complete domination of NFT and the Nations Funds themselves is so pervasive that as a Vice President of the Bank, Ted Scharch, in defining the relationship between the Bank and the Nations Funds, claimed that the Bank owns the Nations Funds, a perception believed to be common among employees of the Bank. Such "ownership" also includes operating the Nations

11

Funds for the benefit of certain corporate and business customers of BAC and the Bank and putting the relations with such customers (and the profits derived therefrom) before the interests of plaintiffs and members of the Class. NFT conducts business within this District by means of, *inter alia*, its distribution of prospectuses and other offering materials of the Nations Funds family of mutual funds through the Bank and its subsidiaries and sister companies, its marketing and sale of shares of such funds, primarily distributed by and through the Bank, BAC and/or their subsidiaries, agents and independent contractors. Upon information and belief, NFT has also maintained an office within this District during the time period relevant to this litigation. As reported in the March 19, 2004 issue of the Charlotte Business Journal, "Bank of America Corp. will close its St. Louis Nations Funds office....shutting an operation that once had 30 analysts and mutual fund managers. The decision to disband the office and consolidate Nations Funds personnel in New York was made last summer, and the remaining handful of staffers in St. Louis will be given severance packages..." As such, defendant NFT maintained long-standing contacts with and a continuous presence in this District and uniformly entered into contracts with subsidiaries and affiliates of each of the other defendants to provide advisory and other services for the Nations Funds, of which contracts plaintiffs are third-party beneficiaries.

17. At all relevant times, the investment decisions of the Spencer Estate were made by the Bank or entities controlled by its parent, BAC or subsidiaries or affiliates thereof. All references herein to the Nations Funds also include, to the extent the defendants have changed the Funds' names, to Columbia Funds. Although certain ministerial activities were carried out in connection with the Spencer Estate by Messrs. MacKinnon and Morris, all policy decisions relating to the subject matter of this litigation, including the investments of the assets of the Spencer Estate in the Nations Funds, were made at the corporate level by the defendants, which

12

decisions originated with the Bank's "Private Bank" and otherwise in St. Louis and in Charlotte, NC, the corporate headquarters of the Bank and BAC. Similarly, the investment decisions by the Bank with respect to the Nations Funds purchased for plaintiff Cohen's IRA, for the Williams Trusts, the Wilson Trust and the Benstein Trust were principally made or directed from St. Louis and Charlotte, notwithstanding any local contacts that might have existed. The handling of the assets of the accounts of the Spencer Estate, the IRA account and the accounts for the Williams, Wilson and Benstein Trusts by the Bank has not been materially different from its handling of the other fiduciary accounts over which the Bank was and/or is serving as corporate fiduciary with respect to its investment of fiduciary assets as described in this Complaint.

18.    Defendant NFT is the holding/operating entity BAC formed to conduct business as the Nations Funds, with its principal place of business at One Bank of America Plaza, Charlotte, NC. Although nominally independent and supervised by its Board of Trustees, defendant NFT has at all relevant times been operated as an *alter ego* of defendants and their respective subsidiaries. Upon information and belief, all the members of the Board of Trustees of NFT were selected and/or approved by the other defendants and their respective subsidiaries. Until recently, in connection with the settlement of certain claims brought against the Bank and its subsidiaries by the Securities & Exchange Commission, no outsider had any role whatsoever in the selection and re-election of NFT's Trustees other than the Bank, BAC and their senior officers. As such, the Bank and BAC controlled NFT and the Nations Funds operated by it. The Nations Funds and other funds controlled by the defendants are generally referred to in the financial community as the Bank's proprietary funds and, even within the Bank, its executives refer to the Nations Funds as "owned" by the Bank.

13

19.     Defendant BAC (through its subsidiaries) and other business entities not owned by defendant BAC individually and collectively, charge substantial fees and expenses to the Nations Funds and other proprietary mutual funds for their purported services which, together with NFT's own operating expenses, have had a substantial cost to plaintiff Reinke (through her share of the Estate), plaintiff Cohen (through his IRA account), the Siepels, plaintiff Page and the Williams Plaintiffs (through their respective Trusts) and to other members of the Class where fiduciary assets have been invested in one or more of the Bank's proprietary mutual funds including, in particular, the Bank's proprietary "money market" funds which, according to the Bank's Vice President and Portfolio Manager, Darcy Johnson, who testified in the *Kutten* case, have expense ratios which are "at least double" those of Vanguard Money Market Funds. The Bank has informed its Trust Officers and Portfolio Managers that "the use of outside mutual funds in fiduciary accounts is in violation of [its] corporate investment policy" and, as set forth below, it takes steps to coerce Portfolio Managers not to violate such policy.

## THE NATIONS FUNDS

20.     NFT holds a "family" of many mutual fund portfolios (which, when re-named Columbia Funds following the merger of certain of such Funds with and into Nations Funds will number more than 100), which are proprietary funds nominally operated by NFT and its Board of Trustees. They are, in fact, as indicated above, directed and controlled by BAC and its subsidiaries, as are others of the defendants' proprietary funds (e.g. Marsico Funds). In addition to being an entity controlled by the other defendants, defendant NFT and its Board of Trustees had actual and/or constructive knowledge of the circumstances of the wrongdoing committed by the other defendants including, in particular, using the fiduciary assets of plaintiffs and the

14

members of the Class to bulk up the Bank's proprietary mutual funds for improper purposes as set forth herein. The acceptance of the fiduciary funds of plaintiffs and members of the Class to purchase shares of the Nations Funds under the circumstances described herein amounted to an acceptance by defendant NFT and each of its Trustees of those assets subject to the pre-existing fiduciary relationship between the Bank and the beneficiaries of such funds. Given the intertwined relationship among the defendants with respect to the investment of the assets of the fiduciary accounts of plaintiffs and the Class, the knowledge of each of them as to how and why the fiduciary funds were being invested (including the Bank's improper motives) each defendant, including NFT, was and/or is a fiduciary and/or acted in furtherance of the Bank's fiduciary responsibilities and, thus, aided and abetted the Bank in the commission of the wrongdoing alleged herein. Defendant NFT and each member of its Board of Trustees including, in particular, William P. Carmichael, William H. Craig, Thomas F. Keller, Carl E. Mundy, Jr., Cornelius J. Pings, Minor M. Shaw, Charles B. Walker, Edmund L. Benson, James B. Sommers and Thomas S. Word, Jr.(each of whom designated his mailing address at the headquarters of BAC and the Bank and few, if any, was capable of fulfilling his fiduciary responsibilities due to non-NFT obligations and otherwise) knew or should have known that they were assisting the Bank in breaching its fiduciary duties to plaintiffs and the members of the Class. At times relevant herein, in conspiracy with the Bank and BAC, subsidiaries of such defendants were selected and/or retained by NFT and its Board of Trustees, each of whom purported to "oversee" at least 78 (now more than 100) separate mutual funds, as advisors to the various Nations Funds on a "no-bid" basis. Additional subsidiaries of the Bank and/or BAC were also selected and/or retained on a "no-bid" basis to provide administrative services to the Nations Funds. As such, given the practical impossibility of actually "overseeing" the Nations Funds consistent with their fiduciary

15

duties, NFT's Trustees permitted the advisory fees and other expenses charged to the various
Nations Funds to be established and maintained by NFT at artificially high levels, all of which
was to the disadvantage of the holders of shares of the various Nations Funds, including the
fiduciary accounts of the Spencer Estate and the IRA, of which plaintiffs Reinke and Cohen were
beneficiaries, respectively, as well as the beneficiaries of the Benstein, Wilson and Williams
Trusts. In furtherance of such conspiracy with the other defendants, at no time have NFT or its
Trustees sought investment advisors or providers of services to the Nations Funds other than
subsidiaries of the Bank and BAC, other than in certain specialized areas, where sub-advisors
were retained or where otherwise necessary, thus unnecessarily increasing the operating expenses
of the affected Nations Funds. By acting as described herein, NFT and its Trustees aided and
abetted the Bank in the breach of its fiduciary duties to the members of the Class, which NFT and
its legal counsel facilitated by generating deceptive Nations Funds prospectuses and other
"disclosure documents" which concealed material facts with respect to the Conversions and
otherwise. Such material facts were concealed from, *inter alia*, the beneficiaries and co-
fiduciaries of the affected fiduciary accounts, as well as the Comptroller of the Currency, which
cautioned BAC to carry out the Conversions consistent with the Bank's fiduciary obligations and
the Securities and Exchange Commission, which had it been informed of the Bank's
misrepresentations and omissions of material facts in connection with the sale of Nations Funds
shares, would not have permitted the Conversions to take place.

21.     The Nations Funds' portfolios cover a wide variety of investment disciplines,
strategies and types of asset categories including, *inter alia*, the Nations Municipal Income
Funds, the Corporate Bond Portfolio; the Nations Small Company Fund; Nations Large Cap
Index Funds and Nations Cash Reserves.

16

22.    Certain of such Nations Funds were funded by the Bank, in substantial part, or "bulked up," by transferring fiduciary assets in its control pursuant to the Conversions or otherwise to one or more of the defendants' proprietary funds described herein. Such funding permitted the affected Nations Funds and other proprietary funds to have substantial asset bases, an important selling point to the defendants in marketing shares in the Nations Funds to potential retail purchasers thereof through the Bank, other subsidiaries of BAC and/or through other marketing channels. The Nations Funds selected for investment of fiduciary assets by the Bank were intended , in many cases, to "mirror" the categories of assets held in the Bank's fiduciary accounts prior to the Conversion of fiduciary assets held in other forms, including assets held in the Bank's Common Trust Funds and/or which were individually invested, when possible. The Spencer Estate, at the time of Ms. Spencer's death in 2001, included municipal bonds paying tax-free interest at an approximately 4% rate, corporate bonds paying interest at an approximately 5% rate and other fixed income instruments paying at a 5-6% interest rate. As to plaintiff Cohen, prior to the Conversion, the assets in the IRA were invested principally in diversified securities and then converted into shares of various Nations Funds. Substantially similar or identical Conversions were carried out by the defendants with respect to the Benstein, Wilson and Williams Trusts and the fiduciary assets in which all members of the Class had interests. Most of such assets not already in the defendants' proprietary mutual funds were liquidated immediately prior to the various Conversions carried out by the Bank around the country, either as part of so-called "Common Trust Funds" or in individually-managed accounts, such as that of the Estate. However, the over-riding objective of the defendants was the transfer of fiduciary assets, in whatever form, into shares of the Nations Funds or others of the Bank's proprietary funds. As to those fiduciary accounts of the Bank not subject to the Conversions, the Bank nevertheless made

17

and continued to make investments of the assets in those accounts in Nations Funds Money Market and other Nations Funds.

23.     Historically, the Bank and its predecessors invested the assets comprising the Spencer Estate, the IRA, the Williams, Wilson and Benstein Trusts and those of members of the Class primarily through individually managed portfolios or through so-called "Common Trust Funds," as well as stocks, bonds and other assets. In addition, some of the Bank's fiduciary accounts held interests in real estate (as did the Spencer Estate), businesses and other assets which were also "converted" into shares of the various Nations Funds and other proprietary mutual funds.  The cost of providing investment and related administrative services to the Bank's fiduciary accounts, pre-Conversion into proprietary mutual funds, was absorbed substantially by the Bank out of the fees it charged for serving as a fiduciary. Beginning some time prior to 1998, in order to, *inter alia,* generate incremental profits from its fiduciary operations and due to massive losses it had incurred from its traditional lending business and to generate savings to justify BAC's acquisition of other financial institutions as referred to above, the Bank and its predecessors, the Acquired Banks, developed various plans and schemes pursuant to which they sought to minimize their operating expenses with respect to fiduciary accounts and maximize their profit from this aspect of their business. BAC's plan included the consolidation and elimination of the previously existing trust departments of the Bank, including the Acquired Banks, with the objective of "servicing" fiduciary accounts and the beneficiaries thereof with fewer and fewer personnel, typically through "Call Centers" operated by the "Private Bank" of the Bank staffed, for the most part, by fungible functionaries, the principal function of which was to retain fiduciary assets within the Bank and to pacify or otherwise "stroke" complaining beneficiaries of those accounts. Pursuant to such business plans, the Bank and BAC decided to

18

utilize the assets within their control, including funds held by the Bank in fiduciary accounts, to fund a group of mutual funds (some newly formed with no operating history) and/or to add assets to such funds controlled by the defendants. These mutual funds included the Nations Funds as well as other mutual funds merged into them (including the Columbia Funds) which had been previously controlled by the Acquired Banks and other proprietary mutual funds (e.g. the Marsico Funds). Thereafter, due to numerous acquisitions, mergers and other transactions referred to above, consistent with their longer-term plan and scheme, BAC, the Bank and their senior officers determined that a substantial portion of the assets of the fiduciary accounts held by the Bank (and formerly held as fiduciary assets by the Acquired Banks), such as the accounts of the Spencer Estate, the IRA and the Benstein, Wilson and Williams Trusts, would be converted into shares of certain members of the "family" of Nations Funds, the management and investment decisions of which were controlled by subsidiaries of BAC and by the Bank and/or into shares of other proprietary mutual funds controlled by them (the "Conversions"). Upon information and belief, the Conversions were carried out with the direct participation or supervision of the senior-most officers of the Bank and BAC including, *inter alia*, David W. Fisher, former President of the Private Bank and former Chief Executive Officers, Hugh McColl and Kenneth Lewis, who conceived of such Conversions as a means by which additional revenues could be obtained for the Bank while, simultaneously, closing down or sharply curtailing the trust departments of Acquired Banks and eliminating the employees therein and replacing them with "Call Centers" which "economies" were mandated by, *inter alia*, the acquisitions of the Acquired Banks and the prices paid for them as referred to above. Neither the Bank's Trust Officers, Portfolio Managers or the ultimate beneficiaries of the affected fiduciary

19

accounts had any practical choice but to accept the Conversions that were forced upon them.

Darcy Johnson, raised the following question with her superiors with respect to the Conversions:

> "Why is this conversion happening? We have an efficient vehicle
> [Common Trust Funds] that doesn't have fees in it, and now we're moving
> to an efficient vehicle that does have fees."

> In response, her superiors at the Bank told her "that [the] train left the
> station. It's [the Conversion] going to happen" which she took to mean:
> "Don't bother complaining or discussing it, because it's—yes, there are no
> choices. The decision had been made."

24.     Through a complicated and barely comprehensible grouping of advisors, sub-advisors, subsidiaries and other affiliated and unaffiliated service providers, and without due regard to the conflicts of interest of the defendants, the defendants engineered a scheme to benefit themselves.

25.     Pursuant to this self-dealing scheme, the Bank effectively co-mingled its fiduciary functions with the other business activities of both the Bank and BAC as well as with the Nations Funds and thereby abdicated many of its traditional fiduciary responsibilities, functions and services to beneficiaries of fiduciary accounts. By "crossing the line" in this manner, the Bank's actions resulted in making investments for these accounts that resulted in higher total direct and indirect expense charges to the fiduciary accounts as compared to the trustee or similar fees historically paid to the Bank for, *inter alia,* active management of the fiduciary accounts' assets. Additionally, the Nations Funds typically generated lower net investment returns than other directly comparable mutual funds available to the Bank, including those offered by, *inter alia*, the Vanguard Group and Fidelity Investments. Indeed, the Nations Funds money market funds even generated lower investment returns than the Bank paid on deposits of cash to customers who walked in off the street for whom the Bank was not in a fiduciary relationship.

20

26.    Beginning in February 2000 or earlier and continuing for some time thereafter, the

Bank's "Private Bank" began sending out standardized form letters informing some co-

fiduciaries, beneficiaries of fiduciary accounts and others of the Bank's planned closing of its

"Common Trust Funds" and/or otherwise touting the so-called "benefits" of the Conversions,

which were then anticipated to take place on a rolling basis pursuant to carefully orchestrated

nationwide plans based, in part, upon the level of integration of the previously Acquired Banks

and other factors. Such letters, signed by David W. Fisher, then President of the Private Bank,

also coerced the recipients of the letter to authorize the Conversion of the fiduciary account

assets into shares in the Nations Funds. In particular, the Bank's letter said:[1]

> Using Nations Funds, we can provide trust and
> fiduciary accounts with an attractive mix of
> investments to pursue the accounts' investment goals.
> Nations Funds also offer the benefits of:
>
> > Daily valuation and liquidity
> > Newspaper performance listings
> > Broader potential diversification
> > Flexibility when making trust distributions

27.    In fact, there was little, if any, material substantive benefit to fiduciary account

beneficiaries from the Conversions that could not have been accomplished more efficiently and

at lower cost to the fiduciary accounts by other alternatives including by maintaining the *status*

*quo*.

28.    Indeed, the more significant of such so-called "benefits," could have been

accomplished by means of the Bank's "Common Trust Funds," investment of fiduciary assets in

---

[1] It is not presently known whether the Bank sent such a letter to beneficiaries of all of its fiduciary accounts or, in
the case of guardianships, the Bank's serving as Executor/Personal Representative of estates and with respect to
similar accounts, to the appropriate courts overseeing such accounts. Further, not all co-trustees and co-executors
received such a letter nor were their consents sought by the Bank. While the manner in which the Conversions were
carried out by defendants may have been different from state-to-state and/or based upon the identity of the Acquired
Bank, such differences were immaterial.

21

non-proprietary mutual funds and management of other assets. In fact, in furtherance of their objective of benefiting itself and BAC at the expense of plaintiffs and the members of the Class, the Bank made no significant, if any, effort to compare the expenses of operating the Nations Funds and other proprietary funds as compared to the thousands of other mutual funds in the marketplace which could have better served plaintiffs and the members of the Class, particularly those with better expense ratios and records of performance.

29. Similarly, the Bank made no effort to compare the management and historical performance of each of the Nations Funds and other proprietary funds with other available funds and fund advisors. Indeed, certain of the Nations Funds, at the time of the Conversions, were newly-formed and had no "track record." Thus, if the Bank was truly interested in obtaining for beneficiaries of fiduciary accounts the "benefits" it claimed to exist, or real benefits, it could have obtained them elsewhere on terms much more favorable to the fiduciary accounts within their control. With respect to those accounts so invested, the Bank could also have obtained most of such benefits by maintaining the *status quo* with its Common Trust Funds and/or individual investments. Curiously, on or about August 16, 1999, the Bank announced that "Common Trust Funds were to be valued at month-end instead of twice each month," despite the fact that computer software programs existed that could generate such valuations on a daily basis, which was one of the claimed benefits of the Conversions. The Bank's letter went on to threaten coercively those who received it:

> Any common trust fund units for which we have not received an authorization [by May 1, 2000] may be liquidated and the proceeds placed in a money market vehicle pending discussion about reinvestment. This liquidation could have adverse tax consequences depending upon the cost basis of the common trust fund units.

30.    In response to such coercion and the deceptive and unclear information provided by the Bank, upon information and belief, co-fiduciaries and beneficiaries of the fiduciary accounts and others who received it signed the enclosed form, thereby providing to the Bank their uninformed and fraudulently induced "consent" to the Conversions. Additionally, the Bank established a systematic program pursuant to which Trust Officers (typically Senior Vice Presidents and Vice Presidents) and others were induced to present the same coercive message to beneficiaries of fiduciary accounts who did not provide consents to the Bank with respect to the Conversion. At no time did such employees' oral presentations differ in any material substantive way from the "disclosure documents" (i.e. Nations Funds prospectuses, form letters from Mr. Fisher and uniform data sheets purporting to disclose the expenses of owning the various Nations Funds).

31.    Enclosed with Mr. Fisher's form letters sent to, *inter alia*, some beneficiaries of fiduciary accounts, co-fiduciaries, administrators of employee benefit plans and/or managers of foundations were various prospectuses and other documents which were drafted so as to conceal the motives of the Bank and BAC for the Conversions into the defendants' proprietary mutual funds, the benefits of the Conversions to them and their subsidiaries or the increased costs and expenses that would be incurred by the fiduciary accounts as a result of the Conversions. There was no explanation in plain English that would put the recipients of these documents on notice of the Bank's wrongdoing as referred to herein. In fact, the Bank and the lawyers who drafted these documents, including NFT's counsel and in-house counsel for BAC and its subsidiaries, used such language to conceal the fact that although in many cases there was a credit for certain of the post-Conversion investment advisory fees to be incurred by fiduciary accounts, the credits were

23

insufficient to overcome the substantially higher expenses that fiduciary accounts would bear post-Conversion and that the Bank intended to reduce or eliminate the credit as soon as practicable thereafter once consents were obtained and/or the Conversions completed. For example, with respect to the Spencer Estate, the Bank now admits that although it provided a "credit" of .30% (30 basis points) toward the fees it charged for serving as a fiduciary of the Estate, it calculated the advisory fees charged against the Nations Money Market Funds .37% (37 basis points) based upon the highest balance so invested, aside from all the other operating expenses such Nations Funds absorbed and which were passed along to the Spencer Estate in terms of lower investment yields. Further, in many other cases, there was no credit for the fiduciary fees charged by the Bank. Despite the outward appearance of independence of NFT and its legal counsel, who may have performed or been involved with the physical tasks of "drafting" them, the content of the Nations Funds prospectuses was effectively dictated by BAC, the Bank and their subsidiaries. Among other material facts these counsel concealed and thus excluded from the Nations Funds prospectuses was the fact that the various fees and expenses of the Nations Funds were determined unilaterally by BAC and/or its subsidiaries and the agreements with them were "no bid" and without any effort to determine whether these BAC subsidiaries were the most appropriate advisors or suppliers of other services to the Nation Funds or how their respective fees and other charges were determined. Indeed, with respect to the prospectuses used by the defendants for the Conversions, Robert Hitpas, a Senior Vice President of the Bank, as well as one who was responsible for overseeing numerous of the Bank's fiduciary accounts, testified in the *Kutten* case that he found them daunting, "full of legalese and fine print and they're very difficult to read."

32.     Apparently as a result of an agreement among the defendants, there was no credit against the fees charged by the Bank to its fiduciary accounts for the substantial operating expenses of the Nations Funds, which substantially reduced the net investment returns to fiduciary accounts, such as the account of the Spencer Estate, the IRA and the Benstein, Wilson and Williams Trusts. At no place in any of the prospectuses the defendants issued to beneficiaries of fiduciary accounts in connection with the Conversions did they disclose that all fiduciary accounts affected by the Conversions would be forced to bear substantially higher investment-related expense levels post-Conversion than those which preceded it, even allowing for whatever credits the Bank applied to its fees for serving as fiduciary. Indeed, upon information and belief, including information provided by one of the Bank's Trust Officers to a member of the Class, most of such credits, to the extent given, have now been substantially reduced.

33.     Significantly, at no time did the foregoing "disclosure" documents disclose clearly to a co-fiduciary, a beneficiary or other person interested in the affected fiduciary accounts the true additional direct and indirect expenses of the Conversion they were being asked to approve (although some of such "disclosures" were buried in the Nations Fund prospectuses) nor, in fulfillment of the Bank's fiduciary responsibilities, did the Bank make any personal efforts to insure that plaintiffs or others similarly situated understood the extent to which the Bank, NFT and BAC would benefit from the Conversions and how the plaintiffs' accounts and other fiduciary accounts would end up paying substantially more for the investment and related services that the Bank had historically supplied in partial consideration for the Bank's fees for serving as a corporate fiduciary.

34.     Upon information and belief, despite its ability to dictate the content of the Nations Funds prospectuses, at no time following the foregoing "disclosure" did the Bank make

any complete and candid disclosure of the full extent of the damages caused to the fiduciary accounts by the Conversions or other improper investments in the Bank's proprietary funds. Further, the defendants made no disclosure of the true motives of the defendants in carrying out the Conversions or the full extent to which the defendants were profiting unjustly therefrom and, in particular, the additional assets which would flow into the Nations Funds and other proprietary mutual funds, making them more saleable to the investing public generally. Even after the Bank applied a so-called credit against its fees for some portion of the advisory fees charged to some of the proprietary funds to some fiduciary accounts, in practical terms, it was (and is) impossible for co-fiduciaries, beneficiaries and others to understand and have knowledge of the true cost of the Conversions to the fiduciary accounts and the income earned upon their assets. Indeed, plaintiff Reinke and certain other beneficiaries have sought to obtain such information or other similar information relating to the expenses of investing the assets of fiduciary accounts in the defendants' proprietary mutual funds from the Bank and have never received "straight" or any answers to their questions with respect thereto and have received misleading or downright deceptive information as to the impact of such investments upon them and their fiduciary accounts.

35.    Upon information and belief, no analyses or determinations were made by the Bank as to the suitability and/or propriety of the relative costs and benefits of investments in the defendants' proprietary mutual funds at the time or before the Conversions were carried out for each fiduciary account as compared to pre-Conversion investments including any comparisons with numerous other available mutual funds or investment vehicles in which the Bank could have invested prudently and at lower cost the assets of the fiduciary accounts in which plaintiffs and the members of the Class had an interest. Indeed, upon information and belief, the Bank

performed no serious analysis comparing the assets of the plaintiffs' accounts with the
anticipated returns of the various Nations Funds in which the assets in such accounts were
subsequently invested, which generated greatly reduced returns and higher expenses. Similarly,
no such analyses were made by the Bank in fulfillment of its fiduciary responsibilities post-
Conversion, which the Bank had a duty to perform on a regular basis. Assets of the fiduciary
accounts within the Bank's control thus remained invested in the defendants' proprietary mutual
funds, to the exclusion of most, if not all, others. Even assuming that the Bank made prudent
decisions to purchase shares in the Nations Funds and other proprietary mutual funds for its
fiduciary accounts, upon information and belief, as noted above, the Bank did not negotiate the
fees and expenses to be charged to the Nations Funds (or other of the Bank's proprietary mutual
funds) or comparison shop with other funds or families of funds or fund advisors in an attempt to
obtain the same or better investment services elsewhere. Similarly, neither NFT nor its
controlled Board of Trustees, sought to obtain the lowest fees from the subsidiaries of the Bank
and BAC actually operating and "advising" the Nations Funds, nor did they seek lower cost
and/or better qualified investment advisors either at the time of the Conversions or at any time
thereafter.

36.       Upon information and belief, BAC and the Bank specifically excluded alternate
investment vehicles (such as other families of funds such as the Vanguard and Fidelity mutual
funds specifically requested by members of the Class) from their considerations in order to
maximize their earnings and those of their corporate affiliates and did not give serious
consideration to leaving the assets of fiduciary accounts invested as they were, pre-Conversion,
and/or giving beneficiaries of such accounts a choice as to the various alternatives available
while, at the same time, disclosing the benefits realized and to be realized by the defendants as a

result of investments in the Nations Funds. Indeed, the Bank coerced its portfolio managers to get them to invest fiduciary assets in the Nations Funds rather than alternative investment vehicles. As testified in the *Kutten* case by Darcy B. Johnson, a former Bank Vice-President and Portfolio Manager, if a portfolio manager selected non-proprietary mutual fund for investment in assigned fiduciary accounts, a black bomb with a fuse attached would appear on her computer screen warning her that the Bank regarded any such prospective investments as "exceptions" and that management would keep tally of such "exceptions" on a "scorecard" upon which her performance was evaluated for compensation purposes.

37. Similarly, with respect to those fiduciary accounts the assets of which were invested in the Bank's Common Trust Funds, at no time did BAC and the Bank give any consideration to making changes in the "Common Trust Funds" so as to provide any of the purported "benefits" that the Bank claimed would be forthcoming as a result of the Conversions.

38. Upon information and belief, as a result of a conspiracy among the defendants and others presently unknown, the Bank and BAC, as part of a corporate business decision, chose to invest the fiduciary assets of the Spencer Estate (of which plaintiff was a beneficiary), the IRA, the Benstein, Wilson and Williams Trusts and the members of the Class in shares of the Nations Funds as part of the Conversion and otherwise, as well as, in shares of other proprietary mutual funds in order to generate investment advisory and administrative fees and other revenues for their various affiliates and to "bulk-up" the Nations Funds and other mutual funds without regard to whether such investments were prudent and in the best interests of plaintiffs and the other beneficiaries of fiduciary accounts within the Bank's control.

39. The foregoing Conversions of the assets of fiduciary accounts to the Nations Funds and/or investment of fiduciary assets therein and in other of the defendants' proprietary

mutual funds generally was carried out in furtherance of the defendants' corporate plan to reduce the Bank's expenses of managing fiduciary assets and increasing unjustly BAC's overall direct and indirect profits from fiduciary operations. BAC and the Bank proceeded to carry out the Conversions since they would not merely profit from the Bank's trustee and similar fiduciary fees but "double dip" by generating additional revenues through BAC's related asset management business and otherwise. Additional profit was also generated by investing the assets in the Bank's fiduciary accounts in the Nations Funds and in shares of other proprietary mutual funds following the Conversions, thereby making them more saleable at retail to the investing public. Further, the Conversions created an opportunity for the Bank to avoid the relatively low profitability of managing the fiduciary accounts (and the expenses related thereto) which the Bank had contracted to do when it (and/or its predecessors) agreed to serve as fiduciary thereof, and substitute ever-increasing fee income and other revenues directly and indirectly through its corporate subsidiaries and affiliates.

40. The Bank and its affiliates reaped many millions of dollars in purported money management, investment advisory and other fees as a result of the Conversions and from the investment of fiduciary assets in the Bank's proprietary mutual funds generally thereafter. The Bank also benefited by receiving Trustee, Personal Representative or similar fees for serving as a corporate fiduciary and by reason of the benefits which flowed from, *inter alia*, substantially reduced operating expenses of the Bank's fiduciary operations. Despite these benefits to the Bank and its affiliates, these investments in proprietary mutual funds have been of little, if any, benefit for the Bank's fiduciary accounts and the beneficiaries thereof, including plaintiffs and the members of the Class. On information and belief, all members of the Class suffered damages

from the investment practices of the Bank as described above in an amount which cannot

presently be determined but which amounts are capable of calculation.

## CLASS ACTION ALLEGATIONS

### The Relief Sought for Members of the Class

41. Over the past 15 years, BAC and the Bank, while making acquisitions around the

country increasingly consolidated their operations and centralized them into a nationwide

template consistent with the goals and objectives set out by Messrs. McColl, Lewis and Hance

affecting all members of the Class herein in substantively the same way.

As observed in the April 20, 1998 issue of the San Francisco Business Journal:

> With the acquisition of BankAmerica, NationsBank, CEO Hugh McColl
> Jr. has finally realized his manifest destiny, a decade-long quest to build a coast-
> to-coast bank.

\*   \*   \*

> NationsBank will superimpose its corporate culture, computer systems and
> practices onto Bank of America."

\*   \*   \*

> McColl discussed the issue of major American cities losing their hometown bank
> in a recent address in St. Louis, which lost its Boatmen's Bancshares to the
> Charlottean. with the headquarters of a major bank or financial institution,'
> McColl said. 'That's one of the realities of the market forces driving
> consolidation in our industry.'

\*   \*   \*

> 'NationsBank has spent a great deal of time and effort over the last six years
> putting in a common platform of systems across its entire franchise,' said James
> Hance Jr., vice chairman and chief financial officer at NationsBank. 'We would
> expect to expand those systems across the entire BankAmerica franchise.'

> **A determined McColl defended the move at a San Francisco news
> conference, saying, 'It's good for our associates, it's good for our customers
> and it's good for our shareholders.'**

> **McColl recently told his shareholders that 'creating a single company is**

important from cost and efficiency standpoints, and it pays off for our
customers in convenience and ease of doing business.     [Emphasis added]

The Class as defined herein was effectively envisioned by Hugh McColl when he said at

the April 28, 1999  Annual Meeting of BAC's shareholders:

> The Model Bank [of Bank of America] is a system that brings together a nationwide,
> integrated technology platform with company-wide products and services, providing bank
> associates with complete information about customer relationships across product lines,
> business lines and geographic lines. **The single system enables us to roll out new
> products and services simultaneously to all our customers throughout the country
> with ease and consistency. It enables us to communicate with customers and on
> behalf of customers throughout the system. It enables us to provide customers with
> uniformity of product, service and experience, no matter where they are ......**the
> creation of a single, nationwide bank charter...will also enable us to eliminate redundant
> and costly administrative functions."
>
>                                          [Emphasis added]

42.    This action is brought by plaintiffs, for themselves, and on behalf of all others

similarly situated, under the provisions of Federal Rules of Civil Procedure Rules 23(a) and

23(b)(3) for: "all beneficiaries, owners, beneficial owners, or principals of trusts, accounts or

other entities for which the Bank or any of its parents, subsidiaries, affiliates, predecessors,

successors or assigns acted as a trustee, fiduciary or agent and that were directly or indirectly

invested in Nations Funds Mutual Funds at any time from September 8, 1998" to the present, (the

"Class"), the quoted portion of which definition was stipulated to by each of the defendants, their

affiliates and others in connection with the settlement of certain related claims against them in *In*

*re Mutual Funds Investment Litigation*, MDL-1586, where it was designated as a "Fiduciary Sub-

Class".

43.    Plaintiffs seek, *inter alia*: (i) an accounting which determines all damages caused

by defendants to the members of the Class defined below and the extent of the unjust enrichment

of the defendants from their wrongful activities, as well as repayment of such unjust enrichment

and the earnings thereupon; (ii) money damages to be paid by the defendants; (iii) injunctive

relief providing for the possible removal of the Bank as fiduciary for all fiduciary accounts in

which members of the Class are currently beneficiaries; (iv) injunctive relief providing for new

procedures and practices at the Bank which put the interests of members of the Class ahead of

those of defendants and which otherwise address the ongoing conflicts of interest forced by the

Bank in the investment of fiduciary assets including, *inter alia,* providing for the creation of a so-

called "Chinese Wall" separating the Bank's fiduciary functions from all other operations; (v)

injunctive relief providing for the Nations Funds and other of the Bank's proprietary mutual

funds to annually select investment advisors chosen based upon, *inter alia,* comparative

investment performance and expense; and (vi) for relief incident and subordinate thereto,

including substantial punitive damages as a result of the greed-driven and egregious self-dealing

engaged in by defendants, as well as the costs and expenses of this action including an award of

attorneys' fees and reimbursement of expenses to plaintiffs' counsel.

## Numerosity of the Members of the Class

44.     Upon information and belief, the Bank serves as a fiduciary (such as a trustee,

guardian, executor, etc.) for many thousands of fiduciary accounts affected by the wrongdoing

described herein.

45.     The Class represented by plaintiffs consists of all those persons including the

beneficiaries of affected fiduciary accounts for which the Bank was corporate fiduciary from

September 8, 1998 to the present ("Class Period"). The Missouri Sub-Class consists of those

members of the Class whose fiduciary accounts originated in and/or affected beneficiaries in the

State of Missouri. The Washington Sub-Class consists of those members of the Class whose

fiduciary accounts originated in and/or affected beneficiaries in the State of Washington. The

32

Florida Sub-Class consists of those members of the Class whose fiduciary accounts originated in
and/or affected beneficiaries in the State of Florida. The New Mexico Sub-Class consists of
those members of the Class whose fiduciary accounts originated in and/or affected beneficiaries
in the State of New Mexico. The Iowa Sub-Class consists of those members of the Class whose
fiduciary accounts originated in and/or affected beneficiaries in the State of Iowa. Such
definitions are subject to modification upon completion of discovery with respect thereto.

46.     The exact number of members of the Class and the Sub-Classes as above
described is not known by plaintiffs, but is within the sole knowledge of the Bank. Upon
information and belief, the members of the Class and Sub-Classes are so numerous as to make a
Class Action appropriate.

47.     On information and belief, the members of the Class are located in most or all
fifty states, and in numerous foreign countries.

48.     Upon information and belief, while the members of the Sub-Classes are
concentrated in the States of Missouri, Florida, Iowa, New Mexico and Washington, respectively,
they are similarly scattered around the country and elsewhere.

## Common Issues of Law and Fact Predominate

49.     On information and belief, at least two years prior to the Conversions, the Bank, at
the direction of its parent, BAC, and in conspiracy with NFT and others, decided to invest the
assets of the affected fiduciary accounts in shares of the Nations Funds and other proprietary
mutual funds, all of which were directly or indirectly "advised" and managed by subsidiaries of
defendants BAC and the Bank or their affiliates. Such Conversions were carried out nationwide
on a rolling basis as an integral part of the consolidations by BAC and the Bank of the Acquired
Banks subject to a master plan developed by them, Messrs. McColl, Hance and Lewis and others.

33

None of such separate Conversions differed materially despite the timing and different locales of each. Upon information and belief, the Conversions were approved and set into motion by the same committees of the Bank's Board of Directors, which included Messrs. McColl, Hance and Lewis and the administrative aspects of each of the Conversions were carried out by substantially the same group of employees of the Bank using common form documents, guidelines and operating methodology. Similarly, separate and apart from the formal Conversions, pursuant to directives from senior executives of the Bank, fiduciary assets were increasingly channeled into the Bank's proprietary mutual funds including Nations Funds money market funds, typically without any material disclosures made to the beneficiaries of the affected accounts.

50. All members of the Class and the Sub-Classes were adversely affected by the self-serving business decision of BAC and the Bank to invest the fiduciary account assets within the Bank's control into shares of the Nations Funds pursuant to the Conversions and/or in their proprietary mutual funds thereafter and/or otherwise invest fiduciary assets therein.

51. All of the Bank's fiduciary accounts and their beneficiaries were negatively impacted by the acquisitions of other financial institutions as described above. Among the material consequences thereof was the substantial reduction in the fiduciary services provided to the members of the Class and, in the wake thereof, the Conversions. All of the Bank's fiduciary accounts, the assets of which were invested in shares of the Nations Funds and others of the Bank's proprietary funds, paid directly or indirectly, administrative and investment advisory fees and other charges to subsidiaries and affiliates of BAC, based on the fiduciary assets invested by the Bank in such mutual funds. All fiduciary accounts of which the Bank was corporate fiduciary were damaged by reason of the higher expenses charged to such accounts as a consequence of

34

the Conversions and the lower investment returns generated as a result thereof and/or by investments in the Nations Funds unrelated to the Conversions.

52.     There are common questions of law and fact that relate to and affect the rights of each member of the Class including, *inter alia*:

(a)     whether the Bank's business decision to invest assets of the fiduciary accounts in the Nations Funds and other proprietary funds was motivated by the best interests of the Class members (which the Bank had a duty to put before its own) or by BAC's desire to generate management and investment advisory fees for its affiliates and subsidiaries, to lower the Bank's expenses of managing fiduciary assets and to generate other benefits for themselves and NFT by, *inter alia*, "bulking-up" the assets invested in the Bank's proprietary funds;

(b)     whether the Bank breached fiduciary and contractual duties to plaintiffs and the Class by failing to conduct its fiduciary operations in conformity with the requirements of the National Banking Act, the guidelines established by the Comptroller of the Currency and other applicable law and regulations and whether the other defendants aided and abetted such breaches;

(c)     whether the Bank breached its fiduciary and contractual duties to all members of the Class by making investment decisions for the fiduciary accounts of plaintiffs and the Class based upon defendants' own interests and those of their affiliates, rather than the interests of the beneficiaries of such fiduciary accounts and whether the other defendants aided and abetted such breaches; and,

(d)     what remedies are appropriate compensation for the damages caused to plaintiffs and each member of the Class.

35

53. The relief sought is common to the entire Class including, *inter alia:*

(a) a declaratory judgment that the Bank violated its fiduciary duty as Trustee (or other similar fiduciary role) with respect to the affected fiduciary accounts and whether it was aided and abetted by defendants BAC, NFT and others in doing so;

(b) payment by the defendants of compensatory damages caused by their commission of and/or aiding and abetting breaches of fiduciary and contractual duties, as well as substantial punitive damages;

(c) payment by the defendants of the costs and expenses of this action, including the attorneys' fees of plaintiffs' counsel;

(d) an injunction preventing the Bank from opposing a petition by current beneficiaries of the fiduciary accounts affected by the Conversions and other wrongdoing referred to herein to replace it as corporate fiduciary; and

(e) an injunction which establishes appropriate procedures and safeguards within the Bank and with respect to the operation of NFT to ensure that the interests of beneficiaries of fiduciary accounts within the Bank's control are fully protected from wrongdoing such as described herein.

## Typicality of Plaintiffs' Claims

54. The interests of each of the plaintiffs and each member of the Class have been adversely affected by the wrongdoing of the defendants as described herein.

55. The assets of the respective plaintiffs' fiduciary accounts, like all other fiduciary accounts, were invested by the Bank in shares of its proprietary mutual funds pursuant to a wholesale business policy decision by BAC at the behest and encouragement of Messrs. McColl,

36

Hance and Lewis and/or their subordinates made some time prior to 1999 and carried out by the Bank and others thereafter pursuant to the Conversions and otherwise.

56.     Upon information and belief, the plaintiffs' respective fiduciary accounts, like all other fiduciary accounts, was used by the Bank, the other defendants and their affiliates to generate additional management, investment advisory and/or other fees and benefits for themselves (even after the so-called credits were applied to the Bank's fiduciary accounts as a result of certain Nations Funds advisory fees being paid to subsidiaries of BAC or the Bank) without regard for the best interests of the beneficiaries of such accounts such as plaintiffs and the members of the Class.

57.     The claims of plaintiffs, who are representatives of the Class and the Sub-Classes, respectively, are typical of the claims of all members thereof. The claims of plaintiffs are based on the same fundamental factual allegations and legal theories as the claims of all other members of the Class and the Sub-Classes.

## Plaintiffs Will Fairly and Adequately Represent the Class and the Sub-Classes

58.     The plaintiffs are able to and will fairly and adequately protect the interests of the Class and the Sub-Classes.

59.     The attorneys for plaintiffs are experienced and capable of prosecuting complex litigation such as this case. The attorneys for plaintiffs and the Class will actively conduct and be responsible for the prosecution of this litigation and the expenses thereof.

## COUNT I
## BREACH OF FIDUCIARY DUTY

60.     Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

61.     Upon information and belief, the Bank's self-dealing and egregious decision to invest the assets of the Spencer Estate, the IRA and the Benstein, Wilson and Williams Trusts and those of the members of the Class in the Nations Funds and other proprietary funds was motivated not by the interests of plaintiffs and the Class members, but by BAC's desire to generate investment advisory and other fees for its affiliates and, indirectly, for itself, as well as, to reduce the Bank's operating expenses, all of which as carried out in the manner described above, was wrongful and damaged plaintiffs and each member of the Class.

62.     Upon information and belief, in conspiracy with the other defendants, the Bank failed to consider fairly the Bank's proprietary funds' high expenses or alternative lower cost families of mutual funds (and deliberately did not do so) when it invested the assets of the Spencer Estate, the IRA and the Benstein, Wilson and Williams Trusts, as well as other fiduciary accounts into shares of the Nations Funds, thus putting its own interests before those of the plaintiffs and other beneficiaries of the Bank's affected fiduciary accounts

63.     Upon information and belief, in conspiracy with the other defendants, the Bank failed to consider the best interests of the IRA, the Spencer Estate, the Benstein, Wilson and Williams Trusts and their beneficiaries when it invested fiduciary assets in the Nations Funds and breached its duty of loyalty to plaintiffs and other Class members by putting the interests of itself and its affiliates before the interests of plaintiffs and the members of the Class.

64.     The Bank's wholesale investment of the assets of the Spencer Estate, the IRA and the Benstein, Wilson and Williams Trusts in the Nations Funds and the Conversions carried out around the country, as well as other investments of fiduciary assets in the Bank's proprietary mutual funds, were breaches of its fiduciary duty to plaintiffs and the members of the Class, which breaches were aided, abetted and/or directed by BAC, NFT and their affiliates. Given their

38

role in the Bank's fulfillment of its fiduciary responsibilities to plaintiffs and the members of the Class, the acts of BAC and NFT described herein also constitute breaches of fiduciary duty.

65.  As a result of, *inter alia*, the Bank's improper wholesale transfer of fiduciary assets held by the fiduciary accounts, including the accounts of the IRA, the Spencer Estate and the Benstein, Wilson and Williams Trusts, into shares of the Nations Funds and other proprietary mutual funds, plaintiffs and other similarly situated beneficiaries of fiduciary accounts for which the Bank was or is a fiduciary have been damaged in an amount to be determined by the Court, but believed to be substantial.

## COUNT II

## BREACH OF CONTRACT

66.  Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

67.  By means of the acceptance by the Bank and its predecessors of the responsibilities of personal representative and Co-Executor of the Spencer Estate, agreeing to manage the assets in the IRA for the benefit of plaintiff Cohen and his designees, agreeing to serve as trustee of the Benstein, Wilson and Williams Trusts, and otherwise agreeing to act as corporate fiduciary with respect to each of the other fiduciary accounts maintained by the Bank and its predecessors, the Bank committed to provide to all such fiduciary accounts complete investment management services of a corporate fiduciary and render such services on an individualized basis consistent with the goals and objectives of the creators of fiduciary accounts and the needs of the beneficiaries thereof as well as the representations made by the Bank in its advertising and marketing materials. As the Bank states: **"It is our responsibility to invest the trust assets prudently and profitably according to the grantor's wishes as outlined in the**

39

**trust document." Such promise by the Bank and its predecessors was a material implied term of each trust agreement or other document which established the underlying fiduciary relationship."** Such language or substantially the same language is an implied and material term in the agreements between the Bank and the creators of fiduciary accounts who appointed the Bank or any of the Acquired Banks as a corporate fiduciary, none of whom anticipated or could reasonably foresee that the Bank would breach its duty of loyalty to the creators of such accounts and their beneficiaries such as plaintiffs and the members of the Class. Similarly, they could not have foreseen that, in the context of their agreeing with the Bank to act as corporate fiduciary, the Conversions would be carried out by the Bank with fiduciary assets under the circumstances described herein, that the Bank would mishandle fiduciary assets as described herein or that the designated fiduciary would be the Bank in its present form as distinct from the Acquired Banks as the existed before acquisition by BAC and the Bank.. Plaintiffs and the members of the Class are the beneficiaries of the agreements made between the Bank and the creators of the fiduciary accounts which are the subject of this litigation.

68. Plaintiffs and each member of the Class were and/or are beneficiaries of the Bank's contractual obligations to the creators of the fiduciary accounts described herein and/or are third party beneficiaries to the contractual obligations among the defendants with respect to the investment of fiduciary assets. By abdicating its responsibilities for individual investment management services (in favor of the wholesale investment of fiduciary assets in shares of the Bank's proprietary mutual funds as described herein) that the Bank was obligated to provide to the beneficiaries of its fiduciary accounts, and by conducting itself in its present business form, the Bank breached its contractual obligations thereto. Defendants BAC and NFT aided and abetted the Bank in its breaches of its contractual obligations to plaintiffs and the Class by

40

participating with the Bank in carrying out the Conversions and/or causing the Bank to act as described above.

69. By virtue of the defendants' breach of their respective contractual obligations owed to the members of the Class and the Sub-Classes, plaintiffs and the members thereof have suffered damages in an amount to be determined by the Court.

## COUNT III

## UNJUST ENRICHMENT

70. Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

71. By reason of the Bank's fiduciary assets being invested in the Nations Funds or other of their proprietary mutual funds as described herein, the Bank and BAC have "double dipped" and obtained other unjustified benefits as described above. All defendants have profited unjustly by the Conversions, the investment of fiduciary assets in the Bank's proprietary funds and the other acts described herein, thereby enriching themselves at the expense of plaintiffs and the members of the Class and the Sub-Classes. Defendants have similarly enriched themselves, their subsidiaries and affiliates by using information regarding the beneficiaries of fiduciary accounts to market various goods and services, including credit cards, loans and deposit accounts, from which products and services they have been unjustly enriched.

72. Such "double dipping" was carried out by the Bank by imposing on fiduciary accounts the Banks' fees for acting as a corporate fiduciary as well as investment advisory fees, administrative fees and other related charges which, when taken together with all the NFT expenses, even after so-called credits for certain Nations Funds advisory fees (which credits may not have been applied by the Bank in connection with the fees it charged to all of its fiduciary

41

accounts) exceeded the amounts to which the Bank was entitled to payment for, *inter alia*, investment of the fiduciary assets and administration of the underlying fiduciary accounts for which services its trustee, executor or similar fees were intended to cover. Such benefits to the Bank and BAC were exacerbated by the Bank's avoidance of substantial operating expenses by reason of its abdication of the Bank's individualized investment and administrative responsibilities owed to the members of the Class and the Sub-Classes. The Bank enhanced its profit performance at the expense of plaintiff and the members of the Class by favoring the use of its own proprietary funds, including the Nations Funds, and fiduciary assets within its control to increase the asset bases thereof, and aggrandizing its own stature, thereby unjustly enriching each of the defendants and their senior officers as well as the Trustees of NFT.

73.     Further, upon information and belief, with respect to at least certain of the fiduciary accounts for which the Bank has acted as corporate fiduciary, the total charges against such accounts for fees/commissions, advisory fees and other amounts payable by the accounts exceed the contractual amounts for such charges agreed upon by the creators of the underlying vehicles for the fiduciary accounts and/or statutory limitations thereof.

74.     The defendants have invested the proceeds of the foregoing unjust enrichment and realized additional profits thereupon, all of which should be returned to the fiduciary accounts and other similarly affected accounts and/or their beneficiaries, as the Court shall deem appropriate. Plaintiffs and others similarly situated are entitled to recover the defendants' ill-gotten gains and profits therefrom.

## COUNT IV

## BREACH OF FIDUCIARY DUTY – MISSOURI STATE LAW

75.     Plaintiff Cohen repeats and realleges each and every allegation contained above as if fully set forth herein.

76.     By acting as alleged herein, the defendants have violated and/or caused the Bank to violate its fiduciary duties of absolute loyalty and candor owed to plaintiff Cohen and members of the Missouri Sub-Class.

77.     By acting as alleged herein, the Bank has violated its fiduciary duty not to participate in transactions in which it had or has a conflict of interest and engage in self-dealing for its primary benefit, as it did and does here.

78.     By acting as alleged herein, the Bank has violated its fiduciary duties of care and productivity it owes to plaintiff Cohen and the members of the Missouri Sub-Class.

79.     By acting as alleged herein, the Bank has violated its fiduciary duty that it owes or owed to plaintiff Cohen and the members of the Missouri Sub-Class to take and exercise control over their fiduciary assets for their primary benefit.

80.     The Bank and its affiliates have already unlawfully extracted huge sums in the form of fees and other charges assessed against fiduciary accounts and they will continue indefinitely to extract unlawful fees and other charges from plaintiff Cohen and members of the Missouri Sub-Class, in an amount which cannot be presently determined.

## COUNT V

## BREACH OF FIDUCIARY DUTY – WASHINGTON, MISSOURI, FLORIDA,

## NEW MEXICO AND IOWA STATE LAW

81.     Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

82.     By acting as alleged herein, the defendants have violated and/or caused the Bank to violate its fiduciary duties of absolute loyalty and candor owed to plaintiffs and the members of the respective Sub-Classes.

83.     By acting as alleged herein, the Bank has violated its fiduciary duty not to participate in transactions in which it had or has a conflict of interest and engage in self-dealing for its primary benefit, as it did and does here.

84.     By acting as alleged herein, the Bank has violated its fiduciary duties of care and productivity it owes or owed to plaintiffs and the members of the Sub-Classes under the respective laws of the States of Washington, Florida, New Mexico, Missouri and Iowa which govern the conduct of fiduciaries such as the Bank.

85.     By acting as alleged herein, the Bank has violated its fiduciary duty that it owes or owed to plaintiffs and the members of the Sub-Classes to take and exercise control over their fiduciary assets for their primary benefit.

86.     Bank and its affiliates have already unlawfully extracted huge sums in the form of fees and other charges assessed against fiduciary accounts, and they will continue indefinitely to extract unlawful fees and other charges from members of the Sub-Classes in an amount which cannot be presently determined.

44

## PRAYER FOR RELIEF

WHEREFORE, plaintiffs respectfully request on their own behalf and on behalf of all members of the Class and the Sub-Classes:

(a)    certification of this action as a Class Action and appointment of plaintiffs and their counsel to represent the Class and the Sub-Classes;

(b)    entry of judgment on the claims for breach of fiduciary duty in favor of plaintiffs individually and as representatives of the other members of the Class and Sub-Classes and against the defendants and an award of compensatory damages, restitution and punitive damages in favor of plaintiffs individually and as representatives of the other members of the Class and Sub-Classes, respectively, and against the defendants in the amount of damages caused by the defendants' breaches of fiduciary duties;

(c)    entry of judgment on the claims for breach of contract in favor of plaintiffs individually and as representatives of the other members of the Class and Sub-Classes against the defendants and an award of compensatory damages in favor of plaintiffs individually and as representatives of the other members of the Class and the Sub-Classes and against the defendants in the amount of damages caused by the defendants' breaches of contract;

(d)    entry of judgment enjoining the Bank from opposing any petition filed by any member of the Class seeking the removal of the Bank as corporate fiduciary and requiring the Bank to pay for all legal fees and expenses incident thereto including its own;

(e)    entry of judgment compelling the defendants to account for their unjust enrichment and disgorging the amount thereof (and the profits earned thereupon) to the affected fiduciary accounts affected by the wrongdoing described herein and/or their beneficiaries, as appropriate;

(f)      entry of judgment compelling the Bank to fully insulate its fiduciary operations from all of its other business activities and those of BAC and NFT by, *inter alia,* establishing a so-called "Chinese Wall" for the purpose of effectuating such insulation;

(g)      entry of judgment compelling the Bank to establish and implement procedures to fully protect the interests of the members of the Class including, *inter alia*, the appointment of an ombudsman to oversee the Bank's fiduciary operations and compelling NFT and the Bank's other operators of its proprietary mutual funds to select annually investment advisors based upon, *inter alia*, comparative investment performance and expenses and the holders of the affected mutual funds;

(h)      repayment to the affected Nations Funds and the holders of its stock of the damages caused to them by the defendants' actions as described herein;

(i)      entry of judgment for punitive damages, together with pre-judgment and post-judgment interest at the maximum rate allowable by law;

(j)      reasonable attorneys' fees and reimbursement of the reasonable costs and expenses of prosecuting this litigation; and

(k)      such other or additional relief as this Court deems appropriate.

## JURY DEMAND

Plaintiffs hereby demand a trial by jury.

December 27, 2005                GREENFIELD &GOODMAN LLC
                                RICHARD D. GREENFIELD
                                7426 Tour Drive
                                Easton, MD 21601
                                (410) 745-4149
                                (410) 745-4158 (Fax)

46

SUMMERS, COMPTON, WELLS & HAMBURG
PROFESSIONAL CORPORATION

*Steven M. Hamburg*

STEVEN M. HAMBURG          #3313
HOLLY M. MCINTYRE          #112203
8909 Ladue Road
St. Louis, MO 63124
(314) 991-4999
(314) 991-2413 (Fax)

GANCEDO & NIEVES LLP
Hector G. Gancedo
Amy Boomhouwer
144 W. Colorado Blvd.
Pasadena, CA 91105
(626) 685-9800
(626) 685-9808 (Fax)

COUNSEL FOR PLAINTIFFS AND THE CLASS

410140_1.DOC

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| GEORGE SIEPEL; PHYLLIS SIEPEL;<br>H. CRAIG WILLIAMS; ELINOR TAMA<br>WILLIAMS; CONSTANCE ELAINE<br>WILLIAMS; DONNA N. REINKE;<br>ROBERT COHEN; CARL M. PAGE<br>and all others similarly situated, | ) ) ) ) ) ) ) ) | |
| Plaintiffs, | ) | Case No. 05:CV:2393  RWS |
| v. | ) ) | JURY TRIAL DEMANDED |
| BANK OF AMERICA, N.A.;<br>COLUMBIA FUNDS SERIES TRUST<br>f/k/a/ NATIONS FUNDS TRUST; COLUM-<br>BIA MANAGEMENT ADVISORS, LLC;<br>COLUMBIA MANAGEMENT DISTRI-<br>BUTORS, INC. ; BANC OF AMERICA<br>INVESTMENT SERVICES, INC. and<br>BANK OF AMERICA CORPORATION, | ) ) ) ) ) ) ) ) | CLASS ACTION |
| Defendants. | ) | |

### AMENDED COMPLAINT[1]

COME NOW Plaintiffs George Siepel, Phyllis Siepel (collectively, "Siepel Plaintiffs"),

H. Craig Williams, Elinor Tama Williams, Constance Elaine Williams (collectively "Williams

Plaintiffs"), Donna N. Reinke, Robert Cohen and Carl M. Page, on behalf of themselves, and for

all other members of the Class hereinafter described, by and through counsel, seek damages from

the Defendants and injunctive relief and state and allege as follows:

### OVERVIEW

1.      This Class Action is brought by Plaintiffs on behalf of themselves and all others

similarly situated, all of whom are or were beneficiaries of fiduciary accounts for which the

Defendant Bank of America N.A. (the "Bank") serves or served as corporate fiduciary.  The

---

[1] This Complaint is filed as a matter of right prior to the filing of a responsive pleading by any Defendant herein
pursuant to Fed. R. Civ. Proc. 15(a).

allegations in this Complaint are directed at the Bank as well as certain of its subsidiaries, Columbia Management Advisors, LLC ("CMA"), Banc of America Investment Services, Inc. ("BAI") and Columbia Management Distributors, Inc. f/k/a BACAP Distributors, LLC ("BACAP") and their ultimate parent company, Bank of America Corporation ("BAC") for their breaches of fiduciary and contractual duties owed by them to beneficiaries of fiduciary accounts ("Clients") as well as their violations of the federal securities laws as specified herein. BAC owns and controls various other entities, including BAI, BACAP and CMA, (collectively, the "Bank Subsidiaries") which effectively operate and carry out various underwriting and other activities on behalf of the Bank's proprietary mutual funds described below, nominally on behalf Columbia Funds Series Trust f/k/a/ Nations Funds Trust ("NFT"),  during the relevant time period.

2.      The Bank and BAC are "control persons" of the Bank Subsidiaries and NFT under and pursuant to the federal securities laws and are liable for their activities described herein including, in particular, causing the filing of NFT registration statements and post-effective amendments thereto with the Securities and Exchange Commission ("SEC") and dissemination of Nations Funds prospectuses.  At least one or more of the foregoing Bank Subsidiaries, NFT and the Bank hold themselves out to the public and/or are registered as such with the SEC as "Financial Advisors" and "Investment Companies" under the Investment Company Act of 1940 as amended, 15 U.S.C. § 80b-1 et. seq., (the "1940 Act").

3.      Collectively, at all relevant times, the Bank, NFT and the Bank Subsidiaries were and are underwriters and/or issuers of the securities of the Bank's proprietary mutual funds. This Complaint alleges that the Bank and BAC, by and through NFT and the Bank Subsidiaries which operated the Defendants' proprietary mutual funds business, breached the fiduciary duties owed

to their Clients by failing to disclose, *inter alia,* material conflicts of interest at the time disclosures were required to be made, as well as by failing to disclose the incremental increases in expenses the Clients sustained when the Bank and BAC implemented a corporate decision on a nationwide basis to funnel assets in the Bank's fiduciary accounts to the Bank's proprietary mutual funds, the Nations Funds, nominally overseen by the Bank's alter ego, Nations Funds Trust ("NFT"), registered with the SEC as an open-ended management investment company under the 1940 Act. In connection with sales of the shares in these proprietary mutual funds to the accounts of Plaintiffs and all members of the Class as defined below, the Bank, NFT and the Bank Subsidiaries failed to exercise good faith and fully disclose all material facts and failed to fully disclose all material facts to them and/or exercise reasonable care to avoid misleading them as more fully set forth below.

   4. The corporate-wide policy of BAC and the Bank was clearly set forth in an October 1, 1999 letter from Bank Vice President W. Thomas Chulick, in response to a request by the Hon. Mary Ann Medler, that the assets in her family's trust accounts be invested in mutual funds other than in the Bank's proprietary funds. Mr. Chulick informed Judge Medler that:

> "The [Administrative and Investment Review] Committee reiterated that **the use of outside mutual funds in fiduciary accounts is in violation of our corporate investment policy."** [emphasis added]

   5. In addition to common law claims, claims are also asserted herein by the Siepel Plaintiffs individually and on behalf of a Sub-Class (the "Federal Securities Law Sub-Class") of all others similarly situated (as defined below) under and pursuant to the Securities Exchange Act of 1934 ("Exchange Act"), the Securities Act of 1933 ("Securities Act") and the 1940 Act. Certain claims are also asserted herein against the Bank on behalf of Florida, Washington,

3

Missouri, New Mexico and Iowa Sub-Classes as defined below. Unless the context indicates

otherwise, the term "Class" includes the members of each of such Sub-Classes.

6.      The Bank through its "Private Bank, " formerly based in St. Louis with offices

throughout the United States, administers fiduciary accounts and offers a variety of financial

planning and investment advisory services to the public, including customized management of

the portfolios held in fiduciary accounts and individualized services for its Clients.

7.      As an integral part of the investment advisory services the Bank and the Private

Bank offer to the public, the Bank promotes that it has expertise in management of financial

resources and "customized unique and comprehensive solutions for each individual, integrating

world-class investment management, trusts, credit and bank services."  The Bank, in order to

obtain the leverage and economies of scale referred to below, engages in "asset gathering" for its

"Private Bank" and for its captive mutual funds. The Bank advertises on its website and

otherwise and holds itself out as providing expertise in portfolio management, proclaiming in

particular its **experienced investment advisors**. The Bank prominently and falsely advertises its

promise and holds itself out to persons such as Plaintiffs and the members of the Class who do

business with its "Private  Bank":

**BANK OF AMERICA  [LOGO]  HIGHER STANDARDS**

THE PRIVATE BANK

**Managing today's complex wealth.**

**Balancing growth, risk, taxes**

**and grandchildren.**

As your financial resources increase, perhaps you need more financial resources

to manage them.  The Private Bank of Bank of America has greater depth and

breadth of wealth management expertise – across the financial spectrum – than

4

any other private bank. Equally important, we bring this expertise together, creating more integrated solutions to your complex needs.  And we provide these customized recommendations based on the extraordinary strength and stability of Bank of America.

It's no wonder we've been entrusted to manage, protect and pass on wealth for more than 150 years.

*The Private Bank is dedicated to serving affluent families and individuals with complex wealth management needs. Our experienced advisors customize unique and comprehensive solutions for each individual, integrating world-class investment management, trusts, credit and bank services. We welcome the opportunity to work with you. We invite you to call Caroline Grace at 800.863.9500 or visit www.bankofamerica.com/privatebank.*  [Emphasis in original].

8.    In fact, despite numerous substantially similar promises in the form of advertising, marketing pieces and direct representations to those who established fiduciary accounts with the Bank (and the beneficiaries thereof),  as described herein, those promises have been and are being uniformly ignored or deliberately broken. In the context of their numerous acquisitions of other financial institutions to create a nationwide "wealth management" business, Hugh McColl,  James Hance and Kenneth Lewis, the senior-most officers of BAC and the Bank) centralized the functions of the Acquired Banks defined below into the Bank's own template, forcing more and more fiduciary accounts to be "serviced" by Call Centers and as many of such accounts' assets into the Bank's proprietary mutual funds, the Nations Funds and now being  re-named as Columbia Funds. In the course of carrying out their "master plan," they and their confederates at the helm of NFT sacrificed the interests of the beneficiaries of the affected fiduciary accounts in favor of the Defendants' "bottom line" as described herein.

9. (a)    The focus of this lawsuit is, in the context of a massive acquisition spree described below,  the corporate strategy of BAC and the Bank to consolidate the fiduciary operations of the various Acquired Banks and to generate operational efficiencies therefrom to

5

make up for the deterioration of the Bank's traditional profit model, commercial lending. In the course of carrying out such strategy, BAC and the Bank planned to and did bulk-up their captive and proprietary mutual funds business to provide the Bank with incremental sources of profit from fee and other income generated by its subsidiaries and affiliates, including the Bank Subsidiaries. They did so from various services provided to the Nations Funds, including investment advisory, distribution and other services. The assets held in the Bank's fiduciary accounts were and are a perfect "cookie jar" for the Bank to use to "seed" and/or bulk-up its proprietary mutual funds and better enable the Bank to streamline its so-called "Private Bank," increase the use of "Call Centers" and otherwise extract economies of scale from fiduciary operations.

(b) In particular, in order to maximize the Bank's profits earned from the Bank's fiduciary accounts for which it acted as corporate fiduciary, the Defendants conspired among themselves and with others presently unknown in a series of business decisions to "double dip," by forcing the Bank's fiduciary accounts, to the greatest extent feasible, to have their assets re-directed from their historic allocations in individually managed accounts and/or so-called Common Trust Funds ("CTFs") and/or other assets, to the Bank's proprietary mutual funds controlled by the Bank Subsidiaries ("Conversions") and/or to force the investments of such assets into the Nations Funds directly. They so conspired by agreeing to act together for their unjust enrichment at the hands of Plaintiffs and the members of the Class, all of which caused them substantial damages as described below. In all such transactions, NFT was the issuer of Nations Funds shares and the Bank and Bank Subsidiaries were the underwriters of the securities being offered and sold to the Bank's fiduciary accounts and to Plaintiffs and members of the Class beneficially.

6

(c)  As used herein, the term "Conversions" refers to the wholesale asset re-directions by the Bank of fiduciary assets within its control into shares of the Nations Funds during the Class Period as referred to below. The "double-dip" refers to the Bank (through the Bank Subsidiaries and otherwise)  extracting fees and expenses from the affected fiduciary accounts, directly and indirectly,  through the investment of the assets in those accounts in shares of various Nations Funds mutual funds taken together with the Bank's traditional fees charged to each account for serving as a corporate fiduciary.

(d)  At no time has the Bank distributed to Plaintiffs or to any member of the Class defined below or to any other appropriate recipient any statement fully and completely disclosing the wrongdoing described below including, *inter alia*,  its conflicts of interest associated with the use of Nations Funds in its fiduciary accounts or the sale of Nations Funds shares thereto.  Nor did it disclose to the victims of the Conversions that the expenses ultimately paid by the Bank's fiduciary accounts from the use of Nations Funds would increase materially as a direct result of the Conversions, facts known to and concealed  by the Defendants from the Nations Funds prospectuses and other Conversion Disclosure Documents (i.e. those documents disseminated by the Defendants in connection with the offering and sale of Nations Funds shares to the Bank's fiduciary accounts in connection with the Conversions).   Further, the Defendants' wrongdoing is continuing in nature.  By late 2005, following the acquisition of another bank together with the fiduciary accounts under its management, Fleet Bank, the Defendants increased the assets in their proprietary mutual funds to over $400 billion and, at the same time, further reduced fiduciary services to the beneficiaries of those accounts. In addition to the Nations Funds shares issued and sold by the Defendants to the fiduciary accounts of members of the Class in and pursuant to the Conversions, such shares were also issued and sold to such accounts otherwise

7

through, *inter alia,* initial investments, reinvested dividends and interest, purchases of Nations Funds money market mutual funds and by other means.

(e)  As a corporate fiduciary, the Bank, together with the other Defendants, was required to be scrupulously forthright, honest and candid with the Plaintiffs, those acting on their behalf and all of the members of the Class, to place their interests above their own, and to supply every beneficiary of the Bank's fiduciary accounts with all the information that a reasonable person might consider relevant to investments in such accounts.  Unbeknownst to Plaintiffs and the members of the Class, however, the Defendants failed to disclose material facts including, *inter alia,* the critical conflicts of interest that were embedded within the fiduciary, investment advisory and other services they provided and the other services they offered, particularly with respect to the purchases of Nations Funds for their accounts.

(f)  Historically, the Bank, either through its so-called "Private Bank," now based in New York, New York [2], or through the Trust Departments of it and its predecessors, promoted itself by touting its purportedly highly individualized trust administration and asset management services, all of which was intended to and did lure grantors, testators and others to designate the Bank as a fiduciary for estates, trusts and other fiduciary accounts.

(g)  In fact, the plans of the Bank, BAC and their respective predecessors, despite these and substantially similar representations over the years and the implicit incorporation of them in the documents governing the Bank's fiduciary accounts, have been to cut back substantially on such so-called "Customized Portfolio Management" and to direct fiduciary funds, once

---

[2]  To consolidate its own position in the Midwest, the Bank's predecessor, Nations Bank, acquired Boatmen's Bancshares, Inc., the parent of Boatmen's Trust Company ("Boatmen's"). The Bank used Boatmen's trust department as the core of its Private Bank, then proceeded to distribute its administrative functions to Private Bank Offices in various parts of the country. As more and more acquisitions of financial institutions around the country were made by Defendants, the "Private Bank" and/or the related asset management functions of the Bank also moved, most recently to Boston and now to New York City.

8

"captured," into standardized investments such as the Bank's proprietary mutual funds, including, *inter alia*, the Nations Funds, as part of the Conversions as described herein and otherwise. Few, if any of the grantors or others who established fiduciary relationships with predecessors of the Bank, such as, *inter alia*, envisaged the Bank in its present form; namely, a nationwide behemoth with few of the individual services typically offered by a fiduciary and implicit in the fiduciary relationship. The Defendants took advantage of their power over beneficiaries of fiduciary accounts and have utilized these captive accounts and their beneficiaries as targets to market other products and services sold by the Defendants through "Relationship" Managers, their subsidiaries, affiliates and otherwise, including loans, credit cards and deposit accounts, all to Defendants' enrichment.[3]

      (h)  The Bank and BAC failed to disclose the existence of blatant conflicts of interest which are endemic in the relationship between and among the Bank's sales force, its employees and the members of the Class. Specifically, the policy of the Bank was to avoid investing fiduciary assets in non-proprietary mutual funds while touting, at the same time, the provision of customized portfolio management and to recommend portfolio strategies to meet a client's investment goals. To lure or retain fiduciary accounts, the Bank created a public image designed to foster the belief that the "Private Bank" is a reliable provider of customized financial advice. "Private Bank" employees, acting under pre-determined Bank policy, provide investment planning advice under the guise that this advice is customized when in fact it is not. Instead, the Bank delivered a platform to peddle the Defendants' proprietary mutual funds and other financial "products". The Defendants' scheme was never disclosed to the Bank's Clients and included, but was not limited to:

---

[3] For a vivid history of the Bank's voracity for conversions of assets which it held as a fiduciary, see:

9

(i)  the Bank's failure to disclose that it did not consider any  non-proprietary mutual funds as appropriate for investments in fiduciary accounts;

(ii)  the Bank's failure to disclose adequately that it had a direct financial interest in selling its own proprietary mutual fund products to its fiduciary accounts;

(iii)  the Bank's failure to disclose that the Conversions would result in a material increase in the expenses of investing the assets of affected fiduciary accounts at the expense of Plaintiffs and the members of the Class;

(iv)  the Bank's failure to disclose to Plaintiffs,  members of the Class and others to whom disclosure was required that it had not negotiated in any meaningful way the fees and expenses that were being charged to the Nations Funds by the Bank's affiliates (including the Bank Subsidiaries) and that the Bank did not negotiate with non-affiliated firms that could provide the same investment advice or other services at lesser cost;

(v)  the Bank's "customized portfolio management" typically included only the purchase of the Bank's proprietary mutual funds when mutual funds were used as the sole investment vehicles for fiduciary accounts; and

(vi)  many of the Bank's proprietary funds were  new or relatively new funds with no established track record of returns; indeed, many of the funds in the Nations Funds family would not exist but for the Conversion of fiduciary assets into them.

---

http://www.bankofamerica.com/newsroom/press/archives.cfm?LOBID=1.

(i)      Each element to the Bank's scheme created a conflict of interest between the financial well-being of Plaintiffs and the members of the Class on the one hand and the Defendants' financial well-being on the other. None of these material facts were expressly disclosed to Plaintiffs, members of the Class or to others to whom the Bank was obligated to make disclosure, in any of the letters and other documents provided to them at the time of the Conversions at the time the Bank was soliciting its designation as corporate fiduciary or during the time the Bank served as fiduciary of the affected accounts. Throughout the Class Period as set forth below, each of the Defendants was keenly aware that these schemes created material conflicts on interest between themselves and the Bank's Clients. All of the Defendants kept these conflicts of interest hidden throughout the Class Period as defined below. As a consequence, the Defendants engaged in rapacious self-dealing to the detriment of each of the Plaintiffs and the members of the Class and, because of the failure to separate the Bank's fiduciary operations from all its other businesses and those of BAC and the Bank Subsidiaries, its continued performance as a corporate fiduciary is and remains materially flawed.

<u>**ACQUISITIONS OF OTHER FINANCIAL INSTITUTIONS**</u>

10.      Over the course of the last 15 years, the Bank and BAC have made numerous acquisitions of other financial institutions throughout the United States (the "Acquired Banks"), many of which acquisitions were driven by their former Chairman and Chief Executive Officer, Hugh L. McColl, Jr. assisted by his subordinates, Kenneth Lewis,  current Chairman and Chief Executive Officer and James  H. Hance, Jr., former Vice Chairman and Chief Financial Officer, whom Mr. Lewis described as "one of the key architects of [BAC and the Bank] as it has grown to be one of the largest financial service providers in the world."

11

11.     A press release issued by the Bank on July 28, 2000, shortly after it had put into operation a corporate-wide plan to eliminate many of the investment-related and other services to beneficiaries of fiduciary accounts as described herein,  explained,  in part, how Messrs. McColl. Lewis, Hance and their subordinates were going to carry out this plan, including the elimination of those personnel who provided services to fiduciary account beneficiaries while at the same time increasing the fees paid by them:

> As part of these initiatives, the company will eliminate between 9,000 and 10,000 positions mostly during the next 12 months, in order to reallocate resources. The principal focus of these reductions will be in middle and senior management and positions eliminated as a result of process improvements. These reductions will take place across the company's franchise. The company now employs about 150,000 people.
>
> "We have been saying for some time that our days of growth by merger and acquisition are behind us," said Chairman and Chief Executive Officer Hugh L. McColl, Jr. "For the most part, our merger transition work also is behind us. We have successfully built a company with unlimited potential. To date, despite our many successes in individual businesses, we have not made the degree of progress we would like toward realizing that potential. We've assembled the right parts, but after years of additions, our resulting structure is neither as efficient, nor as effective as it needs to be. We're going to fix it in order to take advantage of our revenue opportunities."
>
> *     *     *
>
> Lewis also announced steps to boost productivity. First, he said, the company intends to eliminate management layers, giving top executives more direct responsibility for customer service. Second, it will overhaul processes and organizational structures to simplify and expedite banking transactions for customers and deliver financial solutions that lead to profitable relationships. These changes, which are still being designed, could affect everything from credit underwriting procedures to call center technology and are heavily weighted toward enhancing revenue growth.
>
> *     *     *
>
> Vice Chairman and Chief Financial Officer James H. Hance, Jr. said the company plans to take a charge of $300-350 million after-tax in the third quarter, primarily to cover severance costs related to the initiatives announced today. Productivity gains are expected to pay for severance and other related costs in approximately one year. Hance added that a substantial portion of these savings will be earmark for reinvestment.

12

12.     Mr. Hance also emphasized what the acquisitions of other financial institutions was intended to accomplish for BAC and the Bank. In a November 19, 1998 speech in St. Louis, he said:

> We also are diversifying our revenue stream away from dependence on gathering deposits and lending them and toward fee income. The latter is now about 40 percent of our total revenues, and our goal is to push fees to more than half of revenues in a short period of time.
>
> *     *     *
>
> The leverage as you increase the assets of a fund is significant.
>
> *     *     *
>
> **The most obvious advantage of scale is cost. Perhaps the best advantage is the exploding world of mutual funds. As the second largest player among banks, we have achieved significant scale. The leverage as you increase the assets of a fund is significant. After all, one money manager can manage $5 million or $50. So as you get bigger, you get much, much more profitable.**
> [Emphasis added]

13.     On April 17, 1998, the <u>San Francisco Business Times</u> noted with respect to the acquisition/consolidation strategy of Mr. McColl:

> With the acquisition of BankAmerica, NationsBank, CEO Hugh McColl Jr. has finally realized his manifest destiny, a decade-long quest to build a coast-to-coast bank.
>
> *     *     *
>
> Those familiar with McColl's style can already see the early signs that the former Marine's typical acquisition strategy is under way. The folksy, Southern charm of McColl and his troops belies a finely tuned merger machine in which an acquired institution's culture and identity are efficiently blended into NationsBank. The Charlotte bank has digested more than 70 deals since 1980. With that level of experience, the bank is not likely to repeat the customer service problems that arose from another San  Francisco merger, Wells Fargo's purchase of First Interstate Bank."

13

14.     During a speech he delivered in Charlotte on May 26, 2004, Mr. Lewis, in

explaining how BAC and the Bank could justify the high-cost acquisitions of other banks in

financial terms said:

> In deliberating the wisdom of [their most recent] merger, much of the
> discussion outside the company has focused on expense savings and
> efficiencies. That's understandable- the history of mergers in our industry
> has been all about expense leverage. I believe expense savings and
> efficiency in this merger are critical, but only as a starting point.
>
>      Mr. Lewis' explanation of how BAC and the Bank could squeeze
> "savings and efficiencies" from BAC's then most recent acquisition was
> reinforced in the business media several months later in April 2004 by
> David Pauly, writing for Bloomberg News:
>
> In October, [BAC] CEO Kenneth Lewis announced the $48.1 billion
> takeover of Fleet Boston Financial Corp.-thereby infuriating Bank of
> America shareholders who said Lewis had committed himself to managing
> the company's myriad acquisitions of the past.
>
> *   *   *
> Lewis offered Fleet Boston stockholders a premium of 43% above the
> market price. **A lot of jobs will have to go to make up for the excessive
> payment.**   [emphasis added]

15.     In the context of this nationwide series of acquisitions, and in order to justify the

high premiums that Messrs. McColl, Lewis and Hance were paying for the Acquired Banks, with

each new acquisition, they required the centralization and streamlining of the fiduciary services

offered by the Bank, including the increased usage of Nations Funds as  vehicles for investment

of the Bank's fiduciary assets. At the same time, they planned to extract greater benefits from the

fiduciary accounts of the Bank and the Acquired Banks by forcing the assets therein to be sold

and reinvested in the Bank's proprietary mutual funds, thereby obtaining the very leverage and

economies of scale (for the Bank Subsidiaries and NFT) as Mr. Hance proclaimed would be

obtained in his speech on November 19, 1998.

16.     The settlors of certain of the trusts at issue, in entrusting their assets to local banks, whether Boatmen's Trust Company in St. Louis, Barnett Bank in Florida or Fleet Bank in Boston, among other Acquired Banks,  did so based upon personal relationships with officers of such Acquired Banks built over many years. These fiduciary relationships were established because, *inter alia*, the Acquired Banks held themselves out to the settlors and to other prospective customers of fiduciary services as institutionally and personally suited not only to the stewardship of settlors' assets over multiple generations but looking after their descendants or other designated beneficiaries of their largesse. Over the years, the Bank and its corporate predecessors swallowed-whole the Acquired Banks, financial institutions nationwide which had fiduciary responsibilities to Plaintiffs and members of the Class.  In the process of being digested by the Bank, these formerly independent institutions' fiduciary operations were transmogrified into just cogs in the fee-generating machinery of the Bank and its corporate parent just as Messrs. McColl, Hance and Lewis predicted would occur.

17.     In the course of the metamorphosis of Boatmen's Trust Company and other acquired financial institutions into the Bank, the interests of Plaintiffs and members of the Class were not represented by caring, knowledgeable trust officers but  frequently by so-called "Call Centers" in Dallas, Atlanta  and elsewhere manned by relatively lower-level Bank personnel with little or no investment expertise and portfolio managers who employ computerized asset allocation programs designed to maximize the use of the Bank's proprietary funds in fiduciary accounts. Except for the highest net worth fiduciary accounts, the "customized recommendations" and "wealth management expertise" promised by the Bank are fictions and have been fictions since the consolidation of the various Acquired Banks  began taking place. The purpose was clear.  As stated by the Bank's own press release:

15

> We will win more business from existing Private Bank Clients by proactively delivering cutting-edge solutions for wealth management, by continuing to win high marks for satisfaction and high touch service, and through the company's financial commitment to the Private Bank which will allow for increased marketing and heightened awareness of the value we bring to each relationship.

18.     At or prior to the time that Boatmen's Trust Company, Barnett Bank and Fleet Bank, among other Acquired Banks were merged into the Bank, it was known by the parties to the acquisition negotiations that the Bank, through its planned consolidations, would materially adversely affect the investments in and administration of the fiduciary accounts at the Acquired Banks.

19.     To the best of the knowledge, information and belief of Plaintiffs, neither Boatmen's nor Nations Bank (as the Bank was then known) provided appropriate written notice as provided in statutes such as §362.331 R.S.Mo., of its transfer of fiduciary capacities to the Bank or which disclosed the material adverse affect of such transfer or which advised interested parties that they had a right to object to the transfer and, *inter alia*, obtain a replacement fiduciary.

20.     Plaintiffs believe and therefore allege that the Bank similarly failed to provide such notice in each of the instances where the fiduciary responsibilities of an Acquired Bank were taken over by the Bank or one of its predecessors.  As such, all similarly affected beneficiaries were wrongly denied notice and the right to object to a transfer of fiduciary responsibilities to the Bank.

## NATIONS FUNDS

21.     (a) Nations Funds Trust ("NFT") is an investment company and Delaware statutory trust which houses a "family" of more than  70 mutual fund portfolios, which are

16

proprietary funds nominally operated by NFT and its Board of Trustees. Even though no more than 60% of NFT's Board is supposed to be an "interested" person, in fact all members thereof were, in fact, elected, re-elected, directed and controlled by the other Defendants, including the Bank Subsidiaries.

(b) It has been the Bank's policy, throughout the Class Period defined below, both before and after the Conversions, to force the assets of its fiduciary accounts into shares of the Nations Funds and other proprietary mutual funds as stated in the letter from the Bank dated October 1, 1999 to Judge Medler as referred in ¶1(d) above.

(c) The Nations Funds' portfolios cover a wide variety of investment disciplines, strategies and types of asset categories including, *inter alia*, the Nations Municipal Income Funds, the Corporate Bond Portfolio; the Nations Small Company Fund; Nations Large Cap Index Funds and Nations Cash Reserves. The Nations Funds are nominally operated by the NFT and its Board of Trustees, a majority of whom are purportedly independent. In fact, the Bank, as the largest single shareholder of record of the various Nations Funds, controls all nominees to the NFT Board and therefore is a "control person" with respect to NFT, Nations Funds and the Bank Subsidiaries, as such term is defined in the federal securities laws and, in particular, § 15 of the Securities Act and §20 of the Exchange Act..

(d)  Certain of such Nations Funds were funded by the Bank and the Bank Subsidiaries in substantial part by transferring fiduciary assets pursuant to the Conversions, in effect, "force selling" Nations Funds shares to and upon the Bank's captive fiduciary accounts for which it served as corporate fiduciary.  Such funding permitted the affected Nations Funds to have substantial asset bases, an important selling point to the Defendants in marketing shares in the Nations Funds to other potential purchasers thereof through the Bank and other subsidiaries

17

of BAC. The Nations Funds selected for investment of fiduciary assets by the Bank and Bank Subsidiaries pursuant to the Conversions were intended generally to "mirror" the categories of assets held by the Bank's fiduciary accounts pre-Conversion, all or most of which were liquidated immediately prior to the Conversions, either as part of so-called "Common Trust Funds" or in individually-managed accounts, in many cases generating premature capital gains and causing the premature payment of taxes thereupon. At no time did the Bank disclose to affected account beneficiaries that the disposal of assets in their fiduciary accounts in connection with the Conversions generated capital gains and caused capital gains taxes to be paid prematurely. Indeed, the Defendants portrayed the Conversions in the Conversion Disclosure Documents and otherwise as being entirely tax-free transactions.

## JURISDICTION AND VENUE

22 .    The claims asserted herein arise under and pursuant to state statutes and common law as well as 15 U.S.C. §§78j(b) and 78t(a) (the "Exchange Act"); Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R.§240.10b-5;  15 U.S.C. §§ 77k and 77l (the "Securities Act") and 15 U.S.C. §§  80b-6 and 80b-14 (the "1940 Act" ). This Court has jurisdiction under 28 U.S.C. § 1331and §22 of the Securities Act, 15 U.S.C. §77v; §27 of the Exchange Act and 28 U.S.C. §1711, the Class Action Fairness Act of 2005. This Court also has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1367 (supplemental jurisdiction).

23.      There is diversity of citizenship between plaintiffs, citizens of the states of Washington, Florida, Pennsylvania, Illinois, Missouri and New Mexico, and each of the defendants. Further, the claims of all members of the Class well exceed $5,000,000, exclusive of interest and costs. Although a substantial number of members of the Class reside in Missouri, more than two-thirds of the Class members are residents of other states.  The conduct of the

Defendants as described herein occurred directly and indirectly within the Eastern District of Missouri, as well as in other states including North Carolina, Florida and New York. Further, each of the Defendants had continuous, material and systemic contacts within this District through, *inter alia*, the offices of the "Private Bank" and otherwise. Accordingly, this Court has personal jurisdiction over all the Defendants pursuant to §506.500 R.S.Mo.

24.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) and 15 U.S.C. § 80b-14 as many of the acts and practices complained of herein occurred in substantial part or arise out of Defendants' activities in this District, including, *inter alia*, the establishment of fiduciary accounts for the benefit of Plaintiff Cohen and numerous other members of the Class as defined herein, the drafting, issuance and dissemination of Nations Funds prospectuses in and from this District and the tortuous interference with the contracts of members of the Class within this District.  Further, Boatmen's Trust Company, a corporate predecessor of the Bank, was based in this District, as was the Bank's "Private Bank." Additionally, the Williams Plaintiffs, among other members of the Class, received from David Fisher, President of the "Private Bank" when it was based in St. Louis, the Conversion Disclosure Documents.  Further, many of the most significant witnesses to the wrongdoing referred to herein are found in and/or did business within this District and will only be available for trial purposes in this District.  In addition, a substantial amount of documents relevant to this dispute were generated by the Bank from this District and each of the Defendants has multi-national legal counsel who conduct business within this District.

25.     In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not

19

limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

## THE PARTIES

26.     Plaintiffs are all present or former beneficiaries of the Bank's fiduciary accounts who were victims of the Defendants' scheme to enhance profits from using the Bank's captive proprietary mutual funds, the Nations Funds, as investments for their fiduciary accounts. Each of such Plaintiffs and the members of the Class are related to one another by being damaged at the expense of Defendants' activities as described herein.

(a)     Plaintiff Donna N. Reinke is a citizen of the State of Washington and was a beneficiary of the Estate of Margaret Spencer, who died on September 11, 2001. ("Spencer Estate" or the "Estate")  The Bank, together with two individuals, Neil MacKinnon and William Morris, were the Personal Representatives/Co-Executors of the Spencer Estate, the assets of which were invested until December 2003, when the remaining cash was distributed to Plaintiff Reinke and the other beneficiaries of the Estate. Although the physical administration of the Estate was carried out in the State of Washington and it was probated by a Washington probate court (the Superior Court), the weight of the conduct giving rise to Plaintiff Reinke's claims as asserted herein; i.e. the appropriateness of investing fiduciary assets of the Estate in shares of the Bank's proprietary mutual funds, was in this District, the former home of the "Private Bank," which was the focal point for the wrongdoing alleged herein. Although Plaintiff Reinke signed a Receipt and Waiver of Notice of Filing  Declaration of Completion of Probate on March 6, 2004, she was induced to do so by the filing of a false and misleading Declaration of Completion of Probate which, *inter alia*, concealed from Plaintiff Reinke and the Superior Court that the Bank, as Personal Representative, had engaged in self-dealing;  that it had purchased shares of the

Nations Funds for the Estate's account knowing that alternative investments could have been purchased for the Estate with higher investment yields with comparable safety; that the Nations Funds prospectuses distributed to Plaintiff Reinke in connection with the Estate's accounts were false and misleading in material respects as set forth below and did not adequately disclose to her "the true direct and indirect expenses charged by Nations Funds"; that the Williams Plaintiffs had commenced litigation against the Bank making many of the Class-wide claims asserted herein, as had other beneficiaries of the Bank's fiduciary accounts; and certain of the other facts set forth below which had impacted negatively upon the assets in the Spencer Estate account. Thus, Plaintiff Reinke's acknowledged receipt of "all to which she is entitled from the Personal Representative" was induced fraudulently. As such, the discharge of the Personal Representatives is and was a nullity, as were all other similar releases and discharges obtained by the Bank from beneficiaries of fiduciary accounts and/or through "accountings" in probate courts and otherwise.

(b)     Plaintiff Robert Cohen is a citizen of the State of Missouri and is a beneficiary of an Individual Retirement Account (the "IRA") over which account the Bank has investment authority as a corporate fiduciary.

(c)     Plaintiffs H.Craig, Elinor Tama and Constance Elaine Williams (the "Williams Plaintiffs") are citizens of the States of Florida and Pennsylvania and are siblings who were beneficiaries of trusts set up by their father, Heberton F. Williams ("H.F.Williams") pursuant to the terms of the Last Will and Testament of H.F.Williams. The Bank, as the successor-in-interest to the original Trustee, was the principal Trustee of the Trusts established pursuant thereto (the "Williams Trusts"). The original Trustee was First National Bank and Trust Company of Jupiter/Tequesta which, in turn, was acquired by and merged into First Marine Bank

21

& Trust Company which, in turn, was acquired by and merged into Barnett Banks Trust Company, N.A. which, in turn, was acquired by and merged into Nations Bank, N.A., now known as Bank of America, N.A. following the acquisition of Bank of America National Association by and merger into Nations Bank, N.A.  At the outset, H.F. Williams wife, Jean, was the Co-Trustee with the Bank. The Williams Plaintiffs commenced a class action against the Bank and BAC in the Circuit Court of Palm Beach County in December 2002, Case Number 02-15454. BAC was dismissed as a defendant by the Court therein and such dismissal is the subject of an appeal. As such, the Williams Plaintiffs do not assert claims against BAC in this action. The remaining claims against the Bank were voluntarily dismissed by the Williams Plaintiffs in November 2005.

(d)      Plaintiffs George and Phyllis Siepel are citizens of the State of Illinois who are beneficiaries of the William J. Benstein and Agnes V. Benstein Residuary Trust ("Benstein Trust"), an Iowa trust of which United Central Bank of Des Moines, N.A., a corporate predecessor of the Bank, was Trustee.

(e)      Plaintiff Carl M. Page is a citizen of the State of Oregon who is a beneficiary of the Janet P. Wilson Trust, a New Mexico trust of which the Bank is Trustee through a Call Center.

27.      The Bank is a federally chartered bank domiciled in North Carolina, and is a wholly owned subsidiary of BAC also domiciled in North Carolina. BAC is a financial holding company, and the parent of the Bank.  At all relevant times, BAC dictated and controlled the business activities of the Bank, including, *inter alia*, the wrongful business activities described herein within the Eastern District of Missouri, and wherever in the United States the Bank, BAC and/or their respective predecessors conducted business.  BAC operates through subsidiaries,

22

including the Bank and the Bank Subsidiaries, Defendants CMA, BAI and BACAP, one or more

of which are "financial advisors" and "investment companies" registered with the SEC under the

1940 Act and/or otherwise acting and holding themselves out to the public variously as

"investment companies," "investment advisors" and/or "financial advisors." In addition, BAC

and the Bank, through the Bank Subsidiaries and otherwise, are underwriters of the sale of

Nations Funds shares sold to, *inter alia*, the fiduciary accounts of Plaintiffs and members of the

Class. Although the Bank and BAC now have their principal places of business in Charlotte, NC,

the Defendants conduct or conducted substantial business within this District in many locations

through the "Private Bank," through retail branches of the Bank where the Defendants sell and

distribute Nations Funds, through the Bank, various of its subsidiaries and otherwise. At all

relevant times, Defendants BAC and the Bank were "control persons" of the Bank Subsidiaries,

NFT and its Board of Trustees/Directors and BAC was a "control person" of the Bank.

      28.     Defendant NFT, is the holding/operating entity the other Defendants formed to

do business as and house the Nations Funds. Notwithstanding the fact that its principal place of

business is and/or has been located variously in Little Rock, Wilmington, New York City and

Charlotte, NFT has conducted business in this District through the Bank and the Bank

Subsidiaries and otherwise through Bank-controlled brokers and dealers in securities. Although

nominally independent and supervised by its Board of Trustees, as indicated above, Defendant

NFT has at all relevant times been operated as an *alter ego* of the other Defendants and the Bank

Subsidiaries. The framework of such relationship is based upon agreements such as the

Investment Advisory Agreement- Nations Funds Trust executed on or about January 1, 2003 by

and between NFT and BACAP and substantially similar earlier agreements of which Plaintiffs

and the members of the Class were and/or are third-party beneficiaries. Similarly, NFT has

23

contracted with the Bank Subsidiaries to provide to it and to the Nations Funds investment advisory, administrative, distribution and other services,   the expenses of which were ultimately passed along and charged to the fiduciary accounts of Plaintiffs and the members of the Class. All the members of the Board of Trustees of NFT were selected and/or approved by BAC and/or its subsidiaries through the Bank's control of the NFT "election" process pursuant to which it votes all the Nations Funds shares held in its fiduciary accounts through proxies representing the majority of the shares outstanding. As a result of the fact that NFT is the issuer of Nations Funds shares sold to Plaintiffs (the Bank being merely an owner of record) and their fiduciary accounts and because it is an *alter ego* of the Bank, it has a direct relationship with each of the Plaintiffs and the members of the Class the functional equivalent of a fiduciary relationship. In carrying out its role as described herein, NFT and its Board provided substantial assistance to the Bank in its breaches of fiduciary duty as described herein.

29.     Defendant BAC (through its subsidiaries) and other business entities not owned by Defendant BAC, individually and collectively, charge substantial fees and expenses to the Nations Funds for their purported services which, together with NFT's own operating expenses, have had and continue to have a substantial cost to Plaintiffs' fiduciary accounts and each of the Bank's other fiduciary accounts, the assets of which have been invested in one or more of the Nations Funds, including Nations Funds money market mutual funds.

## FACTUAL ALLEGATIONS

30.     Notwithstanding the fact that the fiduciary accounts of members of the Class have been under the fiduciary responsibility of the Bank, it has bounced the beneficiaries of many of these accounts around the country, most significantly to the Bank's Call Centers in remote locations, which beneficiaries  are now "serviced" by low-level employees, rather than

24

fiduciary officers with knowledge of the beneficiaries or their individual needs, notwithstanding

the following representations of Kenneth D. Lewis, Chairman and Chief Executive Officer of

BAC and the Bank on November 3, 2003 in the context of a new acquisition of yet another bank,

which claims are baseless and ring hollow:

> The people you know at your branch today will be there
> tomorrow, and will continue to strive to anticipate and meet
> your financial needs.

31.     Historically, the Bank and its predecessors invested the assets of the fiduciary

accounts of members of the Class primarily through individually managed portfolios and/or

through so-called "Common Trust Funds" or "Collective Investment Funds." The expenses of

the Bank for such investment vehicles and related administrative services were absorbed by the

Bank out of its fees for serving as fiduciary.

32.     Beginning some time prior to 1998, in order to, *inter alia*, compensate for

massive losses it was incurring from its traditional lending business and the excessive premiums

the Bank and BAC were paying for the Acquired Banks, the Bank and its predecessors

developed various plans and schemes pursuant to which they sought to minimize their operating

expenses with respect to fiduciary accounts and maximize their profits from their fiduciary

business, particularly through the use of proprietary mutual funds as investment vehicles.

33.     Upon information and belief, former Bank Chief Executive Officer Hugh McColl

and incumbent Kenneth Lewis, were significant motivating forces behind these plans, which

were integral to their master plan of extracting higher profits from the Acquired Banks and

consolidating their various trust department and "wealth management" activities under the

banner of the so-called "Private Bank."  Defendants' plan included the consolidation and

elimination of the previously existing trust departments of the Acquired Banks with the objective

25

of "servicing" fiduciary accounts and the beneficiaries thereof with fewer and fewer personnel and greater standardization of investments in fiduciary accounts. Pursuant to such business plans, they decided, *inter alia*, to utilize the assets held by the Bank in fiduciary accounts to fund an initial group of mutual funds and/or to add assets to such funds controlled by the Defendants and the Bank Subsidiaries, the Nations Funds, as well as other mutual funds merged into them following the acquisition of, *inter alia*, Fleet Bank. Thereafter, due to numerous acquisitions, mergers and other transactions referred to above, consistent with their longer-term plan and scheme, the Defendants determined that most or all of the assets in certain fiduciary accounts held by the Bank (and formerly held as fiduciary assets by the Acquired Banks) would be converted into shares of the Bank's proprietary funds, such as the "family" of Nations Funds (or other of the Bank's proprietary mutual funds) or only invested in such mutual funds initially.

34.    Through a complicated and barely comprehensible grouping of advisors, sub-advisors, subsidiaries and other affiliated and unaffiliated service providers, the Defendants engineered a scheme pursuant to which the Bank was able to abdicate many of its traditional fiduciary responsibilities, functions and services to beneficiaries of its fiduciary accounts in favor of alternatives that resulted in higher total direct and indirect expense charges to the Bank's fiduciary accounts as compared to the trustee or similar fees historically paid to the Bank for, *inter alia*, active management of the fiduciary accounts' assets and to extract additional profits by utilizing the Nations Funds as compared to higher yielding and better-managed non-proprietary mutual funds that were commercially available in the marketplace.

35.    As indicated below, beginning some time prior to the commencement of the Class Period and continuing for some time thereafter, the Bank's "Private Bank" began sending out standardized form letters informing some co-trustees, beneficiaries of the fiduciary accounts

26

and others of the Bank's planned liquidation of its "Common Trust Funds" and touting the so-
called "benefits" of the Conversions and certain mutual funds "reorganizations", which
liquidations were carried out pursuant to carefully orchestrated plans nationwide based, in part,
upon the level of integration of the previously Acquired Banks and other factors.

36.     All of these Conversions and reorganizations were carried out on a rolling basis
and, although assets were held in individual accounts in various states, the Conversions did not
differ from each other in any material way. A typical form letter, signed by David W. Fisher,
President of the "Private Bank," also coerced the recipients of the letter to authorize the
Conversion of the Trusts' assets into shares in the Nations Funds. In particular, the Bank's letter
said:[4]

> Using Nations Funds, we can provide trust and fiduciary
> accounts with an attractive mix of investments to pursue
> the accounts' investment goals. Nations Funds also offer
> the benefits of:
>
> > Daily valuation and liquidity
> > Newspaper performance listings
> > Broader potential diversification
> >
> > Flexibility when making trust distributions

---

[4]  It is not presently known whether the Bank sent such a letter to beneficiaries of all of its fiduciary accounts (it
appears that this was not the case) or, in the case of guardianships and similar accounts, to the appropriate courts
overseeing such accounts. Further, not all co-fiduciaries received such a letter nor were their consents sought by the
Bank. The Conversions carried out by Defendants did not differ in any material way for each fiduciary account
regardless of its terms and the state in which the account was domiciled. Further, "trust officers" were required,
pursuant to a carefully orchestrated  plan, to convey the identical information to members of the Class and to
similarly threaten them with adverse tax consequences and other "horrors" if they did not indicate their consents to
the Conversions. Each such oral solicitation of consent to the Conversion misrepresented the Bank's reasons for
carrying it out, concealed the conflicts of interest and the  increased  investment-related  expenses that would be
incurred by the Bank's fiduciary accounts post-Conversion and misrepresented  that so-called "credits"  that the
Bank would thereafter apply to fiduciary accounts would be sufficient to compensate for all such additional
expenses. Further, as with the prospectuses and other documents provided to beneficiaries and co-fiduciaries, the
Bank concealed all the benefits it and its affiliates would derive from the Conversions, including those derived from
"bulking-up" the Nations Funds and from utilizing the Nations Funds to benefit corporate customers of the
Defendants at the expense of the holders of Nations Funds shares.

27

In fact, there was little, if any, benefit that would flow to beneficiaries of the Bank's fiduciary accounts and this letter was a sham.

37.     Indeed, all such so-called "benefits," could have been accomplished by means of the Bank's "Common Trust Funds." Curiously, on or about August 16, 1999, the Bank announced that "Common Trust Funds will be valued at month-end instead of twice each month," despite the fact that computer software programs existed that could generate such valuations on a daily basis. The Bank's form letter used for its year 2000 Conversions went on to threaten coercively:

> Any common trust fund units for which we have not received an authorization [by May 1, 2000] may be liquidated and the proceeds placed in a money market vehicle pending discussion about reinvestment. This liquidation could have adverse tax consequences depending upon the cost basis of the common trust fund units.

38.     Although not every member of the Class affected by the Conversions received documents seeking authorizations for the Conversions as well as Nations Funds prospectuses (that were made a part of registration statements filed by NFT or one of the Bank Subsidiaries covering the various offerings and sales of Nations Funds shares), in response to such coercion and the deceptive and unclear information provided by the Bank in the disclosure/authorization forms and accompanying prospectuses that were among the Conversion Disclosure Documents, co-trustees and beneficiaries of fiduciary accounts who received such forms, signed the enclosed forms, thereby providing to the Bank their uninformed and fraudulently induced "consent" to the Conversions.

39.     Undisclosed to those who received the Conversion Disclosure Documents from the Bank, including the Nations Funds prospectuses therein, was the fact that, whether or not

28

consent was obtained, the Bank planned to proceed with the Conversions, that the Conversions were rife with self-dealing and conflicts of interest, that as a direct result of the Conversions, affected fiduciary accounts would end up paying materially higher investment-related expenses and the Defendants would reap substantial benefits therefrom.

40.     Enclosed with the Bank's form letters sent to fiduciary account beneficiaries and/or co-fiduciaries were various Nations Funds prospectuses and other Conversion Disclosure Documents which were drafted so as to conceal, *inter alia*, the motives of the Bank and BAC for the Conversions into Nations Funds, the conflicts of interest between the Bank and members of the Class, the benefits of the Conversions to them and the Bank Subsidiaries and the materially increased expenses that would be incurred by the fiduciary accounts as a result of the Conversions. Among the specific material facts concealed from the Conversion Disclosure Documents and the Nations Funds prospectuses included therewith are those increased expenses known by each of the Defendants to be absorbed by the Bank's fiduciary accounts as identified in, *inter alia*, Document #BOA_K+A 73193 produced in *Kutten* v. *Bank of America, N.A.,* Case No. 4:04-CV-244 (E. D. Mo.)(to which this case, upon commencement, was designated as "related"), which documents would be quoted herein but for their improper designation in *Kutten* as "Confidential. Attorneys Eyes Only."

41.     Although the Nations Funds prospectuses and other of the Conversion Disclosure Documents issued during the Class Period in connection with the Conversions did disclose estimated or actual fees and expenses that would be charged to the Nations Funds, including fees and expenses paid by NFT and the Nations Funds to the Bank Subsidiaries, these prospectuses uniformly concealed that, in order to reduce the amount of "credits" or "fee waivers" that the Bank would apply to certain fiduciary accounts, re-allocations of various expenses were made to

29

benefit the Bank and Bank Subsidiaries and the expense of the fiduciary accounts affected by the Conversions.

42.     The Nations Funds prospectuses used by the Defendants for the Conversions and otherwise to sell Nations Funds shares to Plaintiffs and members of the Class also failed to disclose that, to the full extent that the Bank was using fiduciary assets to purchase shares in the Nations Funds, and thereby greatly increasing the asset bases of each of the affected funds, it and the Bank Subsidiaries were benefiting substantially by obtaining great operating efficiencies (and lower per-dollar invested expenses) as well as "bragging rights" which enabled the Bank to tout the amounts of assets in its mutual funds, making it easier to sell shares therein to, *inter alia*, other customers of the Bank and its brokerage subsidiaries.

43.     The Nations Funds prospectuses also failed to disclose that the contracts between NFT and the Bank Subsidiaries relating to the provision of investment advisory, administrative, distribution and other services were determined on a no-bid basis to benefit the Defendants and contrary to the best interests of Plaintiffs and the members of the Class.

44.     Each of the facts identified above and others were material facts that the Defendants should have disclosed in the foregoing Nations Funds prospectuses and in the other documents provided to the beneficiaries of the Bank's fiduciary accounts at the times of the Conversion and generally when they were selling to such accounts shares of the Nations Funds as underwriters, financial advisers, investment companies, broker/dealers  and otherwise.

45.     There was no explanation in plain English that would put the recipients of the Conversion Disclosure Documents on notice of the Bank's wrongdoing as referred to herein. In fact, one of those documents, (Form 3.05D 7/1999) entitled "Disclosure of Investment in Nations Funds," stated deceptively:

**FILED**

UNITED STATES DISTRICT COURT   J N
NORTHERN DISTRICT OF ILLINOIS

OCT X 6 2006
Oct 6 2006
MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

S.C. RABIN on behalf of herself )
and all others similarly situated, )
  )
  ) CIVIL ACTION NO.____
Plaintiff, )
  ) JURY TRIAL DEMANDED
v. )
  ) CLASS ACTION
  )
JPMORGAN CHASE BANK, N.A., )
  ) 06CV5452
Defendant. ) JUDGE HIBBLER
  MAG. JUDGE NOLAN

**COMPLAINT**

S.C. Rabin, on behalf of herself and for all other members of the Class hereinafter

described, by and through counsel, seeks damages from the defendant JP Morgan Chase Bank,

N.A. (the "Bank") and injunctive relief and states and alleges as follows:

**OVERVIEW**

1.     This Class Action is brought by plaintiff on behalf of herself and all others

similarly situated, all of whom are or were beneficiaries of fiduciary accounts for which the Bank

serves or served as corporate fiduciary. The allegations in this Complaint are directed at the Bank

as well as certain of its subsidiaries, and their ultimate parent company, JPMorgan Chase & Co.

("JPM") for their breaches of fiduciary duties owed by them to beneficiaries of fiduciary

accounts ("Clients"). Neither such subsidiaries nor JPM are named as defendants at this time.

The Bank and JPM and their respective corporate predecessors (the "Acquired Banks") own and

control various other entities (collectively, the "Bank Subsidiaries") which effectively operate

and carry out various underwriting and other activities on behalf of the proprietary mutual funds

of the Bank and the Acquired Banks described below, which are referred to herein as the

"Captive Funds".

2.      The Bank and JPM totally control the Bank Subsidiaries and the Captive Funds and are liable for their activities described herein.

3.      This Complaint alleges that the Bank , the Acquired Banks and JPM, by and through the Bank Subsidiaries which operated the Captive Funds business, breached the fiduciary duties owed to the Clients of the Bank and the Acquired Banks by, *inter alia,* acting in their own interests and putting them before those of plaintiff and the members of the Class, yielding to the material conflicts of interest at the time they owed duties of loyalty to such persons and otherwise operating the fiduciary activities of the Bank to the detriment of the persons in the Bank's care. Such behavior was manifested, in part, by the incremental increases in expenses fiduciary accounts sustained when the Bank and the Acquired Banks before it implemented corporate decisions to funnel assets in their respective fiduciary accounts to the proprietary mutual funds of the Bank and the Acquired Banks, the Captive Funds, nominally overseen by purportedly independent trustee/directors. In connection with sales of the shares in these proprietary mutual funds to the accounts of plaintiff and all members of the Class as defined below, the Bank failed to exercise good faith and/or exercise reasonable care to avoid making imprudent investment decisions for such accounts as more fully set forth below. In the process, it unjustly enriched itself both by and through the Bank Subsidiaries and otherwise.

4.      The Bank through its "Private Bank" and "Private Client Services" formerly so-called "trust departments" of the Acquired Banks (collectively "Private Bank"), with offices in many parts of the United States, administers fiduciary accounts and offers a variety of financial planning and investment advisory services to the public, including customized management of the portfolios held in fiduciary accounts and individualized services for their Clients.

5.      As an integral part of the investment advisory services the Bank offers to the public, the Bank promotes that it has expertise in management of financial resources and

2

customized "wealth management" solutions for each individual, integrating the Bank's various investment management and related services. The Bank, in order to obtain the leverage and economies of scale referred to below, engages in "asset gathering" for its "Private Bank" and for its Captive Funds. The Bank, currently using the "JPMorgan Chase," JP Morgan" and "Chase" brands, advertises on its website and otherwise and holds itself out as providing expertise in portfolio management, proclaiming in particular its **experienced investment advisors**. The Bank prominently advertises its promise and holds itself out to persons who do business with its "Private Bank."

6.        In fact, despite the Bank's advertising, marketing pieces and direct solicitations of those who established fiduciary accounts with the Bank and the Acquired Banks (and the beneficiaries thereof), as described herein, those promises have been and are being uniformly ignored or deliberately broken. In the context of their numerous acquisitions of other financial institutions to create a nationwide "wealth management" business, senior management of JPM and the Bank centralized the functions of the Acquired Banks defined below into the Bank's own template, forcing more and more fiduciary accounts to be "serviced" at as low a level as possible and funneling as many of such accounts' assets into the Bank's Captive Funds. In the course of carrying out their "master plan," JPM and the Bank and their confederates at the helm of the Captive Funds sacrificed the interests of the beneficiaries of the affected fiduciary accounts in favor of the "bottom line" of JPM and the Bank as described herein.

7. (a)    The focus of this lawsuit is, in the context of a massive acquisition spree described below, the corporate strategy of JPM and the Bank to consolidate the fiduciary operations of the various Acquired Banks and to generate operational efficiencies therefrom to make up for the deterioration of the Bank's traditional profit model, commercial lending and replace it with fee and related income. In the course of carrying out such strategy, JPM, the Bank

3

and the Acquired Banks planned to and did bulk-up the Captive Funds business to provide themselves with incremental sources of profit from fee and other income generated by, *inter alia*, the Bank Subsidiaries. They did so from various services provided to the Captive Funds, including investment advisory, distribution and other services. The assets held in the fiduciary accounts of the Bank and the Acquired Banks were and are a perfect "cookie jar" for them to use to "seed" and/or bulk-up the Captive Funds and better enable the Bank to streamline its so-called "Private Bank" and otherwise extract economies of scale from fiduciary operations, all of which conduct breached the Bank's duties to the fiduciary account beneficiaries and provided them less than the attention and services to which they were entitled.

(b) In particular, in order to maximize the Bank's profits earned from the Bank's fiduciary accounts for which it and the Acquired Banks acted as corporate fiduciary, they conspired with others presently unknown in a series of business decisions to eliminate the personalized investment services inherent in the provision of corporate fiduciary services, to "double dip," by forcing their fiduciary accounts, to the greatest extent feasible, to have to the greatest extent feasible, their assets re-directed from their historic allocations in individually managed accounts and/or so-called Common Trust Funds ("CTFs") and/or other assets, to the Bank's proprietary mutual funds controlled by the Bank Subsidiaries ("Conversions") and/or to force the investments of such assets into the Captive Funds directly. No claims are asserted herein as a result of the Conversions to the extent plaintiff and/or members of the Class validly released any such claims. They so conspired by agreeing to act together for their unjust enrichment at the expense of plaintiff and the members of the Class, all of which caused them substantial damages as described below.

(c) As used herein, the term "Conversions" refers to the wholesale asset re-directions by the Bank and/or the Acquired Banks of fiduciary assets within their control into shares of the

4

Captive Funds during the Class Period as referred to below. The "double-dip" refers to the Bank and/or the Acquired Banks (through the Bank Subsidiaries and otherwise) extracting fees and expenses from the affected fiduciary accounts, directly and indirectly, through the investment of the assets in those accounts in shares of various Captive Funds taken together with the traditional fees charged by the Bank and/or the Acquired Banks to each account for serving as a corporate fiduciary. Although, as discussed below, some of such "double dipping" was ameliorated in some cases by fee credits, the net effect of employing the Captive Funds as investment vehicles for the affected fiduciary accounts, including those of plaintiff, was to cause those accounts to be charged excessive amounts for the investment-related services rendered to them, which services they were entitled to receive as an integral part of the fiduciary relationship.

(d) In addition to causing the fiduciary unnecessary and/or excessive investment-related expenses, the victims of the Conversions had no practical way to know that the expenses ultimately paid by their fiduciary accounts from the use of the Captive Funds would increase materially as a direct result of the Conversions. Further, the Bank's wrongdoing is continuing in nature. Upon information and belief, JPM and the Bank continue to seek other financial institutions to acquire in which, *inter alia,* fiduciary services will be further marginalized as they have been with the Acquired Banks as described herein. In addition to the Captive Funds shares purchased for the fiduciary accounts of members of the Class in and pursuant to the Conversions, such shares were also purchased for such accounts otherwise through, *inter alia,* initial investments, reinvested dividends and interest, purchases of Captive Funds money market mutual funds and by other means.

(e) As corporate fiduciaries, the Bank and the Acquired Banks which the Bank absorbed through merger, were required to place the interests of Class members above their own. Pursuant

to the trust agreements and other documents pursuant to which the fiduciary relations were established, the Bank and the Acquired Banks were obligated to provide, in exchange for the fees charged by them for serving as corporate fiduciary, a range of personalized administrative and investment services. During the Class Period as defined below, however, there existed and exist critical conflicts of interest that are embedded within the fiduciary, investment advisory and other services the Defendants provided to fiduciary accounts, particularly with respect to the provision of the individualized services to which beneficiaries were and are entitled and the Bank's purchases of Captive Funds shares for their accounts.

(f) Historically, the Bank, either through its so-called "Private Bank," "Private Client Services", or through the trust departments of it and its predecessors, promoted itself by touting its purportedly highly individualized trust administration and asset management services, all of which was intended to and did lure grantors, testators and others to designate the Bank and the Acquired Banks as a fiduciary for estates, trusts and other fiduciary accounts.

(g) In fact, the plans of the Bank, JPM and their respective predecessors have been to cut back substantially on such so-called customized portfolio management and to direct fiduciary funds to the greatest extent feasible, once "captured," into standardized investments such as the Bank's proprietary mutual funds, including, *inter alia*, the Captive Funds, as part of the Conversions as described herein and otherwise. However, as an integral part of the fiduciary relationship between her father and the Bank's predecessor, plaintiff became entitled to receive individual and prudent management of the assets placed in the Bank's care with the understanding that the Bank, in making investment-related decisions, would put the plaintiff's interests first before any others. As described herein, the Bank and its predecessors, breached their fiduciary obligations to plaintiff (and her parents) by, *inter alia*, putting their own interests foremost and not investing the entrusted assets in the most prudent manner.

6

(h) The Bank, the Bank Subsidiaries and JPM have blatant conflicts of interest which are endemic to the relationship between and among the Bank's sales force, its employees and the members of the Class. Specifically, the policy of the Bank and the Acquired Banks was to avoid investing fiduciary assets in non-proprietary mutual funds while touting, at the same time, the provision of customized portfolio management and to recommend portfolio strategies to meet a client's investment goals. To lure or retain fiduciary accounts, the Bank and its predecessors created public images designed to foster the belief that the "Private Bank," "Private Client Services" and the Acquired Banks' trust departments were reliable providers of customized financial advice. "Private Bank" employees, acting under pre-determined Bank policy, provide investment planning "advice" under the guise that this advice is customized when in fact it is not. Instead, the Bank and its predecessors invested fiduciary assets in their proprietary mutual funds and other financial "products" in the Clients' fiduciary accounts. These practices included, but were not limited to:

> (i) the Bank and its predecessors failed, to the greatest extent possible, to consider any non-proprietary mutual funds as appropriate for investments in fiduciary accounts, particularly non-proprietary money market mutual funds even when these non-proprietary money market funds were higher yielding than the proprietary ones;

> (ii) the Bank had a direct financial interest in selling its own proprietary mutual fund and other products to its fiduciary accounts;

> (iii) the Conversions resulted in material increases in the expenses of investing the assets of affected fiduciary accounts at the expense of plaintiff and members of the Class;

7

(iv) the Bank and its predecessors had not negotiated in any meaningful way the fees and expenses that were being charged to the Captive Funds by their affiliates (including the Bank Subsidiaries) nor did they negotiate with non-affiliated firms that could provide the same investment advice or other services to fiduciary accounts at lower cost;

(v) the Bank and its predecessors assigned, in "musical chairs" fashion, uninformed and relatively inexperienced "trust advisors" and "portfolio managers" to service fiduciary accounts and their beneficiaries consistent with their plan to shrink fiduciary services at the expense of the beneficiaries who were dependent upon them;

(vi) the Bank and its predecessors, instead of providing investment management of most fiduciary accounts, invested their assets pursuant to computerized models and did not regularly conduct the Regulation 9 review of the accounts and their beneficiaries to determine whether the assets purchased therefor were suitable and otherwise appropriate and prudent, particularly when compared with non-proprietary alternatives;

(vii) the Bank's "customized portfolio management" typically included only the purchase of the Bank's proprietary mutual funds when mutual funds were used as the sole investment vehicles for fiduciary accounts;

(viii) the Bank regularly and as a matter of corporate policy typically prohibited co-fiduciaries from having any serious role in the investment of the assets in fiduciary accounts including, *inter alia*, denying them timely and complete information with respect thereto; and

(ix) many of the proprietary funds of the Bank and the Acquired Banks were new or relatively new funds with no established track record of returns; indeed, many

8

of the funds in the Captive Funds family would not exist but for the Conversion and/or the Bank's funneling other fiduciary assets into them.

(i) Each element to the foregoing practices created a conflict of interest between the financial well-being of plaintiff and the members of the Class on the one hand and the financial well-being of JPM, the Bank and their predecessors on the other. Throughout the Class Period as set forth below, each of the Bank and the Acquired Banks was aware that these schemes created material conflicts of interest between themselves and their Clients. As a consequence, the Bank and its predecessors engaged in improper self-dealing to the detriment of plaintiff and the members of the Class and, because of the failure to separate the Bank's fiduciary operations from all its other businesses and those of JPM and the Bank Subsidiaries, its continued performance as a corporate fiduciary is and remains materially flawed.

## ACQUISITIONS OF OTHER FINANCIAL INSTITUTIONS

8.     Over the course of the last 15 years, the Bank and JPM have made numerous acquisitions of other financial institutions throughout the United States (the "Acquired Banks").

9.     As an integral part of these acquisitions, JPM and the Bank put into operation a corporate-wide plan to eliminate many of the investment-related and other services to beneficiaries of fiduciary accounts as described herein, including the elimination of those personnel who provided services to fiduciary account beneficiaries while at the same time increasing the fees paid by them which individualized services were integral to the contractual arrangement between, *inter alia*, plaintiff's father and others who established fiduciary accounts with the Bank and/or the Acquired Banks and them.

10.     In the context of this nationwide series of acquisitions, and in order to justify the high premiums that JPM and the Bank were paying for the Acquired Banks, with each new acquisition, they required the centralization and streamlining of the fiduciary services offered by

9

the Bank, including the increased usage of Captive Funds as vehicles for investment of their fiduciary assets. At the same time, they planned to extract greater benefits from the fiduciary accounts of the Bank and the Acquired Banks at the expense of the beneficiaries thereof by forcing CTFs and other assets therein to be sold and reinvested in the Bank's proprietary mutual funds to as great an extent as feasible, thereby obtaining the very leverage and economics of scale needed to throw off the financial benefits from the acquisitions.

11.     The settlors of certain of the trusts at issue, including David Dan Rabin, plaintiff's late father, in entrusting their assets to local banks, whether First National Bank of Chicago, Chase Manhattan Bank or Morgan Guaranty Trust, among other Acquired Banks, did so based upon personal relationships with officers of such Acquired Banks built over many years. These fiduciary relationships were established because, *inter alia*, the Acquired Banks held themselves out to the settlors and to other prospective customers of fiduciary services as institutionally and personally suited not only to the stewardship of settlors' assets over multiple generations but looking after their descendants or other designated beneficiaries of their largesse. Over the years, the Bank and its corporate predecessors swallowed-whole the Acquired Banks, financial institutions which had fiduciary responsibilities to plaintiff and members of the Class.

12.     In the course of the metamorphosis of First National Bank of Chicago and other acquired financial institutions into the Bank, the interests of plaintiff and members of the Class were not represented by caring, knowledgeable trust officers but frequently by relatively lower-level Bank personnel with little or no investment expertise and portfolio managers who employ computerized asset allocation programs designed to maximize the use of the Bank's proprietary funds in fiduciary accounts instead of the individual management and attention to which the beneficiaries of the affected accounts were entitled. Except for the highest net worth fiduciary accounts which are still provided with "open architecture" asset management giving the

10

beneficiaries thereof the "customized recommendations" and "wealth management expertise" promised by the Bank, most of its fiduciary accounts are not and have not been provided the services to which they are entitled since the consolidation of the various Acquired Banks began taking place. As such, the Bank and the Acquired Bank breached their corporate fiduciary obligations to plaintiff and other account beneficiaries.

13.     At or prior to the time that First National Bank of Chicago and Bank One, among other Acquired Banks were merged into the Bank, it was known by the parties to the acquisition negotiations that the Bank, through its planned consolidations, would materially adversely affect the investments in and administration of the fiduciary accounts at the Acquired Banks, including plaintiff's account..

14.     To the best of the knowledge, information and belief of plaintiff, neither the Bank or its predecessors provided appropriate written notice to her of the transfer of fiduciary capacities to the Bank or which disclosed the material adverse affect of such transfer or which advised her or other interested parties that they had a right to object to the transfer and, *inter alia*, obtain a replacement fiduciary. Further, at no time did either the Bank or the Acquired Banks advise plaintiff or the members of the Class with respect to their legal rights as a result of the foregoing mergers and acquisitions of the Acquired Banks.

15.     Plaintiff believes and therefore alleges that the Bank similarly failed to provide such notice in each of the instances where the fiduciary responsibilities of an Acquired Bank were taken over by the Bank or one of its predecessors. As such, all similarly affected beneficiaries were wrongly denied notice and the right to object (or take legal action) with respect to a transfer of fiduciary responsibilities to the Bank.

## THE BANK'S CAPTIVE FUNDS

16.    (a) The Captive Funds are proprietary funds nominally operated by a so-called predominantly independent Board of Trustees. Even though no more than 60% of the Board is supposed to be an "interested" person, in fact all members thereof were, in fact, elected, re-elected, directed and controlled by the Bank and the Bank Subsidiaries.

(b) It has been the Bank's policy, throughout the Class Period defined below, both before and after the Conversions, to force the assets of its fiduciary accounts into shares of the Captive Funds to the greatest extent feasible.

(c) The Captive Funds' portfolios sold to the fiduciary accounts or plaintiff and the members of the Class through most of the relevant period cover a wide variety of investment disciplines, strategies and types of asset categories including, *inter alia*, money market, equity and bond funds. The Captive Funds are nominally operated by a Board of Trustees, a majority of who are purportedly independent. In fact, the Bank, as the largest single shareholder of record of the various Captive Funds, controls all nominees to the Captive Funds' Board and therefore controls the Captive Funds and the Bank Subsidiaries.

(d) Certain of such Captive Funds were funded by the Bank and the Bank Subsidiaries in substantial part by transferring fiduciary assets pursuant to the Conversions, in effect, "force selling" shares of the Captive Funds to and upon the Bank's fiduciary accounts for which it served as corporate fiduciary. Such funding permitted the affected Captive Funds to have substantial asset bases, an important selling point to the JPM, the Bank and the Bank Subsidiaries in marketing shares in the Captive Funds to other potential purchasers thereof through the Bank and other subsidiaries of JPM.

12

## JURISDICTION AND VENUE

17.    The claims asserted herein arise under and pursuant to state statutes and common law. This Court has jurisdiction under 28 U.S.C. § 1331and the Class Action Fairness Act of 2005. Plaintiff makes no claims under or pursuant to federal law and does not allege that the Bank misrepresented or omitted to disclose any material fact to her in connection with the purchase, sale or ownership of securities.

18.    There is diversity of citizenship between plaintiff, a citizen of the State of Illinois and the Bank, a federally chartered bank with its headquarters in the State of New York. Further, the claims of all members of the Class well exceed $5,000,000, exclusive of interest and costs. Although plaintiff and a substantial number of members of the Class reside in Illinois, more than two-thirds of the Class members are residents of other states.  The conduct of the Bank as described herein occurred directly and indirectly within this District, as well as in other states. Further, each of the Bank has continuous, material and systemic contacts within this District through, *inter alia*, the offices of the "Private Bank" and otherwise. Accordingly, this Court has personal jurisdiction over the Bank.

19.    Venue is proper in this District as many of the acts and practices complained of herein occurred in substantial part or arise out of the activities of the Bank and the Bank Subsidiaries in this District, including, *inter alia*, the breaches of fiduciary duties as more fully alleged below.

## THE PARTIES

20.    Plaintiff is a beneficiary of one of the Bank's fiduciary accounts who were victims of its scheme to enhance profits by means of, *inter alia*, diminishing the fiduciary services to which she and other beneficiaries were and are entitled, using the Bank's proprietary mutual funds, the Captive Funds, as investments for their fiduciary accounts and otherwise.

13

Plaintiff and the members of the Class are related to one another by being damaged at the expense of the activities of JPM, the Bank and the Bank Subsidiaries as described herein.

21.    The Bank is a federally chartered bank domiciled in New York, and is a wholly owned subsidiary of JPM.

## FACTUAL ALLEGATIONS

22.    Notwithstanding the fact that the fiduciary accounts of plaintiff and members of the Class have been under the fiduciary responsibility of the Bank, it has bounced the beneficiaries of many of these accounts around the country, which beneficiaries are now "serviced" by low-level employees, rather than fiduciary officers with knowledge of the beneficiaries or their individual needs.

23.    Historically, the Bank and its predecessors invested the assets of the fiduciary accounts of members of the Class primarily through individually managed portfolios and/or through so-called "Common Trust Funds" or "Collective Investment Funds." The expenses of the Bank for such investment vehicles and related administrative services were absorbed by the Bank out of its fees for serving as fiduciary.

24.    Beginning some time before 2000, in order to, *inter alia,* compensate for massive losses it was incurring from its traditional lending business and the excessive premiums the Bank and JPM were paying for the Acquired Banks, the Bank and its predecessors developed various plans and schemes pursuant to which they sought to minimize their operating expenses with respect to fiduciary accounts and maximize their profits from their fiduciary business, particularly through the use of proprietary mutual funds as investment vehicles to the greatest extent feasible.

25.    Upon information and belief, the chief executive officers of JPM, the Bank, and of each of the Acquired Banks, were significant motivating forces behind these plans, which

14

were integral to their respective and similarly-motivated plans to extract higher profits from the Acquired Banks and consolidating their various trust department and "wealth management" activities under the banner of the so-called "Private Bank" or similar exclusive-sounding replacements for the Acquired Banks' trust departments. The plans of the Bank and the Acquired Banks included the consolidation and elimination of the previously existing trust departments of the Acquired Banks with the objective of "servicing" fiduciary accounts and the beneficiaries thereof with fewer and fewer personnel and greater standardization and computerized selection of investments in fiduciary accounts, all of which was contrary to the obligations created by their fiduciary relationships with plaintiff and members of the Class. Pursuant to such business plans, they decided, *inter alia*, to utilize the assets held by the Bank in fiduciary accounts to fund an initial group of mutual funds and/or to add assets to such funds controlled by the Bank, the Acquired Banks and the Bank Subsidiaries, the Captive Funds, as well as other mutual funds merged into them following the acquisition of, *inter alia*, the Acquired Banks. Thereafter, due to numerous acquisitions, mergers and other transactions referred to above, consistent with their longer-term plan and scheme, the Bank determined that most or all of the assets in certain fiduciary accounts held by the Bank (and formerly held as fiduciary assets by the Acquired Banks) would be converted into shares of the Bank's proprietary funds, such as the "family" of Captive Funds or only invested in such mutual funds initially. Even in fiduciary accounts such as that of plaintiff, where the assets invested in were "selected" by computerized "models," the Bank caused uninvested cash to be placed in Captive Funds money market mutual funds instead of optimal investment vehicles that would generate the highest rates of return.

26.     Through a complicated and barely comprehensible grouping of advisors, sub-advisors, subsidiaries and other affiliated and unaffiliated service providers, the Bank and the

Bank Subsidiaries engineered a scheme pursuant to which the Bank was able to abdicate many of its traditional fiduciary responsibilities, functions and services to beneficiaries of its fiduciary accounts, in breach of its fiduciary obligations to plaintiff and the members of the Class, in favor of alternatives that resulted in higher total direct and indirect expense charges made to the Bank's fiduciary accounts as compared to the trustee or similar fees historically paid to the Bank for, *inter alia*, active management of the fiduciary accounts' assets and to extract additional profits by utilizing the Captive Funds as compared to higher yielding and better-managed non-proprietary mutual funds that were commercially available in the marketplace.

27.     Throughout the Class Period, while the Bank and the Acquired Banks were using fiduciary assets to purchase shares in the Captive Funds, and thereby greatly increasing the asset bases of each of the affected funds, they and the Bank Subsidiaries were benefiting substantially by obtaining great operating efficiencies (and lower per-dollar invested expenses) as well as "bragging rights" which enabled the Bank and the Acquired Banks to tout the amounts of assets in their proprietary mutual funds, making it easier to sell shares therein to, *inter alia*, other customers of the Bank, the Acquired Banks and their brokerage subsidiaries.

28.     The contracts between the Captive Funds' Board of Trustees and the Bank Subsidiaries relating to the provision of investment advisory, administrative, distribution and other services were determined on a no-bid basis to benefit the Bank and the Acquired Banks and contrary to the best interests of plaintiff and the members of the Class.

29.     While the Bank and the Acquired Banks provided "credits" to some fiduciary accounts for what were the purported fees received by the Bank Subsidiaries from the Captive Funds, such credits were substantially less than the incremental expenses their fiduciary accounts incurred, directly and indirectly, as a result of having Captive Funds purchased for such accounts. Further, in many other cases, there was no credit for the fiduciary fees charged by and

16

thus the Bank and the Acquired Banks were able to fully "double dip," charging fees to serve as a corporate fiduciary and, as well, imposing substantial fees and expenses on the Captive Funds acquired for the affected fiduciary accounts. Additionally, upon information and belief, the Bank Subsidiaries had arrangements with purportedly independent vendors of advisory and administrative services, from which arrangements the Bank and Bank Subsidiaries benefited in undisclosed ways.

30.    Upon information and belief, no analyses or determinations were made by the Bank or the Acquired Banks as to the suitability and/or propriety of the relative costs and benefits of investments in the Captive Funds at the time of or before the purchases of shares therein were carried out for each of the Bank's fiduciary accounts as compared to numerous other available mutual funds or investment vehicles in which the Bank and the Acquired Banks could have invested prudently and at lower cost the assets in the fiduciary accounts of which plaintiff and the members of the Class were beneficiaries.

31.    Even assuming that the Bank and the Acquired Banks made prudent decisions to purchase shares in the Captive Funds for their fiduciary accounts, which they did not, as indicated above, neither the Bank nor the Acquired Banks negotiated the fees and expenses to be charged to the Captive Funds or comparison shop in any significant way with other funds or families of funds in an attempt to obtain the same or better investments elsewhere and at lower net expense to their fiduciary accounts. Upon information and belief, any "comparisons" that were done by the Bank or the Acquired Banks with non-proprietary mutual funds or investment advisors were merely to "paper" the files so it would appear that an effort was made to consider alternative mutual funds or advisors. Similarly, the Captive Funds' Board of Trustees, dominated and controlled by the Bank and/or the Acquired Banks, sought to obtain the lowest fees from the Bank Subsidiaries actually operating the Captive Funds. Indeed, as stated by New York's

17

Attorney General Eliot Spitzer: "Fund directors do not – and cannot – negotiate hard on the fees." This is particularly the case when, as here, all of the Captive Funds' Trustees were nominated and voted upon by the Bank, which totally controlled the composition of the Board and, thus, the Captive Funds.

32.    Upon information and belief, the Bank and the Acquired Banks specifically excluded alternate investment vehicles (such as other families of funds such as the Vanguard Group and Fidelity Investments mutual funds) from their considerations in order to maximize their earnings and those of their affiliates (including the Bank Subsidiaries) and did not give serious consideration to investing the assets of fiduciary accounts invested as they were historically in fee and expense free CTFs, which could be structured to generate, e.g. daily pricing and full diversification.

33.    Upon information and belief, as a result of a conspiracy among the Bank, the Acquired Banks and others presently unknown, as part of corporate business decisions. chose to invest the fiduciary assets of plaintiff and the members of the Class in shares of the Captive Funds as part of the Conversions and otherwise in order, *inter alia*, to generate investment advisory fees and other fees for its various affiliates and to "bulk-up" the Captive Funds without regard to whether such investments were prudent and in the best interest of plaintiff and the other beneficiaries of fiduciary accounts.

34.    The Conversions of the assets of fiduciary accounts to the Captive Funds and the investment of fiduciary assets therein generally was carried out in furtherance of the corporate plans of JPM and the Bank and their predecessors to reduce their expenses of managing fiduciary assets and increasing their overall direct and indirect profits from fiduciary operations, one of the objectives in consolidating the operations of the Acquired Banks. The assets in the fiduciary accounts managed by the Bank and the Acquired Banks were particularly vulnerable to misuse

since they regarded the fiduciary accounts in their care as a "cookie jar" open for the taking. The Bank and the Acquired Banks invested fiduciary assets in the Captive Funds because they would not merely profit from their trustee and similar fiduciary fees but "double dip" by generating additional revenues through the their related asset management businesses, administrative service businesses and otherwise. Further, the Conversions created an opportunity for the Bank and the Acquired Banks to avoid the relatively low profitability of managing the fiduciary accounts (and the expenses related thereto) which they had contracted to do when the Bank (and/or its predecessor Acquired Banks) agreed to serve as fiduciary thereof, and substitute ever-increasing fee income directly and through its corporate affiliates.

35.     The Bank, the Acquired Banks and their subsidiaries and affiliates reaped many millions of dollars in purported money management, investment advisory and other fees as a result of the Conversions and thereafter from the investment of fiduciary assets in the Captive Funds. The Bank and the Acquired Banks also benefited by receiving trustee or similar fees for serving as a fiduciary and by reason of the benefits which flowed from, *inter alia*, substantially reduced operating expenses of their fiduciary operations. Despite these benefits to the Bank and the Acquired Banks, these investments have been of little, if any, benefit for their fiduciary accounts and the beneficiaries thereof, including plaintiff and the members of the Class. On information and belief, plaintiff and all members of the Class suffered damages from the investment and fiduciary practices of the Bank and the Acquired Banks generally as described above in an amount which cannot presently be determined but which is capable of calculation and they are entitled to restitution of the Bank's unjust enrichment as described below.

## CLASS ACTION ALLEGATIONS

36.    Plaintiff brings this action on her own behalf and pursuant to Rule 23(b)(3) of the

Federal Rules of Civil Procedure as a class action on behalf of the following Class:

> All beneficiaries of trust, estate or other fiduciary accounts
> for which the Bank or any of its predecessors acted as a trustee,
> executor or other form of corporate fiduciary the assets of which
> accounts were directly or indirectly invested in one or more of the
> Captive Funds at any time from January 1, 1996 to the present (the
> "Class" and "Class Period").

37.    The Class defined above excludes all such persons whose claims are barred by an

applicable statute of limitations and/or a validly executed or otherwise obtained release obtained

after full disclosure of all material facts with respect thereto. The definition of the Class, the

Class Period and the identity of those excluded from the Class may be amended following

discovery with respect thereto. No claims are made in this Complaint with respect to the

Conversions.

38.    Over the past 15 years, JPM and the Bank, while making acquisitions around the

country increasingly consolidated their operations and centralized them into a nationwide

template consistent with the goals and objectives set out by their senior management and other

senior executives of the Acquired Banks, took actions which affected all members of the Class

herein in substantively the same way.

39.    Plaintiff seeks, *inter alia*: (i) an accounting which determines all damages caused

by the Bank and the Acquired Banks to plaintiff and the members of the Class defined above and

the extent of the unjust enrichment of them from their wrongful activities, as well as repayment

of such unjust enrichment and the earnings thereupon; (ii) money damages to be paid by the

Bank as a result of its breaches of duty; (iii) injunctive relief providing for the possible removal

of the Bank as fiduciary for all fiduciary accounts in which members of the Class are currently

20

beneficiaries; (iv) injunctive relief providing for new procedures and practices at the Bank which put the interests of members of the Class ahead of those of the Bank and its affiliates and which otherwise address the ongoing conflicts of interest forced by the Bank in the investment of fiduciary assets including, *inter alia*, providing for the creation of a so-called "Chinese Wall" separating the Bank's fiduciary functions from all other operations; (v) injunctive relief providing for the Bank to annually select investment advisors for its fiduciary accounts chosen based upon, *inter alia*, comparative investment performance and expense; (vi) injunctive relief providing for the appointment of a Special Master to oversee the Bank's fiduciary operations pending completion of the other injunctive relief ordered by the Court; and (vii) for relief incident and subordinate thereto, including substantial punitive damages as a result of the greed-driven and egregious self-dealing engaged in by the Bank.

## Numerosity of the Members of the Class

40.     Upon information and belief, the Bank serves as a fiduciary (such as a trustee, guardian, executor, etc.) for many thousands of fiduciary accounts affected by the wrongdoing described herein. Similarly, there are many thousands of beneficiaries thereof who are members of the Class.

41.     The exact number of members of the Class as above described is not known by plaintiff, but is within the sole knowledge of the Bank. Upon information and belief, the members of the Class are so numerous as to make a class action appropriate.

42.     On information and belief, the members of the Class are located in most or all fifty states, and in numerous foreign countries.

## Common Issues of Law and Fact Predominate

43.     On information and belief, throughout and prior to the Class Period, the Bank and the Acquired Banks, in conspiracy with the Bank Subsidiaries and others, decided to invest the assets of the affected fiduciary accounts in shares of the Captive Funds, all of which were directly or indirectly "advised," managed and otherwise administered by the Bank Subsidiaries or their affiliates.

44.     All members of the Class were adversely affected by the self-serving business decision of the Bank and the Acquired Banks to invest the fiduciary account assets within their control into shares of one or more of the Captive Funds.

45.     All of the fiduciary accounts of the Bank and the Acquired Banks and their beneficiaries were negatively impacted by the acquisitions of other financial institutions and diminished fiduciary services as described above. Among the material consequences thereof was the substantial reduction in the fiduciary services provided to the members of the Class and, in the wake thereof, the Conversions and otherwise. All of the fiduciary accounts of the Bank and the Acquired Banks, the assets of which were invested in shares of one or more of the Captive Funds, paid directly or indirectly, administrative and investment advisory fees and other charges to subsidiaries and affiliates of the Bank, including the Bank Subsidiaries, based on the fiduciary assets invested by the Bank and the Acquired Banks in such mutual funds. All fiduciary accounts of which the Bank and the Acquired Banks served as corporate fiduciary were damaged  by reason of the higher expenses charged to such accounts as a consequence of the Conversions and the lower investment returns generated as a result thereof and/or by investments in the Captive Funds unrelated to the Conversions. Those members of the Class not affected by the Conversions but whose assets were nevertheless invested in shares of the Nations Funds were similarly damaged as a result of such purchases.

22

46.     There are common questions of law and fact that relate to and affect the rights of each member of the Class including, *inter alia*:

(a)     whether the business decisions of the Bank and the Acquired Banks to invest assets of their fiduciary accounts in the Captive Funds were motivated by the best interests of the Class members (which the Bank and the Acquired Banks had a duty to put before their own) or by their desire to generate management, administrative and investment advisory fees for themselves, their affiliates and subsidiaries, to lower their expenses of managing fiduciary assets and to generate other benefits for themselves by, *inter alia*, "bulking-up" the assets invested in the Captive Funds;

(b)     whether the Bank and the Acquired Banks breached fiduciary duties to plaintiff and the members of the Class by failing to conduct their fiduciary operations in conformity with the requirements of the National Banking Act, the guidelines established by the Comptroller of the Currency and other applicable law and regulations;

(c)     whether the Bank and the Acquired Banks breached their fiduciary duties to members of the Class by making investment decisions for the fiduciary accounts of plaintiff and the Class not based upon individual investment decisions but based upon their own interests and those of their affiliates, rather than the interests of the beneficiaries of such fiduciary accounts; and,

(d)     what remedies are appropriate compensation for the damages caused to plaintiff and each member of the Class.

47.     The relief sought is common to the entire Class including, *inter alia*:

(a)     a declaratory judgment that the Bank and the Acquired Banks violated their fiduciary duties as trustee (or other similar fiduciary role) with respect to the affected fiduciary accounts;

23

(b)     payment by the Bank of compensatory damages caused by breaches of fiduciary duties as described herein, as well as substantial punitive damages;

(c)     an injunction preventing the Bank from opposing a petition by current beneficiaries of the fiduciary accounts affected by the wrongdoing referred to herein to replace it as corporate fiduciary; and

(d)     an injunction which establishes appropriate procedures and safeguards within the Bank to ensure that the interests of beneficiaries of fiduciary accounts within the Bank's control are fully protected from wrongdoing such as described herein.

## Typicality and Predominance of Plaintiff's Claims

48.     The interests of the plaintiff and each member of the Class have been adversely affected by the wrongdoing of the Bank and/or the Acquired Banks as described herein.

49.     The assets of the plaintiff's fiduciary account, like all other fiduciary accounts of members of the Class, were invested by the Bank and/or the Acquired Banks in shares of the Captive Funds pursuant to a wholesale business policy decisions by the Bank and the Acquired Banks made some time prior to the beginning of the Class Period and carried out thereafter.

50.     Upon information and belief, the plaintiff's fiduciary account, like all other fiduciary accounts, was used by the Bank, the Acquired Banks and their affiliates to generate additional management, administrative investment advisory and/or other fees and benefits for themselves (even after the so-called credits were applied to such fiduciary accounts) without regard for the best interests of the beneficiaries of such accounts such as plaintiff and the members of the Class. These claims that plaintiff has in common with all members of the Class and predominate over any individual claims they have against the Bank.

24

51.     The claims of plaintiff, who is a representative of the Class, are typical of the claims of all members thereof. The claims of plaintiff are based on the same fundamental factual allegations and legal theories as the claims of all other members of the Class.

### Plaintiff Will Fairly and Adequately Represent the Class

52.     The plaintiff is able to and will fairly and adequately protect the interests of the Class and the members thereof.

53.     The attorneys for plaintiff are experienced and capable of prosecuting complex litigation such as this case. The attorneys for plaintiff and the Class will actively conduct and be responsible for the prosecution of this litigation and the expenses thereof.

### PLAINTIFF'S ENTITLEMENT TO PUNITIVE DAMAGES

54.     The conduct of the Bank and the Acquired Banks was outrageous because of their malice, evil motive and reckless indifference to the rights of the plaintiff and all others similarly situated in implementing a nationwide across-the-board policy to invest the assets of the fiduciary accounts in one or more of the Captive Funds which:

(a)     took advantage of their conflicts of interest and the increased costs and expenses they would incur as a result of investing fiduciary assets in the Captive Funds, which costs and expenses inured to the benefit of the Bank and the Acquired Banks in flagrant violation of their duty of loyalty;

(b)     deliberately and knowingly changed the investment vehicles historically used by financial institutions for investments of fiduciary assets in shares of the Captive Funds, specifically to generate revenues and profits at the expense of the beneficiaries of the fiduciary accounts in flagrant violation of the duties of loyalty and prudence of the Bank and the Acquired Banks;

25

(c) deliberately and knowingly applied fee credits to fiduciary accounts which, if applied at all, only partially offset the additional cost of Captive Funds investments in flagrant violation of the duties of loyalty and prudence of the Bank and the Acquired Banks;

(d) deliberately and knowingly engaged in conflict of interest and self dealing transactions and failed to consider whether this conduct was in the sole interests of the beneficiaries of the fiduciary accounts to whom the Bank and the Acquired Banks owed a fiduciary duty, including the duties of loyalty and prudence and instead, put their interest in generating revenues and profits for themselves ahead of those to whom they owed a fiduciary duty;

(e) knowingly and intentionally or as a result of gross negligence proceeded with investments of fiduciary assets in the Captive Funds despite the fact that the true expenses to be borne by investing the assets therein were not appropriately compared with the performance and expenses of non-proprietary mutual funds available in the marketplace or CTFs.

## COUNT ONE

## BREACH OF FIDUCIARY DUTY

55. Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

56. On information and belief, the decisions of the Bank and the Acquired Banks to invest the assets of their fiduciary accounts in the Captive Funds was motivated not by the interests of plaintiff and the Class members but by their own interests in generating additional profits for themselves, including rationalizing fiduciary services to beneficiaries improperly as described above. In making their Class-wide decisions to purchase their proprietary mutual funds for their fiduciary accounts, the Bank and the Acquired Banks failed to consider the Captive

Funds' high expenses or alternative lower cost families of mutual funds (or deliberately did not do so) when they invested the assets of their fiduciary accounts in. shares of the Captive Funds. The Bank and the Acquired Banks simply put their own interests and those of the Bank Subsidiaries and their affiliates before those of the beneficiaries of their fiduciary accounts.

57.     The Bank and the Acquired Banks failed to consider the best interests of these beneficiaries when they invested the assets of fiduciary accounts in the Captive Funds and breached their duty of loyalty to them by putting the interests of themselves, the Bank Subsidiaries and their affiliates before the interests of plaintiff and the members of the Class.

58.     The investment of the assets of the affected fiduciary accounts by the Bank and the Acquired Banks in the Captive Funds for fiduciary accounts was a breach of their fiduciary duty to plaintiff and the members of the Class.

59.     As a result of, *inter alia*, the Bank's improper diminution of the fiduciary services provided to plaintiff and the members of the Class and the purchase of Captive Funds shares for their fiduciary accounts, the beneficiaries of these accounts have been damaged in an amount to be determined.

## COUNT II

## UNJUST ENRICHMENT

60.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

61.     By reason of causing the fiduciary assets in affected accounts to be invested in the Captive Funds, the Bank, the Acquired Banks and the Bank Subsidiaries have "double dipped" as well as gained other unjustified benefits for themselves and JPM as described above. They have profited by the sales of Captive Funds shares to fiduciary accounts as described

herein, thereby unjustly enriching themselves at the expense of plaintiff and the members of the Class.

62.     The foregoing "double dipping" was carried out by the Bank, the Acquired Banks and the Bank Subsidiaries by, *inter alia*, imposing on fiduciary accounts fees for acting as a corporate fiduciary as well as investment advisory fees, and other related charges which, when taken together with all the Captive Funds' expenses, even after so-called credits for certain fees paid to the Bank Subsidiaries by the Captive Funds, exceeded the amounts to which the Bank and the Acquired Banks were entitled. Such benefits to the Bank, the Acquired Banks and the Bank Subsidiaries were exacerbated by their avoidance of substantial operating expenses by reason of the abdication of the formerly individualized investment and administrative responsibilities owed by the Bank and the Acquired Banks to the members of the Class implicit in the fiduciary relationship.

63.     The Bank has retained and invested the proceeds of the foregoing unjust enrichment and realized additional profits thereupon, all of which should be returned to the fiduciary accounts from which they were derived and/or their beneficiaries, as the Court shall deem appropriate and otherwise.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff respectfully requests on her own behalf and on behalf of all members of the Class:

(a)     certification of this action as a class action and appointment of plaintiff and her counsel to represent the Class;

(b)     entry of judgment on the claims for breach of fiduciary duty in favor of plaintiff individually and as a representative of the other members of the Class and against the Bank and an award of compensatory damages and punitive damages in favor of plaintiff

individually and as representative of the other members of the Class and against the Bank in the amount of damages caused by the breaches of fiduciary duties by the Bank and the Acquired Banks;

(c)     entry of judgment enjoining the Bank from opposing any petition filed by any member of the Class seeking the removal of the Bank as corporate fiduciary and requiring the Bank to pay for all legal fees and expenses incident thereto including its own;

(d)     entry of judgment compelling the Bank to account for the unjust enrichment by the Bank and the Acquired Banks and disgorging the amount thereof (and the profits earned thereupon) to the fiduciary accounts affected by the wrongdoing described herein and/or their beneficiaries, as appropriate;

(e)     entry of judgment compelling the Bank to fully insulate its fiduciary operations from all of its other business activities and those of the Captive Funds, the Bank Subsidiaries and JPM;

(f)     entry of judgment compelling the Bank to establish and implement procedures to fully protect the interests of the members of the Class including, *inter alia*, the appointment of a Special Master to oversee the Bank's fiduciary operations pending completion of the other injunctive relief ordered by the Court;

(g)     repayment to the affected Captive Funds of the damages caused to them by the Bank's actions as described herein;

(h)     pre-judgment and post-judgment interest at the maximum rate allowable by law;

(i)     reasonable attorneys' fees and reimbursement of the reasonable costs and expenses of prosecuting this litigation and distributing the recovery to members of the Class; and

(j)     such other or additional relief as this Court deems appropriate.

## JURY DEMAND

Plaintiff hereby demands a trial by jury.

September 29, 2006

S.C. RABIN, on behalf of herself and others similarly situated

By: _____
     One of Her Attorneys

MYRON M. CHERRY & ASSOCIATES LLC
MYRON M. CHERRY
DANIEL J. BECKA
30 North LaSalle Street, Suite 2300
Chicago, Illinois 60602
(312) 372-2100
(312) 853-0279 Facsimile

GREENFIELD & GOODMAN LLC
RICHARD D. GREENFIELD
7426 Tour Drive
Easton, Maryland
(410)745-4149
(410) 745-4158 Facsimile

ANN MILLER LLC
ANN MILLER
834 Chestnut Street, Suite 206
Philadelphia, PA 19107
(215) 238-0468
(215) 574-0699 Facsimile

COUNSEL FOR PLAINTIFF AND THE CLASS

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| **S.C. RABIN**, individually and on behalf of herself and all others similarly situated | : : : : | |
| and | : : | |
| **JOHN HOLLINGER**, individually and on behalf of himself and all others similarly situated | : : : | |
| Plaintiffs, | : : | Case No. 06-C-5452 |
| vs. | : : | Judge William J. Hibbler |
| | : | Magistrate Judge Nolan |
| **JPMORGAN CHASE BANK, N.A. and JPMORGAN CHASE & Co.,** | : : : | CLASS ACTION |
| Defendants. | : | |

## AMENDED COMPLAINT

Plaintiffs, through their counsel, hereby allege the following upon personal knowledge as to their own acts and upon information and belief based, among other things, upon the investigation made by plaintiffs by and through such counsel as to the acts of the defendants JP Morgan Chase Bank, N.A. (the "Bank"), JPMorgan Chase & Co, ("JPM") and others as described herein. The majority of evidence in support of plaintiffs' claims is in defendants' exclusive possession, custody, or control. Plaintiffs' claims are likely to have additional evidentiary support after a reasonable opportunity for discovery.

## JURISDICTION AND VENUE

1.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and § 22 of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. § 77(v); § 27 of the Securities

Exchange Act of 1934 ("Exchange Act"), 28 U.S.C. § 1332 (b), the Class Action Fairness Act of 2005

and 28 U.S.C. § 1367.

2.      There is diversity of citizenship between each plaintiff and defendant Bank, a federally

chartered bank and JPM, with their headquarters in the State of New York.  Further, the claims of all

members of the Class will exceed $5,000,000, exclusive of interest and costs.  Although plaintiff Rabin and

a substantial number of members of the Class reside in Illinois, more than two-thirds of the Class members

are residents of other states.  The conduct of the defendants as described herein occurred directly and

indirectly within this District, as well as in other states.  Further, defendants have continuous, material and

systemic contacts within this District through, *inter alia*, numerous branches and offices of the Bank and

otherwise.  Accordingly, this Court has personal jurisdiction over the defendants.

3.      Venue is proper in this District pursuant to § 22 of the Securities Act, § 27 of the Exchange

Act and 28 U.S.C. § 1391(b) because the defendants had undeniable daily and regular contacts with this

District by reason of, *inter alia*, the common scheme, plan and conspiracy set forth below, to materially

reduce the fiduciary responsibilities owed by the Bank to plaintiffs and members of the Class, to foist upon

the fiduciary accounts of plaintiffs and all members of the Class shares of the proprietary mutual funds of

defendant including, in particular, those of the  JPMorgan Funds, and to extract from such accounts

excessive and unjust fees and other benefits.

4.      In connection with the acts alleged in this Complaint, defendants, directly or indirectly, used

the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate

telephone communications and the facilities of the national securities markets.  Defendants, directly and/or

through agents, affiliates and/or independent contractors distributed prospectuses within and otherwise

marketed and sold JPMorgan Funds shares to the fiduciary accounts of members of the Class residing in this District, much of which conduct originated within this District.

## THE PARTIES

5.      Plaintiff S.C. Rabin, a citizen of the State of Illinois, is a beneficiary of one of the Bank's fiduciary accounts who is and was victim of its breaches of fiduciary duties and its other wrongful conduct as set forth herein.

6.      Plaintiff John Hollinger, a citizen of the State of Colorado, was a beneficiary of one of the Bank's fiduciary accounts until on or about August, 2006, when the account was closed.  He too was a victim of the Bank's breaches of fiduciary duties and its other wrongful conduct as set forth herein.

7.      Defendant JPMorgan Chase Bank, N.A. (the "Bank") is a federally chartered Bank domiciled in New York, and is a wholly owned subsidiary of defendant JPMorgan Chase & Co. ("JPM"). At material times during the Class Period defined below, the Bank has served as a corporate fiduciary for fiduciary accounts for the benefit of plaintiffs and members of the Class. As indicated below, at all material times, JPM controlled the transactions described herein directly sand indirectly.

## BACKGROUND FACTS

8.      This Class Action is brought by plaintiffs on their own behalf and on behalf of all those similarly situated against the defendants arising out of, *inter alia,* violations of the federal securities law as well as breaches of fiduciary duty owed to them by defendant Bank. This case is brought against the backdrop, *inter alia*, of the Bank's breaches of fundamental fiduciary duties owed by it to plaintiffs and the members of the Class defined below.

9.      As stated by the Court in *Busby v. Worthen Bank & Trust Co., N.A.,* 484 F. Supp. 647,

(E.D.Ark. 1979):

> The dispositive point, in this Court's judgment, is that [the bank] is the trustee of an express trust. As such, **it is subject to what is probably the highest standard of fiduciary duty known to the law. Doubts must be resolved against the trustee, and against its employees, and in favor of the beneficiaries.** The famous passage by Chief Judge (later Mr. Justice) Cardozo, speaking for the New York Court of Appeals, has lost none of its force: **'Many forms of conduct permissible in a work-a-day world for those acting at arm's length, are forbidden to those bound by fiduciary ties. A trustee is held to something stricter than the morals of the market place.** Not honesty alone, but the punctilio of an honor the most sensitive, is then the standard of behavior. As to this there has developed a tradition that is unbending and inveterate. Uncompromising rigidity has been the attitude of courts of equity when petitioned to undermine the rule of undivided loyalty by the "disintegrating erosion" of particular exceptions. Only thus has the level of conduct for fiduciaries been kept at a level higher than that trodden by the crowd. It will not consciously be lowered by any judgment of this court....' **The trustee has a duty to avoid even the appearance of impropriety..."**

> [emphasis added, internal citations omitted]

10.     By acting as described herein and ignoring the explicit guidance provided by federal banking regulators and the Court in the *Busby* case as quoted above and other pronouncements of fiduciary obligations, the Bank has been a "faithless fiduciary" which put its own interests before those of the plaintiffs and members of the Class.

## Plaintiffs' Trust Accounts

11.     In 1969, plaintiff Hollinger, as a result of medical malpractice when he was one year old, was caused to be afflicted with cerebral palsy and other serious medical conditions. Following a jury trial in 1974, a judgment in his favor was rendered leaving his parents with a net amount of approximately $600,000, to be used for his lifetime care.

12.     Thereafter, his family caused the funds available from the malpractice judgment to be placed

in trust for plaintiff Hollinger at the American National Bank of Chicago, one of the numerous predecessor financial institutions ultimately merged into the Bank. The income from his trust account has been applied to his care and welfare including, *inter alia*, tutoring expenses, creating a wheelchair-accessible bathroom, therapists' fees and, for some years, payments to his mother, Katherine Kylen, for plaintiff Hollinger's benefit.

13.    Despite the fact that plaintiff Hollinger's parents were co-trustees with the Bank, the Bank did not make any attempt to determine his needs from them or from plaintiff Hollinger directly. Despite federal regulatory requirements to do so, neither the Bank nor its predecessors had annual or other periodic reviews of plaintiff Hollinger's account with him or with the co-trustees to discuss appropriate investment strategies of otherwise. As with other co-fiduciaries of accounts at the Bank, it ignored such co-fiduciaries and the beneficiaries of the accounts and made investment decisions unilaterally.

14.    Plaintiff Rabin's Trust accounts were established by her father, David D. Rabin, to insure that his wife and daughter would be well cared for throughout their lives. Plaintiff Rabin is the daughter of David D. Rabin, deceased. Although the Bank periodically had discussions with plaintiff and her mother, Bertha Rabin, with respect to certain of the investments purchased for plaintiff Rabin's trust accounts, at all relevant times, the Bank acted unilaterally in making investment decisions and never had annual or other periodic reviews of plaintiff Rabin's trust accounts with her to discuss appropriate investment strategies of otherwise.

**JPM's Goal To Be A Nationwide Financial Giant**

15.    Over the course of the last 15 years, JPM has made numerous acquisitions of other financial institutions throughout the United States, including Bank One and predecessors, American National Bank of Chicago and First National Bank of Chicago, which previously serviced the fiduciary accounts of

plaintiffs.  In 2004, Bank One and JPM merged to form "one of the strongest financial institutions in the world" as touted by Bank One's press release.

16.    In the course of JPM's long chain of acquisitions of other financial institutions ("Acquired Banks"), many of which were purchased for substantial premiums over book value, it relied increasingly on squeezing more and more revenues and profits from fiduciary operations, including standardizing the investment of fiduciary assets and forcing them, increasingly, into proprietary mutual funds. As stated at p.60 of the JPMorgan Funds Statement of Additional Information dated November 1, 2006, it is acknowledged that one of the investment advisors to the JPMorgan Funds "represents a consolidation of the investment advisory staffs of a number of [Acquired Banks] of the former Bank One Corporation…"

**Sales of JPMorgan Funds Shares To The Bank's Fiduciary Accounts**

17.    Throughout and on a regular basis during the Class Period defined below, defendant Bank purchased and sold shares of various JPMorgan Funds for plaintiffs' respective trust accounts including, but not limited to the following:

**Plaintiff Rabin's Accounts**

| Purchase | JP Morgan Municipal Money Market Premier | 11/05 |
|---|---|---|
| Sale | JP Morgan Municipal Money Market Premier | 11/05 |
| Purchase | JP Morgan Multi Cap Market Neutral Fd | 4/05 |
| Sale | JP Morgan Intermediate Tax Free Bond | 4/05 |

**Plaintiff Hollinger's Account**

| Exchange | JP Morgan Intermediate Tax Free Bond Fund | 2/05 |
|---|---|---|
| Sale | JP Morgan Intermediate Tax Free Bond Fund | 2/05 |
| Sale | JP Morgan Equity Index Fund | 2/05 |

18.     Plaintiffs were not made aware of these or any other purchase, sale or other transactions by

the Bank involving shares of JPMorgan Funds until after they had occurred and plaintiffs played no role in

connection with such transactions.  The Bank informed plaintiffs of these transactions by sending them

periodic account statements which so advised them of the Bank's purchases, sales and holdings of JPMorgan Funds shares for their respective accounts.

19.     Similarly, the Bank purchased shares of JPMorgan Funds for all or practically all of its fiduciary accounts, including accounts which have or had co-fiduciaries, such as plaintiff Hollinger's account. In the course of carrying out such purchases, the Bank intentionally excluded from consideration investing the assets in these fiduciary accounts on a fee and expense-free basis through Common Trust Funds ("CTFs") or other in-house pools of investments or alternate, lower cost, better managed non-proprietary mutual funds or the investment preferences of co-fiduciaries.

## FACTS UNDERLYING  THE VIOLATIONS OF FEDERAL  AND COMMON LAW

### The Bank's Relationship To Fiduciary Account Beneficiaries

20.     The Bank markets itself as a sophisticated corporate fiduciary which provides personalized financial solutions and excellent service.

21.     The Bank holds itself out as possessing a degree of skill greater than that of an individual of ordinary intelligence.  Accordingly, the Bank is held to that higher degree of skill when evaluating its management (or in this case, lack thereof) of the fiduciary accounts at issue here.

### Under Federal Regulations The Bank Owes the Highest Fiduciary Duty to the Trust Beneficiaries

22.     Trustees, executors and other corporate fiduciaries such as the Bank are bound by the highest standards of fiduciary duty to their charges.  For that reason, much guidance exists to inform corporate fiduciaries of the extent of their fiduciary obligations.

23.     For example, recognizing the inherent dangers prevalent when a bank acts as a

trustee, the Office of the Comptroller of the Currency (the "OCC"), the Bank's principal regulator, has set

up stringent guidelines to ensure that banks do not breach fiduciary duties owed to beneficiaries of trusts and

other fiduciary accounts under their management.  In that regard, the OCC directs:

> *Investment of fiduciary accounts* – (1) *In general*.  Unless authorized by
> applicable law, a national bank may not invest funds of a fiduciary account for
> which a national bank has investment discretion in the stock or obligations of,
> or in assets acquired from:  The bank or any of its directors, officers, or
> employees; affiliates of the bank or any of their directors, officers, or
> employees; or individuals or organizations with whom there exists an interest
> that might affect the exercise of the best judgment of the bank.  12 C.F.R. §
> 9.12(a).

24.    As a follow up to the generalized limitations on the investments that may be made by a bank

as set forth in 12 C.F.R. § 9.12(a), the OCC released:  Acceptance of Financial Benefits By Bank Trust

Departments, Comptroller of Currency – Banking Issues B-233, *Chief Executive Officers of National*

*Banks Authorized to Exercise Fiduciary Powers, Deputy Comptrollers (District), and Examining*

*Personnel,* February 3, 1989, which states in pertinent part:

> FIDUCIARY DUTIES OF BANK TRUST DEPARTMENTS

> National bank trustees owe exacting fiduciary duties to customers who place
> trust funds under the bank's management. **Trustees are obligated to make
> decisions concerning the investment of trust assets based exclusively
> on the best interest of trust customers.**  This principle is reflected in 12
> C.F.R. § 9.12(a) . . . .

> \* \* \* \*

> When selecting a mutual fund or money market investment, a trustee should
> evaluate the return being paid, the composition and length of maturities of its
> portfolio, the fund's management and all other factors relevant to the suitability
> of the investment for customers. ***The trustee must not place themselves in
> a position where their judgments concerning the optimal investment
> for trust accounts may be influenced by the trustees' receipt of
> financial benefits for selecting a particular investment.  The same
> principles apply whether the bank (i) rebates or discounts services
> provided by or at the direction of an investment management firm***

*(such as accounting and administrative services), (ii) computer goods or services, (iii) seminars and travel expenses which are offered by, or at the direction of, such firms, or (iv) any other financial benefits in exchange for investing trust funds in particular money market funds.*

\* \* \*

*In sum, if a bank receives incentives for placing trust assets in an investment fund offered by a particular provider, the bank must pass those incentives on to the accounts which have had their asset interests invested in the fund.*

REMEDIAL ACTION

**National banks that engage, or have engaged, in conduct inconsistent with their fiduciary duties may be subject to significant liability for fiduciary breaches of these duties**.

[Emphasis added].

25.     The language contained in both 12 C.F.R. § 9.12(a) and the OCC's directive contemplate that the Bank **must conduct an analysis and evaluation** of whether its fiduciary obligations to beneficiaries are affected by the transactions it mandates and to what extent its judgment may be compromised by its own interests. Despite the fact that the Bank was and is bound to follow OCC directives, it did not conduct such an objective analysis of the fiduciary accounts of plaintiffs and the members of the Class, clearly engaged in self-dealing and completely abrogated its fiduciary obligation to actively and independently analyze and monitor fiduciary account assets. Indeed, the actions of the Bank were driven purely by its desire to maximize its profit rather than by the Bank's obligations to the beneficiaries entrusted to it.

26.     The Board of Governors of the Federal Reserve System ("Federal Reserve") in its February 26, 1997, Supervision and Regulation letter SR 97-3 (SPE) similarly analyzed the Bank's obligations when investing assets under management in its own proprietary funds either in connection with

Conversions or otherwise, as the Bank did here with the assets in plaintiffs' accounts, and provided the following guidelines to it:

> In determining whether to convert common trust funds to mutual funds, a banking organization must address the possibility that the conversion could result in conflicts between the best interest of the organization and the best interests of its fiduciary customers. The banking organization must also determine that the mutual fund shares are suitable for accounts which previously held common trust fund units. Banking organizations that convert or transfer common trust funds to mutual funds may face questions from current and future beneficiaries with respect to those two issues.

> **Potential conflicts can arise if a banking organization were to charge a direct fee to the trust customers for serving as trustee while also charging an advisor's fee to the mutual fund . . . it may appear that the organization's primary motive for conversion was a self-interest in generating greater fee income.**

> **Another possible conflict of interest could arise from the use of proprietary mutual funds when there are unaffiliated mutual funds or alternate investment opportunities available that may be equally appropriate for the participants' portfolio**. Again, the appearance that the organization put its own interests above those of its fiduciary customers may cause concern particularly if investments are made in a newly established proprietary fund with no history or track record.

> [emphasis added]

27.    Here, in direct contradiction of the foregoing Federal Reserve guidelines, which it was obligated to follow in fulfillment of its fiduciary duties to plaintiffs and the members of the Class, the Bank mandated investment of fiduciary assets in its care in its captive proprietary mutual funds – the JPMorgan Funds – when there were and are unaffiliated mutual funds (such as low-expense ratio Vanguard Funds or Fidelity Funds) or alternate investment opportunities that were available to the Bank's fiduciary accounts and which were at least equally appropriate for the participants' portfolios.

**The Bank Failed to Exercise Any Standards of Prudent Investment**

28.    A fiduciary such as the Bank is obligated to invest and manage the assets held in a fiduciary capacity as a prudent investor would, in light of the purpose, terms, distribution, requirements, and other circumstances of the instruments which established the relationship.  This requires a fiduciary to exercise reasonable care, skill and caution before investing the assets in its care.  As such, a fiduciary must always incorporate risk and return objectives reasonably suitable and otherwise appropriate for the beneficiaries for whom it is obligated to act..[1]

29.    In addition, a fiduciary must always:

  a.   abide by its fundamental fiduciary duty of loyalty;

  b.   act with prudence in deciding whether and how to delegate authority and when selecting supervisory agents; and

  c.   incur only reasonable and appropriate costs for the trustees' investment responsibilities.

30.    In general, trustees such as the Bank have a fiduciary obligation to comply with the terms of the trust agreements and other underlying instruments creating the fiduciary relationship. The fiduciary must also adhere to fundamental duties as outlined above which are implied terms in all agreements establishing such relationships.  An evaluation of whether or not a fiduciary has breached its obligations to those in its care is judged at the time of the investment decision in question.  Thus, the question of whether the Bank breached its fiduciary duties turns on the prudence of its original conduct, not on the hindsight analysis of the eventual results of its decision.

31.    Plaintiffs and members of the Class were and are being damaged by having their fiduciary accounts charged, directly and indirectly, as a result of the JPMorgan Funds incurring investment advisory,

administrative and other fees and expenses which such accounts would not have incurred (thereby lowering net investment returns) if the Bank had made direct investments in securities such as through fee and expense-free CTFs and otherwise. While it is not disputed that investments in proprietary mutual funds may be appropriate as investments by a corporate fiduciary which controls them in some instances, such investments may be made only if they are the most cost-effective and prudent investment choices, after the fiduciary has made an careful and thorough analysis of all available alternatives, including direct investment of fiduciary assets and/or use of fee and expense-free CTFs or other similar investment pools. Plaintiffs and members of the Class are being and have been further damaged by the defendants, through their subsidiaries and the controlled Board of Trustees of the JPMorgan Funds (acting nominally through business trusts established pursuant to Massachusetts law and statutory trusts established pursuant to Delaware law), by not causing the JPMorgan Funds to obtain the best qualified, lowest cost advisory, administrative, and other services rather than utilizing subsidiaries of the Bank and its parent, JPM, on a no-bid basis.

32.    In addition, as mandated by the Federal Reserve, a fiduciary such as the Bank owes a duty of undivided loyalty to a beneficiary entrusted to it and must administer a trust or other fiduciary account solely in the interest of the account's beneficiaries. The strict adherence to this duty prohibits a fiduciary from, as the Bank did with respect to the plaintiffs' fiduciary accounts, investing in or managing investments in a manner that gives rise to an undue profit from a personal conflict of interest. If a fiduciary, by virtue of his or her disloyalty to a beneficiary, generates an undue profit, as the Bank did in the case of plaintiffs and the members of the Class, the beneficiary is entitled to recover that profit from the Bank, as well as all the fees paid to it as a "faithless fiduciary."

---

[1] *See* Restatement (Third) Trusts §§ 227 (1992).

33.    Further, the duty of care requires a fiduciary such as the Bank to exercise reasonable effort and diligence in making and monitoring investments of the assets in its care, paying particular attention to the objectives of the fiduciary relationship, which the Bank failed to do with respect to the accounts of the plaintiffs and members of the Class. Instead, to generate the operational efficiencies needed by it to justify the acquisitions of the Acquired Banks, the Bank shifted and is increasingly directing its approach from individual investment decisions to computerized and standardized model investment portfolios. Such practices of the Bank are contrary to its fundamental obligations to the beneficiaries in its care:

> The Trustee must give reasonably careful consideration to both the formulation and the implementation of an appropriate investment strategy, with investments to be selected and reviewed in a manner reasonably appropriate to that strategy. Ordinarily this involves obtaining relevant information about such matters as the circumstances and requirements of the trust and its beneficiaries, the contents and resources of the trust estate, and the nature and characteristics of available investment alternatives.

> * * * *

> [I]f the trustee, such as a corporate or professional fiduciary, procured appointment as a trustee by expressly or impliedly representing that it possessed greater skill than that of an individual of ordinary intelligence, or if the trustee has or represents that it has special facilities for investment management, the trustee is liable for a loss that results from the failure to make reasonably diligent use of that skill or of those special facilities. *See* Restatement (Third) Trusts § 227, cmt. d.

34.    Clearly, in this case, the Bank, by investing the assets of plaintiffs' respective trust accounts and other accounts similarly situated in JPMorgan Funds and otherwise increasingly proceeding to make investments for fiduciary accounts based on computer-generated portfolios, did not and do not undertake an account-by-account analysis in order to insure that its investment decisions were and are consistent with the circumstances and requirements of the various fiduciary accounts and their beneficiaries, the contents and resources available and the nature and characteristics of all appropriate investment alternatives, all of

which was and is required to be done pursuant to OCC and Federal Reserve directives. Indeed, the Bank

is far removed from the actual investment decisions that were made for the accounts of plaintiffs and the

members of the Class. As stated in the JPMorgan Funds Statement of Additional Information dated

November 1, 2006, in Part II, page 59 thereof:

> "The [JPMorgan] Funds are managed by employees of JPMIM [a subsidiary of JPM]
> who, in acting for their customers, including the Funds, do not discuss their investment
> decisions with any personnel of JPMorgan Chase…"

35.    Instead, the Bank, consistent with its overall nationwide corporate policy,

uniformly applied its mandate that fiduciary assets increasingly be invested in JPMorgan Funds despite the

fact that it is capable directly and through the subsidiaries of JPM of investing assets in CTFs, as it continues

to do for selective trusts and estates. See, e.g. Part II, p.59 of the JPMorgan Funds Statement of Additional

Information.  By virtue of its wholesale abrogation of its fiduciary obligations and its failure to act as a

prudent investor would, the Bank breached its fiduciary duties and damaged all members of the Class.

36.    At least through June 30, 2004, the Bank, in order to benefit itself and its commercial

customers, permitted there to be late trading and market timing transactions in certain of the JP Morgan

Funds.  Such transactions damaged members of the Class.  In the wake of the public exposure of such self-

dealing practices, on June 29, 2004, JP Morgan Investment Advisors, Inc. a subsidiary of the Bank

("JPIA") (f/k/a Banc One Investment Advisors Corporation) announced a settlement with the SEC and the

office of the New York Attorney General which provided, *inter alia,* a payment of $10 million in total

disgorgement and restitution and $40 million as a penalty, as well as $40 million in reduced fees charged to

certain JP Morgan Funds over a 5-year period. No claims for damages are asserted in this Complaint with

respect to the damages caused by the defendants and their affiliates as described in this paragraph, such

15

damages to be addressed in litigation commenced by others and now consolidated as part of MDL # 1586, *In re Mutual Funds Investment Litigation*, where such claims have purportedly been settled.

### **The Defendants, Their Subsidiaries and "Controlled Persons" Concealed Material Facts and Misrepresented Other Material Facts in Filings with the SEC and Otherwise**

37.     The Bank, JPM and their "controlled persons" as defined below were able to carry out their plan and scheme to sell shares of the JPMorgan Funds to the Bank's fiduciary accounts by having share offerings registered with the SEC pursuant to registration statements and other documents filed with the SEC.

38.     As set forth in the Counts of this Complaint asserted to address the defendants' violations of the federal securities laws, the foregoing registration statements and incorporated JPMorgan Funds prospectuses as well as other documents deceived the SEC into permitting the marketing and sale of the JPMorgan Funds shares including the sales by the Bank to the fiduciary accounts of plaintiffs and the members of the Federal Securities Sub-Class defined below.

39.     But for such deception, the Bank would not have been permitted to sell JPMorgan Funds shares.

### **CLASS ACTION ALLEGATIONS**

### **The Relief Sought for Members of the Class and Sub-Class**

40.     This action is brought by plaintiffs, for themselves and on behalf of all others similarly situated, under the provisions of Federal Rules of Civil Procedure Rules 23(a) and 23(b)(3) for: (i) an accounting which determines all damages caused by the defendants to plaintiffs, the members of the Class and Sub-Class defined below and the extent of the unjust enrichment of the defendants from their wrongful

activities, as well as repayment of such unjust enrichment and the earnings thereupon;  (ii) money damages

to be paid by the defendants, including all fees the Bank charged its fiduciary accounts while it was a

"faithless fiduciary;" (iii) injunctive relief providing for, *inter alia,* the possible removal of the Bank as

fiduciary for all fiduciary accounts in which members of the Class are currently beneficiaries; (iv) injunctive

relief providing for new procedures and practices at the Bank which put the interests of  members of the

Class ahead of those of defendant, its parent and their affiliates and which otherwise address the ongoing

conflicts of interest faced by the Bank in the investment of fiduciary assets including, *inter alia*, providing for

the creation of a so-called "Chinese Wall" separating the Bank's fiduciary functions from all of its and

JPM's other operations and/or requiring it to totally "outsource" the actual financial management of the

assets in its fiduciary accounts; (v) injunctive relief providing for the JPMorgan Funds and other of the

Bank's proprietary mutual funds to annually select investment advisors and other service providers  chosen

based upon, *inter alia*, comparative investment performance and expense; and (vi) for relief  incident and

subordinate thereto, including substantial punitive damages, the costs and expenses of this action and an

award of attorneys' fees and reimbursement of expenses to plaintiffs' counsel.

## Numerosity of the Members of the Class

41.     Upon information and belief, the Bank serves as a fiduciary (such as a Trustee, Guardian,

Executor, etc.) for many thousands of fiduciary accounts affected by the wrongdoing described herein. The

exact number of members of the Class is known by the Bank and is not presently known by plaintiffs

although, upon information and belief, plaintiffs allege that there are at least 5,000 members of the Class.

42.     The Class represented by plaintiffs consists of all beneficiaries of fiduciary accounts for

which the Bank was corporate fiduciary whose assets were invested by the Bank in J.P. Morgan Funds.

Those members of the Class who have or had shares of  JPMorgan Funds purchased for their fiduciary

accounts within the applicable limitations periods, which shares were issued and sold pursuant to JPMorgan

Funds Registration Statements filed with the SEC, are referred to herein as the "Federal Securities Sub-

Class."

43.    The Class Period runs from the Bank's investment of fiduciary assets in any of its

proprietary mutual funds to the present. Excluded from the Class and Sub-Class members' claims are any

claims no longer valid due to the expiration of applicable statutory limitations periods or otherwise.  Such

definitions of the Class and the claims of Class members are subject to modification upon completion of

discovery with respect thereto.

44.    As indicated above, the exact number of members of the Class as above described is not

known by plaintiffs, but is within the sole knowledge of the Bank. Upon information and belief, the members

of the Class are so numerous as to make a class action appropriate.

45.    On information and belief, the members of the Class are located in most or all fifty states,

and in numerous foreign countries.

**Common Issues of Law and Fact Predominate**

46.    Upon information and belief, no such individualized analyses were ever performed for the

fiduciary accounts of plaintiffs and members of the Class. Indeed, the failure of the Bank to perform such

individualized analyses or individually determine the assets in which fiduciary accounts should be invested

creates Class-wide issues of fact further supporting certification of the Class defined herein.

47.    All members of the Class were adversely affected by the self-serving business decisions of

the Bank to, *inter alia*, abdicate its obligations as a corporate fiduciary, invest the fiduciary account assets

within the Bank's control into shares of the JPMorgan Funds and otherwise fail to act in the best interests of

plaintiffs and members of the Class.

48.     There are common questions of law and fact that relate to and affect the rights of each member of the Class including, *inter alia*:

(a)     whether, as a corporate fiduciary, the Bank owes and owed fiduciary duties to plaintiffs and members of the Class, including a duty of loyalty, a duty of candor, a duty of fair dealing, a duty to avoid self-dealing, an affirmative duty to furnish information and disclose all material facts involving the beneficiaries' fiduciary accounts, and a duty to administer such accounts solely in the beneficiaries' interests, rather than in the Bank's own interests;

(b)     whether, as a corporate fiduciary which held itself out as an expert in investments and financial management, the Bank was required to exercise a higher degree of care in managing fiduciary assets than would have been required of the average person;

(c)     whether the defendants' corporate business decision to invest assets of the Bank's fiduciary accounts in the JPMorgan Funds was motivated by the best interests of the Class members (which the Bank had a duty to put before its own) or by defendants' desire to generate administrative and investment advisory fees for their affiliates and subsidiaries, to lower the Bank's expenses of managing fiduciary assets and to generate other benefits for themselves by, *inter alia*, "bulking-up" the assets invested in the Bank's JPMorgan Funds;

(d)     whether the Bank breached fiduciary and contractual duties owed to plaintiffs and the Class by failing to conduct its fiduciary operations in conformity with the requirements of the National Banking Act, the guidelines established by the OCC, the Federal Reserve and other applicable law and regulations;

(e)     whether the Bank breached its fiduciary and contractual duties owed to all members of the Class by making investment decisions for the fiduciary accounts of plaintiffs and the members of the Class based upon defendants' own interests and those of their affiliates, rather than the primary interests of the

beneficiaries of such fiduciary accounts;

(f)    whether the Bank appropriated to itself the benefit of the "float" that was created by the delay between the receipt of fees charged by its subsidiaries and affiliates charged to the JPMorgan Funds and the dates upon which any of such amounts were purportedly credited against the Bank's fees charged to its fiduciary accounts;

(g)    whether the Bank's conduct constituted self-dealing at the expense of plaintiffs and the members of the Class;

(h)    whether the defendants, as "control persons" under §15 of the Securities Act and §20 of the Exchange Act  violated the federal securities laws;

(i)    whether the defendants are liable to plaintiffs and members of the Class for the damages they suffered due to the Bank's breach of fiduciary duties and otherwise;

(j)    what is the appropriate injunctive relief that is warranted in the circumstances; and

(k)    what remedies are appropriate compensation for the damages caused to plaintiffs and each member of the Class.

49.    The relief sought is common to the entire Class including, *inter alia:*

(a)    a declaratory judgment that the Bank violated its fiduciary duty as Trustee (or other similar fiduciary role) with respect to the affected fiduciary accounts;

(b)    payment by the defendants of compensatory damages caused by it's the Bank's breaches of fiduciary and contractual duties, the other acts of JPM as described herein, as well as substantial punitive damages due to the egregious nature of the wrongdoing committed by them;

(c)    payment by the defendants of the costs and expenses of this action, including the attorneys fees of plaintiffs' counsel;

(d)     an injunction which, *inter alia*, establishes appropriate procedures and safeguards within the Bank to ensure that the interests of beneficiaries of fiduciary accounts within the Bank's control are fully protected from wrongdoing such as described herein.

## Typicality of Plaintiffs' Claims

50.     The accounts of plaintiffs and plaintiffs, as beneficiaries of those accounts, have been adversely affected by the wrongdoing of the defendants as described herein.

51.     Upon information and belief, plaintiffs' accounts, like all other fiduciary accounts, were used by the Bank and through it, its parent, JPM and their affiliates and subsidiaries, to generate additional unnecessary and unjustly charged management, investment advisory and/or other fees and benefits for themselves without regard for the best interests of the beneficiaries of such accounts such as plaintiffs and the members of the Class.

52.     The claims of plaintiffs are typical of the claims of all members of the Class. The claims of plaintiffs are based on the same fundamental factual allegations and legal theories as the claims of all other members of the Class.

## Plaintiffs Will Fairly and Adequately Represent the Members of the Class

53.     Plaintiffs are able to and will fairly and adequately protect the interests of the members of the Class.

54.     The attorneys for plaintiffs are experienced and capable of prosecuting complex litigation such as this case. The attorneys for plaintiffs and the Class will actively conduct and be responsible for the prosecution of this litigation and the expenses thereof.

## COUNT I

## VIOLATIONS OF THE SECURITIES ACT

55.    Plaintiffs reassert and reallege each and every allegation set forth in the paragraphs above as if stated herein on behalf of themselves and the Federal Securities Sub-Class against the Bank and JPM. At all relevant times during the period within which purchases of shares of JPMorgan Funds were made by the Bank for the accounts of plaintiffs and the members of the Federal Securities Sub-Class and within the applicable limitations period,, the SEC was kept uninformed by the Bank and its subsidiaries of material facts with respect to the JPMorgan Funds operations, which facts were omitted from the JPMorgan Funds Registration Statements on Form N-1A (which contained JPMorgan Funds prospectuses), Post-effective Amendments thereto, Certifications on Form 497J and in other documents filed with the SEC which served to supplement and up-date the foregoing Registration Statements (collectively "Registration Statements"). Had the SEC been informed that the foregoing Registration Statements omitted material facts required to be included therein and misrepresented material facts therein, it would not have allowed such Registration Statements to have become effective and, thus, the Bank, JPM and their controlled entities would not have been permitted to sell shares of the JPMorgan Funds to the Bank's fiduciary accounts and to the public generally.

56.    Similarly, the plaintiffs were without knowledge of the omissions of material facts from the Registration Statements which provided for the issuance and sale of the JPMorgan Funds by the Bank to their respective trust accounts. Further, at no time did plaintiffs personally rely upon the content of the Registration Statements in connection with the purchase of JPM Funds shares or otherwise.

22

57.     The claims asserted herein, which are not fraud-based and are distinct from the claims set forth in Count II hereof, are asserted in the alternative to those in the other Counts of this Amended Complaint.  The claims asserted herein are not time-barred and are asserted within one year of being discovered by plaintiffs and within three years from the sale to the plaintiffs' trust accounts of shares of the JPMorgan Funds. Such sales to plaintiffs' accounts were made continually throughout such period until, in the case of plaintiff Hollinger, his account ceased being within the control of the Bank. The exact dates of the Bank's purchases of JPMorgan Funds shares for plaintiffs' respective accounts is known by the Bank and, while certain dates are identified on the Bank's monthly and other account statements, upon information and belief, such dates are not the actual dates upon which the Bank made such purchases, which were made on a wholesale basis.    At no time prior to the commencement of this litigation did plaintiffs have knowledge of the wrongdoing referred to in this Count, none of which was disclosed to the SEC or otherwise made publicly available.

58.     At all relevant times, the Bank, its parent JPM, and their respective subsidiaries, including those referred to below in this Count, were "control persons" pursuant to § 15 of the Securities Act of the JPMorgan Funds and the members of the JPMorgan Funds Board of Trustees.  The Bank was, at all relevant times, an underwriter, offeror, seller and issuer of the shares of the JPMorgan Funds sold to the accounts of the Federal Securities Sub-Class pursuant to the Registration Statements.  Individually and/or collectively, the Bank, JPM and their "controlled persons" caused the Registration Statements to be filed with the SEC which contained, *inter alia*, JPMorgan Funds prospectuses, to be disseminated to members of the Federal Securities Sub-Class, which prospectuses omitted material facts as described herein.

59.     During the period in which the Bank was making purchases of shares of the JPMorgan Funds for the fiduciary accounts of plaintiffs and members of the Federal Securities Sub-Class, the Bank,

JPM and certain "controlled persons" including the "controlled" Trustees of the JPMorgan Funds, caused the JPMorgan Funds to file the Registration Statements with the SEC on Form N1-A and otherwise, periodically supplementing and updating them throughout such period. Each of such Registration Statements became effective. In connection therewith, the SEC, believing the Registration Statements to have disclosed all material facts, permitted the offering and sale of JPMorgan Funds shares and, *inter alia*, permitted the sale of such shares by the Bank to the fiduciary accounts of plaintiffs and members of the Federal Securities Sub-Class.

60.    Each of the foregoing Registration Statements omitted material facts regarding, *inter alia*: (1) the relationships between and among the Bank, JPM, their subsidiaries and the Board of Trustees of the JPMorgan Funds with respect to the operation of the Funds; (2) the control exercised over the JPMorgan Funds and its Board of Trustees by JPM and the Bank through their "controlled persons"; (3) the necessity for the fees and expenses charged to fiduciary accounts as a result of the offerings of JPMorgan Funds which would not have been incurred by the affected fiduciary accounts but for being forced to invest in JPMorgan Funds; (4) the failure of the JPMorgan Funds' Board of Trustees to seek asset managers and other providers of services to the Funds based upon quality and cost, as compared to their relationships to JPM and the Bank; (5) the Bank's permitting favored customers to engage in illegal and improper transactions in JPMorgan Funds shares, which benefited the Bank and such customers while concurrently causing damages to the holders of JPMorgan Fund shares.

61.    Further, such Registration Statements failed to disclose that the shares of the JPMorgan Funds registered and sold pursuant thereto were being sold mostly to fiduciary accounts in the Bank's care, that the Bank, in light of such fact, voted the majority of the outstanding JPMorgan

Funds shares in its self-interest to exercise its total control and domination of the respective JPMorgan Funds' Board of Trustees.

62.    These Registration Statements also failed to disclose that among the risk factors faced by investors in JPMorgan Funds was the risk that, because the Fund's Board of Trustees (which was controlled by the Bank) selected and contracted with subsidiaries of JPM and the Bank to provide investment management and administrative services on a "no-bid" basis, the JPMorgan Funds were being charged excessive fees for such services and because their Board of Trustees was not objective in its selection of investment advisers to the JPMorgan Funds, the shareholders thereof (including the fiduciary accounts of plaintiffs and the members of the Federal Securities Sub-Class) were not able to obtain the benefit of having the assets in their accounts managed by the most qualified personnel and the lowest cost consistent with such quality.

63.    By way of example, each of the JPMorgan Funds prospectuses contained in the Registration Statements for, *inter alia*, the JPMorgan Multi-Cap Market Neutral A, Equity Index A, Market Expansion Index A, Tax Free Bond A, Intermediate Tax Free Bond A, Municipal Income A and International A Funds, disclosed various material risks to be faced by investors therein including plaintiffs and members of the Federal Securities Sub-Class. Notwithstanding the risks that were disclosed, each such prospectus failed to disclose the material risk that, because of the relatively high expense structure of these funds (and indeed, all JPMorgan Funds) as compared with the expenses of the Bank's direct investment of the invested assets such as in CTFs, the affected fiduciary accounts would have materially lower yields (*i.e.* net income) from such investments than if the Bank had invested the assets of these accounts directly in the identical securities bought by the foregoing JPMorgan Funds through the subsidiaries of the Bank and JPM.

64.    By way of example, in the November 1, 2006 Prospectus for the JPMorgan U.S. Equity

Funds ("November 1 Prospectus"), among which is the JPMorgan Equity Index A Shares Fund (shares of

which the Bank purchased for plaintiff Hollinger's trust account), at pp. 19, 98-105 thereof, the Prospectus

purports to disclose all material risks under the titles "The Fund's Main Risks" (p.19) and "Risk and

Reward Elements for the Funds" (pp.98-105). In making such purported disclosures of the "main risks" of

the Funds, the Bank, JPM and their "controlled persons" failed to disclose the risk to investment returns

caused by the expenses charged against the Funds as compared to the absence thereof if the Bank had a

fee and expense-free CTF containing the same securities and in the same weights as those in the Standard

and Poor 500 Composite Stock Price Index, the primary investment objective of the JPMorgan Equity

Index A Fund.

65.    Similarly, in each of such prospectuses (and in the November 1 Prospectus, by way of

example), in discussing the historical and likely performance and fees and expenses faced and to be faced

by investors therein, the Bank, JPM and/or their "controlled persons" failed to disclose therein the true

aggregate "Total Returns" for the shares of the JPMorgan Equity Index Fund since it did not reflect the net

effect of the other charges imposed by the Bank as a fiduciary, which had the effect, even after deduction of

so-called "credits" against the Bank's fees, of lowering the net return of the assets invested.

66.    Such prospectuses also similarly misrepresented the totality of all fees and expenses borne

by the invested assets since, in effect, the Bank, JPM and their "controlled persons" were "double dipping",

even after occasional "credits" or "fee waivers" applied by the Bank against its direct fees for serving as a

corporate fiduciary for the accounts of plaintiffs and the members of the Federal Securities Sub-Class.

67.    The above-referenced November 1 Prospectus and others contained and/or incorporated

in the Registration Statements also failed to disclose that the services provided to the JPMorgan Funds by

subsidiaries of the Bank and JPM were and are obtained on a no-bid basis and that the JPMorgan Funds

Board of Trustees specifically excluded from consideration other providers of the same services that are

better managed and lower cost. Indeed, the Registration Statements concealed the fact that the Board of

Trustees specifically knew that at least certain of the JPMorgan Funds were being subjected to higher levels

of fees than comparable non-proprietary mutual funds but made no effort to have them lowered. The

Registration Statements also concealed the fact that the Board specifically excluded comparisons with low

expense fund managers such as Vanguard Group and Fidelity Investments and were skewed so as to

provide a purported rationale for the Board to avoid putting out for bid the provision of investment advisory

and other services provided to the JPMorgan Funds.

68.     In discussing "The Funds' Management and Administration", at page 76 of the November 1

Prospectus, it is disclosed that two subsidiaries of JPM, JPMorgan Investment Management, Inc.

("JPMIM") and JPMorgan Investment Advisors, Inc. ("JPMIA"), are the investment advisors to the

JPMorgan U.S. Equity Funds. After disclosing the percentage of assets paid from each of the "advised"

JPMorgan Funds, it goes on to state:

> "A discussion of the basis of each trust [*i.e.* the legal entity which issues the Fund's
> shares] and the directors of [JPM] used in approving the investment advisory
> agreements for the Funds is available in the annual or semi-annual report for the
> most recent fiscal period ended December 31Š."

69.     In fact, such statement, to the extent that it is comprehensible, is false and no disclosure is

made in the JPMorgan Funds Annual Report dated June 30, 2006 or its Semi-Annual Report dated

December 31, 2005 of the material fact that such "basis" is nowhere disclosed. Neither of such documents,

nor the November 1 Prospectus, disclose anywhere among their hundreds of pages, that the fees paid to

JPMIM and JPMIA, wholly-owned subsidiaries of JPM, are determined by JPMIM and JPMIA on a no-bid basis and that the Trustees have made no effort to secure competitive bids for such services.

70.     With respect to other material charges made to the JPMorgan Funds purchased for the fiduciary accounts of plaintiffs and members of the Federal Securities Sub-Class by subsidiaries of JPM or the Bank, the November 1 Prospectus states, *inter alia:*

### '**The Funds' Administrators**

> JPMorgan Funds Management, Inc. (the "Administrator") provides administrative services for and oversees the other service providers of each Funds. The Administrator receives a pro-rata portion of the following annual fee on behalf of each Funds for administrative services: 0.15% of the first $25 billion of average daily net assets of all Funds (excluding funds of funds and money market funds) in the JPMorgan Funds Complex plus 0.075% of the average daily net assets over $25 billion."

71.     Notwithstanding the fact that such administrative charges are material to the net return on the invested assets in such Funds, neither the November 1 Prospectus nor any of the JPMorgan Funds Registration Statements issued during the Class Period disclose that the fees paid to the Administrator, a wholly-owned subsidiary of JPM, are determined by the Administrator on a no-bid basis and that the Trustees have made no effort to secure competitive bids for such services or for any of the other services provided to the JPMorgan Funds.

72.     Neither the November 1 Prospectus nor any of the JPMorgan Funds Registration Statements filed with the SEC during the Class Period, disclosed that the Bank, by its control of the Trustee election process through its abrogation to itself of the proxies rightly belonging, indirectly, to plaintiffs and members of the Class, selects and nominates all of the Trustees of the Funds and, thereby, controls the Trustees themselves.

73.     Neither the November 1 Prospectus nor any of the JPMorgan Funds Registration Statements filed with the SEC during the Class Period, disclose that the Trustees of the JPMorgan Funds spend little or no time overseeing particular Funds including, those purchased for the plaintiffs' fiduciary accounts. While such documents, including Part I, p.25 of the Funds' Statement of Additional Information dated November 1, 2006, disclose that the JPMorgan Funds Board of Trustees and its Committees have a number of meetings each year, the November 1 Prospectus and the JPMorgan Registration Statements fail to disclose that business at such meetings is conducted on a wholesale basis for all the JPMorgan Funds purportedly overseen by the Trustees and that no material amount of time is or was expended to obtain the most advantageous terms and conditions for the service contracts (for investment advisory, administrative and other services) of the JPMorgan Funds including, in particular, those purchased for the purported benefit of the fiduciary accounts of plaintiffs and members of the Federal Securities Sub-Class. Indeed, despite the fact that they were not "reasonable" under all the circumstances, the Trustees approved contracts with subsidiaries of the Bank and/or JPM as "reasonable" on behalf of the JPMorgan Funds, including those Funds in which the assets of plaintiffs and the members of the Federal Securities Class were invested by the Bank.

74.     Each of the foregoing misrepresentations and/or material omissions is typical of those of all JPMorgan Funds Registration Statements filed with the SEC and prospectuses issued and disseminated during at least the last three years in that each of them contains what their drafters regard as common "boilerplate".

75.     As set forth above, the Bank and JPM were either directly or through their "controlled persons" underwriters, issuers, offerors, solicitors of sales and or selling shareholders with respect to the JPMorgan Funds shares sold under and pursuant to the foregoing Registration Statements and/or signers

thereof through "controlled persons." As "controlling persons," the defendants were and are responsible for the false and misleading Registration Statements filed with the SEC in the name of the JPMorgan Funds.

76.      Each of such defendants and their "controlled persons" was capable of and did in fact cause JP Morgan Funds to sell the JP Morgan Funds shares issued pursuant to the Registration Statements and Post-Effective Amendments referred to herein.

77.      The Bank, JPM and/or their "controlled persons" were provided with or had unlimited access to the foregoing Registration Statements prior to and/or shortly after these documents were filed with the SEC and had the power to prevent the filing, issuance and dissemination of the JPMorgan Funds prospectuses therein and/or cause the statements therein to be corrected.

78.      The Bank and JPM, which shared senior officers with the Bank, dominated and controlled each of the Trustees of the JPMorgan Funds who were the signatories to the foregoing SEC filings, all of whom were "controlled persons" under and pursuant to § 15 of the Securities Act.

79.      As such, the Bank and JPM were and are responsible for the statements made by or in the name each of their "controlled persons," their officers and directors, as well as the JPMorgan Funds Board of Trustees as described above. The Bank and JPM, directly and through their "controlled persons" and their respective legal counsel not only participated in the sale of JPMorgan Funds shares but participated in the preparation of the false and misleading Registration Statements referred to above.

80.      As a result thereof, and the scheme of which the issuance and filing with the SEC of the foregoing Registration Statements were an integral part, the Bank, its parent, JPM and their "controlled persons" directly as underwriters, issuers, sellers and offerors, as well as indirectly caused JPMorgan Funds shares to be issued and sold to plaintiffs' fiduciary accounts and those of the members of the Federal Securities Sub-Class, all of which was in violation of §§ 11 and 12 (a)(2) of the Securities Act, all of which

caused them damages in an amount which cannot presently be determined. Although the total amount of

such damages is not capable of presently being determined because of the fungibility of the shares

purchased and sold and without discovery of the Bank's actual transactions in JPMorgan Funds, upon

information and belief the Bank has sold certain of such shares purchased for plaintiffs' accounts for prices

less than the amounts paid therefore and the Bank retains in plaintiff Rabin's accounts JPMorgan Funds

shares that are presently worth less than the amounts the Bank paid for them. Additional damages were

sustained by plaintiffs and the members of the Federal Securities Sub-Class as a result of, *inter alia,* the

incremental and undisclosed expenses that were borne by the JPMorgan Funds shares in their accounts in

amounts which cannot presently be determined.   Members of the Federal Securities Sub-Class whose

fiduciary accounts still hold such shares covered by this Count and have sustained losses thereupon hereby

demand that the Bank tender those shares and seek the recovery of the consideration paid for such shares.

Plaintiff Hollinger and the remaining members of the Federal Securities Sub-Class seek recissory damages

with respect to the JPMorgan Funds shares upon which their accounts have sustained losses.


## COUNT II

## VIOLATIONS OF THE EXCHANGE ACT

81.    Plaintiffs reassert and reallege each and every allegation set forth in the paragraphs above as

if stated herein on behalf of themselves and the Federal Securities Sub-Class against the Bank and JPM.

The claims asserted herein, which are separate and distinct from the non-fraud-based claims in the other

Counts of this Complaint, are asserted in the alternative to such other claims.

82.    As described above, the Bank and JPM, through their "controlled persons," caused the

dissemination of false and misleading JPMorgan Funds prospectuses and other documents which concealed

material facts and misrepresented other material facts bearing upon the Bank's purchase, holding and sale of JPMorgan Funds shares for the fiduciary accounts of plaintiffs and the members of the Federal Securities Sub-Class. Had the SEC been informed of such omissions and misrepresentations, which were concealed from the SEC by the Bank, JPM and their "controlled persons," the SEC would have either commenced enforcement proceedings or taken other action which would have prevented such transactions in the forgoing fiduciary accounts from taking place. The sales by the Bank of JPMorgan Funds to the fiduciary accounts of plaintiffs and the members of the Federal Securities Sub-Class shares were integral to the scheme and plan of the Bank and JPM to intentionally, unfairly and fraudulently extract unjust fees and other income from the fiduciary accounts of plaintiffs and those of the members of the Federal Securities Sub-Class.

83.    The Bank and its parent JPM, through their common senior officers, dominated and controlled their subsidiaries and the Trustees of the JPMorgan Funds, all of whom were "controlled persons" under and pursuant to § 20 of the Exchange Act. As such, the Bank was and is responsible for the statements made by or in the name of the Board of Trustees of the JPMorgan Funds and the JPMorgan Funds themselves as described above and in this Count.

84.    Despite the fact that the Bank, JPM and each of their "controlled persons" had a duty to disseminate accurate and truthful information as to the manner in which the JPMorgan Funds were operated and selected, the manner in which vendors of investment advisory and other services provided to the JPMorgan Funds were selected and the existence of excessive expenses to be borne by the Bank's fiduciary accounts in connection with their ownership of JPMorgan Funds shares, such persons failed to fulfill such duty.

85.     Each of them carried out the plan and scheme described herein intentionally to enrich JPM and the Bank at the expense of plaintiffs, the members of the Federal Securities Class as well members of the public who were otherwise induced to purchase JPMorgan Funds shares. Each misrepresentation of material fact and/or omission of material facts described herein or in Count I hereof was either made with reckless disregard for, or knowledge of, its false and misleading nature. Further each of the Bank, JPM and their "controlled persons" including, *inter alia*, the members of the JPMorgan Funds Board of Trustees, employed devices, schemes and artifices to defraud, while in possession of material adverse information not available to the SEC and engaged in the acts, practices and course of conduct as alleged herein, which included the making of, or the participation in the making of directly or through "controlled persons" untrue statements of material facts and/or omitting to state material facts necessary in order to make the statement made about the JPMorgan Funds, the relationships between and among the Bank, JPM and the "controlled persons" and otherwise, not misleading as set forth above. By so doing, they engaged in transactions, practices, and a course of business which operated as a fraud and deceit upon the SEC and, through it, the fiduciary accounts of plaintiffs and the members of the Federal Securities Sub-Class.

86.     Each of the Bank, JPM, their senior officers and their "controlled persons" had actual knowledge of the misrepresentations and omissions of material facts set forth above or acted with reckless disregard for the truth. Such misrepresentations and/or omissions were carried out knowingly or recklessly for the purpose and effect of concealing the truth from the SEC in connection with the purchase and sale of shares by the Bank of the JPMorgan Funds for the fiduciary accounts of plaintiffs and the members of the Federal Securities Sub-Class.

87.     As a direct result thereof, and the manipulative scheme of which the issuance and dissemination of, *inter alia*, JPMorgan Funds Registration Statements and the prospectuses incorporated

therein were an integral part, , the SEC took no action and the Bank caused JPMorgan Funds shares to be purchased for the beneficial ownership of plaintiffs and for the members of the Federal Securities Sub-Class, all of which was in violation of § 10b of the Exchange Act and Rule 10b-5 promulgated thereunder by the SEC, all of which caused plaintiffs and the members of the Federal Securities Sub-Class damages in an amount which cannot presently be determined.

88.    Had the SEC known of the fact that the foregoing JPMorgan Funds Registration Statements, other documents filed with it and/or otherwise publicly disseminated by the Bank were false and misleading and prepared in violation of §10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder by the SEC, the SEC would not have declared such Registration Statements effective or permitted the sale of the JPMorgan Funds registered thereby to be sold.

89.    As described above, the Bank caused the filing with the SEC and dissemination of false and misleading Registration Statements, the prospectuses incorporated therein and other documents which concealed material facts and misrepresented other material facts in connection with the purchase and sale of JPMorgan Funds shares by and for the accounts of plaintiffs and the members of the Federal Securities Sub-Class.  Such sales of JPMorgan Funds shares were integral to the scheme and plan of the Bank and JPM to unfairly and fraudulently extract unjust fees and other income from the accounts of plaintiffs and the members of the Federal Securities Sub-Class.

90.    Despite the fact that the Bank, JPM and their "controlled persons" had a duty to provide accurate and truthful information in the Registration Statements filed with the SEC as to the manner in which the JPMorgan Funds were operated , the manner in which vendors of investment advisory and other services were selected and the reasons for the existence of excessive expenses to be borne by the JPMorgan Funds shares, neither the Bank, JPM  nor their subsidiaries involved in the sale of JPMorgan

Fund shares, fulfilled their respective disclosure obligations under the federal securities laws or rules promulgated thereunder by the SEC.. Each of them carried out the plan and scheme described herein intentionally to enrich the Bank and JPM at the expense of plaintiffs and the members of the Federal Securities Class. While the Bank and JPM were well aware that neither plaintiffs nor members of the Federal Securities Class would rely on the materially deceptive Registration Statements (and incorporated prospectuses) filed with the SEC in connection with the Bank's purchase of JPMorgan Funds shares for their accounts, each misrepresentation of material fact and/or omission of material facts described herein was either made with reckless disregard for, or knowledge of, its false and misleading nature. Further, the Bank, JPM and their "controlled persons" employed devices, schemes and artifices to defraud, while in possession of material adverse information not available to the SEC and engaged in the acts, practices and course of conduct as alleged herein, which included the making of, or the participation in the making of directly or through "controlled persons" untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements made about the JPMorgan Funds not misleading as set forth above.

91.     By so doing, Bank and JPM engaged in transactions, practices, and a course of business which operated as a fraud and deceit upon the SEC, which was induced to permit the sale of the JPMorgan Funds shares and, indirectly upon, plaintiffs and the members of the Federal Securities Sub-Class for whose accounts the Bank purchased the JPMorgan Funds shares. At no time were plaintiffs expected nor did they rely upon the false, misleading or other written statements made by the Bank, its subsidiaries or the JPMorgan Funds in connection with the purchase of JPMorgan Funds shares. At all relevant times, in fact, plaintiffs learned of the purchases, sales or holdings of such shares for their respective accounts after the fact.

92.     The defendants had actual knowledge of the misrepresentations and omissions of material facts set forth above or acted with reckless disregard for the truth. Such misrepresentations and/or omissions were carried out knowingly or recklessly for the purpose and effect of concealing the truth from the SEC, all of which damaged plaintiffs and members of the Federal Securities Sub-Class in connection with the purchase of shares of the JPMorgan Funds for their fiduciary accounts by the Bank.

93.     As a direct result thereof, and the manipulative scheme of which the issuance and dissemination of such JPMorgan Funds Registration Statements and the prospectuses incorporated therein, the Bank and JPM caused JPMorgan Funds shares to be purchased for the beneficial ownership of plaintiffs and for the members of the Federal Securities Sub-Class, all of which was in violation of § 10b of the Exchange Act and Rule 10b-5 promulgated thereunder by the SEC, all of which caused them damages in an amount which cannot presently be determined. Had the SEC known of the fact that the foregoing JPMorgan Funds Registration Statements and the prospectuses incorporated therein were false and misleading and prepared in violation of §10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder by the SEC, the SEC would not have declared such Registration Statements effective or permitted the sale of the JPMorgan Funds registered thereby to be sold by the Bank and its subsidiaries to the accounts of plaintiffs and the members of the Federal Securities Sub-Class.

## COUNT III

## BREACH OF FIDUCIARY DUTY

94.     Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein. The Bank is the sole defendant to this Count. The Bank owed and has owed fiduciary duties to plaintiffs and each member of the Class as defined herein.

95.    As set forth above, in the course of consolidating the fiduciary operations of the Acquired Banks, the Bank provided fewer and fewer of the individual services to the beneficiaries of fiduciary accounts, which services were fundamental in a fiduciary relationship.

96.    The Bank, in failing to provide individual account-by-account periodic evaluation of the needs of the beneficiaries thereof and failing to determine the specific investments that were appropriate to the beneficiaries thereof on an individual basis, breached the fiduciary duties owed to plaintiffs and the members of the Class.

97.    In addition to the Bank's failure to provide the foregoing services it was obligated to provide to plaintiffs and members of the Class, each of them was damaged by the defendants' charging their respective accounts excessive fees and expenses arising from "double dipping"; i.e. the Bank's charging the accounts for serving as a corporate fiduciary and the indirect charges imposed by subsidiaries of JPM against the JPMorgan funds for, *inter alia*, investment advisory, administrative and other services. The accounts of plaintiffs and members of the Class would not have been subject to paying both the fees of the Bank and the incremental fees and expenses charged to the JPMorgan funds if the Bank had made direct investments in securities either through CTFs or otherwise.

98.    As a result of the Bank's failure to provide the foregoing services to plaintiffs and the members of the Class, the Bank breached its fiduciary duties owed to them causing them damages in an amount which cannot presently be determined.

## COUNT IV

## BREACH OF FIDUCIARY DUTY

99.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein. The Bank is the sole defendant to this Count.

100.    The Bank owed and has owed fiduciary duties to plaintiffs and each member of the Class as defined herein.

101.    The Bank's decisions to invest the assets of the plaintiffs' respective fiduciary accounts and those of the members of the Class in the JPMorgan Funds and other proprietary funds were motivated not by the primary interests of plaintiffs and the Class members or compliance with guidelines established by the OCC and the Federal Reserve, which were ignored by the Bank, but by the Bank's desire to generate investment advisory and other fees for itself and its affiliates and, as well, to reduce the Bank's operating expenses and to bulk up the assets of the JPMorgan Funds, all of which as carried out in the manner described above, caused the fiduciary accounts of plaintiffs and the members of the Class to pay unnecessary and or otherwise excessive fees and expenses, which lowered by material amounts the net investment returns on the assets in such accounts. The Bank's conduct was wrongful and damaged plaintiffs and each member of the Class in an amount which cannot presently be determined

102.    With respect to cash paid into the fiduciary accounts of plaintiffs and the members of the Class generated by the payment of dividends and/or interest, which cash was to be held temporarily pending disbursement from such accounts for the benefit or use of plaintiffs and other beneficiaries, the Bank failed to seek optimal rates of interest on such cash. Indeed, the Bank frequently paid higher rates of interest to depositors who were not beneficiaries of the Bank and who dealt with the Bank on an arm's length basis and in a competitive environment.

103.    The Bank regularly and as a matter of corporate policy typically prohibited co-fiduciaries from having any serious role in the investment of the assets in the fiduciary accounts of plaintiffs and the members of the Class including, *inter alia*, denying them timely and complete information with respect

thereto, all of which conduct was a breach of the fiduciary duties owed by the Bank to plaintiffs and members of the Class.

104.     To the extent that the Bank provided credits or fee waivers for the portion of the fees charged to the JPMorgan Funds against its own fees for serving as corporate fiduciary, the subsidiaries of JPM which received the fees charged to the Funds received them monthly while the credits or fee waivers were not applied to the accounts of plaintiffs and members of the Class until months later, thereby generating "float" in the hands of JPM or the Bank, which benefited them at the expense of plaintiffs and the members of the Class.

105.     As a result of, *inter alia*, the Bank's improper conduct as described above, plaintiffs and other similarly situated beneficiaries of fiduciary accounts for which the Bank was or is a fiduciary have been damaged in an amount to be determined by the Court, but believed to be substantial and well in excess of $5,000,000.

## COUNT V

## UNJUST ENRICHMENT

106.     Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

107.     By reason of the Bank's investment of fiduciary assets in affected accounts to be used to purchase shares of JPMorgan Funds, the Bank and JPM have "double dipped" and obtained other unjustified benefits as described above such as retention of "float" as described above.

108.     Similarly, the Bank, both directly and indirectly, charged more for the provision of services to plaintiffs, their trust accounts and those fiduciary accounts of members of the Class herein by failing to

provide the fiduciary services contemplated by the underlying instruments for **reasonable** compensation. Indeed, as shown by the conduct of the Bank as alleged above, it has been and is a "faithless fiduciary" and, as such, it should not be permitted to retain any of the fees it has been paid by plaintiffs and the Class during the Class Period for its purported services for acting as a corporate fiduciary.

109.    Defendants have accepted and retained the foregoing benefits and others presently unknown to plaintiffs.  As a matter of fact and law, it would be unjust and inequitable for them to retain such benefits without compensating plaintiffs and the members of the Class for such benefits.

110.    The defendants enhanced their profit performance at the expense of plaintiffs and the members of the Class by, *inter alia*, favoring the use of their own proprietary funds, including the JPMorgan Funds, and fiduciary assets within the Bank's control to increase the asset bases thereof, to aggrandize their own stature and retaining the fees the Bank charges to the accounts of the plaintiffs and members of the Class despite being a "faithless fiduciary," thereby unjustly enriching themselves in amounts which cannot presently be determined.

111.    Further, the Bank has unjustly enriched itself by not making timely credits to its fiduciary accounts of the amounts paid by the JPMorgan Funds to other subsidiaries of JPM or the Bank. As a result, during the time periods when the defendants had the use of these amounts (or "float") pre-crediting, it not only deprived plaintiffs and the members of the Class the ability to have such "float" invested but unjustly enriched the defendants by investing such "float" and generating income thereupon for themselves, which income was not timely credited back to the affected fiduciary accounts.

112.    The defendants have invested the proceeds of the foregoing unjust enrichment and realized additional profits thereupon, all of which should be returned to the fiduciary accounts and other similarly affected accounts and/or their beneficiaries, as the Court shall deem appropriate.

113.    Plaintiffs and others similarly situated are entitled to recover the defendants' ill-gotten gains and the profits thereupon.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a trial by jury as to all issues so triable.

## PRAYER FOR RELIEF

**WHEREFORE**, plaintiffs respectfully request on their own behalf and on behalf of all members of the Class and Federal Securities Sub-Class:

(a)    Certification of this action as a class action and appointment of plaintiffs and plaintiffs' counsel to represent the Class and Federal Securities Sub-Class;

(b)    entry of judgment on the claims for breach of fiduciary duty in favor of plaintiffs individually and as representative of the other members of the Class and Federal Securities Sub-Class and against the Bank and an award of compensatory damages, restitution and punitive damages in favor of plaintiffs individually and as representatives of the other members of the Class and Federal Securities Sub-Class and against the Bank in the amount of damages caused by the Bank's breaches of fiduciary duties;

(c)    entry of judgment on the claims for violations of §10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder in favor of plaintiffs individually and as a member of the Federal Securities Sub-Class against defendants and an award of compensatory damages in favor of plaintiffs individually and as a representatives of the other members of the Federal Securities Sub-Class and against defendants in an amount of damages caused by such defendants' violations of §10 (b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

(d)    entry of judgment on the claims for violations of §§ 11 and 12(a)(2) of the Securities Act including, as appropriate, compensatory and recissory damages against defendants and, as

to those shares of the JPMorgan Funds upon which Federal Securities Sub-Class members who retain such shares, have sustained losses thereupon, the right to be repaid their purchase prices by the Bank;

(e)    entry of judgment enjoining  the Bank from opposing any petition filed by any member of the Class seeking the removal of the Bank as corporate fiduciary and requiring the Bank to pay for all legal fees and expenses incident thereto including its own;

(f)    entry of judgment compelling the defendants to account for their unjust enrichment and disgorging the amount thereof (and the profits earned thereupon) to the fiduciary accounts, including to plaintiffs, affected by the wrongdoing described herein and/or their beneficiaries, as appropriate;

(g)    entry of judgment compelling the Bank to fully insulate its fiduciary operations from all of its other business activities and those of PM and the JPMorgan Funds by, *inter alia,* establishing a so-called "Chinese Wall" for the purpose of effectuating such insulation and/or requiring the Bank to totally "outsource" the asset management aspects of its fiduciary accounts to wholly independent vendors;

(h)    entry of judgment compelling the Bank to establish and implement procedures to fully protect the interests of the members of the Class including,  *inter alia*, the appointment of an ombudsman to oversee the Bank's fiduciary operations and compelling the JPMorgan Funds through the defendants' control of its Board of Trustees to select annually investment advisors and other suppliers of services to the JPMorgan Funds based upon, *inter alia*, comparative investment performance and expenses and to similarly evaluate and select other providers of services to the JPMorgan Funds;

(i)    repayment to the affected JPMorgan Funds of the damages caused to them by the defendants' actions as described herein;

(j)    entry of judgment for punitive damages for plaintiffs and each member of the Class, together with pre-judgment and post-judgment interest at the maximum rate allowable by law;

42

(k)    reasonable attorneys' fees and reimbursement of the reasonable costs and expenses of prosecuting this litigation and distributing the net recovery to members of the Class and the Federal Securities Sub-Class; and

(l)    such other or additional relief as this Court deems appropriate.

February 20, 2007

S.C. RABIN, JOHN HOLLINGER on behalf of themselves and others similarly situated

By:    _____s/ Myron M. Cherry
MYRON M. CHERRY & ASSOCIATES LLC
MYRON M. CHERRY
DANIEL J. BECKA
30 North LaSalle Street, Suite 2300
Chicago, Illinois  60602
(312) 372-2100

GREENFIELD & GOODMAN LLC
RICHARD D. GREENFIELD
7426 Tour Drive
Easton, MD 21601
(410) 745-4149
(410) 745-4158 (Fax)
Email:  whitehatrdg@earthlink.net

ANN MILLER, LLC
ANN MILLER
The Benjamin Franklin, Suite 206
834 Chestnut Street
Philadelphia, PA 19107
(215) 238-0468
(215) 574-0699 (Fax)
Email:  am@attorneyannmiller.com

COUNSEL FOR PLAINTIFFS AND THE CLASS

## <u>CERTIFICATE OF SERVICE</u>

The undersigned does hereby certify that he caused to be served on this 20th day of February, 2007, via U.S. Mail, First Class, postage prepaid, and electronically, a true and correct copy of the Amended Complaint on the following:

Michael P. Conway, Esquire
David M. Rotenberg, Esquire
Grippo & Elden LLC
111 South Wacker
Chicago, IL  60606

Kristopher Issac deVyver, Esquire
Gregory B. Jordan, Esquire
Sharon L. Rusnak, Esquire
Mary J. Hackett, Esquire
Reed Smith LLP
435 Sixth Avenue
Pittsburgh, PA  15219

s/ Myron M. Cherry



IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| S.C. Rabin, individually and on behalf of herself and all others similarly situated<br><br>and<br><br>John Hollinger, individually and on behalf of himself and all others similarly situated<br><br>Plaintiffs,<br><br>vs.<br><br>JPMorgan Chase Bank, N.A. and JPMorgan Chase & Co.,<br><br>Defendants. | No. 06 C 5452<br><br>Honorable William J. Hibbler |

## MEMORANDUM OPINION AND ORDER

Plaintiff S.C. Rabin ("Rabin") and John Hollinger ("Hollinger"), individually and on behalf of all others similarly situated, filed a five-count Amended Complaint against Defendants JPMorgan Chase Bank, N.A. ("Bank Trustee") and JPMorgan Chase & Co. ("JPM"), alleging various federal securities and state law claims. Before the Court are Defendants' motions to dismiss the Amended Complaint in its entirety, pursuant to *Federal Rule of Civil Procedure 12(b)(6)*. For the reasons set forth below, Defendants' motions to dismiss the Amended Complaint are GRANTED.

1

## I. Factual Background

The following summary of factual allegations is taken from Plaintiffs' Amended Complaint and is deemed true for purposes of this motion.[1] *See Cody v. Harris,* 409 F.3d 853, 857 (7th Cir. 2005). Plaintiff Rabin is a beneficiary and Plaintiff Hollinger is a former beneficiary of a trust maintained by the Bank Trustee. The Bank Trustee, a federally chartered bank domiciled in New York, is a wholly-owned subsidiary of JPM. During the times relevant to this action, the Bank Trustee served as fiduciary for accounts that were to benefit Plaintiffs and Class Members.

According to Plaintiffs, on several occasions, the Bank Trustee purchased and sold shares of various JPMorgan Funds ("Fund") for Plaintiffs' trust accounts without informing Plaintiffs until the conclusion of the transaction. Further, Plaintiffs charge that the Bank Trustee unilaterally invested fiduciary account assets into its proprietary mutual fund - the Fund — without regard to whether such investments were in the best interests of the beneficiaries. Plaintiffs further contend that as a result of these investment practices, Defendants generated undue profits by charging fees to the accounts of the beneficiaries at both the mutual fund and trust levels for managing the same assets. Accordingly, Plaintiffs argue that the Bank Trustee breached its fiduciary duty to the beneficiaries and engaged in self dealing transactions.

Plaintiffs maintain that in furtherance of its scheme, Defendants misrepresented and omitted material facts to the Securities Exchange Commission ("SEC") on Defendants' Registration Statements. Had the SEC known the relationship and ensuing control that Defendants exercised over the Fund and the Board of Trustees, the risks faced by the Fund's

---

[1]Plaintiffs' Amended Complaint contains over 112 lengthy paragraphs encompassing over 40 pages. The Court reminds Plaintiffs that pursuant to the Federal Rules of Civil Procedure, "each averment of a pleading shall be simple, concise, and direct." *See F.R.C.P. 8(e)(1).*

investors, and the totality of fees and expenses borne by the Fund, Plaintiffs contend that the SEC would have prevented the Registration Statements from becoming effective and Defendants would have been unable to sell shares of the Fund. Plaintiffs bring Count I against both Defendants for violations of the Securities Exchange Act of 1933 ("Securities Act"). Plaintiffs bring Count II against both Defendants for violations of the Securities Exchange Act of 1934 ("Exchange Act"). Counts III and IV – brought solely against the Bank Trustee – allege that the Bank Trustee breached its fiduciary duty. In Count V, Plaintiffs allege a claim of unjust enrichment against Defendants. Plaintiffs seek class certification, asserting that there are a minimum of 5,000 class members dispersed throughout the United States and foreign countries. Plaintiffs also seek an accounting, injunctive relief, monetary damages, litigation costs and expenses, attorneys' fees, and such additional relief that the Court deems appropriate. Defendants move to dismiss the Complaint in its entirety pursuant to *Federal Rule of Civil Procedure 12(b)(6).*[2]

## II. Standard of Review

Motions to dismiss under *Rule 12(b)(6)* test the sufficiency of the complaint rather than the merits of the case. *Midwest Gas Servs. v. Ind. Gas Co.,* 317 F.3d 703, 714 (7th Cir. 2003). In reviewing a motion to dismiss, a court construes all allegations in the complaint in the light most favorable to the plaintiff, taking all well-pleaded facts and allegations within the complaint

---

[2] Plaintiffs argue that Defendants in their motions to dismiss made factual assertions not contained in the Amended Complaint nor any document relied on by the Complaint. As a result, Plaintiffs urge the Court to convert Defendants' motions to dismiss to motions for summary judgment, pursuant to *Federal Rule of Civil Procedure 56.* A motion under *Rule 12(b)(6)* becomes a motion for summary judgment when matters outside of the pleadings are presented and "actually considered" by the Court. *Marques v. Fed. Reserve Bank of Chicago,* 286 F.3d 1014, 1017 (7th Cir. 2002). The Court did not consider or rely on any of the facts cited by Plaintiffs on pages 3 and 4 of their memorandum in opposition to the Bank Trustee's motion to dismiss. Rather, the Court relied solely on the Amended Complaint. Accordingly, the motions will not be converted to motions for summary judgment.

as true. *Albany Bank & Trust Co. v. Exxon Mobil Corp.*, 310 F.3d 969, 971 (7th Cir. 2002); *Stachon v. United Consumers Club, Inc.*, 229 F.3d 673, 675 (7th Cir. 2000). The moving party bears the burden of showing beyond a doubt that the plaintiff can prove no set of facts in support of his claim that would entitle him to relief. *Conley v. Gibson*, 355 U.S. 41, 45, 78 S. Ct. 99, 2 L. Ed. 2d 80 (1957). A complaint is not required to allege all or any of the facts logically entailed by the claim. *Bennett v. Schmidt*, 153 F.3d 516, 518 (7th Cir. 1998).

### III. Analysis

#### A. Federal Securities Law Claims

Both Defendants advance several arguments in favor of dismissal of Plaintiffs' claims for violations of the Securities Act (Count I) and Plaintiffs' claims for violations of the Exchange Act (Count II).

##### 1. Securities Act

Plaintiffs maintain that the issuance and filing of false and misleading Registration Statements by Defendants and their "controlled persons" was in violation of §§ 11, 12, and 15 of the Securities Act.

Section 11 of the Securities Act holds parties liable for damages sustained by those who purchased stock pursuant to a registration statement that "contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading." 15 U.S.C. § 77k(a). The statute provides that "any person acquiring such security" has a cause of action. 15 U.S.C. § 77k(a); *See also Ong v. Sears Roebuck & Co.*, 388 F.Supp.2d 871, 890 (N.D. Ill. 2004)(plaintiff must have purchased securities at issue to have standing to bring § 11 claim); *Central Laborers' Pension Fund v.*

4

*Sirva, Inc.,* No. 04 C 7644, 2006 U.S. Dist. LEXIS 73375, at *9 (N.D. Ill. September 22, 2006)(violators of § 11 are liable to those who purchased stock). Similarly, § 12 of the Securities Act imposes civil liability on any person who offers or sells a security "by means of a prospectus or oral communication, which includes an untrue statement of a material fact or omits to state a material fact." U.S.C. § 77l(a)(2). A plaintiff has standing to bring suit under §12 if plaintiff is the person who purchased the security. *Id.; See Cathedral Trading, LLC v. Chicago Board of Options Exchange,* 199 F.Supp.2d 851, 858 (N.D. Ill. 2002). In addition, § 15 provides:

> every person who, by or through stock ownership, agency, or otherwise,
> or who, pursuant to or in connection with an agreement or understanding
> with one or more persons by or through stock ownership, agency, or
> otherwise, control any person liable under section 11 or 12, shall also
> be liable jointly and severally with and to the same extent as such
> controlled person to any person to whom such controlled person is liable.

15 U.S.C. § 77o

Defendant JPM argues that Count 1 must be dismissed because there is no allegation that it registered or underwrote the underlying securities. Section 11 of the Securities Act imposes liability only upon the issuer of the security, directors of the issuer, anyone who signed the registration statement, underwriters of the issuer, and experts preparing or certifying a false part of the statement. *See* 15 U.S.C. § 77k(a)(1)-(a)(5). Further, Defendant JPM maintains that Plaintiffs' tenuous accusations that it "caused" the registrations to be filed and the mutual funds were issued "through" controlled persons are insufficient to sustain the allegation.

This Court finds that Plaintiffs lack standing to bring their asserted Securities Act claims. Plaintiffs' Amended Complaint explicitly sets forth that Plaintiffs were not purchasers of the securities at issue. (Am. Compl. at 7.) Further, the Complaint asserts that Plaintiffs were not

even made aware of the purchases until after they had occurred. *Id.* Section 11 of the Securities Act specifically provides a cause of action for "purchasers" or "those acquiring such security" against parties who play a direct role in a registered offering, for harm caused by material misstatements and omissions in the registration statement. 15 U.S. C. § 77k. Indeed, Rabin and Hollinger, as beneficiaries, were not involved to any extent with the purchase of the securities. Consequently, Plaintiffs lack the standing necessary to proceed with these claims.[3]  Therefore, Count I of Plaintiffs' Amended Complaint is dismissed without prejudice.

2. Exchange Act

Plaintiffs maintain that Defendants' dissemination of false and misleading Registration Statements was in violation of § 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") and *Rule 10b-5* of the SEC, collectively "10(b)."

Section 10(b) prohibits the use "in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe." 15 U.S.C. § 78j(b). In accordance with this section, the SEC promulgated Rule 10b-5, which makes it unlawful for any person:

> (a) To employ any device, scheme, or artifice to defraud, (b) to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, or (c) to engage in any act, practice or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5.

---

[3] Because the Court finds that Plaintiffs lack standing, Plaintiffs' claims under § 12, which imposes liability on persons who offer or sell securities and only grants standing to the person purchasing such security and Plaintiffs' "controlled person" claims brought pursuant to § 15 are moot.

"[A] court should be reluctant to imply a 10b-5 cause of action for wrongs that do not fall within § 10(b)'s fundamental purpose of requiring full and fair disclosure to participants in securities transactions of the information that would be useful to them in deciding whether to buy or sell securities." *O'Brien v. Continental Illinois Nat'l Bank and Trust Co. of Chicago*, 593 F.2d 54, 60 (7th Cir. 1979)(citing *Santa Fe Industries, Inc. v. Green*, 430 U.S. 462, 477-78, 51 L. Ed. 2d 480, 97 S. Ct. 1292 (1977)). Section 10(b) and *Rule 10b-5* were enacted to provide a cause of action for plaintiffs suffering an injury as a result of misleading practices made in connection with the sale or purchase of securities. *Santa Fe Indus., Inc.*, 430 U.S. at 477-78. Defendants contend that Plaintiffs' claims are not covered by 10(b) because Defendants' alleged unlawful conduct was not done "in connection with" Plaintiffs' purchase of the securities. In particular, Defendants argue that Plaintiffs were not purchasers of shares of the Fund. Indeed, Plaintiffs concede that they were not purchasers of the securities at issue. (Am. Compl. at 7.)

The purpose of 10(b) is to create a remedy for a plaintiff induced by misrepresentations or omissions to buy or sell stock. *Isquith v. Caremark Int'l, Inc.*, 136 F.3d 531, 534 (7th Cir. 1998)(upholding dismissal of securities fraud class action where plaintiffs made no investment decision to buy or sell stock but rather received the stock in connection with a spin-off); *O'Brien*, 593 F.2d at 60 ("the relevant inquiry is whether plaintiffs were denied information that would or might have been useful to them in deciding whether to purchase or sell securities which they actually did purchase or sell.")  "This presupposes that someone had a choice, a choice distorted by the fraud;" that the plaintiff made an "investment decision." *Isquith*, 136 F.3d at 534.

In *O'Brien*, the Seventh Circuit held that 10(b) does not provide a remedy to an investor who completely lacked investment authority. *O'Brien*, 593 F.2d at 59. The trustee in *O'Brien* was vested with sole discretionary power to purchase and sell securities. *Id.* at 58. Because plaintiffs had no voice in the investment decision, the Court refused to recognize a cause of action under 10(b). *Id.* at 59. The Court stated,

> When the trustee or agent alone makes the investment decision to purchase or sell, his failure to disclose information about the purchase or sale to the beneficiary or agent does not satisfy the "in connection with" requirement of § 10(b). The enforcement of fiduciary and contractual duties owed by a trustee or agent to the beneficiary or principal is the concern of state law, not the federal securities laws.

*Id.* at 63.

As in *O'Brien*, Plaintiffs are suing the trustee for improper investment decisions. Under *O'Brien* and its progeny, a plaintiff's ability to state a claim against an agent or trustee under the securities law boils down to whether the investor actually made an investment decision. *See O'Brien*, 593 F.2d at 60; *Congregation of the Passion, Holy Cross Province v. Kidder Peabody & Co., Inc.*, 800 F.2d 177, 181 (7th Cir. 1986); *See also Kayne v. Paine Webber, Inc.*, 703 F. Supp. 1334, 1340 (N.D. Ill. 1989)("an investor who has delegated the entire authority to make investment decisions to his securities broker may not sue the broker under § 10(b) or Rule 10b-5 for misuse of his delegated powers"); *Capalbo v. Paine Webber*, 672 F. Supp. 1048, 1052 (N.D. Ill. 1987)(dismissing federal securities law claims because plaintiffs gave advisor complete investment discretion and thus, "the misrepresentations and omissions alleged could not relate to [the plaintiffs'] own decision to purchase or sell."); *Compare Norris v. Wirtz*, 719 F.2d 256 (7th Cir. 1983)(trust beneficiary had standing to sue trustee under § 10(b) because the trust document gave the beneficiary the authority to approve transactions and beneficiary did so). Because

8

Plaintiffs explicitly provide that they did not, at any time, make any investment decisions, they failed to satisfy this necessary requirement to bring a § 10(b) claim. Accordingly, Count II is dismissed.

Because this Court finds that Plaintiffs' lack standing to allege this claim, it does not determine the merits of whether Plaintiffs sufficiently met the heightened pleading requirements of the PLSRA for §10(b) or failed to plead loss causation. This Court notes that pursuant to the Supreme Court's recent ruling in *Tellabs, Inc. v. Makor Issues & Rights, Ltd.,* 168 L. Ed. 2d 179, 127 S.Ct. 2499 (2007), Plaintiffs are required to "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." In order to qualify as "strong" within the meaning of the statute, an "inference of scienter must be more than simply plausible or reasonable – it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Id.* at 188.

### B. State Law Claims

Plaintiffs allege claims for breach of fiduciary duty (Counts III and IV) and unjust enrichment (Count V). Defendants contend that these claims should be dismissed as they are state law claims and, thus, preempted by the Securities Litigation Uniform Standards Act of 1998 ("SLUSA").

In enacting the Private Securities Litigation Reform Act of 1995 ("PSLRA"), Congress targeted "perceived abuses of the class-action vehicle in litigation involving nationally traded securities." *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Dabit,* 126 S. Ct. 1503, 1510, 64 L. Ed. 2d 179 (2006). However, "[r]ather than face the obstacles set in their path by the Reform Act, plaintiffs and their representatives began bringing class actions under state law . . ." *Id.* at

9

1511. Subsequently, the Securities Litigation Uniform Standards Act of 1998 was enacted in order to prevent plaintiffs from frustrating the objectives of the PSLRA by using private securities class action lawsuits alleging fraud. Pub. L. No. 105-353, 112 Stat. 3227 (1998) (codified at 15 U.S.C. §§ 77p(b)-(f) and 15 U.S.C. § 78bb(f). SLUSA provides that,

> No covered class action based upon the statutory or common law of any State or subdivision thereof may be maintained in any State or Federal court by any private party alleging --
>
> (1) an untrue statement or omission of a material fact in connection with the purchase or sale of a covered security; or
> (2) that the defendant used or employed any manipulative or deceptive device or contrivance in connection with the purchase or sale of a covered security

15 U.S.C. § 77p(b).

Therefore, an action will dismissed as preempted by the SLUSA if the action is: (1) a "covered class action," (2) that is based on a state law, (3) alleging a misrepresentation or omission of a material fact or use of any manipulative or deceptive device or contrivance (4) "in connection with" the purchase or sale of a covered security. *Denton v. H&R Block Fin. Advisors, Inc.*, 2001 U.S. Dist. LEXIS 15831 (N.D. Ill. 2001). "A 'covered class action' is a lawsuit which damages are sought on behalf of more than 50 people." *Dabit*, 126 S. Ct. at 1512, *See* 15 U.S.C. § 78bb(f)(5)(B). "A 'covered security' is one traded nationally and listed on a regulated national exchange." *Dabit*, 126 S. Ct. at 1512, *See* 15 U.S.C. §§ 78bb(f)(5)(E), 77r(b). In order to determine preemption, the Court focuses on the "substance of the claim, not the Plaintiff's characterization of it." *Denton*, 2001 U.S. Dist. LEXIS 15831 * 7.

Plaintiffs argue that it pleads the state law claims of breach of fiduciary duty and unjust enrichment as an alternative to its federal securities claims. Further, while Plaintiffs do not dispute that the class action and securities at issue are "covered" within the meaning of the

10

SLUSA; the parties dispute whether Defendants' misrepresentations and omissions occurred "in connection with the purchase or sale" of securities.

      1. Misrepresentations and Omissions

Plaintiffs maintain that their claims for breach of fiduciary duty and unjust enrichment are merely ancillary to and not predicated upon Defendants' material misrepresentations and omissions. For that reason, Plaintiffs argue, these claims are not preempted by SLUSA. "The fact that Plaintiffs have chosen to disguise what amount to claims of securities fraud as claims for . . . breach of fiduciary duty under state law is not enough to evade preclusion of those claims under SLUSA." *Potter v. Janus Inv.*, 483 F.Supp.2d 692, 702 (N.D. Ill 2007). In the case at bar, Plaintiffs assert state law claims of breach of fiduciary duty and unjust enrichment. Rather than focus on the labels that Plaintiffs assigned to the claims, the Court analyzes the substance of the allegations and finds that at the heart of the Amended Complaint is that Defendants misrepresented and omitted material facts related to the purchase of shares of the Fund for the accounts of the beneficiaries. In fact, the forty-four page Amended Complaint is rife with such claims of misrepresentations and omissions relating to the purchase of the mutual funds:

> Individually and/or collectively, the Bank, JPM and their "controlled persons" caused the Registration Statements to be filed with the SEC which contained, *inter alia*, JPMorgan Funds prospectuses, to be disseminated to members of the Federal Securities Sub-Class, which prospectuses omitted material facts . . . (Am. Compl. at 23.)

> . . . Had the SEC been informed that the foregoing Registration Statements omitted material facts required to be included therein and misrepresented material facts therein, it would not have allowed such Registration Statements to have become effective and, thus, the Bank, JPM and their controlled entities would not have been permitted to sell shares of the JPMorgan Funds to the Bank's fiduciary accounts and to the public generally. (Am. Compl. at 24.)

11

In *Siepel v. Bank of America, N.A.*, 239 F.R.D. 558 (E.D. Mo. 2006), current and former beneficiaries of trusts brought suit against a bank and an investment trust alleging various state law claims, including breach of fiduciary duty and unjust enrichment. *Id.* at 567. The beneficiaries alleged that the bank wrongfully transferred fiduciary account assets into proprietary mutual funds without considering other alternatives, failed to disclose the conflict of interest and the resulting fees, and misrepresented that the bank provided individualized account services. *Id.* at 561. The Court held that the "essence" of the complaint was that the defendants made misrepresentations and omissions of material facts regarding the transfer of fiduciary account assets to the proprietary mutual fund. *Id.* at 568. Consequently, the Court held that the state law claims were preempted by the SLUSA. *Id.* at 570; *See also Disher v. Citigroup Global Markets, Inc.*, No. 07-132-GPM, 2007 U.S. Dist. LEXIS 36972, at *22 (S.D. Ill. May 3, 2007) (claims for breach of fiduciary duty and unjust enrichment "clearly . . . precluded under SLUSA"); *Potter*, 483 F.Supp.2d at 700 ("no difficulty concluding" that breach of fiduciary duty claims preempted by SLUSA). While *Siepel* is not binding on this Court, its reasoning is consistent with the SLUSA's stated purpose, which is "to prevent certain State private securities class action lawsuits alleging fraud from being used to frustrate the objectives" of the 1995 Reform Act. SLUSA § 2(5), 112 Stat. 3227. Additionally, given the similarities between *Siepel* and the case at bar, the Court finds *Siepel* persuasive. Therefore, the attempt by Plaintiffs to characterize their allegations of misrepresentation and omission of material facts as claims for breach of fiduciary duty and unjust enrichment is futile.

12

2. "In Connection with the Purchase or Sale of a Covered Security"

Plaintiffs assert that because they lacked investment authority and were beneficiaries rather than purchasers or sellers, the "in connection with the purchase or sale of a covered security" requirement is not met. Plaintiffs rely on several cases – including *O'Brien*, 593 F.2d at 54 – where the Seventh Circuit found that the SLUSA preemption inapplicable because plaintiffs had "no voice" in the investment decisions.[4] *Id. at 60*. SLUSA does not define the "in connection with" language. In *Dabit*, however, the Supreme Court construed the language in the context of the SLUSA and held that courts should interpret the "in connection with" language to include purchasers and sellers as well as holders of covered securities, where the alleged fraud coincides with a securities transaction. *Dabit*, 126 S. Ct. at 1513. In *Dabit*, a former Merrill Lynch broker filed a putative class action suit on behalf of himself and other former and current brokers of Merrill Lynch who purchased certain securities for themselves and their clients. *Id.* at 1507. The securities broker – in bringing claims for breach of fiduciary duty and breach of contract – alleged that Merrill Lynch unlawfully manipulated stock prices which led him, other brokers, and their clients to continue to hold their stocks long after the time that they would have traded them had the true value been known. *Id.* Finding that the SLUSA preempted the state law claims, the district court dismissed the complaint. *Id.* at 1508. The Second Circuit disagreed and held that because the brokers were fraudulently induced to hold rather than sell the securities, the claims were beyond the SLUSA's preemptive scope. *Id.* The Supreme Court

---

[4] Plaintiffs' reliance on two pre-*Dabit* cases – *O'Brien* and *Norris v. Wirth*, 719 F.2d at 256 – is misplaced. The Court believes that *SEC v. Sandford* (a case cited in *Dabit* with approval) belies Plaintiffs' contention that, in the context of SLUSA, the plaintiff must have possessed investment authority in order that the "in connection with" language be satisfied. 535 U.S. 813, 122 S. Ct. 1899, 153 L. Ed. 2d 1 (2002). Despite the plaintiff's lack of investment authority in *Sandford,* the Supreme Court held that the "in connection with" language was fulfilled. *Id.* at 820-21.

13

reversed and explained that the identity of the plaintiff was irrelevant: "For purposes of SLUSA pre-emption . . . the identity of the plaintiffs does not determine whether the complaint alleges fraud 'in connection with the purchase or sale' of securities." *Id.* at 1515. The Court indicated that the requisite showing involved "deception 'in connection with the purchase or sale of any security,' not deception of an identifiable purchaser or seller." *Id.* at 1513. In the instant matter, Plaintiffs seek to avoid the SLUSA preemption by arguing that they were beneficiaries and therefore, did not purchase or sell shares of the Fund in response to the misrepresentations and omissions. However, in rejecting this same argument, *Dabit* focused on the conduct of the defendants rather than the identity of the plaintiffs. Plaintiffs contend that Defendants engaged in a scheme to invest proceeds from the beneficiaries' accounts into Defendants' proprietary mutual fund despite better suited options, through misrepresentations and omissions of material facts in Defendants' public filings and other disclosures. Despite the fact that they did not purchase, sell, or hold the shares, Plaintiffs have alleged fraud that occurred "in connection with the purchase or sale" of the Fund.[5] Accordingly, Counts III, IV, and V are dismissed as they are preempted by the SLUSA.

---

[5] The Court finds *Gavin v. AT&T Corp.*, 464 F.3d 634 (7th Cir. 2006), cited by Plaintiffs, to be inapposite to the facts of the case at bar. Further, in determining which issues were germane to whether the letter at issue in *Gavin* was fraudulent, the Seventh Circuit explained that the *Gavin* plaintiffs were trying to litigate a consumer fraud case against companies that had made no effort to influence the purchase or sale of a covered security, and not alleging a securities fraud case. The *Gavin* court also determined that "Congress, in enacting the securities laws, did not intend to provide a broad federal remedy for all fraud." *Id.* at 640 (citing Marine Bank v. Weaver, 455 U.S. 551, 556, 102 S. Ct. 1220, 71 L. Ed. 2d 409 (1982)).

14

## IV. Conclusion

For the reasons articulated above, the Court GRANTS Defendants' motions to dismiss. Counts I and II are dismissed without prejudice. Plaintiffs may amend their complaint within 21 days from entry of this order in accordance with this Court's ruling, if they so choose. Counts III, IV, and V are dismissed as preempted by the SLUSA.

IT IS SO ORDERED.

_8/3/07_
Dated

_Wm. J. Hibbler_
The Honorable William J. Hibbler
United States District Court

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION (Cincinnati)

07 NOV -1 PM 1:49

| | | |
|---|---|---|
| DANIEL J. SEGAL, on behalf of himself and all others similarly situated, | ) ) ) | CIVIL ACTION NO. **1:07 CV 348** |
| Plaintiff, | ) ) | JURY TRIAL DEMANDED |
| v. | ) ) | CLASS ACTION |
| FIFTH THIRD BANK, N.A. and FIFTH THIRD BANCORP, | ) ) ) | **J. DLOTT** |
| Defendants. | ) | |

## CLASS ACTION COMPLAINT

Daniel J. Segal, on behalf of himself and for all other members of the Classes hereinafter

described, by and through counsel, seeks damages from the defendants Fifth Third Bank, N.A.

(the "Bank" or "Fifth Third") and its corporate parent, Fifth Third Bancorp ("Bancorp") and

injunctive relief and states and alleges as follows:

## OVERVIEW

1.      This Class Action is brought by plaintiff on behalf of himself and all others

similarly situated, all of whom are or were beneficiaries of fiduciary accounts for which the Bank

serves or served as corporate fiduciary. The allegations in this Complaint are directed at the Bank

as a result of its breaches of fiduciary and contractual duties owed by it to beneficiaries of the

Bank's fiduciary accounts (e.g. trust, estate, guardianship, employee benefit accounts)

("Beneficiaries") as well as against Bancorp, which at all relevant times through its Board of

Directors and senior management, controlled the Bank including its activities as described

herein. None of the claims made herein are based upon any misrepresentation or failure to

disclose material facts to plaintiff or members of the Classes as defined below. Rather the claims

made are based solely on the defendants' acts and, most specifically, the Bank's failure to fulfill

its responsibilities as a corporate fiduciary. The Bank and/or Bancorp own and control Fifth

Third Asset Management, Inc. and various other entities (collectively, the "Bank Subsidiaries")

which effectively operate and carry out various underwriting and other activities on behalf of the

proprietary mutual funds of the Bank, designated the "Fifth Third Funds," which are referred to

herein as the "Captive Funds". Separate and distinct from the foregoing Captive Funds," the

Bank carries out its fiduciary functions itself and through various financial institutions with

which it has been merged ("Acquired Banks") in such a way as to put its own interests before

those of the Beneficiaries in connection with the management of the assets in their various

fiduciary accounts. Such conduct has been carried out and continues to be carried out by the

Bank notwithstanding proclamations made by it and its corporate parent, Bancorp, of the highest

integrity and trust as follows:

### Corporate Governance

"Effective corporate governance and oversight are important keys to a company's
success. Fifth Third has long been known for its commitment to accountability at
every level of its organization. This holds true for our corporate governance and
oversight functions as well. Through our corporate governance initiatives and our
continuing oversight and evaluation, we are working hard to continually earn and
keep your trust and confidence."

Dudley S. Taft
Lead Director & Chairman of the Nominating & Corporate Governance
Committee of the Board of Directors

Bancorp's Code of Business Conduct and Ethics similarly touts the manner in which the

defendants and their employees are expected to act and, *inter alia*, to treat beneficiaries of the

Bank's fiduciary accounts such as plaintiff and members of the Class:

**Fifth Third Bancorp "Fifth Third"), and its subsidiaries and affiliates, have
many** important assets, but the most valuable is our established and unquestioned
reputation for **integrity. As professionals, we are judged by our conduct and**

2

**we must act in a manner that merits public trust and confidence. Because of the nature of the banking business, many people hold us to a higher standard than other industries.**

Fifth Third has adopted this Code of Business Conduct and Ethics to help ensure that it retains its integrity and merits public trust and confidence.

[emphasis added]

\* \* \*

**Business Conduct**

**You should endeavor to deal honestly, ethically, fairly and in good faith with Fifth Third's customers,** shareholders, employees, suppliers, regulators, business partners, competitors and others. **You may not take unfair advantage of anyone through manipulation, concealment, abuse of privileged or confidential information, misrepresentation, fraudulent behavior or any other unfair dealing practice.**

[emphasis added]

2.      The defendants totally control the Bank Subsidiaries and the Captive Funds and are liable for their activities described herein.

3.      Plaintiff complains, *inter alia*, that the Bank, by and through the Bank Subsidiaries and otherwise, breached the fiduciary and contractual duties owed to the present and former beneficiaries of the Bank's fiduciary accounts by, *inter alia,* acting in their own interests and putting them before those of plaintiff and the members of the Classes defined below, yielding to the material conflicts of interest at the time they owed duties of loyalty to the beneficiaries and otherwise operating the fiduciary business of the Bank to the detriment of the persons in the Bank's care. The core allegation of this Complaint is that the defendants did not deal honestly, ethically, fairly and in good faith with Fifth Third's Beneficiaries, contrary to Bancorp's own Code of Business Conduct and Ethics as stated above. Such behavior was manifested, in part, by the incremental increases in expenses fiduciary accounts sustained when the Bank implemented corporate decisions made on a Class-wide basis to funnel assets in their

3

respective fiduciary accounts to the proprietary mutual funds of the Bank, the Captive Funds, nominally overseen by a purportedly independent Board. The Bank purchased shares in these proprietary mutual funds for the fiduciary accounts of plaintiff and all members of the Captive Funds Class as defined below, which purchases the beneficiaries learned about after the fact. Indeed, neither plaintiff nor the Beneficiaries played any role whatsoever in purchases, sales or the holding of shares in the Captive Funds the Bank purchased for their accounts. In making such purchases, the Bank failed to exercise good faith and/or exercise reasonable care to avoid making imprudent investment decisions for such accounts as more fully set forth below. In the process, it and Bancorp unjustly enriched themselves both by and through the Bank Subsidiaries and otherwise.

4.    The Bank, headquartered in Cincinnati with offices throughout the Midwest and Florida, administers fiduciary accounts and offers a variety of financial planning and investment advisory services to the public, including purportedly customized management of the portfolios held in fiduciary accounts and individualized services for the Beneficiaries. In the case of plaintiff's trust accounts (the "Segal Trusts"), the Bank failed to live up to the standards of competence, good faith and integrity as set forth in its own pronouncements such as those set forth and quoted in ¶1, above.

5.    As an integral part of the investment advisory services the Bank offers to the public, the Bank promotes that it has expertise in management of financial resources and customized "wealth management" solutions for each individual, integrating the Bank's various investment management and related services. The Bank, through its regular legal counsel and other lawyers to whom it refers business, "scratch each other's backs" so that these lawyers will designate the Bank as corporate fiduciary in wills, trust documents, and otherwise, all of which

4

has permitted the Bank and the Acquired Banks to have substantial numbers of fiduciary accounts to manage. The Bank, in order to obtain the leverage and economies of scale referred to below and to generate the highest profits from the fiduciary accounts so attracted, engages in "asset gathering" for its Captive Funds and otherwise. The Bank, currently using the "Fifth Third" name, advertises on its website and otherwise and holds itself out as providing expertise and "customized trust solutions" in portfolio management. The Bank prominently advertises its promise and holds itself out to persons who do business with it. Notwithstanding such advertisements, the Bank has sought and continues to seek opportunities to standardize the investments for its fiduciary accounts, most typically by forcing fiduciary assets to be invested by it in the Captive Funds. Such action is and has been taken, for example, by liquidating individual assets held in Beneficiaries' accounts and replacing them with shares in the Captive Funds.

6.      In fact, despite the Bank's advertising, marketing pieces and direct solicitations of those who established fiduciary accounts with the Bank (and the beneficiaries thereof), as described herein, those promises have been and are being uniformly ignored. In the context of their acquisitions and planned acquisitions of other financial institutions to create a substantial "wealth management" business, it centralized the functions of the Acquired Banks defined below into the Bank's own template, forcing more and more fiduciary accounts to be "serviced" at as low a level as possible despite proclaiming its "experienced trust professionals" and funneling as many of such accounts' assets into the Bank's Captive Funds and without adequate regard for the tax circumstances of the beneficiaries of the accounts. In the course of carrying out its "master plan," the Bank, Bancorp, their senior officers and their confederates at the helm of the Captive

5

Funds sacrificed the interests of the Beneficiaries of the affected fiduciary accounts in favor of the "bottom line" of the defendants as described herein.

7. (a)    Beyond the recovery of plaintiff's individual damages (including those of the trusts of which he is a beneficiary), the focus of this lawsuit is, in the context of the acquisitions described herein, the corporate strategy of the defendants to consolidate the fiduciary operations of the various Acquired Banks and to generate operational efficiencies therefrom to make up for the deterioration of the Bank's traditional profit model, commercial lending, and replace it with fee and related income. Such conduct caused plaintiff substantial damages individually; similarly, all members of the Beneficiary Class defined below (many of whom are also members of the Captive Funds Class) were also damaged. In the course of carrying out such strategy and the consequential increase of the expense and diminution of fiduciary services, the Bank planned to, formed and did bulk-up its Captive Funds business to provide it with incremental sources of profit from fee and other income generated by, *inter alia*, the Bank Subsidiaries and the reduction in its expenses of providing services as a corporate fiduciary. The defendants and the Bank Subsidiaries did so from various services provided to the Captive Funds, including investment advisory, distribution and other services. The assets held in the fiduciary accounts of the Bank have been and are a perfect "cookie jar" for them to use to "seed" and/or bulk-up the Captive Funds and better enable the Bank to streamline its fiduciary operations and otherwise extract economies of scale therefrom, all of which conduct breached the Bank's duties to the fiduciary account beneficiaries and provided them less than the attention and services to which they were entitled.

(b)    In particular, in order to maximize the Bank's profits from the Bank's fiduciary accounts for which it acted as corporate fiduciary, it conspired with others presently unknown in

6

a series of business decisions to eliminate the personalized investment services inherent in the provision of corporate fiduciary services, to "double dip," by directing the assets in the Bank's fiduciary accounts, to the greatest extent feasible from their historic allocations in individually managed accounts and/or so-called Common Trust Funds ("CTFs") and/or other assets, into the Bank's proprietary mutual funds controlled by the Bank Subsidiaries ("Conversions") and/or to direct such assets into the Captive Funds directly. They so conspired by agreeing to act together for their unjust enrichment at the expense of plaintiff and members of the Classes, all of which caused them substantial damages as described below.

(c) As used herein, the term "Conversions" refers to the wholesale asset re-directions by the Bank and/or the Acquired Banks of fiduciary assets within their control into shares of the Captive Funds during the Class Period as referred to below. The "double-dip" refers to the Bank and/or the Acquired Banks (through the Bank Subsidiaries and otherwise) extracting fees and expenses from the affected fiduciary accounts, directly and indirectly, through the investment of the assets in those accounts in shares of various Captive Funds taken together with the traditional fees charged by the Bank and/or the Acquired Banks to each account for serving as a corporate fiduciary. The net effect of employing the Captive Funds as asset vehicles for the affected fiduciary accounts, including those of plaintiff, was to cause those accounts and those of the members of the Classes to be charged excessive amounts for the investment-related services rendered to them, which services they were entitled to receive as an integral part of the fiduciary relationship.

(d) As a direct consequence of the Conversions, the Beneficiaries' accounts were subjected to unnecessary and/or excessive investment-related expenses, which increased materially. Further, the Bank's wrongdoing is continuing in nature. Upon information and belief,

the Bank continues to seek other financial institutions to acquire in which, *inter alia,* fiduciary

services will be further marginalized as they have been with the Acquired Banks as described

herein. In addition to the Captive Funds shares purchased for the fiduciary accounts of members

of the Captive Funds Class in and pursuant to the Conversions, such shares were also purchased

for such accounts otherwise through, *inter alia,* initial investments, reinvested dividends and

interest, purchases of Captive Funds money market mutual funds by the Bank, and by other

means.

(e)    As corporate fiduciaries, the Bank and the Acquired Banks which the Bank

absorbed through merger were required to place the interests of Beneficiary Class members

above their own. Pursuant to the trust agreements and other documents pursuant to which the

fiduciary relationships were established, the Bank and the Acquired Banks were obligated to

provide, in exchange for the fees charged by them for serving as corporate fiduciary, a range of

personalized administrative and investment services. During the Class Period as defined below,

however, there existed and exist critical conflicts of interest that are within the fiduciary,

investment advisory, and other services the Bank provided to fiduciary accounts, particularly

with respect to the provision of the individualized services to which beneficiaries were and are

entitled, and the Bank's purchases of Captive Funds shares for their accounts.

(f)    Historically, the Bank, either through the trust departments of it and its

predecessors, promoted itself directly or through cooperating legal counsel by touting its

purportedly highly individualized trust administration and asset management services, all of

which services were to be paid out of the fees it was to receive as corporate fiduciary. The

promised provision of such services made by or on behalf of the Bank and/or the Acquired

8

Banks was intended to and did lure grantors, testators and others to designate such financial institutions as corporate fiduciary for estates, trusts and other fiduciary accounts.

(g)    In fact, the plans of the Bank, Bancorp, the Acquired Banks and their respective predecessors have been to cut back substantially on such so-called customized portfolio management and to direct fiduciary funds to the greatest extent feasible, once "captured," into standardized investments such as the Bank's proprietary mutual funds, including, *inter alia*, the Captive Funds, as part of the Conversions as described herein and otherwise. Few, if any of the grantors or others who established fiduciary relationships with the Bank and predecessors of the Bank, could have envisioned the Bank in its present form; namely, a regional and ever-expanding behemoth with few of the individual services typically offered by a fiduciary and implicit in the fiduciary relationship. As an integral part of the fiduciary relationships between plaintiff and the members of the Classes and the Bank, they were entitled to receive individual and prudent management of the assets placed in the Bank's care with the understanding that the Bank, in making investment-related decisions, would put the Beneficiaries' interests first before any others. As described herein, the Bank and its predecessors, breached their contractual obligations to plaintiff by, *inter alia*, putting its own interests foremost and not investing the entrusted assets in the most prudent manner.

(h)    The Bank, the Bank Subsidiaries, and employees and "experts" engaged by them, have blatant conflicts of interest which are endemic to the relationship between and among the Bank and the members of the Beneficiary Class. Specifically, the policy of the Bank was and is to direct fiduciary assets, the greatest extent feasible, to the Bank's proprietary mutual funds while touting, at the same time, the provision of customized portfolio management and to recommend portfolio strategies to meet clients' investment goals. To lure or retain fiduciary

9

accounts, the Bank and its predecessors (including the lawyers who fronted for them) created

public images designed to foster the belief that they were and are reliable providers of

customized financial advice. The Bank's employees, acting under pre-determined Bank policy,

provide investment planning "advice" under the guise that this advice is customized when in fact

it is not. Instead, the Bank invested fiduciary assets in its proprietary mutual funds and other

financial "products" for the Beneficiaries' fiduciary accounts. These practices included, but

were not limited to:

> (i)  the Bank and its predecessors failed to consider properly and independently
> any non-proprietary mutual funds for investments of fiduciary assets, particularly
> non-proprietary money market mutual funds even when such non-proprietary money
> market funds were higher yielding than the proprietary ones;

> (ii)   the Bank had a direct financial interest in placing shares of its own
> proprietary mutual funds and other products in its fiduciary accounts;

> (iii)   the Conversions resulted in material increases in the expenses of investing
> the assets of affected fiduciary accounts at the expense of plaintiff and members of
> the Captive Funds Class;

> (iv) the Bank had not negotiated in any meaningful way the fees and expenses
> that were being charged to the Captive Funds by their affiliates (including the Bank
> Subsidiaries) nor did they negotiate with non-affiliated firms that could provide the
> same investment advice or other services to fiduciary accounts at lower cost;

> (v)   the Bank assigned, in "musical chairs" fashion, uninformed and relatively
> inexperienced personnel to service fiduciary accounts and their Beneficiaries

10

consistent with the plan of the defendants to shrink fiduciary services at the expense of the Beneficiaries who were dependent upon them;

(vi)    the Bank and its predecessors, instead of providing investment management of most fiduciary accounts, invested their assets pursuant to computerized models and did not regularly conduct the Regulation 9 review of the accounts and their beneficiaries to determine whether the assets purchased therefor were suitable and otherwise appropriate and prudent, particularly when compared with non-proprietary alternatives;

(vii)   the Bank's purported customized portfolio management typically included only the use of the Bank's Captive Funds when mutual funds were used as investment vehicles for its fiduciary accounts;

(viii)  the Bank regularly and as a matter of corporate policy typically prohibited co-fiduciaries from having any serious role in the investment of the assets in fiduciary accounts including, *inter alia*, denying then timely and complete information with respect thereto;

(ix)    many of the proprietary funds of the Bank were new or relatively new funds with no established track record of returns; indeed, many of the funds in the Captive Funds family would not exist but for the Conversion and/or the Bank's funneling other fiduciary assets into them; and

the Bank, in order to force increasing amounts of assets to be placed in the Captive Funds, caused substantial income-producing assets held in fiduciary accounts to be sold and replaced with lower-yielding shares of Captive Funds.

11

8.      Each element of the foregoing practices created a conflict of interest between the financial well-being of plaintiff and the members of the Beneficiary Class on the one hand and the financial well-being of the Bank, Bancorp and the Bank Subsidiaries on the other. Throughout the Class Period as set forth below, notwithstanding Bancorp's Code of Conduct and Ethics referred to above, each of the Bank and its "trust officers" was keenly aware that these practices created material conflicts of interest between themselves and the members of the Beneficiary Class. As a consequence, the Bank engaged in rapacious self-dealing to the detriment of plaintiff and the members of the Classes and, because of the failure to separate the Bank's fiduciary operations from all its other businesses and those of the Bank Subsidiaries, its continued performance as a corporate fiduciary is and remains materially flawed.

## ACQUISITIONS OF OTHER FINANCIAL INSTITUTIONS

9.      Over the course of the last 20 years, the Bank and its corporate parent, Bancorp, have made a number of acquisitions of other financial institutions concentrating in the Midwest and, more recently, in Florida (the "Acquired Banks"). As an integral part of these acquisitions, the Bank put into operation a corporate-wide plan to eliminate many of the investment-related and other services to beneficiaries of fiduciary accounts as described herein, including the elimination of those personnel who provided services to fiduciary account beneficiaries while at the same time increasing the fees paid by them which individualized services were integral to the contractual arrangement between, *inter alia*, those who established fiduciary accounts with the Bank and/or the Acquired Banks.

10.      In the context of this series of acquisitions, and in order to justify the premiums that were being paid for the Acquired Banks, with each new acquisition, they required the centralization and streamlining of the fiduciary services offered by the Bank, including,

12

ultimately, the increased usage of Captive Funds as vehicles for placement of fiduciary assets. At the same time, they planned to extract more money from the fiduciary accounts of the Bank and the Acquired Banks at the expense of the beneficiaries thereof by forcing CTFs and other assets held in fiduciary accounts increasingly to be sold and the proceeds reinvested by the Bank in the Captive Funds to as great an extent as feasible, thereby obtaining the very leverage and economies of scale needed to increase financial benefits resulting from the acquisitions and to help prepare, *inter alia*. Bancorp to be a valuable acquisition target itself.

11.    Those who established or caused to be established fiduciary relationships, in entrusting their assets to local banks, whether the Bank or the Acquired Banks, did so based upon personal relationships with officers of such Banks or Acquired Banks that had been built over many years. These fiduciary relationships were established because, *inter alia*, these officers and the banks themselves were institutionally and personally suited not only to the stewardship of assets over multiple generations but looked after their descendants or other designated beneficiaries of their largesse. Over the years, the Bank and its corporate predecessors swallowed-whole the Acquired Banks, financial institutions which had fiduciary responsibilities to members of the Beneficiary Class.  In the process of being digested by the Bank, these formerly independent institutions' fiduciary operations were transmogrified into just cogs in the fee-generating machinery of the Bank.

12.    In the course of this metamorphosis, the interests of plaintiff and members of the Beneficiary Class were not represented by qualified, knowledgeable trust officers, but frequently by relatively lower-level Bank personnel with little or no investment expertise and portfolio managers who employ computerized asset allocation programs designed to maximize the use of

the Bank's proprietary funds in fiduciary accounts instead of the individual management and attention to which the beneficiaries of the affected accounts were entitled.

13.     Except for the highest net worth fiduciary accounts, which are still provided with "open architecture" asset management by the Bank giving the beneficiaries thereof the customized recommendations and wealth management expertise promised by it, most of its fiduciary accounts are not and have not been provided the services to which they are entitled since the consolidation of the various Acquired Banks began taking place. As such, the Bank and the Acquired Banks breached the contractual agreements they made with those who selected the Bank and the Acquired Banks as corporate fiduciary, of which relationships and members of the Beneficiary Class are beneficiaries.

## THE BANK'S CAPTIVE FUNDS

14. (a)  The Captive Funds are proprietary funds nominally operated by a so-called predominantly independent Board. Even though no more than 60% of the Board is supposed to be "interested" persons, in fact all members thereof were, in fact, elected, re-elected, directed and controlled by the Bank, Bancorp and the Bank Subsidiaries.

(b)  It has been the Bank's policy, throughout the Class Period defined below, to force the assets of its fiduciary accounts into shares of the Captive Funds to the greatest extent feasible.

(c)  The Captive Funds' portfolios cover a wide variety of investment disciplines, strategies and types of asset categories including, *inter alia*, money market, equity and bond funds. The Captive Funds are nominally operated by a Board, a majority of whom are purportedly independent. In fact, the Bank, as the largest single shareholder of record of the

14

various Captive Funds, controls all nominees to the Captive Funds' Board and therefore controls the Captive Funds and the Bank Subsidiaries.

(d) Certain of such Captive Funds were funded by the Bank and the Bank Subsidiaries in substantial part by transferring fiduciary assets pursuant to the Conversions, in effect, forcing the Captive Funds to and upon the Bank's fiduciary accounts for which it served as corporate fiduciary. Such funding permitted the affected Captive Funds to have substantial asset bases, an important selling point to the Bank and the Bank Subsidiaries (including the nominally separate Fifth Third Securities, Inc.) in marketing shares in the Captive Funds to other potential purchasers thereof through the Bank and other subsidiaries of the defendants.

## JURISDICTION AND VENUE

15.    The claims asserted herein arise under and pursuant to common law. The jurisdiction of the Court is based upon 28 U.S.C. § 1332(d) since there is diversity of citizenship between at least one member of the Classes and at least one of the defendants and the amount in dispute exceeds $5 million exclusive of interest and costs. Further, the Court has supplemental jurisdiction over the plaintiff's individual, non-classwide claims as set forth below. Plaintiff makes no claims under or pursuant to federal law and does not allege that the Bank or Bancorp misrepresented or omitted to disclose any material fact to him upon which he relied in connection with the purchase, sale or ownership of securities purchased for the Segal Trusts' accounts by the Bank, all of which he learned about after such transactions had taken place.

16.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(a). Many of the acts charged herein, including the mismanagement of the fiduciary assets of plaintiff and members of the Classes defined herein, occurred in substantial part in this District. In addition, the Bank and its parent, Bancorp, maintain their corporate headquarters in this District.

15

## THE PARTIES

17.     Plaintiff, Daniel J. Segal, is a citizen of Ohio, a resident of this District and is a beneficiary of fiduciary accounts of which the Bank was formerly a Trustee. He is a victim of the Bank's scheme to enhance profits by means of, *inter alia*, diminishing the fiduciary services to which plaintiff and other Beneficiaries were and are entitled, using the Bank's proprietary mutual funds, the Captive Funds, as investments for their fiduciary accounts and otherwise. Plaintiff and the members of the Classes, who are citizens of numerous states throughout the country including Ohio and other states, are related to one another by being damaged at the expense of the activities of the Bank and the Bank Subsidiaries as described herein.

18.     (a) The Bank is a federally chartered bank domiciled in Cincinnati with operations through the Midwest and in Florida.

(b) Bancorp is an Ohio corporation domiciled in Cincinnati and is a bank holding company, its principal asset being the Bank.

## FACTUAL ALLEGATIONS

19.     Notwithstanding the fact that the fiduciary accounts of plaintiff and members of the Beneficiary Class have been under the fiduciary responsibility of the Bank, it has bounced the beneficiaries of many of these accounts from one trust officer to another, which beneficiaries are now "serviced" by low-level employees, rather than fiduciary officers with knowledge of the beneficiaries or their individual needs.

20.     Historically, the Bank and its predecessors invested the assets of the fiduciary accounts of members of the Class primarily through individually managed portfolios and/or through so-called "Common Trust Funds," collective investment funds that do not require

16

payments of fees or expenses by the investors.  The expenses of the Bank for such investment

vehicles and related administrative services were absorbed by the Bank out of its fees for serving

as fiduciary.

21.    In order to, *inter alia*, compensate for the lack of profits from its traditional

lending business and the excessive premiums the Bank and its parent were paying for the

Acquired Banks, the Bank and its predecessors developed various plans and schemes pursuant to

which they sought to minimize their operating expenses with respect to fiduciary accounts and

maximize their profits from their fiduciary business, particularly through the use of proprietary

mutual funds as investment vehicles to the greatest extent feasible.

22.    Upon information and belief, these plans were integral to plans to extract higher

profits from the Acquired Banks and consolidating their various trust departments and fiduciary

operations under the banner of "wealth management," an exclusive-sounding replacement for the

Acquired Banks' trust departments.  The plans of the Bank included the consolidation and

elimination of the previously existing trust departments of the Acquired Banks with the objective

of "servicing" fiduciary accounts and the beneficiaries thereof with fewer and fewer personnel

and greater standardization and computerized selection of investments in fiduciary accounts.

Pursuant to such business plans, they decided, *inter alia,* to utilize the assets held by the Bank in

fiduciary accounts to fund an initial group of mutual funds and/or to add assets to such funds

controlled by the Bank, the Acquired Banks and the Bank Subsidiaries, the Captive Funds, as

well as other mutual funds merged into them following the acquisition of, *inter alia*, the

Acquired Banks.  Thereafter, due to numerous acquisitions, mergers and other transactions

referred to above, consistent with their longer-term plan and scheme, the Bank determined that

most or all of the assets in certain fiduciary accounts held by the Bank (and formerly held as

fiduciary assets by the Acquired Banks) would be converted into shares of the Bank's proprietary funds, such as the "family" of Captive Funds or only invested in such mutual funds initially. Even in fiduciary accounts such as those of plaintiff, the Bank caused uninvested cash to be placed in Captive Funds money market mutual funds instead of optimal investment vehicles that would generate the highest rates of return.

23.    Through a complicated and barely comprehensible grouping of advisors, sub-advisors, subsidiaries and other affiliated and unaffiliated service providers, the Bank and the Bank Subsidiaries engineered a scheme pursuant to which the Bank was able to abdicate many of its traditional fiduciary responsibilities, functions and services to Beneficiaries of its fiduciary accounts, in breach of its contractual obligations to plaintiff and the members of the Beneficiary Class, in favor of alternatives that resulted in higher total direct and indirect expense charges made to the Bank's fiduciary accounts as compared to the trustee or similar fees historically paid to the Bank for, *inter alia*, active management of the fiduciary accounts' assets and to extract additional profits by utilizing the Captive Funds as compared to higher yielding and better-managed non-proprietary mutual funds that were commercially available in the marketplace.

24.    Throughout the Class Period, while the Bank was using fiduciary assets to purchase shares in the Captive Funds, and thereby greatly increasing the asset bases of each of the affected funds, it and the Bank Subsidiaries were benefiting substantially by obtaining great operating efficiencies (and lower per-dollar investment expenses) as well as "bragging rights" which enabled the Bank and the Acquired Banks to tout the amounts of assets in their proprietary mutual funds, making it easier for the Bank and Fifth Third Securities, Inc. to sell shares therein to, *inter alia*, other customers of the Bank, the Acquired Banks and their brokerage subsidiaries.

25.     The contracts between the Captive Funds' Board and the Bank Subsidiaries relating to the provision of investment advisory, administrative, distribution and other services were determined on a no-bid basis to benefit the Bank and contrary to the best interests of plaintiff and the members of the Captive Funds Class.

26.     While the Bank may have provided "credits" to some fiduciary accounts for what were the purported fees received by the Bank Subsidiaries from the Captive Funds, such credits were substantially less than the incremental expenses the Beneficiaries' fiduciary accounts incurred, directly and indirectly, as a result of having Captive Funds shares purchased by the Bank for such accounts. Thus, the Bank and the Bank Subsidiaries were able to "double dip," charging fees to serve as a corporate fiduciary and, as well, imposing substantial fees and expenses on the Captive Funds acquired for the affected fiduciary accounts. Additionally, upon information and belief, the Bank Subsidiaries had arrangements with purportedly independent vendors of advisory and administrative services, from which arrangements the Bank and Bank Subsidiaries benefited in undisclosed ways. All of such practices caused the affected fiduciary accounts to pay, both directly and indirectly, fees and expenses which they should not have been required to pay.

27.     Upon information and belief, no analyses or determinations were made by the Bank as to the relative costs and benefits of its investments in the Captive Funds at the time of or before the purchases of shares therein were carried out for each of the Bank's fiduciary accounts as compared to, *inter alia*, direct  fee and expense-free investment of fiduciary assets by the Bank, numerous other available mutual funds or investment vehicles in which the Bank could have invested prudently and at lower cost the assets in the fiduciary accounts of which plaintiff and the members of the Captive Funds Class were Beneficiaries.

28.     Even assuming that the Bank made prudent decisions to purchase shares in the Captive Funds for the fiduciary accounts of the members of the Captive Funds Class, which it did not, as indicated above, the Bank did not negotiate the fees and expenses to be charged to the Captive Funds or comparison shop in any significant way with other mutual funds or families of funds in an attempt to obtain the same or better investments elsewhere and at lower net expense to the Bank's fiduciary accounts.  Upon information and belief, any "comparisons" that were done by the Bank with non-proprietary mutual funds or investment advisors were merely to "paper" the files so it would appear that an effort was made to consider alternative mutual funds or advisors. Similarly, the Captive Funds' Board, dominated and controlled by the Bank and/or the Bank Subsidiaries, should have obtained but did not obtain the lowest fees from the Bank Subsidiaries actually operating the Captive Funds. Indeed, as stated by former New York Attorney General Eliot Spitzer: "Fund directors do not – and cannot – negotiate hard on the fees." This is particularly the case when, as here, the Captive Funds' Board members were nominated and voted upon by the Bank, which totally controlled the composition of the Board and, thus, the Captive Funds.

29.     Upon information and belief, the Bank specifically excluded alternate investment vehicles (such as other families of funds such as the Vanguard Group and Fidelity Investments mutual funds) from its considerations in order to maximize its earnings and those of its affiliates (including the Bank Subsidiaries) and did not give serious consideration to investing the assets of fiduciary accounts as they were historically in fee and expense free CTFs, which could be structured to generate, e.g. daily pricing and full diversification.

30.     Upon information and belief, as a result of a conspiracy among Bancorp, the Bank, the Bank Subsidiaries and others presently unknown, as part of corporate business

decisions, chose to invest the fiduciary assets of plaintiff and the members of the Class in shares

of the Captive Funds as part of the Conversions and otherwise in order, *inter alia*, to generate

investment advisory and administrative fees and other income for its various affiliates and to

"bulk-up" the Captive Funds without regard to whether such investments were prudent and in the

best interest of plaintiff and the other members of the Captive Funds Class.

31.    The Conversions of the assets of fiduciary accounts to the Captive Funds and the

investment of fiduciary assets therein generally was carried out in furtherance of the corporate

plans of the Bank and its predecessors and of Bancorp, including their senior executives, to

reduce the expenses of managing fiduciary assets and increasing the Bank's overall direct and

indirect profits from fiduciary operations, one of the objectives in consolidating the operations of

the Acquired Banks. The assets in the fiduciary accounts managed by the Bank and the Acquired

Banks were particularly vulnerable to misuse since they regarded the fiduciary accounts in their

care as a "cookie jar" open for the taking. The Bank invested fiduciary assets in the Captive

Funds because it would not merely profit from trustee and similar fiduciary fees but "double dip"

by generating additional revenues through the its related asset management businesses,

administrative service businesses and otherwise. Further, the Conversions created an opportunity

for the Bank to avoid the relatively low profitability of managing its fiduciary accounts (and the

expenses related thereto) which it and the Acquired Banks had contracted to do when the Bank

(and/or its predecessor Acquired Banks) agreed to serve as fiduciary thereof, and substitute ever-

increasing fee income directly and through its corporate affiliates.

32.    The Bank, the Bank Subsidiaries and their affiliates (and through them, Bancorp)

reaped many millions of dollars in purported money management, investment advisory and other

fees as a result of the Conversions and thereafter from the investment of fiduciary assets in the

Captive Funds. The Bank also benefited by receiving trustee or similar fees for serving as a

fiduciary and by reason of the benefits which flowed from, *inter alia*, substantially reduced

operating expenses of its fiduciary operations. Despite these benefits to the Bank, these

investments have been of little, if any, benefit for their fiduciary accounts and the beneficiaries

thereof, including plaintiff and the members of the Captive Funds Class. On information and

belief, plaintiff and all members of the Classes suffered damages from the investment and

fiduciary practices of the Bank generally as described above in an amount which cannot

presently be determined but which is capable of calculation and they are entitled to restitution of

the Bank's unjust enrichment as described below.

## CLASS ACTION ALLEGATIONS

33.    Plaintiff brings this action on his own behalf and pursuant to Rule 23(b)(3) of the

Federal Rules of Civil Procedure as a class action on behalf of the following Classes:

> (a) **The Beneficiary Class** consisting of all beneficiaries
> of trust, estate or other fiduciary accounts for which the
> Bank or any of its predecessors acted as a trustee,
> executor or other form of corporate fiduciary at any
> time from March 1, 2001 to the present (the "Class
> Period"); and

> (b) **The Captive Funds Class** consisting of all Beneficiary
> Class members whose trust, estate or other fiduciary
> accounts for which the Bank or any of its predecessors
> acted as a trustee, were directly or indirectly invested
> in a Captive Funds at any time during the Class Period.

34.    The Classes defined above exclude all such persons whose claims are barred by

an applicable statute of limitations and/or a validly executed or otherwise validly obtained

release obtained after full disclosure of all material facts with respect thereto. The definition of

the Classes, the Class Period and the identity of those excluded from the Classes may be amended following discovery with respect thereto.

35.     Over the past 20 years, the Bank, while making acquisitions, increasingly consolidated its operations and centralized them into a mostly regional template consistent with the goals and objectives set out by the Bank's senior executives, took actions which affected all members of the Classes herein in substantively the same way. The state of domicile of the respective trusts, estates or other types of fiduciary accounts is irrelevant for the purposes of certification of the Classes since, pursuant to the law of all states, defendants' conduct as described herein, warrants the claims asserted herein.

### Numerosity of the Members of the Classes

36.     Upon information and belief, the Bank serves as a fiduciary (such as a trustee, guardian, executor, etc.) for many thousands of fiduciary accounts affected by the wrongdoing described herein. Similarly, there are many thousands of Beneficiaries thereof who are members of the Classes, most of whom are members of both Classes.

37.     The exact number of members of the Classes as above described is not known by plaintiff, but is within the sole knowledge of the Bank. Upon information and belief, the members of the Classes are so numerous as to make a class action appropriate and there are believed to be more than 5,000 members of each.

38.     On information and belief, the members of the Classes are located in many of the fifty states, and in foreign countries. They can be identified and easily ascertained from the Bank's records and be provided with notice of the pendency of this litigation.

23

### Common Issues of Law and Fact Predominate

39. On information and belief, throughout and prior to the Class Period, Bancorp, the Bank and their senior executives, in conspiracy with the Bank Subsidiaries and others, decided to, *inter alia,* dramatically reduce the provision of services to the members of the Beneficiaries Class and, with respect to the members of the Captive Funds Class, to invest the assets of the affected fiduciary accounts in shares of the Captive Funds, all of which were directly or indirectly "advised," managed and otherwise administered by the Bank Subsidiaries or their affiliates.

40. All members of the Classes were adversely affected by the self-serving business decisions of the Bank as described herein.

41. All of the fiduciary accounts of the Bank and the Acquired Banks and their Beneficiaries were negatively impacted when, upon the acquisitions of other financial institutions, defendants diminished and standardized fiduciary services as described above. Among the material consequences thereof was the substantial reduction in the fiduciary services provided to the members of the Beneficiaries Class and, in the wake thereof, the Conversions and otherwise. All of the fiduciary accounts of the Bank and the Acquired Banks, the assets of which were invested in shares of one or more of the Captive Funds, paid directly or indirectly, administrative and investment advisory fees and other charges to subsidiaries and affiliates of the Bank, including the Bank Subsidiaries, based on the fiduciary assets invested by the Bank and the Acquired Banks in such mutual funds. All fiduciary accounts of members of the Captive Funds Class for which the Bank and the Acquired Banks served as corporate fiduciary were damaged by reason of the unnecessary and higher expenses charged to such accounts, directly and indirectly, as a consequence of the Conversions and the lower investment returns generated

24

as a result thereof and/or by investments in the Captive Funds unrelated to the Conversions. Those members of the Captive Funds Class not affected by the Conversions but whose assets were nevertheless invested by the Bank in shares of the Captive Funds thereafter were similarly damaged as a result of such purchases.

42.      There are common questions of law and fact that relate to and affect the rights of each member of the Classes including, *inter alia*:

(a)      whether the Bank and Bancorp, in connection with their acquisition of the Acquired Banks, intended to and did materially reduce the provision of fiduciary services to the members of the Beneficiaries Class;

(b)      whether the business decisions of Bancorp, the Bank and the Bank Subsidiaries to place the assets of the Bank's fiduciary accounts in the Captive Funds was motivated by the best interests of the Captive Class members (which the Bank had a duty to put before its own) or by their desire to generate management, administrative and investment advisory fees for themselves, their affiliates and subsidiaries, to lower their expenses of managing fiduciary assets and to generate other benefits for themselves by, *inter alia*, "bulking-up" and increasing the assets invested in the Captive Funds;

(c)      whether the Bank breached fiduciary and contractual duties to plaintiff and the members of the Classes by failing to conduct its fiduciary operations in conformity with the requirements of the National Banking Act, the guidelines established by the Comptroller of the Currency and other applicable law, regulations and federal banking guidelines for fiduciaries;

(d)      whether the Bank breached fiduciary duties to members of the Classes by making investment decisions for the fiduciary accounts of plaintiff and the Classes not based

upon individual considerations, but based upon its own interests and those of its subsidiaries and

affiliates, rather than the interests of the Beneficiaries of such fiduciary accounts; and,

      (e)    what remedies are appropriate compensation for the damages caused to

plaintiff and each member of the Classes.

    43.    The relief sought is common to all members of the Classes including, *inter alia:*

      (a)    a declaratory judgment that the Bank violated its fiduciary duties as trustee

(or other similar fiduciary role) in connection with its actions described herein with respect to the

affected fiduciary accounts;

      (b)    payment by the defendants of compensatory damages caused by breaches

of fiduciary and contractual duties as described herein,  as well as substantial punitive damages;

      (c)    an injunction preventing the Bank from opposing a petition by current

beneficiaries of the fiduciary accounts affected by the wrongdoing referred to herein to replace it

as corporate fiduciary; and

      (d)    an injunction which establishes appropriate procedures and safeguards

within the Bank to ensure that the interests of beneficiaries of fiduciary accounts within the

Bank's control are fully protected from wrongdoing such as described herein including, *inter*

*alia*, providing for a "Chinese wall" to segregate the Bank's fiduciary operations from all other

operations of the defendants.

**Typicality and Predominance of Plaintiff's Claims**

    44.    The interests of the plaintiff and each member of the Classes have been adversely

affected by the wrongdoing of the Bank as described herein.

    45.    All of the fiduciary accounts in the care of the Bank and, previously, the Acquired

Banks, suffered the same fate at the expense of the defendants' decisions pursuant to which

26

fiduciary services to such accounts and their Beneficiaries were materially reduced including, *inter alia*, the elimination of any real consideration of the needs of the Beneficiaries or the investment of the assets in such accounts for the Beneficiaries' primary benefit. The assets of the plaintiff's fiduciary account, like all other fiduciary accounts of members of the Classes, were invested by the Bank and/or the Acquired Banks in shares of the Captive Funds pursuant to wholesale business policy decisions by the defendants and their senior officers made some time prior to the beginning of the Class Period and carried out thereafter.

46.     Upon information and belief, the plaintiff's fiduciary accounts at the Bank, like all other fiduciary accounts, were negatively impacted by its reduction of fiduciary services and competence of the Bank's employees providing them. The assets in such accounts were used by the Bank, the Bank Subsidiaries and their affiliates to generate additional management, administrative investment advisory and/or other fees and benefits for themselves (even after the so-called credits were applied to such fiduciary accounts) and for Bancorp without regard for the best interests of the Beneficiaries of such accounts such as plaintiff and the members of the Classes. These claims that plaintiff has in common with all members of the Classes and predominate over any individual claims they have against the defendants, including the individual claims of plaintiff as alleged be.

47.     The claims of plaintiff, who is a representative of the Classes, are typical of the claims of all members thereof. The claims of plaintiff are based on the same fundamental factual allegations and legal theories as the claims of all other members of the Classes.

### Plaintiff Will Fairly and Adequately Represent the Classes

48.     The plaintiff is able to and will fairly and adequately protect the interests of the Classes and the members thereof.

27

49.    The attorneys for plaintiff are experienced and capable of prosecuting complex litigation such as this case. The attorneys for plaintiff and the Classes will actively conduct and be responsible for the prosecution of this litigation and the expenses thereof.

## PLAINTIFF'S ENTITLEMENT TO PUNITIVE DAMAGES

50.    The conduct of the defendants as described herein was outrageous because of its malice, evil motive and reckless indifference to the rights of the plaintiff and all others similarly situated members of the Classes in implementing an across-the-board diminution of fiduciary services and effectuating a policy to invest the assets of the fiduciary accounts of the Beneficiaries in one or more of the Captive Funds which, *inter alia,*:

(a)    took advantage of the Bank's conflicts of interest and the increased costs and expenses plaintiff and the members of the Captive Funds Class would incur as a result of investing fiduciary assets in the Captive Funds, which costs and expenses inured to the benefit of Bancorp, the Bank and the Bank Subsidiaries in flagrant violation of their duty of loyalty;

(b)    deliberately and knowingly changed the investment vehicles historically used by financial institutions for investments of fiduciary assets (e.g. individual assets or CTFs) into shares of the Captive Funds, specifically to generate revenues and profits at the expense of the Beneficiaries of the fiduciary accounts in flagrant violation of the duties of loyalty and prudence of the Bank;

(c)    deliberately and knowingly applied fee credits to fiduciary accounts which, if applied at all, only partially offset the additional cost of Captive Funds investments in flagrant violation of the duties of loyalty and prudence of the Bank;

(d)    deliberately and knowingly engaged in conflict of interest and self dealing transactions and failed to consider whether this conduct was in the sole interests of the

28

Beneficiaries of the fiduciary accounts to whom the Bank and the Acquired Banks owed a fiduciary duty, including the duties of loyalty and prudence and instead, put their interests in generating revenues and profits for themselves ahead of those to whom they owed a fiduciary duty;

          (e)      knowingly and intentionally or as a result of gross negligence proceeded with investments of fiduciary assets in the Captive Funds despite the fact that the true expenses to be borne by investing the assets therein were not appropriately compared with the performance and expenses of non-proprietary mutual funds available in the marketplace or in fee and expense-free CTFs.

**COUNT I**

**BREACH OF FIDUCIARY DUTY**

51.      Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.  This Count is asserted by plaintiff individually and on behalf of the Classes against the Bank.

52.      On information and belief, the decisions of the Bank and Bancorp to rationalize the fiduciary services provided formerly by the Bank and the Acquired Banks, which featured, *inter alia*, personalized attention and individual portfolio management, and to invest the assets of its fiduciary accounts in the Captive Funds, was motivated not by the interests of plaintiff and the members of the Classes but by the defendants' own interests in generating additional profits. In making Class-wide decisions to purchase shares in its proprietary mutual funds for its fiduciary accounts, the Bank failed to consider maintaining the *status quo*, with fee and expense-free investment of fiduciary assets. Further, the Bank did not seriously consider the Captive Funds' high expenses or alternative lower cost families of mutual funds (or deliberately did not do so)

29

when the Bank invested the assets of its fiduciary accounts in shares of the Captive Funds.

Following the mandate of Bancorp and its senior executives, the Bank simply put its own

interests and those of the Bank Subsidiaries and their affiliates before those of the Beneficiaries

of their fiduciary accounts, plaintiff and the members of the Captive Funds Sub-Class. Such

persons played no role in such investments and only learned of the Bank's transactions in shares

of the Captive Funds after-the-fact.

53.    The Bank failed to consider the best interests of these Beneficiaries when it

invested the assets of fiduciary accounts in the Captive Funds and breached its duty of loyalty to

them by putting the interests of Bancorp, the Bank, the Bank Subsidiaries and their affiliates

before the interests of plaintiff and the members of the Classes.

54.    The investment of the assets of the affected fiduciary accounts by the Bank in the

Captive Funds for fiduciary accounts was a breach of its fiduciary duty to plaintiff and the

members of the Classes. Such breaches caused damages to plaintiff and the members of the

Classes by, *inter alia*, providing them materially less fiduciary services than those to which they

were entitled and having their fiduciary accounts subjected to unnecessary and/or excessive fees

and expenses as referred to above in an amount which cannot presently be calculated.

55.    As a fiduciary, under and pursuant to Ohio Rev. Code §1339.52, the Bank was

and is obligated to comply with the Uniform Prudent Investor Act. By acting as described in this

Count and investing the funds of the fiduciary accounts of members of the Classes, the Bank

made imprudent investments and thereby violated Ohio Rev. Code §1339.53.

56.    As a result of, *inter alia*, the Bank's improper diminution of the fiduciary

services provided to plaintiff and the members of the Beneficiaries Class, the Beneficiaries have

been denied the services to which they were entitled had the Bank fulfilled its fiduciary responsibilities and thereby damaged in an amount to be determined.

**COUNT II**

**UNJUST ENRICHMENT**

57.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein. This Count is asserted by plaintiff individually and on behalf of the Classes against both defendants.

58.     By reason of, *inter alia*, causing the Bank and the Acquired Banks to provide a materially lower level of fiduciary services than those to which they were entitled and causing the fiduciary assets in affected accounts to be invested in the Captive Funds, the Bank and the Bank Subsidiaries have "double dipped" as well as gained other unjustified benefits for themselves as described above.  They have saved substantial operating costs by reducing fiduciary services at the expense of plaintiff and the other affected Beneficiaries whose fiduciary accounts were and are charged by the Bank as if were providing the full range of services to which the Beneficiaries were and are entitled. The defendants also profited by placing Captive Funds shares in the Beneficiaries' fiduciary accounts as described herein, thereby unjustly enriching themselves at the expense of plaintiff and the members of the Classes.

59.     The foregoing "double dipping" was carried out by the Bank and the Bank Subsidiaries by, *inter alia*, imposing on fiduciary accounts fees for acting as a corporate fiduciary as well as investment advisory and administrative fees, and other related charges which, when taken together with all the Captive Funds' expenses, even after so-called credits for certain fees paid to the Bank Subsidiaries by the Captive Funds, exceeded the amounts to which the Bank was and is entitled. Additionally, as indicated above, such benefits to the Bank and the

Bank Subsidiaries were exacerbated by their avoidance of substantial operating expenses by reason of the abdication of the formerly individualized investment and administrative responsibilities owed by the Bank and the Acquired Banks to the members of the Classes implicit in the fiduciary relationship.

60.     The defendants have retained and invested the proceeds of the foregoing unjust enrichment and realized additional profits thereupon, all of which should be returned to the fiduciary accounts from which they were derived and/or their Beneficiaries, as the Court shall deem appropriate and otherwise.

## COUNT III

## BREACH OF CONTRACT

61.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein. This Count is asserted by plaintiff individually and on behalf of the Beneficiaries Class against the Bank.

62.     Those who established fiduciary relationships with the Bank and its predecessors did so pursuant to contractual agreements and understandings pursuant to which the beneficiaries thereof became entitled to receive, in exchange for the corporate fiduciary fees paid to the Bank and the Acquired Banks, *inter alia*, individualized and prudent management of the respective fiduciary accounts and expense and fee-free investment of the assets within the care of the Bank and the Acquired Banks. Instead, they provided rationalized and impersonal fiduciary services by relatively inexperienced personnel and computerized "model" portfolios which always included Captive Funds. As set forth above, the Bank and the Acquired Banks failed to provide to plaintiff and the members of the Class the individualized attention to which they were and are entitled and to the impartial and prudent investments implicit therein. Further, the Bank and the Acquired

Banks were in control of such fiduciary relationships and, as such, were required to act fairly and in good faith toward the Beneficiaries. As set forth herein, the Bank failed to act as it was legally required to act under the circumstances, all of which damaged plaintiff and members of the Beneficiaries Class.

63.     By acting as described herein, the Bank and the Acquired Banks breached the foregoing contractual agreements with those individuals who established fiduciary relationships with the Bank and/or the Acquired Banks and the implicit obligations to plaintiff and the members of the Beneficiaries Class thereunder, causing them damages in an amount which cannot presently be determined.

## COUNT IV

## BREACH OF FIDUCIARY DUTY

64.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein. This Count is asserted against the Bank by plaintiff individually and on behalf of those members of the Beneficiaries Class who were affected by the wrongful conduct described herein.

65.     Periodically, various of the fiduciary accounts of plaintiff and members of the Beneficiaries Class were subject to estate, trust or other tax obligations. The Bank typically segregated funds to pay the tax obligations of these accounts and routinely did so by placing the segregated funds in low-yielding money market mutual funds operated by the Captive Funds. The amounts so segregated from plaintiff's and other fiduciary accounts was, upon information and belief, always substantially in excess of the amounts needed to satisfy the account's near-term tax obligations. These money market funds paid far lower yields than the Bank could have

obtained from alternate short-term investment vehicles including those available to the Bank's depositors in a competitive, arm's length environment.

66.    As a fiduciary, under and pursuant to Ohio Rev. Code §1339.52, the Bank was and is obligated to comply with the Uniform Prudent Investor Act. By acting as described in this Count and investing the funds of the fiduciary accounts of members of the Beneficiaries Class, the Bank made imprudent investments and thereby violated Ohio Rev. Code §1339.53.

67.    Thus, plaintiff and the other affected members of the Beneficiaries Class were damaged in an amount which cannot presently be determined by the Bank's self-dealing and imprudent investment practices, all of which was and is a continuing breach of fiduciary duty.

**COUNT IV**

**BREACH OF FIDUCIARY DUTY**

**(Non-Class, Individual Claim by Plaintiff Segal)**

68.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein. This Count is asserted by plaintiff individually and on behalf of the Segal Trusts against the Bank and arises from, *inter alia*, the Bank's disregard of the express wishes of the Segal Trusts' grantors, the Bank's obligation to properly and prudently balance the income and long-term growth requirements of the beneficiaries in favor of benefiting itself and its affiliates.

69.    Three of the plaintiff's trust accounts and plaintiff individually, for many years, was the owner of the stock of the Oakdale Corporation ("Oakdale"), a real estate holding company which owned, *inter alia*, various commercial and residential properties. In its capacity as Trustee, the Bank controlled Oakdale at all times relevant to this Complaint. Among the properties owned by Oakdale was its "crown jewel," a building located at 2509-11-13 West

34

Clifton Avenue at the intersection of West Clifton Avenue and Calhoun Street in Cincinnati (the "Building"), located on the edge of the University of Cincinnati campus. The Building generated substantial returns to Oakdale (approx. 11.5% per year) and, therefore, to plaintiff individually and to the trust accounts in the Bank's care. At all relevant times, the Building had a long-term tenant, the DuBois Book Store, and also had excellent potential for capital appreciation, particularly given its location near a planned $270 million development.

70.     Consistent with the Bank's self-dealing and efforts to convert ever-increasing assets of Beneficiaries' accounts, including those of the Segal Trusts, into shares of the Captive Funds, despite the cash-generating and commercial prospects for the Building and the other assets of Oakdale, the Bank embarked upon a scheme to sell off such real estate and use the net proceeds to purchase shares in the Captive Funds, which generated meager returns for plaintiff's trust accounts, which were well below the returns generated before the transaction, particularly given the substantial capital gains taxes that had to be and were paid in connection therewith.

71.     On March 4, 2003, without consultation with plaintiff and in fulfillment of an integral part of the foregoing plan and scheme, the Bank, relying upon a questionable appraisal by a confederate of the Bank and possibly other appraisals of questionable validity, caused Oakdale to sell the Building for $828,000.

72.     The transaction, which was carried out without any serious marketing effort by the Bank, despite payment by it of an $8,000 "commission" to one of its former employees with whom the Bank has a number of questionable transactions, was sold to the prime tenant in the Building, someone who had approached plaintiff many times over the years about a possible sale of the Building to such tenant.

73.    The sale of the Building generated substantial unnecessary capital gains and caused Oakdale to pay approximately $300,000 in capital gains taxes. Indeed, if there was a legitimate reason for the Bank to cause Oakdale to sell the Building, which there was not, it could have saved Oakdale and, ultimately, the plaintiff and potential beneficiaries of the Segal Trusts, such capital gains taxes by effectuating a tax-free exchange for another income-producing commercial property under and pursuant to Internal Revenue Service regulation §1031. Apparently, the Bank never considered such a common strategy.

74.    The net proceeds of the sale of the Building were placed by the Bank in the Captive Funds. Such investment generated a rate of return on assets of approximately 1%, substantially less the 11.5% that Oakdale was receiving from the Building prior to its sale and without the same potential for future appreciation in value and substantially less than the 7% interest the Bank caused Oakdale to pay on a $750,000 mortgage it held at the same time the net proceeds from the Building's sale were being invested by it in the Captive Funds. Indeed, a reflection of the real value of the Building is reflected in the sale of a parcel (with a footprint half the size of that of the Building) one block away for $1.6 million in 2005.

75.    In effectuating such transaction for the Building, the Bank failed  to consider fairly the continued ownership of the Building by Oakdale, the unnecessary and premature capital gains taxes that would have to be paid and were paid upon sale, the potential for future price appreciation and whether, if the Building was to be sold at all, what was the most appropriate means of selling it for the highest selling price. Indeed, the Bank could have avoided subjecting the Segal Trusts and plaintiff to excessive income taxes (and did not) by, *inter alia*, changing the nature of the IRS' tax treatment of Oakdale's earnings but never considered doing so.

76.    As a fiduciary, under and pursuant to Ohio Rev. Code §1339.52, the Bank was and is obligated to comply with the Uniform Prudent Investor Act. By acting as described in this Count, selling the Building in the manner that it did for the price realized and investing the net proceed of the sale in Captive Funds, the Bank made imprudent investment decisions and thereby violated Ohio Rev. Code §1339.53.

77.    At all times relevant to the Bank's control of Oakdale and its assets, the Bank had an affirmative duty to professionally and prudently manage such assets in its care consistent with its role as a corporate fiduciary. As a result of the foregoing reckless conduct leading to the sale of the Building, which conduct was a breach of the Bank's fiduciary duties owed to plaintiff and the other beneficiaries of the affected Segal Trusts and to Oakdale, plaintiff sustained substantial damages in an amount which cannot presently be quantified.

### PRAYER FOR RELIEF

WHEREFORE, plaintiff respectfully requests on his own behalf and on behalf of all members of the Classes as follows:

(a)    certification of this action as a class action and appointment of plaintiff and to represent the Classes and his Counsel as Class Counsel;

(b)    entry of judgment on the claims for breach of fiduciary duty in favor of plaintiff individually and as a representative of the other members of the Classes and against the Bank and an award of compensatory damages and punitive damages in favor of plaintiff individually and as representative of the other members of the Classes and against the Bank in the amount of damages caused by the breaches of fiduciary duties by the Bank;

(c)    entry of judgment on the claims for breach of contract in favor of plaintiff individually and as a representative of the other members of the Classes and against the Bank

37

and an award of compensatory damages and punitive damages in favor of plaintiff individually and as representative of the other members of the Classes and against the Bank in the amount of damages caused by the breaches of contract by the Bank;

(d) entry of judgment enjoining the Bank from opposing any petition filed by any member of the Classes seeking the removal of the Bank as corporate fiduciary and requiring the Bank to pay for all legal fees and expenses incident thereto including its own;

(e) entry of judgment compelling the defendants to account for the unjust enrichment by them and disgorging the amount thereof (and the profits earned thereupon) to the fiduciary accounts affected by the wrongdoing described herein and/or their Beneficiaries, as appropriate;

(f) entry of judgment compelling the Bank to fully insulate its fiduciary operations from all of its other business activities and those of the Captive Funds and the Bank Subsidiaries as well as those of Bancorp;

(g) entry of judgment compelling the Bank to establish and implement procedures to fully protect the interests of the members of the Classes including, *inter alia,* the appointment of a Special Master to oversee the Bank's fiduciary operations pending completion of the other injunctive relief ordered by the Court;

(h) pre-judgment and post-judgment interest at the maximum rate allowable by law;

(i) reasonable attorneys' fees and reimbursement of the reasonable costs and expenses of prosecuting this litigation and distributing the recovery to members of the Classes; and

(j) such other or additional relief as this Court deems appropriate.

38

ANN LUGBILL

_Ann Lugbill_

Ann Lugbill (0023632)
Ann Lugbill & Associates, Inc.
2406 Auburn Ave.
Cincinnati OH 45219
(513)784-1280
(513)784-1449 Fax
alugbill@choice.net
Trial Attorney for Plaintiff and the Proposed Classes

RICHARD D. GREENFIELD
GREENFIELD & GOODMAN LLC
7426 Tour Drive
Easton, MD 21601
(410)745-4149
(410) 745-4158 Fax
whitehatrdg@earthlink.net

Trial Attorney for Plaintiff and the Proposed Classes

DAVID A.P. BROWER
BROWER PIVEN
A PROFESSIONAL CORPORATION
433 Madison Ave., 8th Floor
New York, NY 10022
(212) 501-9000
(212) 501 0300 Fax
brower@browerpiven.com

Trial Attorney for Plaintiff and the Proposed Classes

## JURY DEMAND

Plaintiff hereby demands a trial by jury.

May 1, 2007

_Ann Lugbill_

**Ann Lugbill**

39

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION (Cincinnati)

**DANIEL J. SEGAL**, on behalf of himself,
his minor children and all others
similarly situated,                           )
                                              )
                                              )     Case No. 1:07 CV 348
                    Plaintiff,                )
        v.                                    )     (District Judge Sandra S. Beckwith)
                                              )
                                              )     (Magistrate Judge Hogan)
**FIFTH THIRD BANK, N.A**. and                )
**FIFTH THIRD BANCORP**,                      )
                                              )
                    Defendants.               )

### AMENDED CLASS ACTION COMPLAINT--DEMAND FOR JURY TRIAL

Daniel J. Segal, on behalf of himself, his minor children and for all other members of the

Classes hereinafter described, by and through counsel, seeks the relief requested herein from the

defendants Fifth Third Bank, N.A. (the "Bank" or "Fifth Third") and its corporate parent, Fifth

Third Bancorp ("Bancorp"); and states and alleges as follows:

### OVERVIEW

1.      This Class Action is brought by plaintiff on behalf of himself, his minor children

and all others similarly situated, all of whom are (or were) beneficiaries of fiduciary accounts for

which the Bank serves (or served) in a fiduciary capacity.  The allegations in this Amended

Complaint ("Complaint") are directed against the Bank as a result of its breaches of fiduciary

and contractual duties owed by it to beneficiaries of the Bank's fiduciary accounts (e.g., trust,

estate, guardianship, employee benefit accounts) ("Beneficiaries"), as well as against Bancorp,

which at all relevant times, through its Board of Directors and senior management, controlled the

Bank, including its activities as described herein.

27574

2.      None of the causes of action stated herein are based upon any misrepresentation or failure to disclose material facts to plaintiff, his children or to members of the Classes, defined below.  Rather, the claims made are based solely on the defendants' failures to fulfill their responsibilities as a corporate fiduciary and/or to unjustly enrich themselves arising out of the fiduciary relationships described herein.  This case is about tortious breach of trust and directly related principles well recognized under Ohio law and the law of other states substantively the same.  Plaintiff makes principally classic state-law breach of trust/fiduciary allegations: defendants used and unjustly benefited from entrusted funds in their own self-interest, not primarily for the benefit of plaintiff, his children or the members of the Classes.

3.      The Bank and/or Bancorp own and control Fifth Third Asset Management, Inc. and various other entities (collectively, the "Bank Subsidiaries") which effectively operate and carry out various activities on behalf of the proprietary mutual funds of the Defendants, designated the "Fifth Third Funds," which are referred to herein as the "Proprietary Funds."  The Bank carries out the fiduciary functions it has legally undertaken through itself and through various financial institutions with which it has been merged ("Acquired Banks") in such a way as to put its own interests before those of the Beneficiaries in connection with the management of the assets in Beneficiaries' various fiduciary accounts.

4.      Defendants engage in the wrongful conduct alleged herein despite defendants' recognition that such conduct violates settled fiduciary principles.  For example, the Bank and/or its corporate parent, Bancorp, by their statements recognize the following:

**Corporate Governance**

"Effective corporate governance and oversight are important keys to a company's success. Fifth Third has long been known for its commitment to accountability at every level of its organization. This holds true for our corporate governance and oversight functions as well. Through our corporate governance initiatives and our

2

continuing oversight and evaluation, we are working hard to continually earn and keep your trust and confidence."

> Dudley S. Taft
> Lead Director & Chairman of the Nominating & Corporate Governance
> Committee of the Board of Directors

Bancorp's Code of Business Conduct and Ethics similarly recognizes the manner in which the

defendants and their employees are expected to act and, *inter alia*, to treat Beneficiaries:

> Fifth Third Bancorp "Fifth Third"), and its subsidiaries and affiliates, have many important assets, but the most valuable is our established and unquestioned reputation for integrity. As professionals, we are judged by our conduct and we must act in a manner that merits public trust and confidence. Because of the nature of the banking business, many people hold us to a higher standard than other industries.
>
> Fifth Third has adopted this Code of Business Conduct and Ethics to help ensure that it retains its integrity and merits public trust and confidence.
>
> *            *            *            *            *
>
> Business Conduct
>
> You should endeavor to deal honestly, ethically, fairly and in good faith with Fifth Third's customers, shareholders, employees, suppliers, regulators, business partners, competitors and others.  You may not take unfair advantage of anyone through manipulation, concealment, abuse of privileged or confidential information, misrepresentation, fraudulent behavior or any other unfair dealing practice.

5.    The defendants totally control the Bank Subsidiaries and the Proprietary Funds

and are liable for their activities described and complained of herein.

6.    Plaintiff complains that the Bank, by and through the Bank Subsidiaries and

otherwise, breached the fiduciary and contractual duties owed to present and former

Beneficiaries by, *inter alia,* acting in their own interests and putting them before those of

plaintiff, his children and the members of the Classes defined below, including yielding to the

material conflicts of interest existing at the time defendants owed duties of loyalty to the

Beneficiaries; and including carrying out the Bank's fiduciary functions to the detriment of the entrusted assets and those persons in the Bank's care including plaintiff, his children and the members of the Classes. The gravamen of this Complaint is that the defendants did not deal honestly, ethically, fairly, and/or in good faith with Fifth Third's Beneficiaries.

7. Such wrongful behavior was manifested, in part, by the incremental increases in expenses fiduciary accounts were forced to incur when the Bank implemented corporate decisions made on a uniform, classwide basis related to asset allocation.

8. The Bank allocated funds to Proprietary Funds for the fiduciary accounts of plaintiff, his children and all members of the Proprietary Funds Class (defined below), such allocation respective Beneficiaries learned about only after the fact. Indeed, neither plaintiff nor his children played any role whatsoever in purchases, sales, or the holding of shares in the Proprietary Funds the Bank purchased for their affected fiduciary accounts or, for that matter, most others held for other Beneficiaries. Hence, neither plaintiff, his children nor the members of the proposed Classes purchased securities.

9. In making the asset allocations as alleged herein, the Bank failed to exercise good faith and/or exercise reasonable care to avoid making conflicted, self-interested, and/or imprudent asset placement decisions for Beneficiaries' accounts, as stated more fully below. In the process, defendants unjustly enriched themselves both by and through the Bank Subsidiaries and otherwise.

10. The Bank, headquartered in Cincinnati, Ohio, with offices throughout the Midwest and Florida, administers fiduciary accounts and contractually offers a variety of services to the public, including purportedly customized management of the portfolios held in fiduciary accounts (including individualized services for the Beneficiaries). In the case of

plaintiff's trust accounts (the "Segal Trusts"), the Bank failed to live up to not only its (and

Bancorp's) stated standards of competence, good faith, and integrity but, as well, to the

regulations and guidelines provided by federal banking regulators.

### FEDERAL RULES AND REGULATIONS AND THE COMMON LAW MAKE CLEAR THAT FIFTH THIRD OWES THE HIGHEST FIDUCIARY TO TRUST BENEFICIARIES

11.    Trustees are bound by the highest standards of fiduciary duty.  For that reason,

much guidance exists to inform trustees of the extent of their fiduciary obligations.

12.    For example, recognizing the inherent dangers prevalent when a bank acts as a

trustee, The Office of the Comptroller of the Currency (the "OCC") has set up stringent

guidelines to ensure that banks such as Fifth Third do not breach fiduciary duties owed to

beneficiaries of trusts and other fiduciary accounts under their management.  In that regard, the

OCC directs:

> *Investment of fiduciary accounts* – (1) *In general*.  Unless authorized
> by applicable law, a national bank may not invest funds of a fiduciary
> account for which a national bank has investment discretion in the
> stock or obligations of, or in assets acquired from:  The bank or any of
> its directors, officers, or employees; affiliates of the bank or any of
> their directors, officers, or employees; or individuals or organizations
> with whom there exists an interest that might affect the exercise of the
> best judgment of the bank.  12 C.F.R. § 9.12(a).

13.    As a follow up to the limitations on the investments that may be made by a bank

as set forth in 12 C.F.R. § 9.12(a), the OCC released:  Acceptance of Financial  Benefits By

Bank Trust Departments Comptroller of Currency – Banking  Issues B-233, *Chief Executive*

*Officers of National Banks Authorized to Exercise Fiduciary Powers, Deputy Comptrollers*

*(District), and Examining Personnel,* February 3, 1989, which states in pertinent part:

FIDUCIARY DUTIES OF BANK TRUST DEPARTMENTS

National bank trustees owe exacting fiduciary duties to customers who place trust funds under the bank's management. **Trustees are obligated to make decisions concerning the investment of trust assets based exclusively on the best interest of trust customers.** This principle is reflected in 12 C.F.R. § 9.12(a) . . . .

\* \* \* \*

When selecting a mutual fund or money market investment, a trustee should evaluate the return being paid, the composition and length of maturities of its portfolio, the fund's management and all other factors relevant to the suitability of the investment for customers. *The trustee must not place themselves in a position where their judgments concerning the optimal investment for trust accounts may be influenced by the trustees' receipt of financial benefits for selecting a particular investment. The same principles apply whether the bank (i) rebates or discounts services provided by or at the direction of an investment management firm (such as accounting and administrative services), (ii) computer goods or services, (iii) seminars and travel expenses which are offered by, or at the direction of, such firms, or (iv) any other financial benefits in exchange for investing trust funds in particular money market funds.*

\* \* \*

*In sum, if a bank receives incentives for placing trust assets in an investment fund offered by a particular provider, the bank must pass those incentives on to the accounts which have had their asset interests invested in the fund.*

REMEDIAL ACTION

**National banks that engage, or have engaged, in conduct inconsistent with their fiduciary duties may be subject to significant liability for fiduciary breaches of these duties**. [Emphasis added].

14.    The language contained in both 12 C.F.R. § 9.12(a) and the OCC's directive contemplate that Fifth Third must conduct an analysis and evaluation of whether its fiduciary obligations to beneficiaries are affected by the transactions it mandates and to what extent its judgment may be compromised by its own interests, as they were as described herein. Fifth

Third did not conduct such an analysis with respect to its purchase of shares of its proprietary funds for its fiduciary accounts or with respect to the other transactions made by it with the Segal Trusts' assets. By acting as such, it clearly engaged in self-dealing and completely abrogated its fiduciary obligation to actively and independently analyze and monitor trust assets. Indeed, Fifth Third's actions were driven purely by its and Bancorp's desire to maximize their profits rather than by Fifth Third's obligations to the beneficiaries, including those owed to plaintiff, his minor children and to the members of the Classes.

15. The Board of Governors of the Federal Reserve System in its February 26, 1997, Supervision and Regulation letter SR 97-3 (SPE) similarly analyzed Fifth Third's obligations when investing assets under management in its own proprietary funds:

> In determining whether to convert common trust funds to mutual funds, a banking organization must address the possibility that the conversion could result in conflicts between the best interest of the organization and the best interests of its fiduciary customers. The banking organization must also determine that the mutual fund shares are suitable for accounts which previously held common trust fund units. Banking organizations that convert or transfer common trust funds to mutual funds may face questions from current and future beneficiaries with respect to those two issues.

> Potential conflicts can arise if a banking organization were to charge a direct fee to the trust customers for serving as trustee while also charging an advisor's fee to the mutual fund . . . it may appear that the organization's primary motive for conversion was a self-interest in generating greater fee income.

> Another possible conflict of interest could arise from the use of proprietary mutual funds when there are unaffiliated mutual funds or alternate investment opportunities available that may be equally appropriate for the participants' portfolio. Again, the appearance that the organization put its own interests above those of its fiduciary customers may cause concern particularly if investments are made in a newly established proprietary fund with no history or track record.

16.    Here, defendants mandated investment of the Bank's fiduciary assets, to the maximum extent feasible, in proprietary mutual funds – the Fifth Third Funds – when there were and are unaffiliated mutual funds or alternate investment opportunities that were available to Fifth Third and which were equally appropriate for the participants' fiduciary account portfolios.

17.    A trustee is obligated to invest and manage trust assets as a prudent investor would, in light of the purpose, terms, distribution, requirements, and other circumstances of the trust.  This requires a trustee to exercise reasonable care, skill and caution before investing trust assets.  As such, a trustee must always incorporate risk and return objectives reasonably suitable to that particular trust.1

18.    In addition, a trustee must always:

a.  abide by the fundamental fiduciary duty of loyalty;

b.  act with prudence in deciding whether and how to delegate authority and when selecting supervisory agents; and

c.  incur only reasonable and appropriate costs for the trustees' investment responsibilities.

19.    In general, trustees have a fiduciary obligation to comply with the terms of the underlying trust agreements or other documents establishing the fiduciary relationship. The trustee must also adhere to fundamental fiduciary duties as outlined above.  An evaluation of whether or not a trustee has breached its fiduciary obligations is judged at the time of the investment decision or other conduct in question.  Thus, the question of whether Fifth Third breached its fiduciary duties turns on the prudence of its original conduct, not on the hindsight analysis of the eventual results of its decision.

---

1 *See* Restatement (Third) Trusts §§ 227 (1992).

20.    Plaintiff, his children and other members of the Classes defined below have suffered harm as a result of Fifth Third's breaches of fiduciary duty.

21.    In addition, a trustee owes a duty of undivided loyalty to a beneficiary and must administer a trust and its assets solely in the interests of the trust's beneficiary.  The strict adherence to this duty prohibits a trustee from investing in or managing trust investments in a manner that gives rise to a personal conflict of interest.  Although the Bank's purchase of its proprietary mutual funds can, under certain circumstances not applicable here, be appropriate as investments for some fiduciary accounts, since it has put its own interests before those of Plaintiff, his children and the members of the Classes, such purchases constitute a breach of fiduciary duty. Thus, if a trustee such as the Bank, by virtue of its disloyalty generates an unjust profit (like Fifth Third did through the collection of trustee's fees, the collection of "other expenses" and the collection, directly or indirectly, of profits resulting from the purchase and sale of Fifth Third Funds), the beneficiary is entitled to recover that profit.

22.    Further, the duty of care requires a trustee to exercise reasonable effort and diligence in making and monitoring trust investments, paying particular attention to the trust's objectives.

> The Trustee must give reasonably careful consideration to both the formulation and the implementation of an appropriate investment strategy, with investments to be selected and reviewed in a manner reasonably appropriate to that strategy.   Ordinarily this involves obtaining relevant information about such matters as the circumstances and requirements of the trust and its beneficiaries, the contents and resources of the trust estate, and the nature and characteristics of available investment alternatives.
>
> * * * *
>
> [I]f the trustee, such as a corporate or professional fiduciary, procured appointment as a trustee by expressly or impliedly representing that it possessed greater skill than that of an individual of ordinary intelligence, or if the trustee has or represents that it has special

facilities for investment management, the trustee is liable for a loss that results from the failure to make reasonably diligent use of that skill or of those special facilities. *See* Restatement (Third) Trusts § 227, cmt. d.

23.    Clearly, in this case, Fifth Third did not undertake a trust-by-trust analysis in order to insure that its investment decisions were consistent with the circumstances and requirements of each of the trusts and their beneficiaries, the contents and resources of the trust estates and the nature and characteristics of available investment alternatives.

24.    Instead, the Bank uniformly applied its mandate that trust assets be invested, to the extent feasible, in Fifth Third Funds. By virtue of its wholesale abrogation of its fiduciary obligations and its failure to act as a prudent investor would, Fifth Third, at the direction and with the participation of Bancorp breached its fiduciary duties and damaged all members of the Classes.

25.    Historically, the Bank, either through the trust departments of it and/or its predecessors, promoted purportedly highly individualized trust administration and asset management services, all of which services were to be paid out of the fees it was to receive as corporate fiduciary. The promised provision of such services made by or on behalf of the Bank and/or the Acquired Banks was intended to (and did) lure grantors, testators, and others to designate those financial institutions as corporate fiduciary for estates, trusts, and other fiduciary accounts. The knowing scheme of the Bank, Bancorp, and the Acquired Banks, as well as their respective predecessors, has been to cut back substantially with respect to the contractually promised customized portfolio management; instead, defendants allocate fiduciary funds to the greatest extent feasible to standardized options, such as their Proprietary Funds. Few, if any, of the grantors or others who established fiduciary relationships with the Bank (and predecessors of the Bank) would have reasonably anticipated the Bank in its present form: namely, a regional

and ever-expanding behemoth with few of the individual services promised and inherent in the fiduciary relationship. As an integral part of the fiduciary relationships between Plaintiff, his children and the members of the Classes (on the one hand) and the Bank (on the other), the former were entitled to receive individual and prudent management of the assets placed in the Bank's care with the understanding that the Bank, in managing trust assets, would put the Beneficiaries' interests first before any others. As described herein, defendants breached contractual and fiduciary obligations including by putting their own interests foremost.

26. The Bank, including through its regular legal counsel and other lawyers to whom it refers business, proverbially "scratch each other's backs," so that these lawyers will designate the Bank as corporate fiduciary in wills, trust documents, and otherwise – all of which has permitted the Bank and the Acquired Banks to have substantial numbers of fiduciary accounts to manage. The Bank, in order to obtain the leverage and economies of scale referred to below and to generate the highest profits from the fiduciary accounts so attracted, engages in "asset gathering" as part of its asset allocation related to Beneficiaries' accounts.

27. The Bank makes (and/or made) the contractual promise of customized "wealth management" solutions to Plaintiff, his children and each Beneficiary of a fiduciary account in its care. The Bank, currently using the "Fifth Third" name, makes (and/or made) the contractual promise (including through its website and otherwise) of "customized trust solutions" in portfolio management. Notwithstanding these and other contractual promises, the Bank has sought (and continues to seek) opportunities to standardize asset placement for its fiduciary accounts (including Beneficiaries' accounts), most typically by allocating fiduciary assets to the Proprietary Funds.

28.    In fact, despite the Bank's contractual promise of substantial, customized "wealth management" business, it centralized the functions of the Acquired Banks (defined below) into the Bank's own template, forcing more and more fiduciary accounts to be "serviced" at as low (and/or as general) a level as possible despite contractual promises of "experienced trust professionals."  The Bank allocates as much of Beneficiaries' accounts' assets into the Bank's Proprietary Funds as it thinks it can get away with, in violation of fiduciary obligations and/or without adequate regard for the tax circumstances of Beneficiaries' accounts.

29.    Fifth Third breached contractual promises, as alleged herein, pursuant to Defendants' planned corporate scheme to consolidate the fiduciary operations of the various Acquired Banks, and to attempt to generate perceived operational efficiencies there from, including to make up for the deterioration of the Bank's traditional profit model (i.e., commercial lending) and to replace that with fee and related income as a primary revenue source (with as little "overhead" as possible).  Such wrongfully over-charged fees include fees for advisory, administrative, and other services.  Such conduct caused Plaintiff and his children substantial damages in a presently unknown amount; similarly, all members of the Classes were also damaged.  In the course of carrying out Defendants' wrongful scheme (with the consequential increase of expenses, with diminution of fiduciary services), the Bank planned to, formed, and did substantially increase its Proprietary Funds business to provide the Bank and Bancorp with incremental sources of profit from fee and other income generated by, among others, the Bank Subsidiaries and the reduction in the Bank's expenses of providing services as a corporate fiduciary.  The assets held in the fiduciary accounts of the Bank have been (and are) a perfect "cookie jar" for Defendants to use to "seed" and/or bulk-up the Proprietary Funds and better enable the Bank to economize its fiduciary operations and otherwise attempt to extract

economies of scale therefrom, all of which conduct breached the Bank's duties to the fiduciary account Beneficiaries.

30.     In particular, in order to maximize the Bank's profits from the accounts for which it acted as corporate fiduciary, it conspired with others in a series of business decisions to eliminate the personalized services inherent to the Bank's provision of corporate fiduciary services, including to "double dip," by directing the assets in the Bank's fiduciary accounts, to the greatest extent feasible, from their historic allocations in individually managed accounts and/or so-called Common Trust Funds ("CTFs") and/or other similar vehicles, to the Proprietary Funds directly (and/or to analogous vehicles) ("Conversions").  They so conspired by agreeing to act together for their unjust enrichment at the expense of Plaintiff, his children and members of the Classes, all of which caused substantial damages as described below.

31.     The net effect of this process was to cause Beneficiaries' accounts to be charged excessive amounts for the asset management services purportedly rendered to them, which services they were (at least) entitled to receive as a customary and integral part of the fiduciary relationship.

32.     As a direct consequence of the Conversions, the Beneficiaries' accounts were subjected to unnecessary and/or excessive expenses, which increased materially.

33.     Further, the Bank's wrongdoing is continuing in nature.  Upon information and belief, the Bank continues to seek other financial institutions to acquire in which, *inter alia,* fiduciary services will be further marginalized as they have been with the Acquired Banks, as described herein.

34.     As fiduciaries under the law, the Bank and the Acquired Banks were required to place the interests of the Plaintiff, his children and the members of the Classes foremost; and *not*

to engage in self-dealing or other self-interested behavior. Per the trust agreements and other documents pursuant to which the fiduciary relationships were established, the Bank and the Acquired Banks were obligated to provide – in exchange for the fees charged by them for serving as a corporate fiduciary – a range of personalized administrative, investment management, and other fiduciary services. During the Class Period (as defined below), however, there existed (and still exist) critical and material conflicts of interest in the fiduciary services the Bank provided to Beneficiaries' fiduciary accounts, particularly with respect to the provision of the individualized services to which Beneficiaries were (and are) entitled.

35.     The Bank, the Bank Subsidiaries, and employees and "experts" engaged by them, have blatant conflicts of interest which are endemic to the relationship between and among the Bank and the members of the Classes. Specifically, the policy of the Bank was (and is) to allocate fiduciary assets, the greatest extent feasible, to the Bank's proprietary mutual funds while purporting to tout, at the same time, the provision of customized portfolio management and to recommend portfolio strategies to meet clients' financial goals. The Bank's employees, acting under pre-determined Bank and Bancorp corporate policy, provide planning "advice" under the guise that this advice is customized when, in fact, it is not. Instead, the Bank allocates fiduciary assets in a self-interested and/or inappropriate manner. Such self-interested and/or inappropriate practices included (and include), but were not (and are not) limited to:

> (a)   the Bank and its predecessors failed to consider, properly and independently, appropriate non-proprietary allocation of fiduciary assets;
>
> (b)   the Bank had a direct financial interest (contrary to Beneficiaries' interests) in allocating proprietary assets in its fiduciary accounts;

(c)    the Conversions resulted in material increases in the expenses of affected fiduciary accounts, at the expense of Plaintiff, his children and members of the Proprietary Funds Class;

(d)    the Bank had not (and has not) negotiated in any meaningful way the fees and expenses that were (and are) being charged to the Proprietary Funds by their affiliates (including the Bank Subsidiaries) nor did Defendants negotiate with non-affiliated firms that could provide the same (or better) financial advice or other services to fiduciary accounts at lower cost;

(e)    the Bank assigned, in "musical chairs" fashion, uninformed and relatively inexperienced personnel to service fiduciary accounts and their Beneficiaries consistent with the plan of the Defendants to scale back fiduciary services at the expense of the Beneficiaries who were dependent upon them;

(f)    the Bank and its predecessors, instead of providing financial management of most fiduciary accounts, allocated Beneficiaries' assets pursuant to computerized models and did not regularly conduct the Regulation 9 review of the accounts and the Beneficiaries to determine whether its asset allocation was suitable and otherwise appropriate and prudent, particularly when compared with non-proprietary alternatives[2]; and

(g)    the Bank regularly and as a matter of corporate policy typically prohibited co-fiduciaries from having any serious role in the placement of the

---

[2]  Many of the proprietary funds of the Bank were new or relatively new funds with no established track record of returns; indeed, many of the funds in the Proprietary Funds family would not exist but for the Conversion and/or the Bank's similar asset allocation decisions.

assets in fiduciary accounts including, *inter alia*, denying then timely and complete information with respect thereto.

36.    Each of the foregoing wrongful practices created a conflict of interest between the financial well-being of Plaintiff, his children and the members of the Beneficiary Class (on the one hand) and the financial well-being of the Bank, Bancorp, and the Bank Subsidiaries (on the other).  Throughout the Class Period (as set forth below), each of the Bank and its "trust officers" was keenly aware that these practices created material conflicts of interest between themselves and the members of the Beneficiary Class.  Nonetheless, the Bank engaged in rapacious self-dealing to the detriment of Plaintiff, his children and the members of the Classes and, because of the failure to separate the Bank's fiduciary operations from all its other businesses and those of the Bank Subsidiaries, its continued performance as a corporate fiduciary is (and remains) materially and inherently flawed.

## ACQUISITIONS OF OTHER FINANCIAL INSTITUTIONS

37.    Over the course of the last 20 years, the Bank and its corporate parent, Bancorp, have made a number of acquisitions of other financial institutions concentrating in the Midwest and, more recently, in Florida (the "Acquired Banks").  As an integral part of these acquisitions, the Bank put into operation a corporate-wide plan developed by both Defendants to eliminate many of the services to Beneficiaries as described herein, including the elimination of those personnel who provided individualized services to fiduciary account beneficiaries, while at the same time increasing the fees paid by the customers to whom individualized services were integral and material as promised by the underlying contractual relationship.

38.    In the context of this series of acquisitions, and in order to justify the premiums that were being paid for the Acquired Banks, with each new acquisition the referenced scheme

required the centralization and streamlining of the fiduciary services offered by the Bank, including, ultimately, the increased usage of Proprietary Funds as vehicles for placement of fiduciary assets.  At the same time, the scheme planned to extract more money from the fiduciary accounts of the Bank and the Acquired Banks at the expense of the Beneficiaries thereof.  Such wrongful proprietary over-allocation allowed Defendants to obtain the very leverage and/or economies of scale needed to increase financial benefits resulting from the acquisitions, including to help prepare, *inter alia*, Bancorp to be a valuable acquisition target itself. The actions of Defendants as described in this Complaint have been consistent with the statements and advice provided by one legal commentator, Gregory B. Jordan, whose firm, Reed Smith, upon information and belief, is also counsel to the Bank, in a June 1, 1996 article (the "Jordan Article"):

> "It has been increasingly important to go beyond mere fee income in the trust area—profitable fee income is now key."

Jordan goes on to advise, most tellingly:

"We must price our products and services profitably and **not be concerned about charging fairly for the services we provide**."  [emphasis added]

39.    In the course of Defendants' acquisition of the Acquired Banks and the related scheme alleged herein, the interests of Plaintiff , his children and other Beneficiaries were not represented by qualified, knowledgeable trust officers, but usually by lower-level Bank personnel (with little or no relevant financial expertise) and purported portfolio "managers" who, in fact, employed only computerized asset allocation programs designed to maximize the use of the Defendants' Proprietary Funds in fiduciary accounts.  Individual management and attention, to which the Beneficiaries of the affected accounts were entitled, was not given as contractually promised.

## THE BANK'S PROPRIETARY FUNDS

40.    The Proprietary Funds are Defendants' captive mutual funds nominally operated by a so-called predominantly independent Board.  Even though no more than 60% of the Board is supposed to be "dis-interested" persons, in fact, all members thereof were, in fact, elected, re-elected, directed, and controlled by the Bank, Bancorp, and the Bank Subsidiaries. The Bank, as the largest single shareholder of record of the various Proprietary Funds, controls all nominees to the Proprietary Funds' Board and therefore controls the Proprietary Funds and the Bank Subsidiaries.  The contracts between the Proprietary Funds' Board and the Bank Subsidiaries relating to the provision of advisory, administrative, distribution, and other services were determined on a no-bid basis to benefit the Defendants and contrary to the best interests of Plaintiff, his children and the members of the Proprietary Funds Class.

41.    It has been the Bank's policy, throughout the Class Period defined below, to effect allocation of Beneficiaries' assets into Bank proprietary vehicles, including the Proprietary Funds, to the greatest extent feasible.

42.    The Proprietary Funds' portfolios cover a wide variety of financial disciplines, strategies, and types of asset categories.  Certain of such Proprietary Funds were funded by the Bank and the Bank Subsidiaries in substantial part by placement of fiduciary assets pursuant to the Conversions – in effect, forcing the Proprietary Funds to, and upon, the Bank's fiduciary accounts.  Such allocation permitted the affected Proprietary Funds to have substantial asset bases, an important selling point to the Bank and the Bank Subsidiaries (including the nominally separate Fifth Third Securities, Inc.) in marketing the Proprietary Funds to outside parties.

## JURISDICTION AND VENUE

43.    The claims asserted herein arise under and pursuant to common law.    The jurisdiction of the Court is based upon 28 U.S.C. § 1332(d) since there is diversity of citizenship between at least one member of the Classes and at least one of the Defendants and the amount in dispute exceeds $5 million exclusive of interest and costs.    Further, the Court has supplemental jurisdiction over the Plaintiff's individual, non-classwide claims, stated below.    Plaintiff does not allege that the Bank or Bancorp misrepresented or omitted to disclose any material fact to him upon which he relied in connection with the purchase, sale, or ownership of securities purchased for the Segal Trusts' accounts by the Bank, all of which he learned about after such transactions had taken place (and, in any event, neither Plaintiff nor his children made any such purchases).

44.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(a).    Many of the acts alleged herein, including the mismanagement of the fiduciary assets of Plaintiff, his children and members of the Classes defined herein, occurred in substantial part in this District.    In addition, the Bank and its parent, Bancorp, maintain their corporate headquarters in this District.

## THE PARTIES

45.    Plaintiff, Daniel J. Segal, is a citizen of Ohio, a resident of this District, and a beneficiary of fiduciary accounts of which the Bank was formerly a Trustee of the Segal Trusts. He brings this action on his own behalf, on behalf of his minor children, Alex J. Segal and Graham H. Segal, and the Classes defined below. He, his children and the members of the Classes are victims of the Defendants' self-interested scheme including unjustly enhancing profits and/or diminishing fiduciary services to which he, his children and other Beneficiaries were (and are) entitled, as further described herein.    Plaintiff, his children and the members of the Classes, who are citizens of numerous states throughout the country including Ohio and other

states, are related to one another by being damaged at the expense of the activities of the Bank, Bancorp, and the Bank Subsidiaries as alleged herein.

46.    The Bank is a federally chartered bank domiciled in Cincinnati with operations through the Midwest and in Florida.  Bancorp is an Ohio corporation domiciled in Cincinnati and is a bank holding company, its principal asset being the Bank.

## ADDITIONAL FACTUAL ALLEGATIONS

47.    The Bank has bounced Beneficiaries of many of its fiduciary accounts from one trust employee to another, such Beneficiaries now "serviced" by low-level employees, rather than (as appropriate and/or contractually-promised) by trust (and/or) fiduciary officers with knowledge of Beneficiaries' circumstances, their individual needs, and/or related suitability issues.

48.    Historically, the Bank and its predecessors placed the assets of the fiduciary accounts of members of the Class primarily through individually managed portfolios and/or through so-called "Common Trust Funds," collective funds that do not require payments of fees or expenses by the beneficial holders.  The expenses of the Bank for such vehicles and related administrative services were absorbed by the Bank out of its fees for serving as fiduciary.

49.    In order to compensate for the lack of profits from its traditional lending business and the excessive premiums the Bank and its parent were paying to acquire the Acquired Banks, the Bank and its predecessors developed a scheme pursuant to which they sought to minimize their operating expenses with respect to fiduciary accounts and to maximize their profits from their fiduciary business, particularly through allocation in proprietary mutual funds to the greatest extent feasible and by rationalization of the fiduciary services actually provided.

50.    Upon information and belief, this scheme was integral to the anticipated plan of Bancorp, the Bank and their senior executives to extract higher profits from the Acquired Banks, including consolidating their various trust departments and fiduciary operations under the banner of "wealth management," an exclusive-sounding replacement for the Acquired Banks' trust departments.  The plans of the Defendants included the consolidation and elimination of the previously existing trust departments of the Acquired Banks with the objective of "servicing" fiduciary accounts (and the beneficiaries thereof) with fewer and fewer personnel and greater standardization and computerized selection of asset placement in fiduciary accounts.  Pursuant to the scheme, it was decided to utilize the assets held by the Bank in fiduciary accounts to allocate Beneficiaries' assets to a group of mutual funds (many new or recently formed) controlled by the Bank, the Acquired Banks, and/or the Bank Subsidiaries (i.e., the Proprietary Funds). Thereafter, due to numerous acquisitions, mergers, and other transactions referred to above, consistent with their longer-term plan and scheme, the Bank determined that most or all of the assets in certain fiduciary accounts held by the Bank would be allocated per this self-interested scheme.

51.    In connection with Defendants' motive to engage in the self-interested scheme complained of herein:  throughout the Class Period, the Bank and the Bank Subsidiaries were benefiting substantially by obtaining great operating efficiencies (and lower per-dollar expenses), as well as "bragging rights," which enabled the Bank and the Acquired Banks to tout the amounts of assets in their Proprietary Funds, making it easier for the Bank and Fifth Third Securities, Inc. to promote and market the Proprietary Funds to non-fiduciary customers.

52.    While the Bank may have provided some "credits" to fiduciary accounts for what were the purported fees received by the Bank Subsidiaries from the Proprietary Funds, such

credits were substantially less than the incremental expenses the Beneficiaries' fiduciary accounts incurred, directly and indirectly, as a result of Beneficiaries' assets being placed in the Proprietary Funds.  Therefore, the Bank and the Bank Subsidiaries were able to "double dip" – charging fees to serve as a corporate fiduciary and, as well, imposing substantial fees and expenses on the Proprietary Funds being held for the affected fiduciary accounts.  Additionally, upon information and belief, the Bank Subsidiaries had arrangements with purportedly independent vendors of advisory and administrative services, from which the Bank and Bank Subsidiaries also benefited. All of such practices caused the affected fiduciary accounts to pay, both directly and indirectly, unnecessary and unjustly charged fees and expenses which they should not have been required to pay.

53.    Even assuming that the Bank made reasonable decisions to allocate assets of the Beneficiaries' fiduciary accounts to the Proprietary Funds (which it did not, as alleged above), the Bank did not reasonably negotiate the fees and expenses to be charged to the Proprietary Funds or engage in any meaningful market comparison with other potential alternatives. Similarly, the Proprietary Funds' Board, dominated and controlled by the Bank and/or the Bank Subsidiaries, should have obtained – but, in fact, did not obtain – the lowest fees and operating reasonably obtainable from the Bank Subsidiaries actually operating the Proprietary Funds. Particularly, here, the members of the Proprietary Funds' Board were Defendants' *de facto* employees and servants, as alleged above.

54.    Upon information and belief, with respect to the Beneficiaries' accounts, the Bank intentionally and specifically (in violation of contractual and fiduciary obligations owed by it) excluded alternate financial vehicles from consideration of asset allocation in order to maximize its and Bancorp's earnings and those of their affiliates (including the Bank

Subsidiaries), including known alternatives with substantially greater past performance success and/or lower management or similar fees.

55.     The assets in the Beneficiaries' fiduciary accounts managed by the Bank and the Acquired Banks were particularly vulnerable to misuse since Defendants regarded the fiduciary accounts in their care as a "cookie jar," open for the taking.  The Bank allocated fiduciary assets to the Proprietary Funds because such action would not only generate profits from trustee and similar fiduciary fees, but allow the "double dip" of generating additional revenues through related asset management businesses, administrative service businesses, and otherwise.  Further, the Conversions created an opportunity for the Bank to avoid the relatively low profitability of managing its fiduciary accounts (and the expenses related thereto) – which it and the Acquired Banks had contracted to do when the Bank (and/or its predecessor Acquired Banks) agreed to serve as fiduciary thereof – and, instead, to substitute ever-increasing management fee income directly and through its corporate affiliates.

56.     The Bank, the Bank Subsidiaries, and their affiliates (and through them, Bancorp) reaped many millions of dollars in purported money management, advisory, and other fees.  The Bank also benefited by receiving trustee or similar fees for serving as a fiduciary and by reason of the benefits which flowed therefrom – e.g., substantially reduced operating expenses of fiduciary operations.  Despite these benefits to the Bank, such asset allocation has been of little meaningful and/or relative benefit (if any) for their fiduciary accounts and the Beneficiaries thereof, including Plaintiff, his children and the members of the Proprietary Funds Class.  Plaintiff, his children and all members of the Classes suffered damages from the fiduciary practices of the Bank, including those described above and in amounts which cannot presently be determined but which are capable of calculation.

## <u>CLASS ACTION ALLEGATIONS</u>

57.    Plaintiff brings this action on his own behalf, on behalf of his children and pursuant to Rule 23(b)(3) of the Federal Rules of Civil Procedure as a class action on behalf of the following Classes:

> (a) **<u>The Beneficiary Class</u>**, consisting of all beneficiaries of trust, estate, or other fiduciary accounts for which the Bank or any of its predecessors acted as a trustee, executor, or other form of corporate fiduciary at any time from March 1, 2001 to the present (the "Class Period"); and

> (b) **<u>The Proprietary Funds Class</u>**, consisting of all Beneficiary Class members whose trust, estate, or other fiduciary accounts, for which the Bank or any of its predecessors acted as a trustee, had, directly or indirectly, Proprietary Fund assets allocated to any such account at any time during the Class Period.

58.    The Classes defined above exclude all such persons whose claims are barred by an applicable statute of limitations and/or a validly executed or otherwise validly obtained release (obtained after full disclosure of all material facts with respect thereto).  The definition of the Classes, the Class Period, and the identity of those excluded from the Classes may be amended following discovery with respect thereto.

59.    Plaintiff alleges primarily a uniform scheme and wrongdoing, herein, including that affected all members of the Classes identified herein in a similar or substantively identical manner.

60.    Plaintiff perceives no difficulty in the management of this action (including choice-of-law) that adversely affects class certification.

## Numerosity of the Members of the Classes

61.     Upon information and belief, the Bank serves and/or served as a fiduciary (such as a trustee, guardian, executor, etc.) for many thousands of fiduciary accounts affected by the wrongdoing alleged herein.  Similarly, there are many thousands of Beneficiaries thereof who are members of the Classes, most of whom are members of both Classes.

62.     The exact number of members of the Classes as above identified is not known by Plaintiff, but is discernible through business records, including those of one or both Defendants. The members of the Classes are so numerous as to make a class action appropriate; individual litigation would impracticable.  There are believed to be more than 5,000 members of each Class identified above.

63.     The members of the Classes are located in many of the fifty states, and in foreign countries.  They can be identified and readily ascertained from the Bank's records and can be provided with sufficient and adequate notice of the pendency of this litigation.

## Common Issues of Law and Fact Predominate

64.     On information and belief, throughout and prior to the Class Period, Bancorp, the Bank, and their senior executives, in conspiracy with the Bank Subsidiaries and others, chose to engage in the scheme alleged herein, including to dramatically reduce the provision of services to the members of the Beneficiaries Class and, with respect to the members of the Proprietary Funds Class, to allocate assets to the Proprietary Funds.

65.     All members of the Classes were adversely affected by the self-serving business decisions of the defendants as described herein.

66.      All of the fiduciary accounts of the Bank and the Acquired Banks (and their Beneficiaries) were negatively impacted by the scheme alleged above.   Members of the

Proprietary Funds Class for which the Bank and the Acquired Banks served as corporate fiduciary were damaged by reason of the unnecessary and higher expenses charged to fiduciary accounts, directly and indirectly, as a consequence of the Conversions and/or the lower financial returns generated as a result thereof and/or by allocation to the Proprietary Funds unrelated to the Conversions.

67.     There are common questions of law and/or fact that relate to and affect the rights of each member of the Classes including but not limited to:

(a)     whether the Bank and Bancorp, including in connection with their acquisition of the Acquired Banks, intended to and did materially reduce the provision of fiduciary services to the members of the Beneficiaries Class and, in the process, overcharge Beneficiaries for the services actually provided;

(b)     whether the business decisions of Bancorp, the Bank, and the Bank Subsidiaries to allocate assets of the Bank's fiduciary accounts to the Proprietary Funds was motivated by the best interests of members of the Classes (which the Bank had a duty to put before its own interests) or by Defendants' desire to generate management, administrative, and advisory fees for themselves, their affiliates, and their subsidiaries (including by this scheme to lower their expenses of managing fiduciary assets and/or to generate other benefits for themselves including by increasing the assets allocated to the Proprietary Funds);

(c)     whether the Bank breached fiduciary and contractual duties to Plaintiff, his children and the members of the Classes by failing to conduct its fiduciary operations in conformity with applicable standards, rules, regulations, and/or guidelines for such fiduciaries;

(d)     whether the Bank breached fiduciary duties to members of the Classes by making decisions for the fiduciary accounts of Plaintiff, his children and the Classes not based

upon individual considerations and Beneficiaries' interests, but based upon its own interests and those of its subsidiaries and affiliates; and

(e)    what remedies are appropriate for the damages / legal injuries caused to Plaintiff, his children and each member of the Classes, including compensatory or other damages.

68.    Relief sought is common to all members of the Classes including but not limited to:

(a)    a declaratory judgment that the Bank violated its fiduciary duties as trustee (or other similar fiduciary role) in connection with its actions described herein including with respect to the Beneficiaries' accounts;

(b)    payment by the defendants of compensatory damages caused by breaches of fiduciary and/or contractual duties as described herein, as well as punitive damages as permitted by applicable law;

(c)    an injunction enjoining the Bank from opposing or otherwise challenging a petition by current beneficiaries of the fiduciary accounts affected by the wrongdoing referred to herein to replace it as corporate fiduciary; and

(d)    an injunction establishing appropriate procedures and safeguards within the Bank to ensure that the interests of Beneficiaries are fully protected from the wrongdoing alleged herein.

### **Typicality and Predominance of Plaintiff's Claims**

69.    The interests of the Plaintiff, his children and each member of the Classes have been adversely affected by the wrongdoing of the Bank as described herein.

70.     Defendants have directed a common scheme and uniform course of conduct to Plaintiff, his children and all members of the Classes, as alleged herein. Such decisions were made pursuant to wholesale business policy decisions by the Defendants and their senior officers.

71.     The claims stated herein – including claims as to damages suffered – are claims that the Plaintiff has in common with all members of the Classes and predominate over any individual claims they have against the defendants, including the individual claims of Plaintiff, as alleged.

72.     The claims of Plaintiff, who is a representative of the Classes, are typical of the claims of all members thereof. Those claim are based on the same fundamental factual allegations and legal theories as the claims of all other members of the Classes.

### Plaintiff Will Fairly and Adequately Represent the Classes

73.     The Plaintiff is able to, and will, fairly and adequately, protect the interests of the Classes and the members thereof.

74.     The attorneys for Plaintiff are experienced in, and capable of, prosecuting complex litigation such as this case. The attorneys for Plaintiff and the Classes will actively conduct and be responsible for the prosecution of this litigation and the expenses thereof.

### PLAINTIFF'S ENTITLEMENT TO PUNITIVE DAMAGES

75.     The conduct of the Defendants as described herein was extreme and/or outrageous because of its malice, evil motive, and reckless indifference to the rights of the Plaintiff, his children and all others similarly situated, as a result of, *inter alia*, acting in their own self-interest at the expense of the interests of the Beneficiaries and by implementing a uniform diminution of fiduciary services and/or effectuating a uniform policy to allocate assets

of Beneficiaries' fiduciary accounts to one or more Proprietary Funds.  Defendants knowingly

overcharged for various services, including through fees, as alleged herein.  Defendants

knowingly engaged in wrongdoing and/or intentionally breached known legal (including

fiduciary) duties and intentionally disregarded applicable rules and regulations promulgated by

federal banking regulators.  As further alleged herein, Defendants perpetrated a uniform scheme

that:

> (a)    took advantage of the Bank's conflicts of interest and the increased costs

and expenses plaintiff and the members of the Proprietary Funds Class incurred, such wrongfully

imposed costs and expenses inuring to the benefit of Bancorp, the Bank, and/or the Bank

Subsidiaries in flagrant violation of their known legal duties, including the duty of loyalty;

> (b)    deliberately and knowingly changed the financial vehicles traditionally

and appropriately used historically by financial institutions for investment of fiduciary assets

(e.g., individual assets or CTFs), specifically to generate revenues and profits for the Defendants

at the expense of the Beneficiaries in flagrant violation of known legal duties, including the

duties of loyalty and prudence owed by the Bank;

> (c)    deliberately and knowingly applied inadequate fee credits to fiduciary

accounts which, if applied at all, only partially offset the additional and unnecessary expenses

incurred by the Proprietary Funds allocated by the Bank in flagrant violation of known legal

duties, including the duties of loyalty and prudence owed by the Bank;

> (d)    deliberately and knowingly engaged in conflict of interest and/or self-

dealing transactions, including breaching the duties of loyalty and prudence; instead, Defendants

put their interests in unjustly generating  revenues and profits for themselves ahead of those to

whom they owed a fiduciary duty; and

(e)    knowingly and intentionally (and/or as a result of gross negligence) made

unsuitable asset allocation with respect to all members of the Classes, as further alleged herein.

## COUNT I

## BREACH OF FIDUCIARY DUTY

76.    Plaintiff repeats and realleges each and every allegation stated, above, as if set

forth fully in this count.  This count is asserted by Plaintiff, individually, on behalf of his

children and on behalf of the Classes against the Bank.

77.    The Bank owed fiduciary duties to Plaintiff, his children and all members of the

Classes.  As further alleged herein, The Bank, under the control and/or at the direction of

Bancorp and its senior executives breached fiduciary duties owed to Plaintiff, his children and all

members of the Classes, proximately causing legal injury / damages.

78.    The Bank breached its duty of loyalty to Beneficiaries by putting the interests of

Bancorp, the Bank, the Bank Subsidiaries, and their affiliates before the interests of Plaintiff, his

children and the members of the Classes.

79.    Damages to Plaintiff, his children and the members of the Classes include those

sustained as a consequence of the Bank's providing them materially diminished fiduciary

services than those to which they were contractually entitled; and having Beneficiaries' fiduciary

accounts subjected to unnecessary and/or excessive fees and expenses, including as alleged,

herein.

80.    As a fiduciary, including under and pursuant to Ohio Rev. Code § 1339.52, the

Bank was (and is) obligated to comply with the Uniform Prudent Investor Act.  By acting as

described in this Count and allocating Beneficiaries' assets as alleged herein, the Bank breached

fiduciary duties (including by violating Ohio Rev. Code § 1339.53).

81.    As a result of the Bank's improper diminution of the fiduciary services contractually promised (or otherwise legally owed) to Plaintiff, his children and the members of the Beneficiaries Class, the Beneficiaries have been denied the services to which they were entitled had the Bank fulfilled its fiduciary responsibilities; corresponding damages, in an amount to be determined, have been proximately caused.  Damages suffered by the Proprietary Funds Class are as alleged herein.

## COUNT II

## UNJUST ENRICHMENT

82.    Plaintiff repeats and realleges each and every allegation stated, above, as if set forth fully in this count.  This Count is asserted by Plaintiff, individually, on behalf of his children and on behalf of the Classes against both Defendants.

83.    This cause of action for unjust enrichment is asserted conditionally, and/or alternately, in the absence of any contractual agreement (generally) or any governing contractual provision (specifically) as to each matter complained of herein.

84.    The unjust enrichment of Defendants includes, but is not limited to, Defendants' saving substantial operating costs by wrongfully reducing fiduciary services to the detriment of Plaintiff, his children and the other affected Beneficiaries whose fiduciary accounts were (and are) charged fees and expenses by the Bank and/or Bank Subsidiaries as well as indirectly through the fees and expenses charged by them to the Fifth Third Funds.  Defendants' (including those of the Bank and the Bank Subsidiaries) imposition of expenses exceeds that to which each was legally (and/or reasonably) entitled under the totality of the circumstances, even after so-called credits for certain fees paid to the Bank Subsidiaries by the Proprietary Funds.  Additionally, as indicated above, such benefits to the Bank and the Bank Subsidiaries were

exacerbated by their avoidance of substantial operating expenses by reason of the abdication of the traditional, appropriate, and/or contractually promised individualized trust, fiduciary, and/or other (including administrative) responsibilities owed by the Bank to the members of the Classes. Further, by carrying out their plan and scheme, the Defendants have been able to market the Fifth Third Funds to non-fiduciary customers, thereby generating additional unjust profits indirectly at the expenses of Plaintiff, his children and members of the Classes.

85.    The Defendants have retained and invested the proceeds of the foregoing unjust enrichment (including by realizing additional profits thereupon), all of which, in fairness and equity, ought to be returned to the fiduciary accounts from which they were wrongfully derived and/or to their Beneficiaries, as the Court shall deem appropriate and otherwise, whether by accounting, restitution, constructive trust, or otherwise.

## COUNT III

## BREACH OF CONTRACT

86.    Plaintiff repeats and realleges each and every allegation stated, above, as if set forth fully in this count.  This count is asserted by Plaintiff, individually, on behalf of his children and on behalf of the Beneficiaries Class against the Bank.

87.    Through the original trust agreements, wills and other documents pursuant to which fiduciary relations were established with the Bank and /or the Acquired Banks, Plaintiff and each member of the Beneficiaries Class had a contractual agreement with the Bank.  As further alleged herein, the Bank materially breached such contractual agreements, proximately damaging Plaintiff, his children and the members of the Beneficiaries Class as further alleged herein.  Each such contract included the implied promise that the Bank would provide individualized and prudent management of the respective fiduciary accounts and expense and

fee-free care of the assets (the fees therefor being covered by its fees for serving as a corporate fiduciary) within the care of the Bank and the Acquired Banks.  Instead, (and in material breach of such implied promises,) the Bank furnished to Beneficiaries generalized and impersonal purported fiduciary services by relatively inexperienced personnel and computerized "model" portfolios, which always included allocation to Proprietary Funds.

88.    By acting as described herein, the Bank and the Acquired Banks breached contractual agreements with Plaintiff, his children and the members of the Beneficiaries Class, causing them damages in a material amount to be determined by the trier of fact.

## COUNT IV

## BREACH OF FIDUCIARY DUTY

89.    Plaintiff repeats and realleges each and every allegation stated, above, as if set forth fully in this Count.  This Count is asserted against the Bank by, individually, on behalf of his children and on behalf of the members of the Beneficiaries Class.

90.    Periodically, various of the fiduciary accounts of Plaintiff, his children and members of the Beneficiaries Class were subject to estate, trust, or other tax obligations. The Bank typically segregated funds to pay the tax obligations of these accounts and routinely did so by allocating Beneficiaries' assets to certain low-yielding asset allocations.  The amounts so segregated from Plaintiff's and other fiduciary accounts was, upon information and belief, always substantially in excess of the amounts needed to satisfy the account's near-term tax obligations.  The money so allocated to low-yielding vehicles was specifically allocated, at the direction and/or policy of Defendants, for the self-interested purposes of one or both Defendants, including for purposes alleged herein related to wrongful allocation to the Proprietary Funds.

91.    As a fiduciary, including under and pursuant to Ohio Rev. Code § 1339.52, the Bank was (and is) obligated to comply with the Uniform Prudent Investor Act.  By acting as alleged herein and allocating Beneficiaries' assets in such manner, the Bank breached fiduciary duties (including by violating Ohio Rev. Code § 1339.53).

92.    Plaintiff, his children and the other affected members of the Beneficiaries Class were damaged in an amount which cannot presently be determined, including by the Bank's self-dealing and imprudent financial practices, all of which was (and is) a continuing breach of fiduciary duty.

## COUNT V

## BREACH OF FIDUCIARY DUTY

### (Non-Class, Individual Claim by Plaintiff Segal)

93.    Plaintiff repeats and realleges each and every allegation contained, above, as if set forth fully in this Count.  This Count is asserted by plaintiff Segal, individually, and on behalf of the Segal Trusts and his minor children, against the Bank and arises from, *inter alia*, the Bank's disregard of the express wishes of the Segal Trusts' grantors and/or the Bank's obligation to properly and prudently oversee entrusted assets, including balancing the income and long-term growth requirements of the Segal Trusts' beneficiaries in favor of benefiting itself and its affiliates.

94.    Three of the Segal Trusts accounts (of which Plaintiff and his children are beneficiaries) and Plaintiff, individually, for many years, were the owner of the stock of the Oakdale Corporation ("Oakdale"), a real estate holding company which owned, *inter alia*, various commercial and residential properties.  In its capacity as Trustee, the Bank controlled Oakdale at all times relevant to this Complaint.  Among the properties owned by Oakdale was its

"crown jewel," a building located at 2509-11-13 West Clifton Avenue at the intersection of West Clifton Avenue and Calhoun Street in Cincinnati (the "Building"), located on the edge of the University of Cincinnati campus. The Building generated substantial returns to Oakdale (approximately 11.5% per year) and, therefore, in turn, to Plaintiff, individually and to the referenced Segal Trust accounts in the Bank's care, of which Plaintiff and his children are beneficiaries. At all relevant times, the Building had a long-term tenant, the DuBois Book Store, and also had excellent potential for capital appreciation, particularly given its location near a planned $270 million development.

95.    Consistent with the Bank's self-dealing and efforts to allocate ever-increasing amounts (including those of the Segal Trusts) to the Proprietary Funds, despite the cash-generating and commercial prospects for the Building and the other assets of Oakdale, the Bank embarked upon a scheme to sell off such real estate and use the net proceeds for allocation to the Proprietary Funds – the latter generating meager returns for the Segal Trusts' accounts, well below the returns generated before the transaction, particularly given the substantial capital gains taxes that had to be (and were) paid in connection therewith.

96.    On March 4, 2003, without consultation with Plaintiff and without acting in the best interests of Plaintiff and his children, and in fulfillment of an integral part of the foregoing plan and scheme, the Bank, relying upon a questionable appraisal by a confederate of the Bank (and possibly relying on other appraisals of questionable validity), caused Oakdale to sell the Building for $828,000.

97.    The Bank's transaction to sell the Building, which was carried out without any serious marketing effort by it – despite payment by the Bank of an $8,000 "commission" to one of its former employees with whom the Bank has had a number of questionable transactions –

the Building was sold to the prime tenant in the Building, someone who had approached Plaintiff many times over the years about a possible sale of the Building, to such tenant.

98.     The sale of the Building generated substantial unnecessary capital gains and caused Oakdale to pay approximately $300,000 in capital gains taxes.  Indeed, if there was a legitimate reason for the Bank to cause Oakdale to sell the Building, which there was not, it could have saved Oakdale and, ultimately, the Plaintiff, his children and other potential beneficiaries of the Segal Trusts, such capital gains taxes by effectuating a tax-free exchange for another income-producing commercial property under and pursuant to Internal Revenue Service regulation § 1031.  Apparently, the Bank never considered such a basic, common  commercial real estate strategy.

99.     The net proceeds of the sale of the Building were allocated by the Bank to the Proprietary Funds.  Such asset allocation generated a rate of return on assets of approximately 1%, substantially less the 11.5% that Oakdale was receiving from the Building prior to its sale and without the same potential for future appreciation in value and substantially less than the 7% interest the Bank caused Oakdale to pay on a $750,000 mortgage it held at the same time the net proceeds from the Building's sale were being allocated to the Proprietary Funds.  Indeed, a reflection of the real value of the Building is emphasized by the sale of a parcel (with a footprint half the size of that of the Building) one block away for $1.6 million in 2005.

100.     In the sale of the Building, the Bank failed to consider fairly (and/or effectuate) the continued ownership of the Building by Oakdale; failed to address the unnecessary and premature capital gains taxes that would have to be (and were) paid upon sale; failed to consider (and/or address) the potential for future price appreciation and whether, if the Building was to be sold at all, what was the most appropriate means of selling it for the highest selling price.

Indeed, the Bank could have avoided subjecting the Segal Trusts, Plaintiff and his children to excessive income taxes (but did not) by, *inter alia*, changing the nature of the IRS' tax treatment of Oakdale's earnings but never considered doing (or never did) so.

101.    As a fiduciary, including under and pursuant to Ohio Rev. Code § 1339.52, the Bank was (and is) obligated to comply with the Uniform Prudent Investor Act.  By acting as described in this Count, selling the Building in the manner that it did for the price realized and allocating assets to the Proprietary Funds, the Bank breached fiduciary duties (including by violating Ohio Rev. Code § 1339.53).

102.    At all times relevant to the Bank's control of Oakdale and its assets, the Bank had an affirmative duty to professionally and prudently manage such assets in its care consistent with its role as a corporate fiduciary.  As a result of its foregoing intentional (and/or reckless) conduct leading to (and related to) the sale of the Building, as well as its own conflicting interests, such being a breach of the Bank's fiduciary duties owed to Plaintiff , his children and other potential beneficiaries of the affected Segal Trusts (and to Oakdale), they sustained substantial damages in an amount to be determined by the trier of fact.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests on his own behalf, on behalf of his minor children and on behalf of all members of the Classes as follows:

(a)    certification of this action as a class action and appointment of Plaintiff to represent the Classes and his Counsel as Class Counsel;

(b)    entry of judgment on the claims for breach of fiduciary duty in favor of Plaintiff, individually and on behalf of his minor children, and as a representative of the other members of the Classes and against the Bank and an award of compensatory, punitive, and/or

other appropriate damages / remedies in favor of plaintiff, individually, and as representative of the other members of the Classes in the amount of damages (or other relief) to be determined by the trier of fact;

(c)     entry of judgment on the claims for breach of contract in favor of plaintiff, individually and his minor children, and as a representative of the other members of the Classes and against the Bank and an award of compensatory, punitive, and/or other appropriate damages / remedies in favor of Plaintiff, individually and his minor children, and as representative of the other members of the Classes in the amount of damages to be determined by the trier of fact;

(d)     entry of judgment enjoining the Bank from opposing any petition filed by any member of the Classes seeking the removal of the Bank as corporate fiduciary and requiring the Bank to pay for all legal fees and expenses incident thereto including its own;

(e)     entry of judgment compelling the Defendants to account for the unjust enrichment by them and disgorging the amount thereof (and the profits earned thereupon) to the fiduciary accounts affected by the wrongdoing described herein and/or for the Beneficiaries, as appropriate; and/or any award of compensatory, punitive, and/or other appropriate damages / remedies (including disgorgement, accounting, constructive trust, and/or restitution) in favor of Plaintiff, individually and his minor children, and as representative of the other members of the Classes against one or both Defendants arising from the unjust enrichment claims asserted herein;

(f)     entry of judgment compelling the Bank to make corrective practices in its fiduciary operations, including by effectively insulating its fiduciary operations from all of its other business activities (including those relating to the Proprietary Funds, the Bank Subsidiaries, and Bancorp);

(g)    entry of judgment compelling the Bank to establish and implement procedures to fully protect the interests of the members of the Classes including, *inter alia,* the appointment of a Special Master to oversee the Bank's fiduciary operations pending completion of the other injunctive relief ordered by the Court;

(h)    pre-judgment and post-judgment interest at the maximum rate allowable by law;

(i)    reasonable attorneys' fees and reimbursement of the reasonable costs and expenses of prosecuting this litigation and distributing the recovery to members of the Classes; and

(j)    such other or additional relief as this Court deems appropriate.

      /s/Ann Lugbill
Ann Lugbill (0023632)
Grant & Eisenhofer, P.A.
2406 Auburn Ave.
Cincinnati OH 45219
(513)784-1280
(513)784-1449 Fax
*alugbill@gelaw.com*

Trial Attorney for Plaintiff and the Proposed Classes

RICHARD D. GREENFIELD
GREENFIELD & GOODMAN LLC
7426 Tour Drive
Easton, MD 21601
(410)745-4149
(410) 745-4158 Fax
*whitehatrdg@earthlink.net*

Trial Attorney for Plaintiff and the Proposed Classes

DAVID A.P. BROWER
BROWER PIVEN,
  A PROFESSIONAL CORPORATION
433 Madison Ave., 8th Floor
New York, NY 10022
(212) 501-9000
(212) 501-0300 Fax
*brower@browerpiven.com*

CHARLES J. PIVEN
MARSHALL N. PERKINS
BROWER PIVEN,
  A PROFESSIONAL CORPORATION
2525 World Trade Center-Baltimore
401 East Pratt Street
Baltimore, Maryland  21202
(410) 332-0030
(410) 685-1300 (fax)
*perkins@browerpiven.com*

Trial Attorney for Plaintiff and the Proposed Classes


## **JURY DEMAND**

Plaintiff hereby demands a trial by jury.


Dated:  October 19, 2007

                    /s/Ann Lugbill
                    Ann Lugbill

## CERTIFICATE OF SERVICE

I hereby certify that on October 19, 2007, I filed the foregoing with the Clerk, using the CM/ECF system, which will send notices of the filing to registered participants.

_____s/Ann Lugbill_____
Ann Lugbill (0023632)
Grant & Eisenhofer, P.A.
2406 Auburn Avenue
Cincinnati, OH   45219
Phone:  (513) 784-1280
Fax:  (513) 784-1449
E-mail:  *alugbill@gelaw.com*