UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

Daniel J. Segal, et al,          :   Case No. 1:07-cv-348
                                 :
     Plaintiffs,                 :
                                 :
vs.                              :
                                 :
Fifth Third Bank, N.A., et al,   :
                                 :
     Defendants.                 :

**ORDER**

Before the Court is Defendants' motion to dismiss Plaintiff's Amended Class Action Complaint. (Doc. 22) Plaintiffs oppose the motion (Doc. 23), and Defendants have replied. (Doc. 25) Plaintiffs have also filed supplemental authorities in support of their opposition. (Docs. 26, 28)

Plaintiff Daniel Segal is a beneficiary of a fiduciary trust account administered by Defendant Fifth Third Bank. Defendant First Third Bancorp is the Bank's corporate parent. Segal generally alleges that the Bank breached its fiduciary duties, unjustly enriched itself at his expense, and breached its contract to properly administer the trust account in accordance with fiduciary duty principles.

Segal alleges individual claims on his own behalf, and also brings claims on behalf of two defined Rule 23(b)(3) classes:

> (a) <u>The Beneficiary Class</u>, consisting of all beneficiaries of trust, estate, or other fiduciary accounts for which the Bank or any

-1-

of its predecessors acted as a trustee,
executor, or other form of corporate
fiduciary at any time from March 1, 2001 to
the present (the "Class Period'); and

(b) The Proprietary Funds Class, consisting
of all Beneficiary Class members whose trust,
estate, or other fiduciary accounts, for
which the Bank or any of its predecessors
acted as a trustee, had, directly or
indirectly, Proprietary Fund assets allocated
to any such account at any time during the
Class Period.

(Am. Complaint ¶57)

According to the complaint, the Bank administers several

types of fiduciary accounts and provides related services,

including customized portfolio management.  (¶10)  The Bank

failed to exercise good faith by engaging in self-interested or

imprudent asset placement decisions for those accounts, primarily

the Bank's purchase of proprietary mutual funds.  (¶8)  The Bank

also failed to "undertake a trust-by-trust analysis" of each

fiduciary account and instead, uniformly decided that trust

assets be invested "to the extent feasible, in Fifth Third

Funds."  (¶¶23 & 24)  The Bank's prior practice of offering

"highly individualized trust administration and asset management

services" paid for with fiduciary account fees, was and is being

replaced by a standardized portfolio management approach adopted

due to various Bank acquisitions and expansions.  This

standardized, lower-level approach "force-placed" the Bank's

fiduciary accounts into the Bank's proprietary funds.  This

-2-

conduct violated the Bank's fiduciary obligations, and disregarded potential adverse tax consequences to the account beneficiaries. (¶¶25-28) This misconduct resulted in increased income to the Bank from higher fees charged to the accounts for advisory, administrative, and other services. Investing the fiduciary funds in the Bank's proprietary mutual funds also permitted the Bank to achieve economies of scale in its mutual fund operation that benefitted the Bank, to the detriment of the account beneficiaries. (¶¶29-32)

Plaintiff alleges that the objectionable conduct is ongoing, because the Bank is continuing to seek merger acquisitions, which will permit the Bank to further dilute the value of its fiduciary and trust services provided to the account beneficiaries. (¶¶37-38)

Jurisdiction is alleged based on diversity between the parties. Segal is an Ohio resident, but he alleges that other members of the putative class are residents of other states. The Bank is a federally chartered bank and Bancorp is an Ohio corporation, both domiciled in Cincinnati. (¶¶43-46) Segal alleges supplemental jurisdiction is proper over his individual claims under 28 U.S.C. §1367. He alleges state law claims for breach of fiduciary duty (Count I), unjust enrichment (Count II), breach of contract premised on the underlying fiduciary instruments (Count III), and another fiduciary duty claim (Count

-3-

IV) based on the improper investments of amounts segregated in the accounts to satisfy tax obligations.  Segal brings an individual claim for breach of fiduciary duty (Count V), arising out of other specific Bank actions taken as Trustee of the Segal Trusts.

Defendants move to dismiss the complaint.  They argue that the class claims are pre-empted by the Securities Litigation Uniform Standards Act of 1998 ("SLUSA").  Alternatively, they argue that each of the state law claims should be dismissed on the merits because, for various reasons, they fail to state claims as a matter of law.

**DISCUSSION**

1.  <u>Standard of Review</u>.

A Rule 12(b)(6) motion operates to test the sufficiency of the complaint.  In considering such a motion, the court is required to construe the complaint in the light most favorable to the Plaintiff, and accept as true all well-pleaded factual allegations.  See <u>Scheuer v. Rhodes</u>, 416 U.S. 232, 236 (1974), and <u>Roth Steel Products v. Sharon Steel Corp.</u>, 705 F.2d 134, 155 (6th Cir. 1983).  The court need not accept as true legal conclusions or unwarranted factual inferences.  <u>Lewis v. ACB Business Servs., Inc.</u>, 135 F.3d 389, 405 (6th Cir. 1998).  A court will, though, accept all reasonable inferences that might be drawn from the complaint.  <u>Fitzke v. Shappell</u>, 468 F.2d 1072,

-4-

1076-77 at n.6 (6th Cir. 1972).

As noted in <u>Mayer v. Mylod</u>, 988 F.2d 635, 637 (6th Cir. 1993):

> The purpose of Rule 12(b)(6) is to allow a defendant to test whether, as a matter of law, the plaintiff is entitled to legal relief even if everything alleged in the complaint is true. . . .  As the court stated in *Conley v. Gibson*, 355 U.S. 41, 45-46, 2 L. Ed. 2d 80, 78 S. Ct. 99 (1957), '[A] complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.'

The Supreme Court's decision in <u>Bell Atlantic Corp. v. Twombly</u>, ___ U.S. ___, 127 S.Ct. 1955 (2007) casts some doubt on these long-standing pleading requirements.  While some uncertainty exists in this Circuit on <u>Twombly</u>'s reach,[1] <u>Twombly</u> requires allegations "plausibly suggesting" the existence of a cognizable claim.  <u>Id</u>. at 1964.  However, <u>Twombly</u> does not alter this Court's duty to construe the complaint in the light most favorable to plaintiff.

2.  <u>SLUSA Preclusion</u>.

Congress enacted SLUSA in 1998, in response to concerns that state law class actions were being utilized to circumvent the Private Securities Litigation Reform Act ("PSLRA"), enacted in 1995.  PSLRA was intended to correct certain perceived abuses of

---

[1] See <u>Weisbarth v. Geauga Park Dist.</u>, 499 F.3d 538, 541-542 (6th Cir. 2007).

class action securities litigation by, among other things,

imposing heightened pleading standards upon class complaints for

securities fraud.  SLUSA's preclusion provision states:

> No covered class action based upon the
> statutory or common law of any State or
> subdivision thereof may be maintained in any
> State or Federal court by any private party
> alleging -
>
> (1) an untrue statement or omission of a
> material fact in connection with the purchase
> or sale of a covered security; or
>
> (2) that the defendant used or employed any
> manipulative or deceptive device or
> contrivance in connection with the purchase
> or sale of a covered security.

15 U.S.C. §77p(b).  The statute also authorizes removal to

federal court of covered class actions originally filed in state

court.  The statute defines a "covered" class action as one

brought on behalf of more than 50 people; a "covered" security is

one traded nationally, listed on a regulated exchange, and

subject to the federal securities laws.  In addition to these

requirements, a state law class action is precluded if the claims

are based on a misrepresentation or omission of material fact (or

the use of a deceptive device or scheme) "in connection with" the

purchase or sale of a security.  See <u>Dudek v. Prudential Secs.</u>,

Inc., 295 F.3d 875, 879 (8th Cir. 2002).

It must be kept in mind that SLUSA does not actually or

completely pre-empt any and all state law claims that may have

something to do with the buying and selling of securities.  See

-6-

Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Dabit, 547 U.S. 71, 87 (2006): "SLUSA does not actually pre-empt any state cause of action.  It simply denies plaintiffs the right to use the class action device to vindicate certain claims.  The Act does not deny any individual plaintiff, or indeed any group of fewer than 50 plaintiffs, the right to enforce any state-law cause of action that may exist."

 A. Misrepresentation or Omission.

 Defendants contend that the class claims, while styled under state law, are in essence claims based on misrepresentations or omissions of material facts (or a fraudulent or deceptive scheme) concerning the purchase of Fifth Third mutual funds.  They point to Plaintiffs' original complaint in this case, which more squarely alleged a plan or scheme hatched by Defendants to shift fiduciary funds managed by the Bank into Fifth Third "Captive" mutual funds.  (See, e.g., Doc. 1, ¶¶20-23)  Defendants responded to the original complaint with a motion to dismiss based on SLUSA preclusion, pointing out the specific allegations of the original complaint that required that result.  (See Doc. 12)  Plaintiffs elected to amend, and removed most of the direct allegations of "misrepresentations," "omissions," and "schemes."  Defendants now argue that Plaintiffs may not "plead around" SLUSA by cloaking their claims with state law titles, as SLUSA is an exception to the well-pleaded complaint rule.

A review of the 92 paragraphs pertaining to the amended complaint's class claims leads to the inescapable conclusion that Plaintiffs' action is premised upon a central factual allegation: that Fifth Third misrepresented or failed to disclose material facts, and/or engaged in a manipulative or deceptive course of conduct, when Fifth Third invested Plaintiffs' fiduciary funds into the Bank's proprietary mutual funds.  That allegation is clearly the gravamen of Plaintiffs' state law claims.

Plaintiffs argue that their amended complaint disavows any such contention, because in paragraph 2 they specifically allege that their claims are **not** based upon any misrepresentation, or failure to disclose, or fraudulent scheme.  They suggest they are "only" alleging classic state law claims based on Defendants' alleged breach of fiduciary duties owed to Plaintiffs.  The Court disagrees.

The fact that Plaintiffs avoid using the words "misrepresentation" and "omission" does not control the result. It is clear that the court can and should disregard the particular labels or titles Plaintiffs may affix to their claims when determining if SLUSA precludes those claims.  It is the substance of the allegations about the defendants' conduct that is key to this determination.  See, e.g., Professional Mgmt. Assocs. Employees Profit Sharing Plan v. KPMG LLP, 335 F.3d 800, 803 (8th Cir. 2003) [holding that a negligence claim is

"essentially" a precluded securities fraud claim]; Dudek v. Prudential Secs., 295 F.3d 875 (8th Cir. 2002), finding SLUSA precluded claims based on placement of tax-deferred annuities in plaintiffs' retirement accounts, and which alleged that the defendant-insurer benefitted from resulting higher fees and costs incurred.

Here, similarly, Plaintiffs allege that increased account fees resulted from Defendants' "asset allocation" decisions (¶7); that the bank enriched itself by making those "asset allocations" (¶9); and that the Bank engaged in self-dealing by investing in its proprietary funds rather than "independently analyz[ing] and monitor[ing] trust assets." (¶14) Whatever the state law mold these allegations may also fit, it is inescapable that the key conduct underlying all the claims is the Bank's misrepresentations or omissions about, or deceptive scheme involving, the Bank's purchase of its proprietary mutual funds with fiduciary assets. All of the class allegations of self-dealing, breach of duty, or unjust enrichment, flow from that central fact. While the alleged misconduct may have breached a contract or a fiduciary duty, it is also a "quintessential example of a fraudulent omission of a material fact under the federal securities laws." Felton v. Morgan Stanley Dean Witter & Co., 429 F.Supp.2d 684, 693 (S.D.N.Y. 2006).

Several district courts that have addressed almost identical

allegations against different banks and investment firms have reached the same conclusion.  See Kutten v. Bank of America, N.A., 2007 U.S. Dist. LEXIS 63897 (E.D. Mo., August 29, 2007), finding SLUSA precluded breach of fiduciary duty and unjust enrichment claims against the bank; Siepel v. Bank of America, 239 F.R.D. 558 (E.D. Mo. 2006) [same]; Spencer v. Wachovia Bank, N.A., 2006 U.S. Dist. LEXIS 52374 (S.D. Fla., May 10, 2006) [same]; Rabin v. JP Morgan Chase Bank, N.A., 2007 U.S. Dist. LEXIS 57437 (N.D. Ill. Aug. 3, 2007) [same].

Plaintiffs have submitted an unpublished order from the Southern District of New York in Hughes v. LaSalle Bank, where the court concluded that SLUSA does not preclude claims for breach of fiduciary duty, tortious interference and unjust enrichment.  (See Doc. 26, Exhibit 2)  The district court's order states that the court was responding to the Second Circuit's remand of the case for an evidentiary hearing on subject matter jurisdiction over the plaintiffs' original complaint.  According to the district court order, the Second Circuit posed questions about both the existence of diversity and whether SLUSA preclusion might apply.  This Court is not bound by that district court's conclusion about whether SLUSA applies to the pleadings and parties before the court in that case.  There is no definitive guidance from the Sixth Circuit on this question.  The Court finds the reasoning set forth in Kutten, Siepel, Spencer,

and Rabin to be a correct application of SLUSA preclusion to the facts and claims alleged here.

In addition, two district courts within this Circuit have followed similar reasoning to apply SLUSA preclusion in slightly different factual settings.  Beary v. Nationwide Life Ins. Co., 2007 U.S. Dist. LEXIS 83137 (S.D. Ohio, September 17, 2007) (Sargus, J.) involved breach of fiduciary duty and unjust enrichment claims brought by retirement and deferred compensation plans against Nationwide, which sponsored those plans. Nationwide had negotiated revenue sharing agreements with various mutual fund companies in return for investing the plans' assets in the mutual funds.  The plaintiff plans alleged that Nationwide breached its fiduciary duty to them by enriching itself with the revenue sharing fees, resulting in loss of value to the plans. The district court held:  "Although Plaintiff does not specifically use the words 'untrue statement' or 'omission' in the Complaint, the substance of Plaintiff's claim is that Nationwide misrepresented a relationship with Investment Advisors or, at a minimum, omitted to disclose material facts about the relationship.  In the Court's view, Plaintiff's allegations fall within the scope of SLUSA."  Id. at *11.

In Horattas v. Citigroup Financial Markets Inc., 2007 U.S. Dist. LEXIS 67411 (W.D. Mich., September 12, 2007), the district court held SLUSA precluded a state law class action brought

against the investment services provider to a cemetery owner. The owner allegedly depleted and absconded with millions of dollars of funds held in irrevocable endowment care accounts for the benefit of the cemeteries, looting the cemeteries' trust assets. The district court concluded that SLUSA precluded the state law class claims against the investment advisor to the owner, finding that they alleged a fraudulent scheme concerning covered securities. The allegations of negligence or "imprudent investment" did not immunize the class claims from preclusion.

The same result applies here. Plaintiffs' allegation that Fifth Third breached its fiduciary duty, or was unjustly enriched as a result of the investments in Fifth Third mutual funds, does not protect their class claims from SLUSA.

B.    "In Connection With" Covered Securities.

Plaintiffs do not dispute that Fifth Third's proprietary mutual funds are covered securities for SLUSA purposes. They argue this is irrelevant, because Defendants' conduct was not "in connection with" the purchase or sale of those securities. Plaintiffs argue they had no knowledge of the purchases and made no purchases themselves, leaving all asset allocation decisions to the Defendants. They also argue that their claims are not based on the purchase of the mutual funds per se, but upon the breach of fiduciary duty inherent in Fifth Third's decision to purchase those funds.

-12-

This argument is foreclosed by <u>Dabit</u>.  There, the Supreme Court held that SLUSA's phrase "in connection with" must be construed consistently with settled case law construing the same phrase used in Section 10b and Rule 10b5.  While standing to bring a private suit under those authorities is limited to purchasers and sellers, limitation was based on policy considerations raised by permitting any private right of action under the securities laws.   See <u>Dabit</u>, 547 U.S. at 84 (discussing <u>Blue Chip Stamps v. Manor Drug Stores</u>, 421 U.S. 723 (1975)).  The Section 10b standing limitation does not mandate imposing a limiting construction of the phrase "in connection with" the purchase or sale of securities.  Citing its prior cases,[2] the Court noted it is enough for 10b and 10b5 actions that the fraud "coincide with a securities transaction – whether by the plaintiff or by someone else." <u>Id</u>. at 85.  The Court then noted that Congress "could hardly have been unaware" of this broad construction when it chose to use the same phrase in SLUSA. <u>Id</u>.  Thus the Court reversed the Second Circuit's decision finding that the plaintiffs - brokers who were fraudulently induced to retain or delay selling securities, and were not purchasers or sellers - fell outside of SLUSA's preclusive scope.

Plaintiffs' reliance on pre-<u>Dabit</u> decisions such as <u>Norman</u>

---

[2] <u>SEC v. Zandford</u>, 535 U.S. 813 (2002), and <u>United States v. O'Hagan</u>, 521 U.S. 642 (1997).

v. Salomon Smith Barney, Inc., 350 F.Supp.2d 382 (S.D.N.Y. 2004)
is therefore misplaced. Norman was clearly driven by the fact
that plaintiffs were not purchasers or sellers of securities.

Plaintiffs also cite LaSala v. UBS, 510 F.Supp.2d 213
(S.D.N.Y. 2007), a post-Dabit opinion finding that a claim
against UBS for aiding and abetting a breach of fiduciary duty
was not precluded by SLUSA. The specific allegation against UBS
in that case, as the district court's opinion makes clear, was
the fact that UBS received **money** from two other private banks in
Switzerland, and then transferred those funds to different
accounts at the direction of the account holders. The holders
had perpetrated a massive fraudulent stock scheme and the funds
in question were allegedly proceeds of illegal stock sales. But
the allegations against UBS were limited to the transfer of money
from one account to another account. The district court noted
that if UBS had facilitated the sale of the stock, the result
would likely have been different. Id. at 243-244. The facts at
issue in that case clearly differentiate it from the facts
underlying Plaintiffs' claims in this case.

Plaintiffs also rely on Burns v. Prudential Securities,
Inc., 218 F.Supp.2d 911 (N.D. Ohio 2002), where the district
court found that SLUSA did not apply to a claim for breach of
fiduciary duty against a broker who sold the securities held in
plaintiffs' accounts without their notice or consent. There was

-14-

no allegation that the broker acted fraudulently, as the district court noted he sold the holdings because he was concerned that the market was about to crash.  (It did not crash, but kept rising.)  Plaintiffs alleged that Prudential, the broker's employer, failed to disclose material facts and made false statements about the broker's actions after the fact.  The district court found the claims were not pre-empted, because the false statement or omissions took place after, and independently of, the broker's sales, and had no relationship to his decision to sell.  The claims against Prudential had nothing to do with the securities in question, but rather were premised on Prudential's failure to honestly and accurately deal with plaintiffs about the situation caused by their broker.  Thus the claims were not "in connection with" the sale of the securities.

    Plaintiffs allegations here are far different, and distinguish the result in <u>Burns</u>.  Plaintiffs allege a course of fraudulent conduct involving Fifth Third's decision to purchase Fifth Third mutual funds, a course of conduct they allege is continuing with every acquisition or merger by Fifth Third.

    For these reasons, the Court concludes that the class claims alleged in Plaintiffs' Amended Complaint are precluded by SLUSA, and are therefore dismissed with prejudice.  Given this result, the Court does not reach Defendants' alternative arguments concerning the merits of the state law claims.

Counts I through IV are also brought by Daniel Segal individually, and Count V is exclusively Segal's individual claim against the Defendants.  His individual claims are not precluded by SLUSA.  However, Segal's allegations make clear that diversity is lacking between Segal and the Defendants.  The Court will therefore dismiss Segal's individual claims without prejudice.

## CONCLUSION

Counts I through IV brought on behalf of the defined class are dismissed with prejudice because they are precluded by SLUSA. Segal's individual claims in Counts I through V are dismissed without prejudice.

SO ORDERED.

THIS CASE IS CLOSED.

Dated: March 25, 2008          s/Sandra S. Beckwith
                               Sandra S. Beckwith, Chief Judge
                               United States District Court

–16–

FILED

FEB 2 7 2004

U. S. DISTRICT COURT
EASTERN DISTRICT OF MO

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

ELLEN JANE KUTTEN
on behalf of herself
and all others similarly situated,       )
                                          )
                Plaintiff,                )
                                          )
        v.                                )
                                          )
BANK OF AMERICA, N.A.,                    )
                                          )
**HOLD FOR SERVICE**                      )
                                          )
and                                       )
                                          )
BANK OF AMERICA                           )
CORPORATION,                              )
                                          )
**HOLD FOR SERVICE**                      )
                                          )
                Defendants.               )

Case No.

JURY TRIAL DEMANDED

## COMPLAINT

COMES NOW Plaintiff, Ellen Jane Kutten, for herself and for all other members of the

Class hereinafter described, and individually on behalf of herself and her daughters, Alessandra

Kutten Cottrell and Louise Kutten Cottrell, by and through counsel, states and alleges as follows:

## INTRODUCTION

1.      (a)    This Class Action is brought by plaintiff on her own behalf and on behalf of

all other members of the Class defined below and individually on behalf of herself and her

daughters against the defendants arising out of, <u>inter alia</u>, serious breaches of fiduciary and

contractual duties owed by the defendants Bank of America, N.A. (the "Bank") and the Bank's

parent, Bank of America Corporation, to beneficiaries of certain trusts and other fiduciary

accounts within the Bank's care. In addition, certain claims are asserted by plaintiff against the Bank on behalf of a California Sub-Class and a Missouri Sub-Class as defined below. Unless the context indicates otherwise, the term "Class" includes the members of the "California Sub-Class" and "Missouri Sub-Class."

(b)    The Bank prominently and falsely advertises its promise as to how it holds itself out to persons such as plaintiff and the members of the Class who do business with its "Private Bank":

Bank Of America [Logo] Higher Standards

THE PRIVATE BANK

# Managing today's complex wealth. Balancing growth, risk, taxes and grandchildren.

As your financial resources increase, perhaps you need more financial resources to manage them.

The Private Bank of Bank of America has greater depth and breadth of wealth management expertise – across the financial spectrum – than any other private bank. Equally important, we bring this expertise together, creating more integrated solutions to your complex needs. And we provide these customized recommendations based on the extraordinary strength and stability of Bank of America.

It's no wonder we've been entrusted to manage, protect and pass on wealth for more than 150 years.

*The Private Bank is dedicated to serving affluent families and individuals with complex wealth management needs. Our experienced advisors customize unique and comprehensive solutions for each individual, integrating world-class investment management, trusts, credit and bank services. We welcome the opportunity to work with you. We invite you to call Caroline Grace at 800.863.9500 or visit www.bankofamerica.com/privatebank.* [Emphasis in original].

2

(c)   In fact, despite numerous substantially similar promises in the form of advertising, marketing pieces and direct representations to those who established fiduciary accounts with the Bank (and the beneficiaries thereof), as described herein, those promises have been and are being uniformly ignored or deliberately broken.

2.    In particular, in order to maximize the Bank's profits earned from trusts, guardianships, estates and other fiduciary accounts (collectively "Trusts") by which it acted as fiduciary, the Bank conspired with its affiliates and others presently unknown in a business decision to "double dip," by forcing trusts and other fiduciary accounts under the care of the Bank to have their assets re-directed from their historic allocations in individually managed accounts and/or so-called Common Trust Funds and/or other assets, to proprietary mutual funds controlled by subsidiaries of the Bank's parent, defendant Bank of America Corporation and its corporate affiliates and subsidiaries (collectively "BAC"). As used herein, the term "Conversion" refers to such wholesale asset re-direction by the Bank into shares of the Nations Funds. At no time has the Bank distributed to plaintiff or to any member of the Class defined below or other appropriate recipient a final, annual, or periodic account or any other statement fully disclosing the Bank's wrongdoing as described in this Complaint. Further, the defendants' wrongdoing is continuing in nature.  However, by August 16, 2000, BAC and its affiliates had increased the assets in their Funds to reach $100 billion. On that date the Bank stated:

> Banc of America Capital Management announced today that the Nations Funds family of funds has reached $100 billion in mutual fund assets. This growth was driven by increases in all three types of mutual funds: equity, fixed income and money market.

3.    Historically, the Bank, either through its so-called "Private Bank," now based in

3

St. Louis, MO [1], or through the Trust Departments of it and its predecessors, promoted itself by touting its purportedly highly individualized trust administration and asset management services, all of which was intended to and did lure grantors (such as the parents of plaintiff), testators and others to designate the Bank as a fiduciary for estates, trusts and other fiduciary accounts. In a recent version of such representations, the Bank stated on its website as follows:

**"Customized Portfolio Management. We do not believe in one-size-fits-all. Rather, we understand that your unique needs require an investment portfolio that is specially tailored to meet them.**

**A tailored approach:**

- **Talk to us** – tell us your investment goals and risk tolerance.

- **A tailored solution** – we will design and recommend a portfolio strategy for you based upon your goals, time horizon, income and liquidity needs.

- **Ongoing communication** – we monitor your portfolio and communicate with you on a regular basis to ensure your goals are being met.

**Our equity selection process.**

Our equity selection follows a core growth strategy with a focus on large cap stocks. The foundation of our process is proprietary research. We use a blend of qualitative and quantitative fundamental research to target companies that have long-term growth potential, proven earnings track records, competitive advantages and strong management.

**A perfect fit.**

**We work with you** to ensure your goals are being met and your total financial picture is being considered. Learn more about our investment management process by contacting a **Private Banker**

---

[1] To consolidate its own position in the Midwest, the Bank's predecessor, Nations Bank, acquired Boatmen's Bancshares, Inc., the parent of Boatmen's Trust Company ("Boatmen's"). The Bank used Boatmen's trust department as the core of its Private Bank, then proceeded to distribute its administrative functions to Private Bank Offices in various parts of the country.

in your area."

In fact, the plans of the Bank, BAC and their respective predecessors, despite these and substantially similar representations over the years and the implicit incorporation of them in the documents governing the Bank's fiduciary accounts, have been to cut back substantially on such so-called "Customized Portfolio Management" and to direct fiduciary funds, once "captured," into standardized investments such as BAC's proprietary mutual funds, the Nations Funds as part of the Conversion as described herein and otherwise. Further, few if any of the grantors or others who established fiduciary relationships with predecessors of the Bank, such as the parents of plaintiff, envisaged the Bank in its present form; namely, a nationwide behemoth with few of the services typically offered by a fiduciary and implicit in the fiduciary relationship. The defendants have also utilized these captive accounts as targets to market other products and services sold by them, their subsidiaries and affiliates, including loans, credit cards and deposit accounts, all to defendants' enrichment.[2]

4.      The Settlors of the Trusts at issue, Joseph Kutten and Carolyn Yalem Kutten (parents of plaintiff), in entrusting their assets to a local bank, in this case, Boatmen's Trust Company in St. Louis, did so based upon personal relationships with officers of Boatmen's, and its predecessors in interest, St. Louis Union Trust Company and Centerre Bank,  built over many years. The fiduciary relationship was established because, _inter alia_, Boatmen's Trust Company and its predecessor banks, held itself out to the settlors and to other prospective customers of

---

[2] For a vivid history of the Bank's voracity for conversions of assets which it held as a fiduciary, see: http://www.bankofamerica.com/newsroom/press/archives.cfm?LOBID=1.

fiduciary serves as institutionally and personally suited not only to the stewardship of settlors' assets over multiple generations but looking after their descendants, the plaintiff in this litigation and her daughters.

5.      Over the years, the Bank and its corporate predecessors swallowed-whole Boatmen's Trust Company and numerous other financial institutions which had fiduciary responsibilities to members of the Class. In the process of being digested by the Bank, these formerly independent institutions' fiduciary operations were transmogrified into just cogs in the fee-generating machinery of the Bank and its corporate parent.

6.      In the course of the metamorphosis of Boatmen's Trust Company into the Bank, the interests of plaintiff and members of the Class were not represented by caring, knowledgeable trust officers but by so-called "Call Centers" in Dallas and Los Angeles manned by lower-level fungible functionaries and other Bank personnel with little or no investment expertise. Except for the highest net worth fiduciary accounts, the "customized recommendations" and "wealth management expertise" promised by the Bank are fictions and have been fictions since the consolidation of the various acquired financial institutions began taking place. The purpose was clear. As stated by the Bank's own press release:

> We will win more business from existing Private Bank clients by proactively delivering cutting-edge solutions for wealth management, by continuing to win high marks for satisfaction and high touch service, and through the company's financial commitment to the Private Bank which will allow for increased marketing and heightened awareness of the value we bring to each relationship.

7.      At or prior to the time that Boatmen's Trust Company was acquired by the Bank's predecessor, Nations Bank, it was known by the parties to the acquisition negotiations that the successor entity (i.e. Nations Bank) would materially adversely affect the administration of

plaintiff's and all other Boatmen's fiduciary accounts.

8.    To the best of plaintiff's knowledge, information and belief, neither Boatmen's nor Nations Bank provided to plaintiff or other interested parties appropriate written notice as provided in §362.331 R.S.Mo. of Boatmen's transfer of fiduciary capacities to Nations Bank disclosing all material facts which disclosed the material adverse affect of such transfer or advising such interested parties (including plaintiff and members of the Class) that they had a right to object to the transfer and, inter alia, obtain a replacement fiduciary.

9.    Plaintiff believes and therefore alleges that the Bank similarly failed to provide such notice in each of the other instances where the fiduciary responsibilities of an acquired bank were taken over by the Bank or one of its predecessors. As such, all similarly affected beneficiaries were wrongly denied notice and the right to object to such transferred fiduciary capacities.

## THE NATIONS FUNDS

10.    The Nations Funds Trust ("NFT") holds a "family" of approximately 70 mutual fund portfolios, which are proprietary funds nominally operated by NFT and its Board of Trustees. They are, in fact, directed and controlled by BAC and its subsidiaries.

11.    The Nations Funds' portfolios cover a wide variety of investment disciplines, strategies and types of asset categories including, inter alia, the Nations Municipal Income Funds, the Corporate Bond Portfolio; the Nations Small Company Fund; Nations Large Cap Index Funds and Nations Cash Reserves.

12.    Certain of such Nations Funds were funded by BAC in substantial part by transferring fiduciary assets pursuant to the Conversion. Such funding permitted the affected

7

Nations Funds to have substantial asset bases, an important selling point to BAC in marketing shares in the Nations Funds to potential purchasers thereof through the Bank and other subsidiaries of BAC. The Nations Funds selected for investment of fiduciary assets by BAC pursuant to the Conversion were intended generally to "mirror" the categories of assets held by the Trusts pre-Conversion, all or most of which were liquidated immediately prior to the Conversion either as part of so-called "Common Trust Funds" or in individually-managed accounts.

## JURISDICTION AND VENUE

13.    The claims asserted herein arise under and pursuant to state statutes and common law.

14.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332 (diversity of citizenship). The amount in dispute exceeds $75,000 exclusive of interest and costs and there is complete diversity of citizenship between plaintiff, a citizen of the state of California, and each of the defendants.

15.    Venue is proper in this District as many of the acts and practices complained of herein occurred in substantial part in this District, including the establishment of trusts for the benefit of plaintiff and her daughters by plaintiff's late parents. Further, Boatmen's Trust Company, a corporate predecessor of the Bank, was based in this District, as is the Bank's Private Bank.

16.    In connection with the acts alleged in this Complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national

securities markets.

## THE PARTIES

17.    Plaintiff Ellen Jane Kutten is a California citizen who has varying interests as

beneficiary, contingent beneficiary, as well as co-trustee of several trusts which had been, until

recently, managed and controlled by the Bank, its corporate parent and affiliates. In particular,

plaintiff is a named beneficiary under trusts created by her parents in this District in 1981 as

amended in 1983, 1987 and 1990, namely, the Joseph Kutten Indenture of Trust and the Carolyn

J. Kutten Indenture of Trust.   In addition, the plaintiff and her daughters were beneficiaries of

trusts established in 1989, namely, the Joseph Kutten and Carolyn Y. Kutten 1989

Grandchildren's Trust (collectively referred to hereinafter as the "Kutten Trusts").[3]  Plaintiff's

family's relationship with the Bank and its predecessors, including her grandfather, noted St.

Louisan and philanthropist, Charles H. Yalem, spans a period in excess of forty years.  At

---

[3] The Original trustee bank under plaintiff's trust and the trust established by her parents for the benefit of plaintiff's daughters was Boatmen's Trust Company which, in turn, was acquired by and merged into Nations Bank, which, in turn, was acquired by and merged with Bank of America, N.A. following such acquisition. On a parallel track, North Carolina National Bank ("NCNB") was similarly making acquisitions until it merged, as Nations Bank with Bank of America, as reflected in the diagram below:



Notwithstanding the foregoing corporate sleight-of-hand, there is little substantive relationship, if any, between the original trustee bank, Boatmen's Trust Company and its successor, Bank of America. Even more significantly, there is virtually no identity of interest between the fiduciary relationship with Boatmen's Trust Company that existed between it and the Kutten Trusts and the one which existed until recently. These circumstances are true with respect to most if not all of the banks presently a part of the Bank.

relevant times, all of the investment decisions of the Kutten Trusts were made by the Bank or entities controlled by its parent, BAC. The handling of the assets of the Kutten Trusts by the Bank has not been materially different from the other trusts and fiduciary accounts of which the Bank was and/or is serving as corporate fiduciary with respect to the Conversion and otherwise as described in this Complaint. Although documents such as the trust agreements establishing the Kutten Trusts or other documents pursuant to which a fiduciary relationship with the Bank was established typically gave the Bank discretion in the investment of fiduciary assets (even in some cases, permitting investments in proprietary funds), none of such documents permitted the egregious behavior described herein.

18. (a) On information and belief, the Bank is a federally chartered bank domiciled in North Carolina, and is a wholly owned subsidiary of BAC also domiciled in North Carolina. BAC is a financial holding company, and the parent of the Bank. At all relevant times, BAC dictated and controlled the business activities of the Bank, including, inter alia, the wrongful business activities described herein within the City of St. Louis and St. Louis County, and wherever in the United States the Bank, BAC and/or their respective predecessors conducted business.

(b) The Bank and BAC now have their principal places of business in Charlotte, NC. BAC conducts substantial business within this District in many locations through its "Private Bank" and elsewhere. Notwithstanding the fact that the Kutten Trusts have been under the fiduciary responsibility of the Bank in St. Louis, BAC and the Bank have bounced the beneficiaries of the Kutten Trusts around the country, most significantly to the Banks' Call Center in Dallas in November, 2002, losing their paper files for a period of months. When plaintiff sought to obtain a transfer of the Kutten Trusts' accounts to California in October, 2002,

where she resides, the Bank refused. As such, the following representations of Kenneth D. Lewis,

Chairman and Chief Executive Officer of BAC and the Bank on November 3, 2003 in the

context of a new acquisition of yet another bank are baseless:

> The people you know at your branch today will be there tomorrow,
> and will continue to strive to anticipate and meet your financial needs.

At all relevant times, the Bank was successor Trustee of the Kutten Trusts of which plaintiff is a

beneficiary of one and her daughters another. The Bank is also Trustee or serving in another

fiduciary role with respect to the other Trusts or similar groupings of assets of which the

remaining members of the Class defined below are beneficiaries.

19.    NFT, a non-party herein, is the holding/operating entity BAC formed to do

business as the Nations Funds. Its principal place of business is located in Charlotte, NC.

Although nominally independent and supervised by its Board of Trustees, NFT has at all relevant

times been operated as an alter ego of BAC and its subsidiaries. Upon information and belief, all

the members of the Board of Trustees of NFT were selected and/or approved by BAC and its

subsidiaries.

20.    Defendant BAC (through its subsidiaries) and other business entities not owned

by defendant BAC individually and collectively, charge substantial fees and expenses to the

Nations Funds for their purported services which, together with NFT's own operating expenses,

have had and continue to have a substantial cost to the Kutten Trusts and to each of the other

fiduciary accounts, the assets of which have been invested in one or more of the Nations Funds.

## Defendants' Self-Serving Investment Decisions

21.  (a) Historically, the Bank and its predecessors invested the assets comprising the

Kutten Trusts and those of members of the Class primarily through individually managed

portfolios and/or through so-called "Common Trust Funds." The cost of such investment and

related administrative services was absorbed by the Bank out of its fees for serving as fiduciary.

Beginning some time prior to 1998, in order to, inter alia compensate for massive losses it was

incurring from its traditional lending business caused by incompetence, the Bank and its

predecessors developed various plans and schemes pursuant to which they sought to minimize

their operating expenses with respect to fiduciary accounts and maximize their profit from such

business. Defendants' plan included the consolidation and elimination of the previously existing

trust departments of the acquired banks with the objective of "servicing" fiduciary accounts and

the beneficiaries thereof with fewer and fewer personnel.  Pursuant to such business plans, they

decided, inter alia, to utilize the funds held by the Bank in fiduciary accounts to fund an initial

group of mutual funds and/or to add assets to such funds controlled by the Bank's corporate

parent, BAC, the Nations Funds, as well as other mutual funds merged into them. Thereafter, due

to numerous acquisitions, mergers and other transactions referred to above, consistent with its

longer-term plan and scheme, BAC determined that most or all of the assets in certain fiduciary

accounts held by the Bank, such as the Kutten Trusts, would be converted again into proprietary

funds such as the "family" of Nations Funds, the management and investment decisions of which

were controlled by subsidiaries of BAC and by the Board of NFT.

(b)  Through a complicated and barely comprehensible grouping of advisors, sub-

advisors, subsidiaries and other affiliated and unaffiliated service providers, BAC engineered a

scheme pursuant to which the Bank was able to abdicate many of its traditional fiduciary

responsibilities, functions and services to beneficiaries of fiduciary accounts in favor of

alternatives that resulted in higher total direct and indirect expense charges to the fiduciary

accounts (such as those of the Kutten Trusts) as compared to the trustee or similar fees

historically paid to the Bank for, <u>inter alia</u>, active management of the Trusts' assets. As indicated

below, beginning in February 2000 and continuing for some time thereafter, the Bank's "Private

Bank" began sending out standardized form letters informing some co-trustees, beneficiaries of

the fiduciary accounts and others of the Bank's planned closing of its "Common Trust Funds"

and touting the so-called "benefits" of the Conversion, which was then anticipated to take place

in May 2000. Such letter, signed by David W. Fisher, President, also coerced the recipients of the

letter to authorize the Conversion of the Trusts' assets into shares in the Nations Funds. In

particular, the Bank's letter said:[4]

> Using Nations Funds, we can provide trust and fiduciary accounts with an
> attractive mix of investments to pursue the accounts' investment goals.
> Nations Funds also offer the benefits of:
>
> > Daily valuation and liquidity
> > Newspaper performance listings
> > Broader potential diversification
> >
> > Flexibility when making trust distributions

In fact, there was little, if any, benefit that would flow to beneficiaries of the Bank's fiduciary

accounts and this letter was a sham.

Indeed, all such so-called "benefits," could have been accomplished by means of the

Bank's "Common Trust Funds." Curiously, on or about August 16, 1999, the Bank announced

that "Common Trust Funds will be valued at month-end instead of twice each month," despite

the fact that computer software programs existed that could generate such valuations on a daily

basis. The Bank's letter went on to threaten coercively:

> Any common trust fund units for which we have not received an

---

[4] It is not presently known whether the Bank sent such a letter to beneficiaries of all of its fiduciary accounts or, in
the case of guardianships and similar accounts, to the appropriate courts overseeing such accounts. Further, not all
co-trustees received such a letter nor were their consents sought by the Bank. While the manner in which the
conversion was carried out by Defendants may have been different from state-to-state and/or based upon the identity
of the acquired bank, such differences were immaterial.

authorization [by May 1, 2000] may be liquidated and the proceeds placed in a money market vehicle pending discussion about reinvestment. This liquidation could have adverse tax consequences depending upon the cost basis of the common trust fund units.

22.    Although plaintiff did not receive such documents, in response to such coercion and the deceptive and unclear information provided by the Bank, upon information and belief, co-trustees and beneficiaries of the Trusts who received it signed the enclosed form, thereby providing to the Bank their uninformed and fraudulently induced "consent" to the Conversion. While the Conversion, i.e. investment in proprietary mutual funds, was authorized as a matter of law in Missouri and other states, such authorization did not and does not permit the Bank to put its own interests before the interests of the beneficiaries of its fiduciary accounts, which it did here.

23.    Enclosed with the Bank's letter sent to some Trust beneficiaries and/or co-Trustees were various prospectuses and other documents which were drafted so as to conceal, inter alia, the motives of the Bank and BAC for the Conversion into BAC proprietary mutual funds, the benefits of the Conversion to them and their subsidiaries or the increased costs and expenses that would be incurred by the Trusts as a result of the Conversion. There was no explanation in plain English that would put the recipients of these documents on notice of the Bank's wrongdoing as referred to herein. In fact, one of those documents, (Form 3.05D 7/1999) entitled "Disclosure of Investment in Nations Funds," stated deceptively:

The fee paid directly by the [Trust] Account to the Bank will be reduced (but not below zero) by the Account's pro rata share of the investment advisory fees paid by the Funds to the Service Providers; provided however, that the amount of the reduction will be based on Bank of America Corporation's percentage ownership of the Service Provider. From time to time, the Bank may elect to reduce the Account's fees in recognition of amounts paid by Nations Funds for other services (such as administrative services), but it is not obligated

14

> to do so, and the amount of any such fee reduction may vary. The Account will not be charged a sales "load" for buying or redeeming Fund shares described in the accompanying prospectuses.

Such doubletalk-laden form went on to state:

> I acknowledge receipt of the current prospectuses for the Funds and a Nations Funds Fee Disclosure Statement. As co-fiduciary for this account, I understand that the Service Providers will be paid investment advisory and other fees by the Funds. **I approve the method for reducing the investment management fees paid to the Bank by the Account**. I understand and agree that the Bank may choose not to reduce the Account's fee on the account of the compensation paid by the Funds for other services, but the Bank is electing to do so at this time. [Emphasis added].

In fact, the Bank used such language to conceal the fact that although in many cases there was a credit for all of the Nations Fund post-Conversion investment advisory fees, the Bank intended to reduce or eliminate the credit as soon as practicable thereafter once consents were obtained. There was no credit for the substantial operating expenses of the Funds, which substantially reduced the net investment returns to fiduciary accounts.

24.    Significantly, at no time did the foregoing "disclosure" documents disclose clearly to a co-Trustee, a beneficiary or other person interested in the affected fiduciary accounts the true additional direct and indirect expenses of the Conversion (although many of such "disclosures" were buried in the Nations Fund prospectuses) nor, in fulfillment of the Bank's fiduciary responsibilities, did the Bank make any personal efforts to insure that plaintiff or others similarly situated understood the extent to which the Bank and BAC would benefit from the Conversion and how the Kutten Trusts and other fiduciary accounts would end up paying substantially more for the investment and related services that the Bank had historically supplied in partial consideration for the Bank's trustee and similar fees. Indeed, Mr. Fisher's letter of August 31,

2000 sent to beneficiaries of fiduciary accounts transmitting the Prospectus for the Nations Funds

was "for information" only and recipients, including Plaintiff, were told: "**you do not need to**

**take any action.**" [Emphasized in original].

      25.    Notwithstanding its overarching duty of loyalty to plaintiff and members of the

Class, upon information and belief, at no time following the foregoing "disclosure" did the Bank

make any complete and candid disclosure to the beneficiaries of the Trusts of the full extent of

the damages caused to the Trusts or their beneficiaries by the Conversion, the true motives of

BAC and the Bank in carrying out the Conversion or the full extent to which the Bank and BAC

were profiting therefrom and, in particular, the additional assets which would flow into the

Nations Funds, making them more saleable to the investing public generally. Even after the Bank

applied a so-called credit against its fees for some portion of the Nations Funds advisory fees, in

practical terms, it was (and is) impossible for co-trustees, executors, beneficiaries and others to

understand and have knowledge of the true cost of the Conversion to the Trusts and the income

earned upon the assets of the Trusts. Indeed, plaintiff and other beneficiaries have sought to

obtain such information from the Bank and have never received "straight" or any answers to their

questions with respect thereto and have received misleading or downright deceptive information

as to the impact of the Conversion upon them.

      26.    Upon information and belief, no analyses or determinations were made by the

Bank as to the suitability and/or propriety of the relative costs and benefits of investments in

BAC's proprietary funds at the time of the 2000 Conversion for each fiduciary account as

compared to pre-Conversion investments including any comparisons with numerous other

available mutual funds or investment vehicles in which the Bank could have invested prudently

and at lower cost the funds of the Trusts in which plaintiff and the members of the Class were

beneficiaries. Even assuming that the Bank made a prudent decision to purchase shares in the Nations Funds, which plaintiff does not, upon information and belief, the Bank did not negotiate the fees and expenses to be charged to the Trusts by the Nations Funds or comparison shop with other funds or families of funds in an attempt to obtain the same or better investment services elsewhere.[5] Similarly, neither NFT nor its Board of Trustees, sought to obtain the lowest fees from the subsidiaries of BAC actually operating the Nations Funds. Indeed, as stated by New York's Attorney General Eliot Spitzer: "Fund directors do not – and cannot – negotiate hard on the fees." As such, NFT and the entire Board of Trustees of NFT, aided and abetted by defendants, breached the fiduciary duties owed to plaintiff and the members of the Class.

27.    Upon information and belief, BAC and the Bank specifically excluded alternate investment vehicles (such as other families of funds such as the Fidelity and Vanguard mutual funds specifically requested by plaintiff) from their considerations in order to maximize their earnings and those of their corporate affiliates and did not give serious consideration to leaving the assets of fiduciary accounts invested as they were, pre-Conversion, and/or giving beneficiaries of such accounts a choice as to the various alternatives available. Similarly, at no time did BAC and the Bank give any consideration to making changes in the Bank's "Common Trust Funds" so as to provide any of the purported "benefits" that the Bank claimed would be forthcoming as a result of the Conversion. Plaintiff's requests for changes in investments were repeatedly rebuffed.

28.    On information and belief, as a result of a conspiracy among the defendants and others presently unknown, the Bank and BAC, as part of a corporate business decision, chose to

---

[5] Plaintiff, although nominally a co-trustee with the Bank, was typically ignored in her role as such and her consent was not sought by the Bank for the Conversion.

invest the fiduciary assets of plaintiff and the members of the Class in shares of the Nations

Funds as part of the Conversion and otherwise in order, <u>inter alia</u>, to generate investment

advisory fees and other fees for its various affiliates and to "bulk-up" the Nations Funds without

regard to whether such investments were prudent and in the best interest of plaintiff and the other

beneficiaries of fiduciary accounts.

29.    The foregoing Conversion of the assets of fiduciary accounts to the Nations Funds

and the investment of fiduciary assets therein generally was carried out in furtherance of BAC's

corporate plan to reduce the Bank's expenses of managing fiduciary assets and increasing BAC's

overall direct and indirect profits from fiduciary operations. The assets in the fiduciary accounts

managed by the Bank, including the Kutten Trusts, were particularly vulnerable to misuse since

BAC and the Bank regarded the fiduciary accounts in their care as a "cookie jar" open for the

taking. BAC and the Bank proceeded to carry out the Conversion since they would not merely

profit from the Bank's trustee and similar fiduciary fees but "double dip" by generating

additional revenues through BAC's related asset management business and otherwise. Additional

profit was also generated by adding the assets in the Bank's fiduciary accounts to the Nations

Funds following the Conversion, thereby making them more saleable at retail to the investing

public. Further, the Conversion created an opportunity for the Bank to avoid the relatively low

profitability of managing the fiduciary accounts (and the expenses related thereto) which the

Bank had contracted to do when it agreed to serve as fiduciary thereof, and substitute ever-

increasing fee income directly and through its corporate affiliates.

30.    The Bank and its affiliates reaped many millions of dollars in purported money

management, investment advisory and other fees as a result of the Conversion and thereafter

from the investment of fiduciary assets in the Nations Funds. The Bank also benefited by

18

receiving Trustee or similar fees for serving as a fiduciary and by reason of the benefits which flowed from, <u>inter alia</u>, substantially reduced operating expenses of the Bank's fiduciary operations. Despite these benefits to the Bank and its affiliates, these investments have been of little benefit for the Bank's fiduciary accounts and the beneficiaries thereof, including plaintiff and the members of the Class. On information and belief, all members of the Class suffered damages from the investment practices of the Bank as described above in an amount which cannot presently be determined but which is capable of calculation.

## <u>TRADING ACTIVITIES IN NATIONS FUND SHARES</u>

31.    Notwithstanding the fact that the Bank now states: "We have zero tolerance for conduct that fails to protect the interests of our clients, associates and shareholders," the defendants for their own financial advantage agreed and conspired with each other and various third parties directly and/or through the operation of the Nations Funds to violate the federal securities laws and breached the fiduciary duties they owed to members of the Class and to the Nations Funds themselves (among others) by, among other things, engaging in fraudulent schemes that benefited the defendants to the extent of tens of millions of dollars at the expense of the affected Nations Funds and its shareholders such as the fiduciary accounts and the beneficiaries of such accounts which held them.  Such schemes involved the express agreement and complicity of the Bank, the Nations Funds and others who conspired to and aided and abetted the breach of the fiduciary duties owed by them to holders of Nations Fund shares in return for substantial fees and other benefits for themselves.

32.    One scheme pursuant to which the defendants violated the federal securities laws and breached fiduciary duties to the Nations Funds and its shareholders was carried out by their

agreeing that certain favored customers of BAC and the Bank, including Canary Capital Partners, Ltd. ("Canary") would be permitted to "late trade" certain Nations Funds shares. The daily price of mutual fund shares is generally calculated as of 4:00 p.m. EST. Orders to buy, sell or exchange mutual fund shares placed at or before 4:00 p.m. EST on a given day receive that day's price. Conversely, orders placed after 4:00 p.m. EST are required to be priced using the following day's price. Canary agreed and conspired with the other defendants directly or through the Nations Funds that orders Canary placed after 4:00 p.m. on a given day would illegally receive that day's price (as opposed to the next day's price, which the order would have received had it been processed lawfully). This allowed Canary to capitalize on post-4:00 p.m. information to the detriment of the fiduciary accounts which held the particular Nations Funds in which Canary was so trading.

33.    Defendants also conspired with others and agreed to violate the federal securities laws and breached fiduciary duties to the members of the Class by allowing Canary and other favored customers of BAC and the Bank to engage in "timing" of transactions in various of the Nations Funds. "Timing" is an investment technique involving short-term, "in and out" trading of mutual fund shares. This technique is designed to exploit inefficiencies in the way mutual fund companies such as NFT price their shares. It is widely acknowledged that timing inures to the detriment of long-term shareholders such as the Bank's fiduciary accounts and through them, the members of the Class. Each of the Nations Funds prospectuses states that timing is monitored and that NFT works to prevent it. However, in return for investments that will increase the revenues of the Bank and its affiliates, certain of the Nations Funds managers – with the express permission of the Bank – entered into undisclosed agreements to allow timing transactions to take place.

20

34.    The Nations Funds' prospectuses distributed to members of the Class at the time of the Conversion and thereafter created the misleading impression that NFT and its Board of Trustees, were vigilantly protecting Class members' fiduciary accounts against the negative effects of timing. However, the opposite was true in that – with the express permission of the Bank and its affiliates – certain of the Nations Fund managers sold the right to "time" transactions to Canary and other "friends" of the Bank and BAC. The prospectuses were silent about these arrangements.

35.    As a result of "late trading" in and "timing" of transactions in shares of the Nations Funds, Canary and the defendants each profited handsomely. The losers were the plaintiff and the members of the Class, as well as unsuspecting (non-fiduciary account) investors in the Nations Funds because excess profits of the favored customers of BAC and the Bank came dollar-for-dollar out of their pockets, all of which exacerbated the damages experienced by the members of the Class in the wake of the Conversion.

## CLASS ACTION ALLEGATIONS
### The Relief Sought for Members of the Class

36.    This action is brought by plaintiff individually as well as on her own behalf and on behalf of all others similarly situated, under the provisions of Federal Rules of Civil Procedure Rules 23(a) and 23(b)(3) for: (i) an accounting which determines all damages caused by defendants to the members of the Class and the extent of the unjust enrichment of the defendants from their wrongful activities; (ii) money damages to be paid by the defendants; (iii) injunctive relief providing for the possible removal of the Bank as fiduciary for all fiduciary accounts in which members of the Class are beneficiaries; (iv) injunctive relief providing for new procedures and practices at the Bank which put the interests of plaintiff and the Class ahead of

those of BAC and the Bank and which otherwise address the ongoing conflicts of interest forced

by the Bank in the investment of fiduciary assets; and (v) for relief incident and subordinate

thereto, including the costs and expenses of this action and an award of attorneys' fees to

plaintiff's counsel. Excluded from the Class are all persons who are members of any Class that

may be certified in <u>Williams v. Bank of America, N.A. et al.,</u> Case No. 02-15454AB pending in

the Circuit Court of the 15th Judicial Circuit in and for Palm Beach County, Florida and/or in

<u>Arnold v. Bank of America, N.A. et al.,</u> Cause No. LAC V03-7997 (C.D. Cal.).

### Numerosity of the Class

37.    On information and belief, the Bank serves as a fiduciary (such as a trustee,

guardian, executor, etc.) for many thousands of Trusts and other fiduciary accounts affected by

the wrongdoing described herein.

38.    The Class represented by plaintiff consists of all persons who are, or were at any

time from the time of the Conversion to the present ("Class Period"), beneficiaries of Trusts for

which the Bank is or was a fiduciary, the assets of which were "converted" into shares of the

Nations Funds. The California Sub-Class consists of those members of the Class whose fiduciary

accounts originated in and/or involved beneficiaries residing in California (such as plaintiff). The

Missouri Sub-Class consists of accounts originated in (as in Plaintiff's case) and/or involved

beneficiaries residing in Missouri. Such definitions are subject to modification upon completion

of discovery with respect thereto.

39.    The exact number of members of the Class and California and Missouri Sub-

Classes as above described is not known by plaintiff, but is within the sole knowledge of the

Bank. On information and belief, there were and are at least 30,000 fiduciary accounts controlled

22

by the Bank with, collectively, more than 45,000 beneficiaries thereof, approximately 10% of which are members of the California Sub-Class and 10% of which are members of the Missouri Sub-Class.

40.    On information and belief, the members of the Class are located in most or all fifty states, and in numerous foreign countries. Similarly, members of the California and Missouri Sub-Classes are located throughout Missouri, California and in many other states.

41.    The beneficiaries of the affected Trusts are so numerous that joinder of individual members is impracticable.

## Common Issues of Law and Fact Predominate

42.    On information and belief, at least two years prior to the Conversion, the Bank, at the direction of its parent, BAC, and in conspiracy with others, decided to invest the assets of the affected Trusts in shares of the Nations Funds, all of which were directly or indirectly "advised" and managed by subsidiaries of BAC.

43.    All members of the Class and Missouri and California Sub-Classes were adversely affected by the Bank's self-serving business decision to invest the Trusts' assets in the Nations Funds pursuant to the Conversion or thereafter.

44.    All Trusts, the assets of which were converted into shares of the Nations Funds, paid directly or indirectly, management and investment advisory fees and other charges to subsidiaries and affiliates of BAC, based on the fiduciary assets invested by the Bank in the Nations Funds.

45.    There are common questions of law and fact that relate to and affect the rights of each member of the Class including, inter alia:

23

(a)    whether the Bank's business decision to invest assets of the Trusts and other fiduciary accounts in the Nations Funds was motivated by the best interests of the Class members (which the Bank had a duty to put before its own) or by BAC's desire to generate management and investment advisory fees for its affiliates and subsidiaries, to lower the Bank's expenses of managing fiduciary assets and to generate other benefits for themselves by inter alia, "bulking-up" the assets invested in the Nations Funds;

(b)    whether the Bank breached fiduciary duties to plaintiff and the Class by failing to conduct its fiduciary operations in conformity with the requirements of the National Banking Act and other applicable law;

(c)    whether the Bank breached its fiduciary duty to all members of the Class by making investment decisions for the Trusts based upon defendants' own interests and those of their affiliates, rather than the interests of Trust beneficiaries; and,

(d)    what remedies are appropriate compensation for the damages caused to plaintiff and each member of the Class.

46.    The relief sought is common to the entire Class including, inter alia:

(a)    a declaratory judgment that the Bank violated its fiduciary duty as Trustee (or other similar fiduciary role) with respect to the affected fiduciary accounts and whether it was aided and abetted by defendant BAC and others in doing so;

(b)    payment by the defendants of compensatory damages caused by such breaches of fiduciary duty as well as punitive damages;

(c)    payment by the defendants of the costs and expenses of this action, including plaintiff's attorneys' fees;

(d)    an injunction preventing the Bank from opposing a petition by beneficiaries of the Trusts affected by the Conversion and other wrongdoing referred to herein to replace it as fiduciary; and

(e)    an injunction which establishes appropriate procedures and safeguards within the Bank to ensure that the interests of beneficiaries of Trusts are fully protected from wrongdoing such as described herein.

## Typicality of Plaintiff's Claims

47.    Plaintiff has been a beneficiary of a fiduciary account affected by the wrongdoing of the Bank as described herein.

48.    The assets of the Kutten Trusts, like all other Trusts and similar fiduciary accounts, were invested by the Bank in the Nations Funds pursuant to a wholesale business policy decision by BAC made some time prior to 1999 and carried out by the Bank and others thereafter pursuant to the Conversion and subsequently regardless of whether the underlying fiduciary accounts "resided" with the Bank or one of its predecessor banks..

49.    On information and belief, the Kutten Trusts, like all other Trusts and similarly situated fiduciary accounts, was used by the Bank and its affiliates to generate additional management, investment advisory and/or other fees and benefits for themselves (even after the so-called credits were applied as a result of certain Nations Funds advisory fees) without regard for the best interests of the beneficiaries of such accounts such as plaintiff and the members of the Class.

50.    The claims of the plaintiff, who is a representative of the Class and the Missouri and California Sub-Classes, are typical of the claims of all members thereof. The claims of

25

plaintiff are based on the same factual allegations and legal theories as the claims of all other members of the Class and the Missouri and California Sub-Classes.

**Plaintiff Will Fairly and Adequately Represent the Class and the Missouri and California Sub-Classes**

51.    The plaintiff is able to and will fairly and adequately protect the interests of the Class and the Missouri and California Sub-Classes.

52.    The attorneys for plaintiff are experienced and capable in complex litigation. The attorneys for plaintiff and the Class will actively conduct and be responsible for the prosecution of this litigation and the expenses thereof.

## COUNT ONE
## BREACH OF FIDUCIARY DUTY

53.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

54.    On information and belief, the Bank's decision to invest the assets of the Trusts in the Nations Funds was motivated not by the interests of plaintiff and the Class members but by BAC's desire to generate investment advisory and other fees for its affiliates and, indirectly, for itself, as well as to reduce the Bank's operating expenses.

55.    On information and belief, the Bank failed to consider the Nations Funds' high expense or alternative lower cost families of mutual funds when it invested the assets of the Trusts into shares of the Nations Funds thus putting its own interests before those of the beneficiaries of fiduciary accounts.

56.     On information and belief, the Bank failed to consider the best interests of the Trust beneficiaries when it invested the Trusts' assets in the Nations Funds and breached its duty of loyalty to them by putting the interests of itself and its affiliates before the interests of plaintiff and the members of the Class.

57.     The Bank's wholesale investment of the assets of the Trusts in the Nations Funds was a breach of its fiduciary duty to plaintiff and the members of the Class, which breach was aided, abetted and/or directed by BAC and its affiliates.

58.     As a result of, <u>inter alia</u>, the Bank's improper wholesale transfer of fiduciary assets held by fiduciary accounts the Trusts into shares of the Nations Funds, the beneficiaries of the Trusts or other similarly situated accounts for which the Bank was a fiduciary have been damaged in an amount to be determined by the Court, but believed to be substantial.

<u>COUNT TWO</u>

<u>BREACH OF CONTRACT</u>

59.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

60.     By means of the acceptance by the Bank and its predecessors of the trusteeship of the Kutten Trusts and each of the other Trusts affected by the Conversion, the Bank and its predecessors committed to provide to all such Trusts complete investment management services of a corporate fiduciary, and render such services on an individualized basis consistent with the goals and objectives of plaintiff's parents and the other creators of the Trusts and the needs of the beneficiaries thereof. As the Bank states: **"It is our responsibility to invest the trust assets prudently and profitably according to the grantor's wishes as outlined in the trust document."** No grantor of a Trust anticipated or could reasonably foresee that the Conversion

27

would be carried out by the Bank with Trust assets that the Bank would mishandle fiduciary

assets as described herein or that the designated fiduciary would be the Bank in its present form.

Further, as set forth in those Counts not asserted on behalf of the Class, the Bank ignored the

express provisions of the Kutten Trusts with respect to the investments made for them by the

Bank and otherwise.

61.     Plaintiff and each member of the Class were and/or are beneficiaries of the Bank's

contractual obligations to the creators of the Trusts and other fiduciary relationships. By

abdicating its responsibilities for individual investment management services and/or through

"Common Trust Funds" in favor of the wholesale Conversion of fiduciary assets that the Bank

was obligated to provide to the beneficiaries of its fiduciary accounts, and by conducting itself in

its present business form, the Bank breached its contractual obligations thereto.

62.     By virtue of the Bank's breach of its contractual obligations to the members of the

Class and Missouri and California Sub-Classes, plaintiff and the members thereof have suffered

damages in an amount to be determined by the Court.

<u>**COUNT THREE**</u>

<u>**BREACH OF CONTRACT**</u>

63.     Plaintiff repeats and realleges each and every allegation contained above as if fully

set forth herein.

64.     This Count if brought by plaintiff on behalf of those members of the Class who

are beneficiaries of Trusts originally established with the designate trustee being one of the

Banks acquired by and/or merged into the Bank ("Acquired Banks").

65.     As with the trusts established by plaintiff's parents with Boatmen's Trust

Company as designated corporate Trustee, the grantors of all affected Trusts selected as Trustee

institutions which promised and agreed to deliver personalized fiduciary services to the beneficiaries thereof. Implicit in the contractual fiduciary relationship between the grantors and the Acquired Banks was the provision of a full range of personalized fiduciary services, including individualized investment management.

66.    The Bank, by eliminating the personalized fiduciary services to members of the Class, including, inter alia, individualized investment management, materially breached the explicit and implied terms of the Indentures of Trust or similar documents which initially caused the formation of such Trusts, including, but not limited to the following:

(a)    failing to provide appropriate trained personnel to supervise and monitor the performance of the assets in their charge, including a uniform failure to invest in appropriate asset classes;

(b)    bouncing plaintiff and others similarly situated to poorly manned and anonymous "Call Centers" with whom there was no pre-existing relationship, trust and fealty;

(c)    changing without plaintiff's and others similarly situated consent representatives of the Bank to deal with plaintiff who had no knowledge of plaintiff and others similarly situated or the purposes for which the Trusts were established; and

(d)    continuing to charge fiduciary fees when failing to perform the services the services that the Acquired Banks had agreed to perform.

67.    Because the transfer of fiduciary responsibilities from the Acquired Banks substantively and materially affected the pre-existing fiduciary relationship with the Bank, it was obliged to give notice to Class members of, inter alia, the terms of the merger or business combination, the forthcoming changes in the relationship and provide to them the opportunity to seek a replacement fiduciary.

29

68.    By virtue of the foregoing lack of appropriate notice and the material change in fiduciary services delivered by the Bank to members of the Class following the acquisition of the Acquired Banks, such notice should now be provided to affected beneficiaries which, inter alia, provides them with the opportunity to seek a replacement fiduciary.

## COUNT FOUR

## UNJUST ENRICHMENT

69.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

70.    By reason of defendant BAC's causing the Bank's fiduciary assets in affected accounts to be invested in the Nations Funds, the Bank and BAC have "double dipped." The defendants have profited by the Conversion and the subsequent acts described herein, thereby unjustly enriching themselves at the expense of plaintiff and the members of the Class and Missouri and California Sub-Classes. Defendants have similarly enriched themselves, their subsidiaries and affiliates by using information regarding the beneficiaries of fiduciary accounts to market various goods and services including credit cards, loans and deposit accounts, from which products and services they have been unjustly enriched.

71.    Such "double dipping" was carried out by the Bank and BAC by imposing on fiduciary accounts the Banks' fees for acting as a corporate fiduciary as well as investment advisory fees, and other related charges which, when taken together with all the Nations Funds' expenses, even after so-called credits for certain Nations Funds advisory fees, exceeded the amounts to which the Bank was entitled to payment for, inter alia, investment of the fiduciary assets, for which services its trustee or similar fees were intended to cover. Such benefits to the Bank and BAC were exacerbated by the Bank's avoidance of substantial operating expenses by

reason of its abdication of its individualized investment and administrative responsibilities owed

to the members of the Class and Missouri and California Sub-Classes. The Bank enhanced its

profit performance at plaintiff's expense by favoring the use of its own NationsFunds and

investing in same to increase its own asset base, and aggrandize its own stature under the guise of

allegedly providing more services to participants in its so-called "Private Bank." The Bank's

objectives were clear from its telling press release of July 14, 1999:

> United by the merger of Bank of America and NationsBank,
> NationsBanc Investments, Inc., and BA Investment Services, Inc.,
> became one brokerage company on July 12. The birth of Banc of
> America Investment Services, Inc., the new name for the retail
> brokerage, gives investors a powerful ally within the Bank of
> America franchise. (For the full press release, see
> http://www.bankofamerica.com/newsroom/press/press.cfm?PressID=
> press.19990714.03.htm&LOBID=1>).

72.    Further, upon information and belief, with respect to at least certain of the Trusts

for which the Bank has acted as Trustee, the total charges against such Trusts for trustee

fees/commissions, advisory fees and other amounts payable by the Trusts exceed the contractual

amounts for such charges agreed upon by the creators of such Trusts.

73.    The defendants have invested the proceeds of the foregoing unjust enrichment and

realized additional profits thereupon, all of which should be returned to the Trusts and other

similarly affected accounts and/or their beneficiaries, as the Court shall deem appropriate (e.g. a

proportionate share of the defendants' profits during the years of misappropriation) pursuant to

California Probate Code, Section 166440(a)(1) and otherwise.  Missouri statutes impose strict

liability against fiduciaries who "at their sole risk" make investments that are improper such that

the Bank is "absolutely liable" to plaintiff and others in the Missouri Sub-Class for their

31

damages. (§362.550.5 R.S.Mo.). Plaintiff and others similarly situated are entitled to recover the Bank's ill-gotten gains and profits therefrom.

**COUNT FIVE**

**VIOLATION OF CALIFORNIA BUSINESS**

**AND PROFESSIONS CODE SECTION 17200**

74.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein. Plaintiff asserts this cause of action in her capacity as a private attorney general on behalf of the members of the general public residing within the State of California and on behalf of the members of the California Sub-Class.

75.    The Bank has engaged in and continues to engage in unfair, unlawful and deceptive business practices, including but not limited to sending representatives from St. Louis, Missouri to meet with plaintiff in California, whereby it has conspired with BAC and its affiliates to force the Trusts to have their assets re-directed from individually managed accounts and/or so-called "Common Trust Funds" and/or other assets to proprietary mutual funds controlled by the Bank and its affiliates. Said conversions have resulted in higher total direct and indirect expenses charged to fiduciary accounts than those historically paid to the Bank.

76.    By acting as alleged herein, the Bank has violated its duties as a fiduciary, which constitutes breach of trust pursuant to Section 16400 of the California Probate Code.

77.    The unlawful acts and practices of the Bank as alleged herein, including violations of Section 16400 of the California Probate Code, constitute unlawful business practices within the meaning of California Business and Professions Code Section 17200, et seq.

32

78.     Unless the Bank is enjoined from continuing to engage in the foregoing unfair and deceptive business practices, plaintiff and the other members of the general public residing within the State of California and the members of the California Sub-Class will continue to be injured and damaged by the Bank's unfair business practices.

79.     So as not to be unjustly enriched by its own wrongful actions and conduct, the Bank should be required to disgorge and restore to plaintiff and the other members of the general public residing within the State of California and the members of the California Sub-Class all monies wrongfully obtained by it as a result of its wrongful conduct, together with interest and profits earned thereon.

## COUNT SIX

## VIOLATION OF CHAPTER 456 MISSOURI REVISED STATUES

80.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein. The claims set forth in Counts Six and Seven are asserted on behalf of the members of the Missouri Sub-Class.

81      Pursuant to §456.520.2 R.S.Mo. and §456.900 *et. seq.* R.S.Mo. ("The Prudent Investor Act") R.S.Mo. (2000), the Bank owes and owed to plaintiff and the members of the Missouri Sub-Class an absolute duty of loyalty. In exercise of that duty, the Bank has a duty to administer the Trusts and other fiduciary accounts solely in the interests of the beneficiaries thereof.

82.     Pursuant to §456.905 R.S.Mo., the Bank owes and owed to plaintiff and the members of the Missouri Sub-Class an absolute duty of loyalty. In exercise of that duty, the Bank has a duty to administer the Trusts and other fiduciary accounts governed by the Missouri law solely in the best interests of the beneficiaries, i.e. the members of the Missouri Sub-Class.

83.     Pursuant to the Missouri Prudent Investor Act, the Bank owes and owed to plaintiff and the members of the Missouri Sub-Class a duty to exercise reasonable care, skill and caution in investment management decisions, to ascertain facts relevant to the investment and management of trust assets, and a duty to use the special skills and expertise it represented itself to possess when investing and managing trust assets..

85.     By acting as alleged herein, the Bank has violated and continues to violate the duties of loyalty and candor it owes and owed to plaintiff and the members of the Missouri Sub-Class. Such violations of the Bank's duties as fiduciary constitute breach of trust imposed by Missouri statute.

86.     Pursuant to the Missouri Prudent Investor Act and §456.570.2 R.S.Mo., the Bank owes and owed to plaintiff and the members of the Missouri Sub-Class a duty not to use or deal with fiduciary assets for its own profit, not to take part in any transaction in which it has an interest adverse to the beneficiary, such as plaintiff and the members of the Missouri Sub-Class.

88.     By acting as alleged herein, the Bank has violated and continues to violate the duty not to use or deal with fiduciary assets for its own profit, and the duty to not take part in any transaction in which it had a conflict of interest. Such violations of the Bank's duties as fiduciary constitute breach of trust pursuant to Missouri statute.

89.     Pursuant to the Prudent Investor Act, the Bank owes and owed to plaintiff and the members of the Missouri Sub-Class a duty of care that includes the duty to invest fiduciary assets prudently and with regard to individualized strategy appropriate to each fiduciary account and to each beneficiary thereof, and the duty to make fiduciary assets productive. Moreover, the Prudent Investor Act requires the Bank to apply fully the special skills of a corporate fiduciary, heightening the duty of care otherwise applicable to it.

34

90.     By acting as alleged herein, the Bank has violated and continues to violate the duties and productivity it owes and owed to plaintiff and the members of the Missouri Sub-Class. Clearly the Bank was interested in seizing new opportunities and lining its own pockets at the expense of plaintiff and those similarly situated.  Such violations of the Bank's duties as fiduciary constitutes breach of trust pursuant to Missouri law.

91.     The Bank and its affiliates have already unlawfully extracted huge sums in the form of fees and other charges assessed against fiduciary accounts and unless enjoined from doing so, they will continue indefinitely to extract unlawful fees and other charges from the members of the Missouri Sub-Class, in an amount which cannot be presently determined in violation of §456.907 R.S.Mo.

92.     The plaintiff and the members of the Missouri Sub-Class may maintain a cause of action against the Bank for its breaches of its duties as fiduciary and its participation in transactions in which it had or has a conflict of interest, as it does here.

93.     The Bank is liable to plaintiff and the members of the Missouri Sub-Class for actual and punitive damages because the Bank acted with reckless disregard for Plaintiff's and others' rights, attorneys' fees, interest, and such other relief as the Court may order.

## COUNT SEVEN

## BREACH OF FIDUCIARY DUTY UNDER MISSOURI COMMON LAW

94.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

95.     Pursuant to the common law of Missouri, the Bank owes and owed to plaintiff and the members of the Missouri Sub-Class an absolute duty of loyalty.  In exercise of that duty, the

Bank has a duty to administer the Trusts and other fiduciary accounts governed by Missouri law solely in the best interests of the beneficiaries, i.e. the members of the Missouri Sub-Class.

96.    By acting as alleged herein, the Bank has violated its fiduciary duties of absolute loyalty and candor owed to plaintiff and the members of the Missouri Sub-Class.

97.    By acting as alleged herein, the Bank has violated its fiduciary duty not to participate in transactions in which it had or has a conflict of interest, as it did and does here.

98.    By acting as alleged herein, the Bank has violated its fiduciary duties of care and productivity it owes or owed to plaintiff and the members of the Missouri Sub-Class.

99.    By acting as alleged herein, the Bank has violated its fiduciary duty that it owes or owed to plaintiff and the members of the Missouri Sub-Class to take and exercise control over fiduciary assets.

100.    Plaintiff and the members of the Missouri Sub-class may maintain a cause of action against the Bank for its breaches of its duties as fiduciary and its participation in transactions in which it had or has a conflict of interest as described above.

101.    The Bank's unlawful conduct, breach of fiduciary duty and breach of contract have damaged plaintiff and the members of the Missouri Sub-Class, inter alia, resulting in waste and mismanagement of fiduciary assets, self-dealing and its consequent unjust enrichment.

102.    The Bank is liable to plaintiff and the members of the Missouri Sub-Class for actual and punitive damages because the Bank acted with reckless disregard for plaintiff's and others' rights,, attorneys' fees, interest and such other relief as the Court may order.

## COUNT EIGHT -- INDIVIDUAL CLAIM OF PLAINTIFF

## BREACH OF FIDUCIARY DUTY

103.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

104.     As noted above, plaintiff's family wealth commenced with the toils of her grandfather, Charles H. Yalem, who founded the Aetna Finance Co., later sold to International Telephone and Telegraph Corporation in 1960.  Yalem, always a conservative investor, donated hundreds of thousands of dollars to St. Louis civic endeavors, including the St. Louis Zoo (the Charles H. Yalem Children's Zoo), St. Louis University, Jewish Hospital of St. Louis, Washington University, the St. Louis Symphony Orchestra and the St. Louis chapter of the YMCA.  Yalem's experience with predecessors to the Bank commenced at least with St. Louis Union Trust which became Centerre Trust Co, which became Boatmen's Trust Co. Yalem's net worth was achieved as a result of a passion for cautious investing and he instilled in his son-in-law and daughter, Joseph and Carolyn Kutten, plaintiff's parents, the wisdom of careful and conservative investing so that future generations of the family might enjoy his good fortune. In turn, plaintiff's parents passed these virtues on to her. The Kutten family employed the St. Louis law firm of Bryan, Cave, McPheeters and McRoberts n/k/a/ Bryan Cave to draft the Kutten Trusts and represent them on estate planning matters.  The relationship of the Kutten family was not only with their trust company, it was with the individuals who represented the trust company who understood and appreciated the desires and needs of the entire family, including the plaintiff, a single mother of two children, as well as one of her brothers, a disabled person who is institutionalized and has special needs.  The Kuttens had long term personal relationships with several individuals, including Robert Hitpas and Richard Klapp. These individuals and their

successors are no longer responsible for the portfolios entrusted to them. Instead, the Bank boasts of a minimum of 450 faceless employees who answer customer inquiries at "Call Centers" established around the country. The systemic change that occurred at the Bank when it acquired the predecessor banks and converted trust assets without the consent of plaintiff for its own gain and profit represents a classic instance of self-dealing and breach of loyalty, the antithesis of conduct expected of a fiduciary. The Bank has breached its fiduciary duties to plaintiff and her daughters, including the duty of loyalty, and various duties highlighted by the federal regulations issued by the Office of the Comptroller of the Currency in 1996 directed to all national banks that act in a fiduciary capacity, with which the Bank failed to comply.[6]   The Bank:

   (a) failed to exercise such specialized care and skill as is required of a fiduciary;

   (b) converted trust assets and their subsequent purchase of the Bank's proprietary mutual funds, the Nations Funds;

   (c) failed to properly diversify investment portfolios of the Trusts, and acting in derogation of the settlor's expressed directions;

   (d) failed to adopt appropriate policies relevant to self-dealing and conflict of interest as required by and in violation of 12 CFR Part 9;

   (e) failed to preview the prospective account to determine if the account could be properly administered subsequent to the acquisition of Boatmen's Trust Co. by the Bank as required by and in violation of 12 CFR, part 9.6;

---

[6] Plaintiff asserts no private cause of action thereunder. Rather, the Bank's failure to comply with them is a fundamental breach of fiduciary duty.

(f)     failed to properly invest funds waiting to be invested to obtain yields consistent with a reasonable rate of return as required by and in violation of 12 CFR Part 9.10;

(g)     failed to assign at least two individuals to her accounts as required by 12 CFR, part 9.13;

(h)     charged excessive fees for fiduciary compensation in violation of 12 CFR part 9.15;

(i)     failed to properly supervise personnel entrusted with the management of the Trusts' assets to ensure implementation of the grantors' expressed directions;

(j)     failed to make appropriate trades in the equity and bond markets to enhance the achievement of the objectives of the Trusts, including failing, through neglect, to make trades of any kind for several years;

(k)     failed to establish a written plan to engage in the sale and marketing of Nations Funds to Trusts under its fiduciary control and failed to absorb the expenses of establishing a collective investment fund, instead charging the beneficiaries, including plaintiff a fee of not less than 0.01%;

(l)     failed to consider and advise the beneficiaries of the adverse tax consequences arising from a conversion of trust assets and the subsequent purchase of Nations Funds;

(m)     failed to consider alternative investments in funds whose returns and ratings are higher than Nations Funds which has scored low on nationally respected ratings;

(n)     created a wholly owned subsidiary to serve as the sole vendor of its own product to Trusts under its fiduciary management and control;

(o)    failed to resign as Trustee when demanded to do so by plaintiff, citing its need for business income as overriding its performance as a fiduciary duty and resigning only after plaintiff's citation of the innumerable occasions when the Bank had breached its duty to plaintiff and the Kutten Trusts;

(p)    failed to observe the parameters of the instructions with regard to conversion issued by the Federal Reserve Bank of the United States in SR 97-3 (SPE), providing [i]n determining whether to convert common trust funds to mutual funds, a banking organization must address the possibility that the conversion could result in conflicts between the best interests of the organization and the fiduciary." Further, the Federal Reserve noted the existence of potential conflicts of interest for a national bank to engage in such transactions and the need for management to demonstrate that it has determined that the governing trust instrument for each affected customer authorizes investment in mutual funds and the mutual funds are suitable investments for the particular accounts;

(q)    lost administrative control of plaintiff's accounts for an undetermined period of time in 2202 and 2003, including electronic access to the accounts and the paper files relating to same; and

(r)    failed to communicate with the plaintiff, return her phone calls and letters and failed to perform as requested by plaintiff with respect to modifying investment strategies consistent with the investment philosophy that reigned in her family for decades.

## COUNT NINE - INDIVIDUAL CLAIM OF PLAINTIFF
## BREACH OF FIDUCIARY DUTY

105.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

106.    On information and belief, the Bank's decision to invest the assets of the Trusts in the Nations Funds was motivated not by the interests of plaintiff and her daughters but by BAC's desire to generate investment advisory and other fees for its affiliates and, indirectly, for itself, as well as to reduce the Bank's operating expenses.

107.    On information and belief, the Bank failed to consider the Nations Funds' high expense or alternative lower cost families of mutual funds when it invested the assets of the Trusts into shares of the Nations Funds thus putting its own interests before those of the beneficiaries of fiduciary accounts maintained for the Kutten Trusts.

108.    On information and belief, the Bank failed to consider the best interests of plaintiff and her daughters when it invested the Trusts' assets in the Nations Funds and breached its duty of loyalty to them by putting the interests of itself and its affiliates before the interests of plaintiff and her daughters.

109.    The Bank's wholesale investment of the assets of the Trusts in the Nations Funds was a breach of its fiduciary duty to plaintiff and her daughters, which breach was aided, abetted and/or directed by BAC and its affiliates.

110.    As a result of, inter alia, the Bank's improper wholesale transfer of fiduciary assets held by fiduciary accounts the Trusts into shares of the Nations Funds, the accounts of Plaintiff and her daughters for which the Bank was a fiduciary have been damaged in an amount to be determined by the Court, but believed to be substantial.

## COUNT TEN--INDIVIDUAL CLAIM OF PLAINTIFF

## BREACH OF CONTRACT

111.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

112.    By means of the acceptance by the Bank and its predecessors of the trusteeship of the Kutten Trusts, the Bank and its predecessors committed to provide to such Trusts complete investment management services of a corporate fiduciary, and render such services on an individualized basis consistent with the goals and objectives of plaintiff's parents and the needs of the beneficiaries thereof. As the Bank states: "It is our responsibility to invest the trust assets prudently and profitably according to the grantor's wishes as outlined in the trust document." No grantor of a Trust anticipated or could reasonably foresee that the Conversion would be carried out by the Bank with Trust assets or that the designated fiduciary would be the Bank in its present form. Further, as set forth in those Counts not asserted on behalf of the Class, the Bank ignored the express provisions of the Kutten Trusts with respect to investments and otherwise.

113.    Plaintiff and her daughters were beneficiaries of the Bank's contractual obligations to the creators of the Trusts and other fiduciary relationships. By abdicating its responsibilities for individual investment management services and/or through "Common Trust Funds" in favor of the wholesale Conversion of fiduciary assets that the Bank was obligated to provide to the beneficiaries of its fiduciary accounts, and by conducting itself in its present business form, the Bank breached its contractual obligations to plaintiff, her parents and daughters.

114.    By virtue of the Bank's breach of its contractual obligations to the plaintiff, her parents and her daughters, plaintiff and her daughters have suffered damages in an amount to be determined by the Court.

115.    The Bank has breached its contractual obligations to plaintiff and her daughters in their individual capacities as a result of its failure to adhere to the terms of the family's

42

engagement of the Bank and its predecessors as a fiduciary and plaintiff as well as her daughters have been damaged.

## COUNT ELEVEN--INDIVIDUAL CLAIM OF PLAINTFF

### BREACH OF CONTRACT

116.   Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

117.   This Count if brought by plaintiff as a beneficiary of Trusts originally established with the Boatman's Trust Company, being one of the Banks acquired by and/or merged into the Bank.

118.   Boatmen's Trust Company, as designated corporate Trustee, promised and agreed to the settlers of the Kutten Trusts and its beneficiaries to deliver personalized fiduciary services. Implicit in the contractual fiduciary relationship between the plaintiff's parents and Boatman's Trust Company was the provision of a full range of personalized fiduciary services, including individualized investment management.

119.   The Bank, by eliminating the personalized fiduciary services to plaintiff, including, inter alia, individualized investment management, materially breached the explicit and implied terms of the Kutten Trusts, including, but not limited to the following:

(a)    failing to provide appropriate trained personnel to supervise and monitor the performance of the assets in their charge, including failing to invest in appropriate asset classes;

(b)    bouncing plaintiff to poorly manned and anonymous "Call Centers" with whom these was no pre-existing relationship, trust and fealty;

43

(c)      changing without plaintiff's consent representatives of the Bank to deal with Plaintiff who had no knowledge of plaintiff or the purposes for which the Kutten Trusts were established; and

(d)      continuing to charge excessive fiduciary fees when failing to perform the services the services that Boatman's Trust Company had agreed to perform.

120.    Because the transfer of fiduciary responsibilities from Boatman's Trust Company substantively and materially affected the pre-existing fiduciary relationship with the Bank, it was obliged to give notice to plaintiff of, <u>inter alia</u>, the terms of the merger, the forthcoming changes in the relationship and provide to them the opportunity to seek a replacement Trustee.

121.    Although not provided with said notice, plaintiff sought the resignation of the Bank in early October, 2003.  In response, on October 17, 2003, the Bank incredibly insisted that they be allowed to remain a trustee:

> The (Bank's) Committee decided that they would not resign from these trusts.  It was a business decision that was based on the fact that Bank of America does not want to give up your business.  Bank of America, like everyone else, has felt the effects of the poor economy and has become very reluctant to voluntarily resign as trustee.

The Bank continued to resist resignation until plaintiff's counsel wrote a seven page letter citing the many examples of the Bank's breach of duties in the administration of the trusts of plaintiff's and her daughters.

## COUNT TWELVE--INDIVIDUAL CLAIM OF PLAINTIFF

### UNJUST ENRICHMENT

122.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

123.    By reason of defendant BAC's causing the Bank's fiduciary assets in affected accounts to be invested in the Nations Funds, the Bank and BAC have "double dipped." The defendants have profited by the Conversion and the subsequent acts described herein, thereby unjustly enriching themselves at the expense of plaintiff and her daughters. Defendants have similarly enriched themselves, their subsidiaries and affiliates by using information regarding the plaintiff to market various goods and services including credit cards, loans and deposit accounts, from which products and services they have been unjustly enriched.

124.    Such "double dipping" was carried out by the Bank and BAC by imposing on plaintiff's accounts the Banks' fees for acting as a corporate fiduciary as well as investment advisory fees, and other related charges which, when taken together with all the Nations Funds' expenses, even after so-called credits for certain Nations Funds advisory fees, exceeded the amounts to which the Bank was entitled to payment for, inter alia, investment of the fiduciary assets, for which services its trustee or similar fees were intended to cover. Such benefits to the Bank and BAC were exacerbated by the Bank's avoidance of substantial operating expenses by reason of its abdication of its individualized investment responsibilities owed to plaintiff and her daughters.. The Bank enhanced its profit performance at plaintiff's expense by favoring the use of its own Funds and investing in same to increase its own asset base, and aggrandize its own stature. under the guise of allegedly provide more services to participants in its "Private Bank" The Bank's objectives were clear from its telling press release in July 14,1999:

> United by the merger of Bank of America and NationsBank, NationsBanc Investments, Inc., and BA Investment Services, Inc., became one brokerage company on July 12. The birth of Banc of America Investment Services, Inc., the new name for the retail brokerage, gives investors a powerful ally within the Bank of America franchise. (For the full press release, see http://www.bankofamerica.com/newsroom/press/press.cfm?PressID=

press.19990714.03.htm&LOBID=1>).

125.    The defendants have invested the proceeds of the foregoing unjust enrichment and realized additional profits thereupon, all of which should be returned to the Kutten Trusts as the Court shall deem appropriate (e.g. a proportionate share of the defendants' profits during the years of misappropriation).  Missouri statutes impose strict liability against fiduciaries who "at their sole risk" make investments that are improper such that the Bank is "absolutely liable" to Plaintiffs for their losses.  §362.550.5  R.S.Mo.  Plaintiff and her daughters are entitled to recover the Bank's ill-gotten gains and profits.

## COUNT THIRTEEN--INDIVIDUAL CLAIM OF PLAINTIFF
## VIOLATION OF CHAPTER 456 MISSOURI REVISED STATUES

126.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

127.    Pursuant to §456.520.2 R.S.Mo. and §456.900 *et. seq.* R.S.Mo. ("The Prudent Investor Act")  RSMo. (2000), the Bank owes and owed to plaintiff and her daughters an absolute duty of loyalty. In exercise of that duty, the Bank has a duty to administer the Trusts and other fiduciary accounts solely in the interests of the beneficiaries thereof.

128.    Pursuant to §456.905 R.S.Mo., the Bank owes and owed to plaintiff and her daughters an absolute duty of loyalty. In exercise of that duty, the Bank has a duty to administer the Kutten Trusts governed by the Missouri law solely in the best interests of the beneficiaries.

129.    Pursuant to the Missouri Prudent Investor Act, the Bank owes and owed to plaintiff and her daughters a duty to exercise reasonable care, skill and caution in investment management decisions, to ascertain facts relevant to the investment and management of trust

46

assets, and a duty to use the special skills and expertise it represented itself to possess when investing and managing trust assets.

130.    By acting as alleged herein, the Bank has violated and continues to violate the duties of loyalty and candor it owes and owed to plaintiff and her daughters. Such violations of the Bank's duties as fiduciary constitute breach of trust imposed by Missouri statute.

131.    Pursuant to the Missouri Prudent Investor Act and §456.570.2 R.S.Mo., the Bank owes and owed to plaintiff and her daughters a duty not to use or deal with fiduciary assets for its own profit, not to take part in any transaction in which it has an interest adverse to the beneficiary, such as plaintiff and her daughters.

132.    By acting as alleged herein, the Bank violated the duty not to use or deal with fiduciary assets for its own profit, and the duty to not take part in any transaction in which it had a conflict of interest. Such violations of the Bank's duties as fiduciary constitute breach of trust pursuant to Missouri statute.

133.    Pursuant to the Prudent Investor Act, the Bank owes and owed to plaintiff and her daughters a duty of care that includes the duty to invest fiduciary assets prudently and with regard to individualized strategy appropriate to each fiduciary account and to each beneficiary thereof, and the duty to make fiduciary assets productive. Moreover, the Prudent Investor Act requires the Bank to apply fully the special skills of a corporate fiduciary, heightening the duty of care otherwise applicable to it.

134.    By acting as alleged herein, the Bank has violated and continues to violate the duties and productivity it owes and owed to plaintiff and her daughters. Clearly the Bank was interested in seizing new opportunities and lining its own pockets at the expense of plaintiff.

47

Such violations of the Bank's duties as fiduciary constitutes breach of trust pursuant to Missouri law.

136. The plaintiff may maintain a cause of action against the Bank for its breaches of its duties as fiduciary and its participation in transactions in which it had or has a conflict of interest, as it does here.

136. The Bank is liable to plaintiff for actual and punitive damages because the Bank acted with reckless disregard for plaintiff's rights, attorneys' fees, interest, and such other relief as the Court may order.

## **PRAYER FOR RELIEF**

WHEREFORE, plaintiff respectfully requests on her own behalf, her daughters' behalf and on behalf of all members of the Class and Missouri and California Sub-Classes:

(a)   certification of this action as a Class Action and appointment of plaintiff and her counsel to represent the Class and the Missouri and California Sub-Classes;

(b)   entry of judgment on the claims for breach of fiduciary duty in favor of plaintiff individually and as a representative of her daughters and the other members of the Class and Missouri and California Sub-Classes and against the defendants and an award of compensatory damages and punitive damages in favor of plaintiff individually and as a representative of her daughters and the other members of the Class and Missouri and California Sub-Classes and against the defendants in the amount of damages caused by the defendants' breaches of fiduciary duties;

(c)   entry of judgment on the claims for breach of contract in favor of plaintiff individually and as a representative of her daughters and the other members of the Class and Missouri and California Sub-Classes against the Bank and an award of compensatory damages in

favor of plaintiff individually and as a representative of her daughters and the other members of the Class and Missouri and California Sub-Classes and against the Bank in the amount of damages caused by the Bank's breaches of contract;

(d)    entry of judgment enjoining the Bank from opposing any petition filed by any member of the Class or Missouri or California Sub-Classes seeking the removal of the Bank as corporate fiduciary and requiring the Bank to pay for all legal fees and expenses incident thereto including its own;

(e)    entry of judgment compelling the defendants to account for their unjust enrichment and disgorging the amount thereof (and the profits earned thereupon) to the fiduciary accounts, including the Kutten Trusts, affected by the wrongdoing described herein and/or their beneficiaries, as appropriate;

(f)    entry of judgment compelling the Bank to fully insulate its fiduciary operations from all of its other business activities;

(g)    entry of judgment compelling the Bank to establish and implement procedures to fully protect the interests of the members of the Class including, inter alia, the appointment of an ombudsman to oversee the Bank's fiduciary operations;

(h)    repayment to the affected Nations Funds of the damages caused to them by the defendants' actions as described herein;

(i)    pre-judgment and post-judgment interest at the maximum rate allowable by law;

(j)    reasonable attorneys' fees and reimbursement of the reasonable costs and expenses of prosecuting this litigation and distributing the recovery to members of the Class and Missouri and California Sub-Classes; and

(k)     such other or additional relief as this Court deems appropriate.

## JURY DEMAND

Plaintiff hereby demands a trial by jury.

SUMMERS, COMPTON, WELLS & HAMBURG
PROFESSIONAL CORPORATION

STEVEN M. HAMBURG          #3313
HOLLY M. MCINTYRE          #112208
8909 Ladue Road
St. Louis, MO 63124
(314) 991-4999
(314) 991-2413 (Fax)
Attorneys for Plaintiff and the Class

346844

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

ELLEN JANE KUTTEN
AND MARY ANN ARNOLD                     )
on behalf of themselves                 )
and all others similarly situated,      )
                                        )
                    Plaintiffs,         )        Case No. 4:04CV00244 TIA
                                        )
                                        )        JURY TRIAL DEMANDED
                                        )
          v.                            )
                                        )
BANK OF AMERICA, N.A                    )
And                                     )
BANK OF AMERICA CORPORATION,            )
                                        )
                    Defendants.         )

## FIRST AMENDED COMPLAINT

COME NOW Plaintiffs Ellen Jane Kutten and Mary Ann Arnold, for themselves and for

all other members of the Classes hereinafter described, and Ellen Jane Kutten, individually on

behalf of herself and her daughters, Alessandra Kutten Cottrell and Louise Kutten Cottrell, by

and through counsel, and state and allege as follows:

## INTRODUCTION

1.      (a)    This Class Action is brought by plaintiffs on their own behalf and on behalf

of all other members of the Classes defined below and by plaintiff Ellen Jane Kutten individually

on behalf of herself and her daughters against the defendants arising out of, inter alia, breaches

of fiduciary and contractual duties owed by the defendants Bank of America, N.A. (the "Bank")

and the Bank's parent, Bank of America Corporation, to beneficiaries of certain trusts and other

fiduciary accounts within the Bank's care. In addition, certain claims are asserted by plaintiffs

against the Bank on behalf of a California Sub-Class and a Missouri Sub-Class as defined below.

Unless the context indicates otherwise, the term "Class" includes the members of the "California

Sub-Class" and "Missouri Sub-Class."

        (b)    The Bank prominently and falsely advertises its promise as to how it holds itself

out to persons such as plaintiffs and the members of the Class who do business with its "Private

Bank":

Bank Of America <sup>[Logo]</sup> Higher Standards

THE PRIVATE BANK

# Managing today's complex wealth. Balancing growth, risk, taxes and grandchildren.

As your financial resources increase, perhaps you need more financial resources to manage them.

The Private Bank of Bank of America has greater depth and breadth of wealth management expertise – across the financial spectrum – than any other private bank. Equally important, we bring this expertise together, creating more integrated solutions to your complex needs. And we provide these customized recommendations based on the extraordinary strength and stability of Bank of America.

It's no wonder we've been entrusted to manage, protect and pass on wealth for more than 150 years.

*The Private Bank is dedicated to serving affluent families and individuals with complex wealth management needs. Our experienced advisors customize unique and comprehensive solutions for each individual, integrating world-class investment management, trusts, credit and bank services. We welcome the opportunity to work with you. We invite you to call Caroline Grace at 800.863.9500 or visit www.bankofamerica.com/privatebank.* [Emphasis in original].

(c)   In fact, despite numerous substantially similar promises in the form of

advertising, marketing pieces and direct representations to those who established fiduciary

accounts with the Bank (and the beneficiaries thereof), as described herein, those promises have

been and are being uniformly ignored or deliberately broken.

2.       In particular, in order to maximize the Bank's profits earned from trusts,

guardianships, estates and other fiduciary accounts (collectively "Trusts") by which it acted as

2

fiduciary, the Bank conspired with its affiliates and others presently unknown in a business

decision to "double dip," by forcing trusts and other fiduciary accounts under the care of the

Bank to have their assets re-directed from their historic allocations in individually managed

accounts and/or so-called Common Trust Funds and/or other assets, to proprietary mutual funds

controlled by subsidiaries of the Bank's parent, defendant Bank of America Corporation and its

corporate affiliates and subsidiaries (collectively "BAC"). As used herein, the term

"Conversion" refers to such wholesale asset re-direction by the Bank into shares of the Nations

Funds. At no time has the Bank distributed to plaintiffs or to any member of the Class defined

below or other appropriate recipient a final, annual, or periodic account or any other statement

fully disclosing the Bank's wrongdoing as described in this Complaint. Further, the defendants'

wrongdoing is continuing in nature.  By August 16, 2000, BAC and its affiliates had increased

the assets in their Funds to reach $100 billion. On that date the Bank stated:

> Banc of America Capital Management announced today that the
> Nations Funds family of funds has reached $100 billion in mutual
> fund assets. This growth was driven by increases in all three types of
> mutual funds: equity, fixed income and money market.

3.      Historically, the Bank, either through its so-called "Private Bank," now based in

St. Louis, MO [1], or through the Trust Departments of it and its predecessors, promoted itself by

touting its purportedly highly individualized trust administration and asset management services,

all of which was intended to and did lure grantors (such as the parents of plaintiff Kutten),

testators and others to designate the Bank as a fiduciary for estates, trusts and other fiduciary

accounts. In a recent version of such representations, the Bank stated on its website as follows:

**"Customized Portfolio Management. We do not believe in one-size-fits-all.**

---

[1]  To consolidate its own position in the Midwest, the Bank's predecessor, Nations Bank, acquired Boatmen's
Bancshares, Inc., the parent of Boatmen's Trust Company ("Boatmen's"). The Bank used Boatmen's trust
department as the core of its Private Bank, then proceeded to distribute its administrative functions to Private Bank
Offices in various parts of the country.

**Rather, we understand that your unique needs require an investment portfolio that is specially tailored to meet them.**

**A tailored approach:**

·    **Talk to us** – tell us your investment goals and risk tolerance.

·    **A tailored solution** – we will design and recommend a portfolio strategy for you based upon your goals, time horizon, income and liquidity needs.

·    **Ongoing communication** – we monitor your portfolio and communicate with you on a regular basis to ensure your goals are being met.

**Our equity selection process.**

Our <u>equity selection</u> follows a core growth strategy with a focus on large cap stocks. The foundation of our process is proprietary research. We use a blend of qualitative and quantitative fundamental research to target companies that have long-term growth potential, proven earnings track records, competitive advantages and strong management.

**A perfect fit.**

**We work with you** to ensure your goals are being met and your total financial picture is being considered. Learn more about our investment management process by contacting a **<u>Private Banker</u>** in your area."

In fact, the plans of the Bank, BAC and their respective predecessors, despite these and substantially similar representations over the years and the implicit incorporation of them in the documents governing the Bank's fiduciary accounts, have been to cut back substantially on such so-called "Customized Portfolio Management" and to direct fiduciary funds, once "captured," into standardized investments such as BAC's proprietary mutual funds, the Nations Funds as part of the Conversion as described herein and otherwise. Further, few if any of the grantors or others who established fiduciary relationships with predecessors of the Bank, such as the parents of plaintiff Kutten and the grandfather of plaintiff Arnold, envisaged the Bank in its present form; namely, a nationwide behemoth with few of the services typically offered by a fiduciary and implicit in the fiduciary relationship.  The defendants have also utilized these captive accounts as targets to market other products and services sold by them, their subsidiaries and affiliates,

including loans, credit cards and deposit accounts, all to defendants' enrichment.[2]

4.      The Settlors of certain of the Trusts at issue, Joseph Kutten and Carolyn Yalem Kutten (parents of plaintiff Kutten), in entrusting their assets to a local bank, in this case, Boatmen's Trust Company in St. Louis, did so based upon personal relationships with officers of Boatmen's, and its predecessors in interest, St. Louis Union Trust Company and Centerre Bank, built over many years. The fiduciary relationship was established because, inter alia, Boatmen's Trust Company and its predecessor banks, held itself out to the settlors and to other prospective customers of fiduciary serves as institutionally and personally suited not only to the stewardship of settlors' assets over multiple generations but looking after their descendants, the plaintiff in this litigation and her daughters. Similarly, the grandfather of plaintiff Arnold, John T. Crowley, through his Last Will and Testament, entrusted his bequeathed assets to a local bank in California, since acquired by a series of banks, now part of Bank of America ("the Crowley Trust").

5.      Over the years, the Bank and its corporate predecessors swallowed-whole Boatmen's Trust Company,  and numerous other financial institutions which had fiduciary responsibilities to plaintiffs and  members of the Class. In the process of being digested by the Bank, these formerly independent institutions' fiduciary operations were transmogrified into just cogs in the fee-generating machinery of the Bank and its corporate parent.

6.      In the course of the metamorphosis of Boatmen's Trust Company and other acquired financial institutions into the Bank, the interests of  plaintiffs and members of the Class were not represented by caring, knowledgeable trust officers but by so-called "Call Centers" in Dallas and elsewhere manned by lower-level fungible functionaries and other Bank personnel with little or no investment expertise. Except for the highest net worth fiduciary accounts, the

---

[2] For a vivid history of the Bank's voracity for conversions of assets which it held as a fiduciary, see:

"customized recommendations" and "wealth management expertise" promised by the Bank are fictions and have been fictions since the consolidation of the various acquired financial institutions began taking place.  The purpose was clear.  As stated by the Bank's own press release:

> We will win more business from existing Private Bank clients by proactively delivering cutting-edge solutions for wealth management, by continuing to win high marks for satisfaction and high touch service, and through the company's financial commitment to the Private Bank which will allow for increased marketing and heightened awareness of the value we bring to each relationship.

7.      At or prior to the time that Boatmen's Trust Company was acquired by the Bank's predecessor, Nations Bank, it was known by the parties to the acquisition negotiations that the successor entity (i.e. Nations Bank) would materially adversely affect the administration of plaintiff Kutten's and all other Boatmen's  fiduciary accounts. Similarly, this was the plan of the defendants with respect to each of the acquired banks and their fiduciary functions.

8.      To the best of plaintiff Kutten's knowledge, information and belief, neither Boatmen's nor Nations Bank provided to her or other interested parties in connection with other fiduciary accounts venued in Missouri  appropriate written notice as provided in §362.331 R.S.Mo. of Boatmen's transfer of fiduciary capacities to Nations Bank disclosing all material facts which disclosed the material adverse affect of such transfer or advising such interested parties (including plaintiff Kutten and members of the Missouri Sub-Class) that they had a right to object to the transfer and, inter alia, obtain a replacement fiduciary.

9.      Plaintiff Kutten believes and therefore alleges that the Bank similarly failed to provide such notice in each of the other instances where the fiduciary responsibilities of an acquired bank were taken over by the Bank or one of its predecessors. As such, all similarly affected beneficiaries were wrongly denied notice and the right to object to such transferred

---

http://www.bankofamerica.com/newsroom/press/archives.cfm?LOBID=1.

fiduciary capacities.

## THE NATIONS FUNDS

10.     The Nations Funds Trust ("NFT") holds a "family" of approximately 70 mutual fund portfolios, which are proprietary funds nominally operated by NFT and its Board of Trustees. They are, in fact, directed and controlled by BAC and its subsidiaries.

11.     The Nations Funds' portfolios cover a wide variety of investment disciplines, strategies and types of asset categories including, inter alia, the Nations Municipal Income Funds, the Corporate Bond Portfolio; the Nations Small Company Fund; Nations Large Cap Index Funds and Nations Cash Reserves.

12.     Certain of such Nations Funds were funded by BAC in substantial part by transferring fiduciary assets pursuant to the Conversion. Such funding permitted the affected Nations Funds to have substantial asset bases, an important selling point to BAC in marketing shares in the Nations Funds to potential purchasers thereof through the Bank and other subsidiaries of BAC. The Nations Funds selected for investment of fiduciary assets by BAC pursuant to the Conversion were intended generally to "mirror" the categories of assets held by the Trusts pre-Conversion, all or most of which were liquidated immediately prior to the Conversion either as part of so-called "Common Trust Funds" or in individually-managed accounts.

## JURISDICTION AND VENUE

13.     The claims asserted herein arise under and pursuant to state statutes and common law.

14.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332 (diversity of citizenship) and 28 U.S.C. § 1367.  The amount in dispute exceeds

$75,000 exclusive of interest and costs and there is complete diversity of citizenship between plaintiffs, citizens of the states of California and Nevada, and each of the defendants. The conduct of the defendants as described herein occurred within the State of Missouri and Eastern District of Missouri. Accordingly, this Court has personal jurisdiction over all the defendants pursuant to §506.500 R.S.Mo.

15.     Venue is proper in this District as many of the acts and practices complained of herein occurred in substantial part in this District, including the establishment of trusts for the benefit of plaintiff Kutten and her daughters by plaintiff Kutten's late parents. Further, Boatmen's Trust Company, a corporate predecessor of the Bank, was based in this District, as is the Bank's Private Bank. Further, many of the most significant witnesses to the wrongdoing referred to herein are found in and/or did business within this District and will only be available for trial purposes in this District. In addition, a substantial amount of documents relevant to this dispute are located in this District.

16.     In connection with the acts alleged in this Complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

## THE PARTIES

17.     (a)     Plaintiff Ellen Jane Kutten is a California citizen who has varying interests as beneficiary, contingent beneficiary, as well as co-trustee of several trusts which had been, until recently, managed and controlled by the Bank, its corporate parent and affiliates. In particular, plaintiff is a named beneficiary under trusts created by her parents in this District in 1981 as amended in 1983, 1987 and 1990, namely, the Joseph Kutten Indenture of Trust and the Carolyn J. Kutten Indenture of Trust. In addition, the plaintiff and her daughters were

beneficiaries of trusts established in 1989, namely, the Joseph Kutten and Carolyn Y. Kutten 1989 Grandchildren's Trust (collectively referred to hereinafter as the "Kutten Trusts").[3] Plaintiff' Kutten's family's relationship with the Bank and its predecessors, including her grandfather, noted St. Louisan and philanthropist, Charles H. Yalem, spans a period in excess of forty years.  At relevant times, all of the investment decisions of the Kutten Trusts were made by the Bank or entities controlled by its parent, BAC. The handling of the assets of the Kutten Trusts by the Bank has not been materially different from the other trusts and fiduciary accounts of which the Bank was and/or is serving as corporate fiduciary with respect to the Conversion and otherwise as described in this Complaint. Although documents such as the trust agreements establishing the Kutten Trusts or other documents pursuant to which a fiduciary relationship with the Bank was established typically gave the Bank discretion in the investment of fiduciary assets (even in some cases, permitting investments in proprietary funds), none of such documents permitted the egregious behavior described herein.

---

[3] The Original trustee bank under plaintiff's trust and the trust established by her parents for the benefit of plaintiff's daughters was Boatmen's Trust Company which, in turn, was acquired by and merged into Nations Bank, which, in turn, was acquired by and merged with Bank of America, N.A. following such acquisition. On a parallel track, North Carolina National Bank ("NCNB") was similarly making acquisitions until it merged, as Nations Bank with Bank of America, as reflected in the diagram below:



Notwithstanding the foregoing corporate sleight-of-hand, there is little substantive relationship, if any, between the original trustee bank, Boatmen's Trust Company and its successor, Bank of America. Even more significantly, there is virtually no identity of interest between the fiduciary relationship with Boatmen's Trust Company that existed between it and the Kutten Trusts and the one which existed until recently. These circumstances are true with respect to most if not all of the banks presently a part of the Bank.

(b)     Plaintiff Mary Ann Arnold is a Nevada citizen who has varying interests pursuant to the Crowley Trust referred to above including her status as a beneficiary thereof.

18.    (a)    On information and belief, the Bank is a federally chartered bank domiciled in North Carolina, and is a wholly owned subsidiary of BAC also domiciled in North Carolina. BAC is a financial holding company, and the parent of the Bank.  At all relevant times, BAC dictated and controlled the business activities of the Bank, including, inter alia, the wrongful business activities described herein within the Eastern District of Missouri, and wherever in the United States the Bank, BAC and/or their respective predecessors conducted business.

(b)    Although the Bank and BAC now have their principal places of business in Charlotte, NC, BAC continues to conduct substantial business within this District in many locations through its "Private Bank" and elsewhere. Notwithstanding the fact that the Kutten Trusts have been under the fiduciary responsibility of the Bank in St. Louis, BAC and the Bank have bounced the beneficiaries of the Kutten Trusts around the country, most significantly to the Banks' Call Center in Dallas in November, 2002, losing their paper files and accounts for a period of months. When plaintiff Kutten sought to obtain a transfer of the Kutten Trusts' accounts to California in October, 2002, where she resides, the Bank refused. Similarly, the Crowley Trust has been bounced around and the beneficiaries thereof are now "serviced" by a Call Center, rather than fiduciary officers with knowledge of the beneficiaries of the Crowley Trust or their individual needs. As such, the following representations of Kenneth D. Lewis, Chairman and Chief Executive Officer of BAC and the Bank on November 3, 2003 in the context of a new acquisition of yet another bank are baseless:

> The people you know at your branch today will be there tomorrow, and will continue to strive to anticipate and meet your financial needs.

At all relevant times, the Bank was successor Trustee of the Kutten Trusts of which plaintiff Kutten is a beneficiary of one and her daughters another. Similarly, the Bank is successor Trustee of the Crowley Trust, of which plaintiff Arnold is a beneficiary. The Bank is also Trustee or serving in another fiduciary role with respect to the other Trusts or similar groupings of assets of which the remaining members of the Class defined below are beneficiaries.

19.    NFT, a non-party herein, is the holding/operating entity BAC formed to do business as the Nations Funds. Its principal place of business is located in Charlotte, NC. Although nominally independent and supervised by its Board of Trustees, NFT has at all relevant times been operated as an alter ego of BAC and its subsidiaries. Upon information and belief, all the members of the Board of Trustees of NFT were selected and/or approved by BAC and its subsidiaries.

20.    Defendant BAC (through its subsidiaries) and other business entities not owned by defendant BAC individually and collectively, charge substantial fees and expenses to the Nations Funds for their purported services which, together with NFT's own operating expenses, have had and continue to have a substantial cost to the Kutten Trusts, the Crowley Trust and to each of the other fiduciary accounts, the assets of which have been invested in one or more of the Nations Funds.

### Defendants' Self-Serving Investment Decisions

21.    (a)    Historically, the Bank and its predecessors invested the assets comprising the Kutten Trusts, the Crowley Trust and those of members of the Class primarily through individually managed portfolios and/or through so-called "Common Trust Funds." The cost of such investment and related administrative services was absorbed by the Bank out of its fees for serving as fiduciary. Beginning some time prior to 1998, in order to, inter alia compensate for

massive losses it was incurring from its traditional lending business, the Bank and its predecessors developed various plans and schemes pursuant to which they sought to minimize their operating expenses with respect to fiduciary accounts and maximize their profit from fiduciary business. Defendants' plan included the consolidation and elimination of the previously existing trust departments of the acquired banks with the objective of "servicing" fiduciary accounts and the beneficiaries thereof with fewer and fewer personnel.  Pursuant to such business plans, they decided, inter alia, to utilize the funds held by the Bank in fiduciary accounts to fund an initial group of mutual funds and/or to add assets to such funds controlled by the Bank's corporate parent, BAC, the Nations Funds, as well as other mutual funds merged into them. Thereafter, due to numerous acquisitions, mergers and other transactions referred to above, consistent with its longer-term plan and scheme, BAC determined that most or all of the assets in certain fiduciary accounts held by the Bank (and formerly held as fiduciary assets by the acquired banks) such as the accounts of the Kutten Trusts and Crowley Trust, would be converted again into proprietary funds such as the "family" of Nations Funds, the management and investment decisions of which were controlled by subsidiaries of BAC and by the Board of NFT.

(b)    Through a complicated and barely comprehensible grouping of advisors, sub-advisors, subsidiaries and other affiliated and unaffiliated service providers, BAC engineered a scheme pursuant to which the Bank was able to abdicate many of its traditional fiduciary responsibilities, functions and services to beneficiaries of fiduciary accounts in favor of alternatives that resulted in higher total direct and indirect expense charges to the fiduciary accounts (such as those of the Kutten and Crowley Trusts) as compared to the trustee or similar fees historically paid to the Bank for, inter alia, active management of the Trusts' assets. As indicated below, beginning in February 2000 and continuing for some time thereafter, the Bank's

"Private Bank" began sending out standardized form letters informing some co-trustees, beneficiaries of the fiduciary accounts and others of the Bank's planned closing of its "Common Trust Funds" and touting the so-called "benefits" of the Conversion, which was then anticipated to take place in May 2000 or at other dates on a carefully orchestrated plan nationwide based, in part, upon the level of integration of the previously acquired banks and other factors. Such letter, signed by David W. Fisher, President, also coerced the recipients of the letter to authorize the Conversion of the Trusts' assets into shares in the Nations Funds. In particular, the Bank's letter said:[4]

> Using Nations Funds, we can provide trust and fiduciary accounts with an attractive mix of investments to pursue the accounts' investment goals. Nations Funds also offer the benefits of:
>
>> Daily valuation and liquidity
>> Newspaper performance listings
>> Broader potential diversification
>
>> Flexibility when making trust distributions

In fact, there was little, if any, benefit that would flow to beneficiaries of the Bank's fiduciary accounts and this letter was a sham.

Indeed, all such so-called "benefits," could have been accomplished by means of the Bank's "Common Trust Funds." Curiously, on or about August 16, 1999, the Bank announced that "Common Trust Funds will be valued at month-end instead of twice each month," despite the fact that computer software programs existed that could generate such valuations on a daily basis. The Bank's letter went on to threaten coercively:

> Any common trust fund units for which we have not received an authorization [by May 1, 2000] may be liquidated and the

---

[4]  It is not presently known whether the Bank sent such a letter to beneficiaries of all of its fiduciary accounts or, in the case of guardianships and similar accounts, to the appropriate courts overseeing such accounts. Further, not all co-trustees received such a letter nor were their consents sought by the Bank. While the manner in which the conversion was carried out by Defendants may have been different from state-to-state and/or based upon the identity of the acquired bank, such differences were immaterial.

> proceeds placed in a money market vehicle pending
> discussion about reinvestment. This liquidation could have
> adverse tax consequences depending upon the cost basis of
> the common trust fund units.

22.    Although plaintiff Kutten did not receive such documents,  in response to such

coercion and the deceptive and unclear information provided by the Bank, upon information and

belief, co-trustees and beneficiaries of the Trusts who received it signed the enclosed form,

thereby providing to the Bank their uninformed and fraudulently induced "consent" to the

Conversion.

23.    Enclosed with the Bank's letter sent to some Trust beneficiaries and/or co-

Trustees were various prospectuses and other documents which were drafted so as to conceal,

inter alia, the motives of the Bank and BAC for the Conversion into BAC proprietary mutual

funds, the benefits of the Conversion to them and their subsidiaries or the increased costs and

expenses that would be incurred by the Trusts as a result of the Conversion. There was no

explanation in plain English that would put the recipients of these documents on notice of the

Bank's wrongdoing as referred to herein. In fact, one of those documents, (Form 3.05D 7/1999)

entitled "Disclosure of Investment in Nations Funds," stated deceptively:

> The fee paid directly by the [Trust] Account to the Bank will be
> reduced (but not below zero) by the Account's pro rata share of the
> investment advisory fees paid by the Funds to the Service Providers;
> provided however, that the amount of the reduction will be based on
> Bank of America Corporation's percentage ownership of the Service
> Provider. From time to time, the Bank may elect to reduce the
> Account's fees in recognition of amounts paid by Nations Funds for
> other services (such as administrative services), but it is not obligated
> to do so, and the amount of any such fee reduction may vary. The
> Account will not be charged a sales "load" for buying or redeeming
> Fund shares described in the accompanying prospectuses.

Such doubletalk-laden form went on to state:

> I acknowledge receipt of the current prospectuses for the Funds and a

> Nations Funds Fee Disclosure Statement. As co-fiduciary for this account, I understand that the Service Providers will be paid investment advisory and other fees by the Funds. **I approve the method for reducing the investment management fees paid to the Bank by the Account**. I understand and agree that the Bank may choose not to reduce the Account's fee on the account of the compensation paid by the Funds for other services, but the Bank is electing to do so at this time. [Emphasis added].

In fact, the Bank used such language to conceal the fact that although in many cases there was a credit for all of the Nations Fund post-Conversion investment advisory fees, the Bank intended to reduce or eliminate the credit as soon as practicable thereafter once consents were obtained. There was no credit for the substantial operating expenses of the Funds, which substantially reduced the net investment returns to fiduciary accounts.

24.     Significantly, at no time did the foregoing "disclosure" documents disclose clearly to a co-Trustee, a beneficiary or other person interested in the affected fiduciary accounts the true additional direct and indirect expenses of the Conversion (although many of such "disclosures" were buried in the Nations Fund prospectuses) nor, in fulfillment of the Bank's fiduciary responsibilities, did the Bank make any personal efforts to insure that plaintiffs or others similarly situated understood the extent to which the Bank and BAC would benefit from the Conversion and how the Kutten and Crowley Trusts and other fiduciary accounts would end up paying substantially more for the investment and related services that the Bank had historically supplied in partial consideration for the Bank's trustee and similar fees. Indeed, Mr. Fisher's letter of August 31, 2000 sent to beneficiaries of fiduciary accounts transmitting the Prospectus for the Nations Funds was "for information" only and recipients, including Plaintiff, were told: "**you do not need to take any action.**" [Emphasized in original].

25.     Notwithstanding its overarching duty of loyalty to plaintiffs and members of the Class, upon information and belief, at no time following the foregoing "disclosure" did the Bank

15

make any complete and candid disclosure to the beneficiaries of the Trusts of the full extent of

the damages caused to the Trusts or their beneficiaries by the Conversion, the true motives of

BAC and the Bank in carrying out the Conversion or the full extent to which the Bank and BAC

were profiting therefrom and, in particular, the additional assets which would flow into the

Nations Funds, making them more saleable to the investing public generally. Even after the Bank

applied a so-called credit against its fees for some portion of the Nations Funds advisory fees, in

practical terms, it was (and is) impossible for co-trustees, executors, beneficiaries and others to

understand and have knowledge of the true cost of the Conversion to the Trusts and the income

earned upon the assets of the Trusts. Indeed, plaintiffs and other beneficiaries have sought to

obtain such information from the Bank and have never received "straight" or any answers to

their questions with respect thereto and have received misleading or downright deceptive

information as to the impact of the Conversion upon them.

26.    Upon information and belief, no analyses or determinations were made by the

Bank as to the suitability and/or propriety of the relative costs and benefits of investments in

BAC's proprietary funds at the time or before the Conversions were carried out for each

fiduciary account as compared to pre-Conversion investments including any comparisons with

numerous other available mutual funds or investment vehicles in which the Bank could have

invested prudently and at lower cost the funds of the Trusts in which plaintiffs and the members

of the Class were beneficiaries. Even assuming that the Bank made a prudent decision to

purchase shares in the Nations Funds, which plaintiffs do not, upon information and belief, the

Bank did not negotiate the fees and expenses to be charged to the Trusts by the Nations Funds or

comparison shop with other funds or families of funds in an attempt to obtain the same or better

investment services elsewhere.  Similarly, neither NFT nor its Board of Trustees, sought to

obtain the lowest fees from the subsidiaries of BAC actually operating the Nations Funds.

Indeed, as stated by New York's Attorney General Eliot Spitzer: "Fund directors do not – and cannot – negotiate hard on the fees." As such, NFT and the entire Board of Trustees of NFT, aided and abetted by defendants, breached the fiduciary duties owed to plaintiffs and the members of the Class.

27.    Upon information and belief, BAC and the Bank specifically excluded alternate investment vehicles (such as other families of funds such as the Vanguard and Fidelity mutual funds specifically requested by plaintiff Kutten) from their considerations in order to maximize their earnings and those of their corporate affiliates and did not give serious consideration to leaving the assets of fiduciary accounts invested as they were, pre-Conversion, and/or giving beneficiaries of such accounts a choice as to the various alternatives available. Similarly, at no time did BAC and the Bank give any consideration to making changes in the Bank's "Common Trust Funds" so as to provide any of the purported "benefits" that the Bank claimed would be forthcoming as a result of the Conversion. Plaintiff Kutten's requests for changes in investments were repeatedly rebuffed. [5]

28.    On information and belief, as a result of a conspiracy among the defendants and others presently unknown, the Bank and BAC, as part of a corporate business decision, chose to invest the fiduciary assets of plaintiffs and the members of the Class in shares of the Nations Funds as part of the Conversion and otherwise in order, inter alia, to generate investment advisory fees and other fees for its various affiliates and to "bulk-up" the Nations Funds without regard to whether such investments were prudent and in the best interest of plaintiffs and the other beneficiaries of fiduciary accounts.

29.    The foregoing Conversion of the assets of fiduciary accounts to the Nations Funds and the investment of fiduciary assets therein generally was carried out in furtherance of BAC's

corporate plan to reduce the Bank's expenses of managing fiduciary assets and increasing BAC's

overall direct and indirect profits from fiduciary operations. The assets in the fiduciary accounts

managed by the Bank, including the Kutten and Crowley Trusts, were particularly vulnerable to

misuse since BAC and the Bank regarded the fiduciary accounts in their care as a "cookie jar"

open for the taking. BAC and the Bank proceeded to carry out the Conversion since they would

not merely profit from the Bank's trustee and similar fiduciary fees but "double dip" by

generating additional revenues through BAC's related asset management business and otherwise.

Additional profit was also generated by adding the assets in the Bank's fiduciary accounts to the

Nations Funds following the Conversion, thereby making them more saleable at retail to the

investing public. Further, the Conversion created an opportunity for the Bank to avoid the

relatively low profitability of managing the fiduciary accounts (and the expenses related thereto)

which the Bank had contracted to do when it (and/or its predecessors) agreed to serve as

fiduciary thereof, and substitute ever-increasing fee income directly and through its corporate

affiliates.

      30.     The Bank and its affiliates reaped many millions of dollars in purported money

management, investment advisory and other fees as a result of the Conversion and thereafter

from the investment of fiduciary assets in the Nations Funds. The Bank also benefited by

receiving Trustee or similar fees for serving as a fiduciary and by reason of the benefits which

flowed from, inter alia, substantially reduced operating expenses of the Bank's fiduciary

operations. Despite these benefits to the Bank and its affiliates, these investments have been of

little benefit for the Bank's fiduciary accounts and the beneficiaries thereof, including plaintiffs

and the members of the Class. On information and belief, all members of the Class suffered

damages from the investment practices of the Bank as described above in an amount which

---

[5] Plaintiff Kutten, although nominally a co-trustee with the Bank, was typically ignored in her role as such and her

cannot presently be determined but which is capable of calculation.

## TRADING ACTIVITIES IN NATIONS FUND SHARES

31.     Notwithstanding the fact that the Bank now states: "We have zero tolerance for conduct that fails to protect the interests of our clients, associates and shareholders," the defendants for their own financial advantage agreed and conspired with each other and various third parties directly and/or through the operation of the Nations Funds to violate the federal securities laws and breached the fiduciary duties they owed to members of the Class and to the Nations Funds themselves (among others) by, among other things, engaging in fraudulent schemes that benefited the defendants to the extent of tens of millions of dollars at the expense of the affected Nations Funds and its shareholders such as the fiduciary accounts and the beneficiaries of such accounts which held them.  Such schemes involved the express agreement and complicity of the Bank, the Nations Funds and others who conspired to and aided and abetted the breach of the fiduciary duties owed by them to holders of Nations Fund shares in return for substantial fees and other benefits for themselves. Although substantial settlements of certain of these claims have now been reached with the SEC and New York Attorney General Spitzer, no benefit from any such settlements has yet accrued to plaintiffs or members of the Class. Further, plaintiff Kutten, will not receive any benefit from any payment by the Bank to the Nations Funds since the Kutten Trusts no longer are shareholders thereof.

32.     One scheme pursuant to which the defendants violated the federal securities laws and breached fiduciary duties to the Nations Funds and its shareholders was carried out by their agreeing that certain favored customers of BAC and the Bank, including Canary Capital Partners, Ltd. ("Canary") would be permitted to "late trade" certain Nations Funds shares. The daily price of mutual fund shares is generally calculated as of 4:00 p.m. EST. Orders to buy, sell

---

consent was not sought by the Bank for the Conversion.

or exchange mutual fund shares placed at or before 4:00 p.m. EST on a given day receive that day's price. Conversely, orders placed after 4:00 p.m. EST are required to be priced using the following day's price. Canary agreed and conspired with the other defendants directly or through the Nations Funds that orders Canary placed after 4:00 p.m. on a given day would illegally receive that day's price (as opposed to the next day's price, which the order would have received had it been processed lawfully). This allowed Canary to capitalize on post-4:00 p.m. information to the detriment of the fiduciary accounts which held the particular Nations Funds in which Canary was so trading.

33.     Defendants also conspired with others and agreed to violate the federal securities laws and breached fiduciary duties to the members of the Class by allowing Canary and other favored customers of BAC and the Bank to engage in "timing" of transactions in various of the Nations Funds. "Timing" is an investment technique involving short-term, "in and out" trading of mutual fund shares. This technique is designed to exploit inefficiencies in the way mutual fund companies such as NFT price their shares. It is widely acknowledged that timing inures to the detriment of long-term shareholders such as the Bank's fiduciary accounts and through them, the members of the Class. Each of the Nations Funds prospectuses states that timing is monitored and that NFT works to prevent it. However, in return for investments that will increase the revenues of the Bank and its affiliates, certain of the Nations Funds managers – with the express permission of the Bank – entered into undisclosed agreements to allow timing transactions to take place.

34.     The Nations Funds' prospectuses distributed to members of the Class at the time of the Conversion and thereafter created the misleading impression that NFT and its Board of Trustees, were vigilantly protecting Class members' fiduciary accounts against the negative effects of timing. However, the opposite was true in that – with the express permission of the

Bank and its affiliates – certain of the Nations Fund managers sold the right to "time" transactions to Canary and other "friends" of the Bank and BAC. The prospectuses were silent about these arrangements.

35.     As a result of "late trading" in and "timing" of transactions in shares of the Nations Funds, Canary and the defendants each profited handsomely. The losers were the plaintiffs and the members of the Class, as well as unsuspecting (non-fiduciary account) investors in the Nations Funds because excess profits of the favored customers of BAC and the Bank came dollar-for-dollar out of their pockets, all of which exacerbated the damages experienced by the members of the Class in the wake of the Conversion.

## CLASS ACTION ALLEGATIONS
### The Relief Sought for Members of the Class

36.     This action is brought by plaintiffs Kutten and Arnold, individually and on their own behalf and on behalf of all others similarly situated, under the provisions of Federal Rules of Civil Procedure Rules 23(a) and 23(b)(3) for: (i) an accounting which determines all damages caused by defendants to the members of the Class and the extent of the unjust enrichment of the defendants from their wrongful activities;  (ii) money damages to be paid by the defendants; (iii) injunctive relief providing for the possible removal of the Bank as fiduciary for all fiduciary accounts in which members of the Class are beneficiaries; (iv) injunctive relief providing for new procedures and practices at the Bank which put the interests of plaintiff Arnold and the Class ahead of those of BAC and the Bank and which otherwise address the ongoing conflicts of interest forced by the Bank in the investment of fiduciary assets; and (v) for relief incident and subordinate thereto, including the costs and expenses of this action and an award of attorneys' fees to plaintiffs' counsel. Excluded from the Class are all persons who are members of any Class that may be certified in Williams v. Bank of America, N.A. et al., Case No. 02-15454AB

pending in the Circuit Court of the 15th Judicial Circuit in and for Palm Beach County, Florida

and/or in <u>Arnold v. Bank of America, N.A. et al.,</u> Cause No. LAC V03-7997 (C.D. Cal.)

although the latter case is about to be subject to a motion to transfer to this District or, in the

alternative, to dismiss without prejudice.

### Numerosity of the Class

37.     On information and belief, the Bank serves as a fiduciary (such as a trustee,

guardian, executor, etc.) for many thousands of Trusts and other fiduciary accounts affected by

the wrongdoing described herein.

38.     The Class represented by plaintiffs consists of all persons who are, or were at any

time from the time of the Conversion to the present ("Class Period"), beneficiaries of Trusts for

which the Bank is or was a fiduciary, the assets of which were "converted" into shares of the

Nations Funds. The California Sub-Class consists of those members of the Class whose fiduciary

accounts originated in and/or involved beneficiaries residing in California (such as plaintiff

Arnold). The Missouri Sub-Class consists of accounts originated in (as in plaintiff Kutten's case)

and/or involved beneficiaries residing in Missouri. Such definitions are subject to modification

upon completion of discovery with respect thereto.

39.     The exact number of members of the Class and California and Missouri Sub-

Classes as above described is not known by plaintiffs, but is within the sole knowledge of the

Bank. On information and belief, there were and are at least 30,000 fiduciary accounts controlled

by the Bank with, collectively, more than 45,000 beneficiaries thereof, approximately 10% of

which are members of the California Sub-Class and 10% of which are members of the Missouri

Sub-Class. These approximations are subject to discovery and the exact number of Class

members is readily ascertainable from the Bank's records.

40.     On information and belief, the members of the Class are located in most or all fifty states, and in numerous foreign countries. Similarly, members of the California and Missouri Sub-Classes are located throughout Missouri, California and in many other states.

41.     The beneficiaries of the affected Trusts are so numerous that joinder of individual members is impracticable.

**Common Issues of Law and Fact Predominate**

42.     On information and belief, at least two years prior to the Conversion, the Bank, at the direction of its parent, BAC, and in conspiracy with others, decided to invest the assets of the affected Trusts in shares of the Nations Funds, all of which were directly or indirectly "advised" and managed by subsidiaries of BAC. It is believed that such Conversions were carried out nationwide on a rolling basis subject to a master plan developed by the defendants and others. None of such separate Conversions differed materially despite the timing and different locales of each.

43.     All members of the Class and Missouri and California Sub-Classes were adversely affected by the Bank's self-serving business decision to invest the Trusts' assets in the Nations Funds pursuant to the Conversion or thereafter.

44.     All Trusts, the assets of which were converted into shares of the Nations Funds, paid directly or indirectly, management and investment advisory fees and other charges to subsidiaries and affiliates of BAC, based on the fiduciary assets invested by the Bank in the Nations Funds.

45.     There are common questions of law and fact that relate to and affect the rights of each member of the Class including, inter alia:

        (a)     whether the Bank's business decision to invest assets of the Trusts and other fiduciary accounts in the Nations Funds was motivated by the best interests of the Class

23

members (which the Bank had a duty to put before its own) or by BAC's desire to generate

management and investment advisory fees for its affiliates and subsidiaries, to lower the Bank's

expenses of managing fiduciary assets and to generate other benefits for themselves by <u>inter alia</u>,

"bulking-up" the assets invested in the Nations Funds;

> (b)    whether the Bank breached fiduciary duties to plaintiffs and the Class by

failing to conduct its fiduciary operations in conformity with the requirements of the National

Banking Act and other applicable law;

> (c)    whether the Bank breached its fiduciary duty to all members of the Class

by making investment decisions for the Trusts based upon defendants' own interests and those of

their affiliates, rather than the interests of Trust beneficiaries; and,

> (d)    what remedies are appropriate compensation for the damages caused to

plaintiffs and each member of the Class.

> 46.    The relief sought is common to the entire Class including, <u>inter alia</u>:

> (a)    a declaratory judgment that the Bank violated its fiduciary duty as Trustee

(or other similar fiduciary role) with respect to the affected fiduciary accounts and whether it

was aided and abetted by defendant BAC and others in doing so;

> (b)    payment by the defendants of compensatory damages caused by such

breaches of fiduciary duty as well as punitive damages;

> (c)    payment by the defendants of the costs and expenses of this action,

including  plaintiffs' attorneys' fees;

> (d)    an injunction preventing the Bank from opposing a petition by

beneficiaries of the Trusts affected by the Conversion and other wrongdoing referred to herein to

replace it as fiduciary; and

(e)    an injunction which establishes appropriate procedures and safeguards within the Bank to ensure that the interests of beneficiaries of Trusts are fully protected from wrongdoing such as described herein.

**<u>Typicality of Plaintiffs' Claims</u>**

47.    Plaintiffs have been beneficiaries of fiduciary accounts affected by the wrongdoing of the Bank as described herein.

48.    The assets of the Kutten and Crowley Trusts, like all other Trusts and similar fiduciary accounts, were invested by the Bank in the Nations Funds pursuant to a wholesale business policy decision by BAC made some time prior to 1999 and carried out by the Bank and others thereafter pursuant to the Conversion and subsequently regardless of whether the underlying fiduciary accounts "resided" with the Bank or one of its predecessor banks..

49.    On information and belief, the Kutten and Crowley Trusts, like all other Trusts and similarly situated fiduciary accounts, were used by the Bank and its affiliates to generate additional management, investment advisory and/or other fees and benefits for themselves (even after the so-called credits were applied as a result of certain Nations Funds advisory fees) without regard for the best interests of the beneficiaries of such accounts such as plaintiffs and the members of the Class.

50.    The claims of the plaintiffs, who are representatives of the Class and the Missouri and California Sub-Classes, are typical of the claims of all members thereof. The claims of plaintiffs are based on the same factual allegations and legal theories as the claims of all other members of the Class and the Missouri and California Sub-Classes.

**Plaintiffs Will Fairly and Adequately Represent the Class and the Missouri and California Sub-Classes**

51.     The plaintiffs are able to and will fairly and adequately protect the interests of the Class and the Missouri and California Sub-Classes.

52.     The attorneys for plaintiffs are experienced and capable in complex litigation. The attorneys for plaintiffs and the Class will actively conduct and be responsible for the prosecution of this litigation and the expenses thereof.

## COUNT ONE
## BREACH OF FIDUCIARY DUTY

53.     Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

54.     On information and belief, the Bank's decision to invest the assets of the Trusts in the Nations Funds was motivated not by the interests of plaintiffs and the Class members but by BAC's desire to generate investment advisory and other fees for its affiliates and, indirectly, for itself, as well as to reduce the Bank's operating expenses.

55.     On information and belief, the Bank failed to consider the Nations Funds' high expense or alternative lower cost families of mutual funds (or deliberately did not do so)  when it invested the assets of the Trusts into shares of the Nations Funds thus putting its own interests before those of the beneficiaries of fiduciary accounts.

56.     On information and belief, the Bank failed to consider the best interests of the Trust beneficiaries when it invested the Trusts' assets in the Nations Funds and breached its duty of loyalty to them by putting the interests of itself and its affiliates before the interests of plaintiffs and the members of the Class.

26

57.     The Bank's wholesale investment of the assets of the Trusts in the Nations Funds

in the Conversions carried out around the country was a breach of its fiduciary duty to plaintiffs

and the members of the Class, which breach was aided, abetted and/or directed by BAC and its

affiliates.

58.     As a result of, inter alia, the Bank's improper wholesale transfer of fiduciary

assets held by fiduciary accounts the Trusts into shares of the Nations Funds, the beneficiaries of

the Trusts or other similarly situated accounts for which the Bank was a fiduciary have been

damaged in an amount to be determined by the Court, but believed to be substantial.

## COUNT TWO

## BREACH OF CONTRACT

59.     Plaintiffs repeat and reallege each and every allegation contained above as if fully

set forth herein.

60.     By means of the acceptance by the Bank and its predecessors of the trusteeship of

the Kutten and Crowley Trusts and each of the other Trusts affected by the Conversion, the Bank

and its predecessors committed to provide to all such Trusts complete investment management

services of a corporate fiduciary, and render such services on an individualized basis consistent

with the goals and objectives of plaintiff Kutten's parents, plaintiff Arnold's grandfather and the

other creators of the Trusts and the needs of the beneficiaries thereof. As the Bank states: **"It is

our responsibility to invest the trust assets prudently and profitably according to the

grantor's wishes as outlined in the trust document." Such promise by the Bank and its

predecessors was a material implied term of each trust agreement or other document

which established the underlying fiduciary relationship.** No grantor of a Trust anticipated or

could reasonably foresee that the Conversion would be carried out by the Bank with Trust assets

that the Bank would mishandle fiduciary assets as described herein or that the designated

fiduciary would be the Bank in its present form. Further, as set forth in those Counts not asserted on behalf of the Class, the Bank ignored the express provisions of the Kutten Trusts with respect to the investments made for them by the Bank and otherwise.

61.      Plaintiffs and each member of the Class were and/or are beneficiaries of the Bank's contractual obligations to the creators of the Trusts and other fiduciary relationships. By abdicating its responsibilities for individual investment management services and/or through "Common Trust Funds" in favor of the wholesale Conversion of fiduciary assets as described herein that the Bank was obligated to provide to the beneficiaries of its fiduciary accounts, and by conducting itself in its present business form, the Bank breached its contractual obligations thereto.

62.      By virtue of the Bank's breach of its contractual obligations to the members of the Class and Missouri and California Sub-Classes, plaintiffs and the members thereof have suffered damages in an amount to be determined by the Court.

## COUNT THREE

## BREACH OF CONTRACT

63.      Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

64.      This Count if brought by plaintiffs on behalf of those members of the Class who are beneficiaries of Trusts originally established with the designate trustee being one of the banks acquired by and/or merged into the Bank or its predecessors ("Acquired Banks").

65.      As with the trusts established by plaintiff Kutten's parents with Boatmen's Trust Company as designated corporate Trustee or by plaintiff Arnold with the Bank of Santa Monica as designate corporate Trustee, the grantors of all affected Trusts selected as Trustee institutions which promised and agreed to deliver personalized fiduciary services to the beneficiaries thereof.

28

Implicit in the contractual fiduciary relationship between the grantors and the Acquired Banks was the provision of a full range of personalized fiduciary services, including individualized investment management.

66.     The Bank, by eliminating the personalized fiduciary services to members of the Class, including, inter alia, individualized investment management, materially breached the explicit and implied terms of the Indentures of Trust or similar documents which initially caused the formation of such Trusts, including, but not limited to the following:

(a)     failing to provide appropriate trained personnel to supervise and monitor the performance of the assets in their charge, including a uniform failure to invest in appropriate asset classes;

(b)     bouncing plaintiffs and others similarly situated to poorly manned and anonymous "Call Centers" with whom there was no pre-existing relationship, trust and fealty;

(c)     changing without plaintiffs' and others similarly situated consent representatives of the Bank to deal with plaintiffs who had no knowledge of plaintiffs' circumstances and others similarly situated or the purposes for which the Trusts were established; and

(d)     continuing to charge fiduciary fees when failing to perform the services the services that the Acquired Banks had agreed to perform.

67.     Because the transfer of fiduciary responsibilities from the Acquired Banks substantively and materially affected the pre-existing fiduciary relationship with the Bank, it was obliged to give notice to Class members of, inter alia, the terms of the merger or business combination, the forthcoming material changes in the relationship and provide to them the opportunity to seek a replacement fiduciary.

68.     By virtue of the foregoing lack of appropriate notice and the material change in fiduciary services delivered by the Bank to members of the Class following the acquisition of the Acquired Banks, such notice should now be provided to affected beneficiaries which, <u>inter</u> <u>alia</u>, provides them with the opportunity to seek a replacement fiduciary.

**COUNT FOUR**

**UNJUST ENRICHMENT**

69.     Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

70.     By reason of defendant BAC's causing the Bank's fiduciary assets in affected accounts to be invested in the Nations Funds, the Bank and BAC have "double dipped." The defendants have profited by the Conversion and the subsequent acts described herein, thereby unjustly enriching themselves at the expense of plaintiffs and the members of the Class and Missouri and California Sub-Classes. Defendants have similarly enriched themselves, their subsidiaries and affiliates by using information regarding the beneficiaries of fiduciary accounts to market various goods and services including credit cards, loans and deposit accounts (and to permit certain customers of the defendants to engage in late trading and other improper practices involving the Nations Funds) from which products and services they have been unjustly enriched.

71.     Such "double dipping" was carried out by the Bank and BAC by imposing on fiduciary accounts the Banks' fees for acting as a corporate fiduciary as well as investment advisory fees, and other related charges which, when taken together with all the Nations Funds' expenses, even after so-called credits for certain Nations Funds advisory fees, exceeded the amounts to which the Bank was entitled to payment for, <u>inter</u> <u>alia</u>, investment of the fiduciary assets and administration of the underlying fiduciary accounts for which services its trustee or

similar fees were intended to cover. Such benefits to the Bank and BAC were exacerbated by the

Bank's avoidance of substantial operating expenses by reason of its abdication of its

individualized investment and administrative responsibilities owed to the members of the Class

and Missouri and California Sub-Classes. The Bank enhanced its profit performance at

plaintiffs' expense by favoring the use of its own NationsFunds and investing in same to increase

the Nations Funds' own asset base, and aggrandize its own stature under the guise of allegedly

providing more services to participants in its so-called "Private Bank."  The Bank's objectives

were clear from its telling press release of July 14, 1999:

> United by the merger of Bank of America and NationsBank,
> NationsBanc Investments, Inc., and BA Investment Services, Inc.,
> became one brokerage company on July 12. The birth of Banc of
> America Investment Services, Inc., the new name for the retail
> brokerage, gives investors a powerful ally within the Bank of
> America franchise. (For the full press release, see
> http://www.bankofamerica.com/newsroom/press/press.cfm?PressID=
> press.19990714.03.htm&LOBID=1>).

72.    Further, upon information and belief, with respect to at least certain of the Trusts

for which the Bank has acted as Trustee, the total charges against such Trusts for trustee

fees/commissions, advisory fees and other amounts payable by the Trusts exceed the contractual

amounts for such charges agreed upon by the creators of such Trusts.

73.    The defendants have invested the proceeds of the foregoing unjust enrichment and

realized additional profits thereupon, all of which should be returned to the Trusts and other

similarly affected accounts and/or their beneficiaries, as the Court shall deem appropriate (e.g. a

proportionate share of the defendants' profits during the years of misappropriation) pursuant to

California Probate Code, Section 166440(a)(1) and otherwise.  Missouri statutes impose strict

liability against fiduciaries who "at their sole risk" make investments that are improper such that

the Bank is "absolutely liable" to plaintiff Kutten and others in the Missouri Sub-Class for their

damages. (§362.550.5 R.S.Mo.). Plaintiffs and others similarly situated are entitled to recover the Bank's ill-gotten gains and profits therefrom.

## COUNT FIVE

## VIOLATION OF CALIFORNIA PROBATE CODE

74.     Plaintiff Arnold repeats and realleges each and every allegation contained above as if fully set forth herein. The claims set forth in Counts Five  through Seven are asserted on behalf of the California Sub-Class.

75.     Pursuant to Section 16002 of the California Probate Code, the Bank owes and owed to  plaintiff Arnold and the members of the California Sub-Class an absolute duty of loyalty. In exercise of that duty, the Bank has a duty to administer the Trusts solely in the interest of the beneficiaries.

76.     Pursuant to the common law of California, the Bank owes and owed to plaintiff Arnold and each member of the California Sub-Class an absolute duty of loyalty. In exercise of that duty, the Bank has a duty to administer the Trusts solely in the best interests of the beneficiaries, i.e. the members of the California Sub-Class.

77.     Pursuant to Section 16060 of the California Probate Code, the Bank owes and owed to plaintiff Arnold and the members of the California Sub-Class a duty of candor.

78.     Pursuant to the common law of California, the Bank owes and owed to plaintiff Arnold and the members of the California Sub-Class a duty of candor.

79.     By acting as alleged herein, the Bank has violated and continues to violate the duties of loyalty and candor it owes and owed to plaintiff Arnold and the members of the California Sub-Class. Such violations of the Bank's duties as fiduciary constitute breach of trust pursuant to 16400 of the California Probate Code.

80.     Pursuant to Section 16004 of the California Probate Code, the Bank owes and owed to plaintiff Arnold and the members of the California Sub-Class a duty not to use or deal with Trust property for its own profit, nor to take part in any transaction in which it has an interest adverse to the beneficiary, such as plaintiff Arnold and the members of the California

32

Sub-Class.

81.    Pursuant to the common law of California, the Bank owes and owed to plaintiff Arnold a duty not to take part in a transaction in which it had a conflict of interest, as it did and does as described above.

82.    By acting as alleged herein, the Bank has violated and continues to violate the duty not to use or deal with Trust property for its own profit, and the duty to not take part in any transaction in which it had a conflict of interest. Such violations of the Bank's duties as fiduciary constitute breach of trust pursuant to Section 16400 of the California Probate Code.

83.    Pursuant to Section 16040 of the California Probate Code, the Bank owes and owed to plaintiff Arnold and the members of the California Sub-Class a duty of care that includes the duty to invest Trust assets prudently and with regard to individualized strategy appropriate and productive pursuant to Probate Code Sections 16007 and 16009. Pursuant to Probate Code Section 16014, the Bank is required to apply fully the special skills of a corporate fiduciary, and this duty heightens the duty of care otherwise applicable to it.

84.    By acting as alleged herein, the Bank has violated and continues to violate the duties of care and productivity it owes and owed to plaintiffs and the members of the California Sub-Class. Such violations of the Bank's duties as fiduciary constitutes breach of trust pursuant to Section 16400 of the California Probate Code.

85.    Pursuant to Section 16420 of the California Probate Code, plaintiff Arnold and the members of the California Sub-Class may maintain a cause of action against the Bank for its breaches of its duties as fiduciary and its participation in transactions in which it had or has a conflict of interest, as it does here.

86.    Pursuant to Section 16440 of the California Probate Code, the Bank is liable to plaintiff Arnold and the members of the California Sub-Class for actual and punitive damages, attorneys' fees, interest, and such other relief as the Court may order.

## COUNT SIX

## BREACH OF FIDUCIARY DUTY UNDER CALIFORNIA LAW

87.     Plaintiff Arnold repeats and realleges each and every allegation contained above as if fully set forth herein.

88.     Pursuant to Section 15002 of the Probate Code, the common law of California with respect to fiduciary and trust matters remains the law of the State of California, and Probate Code Section 16420(b) expressly preserves "any other appropriate remedy provided by statute or the common law."

89.     By acting as alleged herein, the Bank has violated its fiduciary duties of absolute loyalty and candor owed to plaintiff Arnold and the members of the California Sub-Class.

90.     By acting as alleged herein, the Bank has violated its fiduciary duty not to participate in transactions in which it had or has a conflict of interest, as it does here.

91.     By acting as alleged herein, the Bank has violated its fiduciary duties of care and productivity it owes or owed to plaintiff Arnold and the members of the California Sub-Class.

92.     By acting as alleged herein, the Bank has violated its fiduciary duty that it owes or owed to plaintiff Arnold and the members of the California Sub-Class to take and exercise control over Trust assets.

93.     The Bank and its affiliates have already unlawfully extracted huge sums in the form of fees and other charges assessed against fiduciary accounts, and they will continue indefinitely to extract unlawful fees and other charges from plaintiff Arnold and the members of the California Sub-Class, in an amount which cannot be presently determined.

94.      Pursuant to Section 16420 of the California Probate Code, plaintiff Arnold and the members of the California Sub-Class may maintain a cause of action against the Bank for its breaches of its duties as fiduciary and its participation in transactions in which it had or has a conflict of interest as described above.

95.     The Bank's unlawful conduct, breach of fiduciary duty and breach of contract have, which constitutes breach of trust pursuant to Section 16400 of the California Probate Code.

96.      The unlawful acts and practices of the Bank as alleged herein, including violations of  violation of Section 16400 of the California Probate Code as well as other state and federal law,  constitute unlawful business practices within the meaning of California Business and Professions Code Section 17200, et seq.

97.      Unless the Bank is enjoined from continuing to engage in the foregoing unfair and deceptive business practices, plaintiff Arnold and the other members of the general public residing within the State of California and the members of the California Sub-Class will continue to be injured and damaged by the Bank's unfair business practices.

98.      So as not to be unjustly enriched by its own wrongful actions and conduct, the Bank should be required to disgorge and restore to plaintiff Arnold and the other members of the general public residing within the State of California and the members of the California Sub-Class all monies wrongfully obtained by it as a result of its wrongful conduct, together with interest and profits earned thereon.

## COUNT SEVEN

## VIOLATION OF CALIFORNIA BUSINESS
## AND PROFESSIONS CODE SECTION 17200

99.      Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein. Plaintiffs assert this cause of action in their capacity as  private attorneys general on behalf of the members of the general public residing within the State of California and on behalf of the members of the California Sub-Class.

100.      The Bank has engaged in and continues to engage in unfair, unlawful and deceptive business practices, including but not limited to sending representatives from St. Louis, Missouri to meet with plaintiff Kutten in Northern California, whereby it has conspired with BAC and its affiliates to force the Trusts to have their assets re-directed from individually managed accounts and/or so-called "Common Trust Funds" and/or other assets to proprietary mutual funds controlled by the Bank and its affiliates. Said Conversions have resulted in higher

total direct and indirect expenses charged to fiduciary accounts than those historically paid to the Bank.

101.    By acting as alleged herein, the Bank has violated its duties as a fiduciary, which constitutes breach of trust pursuant to Section 16400 of the California Probate Code.

102.    The unlawful acts and practices of the Bank as alleged herein, including violations of Section 16400 of the California Probate Code, constitute unlawful business practices within the meaning of California Business and Professions Code Section 17200, et seq.

103.    Unless the Bank is enjoined from continuing to engage in the foregoing unfair and deceptive business practices, plaintiffs and the other members of the general public residing within the State of California and the members of the California Sub-Class will continue to be injured and damaged by the Bank's unfair business practices.

104.    So as not to be unjustly enriched by its own wrongful actions and conduct, the Bank should be required to disgorge and restore to plaintiffs and the other members of the general public residing within the State of California and the members of the California Sub-Class all monies wrongfully obtained by it as a result of its wrongful conduct, together with interest and profits earned thereon.

## COUNT EIGHT

## VIOLATION OF CHAPTER 456 MISSOURI REVISED STATUES

105.    Plaintiff Kutten repeats and realleges each and every allegation contained above as if fully set forth herein. The claims set forth in Counts Eight and Nine are asserted on behalf of the members of the Missouri Sub-Class.

106.    Pursuant to §456.520.2 R.S.Mo. and §456.900 et. seq. R.S.Mo. ("The Prudent Investor Act") R.S.Mo. (2000), the Bank owes and owed to plaintiff Kutten and the members of the Missouri Sub-Class an absolute duty of loyalty. In exercise of that duty, the Bank has a duty

to administer the Trusts and other fiduciary accounts solely in the interests of the beneficiaries thereof.

107.    Pursuant to §456.905 R.S.Mo., the Bank owes and owed to plaintiff Kutten and the members of the Missouri Sub-Class an absolute duty of loyalty. In exercise of that duty, the Bank has a duty to administer the Trusts and other fiduciary accounts governed by the Missouri law solely in the best interests of the beneficiaries, i.e. the members of the Missouri Sub-Class.

108.    Pursuant to the Missouri Prudent Investor Act, the Bank owes and owed to plaintiff Kutten and the members of the Missouri Sub-Class a duty to exercise reasonable care, skill and caution in investment management decisions, to ascertain facts relevant to the investment and management of trust assets, and a duty to use the special skills and expertise it represented itself to possess when investing and managing trust assets..

109.    By acting as alleged herein, the Bank has violated and continues to violate the duties of loyalty and candor it owes and owed to plaintiff Kutten and the members of the Missouri Sub-Class. Such violations of the Bank's duties as fiduciary constitute breach of trust imposed by Missouri statute.

110.    Pursuant to the Missouri Prudent Investor Act and §456.570.2 R.S.Mo., the Bank owes and owed to plaintiff Kutten and the members of the Missouri Sub-Class a duty not to use or deal with fiduciary assets for its own profit, not to take part in any transaction in which it has an interest adverse to the beneficiary, such as plaintiff Kutten and the members of the Missouri Sub-Class.

111.    By acting as alleged herein, the Bank has violated and continues to violate the duty not to use or deal with fiduciary assets for its own profit, and the duty to not take part in any transaction in which it had a conflict of interest. Such violations of the Bank's duties as fiduciary constitute breach of trust pursuant to Missouri statute.

112.    Pursuant to the Prudent Investor Act, the Bank owes and owed to plaintiff Kutten and the members of the Missouri Sub-Class a duty of care that includes the duty to invest fiduciary assets prudently and with regard to individualized strategy appropriate to each fiduciary account and to each beneficiary thereof, and the duty to make fiduciary assets productive. Moreover, the Prudent Investor Act requires the Bank to apply fully the special skills of a corporate fiduciary, heightening the duty of care otherwise applicable to it.

113.    By acting as alleged herein, the Bank has violated and continues to violate the duties and productivity it owes and owed to plaintiff Kutten and the members of the Missouri Sub-Class. Clearly the Bank was interested in seizing new opportunities and lining its own pockets at the expense of plaintiff Kutten and those similarly situated.  Such violations of the Bank's duties as fiduciary constitutes breach of trust pursuant to Missouri law.

114.    The Bank and its affiliates have already unlawfully extracted huge sums in the form of fees and other charges assessed against fiduciary accounts and unless enjoined from doing so, they will continue indefinitely to extract unlawful fees and other charges from the members of the Missouri Sub-Class, in an amount which cannot be presently determined in violation of §456.907 R.S.Mo.

115.    Plaintiff Kutten and the members of the Missouri Sub-Class may maintain a cause of action against the Bank for its breaches of its duties as fiduciary and its participation in transactions in which it had or has a conflict of interest, as it does here.

116.    The Bank is liable to plaintiff Kutten and the members of the Missouri Sub-Class for actual and punitive damages because the Bank acted with reckless disregard for plaintiff Kutten's and others' rights, attorneys' fees, interest, and such other relief as the Court may order.

## COUNT NINE

## BREACH OF FIDUCIARY DUTY UNDER MISSOURI COMMON LAW

117.    Plaintiff Kutten repeats and realleges each and every allegation contained above as if fully set forth herein.

118.    Pursuant to the common law of Missouri, the Bank owes and owed to plaintiff Kutten and the members of the Missouri Sub-Class an absolute duty of loyalty.  In exercise of that duty, the Bank has a duty to administer the Trusts and other fiduciary accounts governed by Missouri law solely in the best interests of the beneficiaries, i.e. the members of the Missouri Sub-Class.

119.    By acting as alleged herein, the Bank has violated its fiduciary duties of absolute loyalty and candor owed to plaintiff Kutten and the members of the Missouri Sub-Class.

120.    By acting as alleged herein, the Bank has violated its fiduciary duty not to participate in transactions in which it had or has a conflict of interest, as it did and does here.

121.    By acting as alleged herein, the Bank has violated its fiduciary duties of care and productivity it owes or owed to plaintiff Kutten and the members of the Missouri Sub-Class.

122.    By acting as alleged herein, the Bank has violated its fiduciary duty that it owes or owed to plaintiff Kutten and the members of the Missouri Sub-Class to take and exercise control over fiduciary assets.

123.    Plaintiff Kutten and the members of the Missouri Sub-class may maintain a cause of action against the Bank for its breaches of its duties as fiduciary and its participation in transactions in which it had or has a conflict of interest as described above.

124.    The Bank's unlawful conduct, breach of fiduciary duty and breach of contract have damaged plaintiff Kutten and the members of the Missouri Sub-Class, inter alia, resulting

in waste and mismanagement of fiduciary assets, self-dealing and its consequent unjust enrichment.

125.    The Bank is liable to plaintiff Kutten and the members of the Missouri Sub-Class for actual and punitive damages because the Bank acted with reckless disregard for plaintiff Kutten's and others' rights,, attorneys' fees, interest and such other relief as the Court may order.

**COUNT TEN**

**INDIVIDUAL CLAIM OF PLAINTIFF KUTTEN**

**BREACH OF FIDUCIARY DUTY**

126.    Plaintiff Kutten repeats and realleges each and every allegation contained above as if fully set forth herein.

127.    As noted above, plaintiff Kutten's family wealth commenced with the toils of her grandfather, Charles H. Yalem, who founded the Aetna Finance Co., later sold to International Telephone and Telegraph Corporation in 1960.  Yalem, always a conservative investor, donated hundreds of thousands of dollars to St. Louis civic endeavors, including the St. Louis Zoo (the Charles H. Yalem Children's Zoo), St. Louis University, Jewish Hospital of St. Louis, Washington University, the St. Louis Symphony Orchestra and the St. Louis chapter of the YMCA.  Yalem's experience with predecessors to the Bank commenced at least with St. Louis Union Trust which became Centerre Trust Co, which became Boatmen's Trust Co. Yalem's net worth was achieved as a result of a passion for cautious investing and he instilled in his son-in-law and daughter, Joseph and Carolyn Kutten, plaintiff Kutten's parents, the wisdom of careful and conservative investing so that future generations of the family might enjoy his good fortune. In turn, plaintiff Kutten's parents passed these virtues on to her. The Kutten family employed the St. Louis law firm of Bryan, Cave, McPheeters and McRoberts n/k/a/ Bryan Cave to draft the Kutten Trusts and represent them on estate planning matters.  The relationship of the Kutten

40

family was not only with their trust company, it was with the individuals who represented the

trust company who understood and appreciated the desires and needs of the entire family,

including  plaintiff Kutten, a single mother of two children, as well as one of her brothers, a

disabled person who is institutionalized and has special needs.  The Kuttens had long term

personal relationships with several individuals, including Robert Hitpas and Richard Klapp.

These individuals and their successors are no longer responsible for the portfolios entrusted to

them.  Instead, the Bank boasts of a minimum of 450 faceless employees who answer customer

inquiries at "Call Centers" established around the country.  The systemic change that occurred at

the Bank when it acquired the predecessor banks and converted trust assets without the consent

of plaintiff Kutten for its own gain and profit represents a classic instance of self-dealing and

breach of loyalty, the antithesis of conduct expected of a fiduciary.  The Bank has breached its

fiduciary duties to plaintiff Kutten and her daughters, including the duty of loyalty, and various

duties highlighted by the federal regulations issued by the Office of the Comptroller of the

Currency in 1996 directed to all national banks that act in a fiduciary capacity, with which the

Bank failed to comply.[6.]   The Bank:

> (a)    failed to exercise such specialized care and skill as is required of a
> fiduciary;

> (b)    converted trust assets and their subsequent  purchase of the Bank's
> proprietary mutual funds, the Nations Funds;

> (c)    failed to properly diversify investment portfolios of the Trusts, and acting
> in derogation of the settlor's expressed directions;

> (d)    failed to adopt appropriate policies relevant to self-dealing and conflict of
> interest as required by and in violation of 12 CFR Part 9;

---

[6] Plaintiff Kutten asserts no private cause of action thereunder.  Rather, the Bank's failure to comply with them is a

(e)      failed to preview the prospective account to determine if the account could be properly administered subsequent to the acquisition of Boatmen's Trust Co. by the Bank as required by and in violation of 12 CFR, part 9.6;

(f)      failed to properly invest funds waiting to be invested to obtain yields consistent with a reasonable rate of return as required by and  in violation of 12 CFR Part 9.10;

(g)      failed to assign at least two individuals to plaintiff Kutten's accounts as required by 12 CFR, part 9.13;

(h)      charged excessive fees for fiduciary compensation in violation of 12 CFR part 9.15;

(i)      failed to properly supervise personnel entrusted with the management of plaintiff Kutten's Trusts' assets to ensure implementation of the grantors' expressed directions;

(j)      failed to make appropriate trades in the equity and bond markets to enhance the achievement of the objectives of the Trusts, including failing, through neglect, to make trades of any kind for several years;

(k)      failed to establish a written plan to engage in the sale and marketing of Nations Funds to Trusts under its fiduciary control and failed to absorb the expenses of establishing a collective investment fund, instead charging the beneficiaries, including plaintiff Kutten a fee of not less than 0.01%;

(l)      failed to consider and advise the beneficiaries of the adverse tax consequences arising from a conversion of trust assets and the subsequent purchase of Nations Funds;

(m)      failed to consider alternative investments in funds whose returns and ratings are higher than Nations Funds which has scored low on nationally respected ratings;

_____

fundamental breach of fiduciary duty.

(n)    created a wholly owned subsidiary to serve as the sole vendor of its own product to Trusts under its fiduciary management and control;

(o)    failed to resign as Trustee when demanded to do so by plaintiff Kutten, citing its need for business income as overriding its performance as a fiduciary duty and resigning only after plaintiff Kutten's citation of the innumerable occasions when the Bank had breached its duty to plaintiff Kutten and the Kutten Trusts;

(p)    failed to observe the parameters of the instructions with regard to conversion issued by the Federal Reserve Bank of the United States in SR 97-3 (SPE), providing [i]n determining whether to convert common trust funds to mutual funds, a banking organization must address the possibility that the conversion could result in conflicts between the best interests of the organization and the fiduciary." Further, the Federal Reserve noted the existence of potential conflicts of interest for a national bank to engage in such transactions and the need for management to demonstrate that it has determined that the governing trust instrument for each affected customer authorizes investment in mutual funds and the mutual funds are suitable investments for the particular accounts;

(q)    lost administrative control of plaintiff Kutten's accounts for an undetermined period of time in 2202 and 2003, including electronic access to the accounts and the paper files relating to same; and

(r)    failed to communicate with the plaintiff Kutten, return her phone calls and letters and failed to perform as requested by plaintiff Kutten with respect to modifying investment strategies consistent with the investment philosophy that reigned in her family for decades.

## COUNT ELEVEN

## INDIVIDUAL CLAIM OF PLAINTIFF KUTTEN

## BREACH OF FIDUCIARY DUTY

128.    Plaintiff Kutten repeats and realleges each and every allegation contained above as if fully set forth herein.

129.    On information and belief, the Bank's decision to invest the assets of the Trusts in the Nations Funds was motivated not by the interests of plaintiff Kutten and her daughters but by BAC's desire to generate investment advisory and other fees for its affiliates and, indirectly, for itself, as well as to reduce the Bank's operating expenses.

130.    On information and belief, the Bank failed to consider the Nations Funds' high expense or alternative lower cost families of mutual funds when it invested the assets of the Kutten Trusts into shares of the Nations Funds thus putting its own interests before those of the beneficiaries of fiduciary accounts maintained for the Kutten Trusts.

131.    On information and belief, the Bank failed to consider the best interests of plaintiff  Kutten and her daughters when it invested the Kutten Trusts' assets in the Nations Funds and breached its duty of loyalty to them by putting the interests of itself and its affiliates before the interests of plaintiff Kutten and her daughters.

132.    The Bank's wholesale investment of the assets of the Kutten Trusts in the Nations Funds was a breach of its fiduciary duty to plaintiff Kutten and her daughters, which breach was aided, abetted and/or directed by BAC and its affiliates.

133.    As a result of, inter alia, the Bank's improper wholesale transfer of fiduciary assets held by fiduciary accounts the Kutten Trusts into shares of the Nations Funds, the accounts of plaintiff Kutten and her daughters for which the Bank was a fiduciary have been damaged in an amount to be determined by the Court, but believed to be substantial.

## COUNT TWELVE

## INDIVIDUAL CLAIM OF PLAINTIFF KUTTEN

## BREACH OF CONTRACT

134.    Plaintiff Kutten repeats and realleges each and every allegation contained above as if fully set forth herein.

135.    By means of the acceptance by the Bank and its predecessors of the trusteeship of the Kutten Trusts, the Bank and its predecessors committed to provide to such Trusts complete investment management services of a corporate fiduciary, and render such services on an individualized basis consistent with the goals and objectives of plaintiff Kutten's parents and the needs of the beneficiaries thereof. As the Bank states: "It is our responsibility to invest the trust assets prudently and profitably according to the grantor's wishes as outlined in the trust document." No grantor of a Trust anticipated or could reasonably foresee that the Conversion would be carried out by the Bank with Trust assets or that the designated fiduciary would be the Bank in its present form. Further, as set forth in those Counts not asserted on behalf of the Class, the Bank ignored the express provisions of the Kutten Trusts with respect to investments and otherwise.

136.    Plaintiff Kutten and her daughters were beneficiaries of the Bank's contractual obligations to the creators of the Kutten Trusts and other fiduciary relationships. By abdicating its responsibilities for individual investment management services and/or through "Common Trust Funds" in favor of the wholesale Conversion of fiduciary assets that the Bank was obligated to provide to the beneficiaries of its fiduciary accounts, and by conducting itself in its present business form, the Bank breached its contractual obligations to plaintiff Kutten, her parents and daughters.

137.     By virtue of the Bank's breach of its contractual obligations to plaintiff Kutten, her parents and her daughters, plaintiff Kutten and her daughters have suffered damages in an amount to be determined by the Court.

138.     The Bank has breached its contractual obligations to plaintiff Kutten and her daughters in their individual capacities as a result of its failure to adhere to the terms of the Kutten family's engagement of the Bank and its predecessors as a fiduciary and plaintiff Kutten as well as her daughters have been damaged.

## COUNT THIRTEEN

## INDIVIDUAL CLAIM OF PLAINTFF KUTTEN

## BREACH OF CONTRACT

139.     Plaintiff Kutten repeats and realleges each and every allegation contained above as if fully set forth herein.

140.     This Count if brought by plaintiff Kutten as a beneficiary of Trusts originally established with the Boatman's Trust Company, being one of the Banks acquired by and/or merged into the Bank.

141.     Boatmen's Trust Company, as designated corporate Trustee, promised and agreed to the settlers of the Kutten Trusts and its beneficiaries to deliver personalized fiduciary services. Implicit in the contractual fiduciary relationship between the plaintiff Kutten's parents and Boatman's Trust Company was the provision of a full range of personalized fiduciary services, including individualized investment management.

142.     The Bank, by eliminating the personalized fiduciary services to plaintiff Kutten, including, inter alia, individualized investment management, materially breached the explicit and implied terms of the Kutten Trusts, including, but not limited to the following:

(a)    failing to provide appropriate trained personnel to supervise and monitor the performance of the assets in their charge, including failing to invest in appropriate asset classes;

(b)    bouncing plaintiff Kutten to poorly manned and anonymous "Call Centers" with whom these was no pre-existing relationship, trust and fealty;

(c)    changing without plaintiff Kutten's consent representatives of the Bank to deal with plaintiff Kutten who had no knowledge of plaintiff Kutten or the purposes for which the Kutten Trusts were established; and

(d)    continuing to charge excessive fiduciary fees when failing to perform the services the services that Boatman's Trust Company had agreed to perform.

143.    Because the transfer of fiduciary responsibilities from Boatman's Trust Company substantively and materially affected the Kutten Trusts' pre-existing fiduciary relationship with the Bank, it was obliged to give notice to plaintiff Kutten of, <u>inter alia</u>, the terms of the merger between it and Nations Bank, the forthcoming changes in the relationship and provide to them the opportunity to seek a replacement Trustee.

144.    Although not provided with said notice, plaintiff Kutten sought the resignation of the Bank in early October, 2003.  In response, on October 17, 2003, the Bank incredibly insisted that they be allowed to remain a trustee:

> The (Bank's) Committee decided that they would not resign from these trusts.  It was a business decision that was based on the fact that Bank of America does not want to give up your business.  Bank of America, like everyone else, has felt the effects of the poor economy and has become very reluctant to voluntarily resign as trustee.

145.    The Bank continued to resist resignation until plaintiff Kutten's counsel wrote a seven page letter citing the many examples of the Bank's breach of duties in the administration of the trusts of plaintiff Kutten and her daughters.

**COUNT FOURTEEN**

**INDIVIDUAL CLAIM OF PLAINTIFF KUTTEN**

**UNJUST ENRICHMENT**

146.     Plaintiff  Kutten repeats and realleges each and every allegation contained above as if fully set forth herein.

147.     By reason of defendant BAC's causing the Bank's fiduciary assets in affected accounts to be invested in the Nations Funds, the Bank and BAC  have "double dipped." The defendants have profited by the Conversion and the subsequent acts described herein, thereby unjustly enriching themselves at the expense of plaintiff Kutten and her daughters.  Defendants have similarly enriched themselves, their subsidiaries and affiliates by using information regarding the plaintiff Kutten to market various goods and services including credit cards, loans and deposit accounts, from which products and services they have been unjustly enriched.

148.     Such "double dipping" was carried out by the Bank and BAC by imposing on plaintiff Kutten's accounts the Banks' fees for acting as a corporate fiduciary as well as investment advisory fees, and other related charges which, when taken together with all the Nations Funds' expenses, even after so-called credits for certain Nations Funds advisory fees, exceeded the amounts to which the Bank was entitled to payment for, inter alia, investment of the fiduciary assets, for which services its Trustee or similar fees were intended to cover. Such benefits to the Bank and BAC were exacerbated by the Bank's avoidance of substantial operating expenses by reason of its abdication of its individualized investment responsibilities owed to plaintiff Kutten and her daughters. The Bank enhanced its profit performance at plaintiff Kutten's expense by favoring the use of its own Funds and investing in same to increase its own asset base, and aggrandize its own stature under the guise of  allegedly providing more services

to participants in its "Private Bank"  The Bank's objectives were clear from its telling press

release in July 14,1999:

> United by the merger of Bank of America and NationsBank,
> NationsBanc Investments, Inc., and BA Investment Services, Inc.,
> became one brokerage company on July 12. The birth of Banc of
> America Investment Services, Inc., the new name for the retail
> brokerage, gives investors a powerful ally within the Bank of
> America franchise.  (For the full press release, see
> http://www.bankofamerica.com/newsroom/press/press.cfm?PressID=
> press.19990714.03.htm&LOBID=1>).

149.    The defendants have invested the proceeds of the foregoing unjust enrichment

and realized additional profits thereupon, all of which should be returned to the Kutten Trusts as

the Court shall deem appropriate (e.g. a proportionate share of the defendants' profits during the

years of misappropriation).  Missouri statutes impose strict liability against fiduciaries who "at

their sole risk" make investments that are improper such that the Bank is "absolutely liable" to

plaintiff Kutten for their losses.  §362.550.5  R.S.Mo.  Plaintiff Kutten and her daughters are

entitled to recover the Bank's ill-gotten gains and profits.

<u>C</u><u>OUNT FIFTEEN</u>

<u>INDIVIDUAL CLAIM OF PLAINTIFF KUTTEN</u>

<u>VIOLATION OF CHAPTER 456 MISSOURI REVISED STATUES</u>

150.    Plaintiff Kutten repeats and realleges each and every allegation contained above

as if fully set forth herein.

151.    Pursuant to §456.520.2 R.S.Mo. and §456.900 *et. seq.* R.S.Mo. ("The Prudent

Investor Act")  RSMo. (2000), the Bank owes and owed to plaintiff Kutten and her daughters an

absolute duty of loyalty. In exercise of that duty, the Bank has a duty to administer the Trusts

and other fiduciary accounts solely in the interests of the beneficiaries thereof.

152.    Pursuant to §456.905 R.S.Mo., the Bank owes and owed to plaintiff Kutten and

her daughters an absolute duty of loyalty. In exercise of that duty, the Bank has a duty to

administer the Kutten Trusts governed by the Missouri law solely in the best interests of the beneficiaries.

153.    Pursuant to the Missouri Prudent Investor Act, the Bank owes and owed to plaintiff Kutten and her daughters a duty to exercise reasonable care, skill and caution in investment management decisions, to ascertain facts relevant to the investment and management of trust assets, and a duty to use the special skills and expertise it represented itself to possess when investing and managing trust assets.

154.    By acting as alleged herein, the Bank has violated and continues to violate the duties of loyalty and candor it owes and owed to plaintiff Kutten and her daughters.  Such violations of the Bank's duties as fiduciary constitute breach of trust imposed by Missouri statute.

155.    Pursuant to the Missouri Prudent Investor Act and §456.570.2 R.S.Mo., the Bank owes and owed to plaintiff Kutten and her daughters a duty not to use or deal with fiduciary assets for its own profit, not to take part in any transaction in which it has an interest adverse to the beneficiary, such as plaintiff Kutten and her daughters.

156.    By acting as alleged herein, the Bank violated the duty not to use or deal with fiduciary assets for its own profit, and the duty to not take part in any transaction in which it had a conflict of interest. Such violations of the Bank's duties as fiduciary constitute breach of trust pursuant to Missouri statute.

157.    Pursuant to the Prudent Investor Act, the Bank owes and owed to plaintiff Kutten and her daughters  a duty of care that includes the duty to invest fiduciary assets prudently and with regard to individualized strategy appropriate to each fiduciary account and to each beneficiary thereof, and the duty to make fiduciary assets productive. Moreover, the Prudent

Investor Act requires the Bank to apply fully the special skills of a corporate fiduciary, heightening the duty of care otherwise applicable to it.

158.    By acting as alleged herein, the Bank has violated the duties and productivity it owed to plaintiff Kutten and her daughters. Clearly the Bank was interested in seizing new opportunities and lining its own pockets at the expense of plaintiff Kutten and her daughters. Such violations of the Bank's duties as fiduciary constitutes breach of trust pursuant to Missouri law.

159.    Plaintiff Kutten may maintain a cause of action against the Bank for its breaches of its duties as fiduciary and its participation in transactions in which it had or has a conflict of interest, as it does here.

160.    The Bank is liable to plaintiff  Kutten for actual and punitive damages because the Bank acted with reckless disregard for plaintiff Kutten's rights, attorneys' fees, interest, and such other relief as the Court may order.

## PRAYER FOR RELIEF

WHEREFORE, plaintiffs respectfully request on their own behalf and on behalf of all members of the Class and Missouri and California Sub-Classes:

(a)    certification of this action as a Class Action and appointment of plaintiff s and their counsel to represent the Class and the Missouri and California Sub-Classes;

(b)    entry of judgment on the claims for breach of fiduciary duty in favor of plaintiffs individually and as  representatives of the other members of the Class and Missouri and California Sub-Classes and against the defendants and an award of compensatory damages and punitive damages in favor of plaintiffs individually and as representatives of the other members of the Class and Missouri and California Sub-Classes and against the defendants in the amount of damages caused by the defendants' breaches of fiduciary duties;

(c)    entry of judgment on the claims for breach of contract in favor of plaintiffs individually and as representatives of the other members of the Class and Missouri and California Sub-Classes against the Bank and an award of compensatory damages in favor of plaintiffs individually and as representatives of the other members of the Class and Missouri and California Sub-Classes and against the Bank in the amount of damages caused by the Bank's breaches of contract;

(d)    entry of judgment enjoining the Bank from opposing any petition filed by any member of the Class or Missouri or California Sub-Classes seeking the removal of the Bank as corporate fiduciary and requiring the Bank to pay for all legal fees and expenses incident thereto including its own;

(e)    entry of judgment compelling the defendants to account for their unjust enrichment and disgorging the amount thereof (and the profits earned thereupon) to the fiduciary accounts, including the Kutten and Crowley Trusts, affected by the wrongdoing described herein and/or their beneficiaries, as appropriate;

(f)    entry of judgment compelling the Bank to fully insulate its fiduciary operations from all of its other business activities and those of BAC;

(g)    entry of judgment compelling the Bank to establish and implement procedures to fully protect the interests of the members of the Class including, inter alia, the appointment of an ombudsman to oversee the Bank's fiduciary operations;

(h)    repayment to the affected Nations Funds of the damages caused to them by the defendants' actions as described herein;

(i)    pre-judgment and post-judgment interest at the maximum rate allowable by law;

(j)      reasonable attorneys' fees and reimbursement of the reasonable costs and expenses of prosecuting this litigation and distributing the recovery to  members of the Class and Missouri and California Sub-Classes; and

(k)      such other or additional relief as this Court deems appropriate.

## JURY DEMAND

Plaintiffs  hereby demand a trial by jury.

SUMMERS, COMPTON, WELLS & HAMBURG
PROFESSIONAL CORPORATION

/s/ Steven M. Hamburg
STEVEN M. HAMBURG          #3313
HOLLY M. MCINTYRE          #112203
8909 Ladue Road
St. Louis, MO 63124
(314) 991-4999
(314) 991-2413 (Fax)


GREENFIELD & GOODMAN LLC
RICHARD D. GREENFIELD
24579 DEEP NECK ROAD
ROYAL OAK, MD 21662
(410)745-4149
(410) 745-4158 (Fax)


GANCEDO & NIEVES LLP
Hector G. Gancedo
144 W. Colorado Blvd.
 Pasadena, CA 91105
(616) 685-9800


CAULEY GELLER BOWMAN & RUDMAN LLP
Nicole R. Avallone
2255 Glades Road, Suite 421A
Boca Raton, FL 33431
(561) 750-3000

(561) 750-3364 (Fax)

COUNSEL FOR PLAINTIFFS AND THE CLASS

**CERTIFICATE OF SERVICE**

I hereby certify that on April 2, 2004, a copy of the foregoing was mailed by United States Postal Service to the following non-participants in Electronic Case Filing:

Mary J. Hackett, Esq.
Reed Smith, LLP
435 Sixth Avenue
Pittsburgh, PA 15219-1886

352275                                                    /s/ Steven M. Hamburg

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| ELLEN JANE KUTTEN, individually and on behalf of her daughters and | ) ) ) ) | |
| MARY ANN ARNOLD and ELSIE MAHLER SCHARFF, | ) ) ) | |
| on behalf of themselves and all others similarly situated, | ) ) ) | |
| Plaintiffs, | ) ) ) | Case No. 4:04CV00244 TIA  JURY TRIAL DEMANDED |
| v. | ) ) ) | |
| BANK OF AMERICA, N.A and BANK OF AMERICA CORPORATION, | ) ) ) ) ) | CLASS ACTION |
| Defendants. | ) | |

## SECOND AMENDED COMPLAINT

COME NOW Plaintiffs Ellen Jane Kutten, individually on behalf of herself and her daughters, Alessandra Kutten Cottrell and Louise Kutten Cottrell, and Mary Ann Arnold and Elsie Mahler Scharff, for themselves and for all other members of the Classes hereinafter described, by and through counsel, and state and allege as follows:

## INTRODUCTION

1.    (a)    This Class Action is brought by plaintiffs Mary Ann Arnold and Elsie Mahler Scharff on their own behalf and on behalf of all other members of the Classes defined below and by plaintiff Ellen Jane Kutten individually on behalf of herself and her daughters against the defendants arising out of, inter alia, breaches of fiduciary and contractual duties owed by the defendants Bank of America, N.A. (the "Bank") and the Bank's parent, Bank of America Corporation, to beneficiaries of certain trusts and other fiduciary accounts within the Bank's

care. In addition, certain claims are asserted by plaintiffs against the Bank on behalf of a

California Sub-Class and a Missouri Sub-Class as defined below. Unless the context indicates

otherwise, the term "Class" includes the members of the "California Sub-Class" and "Missouri

Sub-Class." Plaintiff Kutten asserts no claims herein as a representative of the Class or any Sub-

Class.

> (b) The Bank prominently and falsely advertises its promise as to how it holds itself

out to persons such as plaintiffs and the members of the Class who do business with its "Private

Bank":

Bank Of America [Logo] Higher Standards

THE PRIVATE BANK

# Managing today's complex wealth. Balancing growth, risk, taxes and grandchildren.

As your financial resources increase, perhaps you need more financial resources to manage them.

The Private Bank of Bank of America has greater depth and breadth of wealth management expertise – across the financial spectrum – than any other private bank. Equally important, we bring this expertise together, creating more integrated solutions to your complex needs. And we provide these customized recommendations based on the extraordinary strength and stability of Bank of America.

It's no wonder we've been entrusted to manage, protect and pass on wealth for more than 150 years.

*The Private Bank is dedicated to serving affluent families and individuals with complex wealth management needs. Our experienced advisors customize unique and comprehensive solutions for each individual, integrating world-class investment management, trusts, credit and*

2

*bank services. We welcome the opportunity to work with you. We invite you to call Caroline Grace at 800.863.9500 or visit www.bankofamerica.com/privatebank.* [Emphasis in original].

(c)    In fact, despite numerous substantially similar promises in the form of advertising, marketing pieces and direct representations to those who established fiduciary accounts with the Bank (and the beneficiaries thereof), as described herein, those promises have been and are being uniformly ignored or deliberately broken.

2.    In particular, in order to maximize the Bank's profits earned from trusts, guardianships, estates and other fiduciary accounts (collectively "Trusts") by which it acted as fiduciary, the Bank conspired with its affiliates and others presently unknown in a business decision to "double dip," by forcing trusts and other fiduciary accounts under the care of the Bank to have their assets re-directed from their historic allocations in individually managed accounts and/or so-called Common Trust Funds and/or other assets, to proprietary mutual funds controlled by subsidiaries of the Bank and the Bank's parent, defendant Bank of America Corporation, and their respective corporate affiliates and subsidiaries (collectively "BAC"). As used herein, the term "Conversion" refers to such wholesale asset re-direction by the Bank into shares of the Nations Funds. At no time has the Bank distributed to plaintiffs or to any member of the Class defined below or other appropriate recipient a final, annual, or periodic account or any other statement fully disclosing the Bank's wrongdoing as described in this Complaint. Further, the defendants' wrongdoing is continuing in nature.  By August 16, 2000, BAC and its affiliates had increased the assets in their Funds to reach $100 billion. On that date the Bank stated:

> Banc of America Capital Management announced today that the Nations Funds family of funds has reached $100 billion in mutual fund assets. This growth was driven by increases in all three types of mutual funds: equity, fixed income and money market.

3.      Historically, the Bank, either through its so-called "Private Bank," now based in

St. Louis, MO [1], or through the Trust Departments of it and its predecessors, promoted itself by

touting its purportedly highly individualized trust administration and asset management services,

all of which was intended to and did lure grantors, testators and others to designate the Bank as a

fiduciary for estates, trusts and other fiduciary accounts. In a recent version of such

representations, the Bank stated on its website as follows:

> **"Customized Portfolio Management. We do not believe in one-size-fits-all. Rather, we understand that your unique needs require an investment portfolio that is specially tailored to meet them.**
>
> **A tailored approach:**
> - **Talk to us** – tell us your investment goals and risk tolerance.
>
> - **A tailored solution** – we will design and recommend a portfolio strategy for you based upon your goals, time horizon, income and liquidity needs.
>
> - **Ongoing communication** – we monitor your portfolio and communicate with you on a regular basis to ensure your goals are being met.
>
> **Our equity selection process.**
>
> Our equity selection follows a core growth strategy with a focus on large cap stocks. The foundation of our process is proprietary research. We use a blend of qualitative and quantitative fundamental research to target companies that have long-term growth potential, proven earnings track records, competitive advantages and strong management.
>
> **A perfect fit.**
>
> **We work with you** to ensure your goals are being met and your total financial picture is being considered. Learn more about our investment management process by contacting a **Private Banker** in your area."

---

[1]  To consolidate its own position in the Midwest, the Bank's predecessor, Nations Bank, acquired Boatmen's Bancshares, Inc., the parent of Boatmen's Trust Company ("Boatmen's"). The Bank used Boatmen's trust department as the core of its Private Bank, then proceeded to distribute its administrative functions to Private Bank Offices in various parts of the country.

In fact, the plans of the Bank, BAC and their respective predecessors, despite these and substantially similar representations over the years and the implicit incorporation of them in the documents governing the Bank's fiduciary accounts, have been to cut back substantially on such so-called "Customized Portfolio Management" and to direct fiduciary funds, once "captured," into standardized investments such as BAC's proprietary mutual funds, including, *inter alia*, the Nations Funds, as part of the Conversion as described herein and otherwise. Further, few if any of the grantors or others who established fiduciary relationships with predecessors of the Bank, such as the parents of plaintiffs Kutten and Scharff and the grandfather of plaintiff Arnold, envisaged the Bank in its present form; namely, a nationwide behemoth with few of the services typically offered by a fiduciary and implicit in the fiduciary relationship. The defendants have also utilized these captive accounts as targets to market other products and services sold by them, through "Relationship" Managers, their subsidiaries, affiliates and otherwise, including loans, credit cards and deposit accounts, all to defendants' enrichment.[2]

4.     The Settlors of certain of the Trusts at issue, Joseph Kutten and Carolyn Yalem Kutten (parents of plaintiff Kutten), in entrusting their assets to a local bank, in this case, Boatmen's Trust Company in St. Louis, did so based upon personal relationships with officers of Boatmen's, and its predecessors in interest, St. Louis Union Trust Company and Centerre Bank, built over many years. The fiduciary relationship was established because, inter alia, Boatmen's Trust Company and its predecessor banks, held itself out to the settlors and to other prospective customers of fiduciary serves as institutionally and personally suited not only to the stewardship of settlors' assets over multiple generations but looking after their descendants, the plaintiff in

---

[2] For a vivid history of the Bank's voracity for conversions of assets which it held as a fiduciary, see:

this litigation and her daughters. Similarly, the grandfather of plaintiff Arnold, John T. Crowley, through his Last Will and Testament, entrusted his bequeathed assets to a local bank in California, since acquired by a series of banks, now part of Bank of America ("the Crowley Trust"). Also similarly, plaintiff Scharff's father, Nicholas Scharff, and mother, Pauli Scharff entrusted their assets to Boatmen's Trust Company.

5.    Over the years, the Bank and its corporate predecessors swallowed-whole Boatmen's Trust Company, **and** numerous other financial institutions which had fiduciary responsibilities to plaintiffs and members of the Class. Such institutions are referred to herein, collectively, as the "Acquired Banks." In the process of being digested by the Bank, these formerly independent institutions' fiduciary operations were transmogrified into just cogs in the fee-generating machinery of the Bank and its corporate parent.

6.    In the course of the metamorphosis of Boatmen's Trust Company and other acquired financial institutions into the Bank, the interests of plaintiffs and members of the Class were not represented by caring, knowledgeable trust officers but by so-called "Call Centers" in Dallas and elsewhere manned by lower-level fungible functionaries and other Bank personnel with little or no investment expertise. Except for the highest net worth fiduciary accounts, the "customized recommendations" and "wealth management expertise" promised by the Bank are fictions and have been fictions since the consolidation of the various acquired financial institutions began taking place. The purpose was clear. As stated by the Bank's own press release:

> We will win more business from existing Private Bank clients by proactively delivering cutting-edge solutions for wealth management, by continuing to win high marks for satisfaction and

---

http://www.bankofamerica.com/newsroom/press/archives.cfm?LOBID=1.

high touch service, and through the company's financial commitment to the Private Bank which will allow for increased  marketing  and heightened awareness of the value we bring to each relationship.

7.    At or prior to the time that Boatmen's Trust Company was acquired by the Bank's predecessor, Nations Bank, it was known by the parties to the acquisition negotiations that the successor entity (i.e. Nations Bank) would materially adversely affect the administration of the fiduciary accounts of  plaintiffs Kutten and Scharff and all other Boatmen's fiduciary accounts. Similarly, this was the plan of the defendants with respect to each of the Acquired Banks and their fiduciary functions.

8.    To the best of the knowledge, information and belief of plaintiffs Kutten and Scharff,  neither Boatmen's nor Nations Bank provided to them or other interested parties in connection with other fiduciary accounts venued in Missouri appropriate written notice as provided in §362.331 R.S.Mo. of Boatmen's transfer of fiduciary capacities to Nations Bank disclosing all material facts which disclosed the material adverse affect of such transfer or advising such interested parties (including plaintiffs Kutten and Scharff and members of the Missouri Sub-Class) that they had a right to object to the transfer and, inter alia, obtain a replacement fiduciary.

9.    Plaintiffs  believe and therefore allege that the Bank similarly failed to provide such notice in each of the other instances where the fiduciary responsibilities of an Acquired Bank were taken over by the Bank or one of its predecessors. As such, all similarly affected beneficiaries were wrongly denied notice and the right to object to such transferred fiduciary capacities.

## THE NATIONS FUNDS

10.    The Nations Funds Trust ("NFT") holds a "family" of approximately 70 mutual fund portfolios, which are proprietary funds nominally operated by NFT and its Board of Trustees. They are, in fact, directed and controlled by BAC and its subsidiaries.

11.    The Nations Funds' portfolios cover a wide variety of investment disciplines, strategies and types of asset categories including, *inter alia*, the Nations Municipal Income Funds, the Corporate Bond Portfolio; the Nations Small Company Fund; Nations Large Cap Index Funds and Nations Cash Reserves. The Nations Funds are nominally operated by the NFT and its Board of Trustees, a majority of whom are purportedly independent. In fact, the Bank, as the largest single shareholder of record of the various Nations Funds controls all nominees to the NFT Board and therefore is a "control person" with respect to NFT and the Nations Funds, as such term is defined in the federal securities laws.

12.    Certain of such Nations Funds were funded by BAC in substantial part by transferring fiduciary assets pursuant to the Conversion, in effect, "force selling" Nations Funds to the captive trust accounts for which it served as Trustee.  Such funding permitted the affected Nations Funds to have substantial asset bases, an important selling point to BAC in marketing shares in the Nations Funds to other potential purchasers thereof through the Bank and other subsidiaries of BAC. The Nations Funds selected for investment of fiduciary assets by BAC pursuant to the Conversion were intended generally to "mirror" the categories of assets held by the Trusts pre-Conversion, all or most of which were liquidated immediately prior to the Conversion,  either as part of so-called "Common Trust Funds." "Collective Income Funds," or in individually-managed accounts.

## JURISDICTION AND VENUE

13.     The claims asserted herein arise under and pursuant to state statutes and common law.

14.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332 (diversity of citizenship) and 28 U.S.C. § 1367.  The amount in dispute exceeds $75,000 exclusive of interest and costs and there is complete diversity of citizenship between plaintiffs, citizens of the states of California, Missouri and Nevada, and each of the defendants. Further, the claims of all members of the Class well exceed $5,000,000. Although a substantial number of members of the Class reside in Missouri, more than two-thirds of the Class members are residents of other states.  The conduct of the defendants as described herein occurred within the State of Missouri and Eastern District of Missouri, as well as in other states including North Carolina, California, Florida and New York. Accordingly, this Court has personal jurisdiction over all the defendants pursuant to §506.500 R.S.Mo.

15.     Venue is proper in this District as many of the acts and practices complained of herein occurred in substantial part in this District, including the establishment of trusts for the benefit of plaintiff Scharff by her late father and mother, as well as for plaintiff Kutten and her daughters by plaintiff Kutten's late parents. Further, Boatmen's Trust Company, a corporate predecessor of the Bank, was based in this District, as was the Bank's "Private Bank."  Further, many of the most significant witnesses to the wrongdoing referred to herein are found in and/or did business within this District and will only be available for trial purposes in this District.  In addition, a substantial amount of documents relevant to this dispute are located in this District.

16.     In connection with the acts alleged in this Complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not

limited to, the mails, interstate telephone communications and the facilities of the national

securities markets.

## THE PARTIES

1.    (a) Plaintiff Ellen Jane Kutten is a California citizen who has varying interests as

beneficiary, contingent beneficiary, as well as co-trustee of several trusts which had been, until

recently, managed and controlled by the Bank, its corporate parent and affiliates. In particular,

plaintiff is a named beneficiary under trusts created by her parents in this District in 1981 as

amended in 1983, 1987 and 1990, namely, the Joseph Kutten Indenture of Trust and the Carolyn

J. Kutten Indenture of Trust.  In addition, the plaintiff Kutten and her daughters were

beneficiaries of trusts established in 1989, namely, the Joseph Kutten and Carolyn Y. Kutten

1989 Grandchildren's Trust (collectively referred to hereinafter as the "Kutten Trusts").[3]

Plaintiff Kutten's family's relationship with the Bank and its predecessors, including her

---

[3] The original trustee bank for the Kutten trust and the trusts established by her parents for the benefit of plaintiff's Kutten's daughters was Boatmen's Trust Company which, in turn, was acquired by and merged into Nations Bank, which, in turn, was acquired by and merged with Bank of America, N.A. following such acquisition. On a parallel track, North Carolina National Bank ("NCNB") was similarly making acquisitions until it merged, as Nations Bank with Bank of America, as reflected in the diagram below:



Notwithstanding the foregoing corporate sleight-of-hand, there is little substantive relationship, if any, between the original trustee bank, Boatmen's Trust Company and its successor, Bank of America. Even more significantly, there is virtually no identity of interest between the fiduciary relationship with Boatmen's Trust Company that existed between it and the Kutten Trusts and the one which existed until recently. These circumstances are true with respect to most if not all of the Acquired Banks that have been merged into and are presently a part of the Bank.

grandfather, noted St. Louisan and philanthropist, Charles H. Yalem, spans a period in excess of forty years.  At relevant times, all of the investment decisions of the Kutten Trusts were made by the Bank or entities controlled by its parent, BAC. The handling of the assets of the Kutten Trusts by the Bank has not been materially different from the other trusts and fiduciary accounts of which the Bank was and/or is serving as corporate fiduciary with respect to the Conversion and otherwise as described in this Complaint. Although documents such as the trust agreements establishing the Kutten Trusts or other documents pursuant to which a fiduciary relationship with the Bank was established typically gave the Bank discretion in the investment of fiduciary assets (even in some cases, permitting investments in proprietary funds), none of such documents permitted the egregious behavior described herein.

(b)    Plaintiff Mary Ann Arnold is a Nevada citizen who has varying interests pursuant to the Crowley Trust referred to above including her status as a beneficiary thereof.

(c)    Plaintiff Elsie Mahler Scharff is a Missouri citizen who has varying interests pursuant to the Nicholas Scharff Trusts and the Pauli R. Scharff Revocable Trust referred to above including her status as a beneficiary thereof.

18.    (a)    On information and belief, the Bank is a federally chartered bank domiciled in North Carolina, and is a wholly owned subsidiary of BAC also domiciled in North Carolina. BAC is a financial holding company, and the parent of the Bank.  At all relevant times, BAC dictated and controlled the business activities of the Bank, including, *inter alia*, the wrongful business activities described herein within the Eastern District of Missouri**,** and wherever in the United States the Bank, BAC and/or their respective predecessors conducted business.

(b)    Although the Bank and BAC now have their principal places of business in Charlotte, NC, BAC continues to conduct substantial business within this District in many locations through its "Private Bank" and elsewhere. Notwithstanding the fact that the Kutten Trusts have been under the fiduciary responsibility of the Bank in St. Louis, BAC and the Bank have bounced the beneficiaries of the Kutten Trusts around the country, most significantly to the Banks' Call Center in Dallas in November, 2002, losing their paper files and accounts for a period of months. When plaintiff Kutten sought to obtain a transfer of the Kutten Trusts' accounts to California in October, 2002, where she resides, the Bank refused. Similarly, the Crowley Trust has been bounced around and the beneficiaries thereof are now "serviced" by a Call Center, rather than fiduciary officers with knowledge of the beneficiaries of the Crowley Trust or their individual needs. As such, the following representations of Kenneth D. Lewis, Chairman and Chief Executive Officer of BAC and the Bank on November 3, 2003 in the context of a new acquisition of yet another bank are baseless:

> The people you know at your branch today will be there tomorrow, and will continue to strive to anticipate and meet your financial needs.

At all relevant times, the Bank was successor Trustee of the Kutten Trusts of which plaintiff Kutten is a beneficiary of one and her daughters another. Similarly, the Bank is successor Trustee  of the Crowley Trust, of which plaintiff Arnold is a beneficiary. The Bank was successor Trustee to the Scharff Trusts, including the Pauli R. Scharff Revocable Trust. The Bank is also Trustee or serving in another fiduciary role with respect to the other Trusts or similar groupings of assets of which the remaining members of the Class defined below are beneficiaries.

19.     NFT, a non-party herein, is the holding/operating entity BAC formed to do business as the Nations Funds. Its principal place of business is located in Charlotte, NC. Although nominally independent and supervised by its Board of Trustees, NFT has at all relevant times been operated as an alter ego of BAC and its subsidiaries. Upon information and belief, all the members of the Board of Trustees of NFT were selected and/or approved by BAC and its subsidiaries.

20.     Defendant BAC (through its subsidiaries) and other business entities not owned by defendant BAC individually and collectively, charge substantial fees and expenses to the Nations Funds for their purported services which, together with NFT's own operating expenses, have had and continue to have a substantial cost to the Kutten Trusts, the Crowley Trust, the Scharff Trusts and to each of the other fiduciary accounts, the assets of which have been invested in one or more of the Nations Funds.

### Defendants' Self-Serving Investment Decisions

21.     (a)     Historically, the Bank and its predecessors invested the assets comprising the Kutten Trusts, the Crowley Trust, the Scharff Trusts and those of members of the Class primarily through individually managed portfolios and/or through so-called "Common Trust Funds" or "Collective Investment Funds." The expenses of the Bank for such investment and related administrative services were absorbed by the Bank out of its fees for serving as fiduciary. Beginning some time prior to 1998, in order to, <u>inter alia</u>, compensate for massive losses it was incurring from its traditional lending business, the Bank and its predecessors developed various plans and schemes pursuant to which they sought to minimize their operating expenses with respect to fiduciary accounts and maximize their profit from fiduciary business. Upon information and belief, former Bank Chief Executive Officers, Hugh McColl and Kenneth

Lewis, were significant motivating forces behind these plans, which were integral to their master

plan of extracting higher profits from the Acquired Banks and consolidating their various trust

department and "wealth management" activities under the banner of the so-called "Private

Bank." Defendants' plan included the consolidation and elimination of the previously existing

trust departments of the Acquired Banks with the objective of "servicing" fiduciary accounts and

the beneficiaries thereof with fewer and fewer personnel and greater standardization of

investments in fiduciary accounts. Pursuant to such business plans, they decided, *inter alia*, to

utilize the funds held by the Bank in fiduciary accounts to fund an initial group of mutual funds

and/or to add assets to such funds controlled by the Bank's corporate parent, BAC, the Nations

Funds, as well as other mutual funds merged into them, which Ted Scharch, a Bank Vice

President, described as "owned" by the Bank. Thereafter, due to numerous acquisitions, mergers

and other transactions referred to above, consistent with its longer-term plan and scheme, BAC

determined that most or all of the assets in certain fiduciary accounts held by the Bank (and

formerly held as fiduciary assets by the acquired banks) such as the accounts of the Kutten

Trusts, the Crowley Trust and the Scharff Trusts, would be converted again into proprietary

funds such as the "family" of Nations Funds (or other of the Bank's proprietary mutual funds),

the management and investment decisions of which were controlled by subsidiaries of BAC and

by the Board of NFT, which was itself controlled and dominated by the defendants.

     (b)    Through a complicated and barely comprehensible grouping of advisors, sub-

advisors, subsidiaries and other affiliated and unaffiliated service providers, BAC engineered a

scheme pursuant to which the Bank was able to abdicate many of its traditional fiduciary

responsibilities, functions and services to beneficiaries of fiduciary accounts in favor of

alternatives that resulted in higher total direct and indirect expense charges to the fiduciary

accounts (such as those of the Kutten, Crowley, and Scharff Trusts) as compared to the trustee or similar fees historically paid to the Bank for, *inter alia*, active management of the Trusts' assets. As indicated below, beginning in February 2000 and continuing for some time thereafter, the Bank's "Private Bank" began sending out standardized form letters informing some co-trustees, beneficiaries of the fiduciary accounts and others of the Bank's planned closing of its "Common Trust Funds" and touting the so-called "benefits" of the Conversion, which was then anticipated to take place in May 2000 or at other dates on a carefully orchestrated plan nationwide based, in part, upon the level of integration of the previously acquired banks and other factors. All of these Conversions were carried out on a rolling basis and did not differ from each other in any material way. Such letter, signed by David W. Fisher, President, also coerced the recipients of the letter to authorize the Conversion of the Trusts' assets into shares in the Nations Funds. In particular, the Bank's letter said:[4]

> Using Nations Funds, we can provide trust and fiduciary accounts with an attractive mix of investments to pursue the accounts' investment goals. Nations Funds also offer the benefits of:
>
>> Daily valuation and liquidity
>> Newspaper performance listings
>> Broader potential diversification

---

[4]  It is not presently known whether the Bank sent such a letter to beneficiaries of all of its fiduciary accounts (it appears that this was not the case) or, in the case of guardianships and similar accounts, to the appropriate courts overseeing such accounts. Further, not all co-trustees received such a letter nor were their consents sought by the Bank. While the manner in which the conversion was carried out by defendants may have been different from state-to-state and/or based upon the identity of the acquired bank, such differences were immaterial. Further, "trust officers" were required, pursuant to a carefully orchestrated plan, to convey the identical information to members of the Class and to similarly threaten them with adverse tax consequences and other "horrors" if they did not indicate their consents to the Conversion. Each such oral solicitation of consent to the Conversion misrepresented the Bank's reasons for carrying it out, concealed the increased investment-related expenses that would be incurred by the Bank's fiduciary accounts post-Conversion and misrepresented that so-called "credits" that the Bank would thereafter apply to fiduciary accounts would be sufficient to compensate for all such additional expenses. Further, as with the prospectuses and other documents provided to beneficiaries and co-fiduciaries, the Bank concealed all the benefits it would derive from the Conversion, including those derived from "bulking-up" the Nations Funds, profits from securitization of advisory fee income, and from utilizing the Nations Funds to benefit corporate customers of the defendants at the expense of the holders of Nations Funds shares.

Flexibility when making trust distributions

In fact, there was little, if any, benefit that would flow to beneficiaries of the Bank's fiduciary accounts and this letter was a sham.

Indeed, all such so-called "benefits," could have been accomplished by means of the Bank's "Common Trust Funds." Curiously, on or about August 16, 1999, the Bank announced that "Common Trust Funds will be valued at month-end instead of twice each month," despite the fact that computer software programs existed that could generate such valuations on a daily basis. The Bank's letter went on to threaten coercively:

> Any common trust fund units for which we have not received an authorization [by May 1, 2000] may be liquidated and the proceeds placed in a money market vehicle pending discussion about reinvestment. This liquidation could have adverse tax consequences depending upon the cost basis of the common trust fund units.

22.    Although plaintiff Kutten did receive some documents seeking authorizations for conversions, in response to such coercion and the deceptive and unclear information provided by the Bank in the disclosure/authorization forms, upon information and belief, Kutten, co-trustees and beneficiaries of other fiduciary accounts who received it, signed the enclosed form, thereby providing to the Bank their uninformed and fraudulently induced "consent" to the Conversion. Undisclosed to those who received the Bank's Conversion document package was the fact that, whether or not consent was obtained, the Bank planned to proceed with the Conversion. In the case of Plaintiff Kutten, she explicitly stated that despite her "consent" to the conversion, the Bank was not authorized to "double charge" her account.

23.    Enclosed with the Bank's letter sent to some Trust beneficiaries and/or co-Trustees were various prospectuses and other documents which were drafted so as to conceal,

*inter alia*, the motives of the Bank and BAC for the Conversion into BAC proprietary mutual funds, the benefits of the Conversion to them and their subsidiaries or the increased costs and expenses that would be incurred by the Trusts as a result of the Conversion. There was no explanation in plain English that would put the recipients of these documents on notice of the Bank's wrongdoing as referred to herein. In fact, one of those documents, (Form 3.05D 7/1999) entitled "Disclosure of Investment in Nations Funds," stated deceptively:

> The fee paid directly by the [Trust] Account to the Bank will be reduced (but not below zero) by the Account's pro rata share of the investment advisory fees paid by the Funds to the Service Providers; provided however, that the amount of the reduction will be based on Bank of America Corporation's percentage ownership of the Service Provider. From time to time, the Bank may elect to reduce the Account's fees in recognition of amounts paid by Nations Funds for other services (such as administrative services), but it is not obligated to do so, and the amount of any such fee reduction may vary. The Account will not be charged a sales "load" for buying or redeeming Fund shares described in the accompanying prospectuses.

Such doubletalk-laden form went on to state:

> I acknowledge receipt of the current prospectuses for the Funds and a Nations Funds Fee Disclosure Statement. As co-fiduciary for this account, I understand that the Service Providers will be paid investment advisory and other fees by the Funds. **I approve the method for reducing the investment management fees paid to the Bank by the Account**. I understand and agree that the Bank may choose not to reduce the Account's fee on the account of the compensation paid by the Funds for other services, but the Bank is electing to do so at this time. [Emphasis added].

In fact, the Bank and the lawyers who drafted these documents used such language to conceal the fact that although in many cases there was a credit for certain of the post-Conversion investment advisory fees to be incurred by fiduciary accounts, the credits were insufficient to overcome the substantially higher expenses that fiduciary accounts would bear post-Conversion and that the

17

Bank intended to reduce or eliminate the credit as soon as practicable thereafter once consents were obtained and/or the Conversions completed. Further, in many other cases, there was no credit for the fiduciary fees charged by the Bank. Despite the outward appearance of independence of NFT and its legal counsel, who may have performed or been involved with the physical tasks of "drafting" them, the content of the Nations Funds prospectuses was effectively dictated by BAC, the Bank and their subsidiaries. Indeed, with respect to the prospectuses used by the defendants for the Conversions, Robert Hitpas, a Senior Vice President of the Bank as well as one who was responsible for overseeing numerous fiduciary accounts including the Kutten Trusts, found them daunting, full of legalese, fine print and difficult to read. Another Bank Senior Vice President, Paul Hundt, reacted similarly and it is believed that many, if not most of the Bank's "trust officers" could not understand many of the material terms of the Conversion and what was set forth in the prospectuses of the Nations Funds provided to beneficiaries of fiduciary accounts in connection therewith.

24.     Apparently as a result of an agreement among the defendants, there was no credit for the substantial operating expenses of the proprietary mutual funds, which substantially reduced the net investment returns to fiduciary accounts, such as the account of the Kutten, Crowley and Scharff Trusts. At no place in any of the prospectuses the defendants issued to beneficiaries of fiduciary accounts in connection with the Conversions did they disclose that, post-Conversion, all fiduciary accounts affected by the Conversion would be forced to bear substantially higher investment-related expense levels post-Conversion than those which preceded it, even allowing for whatever credits the Bank applied to its fees for serving as fiduciary.   Indeed, upon information and belief, most of such credits, to the extent given, have now been substantially reduced on a nationwide basis.

25.    Upon information and belief, despite its ability to dictate the content of the Nations Funds prospectuses, at no time following the foregoing "disclosure" did the Bank make any complete and candid disclosure of the full extent of the damages caused to the fiduciary accounts by the Conversions or other improper investments in the Bank's proprietary funds. Further, the defendants made no disclosure of the true motives of the defendants in carrying out the Conversions or the full extent to which the defendants were profiting unjustly therefrom and, in particular, the additional assets which would flow into the Nations Funds and other proprietary mutual funds, making them more saleable to the investing public generally. Even after the Bank applied a so-called credit against its fees for some portion of the advisory fees charged to some of the proprietary funds to some fiduciary accounts, in practical terms, it was (and is) impossible for co-fiduciaries, beneficiaries and others to understand and have knowledge of the true cost of the Conversions to the fiduciary accounts and the income earned upon their assets.  Indeed, plaintiffs Kutten, Arnold and Scharff and certain other beneficiaries have sought to obtain such information or other similar information relating to the expenses of investing the assets of fiduciary accounts in the defendants' proprietary mutual funds from the Bank and have never received "straight" or any answers to their questions with respect thereto and have received misleading or downright deceptive information as to the impact of such investments upon them and their fiduciary accounts.

26.    Significantly, at no time did the foregoing "disclosure" documents disclose clearly to a co-Trustee, a beneficiary or other person interested in the affected fiduciary accounts the true additional direct and indirect expenses of the Conversion (although many of such "disclosures" were buried in the Nations Fund prospectuses) nor, in fulfillment of the Bank's fiduciary responsibilities, did the Bank make any personal efforts to insure that plaintiffs or

19

others similarly situated understood the extent to which the Bank and BAC would benefit from the Conversion and how the Kutten, Crowley, and Scharff Trusts and other fiduciary accounts would end up paying substantially more for the investment and related services that the Bank had historically supplied in partial consideration for the Bank's trustee and similar fees. Indeed, Mr. Fisher's letter of August 31, 2000 sent to beneficiaries of fiduciary accounts transmitting the Prospectus for the Nations Funds was "for information" only and recipients, including Plaintiff, were told: "**you do not need to take any action."** [Emphasized in original].

27.     Notwithstanding its overarching  duty of loyalty to plaintiffs and members of the Class, upon information and belief, at no time following the foregoing "disclosure" did the Bank make any complete and candid disclosure to the beneficiaries of the Trusts of the full extent of the damages caused to the Trusts or their beneficiaries by the Conversion, the true motives of BAC and the Bank in carrying out the Conversion or the full extent to which the Bank and BAC were profiting therefrom and, in particular, the additional assets which would flow into the Nations Funds, making them more saleable to the investing public generally. Even after the Bank applied a so-called credit against its fees for some portion of the Nations Funds advisory fees, in practical terms, it was (and is) impossible for co-trustees, executors, beneficiaries and others to understand and have knowledge of the true cost of the Conversion to the Trusts and the income earned upon the assets of the Trusts. Indeed, plaintiffs and other beneficiaries have sought to obtain such information from the Bank and have never received "straight" or any answers to their questions with respect thereto and have received misleading or downright deceptive information as to the impact of the Conversion upon them.

28.     Upon information and belief, no analyses or determinations were made by the Bank as to the suitability and/or propriety of the relative costs and benefits of investments in

BAC's proprietary funds at the time or before the Conversions were carried out for each

fiduciary account as compared to pre-Conversion investments including any comparisons with

numerous other available mutual funds or investment vehicles in which the Bank could have

invested prudently and at lower cost the funds of the Trusts in which plaintiffs and the members

of the Class were beneficiaries. Even assuming that the Bank made a prudent decision to

purchase shares in the Nations Funds, which plaintiffs do not contend that it did, upon

information and belief, the Bank did not negotiate the fees and expenses to be charged to the

Trusts by the Nations Funds or comparison shop in any significant way with other funds or

families of funds in an attempt to obtain the same or better investment services elsewhere.  Upon

information and belief, any "comparisons" that were done by the Bank were merely to "paper"

the file so it would appear that a true effort was made to consider investments in alternative

mutual funds or mutual fund families. Similarly, neither NFT nor its Board of Trustees, sought to

obtain the lowest fees from the subsidiaries of BAC actually operating the Nations Funds.

Indeed, as stated by New York's Attorney General Eliot Spitzer: "Fund directors do not – and

cannot – negotiate hard on the fees."  This is particularly the case when, as here, all of NFT's

Trustees were nominated and voted upon by the Bank, which totally controlled the composition

of NFT's Board. As such, NFT and the entire Board of Trustees of NFT, aided and abetted by

defendants, breached the fiduciary duties owed to plaintiffs and the members of the Class and, by

reason of their knowledge of the defendants' motives for the Conversion, were themselves *de

facto* fiduciaries.

      29.     Upon information and belief, BAC and the Bank specifically excluded alternate

investment vehicles (such as other families of funds such as the Vanguard and Fidelity mutual

funds specifically requested by plaintiffs Kutten and Arnold) from their considerations in order

to maximize their earnings and those of their corporate affiliates and did not give serious

consideration to leaving the assets of fiduciary accounts invested as they were, pre-Conversion,

and/or giving beneficiaries of such accounts a choice as to the various alternatives available.

Similarly, at no time did BAC and the Bank give any consideration to making changes in the

Bank's "Common Trust Funds" so as to provide any of the purported "benefits" that the Bank

claimed would be forthcoming as a result of the Conversion.  The requests of Plaintiffs Kutten,

Scharff and Arnold and other beneficiaries of the Bank's fiduciary accounts for changes in

investments were repeatedly rebuffed. [5]

30.     On information and belief, as a result of a conspiracy among the defendants and

others presently unknown, the Bank and BAC, as part of a corporate business decision, chose to

invest the fiduciary assets of plaintiffs and the members of the Class in shares of the Nations

Funds as part of the Conversion and otherwise in order, inter alia, to generate investment

advisory fees and other fees for its various affiliates and to "bulk-up" the Nations Funds without

regard to whether such investments were prudent and in the best interest of plaintiffs and the

other beneficiaries of fiduciary accounts.

31.     The foregoing Conversion of the assets of fiduciary accounts to the Nations Funds

and the investment of fiduciary assets therein generally was carried out in furtherance of BAC's

corporate plan to reduce the Bank's expenses of managing fiduciary assets and increasing BAC's

overall direct and indirect profits from fiduciary operations. The assets in the fiduciary accounts

managed by the Bank, including the Kutten, Crowley, and Scharff Trusts, were particularly

vulnerable to misuse since BAC and the Bank regarded the fiduciary accounts in their care as a

"cookie jar" open for the taking. BAC and the Bank proceeded to carry out the Conversion since

---

[5] Plaintiff Kutten, although nominally a co-trustee with the Bank, was typically ignored in her role as such and her

they would not merely profit from the Bank's trustee and similar fiduciary fees but "double dip" by generating additional revenues through BAC's related asset management business and otherwise. Additional profit was also generated by adding the assets in the Bank's fiduciary accounts to the Nations Funds following the Conversion, thereby making them more saleable at retail to the investing public. Further, the Conversion created an opportunity for the Bank to avoid the relatively low profitability of managing the fiduciary accounts (and the expenses related thereto) which the Bank had contracted to do when it (and/or its predecessors) agreed to serve as fiduciary thereof, and substitute ever-increasing fee income directly and through its corporate affiliates.

32.     The Bank and its affiliates reaped many millions of dollars in purported money management, investment advisory and other fees as a result of the Conversion and thereafter from the investment of fiduciary assets in the Nations Funds and the securitized cash flow therefrom. The Bank also benefited by receiving Trustee or similar fees for serving as a fiduciary and by reason of the benefits which flowed from, *inter alia*, substantially reduced operating expenses of the Bank's fiduciary operations. Despite these benefits to the Bank and its affiliates, these investments have been of little benefit for the Bank's fiduciary accounts and the beneficiaries thereof, including plaintiffs and the members of the Class. On information and belief,  plaintiffs and all members of the Class suffered damages from the investment practices of the Bank as described above in an amount which cannot presently be determined but which is capable of calculation.

---

consent was not sought by the Bank for the Conversion.

## CLASS ACTION ALLEGATIONS

### The Relief Sought for Members of the Class

33.     This action is brought by plaintiffs Arnold and Scharff, individually and on their own behalf and on behalf of all others similarly situated, under the provisions of Federal Rules of Civil Procedure Rules 23(a) and 23(b)(3) for: (i) an accounting which determines all damages caused by defendants to the members of the Class and the extent of the unjust enrichment of the defendants from their wrongful activities;  (ii) money damages, including punitive damages, to be paid by the defendants; (iii) injunctive relief providing for the possible removal of the Bank as fiduciary for all fiduciary accounts in which members of the Class are beneficiaries; (iv) injunctive relief providing for new procedures and practices at the Bank which put the interests of plaintiffs Arnold, Scharff and the members of the Class ahead of those of BAC and the Bank and which otherwise address the ongoing conflicts of interest forced by the Bank in the investment of fiduciary assets; and (v) for relief incident and subordinate thereto, including the costs and expenses of this action and an award of attorneys' fees to plaintiffs' counsel. Excluded from the Class are all persons who are members of any certified Class in <u>Williams v. Bank of America, N.A. et al.</u>, Case No. 02-15454AB pending in the Circuit Court of the 15th Judicial Circuit in and for Palm Beach County, Florida.

### Numerosity of the Class

34.     On information and belief, the Bank serves as a fiduciary (such as a trustee, guardian, executor, etc.) for many thousands of Trusts and other fiduciary accounts affected by the wrongdoing described herein.

35.     The Class represented by plaintiffs Arnold and Scharff consists of all persons who are, or were at any time from the time of the Conversion to the present ("Class Period"), beneficiaries of Trusts for which the Bank is or was a fiduciary, including inter alia, the remainder beneficiaries, the assets of which were "converted" into shares of the Nations Funds. The California Sub-Class consists of those members of the Class whose fiduciary accounts originated in and/or involved beneficiaries residing in California (such as plaintiff Arnold). The Missouri Sub-Class consists of accounts originated in (as in plaintiff Scharff's case) and/or involved beneficiaries residing in Missouri. Such definitions are subject to modification upon completion of discovery with respect thereto.

36.     The exact number of members of the Class and California and Missouri Sub-Classes as above described is not known by plaintiffs, but is within the sole knowledge of the Bank. On information and belief, there were and are at least 30,000 fiduciary accounts controlled by the Bank with, collectively, more than 45,000 beneficiaries thereof, approximately 10% of which are members of the California Sub-Class and 10% of which are members of the Missouri Sub-Class. These approximations are subject to discovery and the exact number of Class members is readily ascertainable from the Bank's records.

37.     On information and belief, the members of the Class are located in most or all fifty states, and in numerous foreign countries. Similarly, members of the California and Missouri Sub-Classes are located throughout Missouri, California and in many other states.

38.     The beneficiaries of the affected Trusts are so numerous that joinder of individual members is impracticable.

### Common Issues of Law and Fact Predominate

39.    On information and belief, at least two years prior to the Conversion, the Bank, at the direction of its parent, BAC, and in conspiracy with others, including, upon information and belief, former Chief Executive Officers Hugh McColl and Kenneth Lewis as part of the plans for the Acquired Banks and their respective fiduciary operations,  decided to invest the assets of the affected Trusts in shares of the Nations Funds, all of which were directly or indirectly "advised" and managed by subsidiaries of BAC. It is believed that such Conversions were carried out nationwide on a rolling basis subject to a master plan developed by the defendants and others. None of such separate Conversions differed materially despite the timing and different locales of each.

40.    All members of the Class and Missouri and California Sub-Classes were adversely affected by the Bank's self-serving business decision to invest the Trusts' assets in the Nations Funds and other proprietary mutual funds pursuant to the Conversion or thereafter.

41.    All Trusts, the assets of which were converted into shares of the Nations Funds, paid directly or indirectly, management and investment advisory fees and other charges to subsidiaries and affiliates of BAC, based on the fiduciary assets invested by the Bank in the Nations Funds.

42.    There are common questions of law and fact that relate to and affect the rights of each member of the Class including, inter alia:

(a)    whether the Bank's business decision to invest assets of the Trusts and other fiduciary accounts in the Nations Funds was motivated by the best interests of the Class members (which the Bank had a duty to put before its own) or by BAC's desire to generate management and investment advisory fees for its affiliates and subsidiaries, to lower the Bank's

expenses of managing fiduciary assets and to generate other benefits for themselves by <u>inter</u> <u>alia</u>, "bulking-up" the assets invested in the Nations Funds;

        (b)     whether the Bank breached fiduciary duties to plaintiffs Arnold and Scharff and the Class by failing to conduct its fiduciary operations in conformity with the requirements of the National Banking Act and other applicable law;

        (c)     whether the Bank breached its fiduciary duty to all members of the Class by making investment decisions for the Trusts based upon defendants' own interests and those of their affiliates, rather than the interests of Trust beneficiaries; and,

        (d)     what remedies are appropriate compensation for the damages caused to plaintiffs and each member of the Class.

43.     The relief sought is common to the entire Class including, <u>inter</u> <u>alia</u>:

        (a)     a declaratory judgment that the Bank violated its fiduciary duty as Trustee (or other similar fiduciary role) with respect to the affected fiduciary accounts and whether it was aided and abetted by defendant BAC and others in doing so;

        (b)     payment by the defendants of compensatory damages caused by such breaches of fiduciary duty as well as punitive damages;

        (c)     payment by the defendants of the costs and expenses of this action, including  plaintiffs' attorneys' fees;

        (d)     an injunction preventing the Bank from opposing a petition by beneficiaries of the Trusts affected by the Conversion and other wrongdoing referred to herein to replace it as fiduciary; and

(e)    an injunction which establishes appropriate procedures and safeguards within the Bank to ensure that the interests of beneficiaries of Trusts are fully protected from wrongdoing such as described herein.

### Typicality of the Claims of Plaintiffs Arnold and Scharff

44.    Plaintiffs Arnold and Scharff  have been beneficiaries of fiduciary accounts affected by the wrongdoing of the Bank as described herein.

45.    The assets of the Crowley and Scharff Trusts, like all other Trusts and similar fiduciary accounts, were invested by the Bank in the Nations Funds pursuant to a wholesale business policy decision by BAC made some time prior to 1999 and carried out by the Bank and others thereafter pursuant to the Conversion and subsequently regardless of whether the underlying fiduciary accounts "resided" with the Bank or one of its predecessor banks.

46.    On information and belief, the Crowley and Scharff Trusts, like all other Trusts and similarly situated fiduciary accounts, were used by the Bank and its affiliates to generate additional management, investment advisory and/or other fees and benefits for themselves (even after the so-called credits were applied as a result of certain Nations Funds advisory fees) without regard for the best interests of the beneficiaries of such accounts such as plaintiffs and the members of the Class.

47.    The claims of plaintiffs Scharff and Arnold, who are representatives of the Class and the Missouri and California Sub-Classes, respectively,  are typical of the claims of all members thereof. The claims of plaintiffs Scharff and Arnold are based on the same factual allegations and legal theories as the claims of all other members of the Class and the Missouri and California Sub-Classes.

**Plaintiffs Arnold and Scharff Will Fairly and Adequately Represent the Class and the Missouri and California Sub-Classes**

48.     Plaintiffs Scharff and Arnold are able to and will fairly and adequately protect the interests of the Class and the Missouri and California Sub-Classes respectively.

49.     The attorneys for plaintiff Scharff and Arnold are experienced and capable in complex litigation. The attorneys for plaintiffs Scharff and Arnold and the Class will actively conduct and be responsible for the prosecution of this litigation and the expenses thereof.

## COUNT ONE

## BREACH OF FIDUCIARY DUTY

50.     Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

51.     On information and belief, the Bank's decision to invest the assets of the Trusts in the Nations Funds was motivated not by the interests of plaintiffs and the Class members but by BAC's desire to generate investment advisory and other fees for its affiliates and, indirectly, for itself, as well as to reduce the Bank's operating expenses and to generate additional revenues from securitizing cash flows derived from the Nations Funds.

52.     On information and belief, the Bank failed to consider the Nations Funds' high expense or alternative lower cost families of mutual funds (or deliberately did not do so) when it invested the assets of the Trusts into shares of the Nations Funds thus putting its own interests before those of the beneficiaries of fiduciary accounts.

53.     On information and belief, the Bank failed to consider the best interests of the Trust beneficiaries when it invested the Trusts' assets in the Nations Funds and breached its duty

of loyalty to them by putting the interests of itself and its affiliates before the interests of plaintiffs and the members of the Class.

54.    The Bank's wholesale investment of the assets of the Trusts in the Nations Funds in the Conversions carried out around the country was a breach of its fiduciary duty to plaintiffs and the members of the Class, which breach was aided, abetted and/or directed by BAC and its affiliates.

55.    As a result of, inter alia, the Bank's improper wholesale transfer of fiduciary assets held by fiduciary accounts the Trusts into shares of the Nations Funds, the beneficiaries of the Trusts or other similarly situated accounts for which the Bank was a fiduciary have been damaged in an amount to be determined by the Court, but believed to be substantial.

## COUNT TWO

## BREACH OF CONTRACT

56.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

57.    By means of the acceptance by the Bank and its predecessors of the trusteeship of the Kutten, Crowley, and Scharff Trusts and each of the other Trusts affected by the Conversion, the Bank and its predecessors committed to provide to all such Trusts complete investment management services of a corporate fiduciary, and render such services on an individualized basis consistent with the goals and objectives of plaintiff Kutten's parents, plaintiff Arnold's grandfather, plaintiff Scharff's father, and the other creators of the Trusts and the needs of the beneficiaries thereof. As the Bank states: **"It is our responsibility to invest the trust assets prudently and profitably according to the grantor's wishes as outlined in the trust document." Such promise by the Bank and its predecessors was a material implied term of**

30

**each trust agreement or other document which established the underlying fiduciary**

**relationship.**  No grantor of a Trust anticipated or could reasonably foresee that the Conversion

would be carried out by the Bank with Trust assets that the Bank would mishandle fiduciary

assets as described herein or that the designated fiduciary would be the Bank in its present form.

Further, as set forth in those Counts not asserted on behalf of the Class, the Bank ignored the

express provisions of the Kutten Trusts with respect to the investments made for them by the

Bank and otherwise.

58.    Plaintiffs and each member of the Class were and/or are beneficiaries of the

Bank's contractual obligations to the creators of the Trusts and other fiduciary relationships. By

abdicating its responsibilities for individual investment management services and/or through

"Common Trust Funds" or "Collective Investment Funds" in favor of the wholesale Conversion

of fiduciary assets as described herein that the Bank was obligated to provide to the beneficiaries

of its fiduciary accounts, and by conducting itself in its present business form, the Bank breached

its contractual obligations thereto.

59.    By virtue of the Bank's breach of its contractual obligations to the members of the

Class and Missouri and California Sub-Classes, plaintiffs and the members thereof have suffered

damages in an amount to be determined by the Court.

**COUNT THREE**

**BREACH OF CONTRACT**

60.    Plaintiffs repeat and reallege each and every allegation contained above as if fully

set forth herein.

61.     This Count is brought by plaintiffs on behalf of those members of the Class who are beneficiaries of Trusts originally established with the designate trustee being one of the banks acquired by and/or merged into the Bank or its predecessors i.e. the Acquired Banks.

62.     As with the trusts established by plaintiff Scharff's parents with Boatmen's Trust Company as designated corporate Trustee or by plaintiff Arnold with the Bank of Santa Monica as designated corporate Trustee, the grantors of all affected Trusts selected as Trustee institutions which promised and agreed to deliver personalized fiduciary services to the beneficiaries thereof. Implicit in the contractual fiduciary relationship between the grantors and the Acquired Banks was the provision of a full range of personalized fiduciary services, including individualized investment management.

63.     The Bank, by eliminating the personalized fiduciary services to members of the Class, including, *inter alia*, individualized investment management, materially breached the explicit and implied terms of the Indentures of Trust or similar documents which initially caused the formation of such Trusts, including, but not limited to the following:

(a)     failing to provide appropriate trained personnel to supervise and monitor the performance of the assets in their charge, including a uniform failure to invest in appropriate asset classes;

(b)     bouncing plaintiffs and others similarly situated to poorly manned and anonymous "Call Centers" with whom there was no pre-existing relationship, trust and fealty;

(c)     changing without plaintiffs' and others similarly situated consent representatives of the Bank to deal with plaintiffs who had no knowledge of plaintiffs' circumstances and others similarly situated or the purposes for which the Trusts were established; and

(d)      continuing to charge fiduciary fees when failing to perform the services

the services that the Acquired Banks had agreed to perform.

64.      Because the transfer of fiduciary responsibilities from the Acquired Banks

substantively and materially affected the pre-existing fiduciary relationship with the Bank, it was

obliged to give notice to Class members of, <u>inter alia</u>, the terms of the merger or business

combination, the forthcoming material changes in the relationship and provide to them the

opportunity to seek a replacement fiduciary.

65.      By virtue of the foregoing lack of appropriate notice and the material change in

fiduciary services delivered by the Bank to members of the Class following the acquisition of the

Acquired Banks, such notice should now be provided to affected beneficiaries which, <u>inter alia</u>,

provides them with the opportunity to seek a replacement fiduciary.

## <u>COUNT FOUR</u>

## <u>UNJUST ENRICHMENT</u>

66.      Plaintiffs repeat and reallege each and every allegation contained above as if fully

set forth herein.

67.      By reason of defendant BAC's causing the Bank's fiduciary assets in affected

accounts to be invested in the Nations Funds, the Bank and BAC have "double dipped." The

defendants have profited by the Conversion and the subsequent acts described herein, thereby

unjustly enriching themselves at the expense of plaintiffs and the members of the Class and

Missouri and California Sub-Classes. Defendants have similarly enriched themselves, their

subsidiaries and affiliates by using information regarding the beneficiaries of fiduciary accounts

to market through "Relationship" Managers and otherwise various goods and services including

credit cards, loans and deposit accounts (and to permit certain customers of the defendants to

33

engage in late trading and other improper practices involving the Nations Funds) from which products and services they have been unjustly enriched. They also unjustly enriched themselves by secretly securitizing the revenues they derived from the Nations Funds, thereby generating additional and hidden profits.  In Plaintiff Scharff's case, the Bank needlessly obtained a mortgage from the Bank when the Trust account had more than sufficient assets to pay for the Grantor's home without a mortgage.

68.    Such "double dipping" was carried out by the Bank and BAC by, *inter alia*, imposing on fiduciary accounts the Banks' fees for acting as a corporate fiduciary as well as investment advisory fees, and other related charges which, when taken together with all the Nations Funds' expenses, even after so-called credits for certain Nations Funds advisory fees, exceeded the amounts to which the Bank was entitled to payment for, *inter alia*, investment of the fiduciary assets and administration of the underlying fiduciary accounts for which services its trustee or similar fees were intended to cover. Such benefits to the Bank and BAC were exacerbated  by the Bank's avoidance of substantial operating expenses by reason of its abdication of its individualized investment and administrative responsibilities owed to the members of the Class and Missouri and California Sub-Classes. The Bank enhanced its profit performance at plaintiffs' expense by favoring the use of its own Nations Funds and investing in same to increase the Nations Funds' own asset base, and aggrandize its own stature under the guise of allegedly providing more services to participants in its so-called "Private Bank."  The Bank's objectives were clear from its telling press release of July 14, 1999:

> United by the merger of Bank of America and NationsBank, NationsBanc Investments, Inc., and BA Investment Services, Inc., became one brokerage company on July 12. The birth of Banc of America Investment Services, Inc., the new name for the retail brokerage, gives investors a powerful ally within the Bank of

America franchise. (For the full press release, see
http://www.bankofamerica.com/newsroom/press/press.cfm?PressID=
press.19990714.03.htm&LOBID=1>).

69.     Further, upon information and belief, with respect to at least certain of the Trusts

for which the Bank has acted as Trustee, the total charges against such Trusts for trustee

fees/commissions, advisory fees and other amounts payable by the Trusts exceed the contractual

amounts for such charges agreed upon by the creators of such Trusts.

70.     The defendants have invested the proceeds of the foregoing

unjust enrichment and realized additional profits thereupon, all of which should be returned to

the Trusts and other similarly affected accounts and/or their beneficiaries, as the Court shall

deem appropriate (e.g. a proportionate share of the defendants' profits during the years of

misappropriation) pursuant to California Probate Code, Section 166440(a)(1) and otherwise.

Missouri statutes impose strict liability against fiduciaries who "at their sole risk" make

investments that are improper such that the Bank is "absolutely liable" to plaintiff Scharff and

others in the Missouri Sub-Class for their damages. (§362.550.5 R.S.Mo.).  Plaintiffs and others

similarly situated are entitled to recover the Bank's ill-gotten gains and profits therefrom.

## COUNT FIVE

## VIOLATION OF CALIFORNIA PROBATE CODE

71.     Plaintiff Arnold repeats and realleges each and every allegation contained above

as if fully set forth herein. The claims set forth in Counts Five through Seven are asserted on

behalf of the California Sub-Class.

72.     Pursuant to Section 16002 of the California Probate Code, the Bank owes and

owed to plaintiff Arnold and the members of the California Sub-Class an absolute duty of

loyalty. In exercise of that duty, the Bank has a duty to administer the Trusts solely in the interest of the beneficiaries.

73.     Pursuant to the common law of California, the Bank owes and owed to plaintiff Arnold and each member of the California Sub-Class an absolute duty of loyalty. In exercise of that duty, the Bank has a duty to administer the Trusts solely in the best interests of the beneficiaries, i.e. the members of the California Sub-Class.

74.     Pursuant to Section 16060 of the California Probate Code, the Bank owes and owed to plaintiff Arnold and the members of the California Sub-Class a duty of candor.

75.     Pursuant to the common law of California, the Bank owes and owed to plaintiff Arnold and the members of the California Sub-Class a duty of candor.

76.     By acting as alleged herein, the Bank has violated and continues to violate the duties of loyalty and candor it owes and owed to plaintiff Arnold and the members of the California Sub-Class. Such violations of the Bank's duties as fiduciary constitute breach of trust pursuant to 16400 of the California Probate Code.

77.     Pursuant to Section 16004 of the California Probate Code, the Bank owes and owed to plaintiff Arnold and the members of the California Sub-Class a duty not to use or deal with Trust property for its own profit, nor to take part in any transaction in which it has an interest adverse to the beneficiary, such as plaintiff Arnold and the members of the California Sub-Class.

78.     Pursuant to the common law of California, the Bank owes and owed to plaintiff Arnold a duty not to take part in a transaction in which it had a conflict of interest, as it did and does as described above.

79.     By acting as alleged herein, the Bank has violated and continues to violate the duty not to use or deal with Trust property for its own profit, and the duty to not take part in any transaction in which it had a conflict of interest. Such violations of the Bank's duties as fiduciary constitute breach of trust pursuant to Section 16400 of the California Probate Code.

80.    Pursuant to Section 16040 of the California Probate Code, the Bank owes and owed to plaintiff Arnold and the members of the California Sub-Class a duty of care that includes the duty to invest Trust assets prudently and with regard to individualized strategy appropriate and productive pursuant to Probate Code Sections 16007 and 16009. Pursuant to Probate Code Section 16014, the Bank is required to apply fully the special skills of a corporate fiduciary, and this duty heightens the duty of care otherwise applicable to it.

81.    By acting as alleged herein, the Bank has violated and continues to violate the duties of care and productivity it owes and owed to plaintiffs and the members of the California Sub-Class. Such violations of the Bank's duties as fiduciary constitutes breach of trust pursuant to Section 16400 of the California Probate Code.

82.    Pursuant to Section 16420 of the California Probate Code, plaintiff Arnold and the members of the California Sub-Class may maintain a cause of action against the Bank for its breaches of its duties as fiduciary and its participation in transactions in which it had or has a conflict of interest, as it does here.

83.    Pursuant to Section 16440 of the California Probate Code, the Bank is liable to plaintiff Arnold and the members of the California Sub-Class for actual and punitive damages, attorneys' fees, interest, and such other relief as the Court may order.

## COUNT SIX

## BREACH OF FIDUCIARY DUTY UNDER CALIFORNIA LAW

84.    Plaintiff Arnold repeats and realleges each and every allegation contained above as if fully set forth herein.

85.    Pursuant to Section 15002 of the Probate Code, the common law of California with respect to fiduciary and trust matters remains the law of the State of California, and Probate Code Section 16420(b) expressly preserves "any other appropriate remedy provided by statute or the common law."

86.     By acting as alleged herein, the Bank has violated its fiduciary duties of absolute loyalty and candor owed to plaintiff Arnold and the members of the California Sub-Class.

87.     By acting as alleged herein, the Bank has violated its fiduciary duty not to participate in transactions in which it had or has a conflict of interest, as it does here.

88.     By acting as alleged herein, the Bank has violated its fiduciary duties of care and productivity it owes or owed to plaintiff Arnold and the members of the California Sub-Class.

89.     By acting as alleged herein, the Bank has violated its fiduciary duty that it owes or owed to plaintiff Arnold and the members of the California Sub-Class to take and exercise control over Trust assets.

90.     The Bank and its affiliates have already unlawfully extracted huge sums in the form of fees and other charges assessed against fiduciary accounts, and they will continue indefinitely to extract unlawful fees and other charges from plaintiff Arnold and the members of the California Sub-Class, in an amount which cannot be presently determined.

91.     Pursuant to Section 16420 of the California Probate Code, plaintiff Arnold and the members of the California Sub-Class may maintain a cause of action against the Bank for its breaches of its duties as fiduciary and its participation in transactions in which it had or has a conflict of interest as described above.

92.     The Bank's unlawful conduct, breach of fiduciary duty and breach of contract have, which constitutes breach of trust pursuant to Section 16400 of the California Probate Code.

93.     The unlawful acts and practices of the Bank as alleged herein, including violations of  violation of Section 16400 of the California Probate Code as well as other state and federal law,  constitute unlawful business practices within the meaning of California Business and Professions Code Section 17200, et seq.

94.     Unless the Bank is enjoined from continuing to engage in the foregoing unfair and deceptive business practices, plaintiff Arnold and the other members of the general public

residing within the State of California and the members of the California Sub-Class will continue to be injured and damaged by the Bank's unfair business practices.

95.     So as not to be unjustly enriched by its own wrongful actions and conduct, the Bank should be required to disgorge and restore to plaintiff Arnold and the other members of the general public residing within the State of California and the members of the California Sub-Class all monies wrongfully obtained by it as a result of its wrongful conduct, together with interest and profits earned thereon.

**COUNT SEVEN**

**VIOLATION OF CALIFORNIA BUSINESS
AND PROFESSIONS CODE SECTION 17200**

96.     Plaintiffs Kutten and Arnold repeat and reallege each and every allegation contained above as if fully set forth herein. Plaintiffs Kutten and Arnold assert this cause of action in their capacity as private attorneys general on behalf of the members of the general public residing within the State of California and/or whose Trusts originated there and, in the case of plaintiff Arnold,  on behalf of the members of the California Sub-Class.

97.     The Bank has engaged in and continues to engage in unfair, unlawful and deceptive business practices, including but not limited to sending representatives from St. Louis, Missouri to meet with plaintiff Kutten in Northern California, whereby it has conspired with BAC and its affiliates to force the Kutten and other trusts to have their assets re-directed from individually managed accounts and/or so-called "Common Trust Funds" and/or other assets to proprietary mutual funds controlled by the Bank and its affiliates. Said Conversions have resulted in higher total direct and indirect expenses charged to fiduciary accounts than those historically paid to the Bank.

98.     By acting as alleged herein, the Bank has violated its duties as a fiduciary, which constitutes breach of trust pursuant to Section 16400 of the California Probate Code.

99.     The unlawful acts and practices of the Bank as alleged herein, including

violations of Section 16400 of the California Probate Code, constitute unlawful business

practices within the meaning of California Business and Professions Code Section 17200, et seq.

100.    Unless the Bank is enjoined from continuing to engage in the foregoing unfair and

deceptive business practices, plaintiffs Kutten and Arnold and the other members of the general

public residing within the State of California and/or whose Trusts originated in California and

the members of the California Sub-Class will continue to be injured and damaged by the Bank's

unfair business practices.

101.    So as not to be unjustly enriched by its own wrongful actions and conduct, the

Bank should be required to disgorge and restore to plaintiffs Kutten and Arnold and the other

members of the general public residing within the State of California and/or whose Trusts

originated in California and the members of the California Sub-Class all monies wrongfully

obtained by it as a result of its wrongful conduct, together with interest and profits earned

thereon.

## COUNT EIGHT

## VIOLATION OF CHAPTER 456 AND 469 MISSOURI REVISED STATUES

102.    Plaintiff Scharff repeats and realleges each and every allegation contained above

as if fully set forth herein. The claims set forth in Counts Eight and Nine are asserted on behalf

of the members of the Missouri Sub-Class.

103.    Pursuant to §456.520.2 R.S.Mo., (now  §456.8 -802 R.S. Mo. 2004 and §456.900,

now  469.900  et. seq. R.S.Mo. 2004 to the extent it supplements prior law) ("The Prudent

Investor Act")  R.S.Mo., the Bank owes and owed to plaintiff Scharff and the members of the

Missouri Sub-Class an absolute duty of loyalty. In exercise of that duty, the Bank has a duty to

40

administer the Trusts and other fiduciary accounts solely in the interests of the beneficiaries thereof.

104.    Pursuant to §456.905 R.S.Mo., (now §469.905) the Bank owes and owed to plaintiff Scharff and the members of the Missouri Sub-Class an absolute duty of loyalty. In exercise of that duty, the Bank has a duty to administer the Trusts and other fiduciary accounts governed by the Missouri law solely in the best interests of the beneficiaries, i.e. the members of the Missouri Sub-Class.

105.    Pursuant to the Missouri Prudent Investor Act, the Bank owes and owed to plaintiff Scharff and the members of the Missouri Sub-Class a duty to exercise reasonable care, skill and caution in investment management decisions, to ascertain facts relevant to the investment and management of trust assets, and a duty to use the special skills and expertise it represented itself to possess when investing and managing trust assets..

106.    By acting as alleged herein, the Bank has violated and continues to violate the duties of loyalty and candor it owes and owed to plaintiff Scharff and the members of the Missouri Sub-Class. Such violations of the Bank's duties as fiduciary constitute breach of trust imposed by Missouri statute.

107.    Pursuant to the Missouri Prudent Investor Act and §456.570.2 R.S.Mo. (now 456.8-802 R.S.Mo. 2004), the Bank owes and owed to plaintiff Scharff and the members of the Missouri Sub-Class a duty not to use or deal with fiduciary assets for its own profit, not to take part in any transaction in which it has an interest adverse to the beneficiary, such as plaintiff Scharff and the members of the Missouri Sub-Class.

108.    By acting as alleged herein, the Bank has violated and continues to violate the duty not to use or deal with fiduciary assets for its own profit, and the duty to not take part in any

41

transaction in which it had a conflict of interest. Such violations of the Bank's duties as fiduciary constitute breach of trust pursuant to Missouri statute.

109.    Pursuant to the Prudent Investor Act, the Bank owes and owed to plaintiff Scharff and the members of the Missouri Sub-Class a duty of care that includes the duty to invest fiduciary assets prudently and with regard to individualized strategy appropriate to each fiduciary account and to each beneficiary thereof, and the duty to make fiduciary assets productive. Moreover, the Prudent Investor Act requires the Bank to apply fully the special skills of a corporate fiduciary, heightening the duty of care otherwise applicable to it.

110.    By acting as alleged herein, the Bank has violated and continues to violate the duties and productivity it owes and owed to plaintiff Scharff and the members of the Missouri Sub-Class. Clearly the Bank was interested in seizing new opportunities and lining its own pockets at the expense of plaintiff Scharff and those similarly situated.  Such violations of the Bank's duties as fiduciary constitutes breach of trust pursuant to Missouri law.

111.    The Bank and its affiliates have already unlawfully extracted huge sums in the form of fees and other charges assessed against fiduciary accounts and unless enjoined from doing so, they will continue indefinitely to extract unlawful fees and other charges from the members of the Missouri Sub-Class, in an amount which cannot be presently determined in violation of §456.907 R.S.Mo. (now  §469.907 R.S. Mo. 2004.)

112.    Plaintiff Scharff and the members of the Missouri Sub-Class may maintain a cause of action against the Bank for its breaches of its duties as fiduciary and its participation in transactions in which it had or has a conflict of interest, as it does here.

113.     The Bank is liable to plaintiff Scharff and the members of the Missouri Sub-Class for actual and punitive damages because the Bank acted with reckless disregard for plaintiff Scharff's and others' rights, attorneys' fees, interest, and such other relief as the Court may order.

## COUNT NINE

## BREACH OF FIDUCIARY DUTY UNDER MISSOURI COMMON LAW

114.     Plaintiff Scharff repeats and realleges each and every allegation contained above as if fully set forth herein.

115.     Pursuant to the common law of Missouri, the Bank owes and owed to plaintiff Scharff and the members of the Missouri Sub-Class an absolute duty of loyalty.  In exercise of that duty, the Bank has a duty to administer the Trusts and other fiduciary accounts governed by Missouri law solely in the best interests of the beneficiaries, i.e. the members of the Missouri Sub-Class.

116.     By acting as alleged herein, the Bank has violated its fiduciary duties of absolute loyalty and candor owed to plaintiff Scharff and the members of the Missouri Sub-Class.

117.     By acting as alleged herein, the Bank has violated its fiduciary duty not to participate in transactions in which it had or has a conflict of interest, as it did and does here.

118.     By acting as alleged herein, the Bank has violated its fiduciary duties of care and productivity it owes or owed to plaintiff Scharff and the members of the Missouri Sub-Class.

119.     By acting as alleged herein, the Bank has violated its fiduciary duty that it owes or owed to plaintiff Scharff and the members of the Missouri Sub-Class to take and exercise control over fiduciary assets.

120.    Plaintiff Scharff and the members of the Missouri Sub-class may maintain a cause of action against the Bank for its breaches of its duties as fiduciary and its participation in transactions in which it had or has a conflict of interest as described above.

121.    The Bank's unlawful conduct, breach of fiduciary duty and breach of contract have damaged plaintiff Scharff and the members of the Missouri Sub-Class, inter alia, resulting in waste and mismanagement of fiduciary assets, self-dealing and its consequent unjust enrichment.

122.    The Bank is liable to plaintiff Scharff and the members of the Missouri Sub-Class for actual and punitive damages because the Bank acted with reckless disregard for plaintiff Scharff's and others' rights,, attorneys' fees, interest and such other relief as the Court may order.

## COUNT TEN

## INDIVIDUAL CLAIM OF PLAINTIFF KUTTEN BREACH OF FIDUCIARY DUTY

123.    Plaintiff Kutten repeats and realleges each and every allegation contained above as if fully set forth herein.

124.    As noted above, plaintiff Kutten's family wealth commenced with the toils of her grandfather, Charles H. Yalem, who founded the Aetna Finance Co., later sold to International Telephone and Telegraph Corporation in 1960.  Yalem, always a conservative investor, donated hundreds of thousands of dollars to St. Louis civic endeavors, including the St. Louis Zoo (the Charles H. Yalem Children's Zoo), St. Louis University, Jewish Hospital of St. Louis, Washington University, the St. Louis Symphony Orchestra and the St. Louis chapter of the YMCA.  Yalem's experience with predecessors to the Bank commenced at least with St. Louis Union Trust which became Centerre Trust Co, which became Boatmen's Trust Co. Yalem's net worth was achieved as a result of a passion for cautious investing and he instilled in his son-in-

law and daughter, Joseph and Carolyn Kutten, plaintiff Kutten's parents, the wisdom of careful and conservative investing so that future generations of the family might enjoy his good fortune. In turn, plaintiff Kutten's parents passed these virtues on to her. The Kutten family employed the St. Louis law firm of Bryan, Cave, McPheeters and McRoberts n/k/a/ Bryan Cave to draft the Kutten Trusts and represent them on estate planning matters.  The relationship of the Kutten family was not only with their trust company, it was with the individuals who represented the trust company who understood and appreciated the desires and needs of the entire family, including plaintiff Kutten, a single mother of two children, as well as one of her brothers, a disabled person who is institutionalized and has special needs.  The Kuttens had long term personal relationships with several individuals, including Bank Senior Vice Presidents Robert Hitpas and Richard Klapp. These individuals and their successors are no longer responsible for the portfolios entrusted to them.  Instead, the Bank boasts of a minimum of 450 faceless employees who answer customer inquiries at "Call Centers" established around the country.  The systemic change that occurred at the Bank when it acquired the predecessor banks and converted trust assets without the consent of plaintiff Kutten for its own gain and profit represents a classic instance of self-dealing and breach of loyalty, the antithesis of conduct expected of a fiduciary. The Bank has breached its fiduciary duties to plaintiff Kutten and her daughters, including the duty of loyalty, and various duties highlighted by the federal regulations issued by the Office of the Comptroller of the Currency in 1996 directed to all national banks that act in a fiduciary capacity, with which the Bank failed to comply.[6]   The Bank:

> (a)     failed to exercise such specialized care and skill as is required of a fiduciary;

---

[6] Plaintiff Kutten asserts no private cause of action thereunder.  Rather, the Bank's failure to comply with them is a

(b)     converted trust assets and their subsequent  purchase of the Bank's proprietary mutual funds, the Nations Funds;

(c)     failed to properly diversify investment portfolios of the Trusts, and acting in derogation of the settlor's expressed directions;

(d)     failed to adopt appropriate policies relevant to self-dealing and conflict of interest as required by and in violation of 12 CFR Part 9;

(e)     failed to preview the prospective account to determine if the account could be properly administered subsequent to the acquisition of Boatmen's Trust Co. by the Bank as required by and in violation of 12 CFR, part 9.6;

(f)     failed to properly invest funds waiting to be invested to obtain yields consistent with a reasonable rate of return as required by and  in violation of 12 CFR Part 9.10;

(g)     failed to assign at least two individuals to plaintiff Kutten's accounts as required by 12 CFR, part 9.13;

(h)     charged excessive fees for fiduciary compensation in violation of 12 CFR part 9.15;

(i)     failed to properly supervise personnel entrusted with the management of plaintiff Kutten's Trusts' assets to ensure implementation of the grantors' expressed directions;

(j)     failed to make appropriate trades in the equity and bond markets to enhance the achievement of the objectives of the Trusts, including failing, through neglect, to make trades of any kind for several years;

(k)     failed to establish a written plan to engage in the sale and marketing of Nations Funds to Trusts under its fiduciary control and failed to absorb the expenses of

fundamental breach of fiduciary duty.

establishing a collective investment fund, instead charging the beneficiaries, including plaintiff Kutten a fee of not less than 0.01%;

(l)    failed to consider and advise the beneficiaries of the adverse tax consequences arising from a conversion of trust assets and the subsequent purchase of Nations Funds;

(m)    failed to consider alternative investments in funds whose returns and ratings are higher than Nations Funds which has scored low on nationally respected ratings;

(n)    created a wholly owned subsidiary to serve as the sole vendor of its own product to Trusts under its fiduciary management and control;

(o)    failed to resign as Trustee when demanded to do so by plaintiff Kutten, citing its need for business income as overriding its performance as a fiduciary duty and resigning only after plaintiff Kutten's citation of the innumerable occasions when the Bank had breached its duty to plaintiff Kutten and the Kutten Trusts;

(p)    failed to observe the parameters of the instructions with regard to conversion issued by the Federal Reserve Bank of the United States in SR 97-3 (SPE), providing [i]n determining whether to convert common trust funds to mutual funds, a banking organization must address the possibility that the conversion could result in conflicts between the best interests of the organization and the fiduciary." Further, the Federal Reserve noted the existence of potential conflicts of interest for a national bank to engage in such transactions and the need for management to demonstrate that it has determined that the governing trust instrument for each affected customer authorizes investment in mutual funds and the mutual funds are suitable investments for the particular accounts;

(q)    lost administrative control of plaintiff Kutten's accounts for an undetermined period of time in 2202 and 2003, including electronic access to the accounts and the paper files relating to same; and

(r)    failed to communicate with the plaintiff Kutten, return her phone calls and letters and failed to perform as requested by plaintiff Kutten with respect to modifying investment strategies consistent with the investment philosophy that reigned in her family for decades.

<u>COUNT ELEVEN</u>

<u>INDIVIDUAL CLAIM OF PLAINTIFF KUTTEN BREACH OF FIDUCIARY DUTY</u>

125.    Plaintiff Kutten repeats and realleges each and every allegation contained above as if fully set forth herein.

126.    On information and belief, the Bank's decision to invest the assets of the Trusts in the Nations Funds was motivated not by the interests of plaintiff Kutten and her daughters but by BAC's desire to generate investment advisory and other fees for its affiliates and, indirectly, for itself, as well as to reduce the Bank's operating expenses.

127.    On information and belief, the Bank failed to consider the Nations Funds' high expense or alternative lower cost families of mutual funds when it invested the assets of the Kutten Trusts into shares of the Nations Funds thus putting its own interests before those of the beneficiaries of fiduciary accounts maintained for the Kutten Trusts.

128.    On information and belief, the Bank failed to consider the best interests of plaintiff Kutten and her daughters when it invested the Kutten Trusts' assets in the Nations Funds and breached its duty of loyalty to them by putting the interests of itself and its affiliates before the interests of plaintiff Kutten and her daughters.

48

129.     The Bank's wholesale investment of the assets of the Kutten Trusts in the Nations Funds was a breach of its fiduciary duty to plaintiff Kutten and her daughters, which breach was aided, abetted and/or directed by BAC and its affiliates.

130.     As a result of, inter alia, the Bank's improper wholesale transfer of fiduciary assets held by fiduciary accounts the Kutten Trusts into shares of the Nations Funds, the accounts of plaintiff Kutten and her daughters for which the Bank was a fiduciary have been damaged in an amount to be determined by the Court, but believed to be substantial.

## COUNT TWELVE

## INDIVIDUAL CLAIM OF PLAINTIFF KUTTEN BREACH OF CONTRACT

131.     Plaintiff Kutten repeats and realleges each and every allegation contained above as if fully set forth herein.

132.     By means of the acceptance by the Bank and its predecessors of the trusteeship of the Kutten Trusts, the Bank and its predecessors committed to provide to such Trusts complete investment management services of a corporate fiduciary, and render such services on an individualized basis consistent with the goals and objectives of plaintiff Kutten's parents and the needs of the beneficiaries thereof. As the Bank states: "It is our responsibility to invest the trust assets prudently and profitably according to the grantor's wishes as outlined in the trust document." No grantor of a Trust anticipated or could reasonably foresee that the Conversion would be carried out by the Bank with Trust assets or that the designated fiduciary would be the Bank in its present form. Further, as set forth in those Counts not asserted on behalf of the Class, the Bank ignored the express provisions of the Kutten Trusts with respect to investments and otherwise.

133.     Plaintiff Kutten and her daughters were beneficiaries of the Bank's contractual obligations to the creators of the Kutten Trusts and other fiduciary relationships. By abdicating its responsibilities for individual investment management services and/or through "Common Trust Funds" in favor of the wholesale Conversion of fiduciary assets that the Bank was obligated to provide to the beneficiaries of its fiduciary accounts, and by conducting itself in its present business form, the Bank breached its contractual obligations to plaintiff Kutten, her parents and daughters.

134.     By virtue of the Bank's breach of its contractual obligations to plaintiff Kutten, her parents and her daughters, plaintiff Kutten and her daughters have suffered damages in an amount to be determined by the Court.

135.     The Bank has breached its contractual obligations to plaintiff Kutten and her daughters in their individual capacities as a result of its failure to adhere to the terms of the Kutten family's engagement of the Bank and its predecessors as a fiduciary and plaintiff Kutten as well as her daughters have been damaged.

## COUNT THIRTEEN

### INDIVIDUAL CLAIM OF PLAINTIFF BREACH OF CONTRACT

136.     Plaintiff Kutten repeats and realleges each and every allegation contained above as if fully set forth herein.

137.     This Count if brought by plaintiff Kutten as a beneficiary of Trusts originally established with the Boatman's Trust Company, being one of the Banks acquired by and/or merged into the Bank.

138.     Boatmen's Trust Company, as designated corporate Trustee, promised and agreed to the settlers of the Kutten Trusts and its beneficiaries to deliver personalized fiduciary services.

Implicit in the contractual fiduciary relationship between the plaintiff Kutten's parents and Boatman's Trust Company was the provision of a full range of personalized fiduciary services, including individualized investment management.

139.    The Bank, by eliminating the personalized fiduciary services to plaintiff Kutten, including, *inter alia*, individualized investment management, materially breached the explicit and implied terms of the Kutten Trusts, including, but not limited to the following:

(a)    failing to provide appropriate trained personnel to supervise and monitor the performance of the assets in their charge, including failing to invest in appropriate asset classes;

(b)    bouncing plaintiff Kutten to poorly manned and anonymous "Call Centers" with whom these was no pre-existing relationship, trust and fealty;

(c)    changing without plaintiff Kutten's consent representatives of the Bank to deal with plaintiff Kutten who had no knowledge of plaintiff Kutten or the purposes for which the Kutten Trusts were established; and

(d)    continuing to charge excessive fiduciary fees when failing to perform the services the services that Boatman's Trust Company had agreed to perform.

140.    Because the transfer of fiduciary responsibilities from Boatman's Trust Company substantively and materially affected the Kutten Trusts' pre-existing fiduciary relationship with the Bank, it was obliged to give notice to plaintiff Kutten of, inter alia, the terms of the merger between it and Nations Bank, the forthcoming changes in the relationship and provide to them the opportunity to seek a replacement Trustee.

141.    Although not provided with said notice, plaintiff Kutten sought the resignation of the Bank in early October, 2003.  In response, on October 17, 2003, the Bank incredibly insisted that they be allowed to remain a trustee:

> The (Bank's) Committee decided that they would not resign from these trusts.  It was a business decision that was based on the fact that Bank of America does not want to give up your business.  Bank of America, like everyone else, has felt the effects of the poor economy and has become very reluctant to voluntarily resign as trustee.

142.    The Bank continued to resist resignation until plaintiff Kutten's counsel wrote a seven page letter citing the many examples of the Bank's breach of duties in the administration of the trusts of plaintiff Kutten and her daughters.

## COUNT FOURTEEN

## INDIVIDUAL CLAIM OF PLAINTIFF KUTTEN UNJUST ENRICHMENT

143.    Plaintiff  Kutten repeats and realleges each and every allegation contained above as if fully set forth herein.

144.    By reason of defendant BAC's causing the Bank's fiduciary assets in affected accounts to be invested in the Nations Funds, the Bank and BAC  have "double dipped." The defendants have profited by the Conversion and the subsequent acts described herein, thereby unjustly enriching themselves at the expense of plaintiff Kutten and her daughters.  Defendants have similarly enriched themselves, their subsidiaries and affiliates by using information regarding the plaintiff Kutten to market various goods and services including credit cards, loans and deposit accounts, from which products and services they have been unjustly enriched.

145.    Such "double dipping" was carried out by the Bank and BAC by imposing on plaintiff Kutten's accounts the Banks' fees for acting as a corporate fiduciary as well as investment advisory fees, and other related charges which, when taken together with all the

Nations Funds' expenses, even after so-called credits for certain Nations Funds advisory fees, exceeded the amounts to which the Bank was entitled to payment for, *inter alia*, investment of the fiduciary assets, for which services its Trustee or similar fees were intended to cover. Such benefits to the Bank and BAC were exacerbated by the Bank's avoidance of substantial operating expenses by reason of its abdication of its individualized investment responsibilities owed to plaintiff Kutten and her daughters. The Bank enhanced its profit performance at plaintiff Kutten's expense by favoring the use of its own Funds and investing in same to increase its own asset base, and aggrandize its own stature under the guise of allegedly providing more services to participants in its "Private Bank"  The Bank's objectives were clear from its telling press release in July 14,1999:

> United by the merger of Bank of America and NationsBank, NationsBanc Investments, Inc., and BA Investment Services, Inc., became one brokerage company on July 12. The birth of Banc of America Investment Services, Inc., the new name for the retail brokerage, gives investors a powerful ally within the Bank of America franchise.  (For the full press release, see http://www.bankofamerica.com/newsroom/press/press.cfm?PressID= press.19990714.03.htm&LOBID=1>).

146.    The defendants have invested the proceeds of the foregoing unjust enrichment and realized additional profits thereupon, all of which should be returned to the Kutten Trusts as the Court shall deem appropriate (e.g. a proportionate share of the defendants' profits during the years of misappropriation).  Missouri statutes impose strict liability against fiduciaries who "at their sole risk" make investments that are improper such that the Bank is "absolutely liable" to plaintiff Kutten for their losses.  §362.550.5  R.S.Mo.  Plaintiff Kutten and her daughters are entitled to recover the Bank's ill-gotten gains and profits.

## COUNT FIFTEEN

## INDIVIDUAL CLAIM OF PLAINTIFF KUTTEN
## <u>VIOLATION OF CHAPTER 456 MISSOURI REVISED STATUES</u>

147.    Plaintiff Kutten repeats and realleges each and every allegation contained above as if fully set forth herein.

148.    Pursuant to §456.520.2 R.S.Mo. and §456.900 *et. seq.* R.S.Mo. ("The Prudent Investor Act")  RSMo. (recently re-codified at §456.900, et. seq. R.S.Mo 2004 to the extent her claims are supplemented thereby), the Bank owes and owed to plaintiff Kutten and her daughters an absolute duty of loyalty. In exercise of that duty, the Bank has a duty to administer the Trusts and other fiduciary accounts solely in the interests of the beneficiaries thereof.

149.    Pursuant to §456.905 R.S.Mo.,(recodified at 469.905 R.S. Mo. 2004) the Bank owes and owed to plaintiff Kutten and her daughters an absolute duty of loyalty. In exercise of that duty, the Bank has a duty to administer the Kutten Trusts governed by the Missouri law solely in the best interests of the beneficiaries.

150.    Pursuant to the Missouri Prudent Investor Act, the Bank owes and owed to plaintiff Kutten and her daughters a duty to exercise reasonable care, skill and caution in investment management decisions, to ascertain facts relevant to the investment and management of trust assets, and a duty to use the special skills and expertise it represented itself to possess when investing and managing trust assets.

151.    By acting as alleged herein, the Bank has violated and continues to violate the duties of loyalty and candor it owes and owed to plaintiff Kutten and her daughters.  Such violations of the Bank's duties as fiduciary constitute breach of trust imposed by Missouri statute.

152.    Pursuant to the Missouri Prudent Investor Act and §456.570.2 R.S.Mo. (recently recodified as   §456.8-802 R.S. Mo. 2004), the Bank owes and owed to plaintiff Kutten and her daughters a duty not to use or deal with fiduciary assets for its own profit, not to take part in any transaction in which it has an interest adverse to the beneficiary, such as plaintiff Kutten and her daughters.

153.    By acting as alleged herein, the Bank violated the duty not to use or deal with fiduciary assets for its own profit, and the duty to not take part in any transaction in which it had a conflict of interest. Such violations of the Bank's duties as fiduciary constitute breach of trust pursuant to Missouri statute.

154.    Pursuant to the Prudent Investor Act, the Bank owes and owed to plaintiff Kutten and her daughters  a duty of care that includes the duty to invest fiduciary assets prudently and with regard to individualized strategy appropriate to each fiduciary account and to each beneficiary thereof, and the duty to make fiduciary assets productive. Moreover, the Prudent Investor Act requires the Bank to apply fully the special skills of a corporate fiduciary, heightening the duty of care otherwise applicable to it.

155.    By acting as alleged herein, the Bank has violated the duties and productivity it owed to plaintiff Kutten and her daughters. Clearly the Bank was interested in seizing new opportunities and lining its own pockets at the expense of plaintiff Kutten and her daughters. Such violations of the Bank's duties as fiduciary constitutes breach of trust pursuant to Missouri law.

156.    Plaintiff Kutten may maintain a cause of action against the Bank for its breaches of its duties as fiduciary and its participation in transactions in which it had or has a conflict of interest, as it does here.

157.    The Bank is liable to plaintiff Kutten for actual and punitive damages because the Bank acted with reckless disregard for plaintiff Kutten's rights, attorneys' fees, interest, and such other relief as the Court may order.

## PRAYER FOR RELIEF

WHEREFORE, plaintiffs Arnold and Scharff  respectfully request on their own behalf and on behalf of all members of the Class and Missouri and California Sub-Classes and plaintiff Kutten requests on behalf of herself and her daughters:

(a)    certification of this action as a Class Action and appointment of plaintiffs' and their counsel to represent the Class and the Missouri and California Sub-Classes;

(b)    entry of judgment on the claims for breach of fiduciary duty in favor of plaintiffs individually and plaintiffs Arnold and Scharff  as  representatives of the other members of the Class and Missouri and California Sub-Classes and against the defendants and an award of compensatory damages and punitive damages in favor of plaintiffs individually and as representatives of the other members of the Class and Missouri and California Sub-Classes and against the defendants in the amount of damages caused by the defendants' breaches of fiduciary duties;

(c)    entry of judgment on the claims for breach of contract in favor of plaintiffs individually and plaintiffs Arnold and Scharff as representatives of the other members of the Class and Missouri and California Sub-Classes against the Bank and an award of compensatory damages in favor of plaintiffs individually and as representatives of the other members of the Class and Missouri and California Sub-Classes and against the Bank in the amount of damages caused by the Bank's breaches of contract;

(d)    entry of judgment enjoining the Bank from opposing any petition filed by any member of the Class or Missouri or California Sub-Classes seeking the removal of the Bank as corporate fiduciary and requiring the Bank to pay for all legal fees and expenses incident thereto including its own;

(e)    entry of judgment compelling the defendants to account for their unjust enrichment and disgorging the amount thereof (and the profits earned thereupon) to the fiduciary accounts, including the Kutten, Crowley and Scharff Trusts, affected by the wrongdoing described herein and/or their beneficiaries, as appropriate;

(f)    entry of judgment compelling the Bank to fully insulate its fiduciary operations from all of its other business activities and those of BAC;

(g)    entry of judgment compelling the Bank to establish and implement procedures to fully protect the interests of the members of the Class including, inter alia, the appointment of an ombudsman to oversee the Bank's fiduciary operations;

(h)    repayment to the affected Nations Funds of the damages caused to them by the defendants' actions as described herein;

(i)    pre-judgment and post-judgment interest at the maximum rate allowable by law;

(j)    reasonable attorneys' fees and reimbursement of the reasonable costs and expenses of prosecuting this litigation and distributing the recovery to  members of the Class and Missouri and California Sub-Classes; and

(k)    such other or additional relief as this Court deems appropriate.

## **JURY DEMAND**

Plaintiffs hereby demand a trial by jury.

June 29, 2005

GREENFIELD & GOODMAN LLC
RICHARD D. GREENFIELD
7426 Tour Drive
Easton, Maryland
(410)745-4149
(410) 745-4158 (Fax)

Lead Counsel for Plaintiffs and the Class


SUMMERS, COMPTON, WELLS & HAMBURG
PROFESSIONAL CORPORATION

/s/ Steven M. Hamburg
STEVEN M. HAMBURG          #3313
HOLLY M. MCINTYRE          #112203
8909 Ladue Road
St. Louis, MO 63124
(314) 991-4999
(314) 991-2413 (Fax)


GANCEDO & NIEVES LLP
Hector G. Gancedo
Amy M. Boomhouwer
144 W. Colorado Blvd.
 Pasadena, CA 91105
(626) 685-9800

COUNSEL FOR PLAINTIFFS AND THE CLASS


## CERTIFICATE OF SERVICE

I hereby certify that on this 29th day of June, 2005, I caused a copy of the foregoing to be served upon Defendants' counsel via the Court's electronic filing system to the following:

| | |
|---|---|
| Jeffery S. Russell, Esq. | Gregory B. Jordan, Esq. |
| Jason E. Maschmann, Esq. | Mary J. Hackett, Esq. |
| Bryan Cave LLP | Sharon L. Rusnak, Esq. |
| One Metropolitan Square | Reed Smith, LLP |

211 N. Broadway, Suite 3600  435 Sixth Avenue
St. Louis, MO 63102     Pittsburgh, PA 15219

/s/ Steven M. Hamburg

384544_1.DOC

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI

| | |
|---|---|
| Ellen Jane Kutten, individually and on behalf of her daughters; and Mary Ann Arnold and Elsie Mahler Scharff, on behalf of themselves and all others similarly situated; | Civ. File No. 04-0244 (PAM) |

Plaintiffs,

v.                                        **MEMORANDUM AND ORDER**

Bank of America, N.A. and Bank of
America Corporation,

Defendants.

---

This matter is before the Court on Defendants' Motion to Dismiss for Lack of Subject Matter Jurisdiction, John F. Medler Jr.'s Motion to Intervene, and Plaintiffs' Motion to Consolidate Cases. For the reasons that follow, the Court grants the Motion to Dismiss and denies all other Motions as moot.

**BACKGROUND**

Plaintiffs Mary Ann Arnold and Elsie Mahler Scharff bring this putative class action on behalf of themselves and a purported class. In addition, Plaintiff Ellen Jane Kutten asserts claims on behalf of herself and her daughters. Initially, Kutten was named as the only putative class representative. However, Arnold and Scharff later joined as putative class representatives, and Kutten opted to pursue only her individual claims.

Plaintiffs allege that Defendants Bank of America, N.A. and Bank of America Corporation (collectively "Bank of America") breached numerous fiduciary and contractual duties with respect to the administration of fiduciary accounts. According to Plaintiffs, the breaches are a result of Bank of America acquiring several smaller banks, which caused the "formerly independent institutions' fiduciary operations [to be] transmogrified into just cogs in the fee-generating machinery of the Bank and its corporate parent." (Sec. Am. Compl. ¶ 5.) In particular, Plaintiffs allege that Bank of America engaged in self-dealing by transferring assets from common trust funds to mutual funds that are controlled by Bank of America subsidiaries. Plaintiffs also allege that Bank of America breached its fiduciary duties by charging the fiduciary accounts greater fees than those charged if the funds had remained in common trust funds. In addition, Plaintiffs allege that Bank of America falsely advertises that it provides individualized fund management when it merely directs funds to standardized investments such as its mutual funds. Finally, Plaintiffs allege that they were denied notice and the right to object to the bank consolidations.

The Second Amended Complaint consists of fifteen counts, including breach of fiduciary duty, breach of contract, unjust enrichment, and violations of various California and Missouri statutes. Arnold and Scharff request compensatory and punitive damages on behalf of the putative class and sub-classes, as well as injunctive relief. Kutten seeks compensatory and punitive damages on behalf of herself and her daughters, as well as injunctive relief.

2

## DISCUSSION

Bank of America moves to dismiss for lack of subject matter jurisdiction, arguing that Plaintiffs cannot satisfy the amount-in-controversy requirement under 28 U.S.C. § 1332(a).[1] Federal district courts have original jurisdiction over all civil actions between citizens of different states in which the amount in controversy exceeds $75,000.  28 U.S.C. § 1332(a). In addition, "where the other elements of jurisdiction are present and at least one named plaintiff in the action satisfies the amount-in-controversy requirement," the Court may exercise supplemental jurisdiction over the claims of other plaintiffs in the same case or controversy, "even if those claims are for less than the jurisdictional amount specified in the statute setting forth the requirements for diversity jurisdiction."  Exxon Mobile Corp. v. Allapattah Servs., Inc., 125 S. Ct. 2611, 2615 (2005).

When determining the amount in controversy, "a complaint that alleges the jurisdictional amount in good faith will suffice to confer jurisdiction, but the complaint will be dismissed if it appears to a legal certainty that the claim is really for less than the jurisdictional amount."  Capitol Indem. Corp. v. 1405 Assocs., Inc., 340 F.3d 547, 549 (8th Cir. 2003) (citation omitted).  Because Bank of America challenges the allegations as to the amount of controversy, Plaintiffs must establish by a preponderance of the evidence that at least one named plaintiff satisfies the amount-in-controversy requirement.  Rasmussen v. State Farm Mut. Auto. Ins. Co., 410 F.3d 1029, 1031 (8th Cir. 2005) (citation omitted).

---

[1] There is no dispute that Plaintiffs meet the diversity-of-citizenship requirement under 28 U.S.C. § 1332(a)(1).

Bank of America asserts that no named plaintiff can satisfy the amount-in-controversy threshold. In contrast, Plaintiffs submit that Kutten may recover compensatory damages greater than $75,000. In addition, Plaintiffs maintain that their claims for punitive damages, injunctive relief, and attorneys' fees greatly exceed the jurisdictional minimum.

**A.    Compensatory Damages**

The parties dispute whether Kutten seeks compensatory damages in excess of $75,000.[2] Specifically, Plaintiffs contend that Kutten seeks over $700,000 in compensatory damages, while Bank of America asserts that Kutten may recover no more than $14,555. The Second Amended Complaint is silent on the amount of compensatory damages Kutten has incurred.

Plaintiffs base their compensatory damage calculation on several fees and losses that Kutten allegedly incurred due to Bank of America's alleged breaches. Notably, however, Plaintiffs fail to submit a scintilla of evidence to establish these alleged damages. Indeed, in her deposition, Kutten was unable to determine the damages she suffered and deferred to her expert witness. The record includes a preliminary report prepared by the expert witness, but that report merely outlines the methodology the expert will use to calculate damages and did not provide any actual calculations.

---

[2] According to Bank of America, the actual damages incurred by Arnold and Scharff does not exceed $4,847 and $12,947, respectively. Plaintiffs seemingly concede this, and present no evidence to establish the compensatory damages incurred by either Arnold or Scharff. Clearly, neither of these amounts exceeds the requisite $75,000.

4

Kutten purports to have produced "thousands of pages of documents" from which her losses and increased expenses can be mathematically ascertained. However, none of those documents are included in the record before the Court. As such, Plaintiffs have failed to show by a preponderance of evidence that Kutten sustained more than $75,000 in compensatory damages.

## B.    Punitive Damages

The parties dispute whether Plaintiffs' claim for punitive damages may contribute to the jurisdictional minimum. The Court may consider a claim for punitive damages in determining the amount in controversy. See Allison v. Sec. Benefit Life Ins., 980 F.2d 1213, 1215 (8th Cir. 1992). However, "when determining the amount in controversy, 'a claim for punitive damages is to be given closer scrutiny, and the trial judge accorded greater discretion, than a claim for actual damages.'" Larkin v. Brown, 41 F.3d 387, 389 (8th Cir. 1994) (citation omitted). Plaintiffs must come forth with a preponderance of evidence establishing the threshold amount. Rasmussen, 410 F.3d at 1031; see also Larkin, 41 F.3d at 388-89 (8th Cir. 1994) (requiring "competent proof" of punitive damages) (citation omitted).

Under Missouri law, a plaintiff may recover punitive damages for a breach of fiduciary duty upon a clear and convincing showing that the defendant acted with evil motive and reckless indifference to the plaintiff's rights. Reinke v. Bank of Am., N.A., No. 4:04-1758, 2005 WL 3454428, at *3 (E.D. Mo. Dec. 16, 2005). Similarly, California law imposes a heightened standard for punitive damages requiring the plaintiff to show "by clear and

convincing evidence that the defendant has been guilty of oppression, fraud, or malice." Cal. Civ. Code § 3294(a). Thus, "a breach of fiduciary duty alone without malice, fraud or oppression does not permit an award of punitive damages." <u>Flyer's Body Shop Profit Sharing Plan v. Ticor Title Ins. Co.</u>, 185 Cal. App. 3d 1149, 1154 (Cal. Ct. App. 1986) (citation omitted). A defendant "must act with the intent to vex, injure, or annoy, or with a conscious disregard of the plaintiff's rights." <u>Id.</u> (internal quotations and citation omitted).

In this case, Plaintiffs allege that Bank of America developed a nationwide scheme to convert assets from fiduciary accounts to proprietary mutual funds to earn profits without regard to their fiduciary duties to Plaintiffs and the purported class as beneficiaries to the fiduciary accounts. They further allege that Bank of America engaged in self-dealing transactions that were rife with conflicts of interest and that Bank of America misrepresented and concealed its wrongful conduct. Although these allegations set forth a breach of fiduciary duty claim, they do not meet the standard for punitive damages. Moreover, Plaintiffs have not produced any evidence that Bank of America acted with nefarious intent. Because Plaintiffs have failed to provide or even allege facts sufficient to support a punitive damages award, their request for this relief cannot contribute to the amount in controversy necessary to invoke federal jurisdiction. <u>See</u> <u>Larkin</u>, 41 F.3d at 389 (dismissing case where plaintiff could not recover punitive damages based on the record before the court).

**C.    Injunctive Relief**

Plaintiffs seek to enjoin Bank of America from opposing any future petitions seeking its removal as fiduciary. In addition, Plaintiffs ask that the Court order Bank of America to

establish and implement new procedures to protect the interests of the purported class.

Bank of America argues that Kutten and Scharff lack standing to assert claims for injunctive relief. "Whether a plaintiff has standing to sue 'is the threshold question in every federal case, determining the power of the court to entertain the suit.'" McClain v. Am. Econ. Ins. Co., 424 F.3d 728, 731 (8th Cir. 2005) (citation omitted). To establish standing, Plaintiffs must establish three elements: (1) they suffered an actual or imminent injury-in-fact that is concrete and particularized; (2) a causal connection exists between the injury and the challenged action; and (3) a favorable decision will likely redress the injury. Id. (citation omitted). When a plaintiff seeks injunctive relief, the injury-in-fact element requires a showing that the plaintiff faces a real and immediate threat of ongoing or future injury. Mosby v. Ligon, 418 F.3d 927, 933 (8th Cir. 2005) (affirming dismissal because the plaintiff lacking standing) (internal quotation and citation omitted); Park v. Forest Serv. of the United States, 205 F.3d 1034, 1037 (8th Cir. 2000) (holding that the plaintiff failed to sufficiently allege a threat of ongoing or future harm).

It is undisputed that Scharff and Kutten are no longer customers of Bank of America. Thus, they lack standing to seek the injunctive relief requested. Grandson v. Univ. of Minn., 272 F.3d 568, 574 (8th Cir. 2001) (individual plaintiffs lacked standing for injunctive relief because they were ineligible for prospective relief sought); Reinke, 2005 WL 3454428, at *4 (individual plaintiffs lacked standing for injunctive relief because they were no longer affiliated with defendants and under no threat of ongoing or future harm).

However, Arnold is still a Bank of America customer. Nonetheless, Bank of America submits that the injunctive relief requested has no value and therefore cannot be used to reach the jurisdictional minimum. Arnold has failed to articulate any real or tangible way in which the requested injunctive relief will benefit her as a current customer of the Bank of America. Burns v. Mass. Mut. Life Ins. Co., 820 F.2d 246, 248 (8th Cir. 1987) ("The amount in controversy in a suit for injunctive relief is measured by the value to the plaintiff of the right sought to be enforced."). Because of this failure, Arnold cannot rely on the value of the injunctive relief to meet the jurisdictional minimum.

## D.    Attorneys' Fees

Plaintiffs contend that their attorneys' fees would exceed the jurisdictional amount. However, "only statutory attorney fees count toward the jurisdictional minimum calculation." Rasmussen, 410 F.3d at 1031 (citation omitted). Plaintiffs have not shown that they are statutorily entitled to attorneys' fees if they prevail on their claims. Moreover, Plaintiffs have not submitted any evidence that the fees exceed the jurisdictional minimum. Thus, the Court will not consider attorneys' fees when making the amount-in-controversy determination.

## CONCLUSION

Plaintiffs have failed to show that any named plaintiff meets the amount-in-controversy requirement to confer subject matter jurisdiction over this action. Accordingly, **IT IS HEREBY ORDERED that**:

8

1.    Defendants' Motion to Dismiss for Lack of Subject Matter Jurisdiction (Docket No. 238) is **GRANTED**;

2.    All outstanding motions (Docket Nos. 200, 202, 205, 209, 218, 225, 228, 231, 238, 241, 251, 261, 264, 265, 267, 269, 277, 294, 303, 307, 318, and 319) are **DENIED as moot**; and

3.    This action is **DISMISSED without prejudice**.

Dated: May 26, 2006

s/ Paul A. Magnuson

Paul A. Magnuson
United States District Court Judge

**FILED**

JUN 1 6 2006

U. S. DISTRICT COURT
EASTERN DISTRICT OF MO
ST. LOUIS

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
## EASTERN DIVISION

ELLEN JANE KUTTEN,
individually, and on behalf
of her daughters

and

MARY ANN ARNOLD,
ELSIE MAHLER SCHARFF,
JOHN F.MEDLER, JR.,
MICHAEL R. MEDLER, and
JEFFREY P. MEDLER,
on behalf of themselves,
and all others similarly situated,

    **Plaintiffs,**

    v.

BANK OF AMERICA, N.A.

and

BANK OF AMERICA CORPORATION,

    **Defendants.**

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

**Case No.:**

**4:06CV0 0937C AS**

**JURY TRIAL DEMANDED**

**CLASS ACTION**

## COMPLAINT

COME NOW Plaintiffs Ellen Jane Kutten, individually on behalf of herself, and her

daughters, Alessandra Kutten Cottrell and Louise Kutten Cottrell, and Mary Ann Arnold, Elsie

Mahler Scharff and John F. Medler, Jr., Michael R. Medler and Jeffrey P. Medler (hereinafter

Medlers), for themselves and for all other members of the Classes hereinafter described, by and

through counsel, and state and allege as follows:

## OVERVIEW

1.      This Class Action is brought by Plaintiffs Mary Ann Arnold, Elsie Mahler

Scharff and the Medlers on behalf of themselves, and all others similarly situated, and by

Plaintiff Ellen Jane Kutten, individually, on behalf of herself and her daughters, all of whom are

or were beneficiaries of fiduciary accounts for which the Defendant Bank of America N.A.

("Bank") serves or served as corporate trustee.

2.      The allegations in this Complaint are directed at the Bank, as well as its parent company, Bank of America Corporation ("BAC"), for their breaches of fiduciary and contractual duties owed by them to beneficiaries of fiduciary accounts, as well as violations of federal law, arising from the Defendants' self-dealing, wholesale re-direction of trust assets from their historic allocations in in-house, fee-free Common Trust Funds to the Bank's proprietary mutual funds, the Nations Funds (hereinafter, "Conversion"), which were serviced and advised by the Bank's affiliates and controlled by subsidiaries of Defendant BAC.

## THE PARTIES

3.      Plaintiffs are all present or former beneficiaries of the Bank's fiduciary accounts whose assets were invested in the Defendants' in-house proprietary mutual funds, known as the Nations Funds ("Nations Funds").

4.      Plaintiff Ellen Jane Kutten is a California citizen who has varying interests as beneficiary, contingent beneficiary, as well as co-trustee of several trusts which had been, until the fall of 2003, managed and controlled by the Bank, its corporate parent and affiliates. In particular, Plaintiff Kutten is a named beneficiary under trusts created by her parents in this District in 1981, as amended in 1983, 1987 and 1990, namely, the Joseph Kutten Indenture of Trust and the Carolyn J. Kutten Indenture of Trust. In addition, Plaintiff Kutten and her daughters were beneficiaries of trusts established in 1989, namely, the Joseph Kutten and Carolyn Y. Kutten 1989 Grandchildren's Trust (collectively referred to hereinafter as the "Kutten Trusts"). The Kutten family's relationship with the Bank and its predecessors, including her grandfather, noted St. Louisan and philanthropist, Charles H. Yalem, spans a period in excess of forty years.

2

5.      Plaintiff Mary Ann Arnold is a Nevada citizen who has varying interests pursuant to a Trust established under California law by her grandfather, John T. Crowley, through his Last Will and Testament ("the Crowley Trust"), including her status as a beneficiary thereof, said Trust having been managed and controlled by the Bank, its corporate parent and affiliates.

6.      Plaintiff Elsie Mahler Scharff is a Missouri citizen who has varying interests pursuant to the Nicholas Scharff Trusts and the Pauli R. Scharff Revocable Trust established under Missouri law, including her status as a beneficiary thereof, said Trusts having been managed and controlled by the Bank, its corporate parent and affiliates.

7.      Plaintiff Medlers are Missouri citizens who are beneficiaries of certain testamentary trusts established in Missouri under the Last Will and Testament of Frances B. Lubbe, deceased (the "Lubbe Trusts"), said trust having been managed and controlled by the Bank, its corporate parent and affiliates.

8.      Defendant Bank is a federally chartered bank, deemed a citizen of North Carolina, and a wholly owned subsidiary of BAC.

9.      BAC is a financial holding company and the parent of the Bank. BAC is domiciled in North Carolina and incorporated in Delaware. At all relevant times, BAC dictated and controlled the business activities of the Bank, including, *inter alia*, the business activities described herein and occurring within this District, and wherever in the United States the Bank, BAC and/or their respective predecessors conducted business.

10.     BAC owns and controls, either directly or through the Bank, various other entities, including Columbia Management Advisors, L.L.C. f/k/a Bank of America Capital Management LLC, Columbia Management Advisors, Inc., a registered investment adviser under the 1940 Act (hereinafter "an RIA"),  Banc of America Advisors, Inc. (an RIA), Columbia Management Distributors, Inc. f/k/a BACAP Distributors, LLC, Bank of America Capital

3

Advisers, LLC (an RIA) and Bank of America Investment Services, Inc. (collectively, the "Bank Subsidiaries"), which controlled and directed the activities of the Nations Funds Trust (hereinafter, "NFT" n/k/a Columbia Funds Series Trust) during the relevant time period.

11.     At all relevant times herein, the Bank was Successor Trustee of the Kutten Trusts, the Crowley Trust and the Scharff Trusts. The Bank and the Hon. Mary Ann L. Medler are currently the Co-Trustees of the Lubbe Trusts. The Bank is also the Trustee or serving in another fiduciary role, with respect to the other Trusts or other fiduciary accounts of which the remaining members of the Class defined below are beneficiaries.

## JURISDICTION AND VENUE

12.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and § 22 of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. § 77(v); § 27 of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78a; the Investment Adviser's Act of 1940 ("the Adviser's Act"); 15 U.S.C. § 80b-1; 28 U.S.C. § 1332(b), the Class Action Fairness Act of 2005 and 28 U.S.C. § 1367. The value of the relief sought on behalf of Class members exceeds $5,000,000, exclusive of interest and costs. Further, there is diversity of citizenship between Plaintiffs, citizens of Missouri, Nevada and California, and each of the Defendants, who are citizens of other states. In addition, as set forth below, Plaintiff Kutten has sustained damages in excess of $75,000, exclusive of interest and costs and, separately, has accrued recoverable attorneys' fees in excess of $75,000.

13.     Further, the claims of Plaintiff Kutten have a value of not less than $1,150,368, excluding attorneys' fees relating to this action, consisting of attorney fees and fees paid to the Bank relating to the resignation of the Bank as Trustee; losses from investments; excess fees; and, repeated and continuing failures to invest according to the terms of the written instrument, which are set forth more specifically in Counts 16 to 20 hereof.

4

14.     In addition to the foregoing claims, Plaintiffs Kutten, Scharff and the Medlers

assert claims under and pursuant to Missouri law, Chapter 456 (Missouri Uniform Trust Code)

RS Mo. which also provide for, *inter alia,* payment of their counsel fees. (Section 456.10-1004

RS Mo. 2005). To date, such Plaintiffs' counsel fees exceed $75,000, exclusive of interest and

costs.

15.     The plan and scheme by the Defendants to unlawfully market Nations Funds

within and from this District was and is an essential, purposeful and integral component of the

Bank's strategy and business plan to be a nationwide financial institution as set forth herein.

This Court has personal jurisdiction over the Defendants given their systematic, repeated and

continuing contacts with and within this District, including the contacts with the other

"controlled persons" and members of the Class as described herein.

16.     Although the Bank and BAC now have their principal places of business in

Charlotte, North Carolina, they conduct substantial business within this District in many

locations through the Bank's "Private Bank" and numerous retail branches. At all relevant

times, the Defendants were "control persons" of the Bank Subsidiaries, NFT and its Board of

Trustees/Directors ("NFT Trustees"). These subsidiaries, in turn, controlled and directed the

activities of the Nations Funds during the relevant time period.

17.     In light of the foregoing substantial contacts with this District, each Defendant

can reasonably be expected to be subject to the jurisdiction of this Court, particularly since

Plaintiffs' claims as asserted herein specifically arise from and are directly related to the

Defendants' contacts with this District as described above.

18.     Venue is proper in this District pursuant to §22 of the Securities Act, §27 of the

Exchange Act and 28 U.S.C. §1391(b) because each of the Defendants had undeniable daily and

5

regular contacts with this District by reason of, *inter alia*, their common scheme and plan to implement the Conversion as set forth herein.

19.    Venue is proper in this District because many of the acts and practices complained of herein had their origin in and/or occurred in substantial part in this District. Further, many significant witnesses to the wrongdoing alleged herein are found in and/or did business within this District and will only be available for trial purposes in this District. Plaintiffs Scharff and the Medlers reside in this District, as do many members of the Class. In addition, a substantial amount of documents relevant to the claims asserted herein including, in particular, documents relating to the sale of Nations Funds to Plaintiffs and numerous other beneficiaries of the Bank's fiduciary accounts are located in this District.

## **CONTROL PERSON LIABILITY**

20.    At all relevant times, BAC and the Bank were and presently are "control persons" as such term is defined pursuant to the § 15 of the Securities Act and § 20 of the Exchange Act inasmuch as they have the power and authority and exercised the same to totally dominate and control each of the Bank Subsidiaries, NFT and the NFT Trustees with respect to the conduct which is the subject of this litigation.

21.    As such, BAC and the Bank are responsible for and liable to Plaintiffs and the members of the Federal Securities Sub-Class defined below for the primary violations of the Securities Act and the Exchange Act by the "controlled persons" as described herein.

## **ALLEGATIONS COMMON TO ALL COUNTS**

### *A.    Acquisition of Other Financial Institutions*

22.    Over the course of more than 15 years, the Bank and BAC made numerous acquisitions of other financial institutions throughout the United States, many of which were driven by their former Chairman and Chief Executive Officer, Hugh L. McColl, Jr.  Mr. McColl

6

was assisted by his subordinates, Kenneth Lewis, the current Chairman and Chief Executive

Officer, and James H. Hance, Jr., former Vice Chairman and Chief Financial Officer, whom

Mr. Lewis described as "one of the key architects of [BAC and the Bank] as it has grown to be

one of the largest financial service providers in the world."

23.      The acquisitions were part of the Bank's business plan pursuant to which many

of the investment-related and other services to beneficiaries of fiduciary accounts as described

herein, would be eliminated, thereby decreasing the Bank's costs of handling said accounts,

while increasing the profits generated there from. In a November 1998 speech, Mr. Hance set

forth the objectives as follows:

> We also are diversifying our revenue stream away from dependence on
> gathering deposits and lending them and toward fee income. The latter is
> now about 40 percent of our total revenues and our goal is to push fees to
> more than half of revenues in a short period of time.
>
> *     *     *
>
> The leverage as you increase the assets of a fund is significant.
>
> *     *     *
>
> **The most obvious advantage of scale is cost. Perhaps the best
> advantage is the exploding world of mutual funds. As the second
> largest player among banks, we have achieved significant scale. The
> leverage as you increase the assets of a fund is significant. After all,
> one money manager can manage $5 million or $50. So as you get
> bigger, you get much, much more profitable.**
>
> [Emphasis added]

24.      During a speech he delivered in Charlotte on May 26, 2004, Mr. Lewis, in

explaining how BAC and the Bank could justify the high-cost acquisitions of other banks in

financial terms said:

> In deliberating the wisdom of [their most recent] merger, much of the
> discussion outside the company has focused on expense savings and
> efficiencies. That's understandable - the history of mergers in our industry
> has been all about expense leverage. I believe expense savings and
> efficiency in this merger are critical, but only as a starting point.

7

25.    Mr. Lewis' explanation of how Defendants could squeeze "savings and

efficiencies" from BAC's then most recent acquisition was reinforced in the business

media several months later in April 2004 by David Pauly, writing for Bloomberg News:

> In October, [BAC] CEO Kenneth Lewis announced the $48.1 billion
> takeover of Fleet Boston Financial Corp. - thereby infuriating Bank of
> America shareholders who said Lewis had committed himself to
> managing the company's myriad acquisitions of the past.
>
> *    *    *
>
> Lewis offered Fleet Boston stockholders a premium of 43% above the
> market price. A lot of jobs will have to go to make up for the excessive
> payment.

26.    In the context of this nationwide series of acquisitions, and in order to justify the

high premiums that Messrs. McColl, Lewis and Hance were paying for the acquired financial

institutions ("Acquired Banks"), with each new acquisition, they required the centralization and

streamlining of the fiduciary services offered by the Bank, including the increased usage of

Nations Funds as vehicles for investment of the Bank's fiduciary assets.

27.    Over the years, the Bank and its corporate predecessors swallowed-whole

Boatmen's Trust Company, and numerous other Acquired Banks, which had fiduciary

responsibilities to Plaintiffs and members of the Class. In the process, these formerly

independent institutions' fiduciary operations were transmogrified into just cogs in the fee-

generating machinery of the Bank and its corporate parent.

28.    In the course of the metamorphosis of Boatmen's Trust Company and other

acquired financial institutions into the Bank, the interests of Plaintiffs and members of the Class

were not represented by caring, knowledgeable trust officers, but were frequently "serviced" by

"Call Centers" in Dallas and Atlanta, as well as elsewhere. These "Call Centers" were manned

by lower-level Bank personnel with little or no investment expertise, who employ computerized

asset allocation programs designed to maximize the use of the Bank's Nations Funds. Except for the highest net worth fiduciary accounts, the "customized recommendations" and "wealth management expertise" promised by the Bank are fictions and have been fictions since the consolidation of the various Acquired Banks began taking place.

29.     Joseph Kutten and Carolyn Yalem Kutten (parents of Plaintiff Kutten), in entrusting their assets to Boatmen's Trust Company in St. Louis, a local bank, did so based upon personal relationships with officers of Boatmen's, and its predecessors in interest, St. Louis Union Trust Company and Centerre Bank, built over many years. The fiduciary relationship was established because, *inter alia*, Boatmen's Trust Company and its predecessor banks, held itself out to Joseph and Carolyn, and to other prospective customers of fiduciary services, as institutionally and personally suited not only to the stewardship of their assets over multiple generations, but looking after their descendants, such as the Plaintiffs in this litigation. Similarly, the grandfather of Plaintiff Arnold, John T. Crowley, through his Last Will and Testament, entrusted his bequeathed assets to a local bank in California. The successor Trustee was a corporate predecessor of the Bank, since acquired by a series of banks, now part of Bank of America. Plaintiff Scharff's father, Nicholas Scharff, and mother, Pauli Scharff, entrusted their assets to Boatmen's Trust Company, as did the grandmother of the Medlers.

30.     At or prior to the time that Boatmen's Trust Company was acquired by the Bank's predecessor, Nations Bank, it was known by the parties to the acquisition negotiations that the successor entity (i.e. Nations Bank) would materially adversely affect the administration of the fiduciary accounts of plaintiffs Kutten, Scharff and Medler and all other Boatmen's fiduciary accounts. Similarly, this was the plan of the Defendants with respect to each of the Acquired Banks and their fiduciary functions.

31.     To the best of the knowledge, information and belief of Plaintiffs Kutten, Scharff,

9

and the Medlers, neither Boatmen's nor Nations Bank provided to them or other interested parties in connection with other fiduciary accounts venued in Missouri appropriate written notice as provided in §362.331 R.S.Mo. of Boatmen's transfer of fiduciary capacities to Nations Bank disclosing all material facts which disclosed the material adverse affect of such transfer or advising such interested parties (including Plaintiffs Kutten, Scharff and Medlers and members of the Missouri Sub-Class) that they had a right to object to the transfer and, *inter alia*, obtain a replacement fiduciary.

32.     Plaintiffs believe and therefore allege that the Bank similarly failed to provide such notice in each of the other instances where the fiduciary responsibilities of an Acquired Bank were taken over by the Bank or one of its predecessors. As such, all similarly affected beneficiaries were wrongly denied notice and the right to object to a transfer of fiduciary responsibilities to the Bank.

### B.    *Nations Funds*

33.     The Nations Funds consist of a "family" of more than 70 mutual fund portfolios, which are proprietary funds of the Bank. The Nations Funds' portfolios cover a wide variety of investment disciplines, strategies and types of asset categories including, *inter alia*, the Nations Municipal Income Funds, the Corporate Bond Portfolio; the Nations Small Company Fund; Nations Large Cap Index Funds and Nations Cash Reserves.

34.     The Nations Funds are nominally operated by NFT and its Board of Trustees, a majority of whom are purportedly independent. In fact, the Bank, as the largest single shareholder of record of the various Nations Funds controls all nominees to the NFT Board and therefore is a "control person" with respect to NFT, the Nations Funds, the NFT Trustees and the Bank Subsidiaries, as such term is defined in the federal securities laws and, in particular, § 15 of the Securities Act and § 20 of the Exchange Act.

35.    Certain of the Nations Funds were funded by the Bank and the Bank Subsidiaries

in substantial part by the Conversion, in effect, "force selling" Nations Funds upon the Bank's

captive fiduciary accounts for which it served as corporate fiduciary in exchange for assets that

were either individually managed by the Bank or in Common Trust Funds. Such funding

permitted the affected Nations Funds to have substantial asset bases, an important selling point

to the Defendants and the Bank Subsidiaries in marketing shares in the Nations Funds to other

potential purchasers thereof through the Bank and other subsidiaries of BAC. The Nations

Funds selected for investment of fiduciary assets by the Bank and Bank Subsidiaries pursuant to

the Conversions were intended generally to "mirror" the categories of assets held by the Bank's

fiduciary accounts pre-Conversion, all or most of which were liquidated immediately prior to

the Conversions, either as part of so-called "Common Trust Funds" or in individually-managed

accounts.

### C.    *Conversion*

36.    Historically, the Bank and its predecessors invested the assets comprising the

Kutten Trusts, the Crowley Trust, the Scharff Trusts, the Lubbe Trusts, and those of members of

the Class, primarily through individually managed portfolios and/or through so-called "Common

Trust Funds" or "Collective Investment Funds." The expenses of the Bank for such investment

vehicles and related administrative services were absorbed by the Bank out of its fees for

serving as fiduciary. Beginning some time prior to 1998, in order to, *inter alia*, compensate for

massive losses it was incurring from its traditional lending business, the Bank and its

predecessors developed various business plans pursuant to which they sought to minimize their

operating expenses with respect to fiduciary accounts and maximize their profits from fiduciary

business.

11

37. Upon information and belief, former Bank Chief Executive Officers, Hugh McColl and Kenneth Lewis, were significant motivating forces behind these plans, which were integral to their master plan of extracting higher profits from the Acquired Banks and consolidating their various trust department and "wealth management" activities under the banner of the so-called "Private Bank." Defendants' plan included the consolidation and elimination of the previously existing trust departments of the Acquired Banks with the objective of "servicing" fiduciary accounts and the beneficiaries thereof, with fewer and fewer personnel and greater standardization of investments in fiduciary accounts.

38. Pursuant to such business plans, they decided, *inter alia*, to utilize the funds held by the Bank in fiduciary accounts to fund an initial group of mutual funds and/or to add assets to such funds controlled by the Defendants and the Bank Subsidiaries, the above described Nations Funds, as well as other mutual funds merged into them.

39. Through a complicated and barely comprehensible grouping of advisors, sub-advisors, subsidiaries and other affiliated and unaffiliated service providers, the Defendants, Bank Subsidiaries and the "controlled persons" engineered a scheme pursuant to which the Bank was able to abdicate many of its traditional fiduciary responsibilities, functions and services to beneficiaries of its fiduciary accounts in favor of alternatives that resulted in higher total direct and indirect expense charges to the fiduciary accounts as compared to the trustee or similar fees historically paid to the Bank for, *inter alia*, active internal management of the fiduciary accounts' assets.

40. Throughout the Class Period defined below, the Defendants developed and implemented a general corporate investment policy pursuant to which most, or all, of the assets in accounts such as the Kutten Trusts, the Crowley Trust and the Lubbe Trusts and other fiduciary accounts similarly situated, would be uniformly converted into shares of the Nations

12

Funds (the "Conversion"), or only invested in such mutual funds at the outset. The management and investment decisions of the Nations Funds were controlled by the Bank Subsidiaries and by the Board of NFT, which was itself controlled and dominated by the Defendants.

41.    As part of this corporate policy, the investment in non-proprietary funds would be prohibited to the greatest extent possible. Indeed, in a letter from the Bank dated October 1, 1999 to the Hon. Mary Ann Medler, the mother of the Medlers, and a beneficiary of the Lubbe Trusts, the Bank reiterated its policy to only invest in its proprietary funds:

> The [Investment Review] Committee [of the Bank] reiterated that **the use of outside mutual funds in fiduciary accounts is in violation of our corporate policy.**
> [Emphasis added].

42.    The Federal Reserve System in Supervisory Letter SR 97-3 warned banking organizations that "conversion could result in conflicts between the best interests of the organization and the best interests of its fiduciary customers. The banking organization must also determine that the mutual fund shares are suitable for accounts which previously held common trust fund units. Another possible conflict of interest could arise from the use of *proprietary* mutual funds when there are unaffiliated mutual funds or alternate investment opportunities available that may be equally appropriate for the participant's portfolio. Again, the appearance that the organization put its own interests above those of its fiduciary customers may cause concern particularly if investments are made in a newly established proprietary fund with no history or track record. It is important that the organization thoroughly document its decision to transfer CTFs into proprietary mutual funds."

43.    In part to implement safeguards to obviate Federal Reserve concerns, the FDIC and the Office of Comptroller of Currency ("OCC"), federal regulators for national Banks, have created Trust Examination Manuals to serve as guides to Banks, including the Defendant Bank,

in their asset management activities, including the use of proprietary mutual funds in fiduciary accounts. The federal government provides an outline on investing to avoid a breach of fiduciary duty. The criteria for proprietary mutual fund investing are contained in Section 3 - Asset Management - Part I. These include due diligence standards which include establishing written investment policies, adoption of procedures for periodic review and comparison with other available funds and establishment of an arm's length process for evaluating the prudence of investing fiduciary accounts in proprietary and bank advised mutual funds rather than in non-proprietary alternative investments. Additionally, the manual suggests on-going comparisons of proprietary funds to peer group performance and fees and warns of "hidden fees" and expense ratios which do not include total costs to the investor.

     44.     Section 8 of the Trust Examination Manual - Compliance/Conflicts of Interest, Self-Dealing and Contingent Liabilities discusses prophylactic measures to be undertaken by Banks to avoid fiduciary transactions which may be set aside by the beneficiary, including documenting management's actions with respect to transactions involving real or potential conflicts of interests, including the prudence of such transactions and that that such documentation be readily available. This section talks about issues relating to the Bank's receipt of traditional trustee's fees and the additional fee received by a Bank from investments in its proprietary funds and what a Bank must do to guard against breach of duty.

     45.     Excerpts from Appendix C - Fiduciary Law, attached to the Trust Examination Manual lists the states that have removed the *per se* ban on the use of proprietary mutual funds (none of which have ever excused a Bank from further analysis as to whether the use of such funds violated a fiduciary duty) and Federal Reserve Supervisory Letter SR 99-7 entitled "Supervisory Guidance Regarding the Investment of Fiduciary Assets in Mutual Funds and Potential Conflicts of Interest" and discusses the fiduciary pitfalls in the financial incentives for

banks to place trust assts into particular mutual funds.

46.     Additionally, the OCC has published Handbooks on Conflicts of Interest and Personal Fiduciary Services discussing the appropriate methods to deal with the use of proprietary mutual funds in fiduciary accounts. Appendix E to the Conflict of Interest handbook discusses what Banks must do to ensure compliance with fiduciary duties when using mutual funds, including annually reviewing that the proprietary mutual fund continues to be an appropriate investment for the account.

47.     Other than a cursory determination of whether the instrument establishing the fiduciary account prohibited mutual fund investments and review of whether a state's law prohibited the investment, nothing was considered by the Bank on an account by account basis to establish the propriety of a Nation Funds investment. This allowed the Bank to send form letters to those interested in the accounts seeking authorizations or consents to the Conversions that were about to be consummated. All letters to tens of thousands of beneficiaries and/or co-trustees across the country were sent from the Bank of America's newly created "Private Bank" in St. Louis, from its President, David Fisher. No authorization or consent was sought from any fiduciary account for which the Bank could act on its own. No regard was documented by the Bank to adherence to the Bank's fiduciary duties to its fiduciary customers. No or little analysis was performed. The Bank converted CTFs and other assets *en masse* across the board to funnel assets into the Nations Funds for their own benefit to jump-start its asset management and otherwise build up its mutual fund business without regard to federal regulations, the Federal Reserve's Supervisory letter, the OCC or the FDIC guidelines.

48.     The Defendants implemented their business plan (sometime prior to the commencement of the Class Period), through the Bank's "Private Bank". The Private Bank sent out standardized form letters informing some co-trustees, beneficiaries of the fiduciary accounts,

and others, of the Bank's planned liquidation of its "Common Trust Funds" and touting the so-

called "benefits" of the Conversions and certain mutual funds "reorganizations". While all of

these Conversions and reorganizations were carried out on a rolling basis and assets were held in

individual accounts in various states, the Conversions did not differ from each other in any

material way.

49.     The standardized form letter, signed by David W. Fisher, President, also coerced

the recipients of the letters to authorize the Conversion of the Trusts' assets into shares in the

Nations Funds, stating:

> Any common trust fund units for which we have not
> received an authorization [by May 1, 2000] may be
> liquidated and the proceeds placed in a money market
> vehicle pending discussion about reinvestment. This
> liquidation could have adverse tax consequences
> depending upon the cost basis of the common trust fund
> units.

50.     In touting the benefits of the Conversion, the letter advised, that:

> Using Nations Funds, we can provide trust and
> fiduciary accounts with an attractive mix of
> investments to pursue the accounts' investment
> goals. Nations Funds also offer the benefits of:
>
> Daily valuation and liquidity
> Newspaper performance listings
> Broader potential diversification
> Flexibility when making trust distributions

In fact, there was little, if any, benefit that would flow to beneficiaries of the Bank's fiduciary accounts and this letter was a sham.[1]

51.      Indeed, all such so-called "benefits," could have been accomplished by means of the Bank's direct investment of fiduciary assets internally or through its fee and expense free "Common Trust Funds." Curiously, on or about August 16, 1999, the Bank announced that "Common Trust Funds will be valued at month-end instead of twice each month," despite the fact that computer software programs existed that could generate such valuations on a daily basis.

52.      Although Plaintiff Kutten did receive some documents seeking authorizations for Conversions, as well as Nations Funds prospectuses (that were made a part of registration statements filed with the SEC by the Defendants or one of their "controlled persons" covering the various offerings and sales of Nations Funds shares), said documents did not disclose the conflicts between the interests of the Bank and BAC with those of the beneficiaries of the affected Trust accounts, such as Plaintiffs; further, the Bank concealed that it did not consider other non-proprietary mutual funds such as Vanguard or Fidelity mutual fund families, which had substantially lower expense levels; that the "benefits" touted by the Bank in their correspondence to co-trustees and beneficiaries were illusory and, in fact, false; that while the

---

[1] The Bank did not send such a letter to beneficiaries of all of its fiduciary accounts nor, in the case of guardianships and similar accounts, to the appropriate courts overseeing such accounts. Further, not all co-fiduciaries received such a letter nor were their consents sought by the Bank. The Conversions carried out by Defendants did not differ in any material way for each fiduciary account regardless of its terms and the state in which the account was domiciled. Further, "trust officers" were required, pursuant to a carefully orchestrated plan, to convey the identical information to members of the Class and to similarly threaten them with adverse tax consequences and other "horrors" if they did not indicate their consents to the Conversions. Each such oral solicitation of consent to the Conversion misrepresented the Bank's reasons for carrying it out, concealed the conflicts of interest and the increased investment-related expenses that would be incurred by the Bank's fiduciary accounts post-Conversion and misrepresented that so-called "credits" that the Bank would thereafter apply to fiduciary accounts would be sufficient to compensate for all such additional expenses. Further, as with the Nations Funds prospectuses and other documents provided to beneficiaries and co-fiduciaries, the Bank concealed all the benefits it and its affiliates would derive from the Conversions, including those derived from "bulking-up" the

Bank disclosed that certain fees and expenses would be charged, it also advised that the

fiduciary accounts would be given a credit against certain of such fees and expenses, making it

**appear** as though the incremental expenses of investing in the captive Nations Funds and the

credit would off-set each other, when in reality, they did not; and that the Conversion resulted in

a material increase in the total expenses assessed to all similarly situated fiduciary accounts (that

investment of the assets in these accounts in the Nations Funds, even after so-called "credits" or

"rebates," cost more to the beneficiaries of the accounts than pre-Conversion investments of

fiduciary assets in the Bank's internal, fee and expense-free Common Trust Funds, for which

the Bank absorbed all the expenses thereof in exchange for the fees it received for serving as

corporate fiduciary);

53.    In response to such coercion and the deceptive and unclear information provided

by the Bank in the disclosure/authorization forms and accompanying prospectuses, upon

information and belief, Plaintiff Kutten, co-fiduciaries and beneficiaries of other fiduciary

accounts who received such forms, signed the enclosed forms, thereby providing to the Bank

their uninformed and fraudulently induced "consent" to the Conversions.  Nonetheless, Plaintiff

Kutten clearly indicated she did not authorize the Bank to charge a fiduciary fee *and* fees and

expenses associated with mutual fund ownership and wrote "NO DOUBLE CHARGES" on her

form.

54.    Enclosed with the Bank's letter sent to some fiduciary account beneficiaries

and/or co-fiduciaries were various Nations Funds prospectuses and other documents which were

drafted so as to conceal, *inter alia*, the motives of the Bank and BAC for the Conversions into

Nations Funds, the conflict of interest between the Bank and members of the Class, the benefits

---

Nations Funds and from utilizing the Nations Funds to benefit corporate customers of the Defendants at the expense
of the holders of Nations Funds shares.

of the Conversions to them and the Bank Subsidiaries, the increased expenses that would be

incurred by the fiduciary accounts as a result of the Conversions, that the investment advisory

and administrative contracts between and among NFT, the NFT Trustees and the Bank

Subsidiaries were entered into on a no-bid basis and, as well, the fact that there would be

negative tax effects as a result of the wholesale disposition of the assets in the affected fiduciary

accounts, pre-Conversions. These were material facts that the Defendants and their "controlled

persons" should have disclosed in the foregoing Nations Funds prospectuses and in the other

documents provided to the beneficiaries of the Bank's fiduciary accounts at the times of the

Conversions and otherwise when they were selling to such accounts shares of the Nations Funds

as underwriters, financial advisers, offerors, selling shareholders and otherwise. There was no

explanation in plain English that would put the recipients of these documents on notice of the

Bank's wrongdoing as referred to herein. In fact, one of those documents, (Form 3.05D 7/1999)

entitled "Disclosure of Investment in Nations Funds," stated deceptively:

> The fee paid directly by the [Trust] Account to the Bank will be
> reduced (but not below zero) by the Account's pro rata share of
> the investment advisory fees paid by the Funds to the Service
> Providers; provided however, that the amount of the reduction will
> be based on Bank of America Corporation's percentage ownership
> of the Service Provider. From time to time, the Bank may elect to
> reduce the Account's fees in recognition of amounts paid by
> Nations Funds for other services (such as administrative services),
> but it is not obligated to do so, and the amount of any such fee
> reduction may vary. The Account will not be charged a sales
> "load" for buying or redeeming Fund shares described in the
> accompanying prospectuses.

Such doubletalk-laden form went on to state:

> I acknowledge receipt of the current prospectuses for the Funds
> and a Nations Funds Fee Disclosure Statement. As co-fiduciary
> for this account, I understand that the Service Providers will be
> paid investment advisory and other fees by the Funds. **I approve
> the method for reducing the investment management fees paid**

> **to the Bank by the Account.** I understand and agree that the
> Bank may choose not to reduce the Account's fee on the account
> of the compensation paid by the Funds for other services, but the
> Bank is electing to do so at this time. [Emphasis added].

55.     In fact, the Bank and the lawyers who drafted these documents, including

lawyers for NFT and the NFT Trustees, used such language to conceal the fact that although in

many cases there was a credit for certain of the post-Conversion investment advisory fees to be

incurred by fiduciary accounts, the credits were insufficient to offset the substantially higher

expenses that fiduciary accounts would bear post-Conversion and that the Bank intended to

reduce or eliminate the credit as soon as practicable thereafter once consents were obtained

and/or the Conversions completed.

56.     Further, in many other cases, there was no credit for the fiduciary fees charged by

the Bank. Despite the outward appearance of independence of NFT, the NFT Trustees and their

legal counsel, who may have performed or been involved with the physical tasks of "drafting"

them, the content of the Nations Funds prospectuses was effectively dictated by BAC, the Bank

and the Bank Subsidiaries. Indeed, with respect to the Nations Funds prospectuses used by the

Defendants for the Conversions, Robert Hitpas, a Senior Vice President of the Bank as well as

one who was responsible for overseeing numerous fiduciary accounts including the Kutten

Trusts, found them daunting, full of legalese, fine print and difficult to read. Another Bank

Senior Vice President, Paula Hundt, reacted similarly and it is believed that many, if not most of

the Bank's "trust officers" could not understand many of the material terms of the Conversions

and what was set forth in the prospectuses of the Nations Funds provided to beneficiaries of

fiduciary accounts in connection therewith or otherwise in connection with the purchase of

Nations Funds shares for such accounts.

57.    Apparently as a result of an agreement among the Defendants and the senior

officers of the Bank Subsidiaries, there was no credit applied to the affected fiduciary accounts

for many of the substantial operating expenses of the Nations Funds, which materially reduced

the net investment returns to fiduciary accounts, such as the accounts of the Kutten, Crowley,

Lubbe and Scharff Trusts. At no place in any of the Nations Funds prospectuses disseminated by

the Bank to beneficiaries of fiduciary accounts and to co-fiduciaries in connection with the

Conversions did Defendants or their "controlled persons" disclose that, post-Conversion, all

fiduciary accounts affected by the Conversions would be forced to bear substantially higher

investment-related expense levels post-Conversion than those which preceded it, even allowing

for whatever credits the Bank applied to its fees for serving as fiduciary. Similarly concealed by

them was the fact that they re-allocated certain expenses incurred by the Nations Funds so that

they would not be subject to the "credits" and thus directly borne by the affected fiduciary

accounts. Indeed, upon information and belief, most of such credits, to the extent given, have

now been substantially reduced on a nationwide basis.

58.    Further, the Defendants made no disclosure of the true motives of the Defendants

in carrying out the Conversions or the full extent to which they were profiting unjustly there

from and, in particular, the benefits that would accrue to them from the additional assets which

would flow into the Nations Funds and other proprietary mutual funds, making them more

saleable to the investing public generally. Even after the Bank applied a so-called credit against

its fees to some fiduciary accounts for some portion of the advisory and administrative fees

charged to the Nations Funds, in practical terms, it was (and is) impossible for co-fiduciaries,

beneficiaries and others (including the Bank's own "trust officers" and "portfolio managers") to

understand and have knowledge of the true cost of ownership of Nations Funds to the fiduciary

accounts and the income earned upon their assets. Indeed, plaintiffs Kutten, Arnold, the

Medlers and Scharff, as well as other beneficiaries, have sought to obtain such information or other similar information relating to the expenses of investing the assets of fiduciary accounts in the Nations Funds from the Bank and have never received "straight" or any answers to their questions with respect thereto and have received misleading or downright deceptive information as to the impact of such investments upon them and their fiduciary accounts.

59.    Significantly, at no time did the foregoing "disclosure" documents disclose clearly to a co-fiduciary, a beneficiary or other person interested in the affected fiduciary accounts the true additional direct and indirect expenses of the Conversions (although many of such "disclosures" were buried in the Nations Fund prospectuses) nor, in fulfillment of the Bank's fiduciary responsibilities, did the Bank make any personal efforts to insure that Plaintiffs or others similarly situated understood the extent to which the Bank, BAC, their subsidiaries and affiliates would benefit from the Conversions and how the fiduciary accounts would end up paying substantially more for the investment and related services that the Bank had historically supplied in partial consideration for the Bank's trustee and similar fees. Indeed, by way of example, Mr. Fisher's letter of August 31, 2000 sent to beneficiaries of fiduciary accounts transmitting Nations Funds prospectuses was purportedly "for information" only and recipients, including Plaintiffs, were told: **"you do not need to take any action."** [Emphasized in original].

60.    The Investment Policy Committee ("IPC") of the Bank, the committee charged with evaluating investments for fiduciary accounts, was involved in the decision to approve the Conversions of Common Trust Funds into the Nations Funds. The members thereof knew in advance of the Conversions that the fiduciary accounts affected by the Conversions would be forced to endure materially higher expenses, post=Conversions, than they had previously. Neither the IPC nor the Bank officers on it made any effort to communicate such material facts to affected beneficiaries, either in the documents provided to them in connection with the

Conversions or otherwise.

61.    The Bank did not disclose to affected beneficiaries that the Conversions would produce capital gains tax liability.  In fact, to the contrary, the Bank advised the beneficiaries that there would no capital gain consequences as a result of the Conversions of the Common Trust Funds into the Nations Funds. The Bank did not disclose that the Conversions would result in a net 20-30 basis point increase at a minimum in the fees and expenses of fiduciary accounts as a result of investments in the Nations Funds.  To the contrary, the Bank provided information with respect to the expense ratios for the Nations Funds in the various Nations Funds prospectuses as well as unintelligible information regarding fee credits, but never advised the beneficiaries that their accounts would pay more for Nations Funds investments than they had paid pre-Conversions.

62.    Each affected fiduciary account sustained a minimum increase in fees and expenses of 20-30 basis points (.20-.30%), a fact that was not readily available to members of the Class affected by the Conversions.  Given the growth of the Nations Funds mutual funds in the hundreds of billions of dollars, most of which comes from the Bank's fiduciary accounts, and the number of years the Bank has extracted these fees and expenses from the fiduciary accounts, compensatory Class-wide damages are quite substantial and are well in excess of $5 million, exclusive of interest and costs.

63.    The documents provided to members of the Class in connection with the Conversions concealed these material facts and were made with the intent that the persons affected by the Conversions provide their consents thereto.

64.    Moreover, the Bank and/or the Bank Subsidiaries, in presenting a substantial amount of data in the Nations Funds prospectuses and otherwise in connection with the Conversions, failed to present for comparison data on other, non-proprietary mutual funds that

would show off the Nations Funds in a favorable light. Thus, members of the Class would have no way of knowing that instead of using low expense ratio, but nevertheless comparable funds generally available in the marketplace, the Bank selected only the Nations Funds for investment of fiduciary assets.

65.     Intentional wrongdoing and misconduct toward the Bank's beneficiaries is apparent from the conflict of interest of the Chairman of the IPC. Owen Shell, a former senior executive of Private Bank, testified that Sandy Galt, the Chairman of the IPC in 1999, was also providing advisory services to the Nations Funds. In other words, he was serving two masters. He worked for the Nations Funds and NFT and had an interest in getting approval by the IPC for investments of the Bank's fiduciary assets in the Nations Funds while he was the Chair of the IPC. This conflict was never disclosed to the beneficiaries of the Bank's fiduciary accounts in Nations Funds prospectuses or in any other written form.

66.     Upon information and belief, no analyses or determinations were made by the Bank as to the suitability and/or propriety of the relative costs and benefits of investments in the Nations Funds at the time or before the Conversions were carried out as to each fiduciary account, as compared to pre-Conversion investments including, *inter alia*, any comparisons with numerous other available mutual funds or investment vehicles in which the Bank could have invested prudently and at lower cost the funds of these accounts in which Plaintiffs and the members of the Class were beneficiaries.

67.     Upon information and belief, neither the Bank, NFT nor the NFT Trustees negotiated the fees and expenses to be charged to the Nations Funds on an arm's-length basis or comparison shopped in any significant way with other funds or families of funds in an attempt to obtain the same or better investment services elsewhere. Upon information and belief, any "comparisons" that were done by the Bank were merely to "paper" the Bank's files so it would

24

appear that an effort was made to consider investments in alternative mutual funds or mutual
fund families. Similarly, neither NFT nor the NFT Trustees, sought to obtain the lowest fees
from the Bank Subsidiaries actually operating the Nations Funds. Indeed, as stated by New
York's Attorney General Eliot Spitzer: "Fund directors do not – and cannot – negotiate hard on
the fees." This is particularly the case when, as here, all of NFT's Trustees were nominated and
voted upon by the Bank, which totally controlled the composition of NFT's Board and, thus,
NFT. By their control of NFT, the NFT Trustees and the Bank Subsidiaries, the Defendants
caused false and misleading Nations Funds prospectuses to be disseminated in connection with
the offering and sale of Nations Funds shares as described herein.

68.     Upon information and belief, the Bank specifically excluded alternate investment
vehicles (such as other non-proprietary mutual funds such as the Vanguard and Fidelity mutual
funds and others specifically requested by Plaintiffs the Medlers, Kutten and Arnold) from their
considerations in order to maximize their earnings and those of their corporate affiliates
(including the Bank Subsidiaries) and did not give serious consideration to leaving the assets of
fiduciary accounts invested as they were, pre-Conversion, and/or giving beneficiaries of such
accounts a choice as to the various alternatives available, such as were sought by, *inter alia*,
Judge Medler. Indeed, only after more than five years of complaints by the Medlers, did the
Bank agree to replace the Nations Funds with low expense Vanguard Funds.  Similarly, at no
time did the Bank give any consideration to making changes in the Bank's "Common Trust
Funds" so as to provide any of the purported "benefits" that the Bank claimed would be
forthcoming as a result of the Conversions, such as providing "daily pricing."  The requests of
Plaintiffs Kutten, the Medlers and Arnold and other beneficiaries of the Bank's fiduciary
accounts for changes in investments were repeatedly rebuffed.

69.      The Bank received millions of dollars in purported money management,

investment advisory, administrative and other fees as a result of the Conversions, as well as

from the investment of fiduciary assets in the Nations Funds generally. The Bank also benefited

by receiving Trustee or similar fees for serving as a fiduciary and by reason of the benefits

which flowed from, *inter alia*, substantially reduced operating expenses of the Bank's fiduciary

operations and bulking up the Nations Funds. Despite these benefits to the Bank and its

affiliates, these investments have been of little, if any, benefit for the Bank's fiduciary accounts

and the beneficiaries thereof, including Plaintiffs and the members of the Class.

70.      In addition to the documents referred to above, the false and misleading

documents disseminated to Plaintiffs and members of the Class include all those form

documents used by the Bank in connection with the Conversions and each of form aspects of the

monthly or other statements of account provided to the beneficiaries of the Bank's fiduciary

accounts. By way of example, the Bank's Account Statement provided to Plaintiff Arnold for

the period dated January 3, 2006 to March 31, 2006, in stating: (i) the "Account Investment

Objectives" failed to disclose that such "objectives" were determined by the Bank unilaterally to

suit its own needs in marketing the Nations (now Columbia) Funds and took no real

consideration of Plaintiff Arnold's own needs and wishes and that the Bank, in determining such

"objectives" failed to comply with the regulations established by the Comptroller of the

Currency in connection therewith; (ii) the assets of the account which were invested in

Columbia Funds could have been invested in non-proprietary mutual funds with better

investment returns and lower expense ratios and/or if such assets were invested internally by the

Bank the investment returns would be higher yet without any incremental expenses being

incurred; (iii) the "Assumed Rates of Return" were higher than the actual performance of the

specific Columbia Funds in which the assets of the account were invested; the actual rates of

return to Plaintiff Arnold's account from the investments in the "Columbia Cash Reserves" were lower than the Bank paid to depositors who walked into its retail branches with no-pre-existing fiduciary relationship; (iv) the "Hypothetical Fees and Expenses" attributed to particular Columbia Funds were understated because they failed to include all of the direct and indirect charges paid for from Plaintiff Arnold's account for such investments; (v) the so-called "Affiliate Disclosure" while generally alluding to potential direct and indirect benefits to affiliates of the Bank conceals the extent and complete nature of such benefits and the exact financial impact on Plaintiff Arnold's account; (vi) the so-called "California Disclosures to Beneficiaries" are nothing more than boilerplate and failed to disclose to Plaintiff Arnold the identity of the Bank's agents and their relationships to the Bank in connection with the transactions referred to in the Account Statement; (vii) the Bank's statement that its "Private Bank…is committed to providing you with customized wealth management solutions" is a fiction when, in fact, the opposite is true and the investments for Plaintiff Arnold's account are determined on a wholesale basis based upon Class-wide investment formulas; and (viii) Plaintiff Arnold and her account have no "Relationship Manager" and, in fact, they are "overseen" by a Call Center in Dallas with interchangeable personnel with little knowledge of the investments made for the account, the relative merits thereof and the expenses incurred in connection therewith as compared with alternative non-proprietary investments.

71.     Each of such documents contains information and statements relating to one or more of the Plaintiffs' fiduciary accounts, including the fees and expenses paid by such accounts, which are materially false, misleading or omitted to state material facts necessary to render such statements true at the times they were made.

72.     Plaintiffs and the members of the Class relied to their detriment on the false statements set forth herein and have suffered damages in an amount to be proven at trial. Had

they not so relied on the honesty and candor of the Bank and not believed in the accuracy and completeness of the written communications from the Bank, they would have sought the resignation of the Bank as corporate fiduciary or pursued their legal rights including the commencement of litigation. Further, had the SEC and the Comptroller of the Currency been informed of the Bank's deception of those entrusted to its care and its misrepresentations and omissions of material facts in connection therewith, such agencies would not have permitted the sale of Nations Funds shares to the Bank's fiduciary accounts.

73.     Upon information and belief, Plaintiffs and all members of the Class suffered damages from the investment practices of the Bank as described above in an amount which cannot presently be determined but which is capable of calculation and they are entitled to restitution of the Bank's unjust enrichment.

## THE SECURITIES AND EXCHANGE COMMISSION

74.     At least one or more of the Bank Subsidiaries identified above are "Financial Advisers" registered as such with the Securities and Exchange Commission (SEC) under the Investment Advisers Act of 1940 as amended, 15 U.S.C. § 80b-1 et. seq., (the "1940 Act") (see paragraph 10 above) and, together with the Defendants and all their "controlled persons" are underwriters, offerors, solicitors of sales and/or selling shareholders of the shares of the Nations Funds that are the subject of this litigation. In connection with the offering and sale of the Nations Funds to members of the Class herein, the Defendants and their "controlled persons" filed with the SEC registration statements and other documents which were false and misleading as indicated herein.

75.     In addition to filing such documents with the SEC, the Bank made application to the SEC for approval of the Conversions. In connection with the Conversions carried out in the year 2000, the Bank filed an application with the SEC prior thereto explaining its purported

28

justifications for the Conversions. In granting its approval thereto, the SEC conditioned its approval of the Conversion upon the Bank's carrying them out in the best interests of the affected beneficiaries. As indicated throughout this Complaint, not only did the Bank fail to comply with the SEC's conditions but concealed this fact from Nations funds prospectuses when offering and selling Nations Funds to Plaintiffs and members of the Class, including the Federal Securities Sub-Class.

76.    For the reasons set forth herein, the across-the-board Conversions of all assets in the Common Trust Funds were not consummated in the best interests of the beneficiaries of the Bank's fiduciary accounts but solely in the Defendants' interests.

## THE COMPTROLLER OF THE CURRENCY

77.    On or about December 16, 2004, the Bank, as a result of certain of the wrongdoing described herein and otherwise, entered into a written agreement with the Office of the Comptroller of the Currency (No. AA-EC-04-35), pursuant to which it agreed to cease and desist such conduct and to effectuate corrective actions to address such conduct. This agreement was signed by, *inter alia,* Messr. Lewis and Hance. Notwithstanding the agreement, the Bank continues to flagrantly breach its obligations there under, including in connection with the purchase of shares of Nations (now Columbia) Funds shares for its fiduciary accounts. Unless further remedial steps are taken, the Bank will continue to not only flout its agreement with the Comptroller of the Currency, but to breach its duties to the beneficiaries of its fiduciary accounts as described herein and otherwise. The Bank failed to disclose to the members of the Class this agreement with the Comptroller and the facts and circumstances which led up to it, either in Nations Funds prospectuses or in any other written form disseminated to members of the Class in connection with their fiduciary accounts.

## CLASS ACTION ALLEGATIONS

78.     Plaintiffs restate and reallege each and every allegation set forth in the

paragraphs above as if stated herein.

79.     Plaintiffs Mary Ann Arnold, the Medlers. and Elsie Mahler Scharff ("Class

Plaintiffs") bring this action on their own behalf respectively, and pursuant to Rule 23(b)(3) of

the Federal Rules of Civil Procedure as a class action on behalf of the following Class:

> all beneficiaries, owners, beneficial owners, or principals of trusts, accounts or other
> entities for which the Bank or any of its parents, subsidiaries, affiliates, predecessors,
> successors or assigns acted as a trustee, fiduciary or agent and that were directly or
> indirectly invested in Nations Funds mutual funds at any time from September 8, 1998 to
> the present (the "Class").

This Class has already been stipulated to by each of the Defendants, their affiliates and others in

connection with the settlement of certain related claims against them in *In re Mutual Funds*

*Investment Litigation*, MDL-1586, where it was designated as a "Fiduciary Sub-Class". None of

the claims set forth in this Complaint are asserted by members of the Class who have executed

valid and legally binding releases or with respect to those claims barred by the expiration of

applicable statutes of limitations.

80.     The California Sub-Class consists of those members of the Class whose fiduciary

accounts originated in and/or involved beneficiaries residing in California (such as Plaintiff

Arnold). The Missouri Sub-Class consists of those members of the Class whose accounts

originated in and/or involved beneficiaries residing in Missouri (such as Plaintiffs Scharff and

the Medlers, as well as Plaintiff Kutten in her individual capacity). The Federal Securities Sub-

Class consists of all those members of the Class who purchased, through their fiduciary accounts

at the Bank, shares of Nations and Columbia Funds issued pursuant to registration statements

filed with the SEC within the applicable limitations period which claims are not otherwise

barred. The Conversions Sub-Class consists of all those members of the Class who, within the

Class Period, have had their fiduciary accounts at the Bank subject to one or more Conversions (collectively, "Sub-Classes"). Such definitions are subject to modification upon completion of discovery with respect thereto.

81.    *Numerosity*: The members of the Class and Sub-Classes are so numerous that joinder of all members is impracticable. The exact number of members of the Class and each of the Sub-Classes as above described is not known by Plaintiffs, but is within the sole knowledge of the Bank. Upon information and belief, there were and are at least 70,000 fiduciary accounts (comprised of trusts, estates, retirement accounts and other types of fiduciary accounts), controlled by the Bank with, collectively, more than 100,000 beneficiaries thereof, approximately 10% of which are members of the California Sub-Class and 10% of which are members of the Missouri Sub-Class. These approximations are subject to discovery and the exact numbers of Class and Sub-Class members is readily ascertainable from the Bank's records. Upon information and belief, the members of the Class and Sub-Classes are located in most or all fifty states, and in numerous foreign countries. Similarly, members of the California and Missouri Sub-Classes are located throughout Missouri, California and in many other states.

82.    *Commonality*: Common questions of law and fact exist as to all Class members and predominate over any questions solely affecting individual members of the Class or Sub-Classes. This case is not about the administration of individual fiduciary accounts; rather, the implementation of an across-the-board business decision of Defendants, on a nationwide basis, to invest their fiduciary funds in the Nations and Columbia Funds. The common questions of fact and law, include but are not limited to:

(a)    Whether the Bank's business decision to invest assets of its fiduciary accounts in the Nations and Columbia Funds was motivated by the best interests of the Class members (which the Bank had a duty to put before its own) or by Defendants'

31

desire to generate management and investment advisory fees for themselves, their
affiliates and subsidiaries, to lower the Bank's expenses of managing fiduciary
assets and to generate other benefits for themselves by *inter alia*, "bulking-up"
the assets invested in the Nations and Columbia Funds;

(b)     Whether the Bank breached fiduciary duties by failing to conduct its fiduciary
operations in conformity with the requirements of the National Banking Act and
other applicable law;

(c)     Whether the Bank breached its fiduciary duty by making investment decisions for
its fiduciary accounts based upon Defendants' own interests and those of their
affiliates, rather than the interests of the beneficiaries of such accounts;

(d)     Whether the Defendants, and those under their control, made misstatements of
material fact and omissions of other material facts in connection with the sale of
shares of Nations Funds to fiduciary accounts in Nations Funds prospectuses and
otherwise as described herein;

(e)     Whether the Bank had a uniform policy of only investing fiduciary accounts in its
proprietary funds, rather than other competitive funds in the market place; and

(f)     Whether the Bank trained and employed its Portfolio Managers to routinely and
systematically make investments for fiduciary accounts, either wholly or
predominantly using the Nations Funds, without disclosing various conflicts of
interest;

83.     *Typicality*: The Plaintiff's class claims are typical of the claims of the Class and
respective Sub-Classes because the Bank and BAC failed to disclose and or intentionally
omitted the information by use of the form letters and disclosures set forth above from each of
the Plaintiffs and the members of the Class. Thus, each of the omissions described above applies

to each Plaintiff in a manner identical to that of the remaining members of the Class and Sub-Classes. As noted above, a central allegation in this case involves, *inter alia*, the Bank's and BAC's failure to disclose the existence of over-arching conflicts of interest between and among the Class Plaintiffs, members of the Class, the Bank and BAC, NFT and the Bank Subsidiaries, presenting a mixed question of law and fact. Specifically, the Bank's and BAC's failures to disclose material facts included, but is not limited to the following:

    (a)    That the foregoing conflicts of interest existed and, to the extent they did, the nature and consequences thereof;

    (b)    That the Bank and BAC were, first and foremost, requiring their personnel to invest fiduciary assets in their proprietary mutual funds, thereby increasing revenues and profits to the Bank and its affiliates, at the expense of the beneficiaries whose fiduciary accounts paid the increased incremental expenses of the more expensive Nations Funds; and

    (c)    That Bank personnel were not allowed to invest in non-proprietary mutual funds, except in rare and isolated circumstances;

    84.    *Adequacy*: The Plaintiffs will adequately and vigorously defend the interests of the Class and prosecute the claims alleged herein on behalf of each of them. Plaintiffs Scharff, the Medlers and Arnold are able to and will fairly and adequately protect the interests of the Class, the Federal Securities Sub-Class and the Missouri and California Sub-Classes, respectively, and Plaintiff Arnold will do the same with respect to the Conversions Sub-Class.

    85.    The attorneys for Plaintiffs Scharff, the Medlers and Arnold are experienced and capable in complex litigation. The attorneys for Plaintiffs Scharff, the Medlers and Arnold and the Class will actively conduct and be responsible for the prosecution of this litigation and the expenses thereof.

86.    The relief sought is common to the entire Class including, *inter alia:*

(a)    a judgment that the Bank violated, the federal securities laws, its fiduciary duty as Trustee (or other similar fiduciary role) and the Consent Decree with the Comptroller of the Currency with respect to the affected fiduciary accounts and whether defendant BAC and the "controlled persons" actively participated and conspired with the Bank in doing so;

(b)    payment by the Defendants of compensatory damages caused by such breaches of fiduciary duty, as well as treble and punitive damages, as appropriate;

(c)    payment by the Defendants of the costs and expenses of this action, including Plaintiffs' attorneys' fees;

(d)    an injunction preventing the Bank from opposing petitions by beneficiaries of the affected fiduciary accounts seeking to replace the Bank as corporate fiduciary; and

(e)    an injunction which establishes appropriate procedures and safeguards within the Bank to ensure that the interests of beneficiaries of fiduciary accounts are fully protected from wrongdoing such as described herein.

## COUNT I

## VIOLATION OF §§11 OF THE SECURITIES ACT

87.    Plaintiffs, who at all relevant times during their purchases of Nations Funds shares, were without knowledge of the material misstatement and omissions of material facts set forth herein, reassert and reallege each and every allegation set forth in the paragraphs above as if stated herein on behalf of themselves and the Federal Securities Sub-Class and bring this Count pursuant to Section 11 of the Securities Act, 15 U.S.C. 77k.

88.    The claims asserted herein, which are not fraud-based and are distinct from the

claims set forth in Count II through VI asserted against BAC, and the Bank whose subsidiaries

controlled the issuance of the Nations Funds securities. The claims asserted herein are asserted

within the limitations period applicable to Section 11 of the Securities Act in that this action was

commenced within one year of the discovery of the material misstatements and omissions

contained in the registration Statement being discovered by Plaintiffs and within three years

from the sale to Plaintiffs and their fiduciary accounts shares of Nations Funds. Although

Plaintiffs had a generalized dissatisfaction with the Bank's performance as a fiduciary and with

the ownership of Nations Funds in their accounts generally, they had no particularized factual

knowledge that would have put them on inquiry notice of the wrongdoing perpetrated upon

them as reflected in such Counts I through VI.

89.    As described above, the Defendants and the "controlled persons" of BAC and the

Bank, including the members of the NFT Board, caused Registration Statements and Post-

Effective Amendments thereof to be filed with the SEC which contained, *inter alia*, Nations

(now Columbia) Funds prospectuses which were disseminated to members of the Federal

Securities Sub-Class, which prospectuses misrepresented material facts and omitted other

material facts as described herein.

90.    On December 30, 2005 and on other dates relevant hereto, the Defendants and

certain "controlled persons" including the NFT Trustees, caused the Nations Funds to file

Registration Statements with the SEC as well as Post-Effective Amendments thereto, each of

which documents incorporated Nations Funds prospectuses. Each of such Registration

Statements and Post-Effective Amendments became effective and, in connection therewith, the

Nations Funds sold shares therein through the Bank Subsidiaries as well as other "controlled

persons" of BAC and the Bank.

35

91.    Each of the foregoing Registration Statements and Post-Effective Amendments and the prospectuses incorporated therein contained untrue statements of material facts and omitted to state other facts necessary to make the statements made not misleading and concealed and failed adequately to disclose material facts regarding, *inter alia*:  (1) the relationships between and among the Defendants and the "controlled persons"; (2) the control exercised over the Nations Funds and the NFT Board by BAC and the Bank, in particular, the Bank's power, through Nations Funds proxies, to dominate the process pursuant to which the members of the NFT Board were nominated and elected; (3) the necessity for the fees and expenses charged to fiduciary accounts as a result of the offering, which would not have been incurred by the affected fiduciary accounts but for being forced to invest in Nations Funds;  and (4) the failure of the NFT Board to seek asset managers and other providers of services to the Nations Funds based upon quality and cost, as compared to their relationship to BAC and the Bank, in violation of 15 U.S.C. 77k..

92.    Further, such Registration Statements and Post-Effective Amendments failed to disclose that the shares of the Nations Funds registered and sold pursuant thereto were being sold mostly to fiduciary accounts in the Bank's care, that the Bank, in light of such fact, voted the majority of the outstanding Nations Funds shares to exercise its total control and domination of the NFT Board.  Additionally, the fact that special classes of Nations Funds shares were sold to the Bank's fiduciary accounts (e.g. "Trust Class Shares," "Z Shares"), such shares were not freely tradable and, as such, the Bank's representation as to the Nations Funds portability was false.

93.    Each of the Nations Funds and Columbia Funds prospectuses purported to disclose certain risks to the investors in the covered securities. These Registration Statements and Post-Effective Amendments also failed to disclose that among the risk factors faced by

investors in Nations Funds was the risk that, because its Board selected and contracted with the Bank Subsidiaries to provide investment management and administrative services on a "no-bid" basis, Nations Funds were being charged excessive fees for such services and because the NFT Board was not objective in its selection of investment advisers to the Nations Funds, shareholders were not able to obtain the most qualified personnel and the lowest cost consistent with such quality.

94.    By way of example, the Columbia Money Market Funds prospectus dated December 30, 2005 discussed various material risks to be faced by investors at page 5 thereof under the heading "Principal risks and other things to consider." Notwithstanding the risks that were disclosed, such prospectus failed to disclose the material risk that, because of the relatively high expense structure of the Columbia Cash Reserves Fund (and indeed, all Nations/Columbia Funds) as compared with the expenses of the Bank's direct investment of the invested assets, the affected fiduciary accounts would have materially lower yields (i.e.net income) from such investment than if the Bank had invested the assets of these accounts directly in the identical securities bought by the Nations Columbia Cash Reserves Fund.

95.    Similarly, at page 5, *et seq* of such prospectus, in discussing the historical and likely performance and fees and expenses faced and to be faced by investors therein, the Defendants and/or their "controlled persons" failed to disclose therein the true aggregate "Total net expenses" for the shares of the Fund since it did not reflect the net effect of the other charges imposed by the Bank as a fiduciary, which had the effect, even after deduction of so-called "credits" (fee waivers and/or reimbursements) against the Bank's fees, of lowering the net return of the assets invested.

96.    Such prospectus also similarly misrepresented the totality of all fees and expenses borne by the invested assets since, in effect, the Defendants and their "controlled

persons" were "double dipping", even after "credits" applied by the Bank against its direct fees.

97.    The above-referenced prospectus also fails to disclose that the services obtained by the Nations Funds from the Bank Subsidiaries are obtained on a no-bid basis and that the NFT Board specifically excluded from consideration other providers of the same services that are better managed and lower cost.

98.    In discussing "Other Important Information" at p. 39 *et seq*, this same prospectus failed to disclose that this and other Nations Funds were subject to unexplained levels of "Portfolio Transaction Costs", none of which were disclosed therein or otherwise disclosed to the beneficiaries of the affected fiduciary accounts. The prospectus also purported to disclose the inter-relationship between and among the Bank and its affiliates without identifying such "affiliates," how and to what extent they profit from the sale of Fund shares and the operations of the Fund generally.

99.    In discussing "How the Funds are managed" at page 41 *et seq* of the above-referenced prospectus, no disclosure is made of the material fact that despite the purported independence and "disinterestedness" of a majority of the NFT Trustees, the Bank, by its control of the Trustee election process through its abrogation to itself of the proxies rightly belonging to Plaintiffs and members of the Class, in fact controls the Trustees themselves, including having the right to hire and fire them at will.

100.    Similarly, such prospectus omits any reference to the voting of the proxies of the Nations Funds themselves or how or why the Bank exercises and votes the majority of proxies itself and in its own interest, all of which is material to the Bank's absolute control and domination of NFT and the NFT Board.

101.    The prospectus also fails to disclose that the NFT Trustees purport to oversee at least 70 different Nations Funds and, as a result thereof, although there are certain efficiencies

38

and cost savings to such Funds, the net effect is that the NFT Trustees do not have the time or inclination to oversee each of the Funds individually and determine what are the most advantageous contractual arrangements for each of such Funds for the benefit of their respective shareholders, including Plaintiffs and the members of the Class. The Prospectus fails to disclose that the members of the NFT Board have totally abdicated their responsibilities to the Nations Funds and their shareholders in favor of giving control over to officers of the Bank Subsidiaries to run the Nations Funds primarily in the Defendants primary interest. Further, because of the compensation package provided to each member of the NFT Board, which is determined and approved by the Defendants, the members thereof are beholden to them and cannot deal with and do not deal with their fiduciary and other responsibilities objectively.

102.    Each of the foregoing misrepresentations and/or material omissions is typical of those of the other Nations/Columbia Funds prospectuses issued and disseminated during at least the last three years in that each of them contain what their drafters regard as common "boilerplate."

103.    The Defendants were either directly or through their "controlled persons" underwriters, issuers, offerors, solicitors of sales and or selling shareholders with respect to the Nations/Columbia Funds shares sold under and pursuant to the foregoing Registration Statements and Post-Effective Amendments and/or signers thereof through "controlled persons."

104.    Each of such Defendants and their "controlled persons" was capable of and did in fact cause NFT and the Bank Subsidiaries to sell the Nations/Columbia Funds shares issued pursuant to the Registration Statements and Post-Effective Amendments referred to herein.

105.    Each of the Defendants and their "controlled persons" were provided with or had unlimited access to the foregoing Registration Statements and Post-Effective Amendments prior to and/or shortly after these documents were filed with the SEC and had the power to prevent

the filing, issuance and dissemination of the prospectuses therein and/or cause the statements therein to be corrected.

106. BAC and the Bank dominated and controlled each of the Bank Subsidiaries and other "controlled persons" and their officers who were the signatories to the foregoing SEC filings, all of which were "controlled persons" under and pursuant to § 15 of the Securities Act. As such, BAC and the Bank were and are responsible for the statements made by or in the name each of the "controlled persons", their officers, including the NFT Trustees as described above. The Defendants, directly and through their "controlled persons" and their respective legal counsel not only participated in the sale of Nations/Columbia Funds shares but participated in the preparation of the false and misleading Registration Statements and Post-Effective Amendments referred to above.

107. As a result thereof, and the scheme of which the issuance and filing with the SEC of the foregoing Registration Statements and Post-Effective Amendments thereto were an integral part, BAC and the Bank, through their "controlled persons" caused Nations/Columbia Funds shares to be issued and sold to Plaintiffs' fiduciary accounts and those of the members of the Federal Securities Sub-Class, all of which was in violation of § 11 of the Securities Act, all of which caused them damages in an amount which cannot presently be determined for which damages each of the Defendants is jointly and severally liable. At the times the Nations Funds shares were issued and sold to Plaintiffs' fiduciary accounts (of which they were beneficial owners), they were without knowledge of the facts concerning the wrongful conduct alleged herein and could not have reasonably discovered those facts. Members of the Federal Securities Sub-Class who still hold such shares covered by this Count and have sustained losses thereupon hereby demand that the Bank hereby tender (and they hereby do tender) those shares and seek the recovery of the consideration of such shares. Plaintiffs Kutten, Scharff and the Medlers as

well as the remaining members of the Federal Securities Sub-Class seek recissionary damages.

### COUNT II - VIOLATION OF SECTION 12(a)2 OF THE SECURITIES ACT

108.    BAC and the Bank offered and sold a security, namely shares of the Nations

Funds, using instruments of interstate commerce, by means of oral statements, correspondence

and a prospectus (hereinafter "Disclosure Materials"), with an intent that such Disclosure

Materials be relied on. The Disclosure Materials contained untrue statements of material facts

and omitted to state material facts necessary to make the statements, in light of the

circumstances under which they were made, not misleading, which statements and omissions

BAC and the Bank knew, or in the exercise of reasonable care would have known, were false or

were material facts which were required to be disclosed to avoid the representations which were

made from being misleading.

C.    The Bank and BAC are  directly liable to plaintiffs under § 12(2) of the Securities

Act of 1933 and are also liable to plaintiffs pursuant to § 15 of the Securities Act of 1933, 15

U.S.C. § 77o, as a control person of NFT with respect to the violations of § 12(2) by NFT.

D.    Plaintiffs and the other members of the class did not know that the representations

made to them by defendants regarding the matters described above were untrue and did not

know the material facts which were not disclosed. Plaintiffs  discovered these

misrepresentations and omissions within one year after the discovery of this wrongdoing.

E.    As a result of the matters set forth herein, pursuant to § 12(2) of the Securities Act,

plaintiffs and the other members of the Securities Sub-Class class are entitled to rescind their

purchases of Nations Fund Trust share and recover from defendants all consideration paid for

their respective shares, plus interest.

## COUNT III - VIOLATION OF SECTION 15 OF THE SECURITIES ACT

109.    Plaintiffs repeat and reallege each and every allegation set forth in paragraphs 1-86 as is more fully set forth herein.

110.    This Count is brought by plaintiffs pursuant to Section 15 of the Securities Act, 15 U.S.C. 77o on behalf of the Securities Sub-Class.

111.    BAC and the Bank were control persons of NFT with respect to the issuance of Nations Funds shares as well as the Conversion process and the dissemination of false and misleading statements and omissions contained in the Registration Statement and Prospectus. The Bank and BAC had the power to control and influence and did control and influence, directly and indirectly, the decision making of the company.  As a result, BAC and the Bank are liable under Section 15 of the Securities Act for NFT's primary violations of Section 11 of the Securities Act.

## COUNT IV - VIOLATION OF §10(b) OF THE EXCHANGE ACT AND RULE 10b-PROMULGATED THEREUNDER

112.    Plaintiffs reassert and reallege each and every allegation set forth in the paragraphs above as if stated herein on behalf of themselves and the Federal Securities Sub-Class. The claims asserted herein are separate and distinct from the non-fraud-based claims asserted in Count I hereof.

109.    As described above, BAC and the Bank, through their "controlled persons" caused the dissemination of false and misleading prospectuses and other documents which concealed material facts and misrepresented other material facts in connection with the purchase and sale of Nations/Columbia Funds shares by and for Plaintiffs and the members of the Federal Securities Sub-Class.  Such sales of Nations/Columbia Funds shares were integral to the

42

Defendants' scheme and plan to unfairly and fraudulently extract unjust fees and other income from Plaintiffs and the members of the Federal Securities Sub-Class.

110.    BAC and the Bank dominated and controlled each of the Bank Subsidiaries, NFT, the NFT Board and their respective agents and employees, all of which were "controlled persons" under and pursuant to § 20 of the Exchange Act. As such, BAC and the Bank are and were responsible for the statements made by or in the name of NFT, the NFT Trust and the Bank Subsidiaries as described above.

111.    Despite the fact that Defendants and each of such other "controlled persons" had a duty to disseminate to Plaintiffs and members of the Federal Securities Sub-Class accurate and truthful information regarding the operation of the Bank's fiduciary accounts and as to the manner in which the Nations/Columbia Funds were operated and selected, the manner in which vendors of investment advisory and other services were selected and the existence of excessive expenses to be borne by the Bank's fiduciary accounts in connection with their ownership of Nations/Columbia Funds shares, such persons failed to fulfill such duty. Each of them carried out the plan and scheme described herein intentionally to enrich BAC and the Bank at the expense of Plaintiffs and the members of the Federal Securities Class. Each misrepresentation of material fact and/or omission of material facts described herein was either made with reckless disregard for, or knowledge of, its false and misleading nature. Further each of the Defendants and their "controlled persons" including, *inter alia*, the NFT Trustees, employed devices, schemes and artifices to defraud, while in possession of material adverse information not available to Plaintiffs and the members of the Federal Securities Sub-Class and engaged in the acts, practices and course of conduct as alleged herein, which included the making of, or the participation in the making of directly or through "controlled persons" untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements

made about the Nations/Columbia Funds, the relationships between and among the Defendants and the "controlled persons" and otherwise, not misleading as set forth above. By so doing, they engaged in transactions, practices, and a course of business which operated as a fraud and deceit upon the purchasers of shares of Nations/Columbia Funds including Plaintiffs and the members of the Federal Securities Sub-Class.

112.    Each of such Defendants and their "controlled persons" had actual knowledge of the misrepresentations and omissions of material facts set forth above or acted intentionally with reckless disregard for the truth. Indeed, Defendants consciously looted the Bank's fiduciary accounts as described herein for their own benefit. Such misrepresentations and/or omissions were carried out knowingly or recklessly for the purpose and effect of concealing the truth from Plaintiffs and members of the Federal Securities Sub-Class in connection with the purchase of shares of the Nations/Columbia Funds for their fiduciary accounts by the Bank. Each of the foregoing misrepresentations and/or material omissions is typical of those of the other Nations Fund prospectuses issued and disseminated during at least the last three years in that each of them contain what their drafters regard as common "boilerplate."

113.    As a direct result thereof, and the manipulative scheme of which the issuance and dissemination of such Nations/Columbia Funds prospectuses, written communications to beneficiaries of the Bank's fiduciary accounts and periodic statements of account were an integral part, the Bank caused Nations/ Columbia Funds shares to be purchased for the beneficial ownership of Plaintiffs and for the members of the Federal Securities Sub-Class, all of which was in violation of § 10b of the Exchange Act and Rule 10b-5 promulgated there under by the SEC, all of which caused them damages in an amount which cannot presently be determined. Had the SEC known of the fact that the foregoing Nations/Columbia Funds Registration Statements and Post-Effective Amendments were false and misleading and

prepared in violation of §10(b) of the Exchange Act and Rule 10b-5 promulgated there under by the SEC, the SEC would not have declared such Registration Statements effective or permitted the sale of the Nations/Columbia Funds registered thereby to be sold.

### COUNT V - VIOLATION OF SECTION 20(a) OF THE EXCHANGE ACT

114.    Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1-86 and Count IV as if more fully set forth herein.

115.    BAC and the Bank acted as controlling persons of NFT and its Board of Trustees within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their ownership of the subsidiaries which advised, influenced and controlled the day to day operations of the NFT and/or maintained substantial ownership of the Nations Funds shares equitably owned by the fiduciary accounts, the Bank and BAC had the power to influence and control and did influence and control, directly or indirectly, the decision making of NFT and its Board of Trustees, including the content and dissemination of the Disclosure Materials which plaintiffs contend are false and misleading. The Bank and BAC were provided with or had unlimited access to copies of the Disclosure Materials allege by plaintiffs to be misleading prior to the Disclosure Materials being issued and had the power to prevent the issuance of the Disclosure Materials or cause the Disclosure Materials to be corrected.

116    As set forth above, the Bank and BAC violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their positions as controlling persons, the Bank and BAC are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of the Bank's and BAC's wrongful conduct, plaintiffs and other members of the Securities Sub-Class suffered damages in connection with their fiduciary account's purchases of the NFT shares during the Class period.

45

## COUNT VI - VIOLATION OF §215 OF THE INVESTMENT ADVISERS ACT

114.    Plaintiffs reassert and reallege each and every allegation set forth in the paragraphs above as if stated herein.

115.    The 1940 Act, 15 U.S.C. § 80B-6, entitled "Prohibited transaction by investment advisers," provides in relevant part, "[i]t shall be unlawful for any investment adviser by use of the mails or any means or instrumentality of interstate commerce, directly or indirectly:

    (a)    To employ any device, scheme, or artifice to defraud any client or prospective client;

    (b)    To engage in any transaction, practice or course of business which operates as a fraud or deceit upon any client or prospective client;

***

    (c)    To engage in any act practice, or course of business which is fraudulent, deceptive or manipulative."

116.    The 1940 Act reflects a congressional intent to eliminate or at least to expose, all conflicts of interest which might cause an investment adviser -- consciously or subconsciously-- to render advice which was not disinterested. *See SEC v. Capital Gains Research Bureau, Inc.* 375 U.S. 180, 191-192 (1963).  As registered advisers, the Bank and BAC, and the RIAs identified in paragraph 10 hereof, by and through the "controlled persons," are bound by a fiduciary duty to each beneficiary of the Bank's fiduciary accounts.  Plaintiffs allege that the Bank and BAC were and are *bound* by that fiduciary duty on a Class-wide basis and *breached* that duty on a Class-wide basis.

117.    Pursuant to the 1940 Act, the Bank and BAC and the "controlled persons" were bound by a legally imposed fiduciary duty to act in the best interests of the beneficiaries of the

Bank's fiduciary accounts. The Bank and BAC owed Plaintiffs and the Class a duty to act with reasonable care in training and supervising their agents, including those of the Bank Subsidiaries and other "controlled persons", and to ensure that full, honest and adequate disclosure was made to each of their fiduciary clients, co-fiduciaries and the beneficiaries of the Bank's fiduciary accounts.

118.    Instead, the Bank and BAC directly and through those acting for them breached their duty by failing to disclose material information to such clients, co-fiduciaries and the beneficiaries of the Bank's fiduciary accounts and operated a program calling for the deployment of their proprietary mutual funds in fiduciary accounts that contaminated its management of fiduciary accounts in its care and its widely advertised "customized portfolio" process. Such conduct included, but is not limited to, the conduct set forth in this Complaint. By such conduct, the Bank and BAC affirmatively breached their duties and conducted their business in a manner that operated as a fraud and deceit upon Plaintiffs and the members of the Federal Securities Sub-Class in violation of the 1940 Act.

119.    As a result of Defendants' breaches of the 1940 Act and, in particular, §215 of the Investment Advisers Act as described above, the Bank's clients and the beneficiaries of the Bank's affected fiduciary accounts, who were the victims of this scheme, were damaged and entitled to a damages, including restitution and recovery of all fees and expenses paid in connection with the Bank's scheme. See *Morris v. BAC Securities, Inc.*, 277 F. Supp. 2d 622, 642-645. (E.D. Va. 2003).

## COUNT VII - BREACH OF FIDUCIARY DUTY

120.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

121.    Upon information and belief, the Bank's decision to invest the assets of the fiduciary accounts in its care in the Nations Funds was motivated not by the interests of Plaintiffs and the Class members but by Defendants' desire to generate investment advisory and other fees for themselves and the Bank Subsidiaries and, as well, to reduce the Bank's operating expenses and to generate additional revenues by other means derived from the Nations Funds.

122.    Upon information and belief, the Bank failed to consider the Nations Funds' high expense ratios or alternative lower cost families of non-proprietary mutual funds (or deliberately did not do so) or to maintain the *status quo* with pre-existing investments when it invested the assets of fiduciary accounts into shares of the Nations Funds, thus putting its own interests before those of the beneficiaries of fiduciary accounts.

123.    The Bank failed to consider the best interests of the beneficiaries of the affected accounts when it invested their fiduciary assets in the Nations Funds and breached its duty of loyalty to them by putting the interests of itself and its affiliates before the interests of Plaintiffs and the members of the Class.

124.    As a result of, *inter alia*, the Bank's improper wholesale transfer of fiduciary assets held by fiduciary accounts into shares of the Nations Funds, the beneficiaries of the Trusts or other similarly situated accounts for which the Bank was a fiduciary have been damaged in an amount to be determined, but believed to be substantially in excess of $5 million.

## COUNT VIII - PLAINTIFFS' CLAIM FOR PUNITIVE DAMAGES

125.    The conduct of the Defendants was outrageous because of the Defendants' deception, malice and evil motive and reckless indifference to the rights of the Plaintiffs and all others similarly situated in implementing the Conversions and otherwise looting of fiduciary accounts in the Bank's care in that Defendants, their "controlled persons" and their employees:

(a)    Deliberately and knowingly withheld and concealed material information in Nations Funds prospectuses and other written communications to the affected beneficiaries relating to, *inter alia*, its conflicts of interest and the increased expenses they would incur as a result of the Conversions and otherwise, which expenses inured to the benefit of the Bank in flagrant violation of the Bank's duty of loyalty;

(b)    Deliberately and knowingly changed the investment vehicles historically used by the Bank for investment of fiduciary assets to the Nations Funds, specifically to "bulk up" the Nations Funds and otherwise generate revenues and profits for the Defendants at the expense of the beneficiaries of the Bank's fiduciary accounts, all of which conduct was and is in flagrant violation of the Bank's duties of loyalty and prudence;

(c)    Deliberately and knowingly failed to properly disclose in Nations Funds prospectuses and otherwise to beneficiaries and/or those who established the Bank's fiduciary accounts the increased expenses of owning Nations Funds shares, the method of the application of fee credits to their accounts to offset such additional expenses of Nations Funds investments and other material facts in flagrant violation of the Bank's duties of loyalty and prudence and the Defendants' obligations under and pursuant to the Securities Act, the Exchange Act and the 1940 Act;

(d)    Deliberately and knowingly withheld information that the beneficiaries would incur capital gains taxes in connection with the Conversions and/or the reorganizations of mutual funds within the Nations Funds while the Bank would

49

suffer no adverse tax consequence in flagrant violation of the Bank's duties of loyalty and prudence;

(e)     Deliberately and knowingly took advantage of conflicts of interest and engaged in self dealing transactions and failed to consider whether such conduct was in the sole interests of the beneficiaries of the Bank's fiduciary accounts to whom the Bank owed a fiduciary duty, including the duties of loyalty and prudence and instead, put their interest in generating revenues and profits for the Bank and BAC ahead of those to whom the Bank owed fiduciary duties;

(f)     Knowingly and intentionally or as a result of gross negligence or willful fraud concealed material facts relating to the true expenses to be borne by the Bank's fiduciary accounts as a result of the Conversions and otherwise by setting forth deceptive comparisons of the expense ratios of Nations Funds.

126.    As a result of the foregoing egregious conduct, Plaintiffs request that the Court award them substantial punitive damages to punish Defendants and deter them from continuing to act as described herein, which conduct is being carried out to the present.

## COUNT IX - AIDING AND ABETTING

127.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

128.    Upon information and belief, Defendants, NFT, the Bank Subsidiaries and others presently unknown, as part of a corporate business decision, chose to invest the fiduciary assets of Plaintiffs and the members of the Class in shares of the Nations Funds as part of the Conversions and otherwise in order, *inter alia*, to generate investment advisory fees and other fees for its various affiliates and to "bulk-up" the Nations Funds without regard to whether such

investments were prudent and in the best interest of Plaintiffs and the other beneficiaries of fiduciary accounts.

129.    The foregoing Conversions of the assets of fiduciary accounts to the Nations Funds was carried out in furtherance of BAC's corporate plan to reduce the Bank's expenses of managing fiduciary assets and increasing BAC's overall direct and indirect profits from fiduciary operations, one of its objectives in consolidating the operations of the Acquired Banks. BAC and the Bank proceeded to carry out the Conversions since they would not merely profit from the Bank's trustee and similar fiduciary fees but "double dip" by generating additional revenues through the Defendants' related asset management businesses, administrative service businesses and otherwise. Additional profit was also generated by adding the assets in the Bank's fiduciary accounts to the Nations Funds following the Conversions, thereby making them more saleable at retail to the investing public. Further, the Conversions created an opportunity for the Bank to avoid the relatively low profitability of managing the fiduciary accounts (and the expenses related thereto) which the Bank had contracted to do when it (and/or its predecessors) agreed to serve as fiduciary thereof, and substitute ever-increasing fee income directly and through its corporate affiliates

130.    The Bank's wholesale investment of the assets of the Trusts in the Nations Funds in the Conversions carried out around the country, and otherwise, was a breach of its fiduciary duty to Plaintiffs and the members of the Class, which breach was aided, abetted and/or directed by BAC and its affiliates, including NFT and the Bank Subsidiaries as set forth herein.

131.    As a result of BAC's aiding and abetting of Defendant Bank, the beneficiaries of the Trusts or other similarly situated accounts for which the Bank was a fiduciary have been damaged in an amount to be determined by the Court, but believed to be substantial.

## COUNT X - UNJUST ENRICHMENT

132.   Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

133.   By causing the Bank's fiduciary assets in affected accounts to be invested in the Nations Funds, the Bank and BAC have "double dipped." The Bank and BAC have profited by the Conversions, the investment of fiduciary assets in the Nations Funds generally, and from the subsequent acts described herein, thereby unjustly enriching themselves at the expense of Plaintiffs and the members of the Class and Missouri and California Sub-Classes. Defendants have similarly enriched themselves, their subsidiaries and affiliates by using information regarding the beneficiaries of fiduciary accounts to market through "Relationship" Managers and otherwise various goods and services including credit cards, loans and deposit accounts (and to permit certain customers of the defendants to engage in late trading and other improper practices involving the Nations Funds) from which products and services they have been unjustly enriched.  In Plaintiff Scharff's case, the Bank needlessly obtained a mortgage from itself when the Scharff Trust account had more than sufficient assets to pay for the Grantor's home without a mortgage.

134.   Such "double dipping" was carried out by the Bank and BAC by, *inter alia*, imposing on fiduciary accounts the Bank's fees for acting as a corporate fiduciary, as well as investment advisory fees, and other related charges which, when taken together with all the Nations Funds' expenses, even after so-called credits for certain Nations Funds fees, exceeded the amounts to which the Bank was entitled to payment for, *inter alia*, investment of the fiduciary assets and administration of the underlying fiduciary accounts for which services its trustee or similar fees were intended to cover. Such benefits to the Bank and BAC were exacerbated by the Bank's avoidance of substantial operating expenses by reason of its

52

abdication of its individualized investment and administrative responsibilities owed to the members of the Class and Missouri and California Sub-Classes. The Bank enhanced its profit performance at Plaintiffs' expense by favoring the use of its own Nations Funds and investing in them to increase the Nations Funds' asset bases, and aggrandize its own stature under the guise of allegedly providing more services to participants in its so-called "Private Bank."

135.    Further, upon information and belief, with respect to at least certain of the Trusts for which the Bank has acted as Trustee, the total charges against such Trusts for trustee fees/commissions, advisory fees and other amounts payable by the Trusts exceed the contractual amounts for such charges agreed upon by the creators of such Trusts.

136.    The Defendants have invested the proceeds of the foregoing unjust enrichment and realized additional profits thereupon, all of which should be returned to the Trusts and other similarly affected accounts and/or their beneficiaries, as the Court shall deem appropriate (e.g. a proportionate share of the defendants' profits during the years of misappropriation) pursuant to California Probate Code, Section 166440(a)(1) and otherwise. Missouri statutes impose strict liability against fiduciaries who "at their sole risk" make investments that are improper such that the Bank is "absolutely liable" to plaintiff Scharff and others in the Missouri Sub-Class for their damages. (§362.550.5 R.S.Mo.). Plaintiffs and others similarly situated are entitled to recover the Bank's ill-gotten gains and profits there from.

## COUNT XI - VIOLATION OF CALIFORNIA PROBATE CODE

137.    Plaintiff Arnold repeats and realleges each and every allegation contained above as if fully set forth herein. The claims set forth herein are asserted on behalf of the California Sub-Class.

138.    Pursuant to Section 16002 of the California Probate Code, the Bank owes and owed to Plaintiff Arnold and the members of the California Sub-Class, an absolute duty of

53

loyalty. In exercise of that duty, the Bank has a duty to administer the Trusts solely in the interest of the beneficiaries.

139.    Pursuant to Section 16060 of the California Probate Code, the Bank owes and owed to Plaintiff Arnold and the members of the California Sub-Class a duty of candor.

140.    By acting as alleged herein, the Bank has violated and continues to violate the duties of loyalty and candor it owes and owed to plaintiff Arnold and the members of the California Sub-Class. Such violations of the Bank's duties as fiduciary constitute breach of trust pursuant to 16400 of the California Probate Code.

141.    Pursuant to Section 16004 of the California Probate Code, the Bank owes and owed to Plaintiff Arnold and the members of the California Sub-Class a duty not to use or deal with Trust property for its own profit, nor to take part in any transaction in which it has an interest adverse to the beneficiary, such as Plaintiff Arnold and the members of the California Sub-Class.

142.    By acting as alleged herein, the Bank has violated and continues to violate the duty not to use or deal with Trust property for its own profit, and the duty to not take part in any transaction in which it had a conflict of interest. Such violations of the Bank's duties as fiduciary constitute breach of trust pursuant to Section 16400 of the California Probate Code.

143.    Pursuant to Section 16040 of the California Probate Code, the Bank owes and owed to Plaintiff Arnold and the members of the California Sub-Class a duty of care that includes the duty to invest Trust assets prudently and with regard to individualized strategy appropriate and productive pursuant to Probate Code Sections 16007 and 16009. Pursuant to Probate Code Section 16014, the Bank is required to apply fully the special skills of a corporate fiduciary, and this duty heightens the duty of care otherwise applicable to it.

54

144.   By acting as alleged herein, the Bank has violated and continues to violate the duties of care and productivity it owes and owed to Plaintiff Arnold and the members of the California Sub-Class. Such violations of the Bank's duties as fiduciary constitutes breach of trust pursuant to Section 16400 of the California Probate Code.

145.   Pursuant to Section 16420 of the California Probate Code, Plaintiff Arnold and the members of the California Sub-Class may maintain a cause of action against the Bank for its breaches of its duties as fiduciary and its participation in transactions in which it had or has a conflict of interest, as it does here.

146.   Pursuant to Section 16440 of the California Probate Code, the Bank is liable to Plaintiff Arnold and the members of the California Sub-Class for actual and punitive damages, attorneys' fees, interest, and such other relief as the Court may order.

### COUNT XII - BREACH OF FIDUCIARY DUTY UNDER CALIFORNIA LAW

147.   Plaintiff Arnold repeats and realleges each and every allegation contained above as if fully set forth herein. This Count is brought on behalf of the California Sub-Class.

148.   Pursuant to Section 15002 of the Probate Code, the common law of California with respect to fiduciary and trust matters remains the law of the State of California, and Probate Code Section 16420(b) expressly preserves "any other appropriate remedy provided by statute or the common law.

149.   Pursuant to the common law of California, the Bank owes and owed to Plaintiff Arnold and each member of the California Sub-Class an absolute duty of loyalty. In exercise of that duty, the Bank has a duty to administer the Trusts solely in the best interests of the beneficiaries, i.e. the members of the California Sub-Class.

150.   Pursuant to the common law of California, the Bank owes and owed to Plaintiff Arnold and the members of the California Sub-Class a duty of candor.

151.    Pursuant to the common law of California, the Bank owes and owed to Plaintiff Arnold a duty not to take part in a transaction in which it had a conflict of interest, as it did and does as described above

152.    By acting as alleged herein, the Bank has violated its fiduciary duties of absolute loyalty and candor owed to Plaintiff Arnold and the members of the California Sub-Class.

153.    By acting as alleged herein, the Bank has violated its fiduciary duty not to participate in transactions in which it had or has a conflict of interest, as it does here.

154.    By acting as alleged herein, the Bank has violated its fiduciary duties of care and productivity it owes or owed to Plaintiff Arnold and the members of the California Sub-Class.

155.    By acting as alleged herein, the Bank has violated its fiduciary duty that it owes or owed to Plaintiff Arnold and the members of the California Sub-Class to take and exercise control over Trust assets.

156.    The Bank and its affiliates have already unlawfully extracted huge sums in the form of fees and other charges assessed against fiduciary accounts, and they will continue indefinitely to extract unlawful fees and other charges from Plaintiff Arnold and the members of the California Sub-Class, in an amount which cannot be presently determined.

## COUNT XIII - VIOLATION OF CALIFORNIA BUSINESS AND PROFESSIONS CODE SECTION 17200

157.    Plaintiffs Kutten and Arnold repeat and reallege each and every allegation contained above as if fully set forth herein. Plaintiffs Kutten and Arnold assert this cause of action in their capacity as private attorneys general on behalf of the members of the general public residing within the State of California and/or whose Trusts originated there and, in the case of Plaintiff Arnold, on behalf of the members of the California Sub-Class.

158.    The Bank has engaged in and continues to engage in unfair, unlawful and deceptive business practices, including but not limited to sending representatives from St. Louis, Missouri to meet with Plaintiff Kutten in Northern California, whereby it has conspired with BAC and its affiliates to force the Kutten and other trusts to have their assets re-directed from individually managed accounts and/or so-called "Common Trust Funds" and/or other assets to proprietary mutual funds controlled by the Bank and its affiliates. Said Conversions have resulted in higher total direct and indirect expenses charged to fiduciary accounts than those historically paid to the Bank.

159.    By acting as alleged herein, the Bank has violated its duties as a fiduciary, which constitutes breach of trust pursuant to Section 16400 of the California Probate Code.

160.    The unlawful acts and practices of the Bank as alleged herein, including violations of Section 16400 of the California Probate Code, constitute unlawful business practices within the meaning of California Business and Professions Code Section 17200, et seq.

161.    Unless the Bank is enjoined from continuing to engage in the foregoing unfair and deceptive business practices, Plaintiffs Kutten and Arnold and the other members of the general public residing within the State of California and/or whose Trusts originated in California and the members of the California Sub-Class will continue to be injured and damaged by the Bank's unfair business practices.

162.    So as not to be unjustly enriched by its own wrongful actions and conduct, the Bank should be required to disgorge and restore to Plaintiffs Kutten and Arnold and the other members of the general public residing within the State of California and/or whose fiduciary accounts originated in California and the members of the California Sub-Class all monies wrongfully obtained by it as a result of its wrongful conduct, together with interest and profits earned thereon.

## COUNT XIV - VIOLATION OF CHAPTERS 456 AND 469 MISSOURI REVISED STATUTES

163.    Plaintiffs Scharff and the Medlers repeat and reallege each and every allegation contained above as if fully set forth herein. The claims set forth in this Count are asserted on behalf of the members of the Missouri Sub-Class.

164.    Pursuant to Mo. Rev. Stat. §469.900 (formerly, 456.520.2), the Bank owes and owed to Plaintiff Scharff and the members of the Missouri Sub-Class an absolute duty of loyalty. In exercise of that duty, the Bank has a duty to administer the Trusts and other fiduciary accounts solely in the interests of the beneficiaries thereof.

165.    Pursuant to Mo. Rev. Stat. § 469.905 (formerly, 456.905), the Bank owes and owed to Plaintiffs Medlers and Scharff and the members of the Missouri Sub-Class an absolute duty of loyalty. In exercise of that duty, the Bank has a duty to administer the Trusts and other fiduciary accounts governed by the Missouri law solely in the best interests of the beneficiaries, i.e. the members of the Missouri Sub-Class.

166.    Pursuant to section 469.900, the Bank owes and owed to Plaintiff Medlers and Scharff and the members of the Missouri Sub-Class a duty to exercise reasonable care, skill and caution in investment management decisions, to ascertain facts relevant to the investment and management of trust assets, and a duty to use the special skills and expertise it represented itself to possess when investing and managing trust assets.

167.    By acting as alleged herein, the Bank has violated and continues to violate the duties of loyalty and candor it owes and owed to Plaintiffs Scharff and the Medlers and the members of the Missouri Sub-Class. Such violations of the Bank's duties as fiduciary constitute breach of trust imposed by Missouri statute.

168.    Pursuant to Mo. Rev. Stat 456.8-802 (formerly, §456.570.2), the Bank owes and owed to Plaintiffs Scharff and the Medlers and the members of the Missouri Sub-Class a duty not to use or deal with fiduciary assets for its own profit, not to take part in any transaction in which it has an interest adverse to the beneficiary, such as plaintiffs Scharff, the Medlers and the members of the Missouri Sub-Class.169.    By acting as alleged herein, the Bank has violated and continues to violate the duty not to use or deal with fiduciary assets for its own profit, and the duty to not take part in any transaction in which it had a conflict of interest. Such violations of the Bank's duties as fiduciary constitute breach of trust pursuant to Missouri statute.170.

Pursuant to section 469.900 et seq., the Bank owes and owed to Plaintiffs Scharff and the Medlers and the members of the Missouri Sub-Class a duty of care that includes the duty to invest fiduciary assets prudently and with regard to individualized strategy appropriate to each fiduciary account and to each beneficiary thereof, and the duty to make fiduciary assets productive. Moreover, the Prudent Investor Act requires the Bank to apply fully the special skills of a corporate fiduciary, heightening the duty of care otherwise applicable to it.171. By acting as alleged herein, the Bank has violated and continues to violate the duties and productivity it owes and owed to Plaintiffs Scharff and the Medlers and the members of the Missouri Sub-Class. Clearly the Bank was interested in seizing new opportunities and lining its own pockets at the expense of Plaintiffs Scharff and the Medlers and those similarly situated. Such violations of the Bank's duties as fiduciary constitutes breach of trust pursuant to Missouri law.

172.    The Bank and its affiliates have already unlawfully extracted huge sums in the form of fees and other charges assessed against fiduciary accounts and unless enjoined from doing so, they will continue indefinitely to extract unlawful fees and other charges from the

members of the Missouri Sub-Class, in an amount which cannot be presently determined in violation of §469.907 (formerly, § 456.907).

173.    Plaintiffs Scharff and the Medlers and the members of the Missouri Sub-Class may maintain a cause of action against the Bank for its breaches of its duties as fiduciary and its participation in transactions in which it had or has a conflict of interest, as it does here.

174.    The Bank is liable to Plaintiffs Scharff and the Medlers and the members of the Missouri Sub-Class for actual and punitive damages because the Bank acted with reckless disregard for the rights of Plaintiff Scharff, the Medlers' and others' rights, attorneys' fees, interest, and such other relief as the Court may order.

## COUNT XV - BREACH OF FIDUCIARY DUTY UNDER MISSOURI COMMON LAW

175.    Plaintiffs Scharff and the Medlers repeat and reallege each and every allegation contained above as if fully set forth herein. This Count is asserted on behalf of the members of the Missouri Sub-Class.

176.    Pursuant to the common law of Missouri, the Bank owes and owed to Plaintiffs Scharff and the Medlers and the members of the Missouri Sub-Class an absolute duty of loyalty. In exercise of that duty, the Bank has a duty to administer the Trusts and other fiduciary accounts governed by Missouri law solely in the best interests of the beneficiaries, i.e. the members of the Missouri Sub-Class.

177.    By acting as alleged herein, the Bank has violated its fiduciary duties of absolute loyalty and candor owed to Plaintiffs Scharff and the Medlers and the members of the Missouri Sub-Class.

178.    By acting as alleged herein, the Bank has violated its fiduciary duty not to participate in transactions in which it had or has a conflict of interest, as it did and does here.

179.    By acting as alleged herein, the Bank has violated its fiduciary duties of care and productivity it owes or owed to Plaintiffs Scharff and the Medlers and the members of the Missouri Sub-Class.

180.    By acting as alleged herein, the Bank has violated its fiduciary duty that it owes or owed to Plaintiffs Scharff, the Medlers and the members of the Missouri Sub-Class to take and exercise control over fiduciary assets.

181.    Plaintiffs Scharff, the Medlers and the members of the Missouri Sub-class may maintain a cause of action against the Bank for its breaches of its duties as fiduciary and its participation in transactions in which it had or has a conflict of interest as described above.

182.    The Bank is liable to Plaintiffs Scharff, the Medlers and the members of the Missouri Sub-Class for actual and punitive damages because the Bank acted with reckless disregard for the rights of Plaintiffs Scharff, the Medlers' and others' rights, attorneys' fees, interest, and such other relief as the Court may order.

## COUNT XVI - INDIVIDUAL CLAIM OF PLAINTIFF KUTTEN BREACH OF FIDUCIARY DUTY AGAINST DEFENDANT BANK AND AIDING AND ABETTING AGAINST DEFENDANT BAC

183.    Plaintiff Kutten repeats and realleges each and every allegation contained above as if fully set forth herein.

184.    The Bank has breached its fiduciary duties to Plaintiff Kutten and her daughters, including the duty of loyalty, and various duties highlighted by the federal regulations issued by the Office of the Comptroller of the Currency in 1996 directed to all national banks that act in a fiduciary capacity, with which the Bank failed to comply[2] in that, the Bank:

---

[2] Plaintiff Kutten asserts no private cause of action there under. Rather, the Bank's failure to comply with them is a fundamental breach of fiduciary duty.

(a)   Failed to exercise such specialized care and skill as is required of a fiduciary;

(b)   Converted trust assets and their subsequent purchase of the Bank's proprietary mutual funds, the Nations Funds;

(c)   Failed to properly diversify investment portfolios of the Trusts, and acting in derogation of the settler's expressed directions, including but not limited to failing to invest assets primarily in securities back by the full faith and credit of the United States Government;

(d)   Failed to adopt appropriate policies relevant to self-dealing and conflict of interest as required by and in violation of 12 CFR Part 9;

(e)   Failed to preview the prospective account to determine if the account could be properly administered subsequent to the acquisition of Boatmen's Trust Co. by the Bank as required by and in violation of 12 CFR, part 9.6;

(f)   Failed to properly invest funds waiting to be invested to obtain yields consistent with a reasonable rate of return as required by and in violation of 12 CFR Part 9.10;

(g)   Failed to assign at least two individuals to Plaintiff Kutten's accounts as required by 12 CFR, part 9.13;

(h)   Charged excessive fees for fiduciary compensation in violation of 12 CFR part 9.15;

(i)   Failed to properly supervise personnel entrusted with the management of Plaintiff Kutten's Trusts assets to ensure implementation of the grantors' expressed directions;

(j)     Failed to make appropriate trades in the equity and bond markets to enhance the achievement of the objectives of the Trusts, including failing, through neglect, to make trades of any kind for several years;

(k)     Failed to establish a written plan to engage in the sale and marketing of Nations Funds to Trusts under its fiduciary control and failed to absorb the expenses of establishing a collective investment fund, instead charging the beneficiaries, including plaintiff Kutten a fee of not less than 0.01%;

(l)     Failed to consider and advise the beneficiaries of the adverse tax consequences arising from a conversion of trust assets and the subsequent purchase of Nations Funds;

(m)    Failed to consider alternative investments in funds whose returns and ratings are higher than Nations Funds which has scored low on nationally respected ratings;

(n)     Created a wholly owned subsidiary to serve as the sole vendor of its own product to Trusts under its fiduciary management and control;

(o)     Failed to resign as Trustee when demanded to do so by plaintiff Kutten, citing its need for business income as overriding its performance as a fiduciary duty and resigning only after plaintiff Kutten's citation of the innumerable occasions when the Bank had breached its duty to plaintiff Kutten and the Kutten Trusts;

(p)     Failed to observe the parameters of the instructions with regard to conversion issued by the Federal Reserve Bank of the United States in SR 97-3 (SPE), providing [i]n determining whether to convert common trust

63

funds to mutual funds, a banking organization must address the possibility that the conversion could result in conflicts between the best interests of the organization and the fiduciary." Further, the Federal Reserve noted the existence of potential conflicts of interest for a national bank to engage in such transactions and the need for management to demonstrate that it has determined that the governing trust instrument for each affected customer authorizes investment in mutual funds and the mutual funds are suitable investments for the particular accounts;

(q)    Lost administrative control of Plaintiff Kutten's accounts for an undetermined period of time in 2202 and 2003, including electronic access to the accounts and the paper files relating to same; and

(r)    Failed to communicate with the Plaintiff Kutten, return her phone calls and letters and failed to perform as requested by Plaintiff Kutten with respect to modifying investment strategies consistent with the investment philosophy that reigned in her family for decades.

185.    Upon information and belief, the Bank's decision to invest the assets of the Trusts in the Nations Funds was motivated not by the interests of Plaintiff Kutten and her daughters but by BAC's desire to generate investment advisory and other fees for its affiliates and, indirectly, for itself, as well as to reduce the Bank's operating expenses.

186.    Upon information and belief, the Bank failed to consider the Nations Funds' high expense or alternative lower cost families of mutual funds when it invested the assets of the Kutten Trusts into shares of the Nations Funds thus putting its own interests before those of the beneficiaries of fiduciary accounts maintained for the Kutten Trusts.

187.    The Bank's wholesale investment of the assets of the Kutten Trusts in the

Nations Funds was a breach of its fiduciary duty to Plaintiff Kutten and her daughters, which

breach was aided, abetted and/or directed by BAC and its affiliates.

188.    As a result of, inter alia, the Bank's improper wholesale transfer of fiduciary

assets held by fiduciary accounts the Kutten Trusts into shares of the Nations Funds, the

accounts of Plaintiff Kutten and her daughters for which the Bank was a fiduciary have been

damaged in an amount to be determined by the Court, but believed to be substantial.

## COUNT XVII - INDIVIDUAL CLAIM OF PLAINTIFF KUTTEN BREACH OF CONTRACT

189.    Plaintiff Kutten repeats and realleges each and every allegation contained above

as if fully set forth herein.

190.    By means of the acceptance by the Bank and its predecessors of the trusteeship of

the Kutten Trusts, the Bank and its predecessors committed to provide to such Trusts complete

investment management services of a corporate fiduciary, and render such services on an

individualized basis consistent with the goals and objectives of Plaintiff Kutten's parents and the

needs of the beneficiaries thereof. As the Bank states: "It is our responsibility to invest the trust

assets prudently and profitably according to the grantor's wishes as outlined in the trust

document." No grantor of a Trust anticipated or could reasonably foresee that the Conversion

would be carried out by the Bank with Trust assets or that the designated fiduciary would be the

Bank in its present form. Further, as set forth in those Counts not asserted on behalf of the Class,

the Bank ignored the express provisions of the Kutten Trusts with respect to investments and

otherwise.

191.    Plaintiff Kutten and her daughters were beneficiaries of the Bank's contractual

obligations to the creators of the Kutten Trusts and other fiduciary relationships. By abdicating

its responsibilities for individual investment management services and/or through "Common Trust Funds" in favor of the wholesale Conversion of fiduciary assets that the Bank was obligated to provide to the beneficiaries of its fiduciary accounts, and by conducting itself in its present business form, the Bank breached its contractual obligations to plaintiff Kutten, her parents and daughters.

192.    By virtue of the Bank's breach of its contractual obligations to plaintiff Kutten, her parents and her daughters, plaintiff Kutten and her daughters have suffered damages in an amount to be determined by the Court.

193.    The Bank has breached its contractual obligations to plaintiff Kutten and her daughters in their individual capacities as a result of its failure to adhere to the terms of the Kutten family's engagement of the Bank and its predecessors as a fiduciary and plaintiff Kutten as well as her daughters have been damaged.

## COUNT XVIII - INDIVIDUAL CLAIM OF PLAINTIFF BREACH OF CONTRACT

194.    Plaintiff Kutten repeats and realleges each and every allegation contained above as if fully set forth herein.

195.    This Count if brought by Plaintiff Kutten as a beneficiary of Trusts originally established with the Boatman's Trust Company, being one of the Banks acquired by and/or merged into the Bank.

196.    Boatmen's Trust Company, as designated corporate Trustee, promised and agreed to the settlers of the Kutten Trusts and its beneficiaries to deliver personalized fiduciary services. Implicit in the contractual fiduciary relationship between the Plaintiff Kutten's parents and Boatman's Trust Company was the provision of a full range of personalized fiduciary services, including individualized investment management.

197.    The Bank, by eliminating the personalized fiduciary services to plaintiff Kutten, including, *inter alia*, individualized investment management, materially breached the explicit and implied terms of the Kutten Trusts, including, but not limited to the following:

(a)    Failing to provide appropriate trained personnel to supervise and monitor the performance of the assets in their charge, including failing to invest in appropriate asset classes;

(b)    Bouncing plaintiff Kutten to poorly manned and anonymous "Call Centers" with whom these was no pre-existing relationship, trust and fealty;

(c)    Changing without plaintiff Kutten's consent representatives of the Bank to deal with plaintiff Kutten who had no knowledge of plaintiff Kutten or the purposes for which the Kutten Trusts were established; and

(d)    Continuing to charge excessive fiduciary fees when failing to perform the services the services that Boatman's Trust Company had agreed to perform.

198.    Because the transfer of fiduciary responsibilities from Boatman's Trust Company substantively and materially affected the Kutten Trusts' pre-existing fiduciary relationship with the Bank, it was obliged to give notice to plaintiff Kutten of, inter alia, the terms of the merger between it and Nations Bank, the forthcoming changes in the relationship and provide to them the opportunity to seek a replacement Trustee.

199.    Although not provided with said notice, plaintiff Kutten sought the resignation of the Bank in early October, 2003. In response, on October 17, 2003, the Bank incredibly insisted that they be allowed to remain a trustee:

> The (Bank's) Committee decided that they would not resign from these trusts. It was a business decision that was based on the fact that Bank of America does not want to give up your business. Bank of America, like everyone else, has felt the effects of the poor economy and has become very reluctant to voluntarily resign as trustee.

200.    The Bank continued to resist resignation until plaintiff Kutten's counsel wrote a seven page letter citing the many examples of the Bank's breach of duties in the administration of the trusts of plaintiff Kutten and her daughters.

## COUNT XIX - INDIVIDUAL CLAIM OF PLAINTIFF KUTTEN UNJUST ENRICHMENT

201.    Plaintiff Kutten repeats and realleges each and every allegation contained above as if fully set forth herein.

202.    By reason of Defendant BAC's causing the Bank's fiduciary assets in affected accounts to be invested in the Nations Funds, the Bank and BAC have "double dipped." The Defendants have profited by the Conversion and the subsequent acts described herein, thereby unjustly enriching themselves at the expense of Plaintiff Kutten and her daughters. Defendants have similarly enriched themselves, their subsidiaries and affiliates by using information regarding the Plaintiff Kutten to market various goods and services including credit cards, loans and deposit accounts, from which products and services they have been unjustly enriched.

203.    Such "double dipping" was carried out by the Bank and BAC by imposing on Plaintiff Kutten's accounts the Banks' fees for acting as a corporate fiduciary as well as investment advisory fees, and other related charges which, when taken together with all the Nations Funds' expenses, even after so-called credits for certain Nations Funds advisory fees, exceeded the amounts to which the Bank was entitled to payment for, *inter alia*, investment of the fiduciary assets, for which services its Trustee or similar fees were intended to cover. Such benefits to the Bank and BAC were exacerbated by the Bank's avoidance of substantial

operating expenses by reason of its abdication of its individualized investment responsibilities

owed to Plaintiff Kutten and her daughters. The Bank enhanced its profit performance at

Plaintiff Kutten's expense by favoring the use of its own Funds and investing in same to

increase its own asset base, and aggrandize its own stature under the guise of allegedly

providing more services to participants in its "Private Bank." The Bank's objectives were clear

from its telling press release in July 14,1999:

> United by the merger of Bank of America and NationsBank,
> Nations Banc Investments, Inc., and BA Investment Services, Inc.,
> became one brokerage company on July 12. The birth of Banc of
> America Investment Services, Inc., the new name for the retail
> brokerage, gives investors a powerful ally within the Bank of
> America franchise.

204.    The Defendants have invested the proceeds of the foregoing unjust enrichment

and realized additional profits thereupon, all of which should be returned to the Kutten Trusts as

the Court shall deem appropriate (e.g. a proportionate share of the defendants' profits during the

years of misappropriation). Missouri statutes impose strict liability against fiduciaries who "at

their sole risk" make investments that are improper such that the Bank is "absolutely liable" to

plaintiff Kutten for their losses. §362.550.5 R.S.Mo. Plaintiff Kutten and her daughters are

entitled to recover the Bank's ill-gotten gains and profits.

## COUNT XX - INDIVIDUAL CLAIM OF PLAINTIFF KUTTEN VIOLATION OF CHAPTER 456 MISSOURI REVISED STATUTES

205.    Plaintiff Kutten repeats and realleges each and every allegation contained above

as if fully set forth herein.

206.    Pursuant to Mo. Rev. Stat §456.900, et. seq., (formerly, 456.520.2) the Bank

owes and owed to plaintiff Kutten and her daughters an absolute duty of loyalty. In exercise of

that duty, the Bank has a duty to administer the Trusts and other fiduciary accounts solely in the

interests of the beneficiaries thereof.

207.    Pursuant to Mo. Rev. Stat. §469.905 (formerly, § 456.905), the Bank owes and owed to Plaintiff Kutten and her daughters an absolute duty of loyalty. In exercise of that duty, the Bank has a duty to administer the Kutten Trusts governed by the Missouri law solely in the best interests of the beneficiaries.

208.    Pursuant §456.900, et. seq, the Bank owes and owed to Plaintiff Kutten and her daughters a duty to exercise reasonable care, skill and caution in investment management decisions, to ascertain facts relevant to the investment and management of trust assets, and a duty to use the special skills and expertise it represented itself to possess when investing and managing trust assets.

209.    By acting as alleged herein, the Bank has violated and continues to violate the duties of loyalty and candor it owes and owed to Plaintiff Kutten and her daughters. Such violations of the Bank's duties as fiduciary constitute breach of trust imposed by Missouri statute.

210.    Pursuant to §456.8-802 (formerly, §456.570.2), the Bank owes and owed to Plaintiff Kutten and her daughters a duty not to use or deal with fiduciary assets for its own profit, not to take part in any transaction in which it has an interest adverse to the beneficiary, such as plaintiff Kutten and her daughters.

211.    By acting as alleged herein, the Bank violated the duty not to use or deal with fiduciary assets for its own profit, and the duty to not take part in any transaction in which it had a conflict of interest. Such violations of the Bank's duties as fiduciary constitute breach of trust pursuant to Missouri statute.

212.    Pursuant to §456.900, et. seq, the Bank owes and owed to Plaintiff Kutten and her daughters a duty of care that includes the duty to invest fiduciary assets prudently and with regard to individualized strategy appropriate to each fiduciary account and to each beneficiary

thereof, and the duty to make fiduciary assets productive. Moreover, §456.900, et. seq, requires the Bank to apply fully the special skills of a corporate fiduciary, heightening the duty of care otherwise applicable to it.

213.    By acting as alleged herein, the Bank has violated the duties and productivity it owed to Plaintiff Kutten and her daughters. Clearly the Bank was interested in seizing new opportunities and lining its own pockets at the expense of Plaintiff Kutten and her daughters. Such violations of the Bank's duties as fiduciary constitutes breach of trust pursuant to Missouri law.

214.    Plaintiff Kutten may maintain a cause of action against the Bank for its breaches of its duties as fiduciary and its participation in transactions in which it had or has a conflict of interest, as it does here.

215.    The Bank is liable to Plaintiff Kutten for actual and punitive damages because the Bank acted with reckless disregard for Plaintiff Kutten's rights, attorneys' fees, interest, and such other relief as the Court may order.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs Arnold, Medler and Scharff respectfully request on their own behalf, and on behalf of all members of the Class and the Sub-Classes identified above, and Plaintiff Kutten requests on behalf of herself, and her daughters for an order:

(a)    Certifying this action as a Class Action and appointment of Class Plaintiffs and their counsel to represent the Class and the various Sub-Classes;

(b)    Entering judgment on the claims for breach of fiduciary duty in favor of Plaintiffs individually and Class Plaintiffs Arnold, Medler and Scharff as representatives of the other members of the Class and Sub-Classes and against the Defendants of their compensatory damages, treble damages as appropriate

71

and punitive damages in favor of Plaintiffs individually and as representatives of the other members of the Class and Sub-Classes and against the Defendants in the amount of damages caused by the Defendants' breaches of fiduciary duties;

(c)     Entry of judgment on the claims for breach of contract in favor of Plaintiff Kutten in the amount of damages caused by the Bank's breach of contract;

(d)     Entry of judgment enjoining the Bank from opposing any petition filed by any member of the Class or Missouri or California Sub-Classes seeking the removal of the Bank as corporate fiduciary and requiring the Bank to pay for all legal fees and expenses incident thereto including its own;

(e)     Entry of judgment compelling the Defendants to account for their unjust enrichment and disgorging the amount thereof (and the profits earned thereupon) to the fiduciary accounts, including the Kutten, Crowley, Lubbe and Scharff Trusts, affected by the wrongdoing described herein and/or their beneficiaries, as appropriate;

(f)     Entry of judgment compelling the Bank to fully insulate its fiduciary operations from all of its other business activities and those of BAC and the various "controlled persons";

(g)     Entry of judgment compelling the Bank to establish and implement procedures to fully protect the interests of the members of the Class including, *inter alia*, the appointment of an ombudsman to oversee the Bank's fiduciary operations;

(h)     Repayment to the affected Nations Funds of the damages caused to them by the Defendants' actions as described herein or failing that to the members of the Class who indirectly sustained damages;

(i)     Pre-judgment and post-judgment interest at the maximum rate allowable by law;

(j)     Reasonable attorneys' fees and reimbursement of the reasonable costs and

expenses of prosecuting this litigation and distributing the recovery to members

of the Class and the various Sub-Classes; and

(k)     Such other or additional relief as this Court deems appropriate.

## JURY DEMAND

Plaintiffs hereby demand a trial by jury.

June 14, 2006

GREENFIELD & GOODMAN LLC
RICHARD D. GREENFIELD
7426 Tour Drive
Easton, Maryland
(410)745-4149
(410) 745-4158 (Fax)
Lead Counsel for Plaintiffs and the Class


SUMMERS, COMPTON, WELLS & HAMBURG
PROFESSIONAL CORPORATION

/s/ Steven M. Hamburg
STEVEN M. HAMBURG          #3313
HOLLY M. MCINTYRE          #112203
8909 Ladue Road
St. Louis, MO 63124
(314) 991-4999
(314) 991-2413 (Fax)

RICHARD A. LOCKRIDGE
W. JOSEPH BRUCKNER
GREGG M. FISHBEIN
LOCKRIDGE GRINDAL NAUEN PLLP
Suite 2200
100 Washington Avenue South
Minneapolis, MN 55401
(612) 339-6900
(612) 339-0981 (Fax)

GANCEDO & NIEVES LLP
Hector G. Gancedo
Amy M. Boomhouwer
144 W. Colorado Blvd.
Pasadena, CA 91105
(626) 685-9800

COUNSEL FOR PLAINTIFFS AND THE CLASS

495323

# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MISSOURI
# EASTERN DIVISION

|  |  |  |
|---|---|---|
| **ELLEN JANE KUTTEN,** individually, and on behalf of her daughters | ) ) ) ) |  |
| and | ) ) | **Case No. 4:06 CIV 0937 (PAM)** |
| **MARY ANN ARNOLD,** **ELSIE MAHLER SCHARFF,** **JOHN F.MEDLER, JR.,** **MICHAEL R. MEDLER, and** **JEFFREY P. MEDLER,** on behalf of themselves, and all others similarly situated, | ) ) ) ) ) ) ) ) |  |
| **Plaintiffs,** | ) ) | **JURY TRIAL DEMANDED** |
| v. | ) ) ) |  |
| **BANK OF AMERICA, N.A.** | ) ) |  |
| and | ) ) | **CLASS ACTION** |
| **BANK OF AMERICA CORPORATION,** | ) ) |  |
| **Defendants.** | ) |  |

## AMENDED COMPLAINT

COME NOW Plaintiffs Ellen Jane Kutten, individually on behalf of herself, and her daughters, Alessandra Kutten Cottrell and Louise Kutten Cottrell, and Mary Ann Arnold, Elsie Mahler Scharff and John F. Medler, Jr., Michael R. Medler and Jeffrey P. Medler (hereinafter Medlers), for themselves and for all other members of the Classes hereinafter described, by and through counsel, and state and allege as follows:

## OVERVIEW

1. This Class Action is brought by Plaintiffs Mary Ann Arnold, Elsie Mahler Scharff and the Medlers on behalf of themselves, and all others similarly situated, and by Plaintiff Ellen Jane Kutten, individually, on behalf of herself and her daughters, all of whom are or were beneficiaries of fiduciary accounts for which the Defendant Bank of America N.A.

("Bank") serves or served as corporate trustee.

2.      The allegations in this Complaint are directed at the Bank, as well as its parent company, Bank of America Corporation ("BAC"), for their breaches of fiduciary and contractual duties owed by them to beneficiaries of fiduciary accounts arising from the Defendants' pervasive self-dealing in the context of the Bank's relationship with such beneficiaries, the Plaintiffs herein, as well as failing to provide to them and the members of the Class the fiduciary services to which they were and/or are entitled. Such self-dealing included, *inter alia*, the investment of the assets of the Bank's fiduciary accounts in its captive and proprietary mutual funds, the Columbia Funds (formerly known throughout most of the relevant period as the "Nations Funds") and, as to many of these accounts wholesale re-direction of the assets therein from their historic allocations in in-house, fee-free Common Trust Funds and individual investments to  the Nations Funds (hereinafter, "Conversion"), which were controlled, serviced and advised by the Bank's affiliates and  subsidiaries and indirectly by Defendant BAC.

3.      This Complaint is not pre-empted by the Securities Litigation Uniform Standards Act (SLUSA) in that the claims asserted herein are not state law claims made "in connection with" the purchase, sale or holding of a security.  No claims are asserted herein, directly, indirectly or by implication, under the federal securities laws or any state securities laws. The Plaintiffs and members of the putative Class are not and have not been purchasers, holders or sellers of securities and have never had any control over the investments made for their respective fiduciary accounts.  The Bank is and always has been the record purchaser, owner, holder and seller of such shares. The Plaintiffs and members of the Class have and had no ability to make decisions with regard to the securities purchased or held by the Bank for their fiduciary accounts for which the Bank served as corporate fiduciary and the Bank is the legal owner

thereof.  Indeed, the Bank rejected the Plaintiffs' attempts (as well as those of co-fiduciaries) to have any role in the selection of investments for fiduciary accounts. None of the claims herein are based upon any  alleged omissions or misrepresentations by the Defendants to Plaintiffs nor were Plaintiffs induced by an omission or a misrepresentation to act  "in connection with" the purchase or sale of a security.  Instead, the purchases of Nations Funds shares as described herein were made in furtherance of the Bank's failure to perform its fiduciary duties owed to Plaintiffs and the members of the Class.  Although SLUSA provides for dismissal of **certain** putative class actions based on state law alleging untrue statements or omissions of material facts made "in connection with" the purchase or sale of a covered security, SLUSA does not pre-empt the claims asserted herein as no statements or omissions had any impact whatsoever on the purchase or sale of a covered security; i.e. the shares of the Columbia and Nations Funds purchased by the Bank.  Rather, the statements and omissions alleged herein are directly related to the failure of the Bank to faithfully and forthrightly perform the fiduciary duties it owed to Plaintiffs and the members of the Class.  That the Bank chose to self-deal in its captive proprietary mutual funds is of no moment and does not turn this breach of fiduciary claim into SLUSA pre-empted securities litigation, notwithstanding the Bank's position to the contrary. Because it chose to self-deal in its proprietary funds, the Bank's conduct should not be immune from judicial scrutiny.[1]

## THE PARTIES

4.     Plaintiffs are present or former beneficiaries of the Bank's fiduciary accounts whose assets were invested by the Bank in its in-house proprietary mutual funds, known variously as the Nations Funds or Columbia Funds ("Nations Funds").

---

[1] In challenging Plaintiffs' original Complaint herein, Defendants  concede that Plaintiffs would have no standing to bring a securities claim because they did not "actually" purchase the mutual fund shares. (*See* Bank's Memorandum

5.    Plaintiff Ellen Jane Kutten is a California citizen who has varying interests as beneficiary, contingent beneficiary, as well as co-trustee of several trusts which had been, until the fall of 2003, managed and controlled by the Bank, its corporate parent and affiliates.  In particular, Plaintiff Kutten is a named beneficiary under trusts created by her parents in this District in 1981, as amended in 1983, 1987 and 1990, namely, the Joseph Kutten Indenture of Trust and the Carolyn J. Kutten Indenture of Trust.  In addition, Plaintiff Kutten and her daughters were beneficiaries of trusts established in 1989, namely, the Joseph Kutten and Carolyn Y. Kutten 1989 Grandchildren's Trust (collectively referred to hereinafter as the "Kutten Trusts"). The Kutten family's relationship with the Bank and its predecessors, including her grandfather, noted St. Louisan and philanthropist, Charles H. Yalem, spans a period in excess of forty years.

6.    Plaintiff Mary Ann Arnold is a Nevada citizen who has varying interests pursuant to a Trust established under California law by her grandfather, John T. Crowley, through his Last Will and Testament ("the Crowley Trust"), including her status as a beneficiary thereof, said Trust having been managed and controlled by the Bank, its corporate parent and affiliates.

7.    Plaintiff Elsie Mahler Scharff is a Missouri citizen who has varying interests pursuant to the Nicholas Scharff Trusts and the Pauli R. Scharff Revocable Trust established under Missouri law, including her status as a beneficiary thereof, said Trusts having been managed and controlled by the Bank, its corporate parent and affiliates.

8.     Plaintiff Medlers are Missouri citizens who are beneficiaries of certain testamentary trusts established in Missouri under the Last Will and Testament of Frances B. Lubbe, deceased (the "Lubbe Trusts"), said trusts having been managed and controlled by the Bank, its corporate parent and affiliates.

of Law In Support of Motion to Dismiss, page 10.)

4

9.    Defendant Bank is a federally chartered bank, deemed a citizen of North Carolina, and a wholly owned subsidiary of BAC.

10.    BAC is a financial holding company and the parent of the Bank.  BAC is domiciled in North Carolina and incorporated in Delaware.  At all relevant times, BAC dictated and controlled the business activities of the Bank, including, *inter alia*, the business activities described herein and occurring within this District, and wherever in the United States the Bank, BAC and/or their respective predecessors conducted business.

11.    BAC owns and controls, either directly or through the Bank, various other entities which controlled and directed the activities of the Nations Funds Trust (hereinafter, "NFT" n/k/a Columbia Funds Series Trust) during the relevant time period.

12.    At all relevant times herein, the Bank was Successor Trustee of the Kutten Trusts, the Crowley Trust, the Lubbe Trusts and the Scharff Trusts.  The Bank and the Hon. Mary Ann L. Medler are currently the Co-Trustees of the Lubbe Trusts.  The Bank is also the Trustee or serving in another fiduciary role, with respect to the other Trusts or other fiduciary accounts of which the remaining members of the Class defined below are beneficiaries.  The non-Bank co-Trustees are not necessary parties to this action as the Bank is the party ultimately responsible for any breach of duty. See, *Jennings et. al. v. Pierce,* 1995 U.S. Dist LEXIS 2385 (N.D. Ill); *Ramsey v. Boatmen's First National Bank of Kansas City, N.A*., 914 S.W.2d 384 (Mo. App. W.D. 1996) *In re The Estate of Merrill W. Chrisman,* 746 S.W.2d 131 (Mo. App. E.D. 1988).  The Bank controls and controlled all investment decisions made on behalf of the fiduciary accounts of Plaintiffs and all members of the Class.

## JURISDICTION AND VENUE

13.    This Court has jurisdiction over the subject matter of this action pursuant to the Class Action Fairness Act of 2005 and 28 U.S.C. § 1367.  The value of the relief sought on

5

behalf of Class members exceeds $5,000,000, exclusive of interest and costs. Further, there is diversity of citizenship between Plaintiffs, citizens of Missouri, Nevada and California, and each of the Defendants, who are citizens of other states. In addition, as set forth below, Plaintiff Kutten has sustained damages in excess of $75,000, exclusive of interest and costs and, separately, has accrued recoverable attorneys' fees in excess of $75,000.

14.     The claims of Plaintiff Kutten have a value of not less than $1,150,368, excluding attorneys' fees relating to this action, consisting of attorney fees and fees paid to the Bank relating to the resignation of the Bank as Trustee; losses from investments; excess fees; and, repeated and continuing failures to invest according to the terms of the written instrument, which are set forth more specifically in Counts 13 to 18 hereof.

15.     In addition to the foregoing claims, Plaintiffs Kutten, Scharff and the Medlers assert claims under and pursuant to Missouri law, Chapter 456 (Missouri Uniform Trust Code) RS Mo. which also provide for, *inter alia,* payment of their counsel fees. (Section 456.10-1004 RS Mo. 2005). To date, such Plaintiffs' counsel fees exceed $75,000, exclusive of interest and costs.

16.     The Defendants' breach of their fiduciary and contractual duties to Plaintiffs occurred within and from this District. The breaches alleged herein resulted from the Bank's strategy and business plan to become a nationwide financial institution as set forth herein. This Court has personal jurisdiction over the Defendants given their systematic, repeated and continuing contacts with and within this District with Plaintiffs and members of the Class as described herein.

17.     Although the Bank and BAC now have their principal places of business in Charlotte, North Carolina, they conduct substantial business within this District in many locations through the Bank's "Private Bank" and numerous retail branches.

6

18.     In light of the foregoing substantial contacts with this District, each Defendant can reasonably be expected to be subject to the jurisdiction of this Court, particularly since Plaintiffs' claims as asserted herein specifically arise from and are directly related to the Defendants' contacts with this District as described above.

19.     Venue is proper under 28 U.S.C. §1391(a) in this District because many of the acts and practices complained of herein had their origin in and/or occurred in substantial part in this District. Further, many significant witnesses to the wrongdoing alleged herein are found in and/or did business within this District and will only be available for trial purposes in this District. Plaintiffs Scharff and the Medlers reside in this District, as do many members of the Class. The trusts established for the benefit of Plaintiff Kutten and her daughters originated in and were "administered" in substantial part from within this District. In addition, a substantial amount of documents relevant to the claims asserted herein including, in particular, documents relating to the sale of Nations Funds to Plaintiffs and numerous other beneficiaries of the Bank's fiduciary accounts are located in this District.

## ALLEGATIONS COMMON TO ALL COUNTS

### A.     *The Bank's' Drastic Curtailment of Fiduciary Services*

20.     Over the course of more than 15 years, the Bank and BAC made numerous acquisitions of other financial institutions throughout the United States, making the Bank one of the largest financial service providers in the world.

21.     The acquisitions were part of the Bank's business plan pursuant to which many of the investment-related and other personal services to beneficiaries of fiduciary accounts as described herein, would be eliminated, thereby decreasing the Bank's costs of handling said accounts, while increasing the profits generated therefrom. As it recently proclaimed, the Bank "has strategically redeployed capital [shifting the focus of its business from loans to fee-based

7

products and services] to build higher-return, higher-growth, fee-based client relationships" such as those which are the subject of this litigation.

22.     In executing its  decision to decrease its operating expenses, the Bank required the centralization and streamlining of fiduciary services offered by the Bank, including the increased use of its proprietary funds, the Nations Funds, as a "cookie cutter" investment vehicle for investment of the Bank's fiduciary assets and the use of so-called regional "Call Centers" staffed by relatively low-level employees rather than experienced trust officers.

23.     Over the years, the Bank and its corporate predecessors swallowed-whole the St. Louis-based Boatmen's Trust Company, and numerous other Acquired Banks, which had fiduciary responsibilities to Plaintiffs and members of the Class.

24.     After the Acquired Banks were merged into the Bank, the interests of Plaintiffs and members of the Class were not represented by caring, knowledgeable trust officers, but were frequently "serviced" by "Call Centers" in Dallas and Atlanta, as well as elsewhere.  These "Call Centers" are manned by Bank personnel with little or no investment expertise, who employ impersonal computerized asset allocation programs designed to maximize the use of the Bank's proprietary mutual funds. Except for the highest net worth fiduciary accounts, the "customized recommendations" and "wealth management expertise" promised by the Bank in its advertisements are fictions and have been fictions since the consolidation of the various Acquired Banks began taking place.

25.     Joseph Kutten and Carolyn Yalem Kutten (parents of Plaintiff Kutten), in entrusting their assets to Boatmen's Trust Company in St. Louis, a local bank, did so based upon personal relationships with officers of Boatmen's, and its predecessors in interest, St. Louis Union Trust Company and Centerre Bank, built over many years. The fiduciary relationship was established because, *inter alia*, Boatmen's Trust Company and its predecessor banks, held itself

out to Joseph and Carolyn, and to other prospective customers of fiduciary services, as institutionally and personally suited not only to the stewardship of their assets over multiple generations, but looking after their descendants, such as the Plaintiffs in this litigation. Similarly, the grandfather of Plaintiff Arnold, John T. Crowley, through his Last Will and Testament, entrusted his bequeathed assets to a local bank in California. The successor Trustee was a corporate predecessor of the Bank, since acquired by a series of banks, now part of Bank of America.  Plaintiff Scharff's father, Nicholas Scharff, and mother, Pauli Scharff, entrusted their assets to Boatmen's Trust Company, as did the grandmother of the Medlers.

26.     At or prior to the time that Boatmen's Trust Company was acquired by the Bank's predecessor, Nations Bank, it was known by the parties to the acquisition negotiations that the successor entity (i.e. Nations Bank) would materially adversely affect the administration of the fiduciary accounts of  plaintiffs Kutten, Scharff and Medler and all other Boatmen's fiduciary accounts. Similarly, this was the plan of the Defendants with respect to each of the Acquired Banks and their fiduciary functions.

27.     To the best of the knowledge, information and belief of Plaintiffs Kutten, Scharff, and the Medlers, neither Boatmen's nor Nations Bank provided to them or other interested parties in connection with other fiduciary accounts venued in Missouri, appropriate written notice as provided in §362.331 R.S.Mo. of Boatmen's transfer of fiduciary capacities to Nations Bank.  In connection with the transfer of fiduciary responsibilities, and in violation of its fiduciary duty, the Bank did not disclose all material facts, including that the transfer would have a material adverse affect on such interested parties (including Plaintiffs Kutten, Scharff and Medlers and members of the Missouri Sub-Class) that they had a right to object to the transfer and, *inter alia*, obtain a replacement fiduciary.

28.     Plaintiffs believe and therefore allege that the Bank similarly failed to provide

9

such notice in each of the other instances where the fiduciary responsibilities of an Acquired Bank were taken over by the Bank or one of its predecessors. As such, all similarly affected beneficiaries were wrongly denied notice and the right to object to a transfer of fiduciary responsibilities to the Bank.

**B.    Nations Funds**

29.    The Nations/Columbia Funds consist of a "family" of more than 70 mutual fund portfolios, which are proprietary funds of the Bank. The Nations Funds' portfolios cover a wide variety of investment disciplines, strategies and types of asset categories including, *inter alia*, the Nations Municipal Income Funds, the Corporate Bond Portfolio; the Nations Small Company Fund; Nations Large Cap Index Funds and Nations Cash Reserves.

30.    The Nations Funds are operated by a controlled entity established by the Bank, Columbia Funds Series Trust, formerly known as Nations Funds Trust ("NFT") and its Board of Trustees. The Bank, as the largest single shareholder of record of the various Nations Funds, votes for and controls all nominees to the NFT Board.[2]

31.    At all relevant times, the Bank's fiduciary accounts were held captive by the Bank and it was either impossible or relatively difficult to replace it as corporate fiduciary. In virtually all instances where beneficiaries sought the replacement of the Bank as corporate fiduciary, the Bank made such replacement difficult and expensive. While in near absolute control of these accounts, and as an integral part of its plan to reduce the expenses of fiduciary operations and generate additional profits from the fiduciary accounts, the Bank proceeded with

---

[2]  That the Bank totally controlled NFT and its Board was recently evidenced by its firing of William Carmichael, Chairman of NFT's Board and replacement of most other Board members in the wake of a scandal involving the misuse of the Nations Funds by certain of the Bank's favored business customers, the primary victims thereof being the members of the Class herein. As part of a $675 million settlement of claims by the SEC and the New York Attorney General, the Bank, its subsidiaries and senior officers made a mockery of the independence of the NFT Board when they unilaterally agreed to make certain changes in the governance of NFT and the operation of the Nations Funds without consultation with NFT's Board.

the Conversions. This allowed the Bank to funnel the assets in its captive fiduciary accounts into shares of the Nations Funds.  All of the Conversions were carried out on a wholesale basis without giving consideration as to whether the Conversions were prudent and in the beneficiaries' best interests.  Pursuant to the Conversions, the Bank purchased Nations Funds shares in exchange for assets that had been individually managed by the Bank and/or held in Common Trust Funds (fee and expense free in-house investment pools).  Such purchases by the Bank "bulked up" some pre-existing funds and "jump-started" others to cause the Nations Funds to have substantial asset bases, an important selling point in marketing the mutual fund shares to the public. The Nations Funds selected for investment of fiduciary assets by the Bank and Bank Subsidiaries pursuant to the Conversions were intended generally to "mirror" the categories of assets held by the Bank's fiduciary accounts pre-Conversion, all or most of which were liquidated immediately prior to the Conversions, either as part of so-called "Common Trust Funds" or in individually-managed accounts.

### C.    Conversions

32.    Historically, the Bank and its predecessors invested the assets comprising the Kutten Trusts, the Crowley Trust, the Scharff Trusts, the Lubbe Trusts, and those of members of the Class, primarily through individually managed portfolios and/or through so-called "Common Trust Funds" or "Collective Investment Funds." The expenses of the Bank for such investment vehicles and related administrative services were paid by the Bank from the fees it collected for serving as corporate fiduciary.

33.    As a result of the use of its proprietary funds, not only did the Bank abdicate many of its traditional fiduciary responsibilities and services to beneficiaries of its fiduciary accounts, the Bank's use of its proprietary funds was intended to generate higher fees to the Bank and its subsidiaries.  The fees realized from the fiduciary accounts, in the form of fees and

11

expenses paid to the Bank by the Nations Funds, resulted in the Bank's ability to collect more than just  the trustee or similar fees historically paid to the Bank.

34.    Throughout the Class Period defined below, the Defendants developed and implemented the general corporate investment policy pursuant to which most, or all, of the assets in accounts such as the Kutten Trusts, the Crowley Trust and the Lubbe Trusts and other fiduciary accounts similarly situated, would be uniformly converted into shares of the Nations Funds (the "Conversion"), or only invested in such mutual funds at the outset.

35.    As part of this corporate policy, investment in non-proprietary funds would be prohibited to the greatest extent possible. Indeed, in a letter from the Bank dated October 1, 1999 to the Hon. Mary Ann Medler, the mother of the Medlers, and a beneficiary of the Lubbe Trusts, the Bank reiterated its policy to only invest in its proprietary funds:

> The [Investment Review] Committee [of the Bank] reiterated that **the use of outside mutual funds in fiduciary accounts is in violation of our corporate policy.** [Emphasis added].

> See Exhibit "A" attached hereto and incorporated herein by reference.

36.    The Federal Reserve System in Supervisory Letter SR 97-3 (SPE) (February 26, 1997) warned banking organizations that:

> "conversion could result in conflicts between the best interests of the organization and the best interests of its fiduciary customers.  The banking organization must also determine that the mutual fund shares are suitable for accounts which previously held common trust fund units. Another possible conflict of interest could arise from the use of *proprietary* mutual funds when there are unaffiliated mutual funds or alternate investment opportunities available that may be equally appropriate for the participant's portfolio. Again, the appearance that the organization put its own interests above those of its fiduciary customers may cause concern particularly if investments are made in a newly established proprietary fund with no history or track record. It is important that the organization thoroughly document its decision to transfer CTFs into proprietary mutual funds."

See Exhibit "B" attached hereto and incorporated herein by reference.

As described more fully in this Complaint, the Bank routinely ignored its conflicts of interest and put its own interests before those of the Plaintiffs and the other members of the Class. Its flouting of the Federal Reserve's clear guidelines as set forth above breached the fiduciary duties the Bank owed to Plaintiffs and the members of the Class.

37.     In part to implement safeguards in fulfillment of  Federal Reserve concerns, the FDIC and the Office of Comptroller of Currency ("OCC"), federal regulators for national banks, have created Trust Examination Manuals to serve as guides to banks, including the Bank, in their asset management activities, including directing fiduciary account assets into proprietary mutual funds. The federal government provides an outline on investing to avoid a breach of fiduciary duty. The criteria for proprietary mutual fund investing are contained in Section 3 - Asset Management - Part I.  These include due diligence standards which include establishing written investment policies, adoption of procedures for periodic review and comparison with other available funds and establishment of an arm's length process for evaluating the prudence of investing fiduciary accounts in proprietary and bank advised mutual funds rather than in non-proprietary alternative investments. Additionally, the manual suggests on-going comparisons of proprietary funds to peer group performance and fees and warns of "hidden fees" and expense ratios which do not include total costs to the investor. The Bank has uniformly ignored such standards and guidelines and, by doing so, breached its fiduciary duties to Plaintiffs and the members of the Class.  See Exhibit "C" attached hereto and incorporated herein by reference.

38.     Section 8 of the Trust Examination Manual - Compliance/Conflicts of Interest, Self-Dealing and Contingent Liabilities sets forth prophylactic measures to be undertaken by banks to avoid fiduciary transactions which may be set aside by the beneficiary, including documenting management's actions with respect to transactions involving real or potential conflicts of interests, including the prudence of such transactions and that that such

documentation be readily available.  This section also alerts banks to issues relating to their receipt of traditional trustee's fees and the additional fees received by the Bank from investments in its proprietary funds and what a bank must do to guard against breach of duty. Notwithstanding such guidance, the Bank did not and does not document the individual investment decisions it made and makes for its fiduciary accounts, which decisions are made on a wholesale and/or computerized model basis without regard for the best interests of the beneficiaries thereof. Nor is there documentation which supports the Bank's decisions to force its fiduciary accounts to be subject to excessive fees and expenses which would not have been incurred if the Bank had continued to invest fiduciary assets in the pre-existing Common Trust Funds.  See Exhibit "D" attached hereto and incorporated herein by reference.

39.     Excerpts from Appendix C - Fiduciary Law, attached to the Trust Examination Manual, list the states that have removed the *per se* ban on the use of proprietary mutual funds (none of which have ever excused a Bank from further analysis as to whether the use of such funds violated a fiduciary duty) and Federal Reserve Supervisory Letter SR 99-7 (SPE) (March 26, 1999) entitled "Supervisory Guidance Regarding the Investment of Fiduciary Assets in Mutual Funds and Potential Conflicts of Interest" which discusses the fiduciary pitfalls in the financial incentives for banks to place trust assts into particular mutual funds. As described herein, the Bank routinely ignored its conflicts of interest in making investment decisions for its fiduciary accounts, thereby ignoring the foregoing supervisory guidance provided by federal banking regulators.  See Exhibit "E" attached hereto and incorporated herein by reference.

40.     Additionally, the OCC has published handbooks on conflicts of interest and personal fiduciary services discussing the appropriate methods to deal with the use of proprietary mutual funds in fiduciary accounts. Appendix E to the Conflict of Interest handbook discusses what banks must do to ensure compliance with fiduciary duties when using mutual

funds, including annually reviewing accounts on an individual basis to insure that the proprietary mutual fund continues to be an appropriate investment for the account. The Bank uniformly failed to make such annual, individualized, account-by-account reviews. Such failures were and are breaches of the fiduciary duties owed to Plaintiffs and members of the Class. See Exhibit "F" attached hereto and incorporated herein by reference.

41. In contravention of the guidelines offered by the federal agencies which supervise banks' fiduciary activities, nothing was considered by the Bank on an account by account basis to establish the propriety of Nation Funds investments, particularly as compared with Common Trust Funds or alternate, non-proprietary mutual funds available for purchase.  At best, the Bank, in some cases, conducted cursory reviews of whether the instrument establishing the fiduciary account prohibited mutual fund investments and/or whether state law prohibited the use of  proprietary mutual funds in the account. The Bank converted Common Trust Funds and other assets into the Nations Funds for its own benefit to jump-start its asset management business and build up its mutual fund business without regard to federal regulations, the Federal Reserve's Supervisory letter, the OCC,  or the FDIC guidelines.

42. The Defendants implemented their business plan to force more and more fiduciary assets into the Bank's Nations Funds beginning sometime prior to the commencement of the Class Period, through its "Private Bank."  The Private Bank sent out standardized form letters informing some co-trustees, beneficiaries of fiduciary accounts, and others, of the Bank's planned liquidation of its "Common Trust Funds" and touting the so-called "benefits" of the Conversions and certain mutual funds "reorganizations".  While all of these Conversions and reorganizations were carried out on a rolling basis and assets were held in individual accounts in various states, the Conversions did not differ from each other in any material way and all were in furtherance of the Defendants' plan and scheme.

15

43.    The standardized form letter, signed by David W. Fisher, President, also coerced the recipients of the letters to authorize the Conversion of the Trusts' assets into shares in the Nations Funds, in further disregard of the Bank's fiduciary duties, stating:

> Any common trust fund units for which we have not received an authorization [by May 1, 2000] may be liquidated and the proceeds placed in a money market vehicle pending discussion about reinvestment. This liquidation could have adverse tax consequences depending upon the cost basis of the common trust fund units.

44.    Mr. Fischer touted the benefits of the Conversions:

> Using Nations Funds, we can provide trust and fiduciary accounts with an attractive mix of investments to pursue the accounts' investment goals. Nations Funds also offer the benefits of:
>
> Daily valuation and liquidity
> Newspaper performance listings
> Broader potential diversification
> Flexibility when making trust distributions

In reality, there was little, if any, benefit that would flow to beneficiaries of the Bank's fiduciary accounts arising from the Conversions.

45.    Indeed, all such so-called "benefits," could have been accomplished by means of the Bank's direct investment of fiduciary assets internally or through its fee and expense free "Common Trust Funds." Curiously, on or about August 16, 1999, the Bank announced that "Common Trust Funds will be valued at month-end instead of twice each month," despite the fact that computer software programs existed that could generate such valuations on a daily basis. Throughout the Class Period, the Bank could have, but for its own selfish reasons, chose not to value fiduciary assets on a daily basis, which it was capable of doing.

46.    As a result of the Conversions, the fees and expenses paid by Plaintiffs' and other fiduciary accounts increased dramatically. Some fees and expenses were disclosed in or

with Mr. Fisher's form letters, which also advised that the fiduciary accounts would be given a credit against certain of such charges. As testified to by Darcy Johnson, a former officer and Portfolio Manager of the Bank, she could not determine the amount of such credits and, despite her position within the Bank, could not readily determine how, in fact the credits were calculated and how much they would be for any particular account. In reality, the credits were a small portion of the substantially increased fees and expenses borne by fiduciary account beneficiaries. An example of the Bank's description of the credits to members of the Class is set forth below in a communication (Form 3.05D 7/1999) entitled "Disclosure of Investment in Nations Funds":

> The fee paid directly by the [Fiduciary] Account to the Bank will be reduced (but not below zero) by the Account's pro rata share of the investment advisory fees paid by the Funds to the Service Providers; provided however, that the amount of the reduction will be based on Bank of America Corporation's percentage ownership of the Service Provider. From time to time, the Bank may elect to reduce the Account's fees in recognition of amounts paid by Nations Funds for other services (such as administrative services), but it is not obligated to do so, and the amount of any such fee reduction may vary. The Account will not be charged a sales "load" for buying or redeeming Fund shares described in the accompanying prospectuses.

Such form went on to state:

> I acknowledge receipt of the current prospectuses for the Funds and a Nations Funds Fee Disclosure Statement. As co-fiduciary for this account, I understand that the Service Providers will be paid investment advisory and other fees by the Funds. **I approve the method for reducing the investment management fees paid to the Bank by the Account**. I understand and agree that the Bank may choose not to reduce the Account's fee on the account of the compensation paid by the Funds for other services, but the Bank is electing to do so at this time.

47.    Members of the Class had no practical way of knowing or understanding how their individual accounts would be affected either by the Conversions or the investments of the

assets therein in Nations Funds or that the Bank was to receive substantial benefits therefrom. Even as to those beneficiaries of fiduciary accounts who recognized there was the possibility of substantially increased fees and expenses, relatively few raised the issue given their relationships with and reliance on the Bank. Certainly, none of them could have wanted to have his or her fiduciary account charged excessively for a marginal "benefit." Indeed, Plaintiff Kutten clearly indicated she did not authorize the Bank to charge a fiduciary fee *and* fees and expenses associated with mutual fund ownership and wrote "NO DOUBLE CHARGES" on one of the multiple forms sent to her.

48.     The Bank breached its duty to beneficiaries of its fiduciary accounts by, *inter alia,* causing these increased expenses to be incurred when they were neither necessary nor integral to prudent investment decisions. By causing its fiduciary accounts to absorb these unnecessary and imprudent fees and expenses in the wake of the Conversions or otherwise, the Bank breached its fiduciary duties to Plaintiffs and the other members of the Class. In further violation of its fiduciary duty to the beneficiaries of the affected accounts, the Bank knowingly and for its own benefit permitted the investment advisory and administrative contracts between and among NFT, the NFT Trustees and the Bank Subsidiaries to be entered into on a no-bid basis[3] Integral to the Conversions was the disposition of assets either held in the Common Trust Funds or otherwise. Because it was determined to proceed with the Conversions for its own benefit, the Bank permitted possible negative tax effects as a result of the wholesale disposition of the assets in the affected fiduciary accounts.

49.     Upon information and belief, as a result of  agreements among the Defendants and the senior officers of the Bank, no credit was applied to the affected fiduciary accounts for many

---

[3] Neither NFT nor the NFT Trustees, sought to obtain the lowest fees from the Bank Subsidiaries actually operating the Nations Funds. Indeed, as stated by New York Attorney General Eliot Spitzer: "Fund directors do not – and

of the substantial operating expenses of the Nations Funds which were passed along to the Bank's fiduciary accounts.  This materially reduced the net investment returns to these accounts, such as those of the Kutten, Crowley, Lubbe and Scharff Trusts.  Further, in order to increase the profits of the Defendants and the Bank Subsidiaries, the Bank and/or such subsidiaries could re-allocate certain expenses incurred by the Nations Funds so that the fiduciary accounts would not be entitled to "credits" and thus directly increase costs for the affected fiduciary accounts. Indeed, upon information and belief, most of such credits, to the extent given, have now been substantially reduced on a nationwide basis.

50.     As indicated above, even after the Bank applied  so-called credits against its fees to some fiduciary accounts for some portion of the advisory and administrative fees charged to the Nations Funds, in practical terms, it was (and is) impossible for co-fiduciaries, beneficiaries and others (including the Bank's own "trust officers" and "portfolio managers") to understand and know the true cost of ownership of Nations Funds to the fiduciary accounts.  Indeed, plaintiffs Kutten, Arnold, the Medlers and Scharff, as well as other beneficiaries, have sought to obtain such information or other similar information relating to the expenses of investing the assets of fiduciary accounts in the Nations Funds from the Bank and have never received "straight" or any answers to their questions with respect thereto and have received misleading or deceptive information as to the impact of such investments upon them and their fiduciary accounts.

51.     In violation of its fiduciary duty, the Bank encouraged the beneficiaries to be passive in the face of its machinations. By way of example, Mr. Fisher's letter of August 31, 2000 sent to beneficiaries with Nations Funds prospectuses was purportedly "for information

---

cannot – negotiate hard on the fees."

only" and recipients, including Plaintiffs, were told: "**you do not need to take any action.**" [Emphasis in original].

52.     The Investment Policy Committee ("IPC") of the Bank, the committee charged with evaluating investments for fiduciary accounts, was involved in the decision to approve the Conversions of Common Trust Funds into the Nations Funds. The  members thereof knew in advance of the Conversions that the fiduciary accounts affected by the Conversions would be forced to incur materially higher expenses, post-Conversion, than they had previously. Neither the IPC nor the Bank officers made any effort to change the Bank's plans with respect to the Conversions or the manner in which fiduciary accounts were induced to pay excessive expenses generally, which expenses would increase, post-Conversion, on average at least 20-30 basis points (approx. 1/5 to 1/3 of 1%) and, in some cases, substantially more, in addition to some capital gains tax liability. Instead of avoiding such excessive and unnecessary expenses, the Bank provided information with respect to the expense ratios for the Nations Funds in the various Nations Funds prospectuses as well as the  information regarding fee credits quoted above in ¶46.  The beneficiaries were left on their own to figure out, if they could, whether  their accounts would pay more for the services related to the Nations Funds investments than they had paid pre-Conversion for the pre-existing investments.

53.     Upon information and belief, each affected fiduciary account sustained a minimum increase in fees and expenses of 20-30 basis points (.20-.30%).  Given the growth of the Nations Funds mutual funds in the hundreds of billions of dollars, most of which comes from the Bank's fiduciary accounts, and the number of years the Bank has extracted these fees and expenses from the fiduciary accounts, compensatory Class-wide damages are quite substantial and are well in excess of $5 million, exclusive of interest and costs.

20

54.     In violation of the Bank's fiduciary duty, the Bank specifically excluded as permissible mutual fund investments non-proprietary mutual funds such as the Vanguard and Fidelity mutual funds and others specifically requested by Judge Medler as well as Plaintiffs Kutten and Arnold from their considerations.  In order to maximize its earnings and those of its corporate affiliates, the Bank failed to consider leaving the assets of fiduciary accounts invested as they were, pre-Conversion, and/or giving beneficiaries of such accounts a choice as to the various alternatives available.  Indeed, only after more than five years of complaints by the Medlers, did the Bank agree to replace the Nations Funds with the highly ranked, lower-expense Vanguard Funds.   Similarly, the Bank failed to consider making changes in the Bank's "Common Trust Funds" so as to provide the purported "benefits" that the Bank claimed would be forthcoming as a result of the Conversions, such as providing "daily pricing."  The requests of Plaintiffs Kutten, the Medlers and Arnold and other beneficiaries of the Bank's fiduciary accounts for changes in investments were repeatedly rebuffed, even when the changes were requested by co-fiduciaries.

55.     The Nations Funds investments in Plaintiffs' and others' fiduciary accounts resulted in the Bank and BAC receiving millions of dollars in purported money management, investment, advisory, administrative, direct brokerage and other fees. At the same time, the Bank received trustee or similar fees for serving as a corporate fiduciary.  Additionally, the Bank received the benefits of substantially reduced operating expenses for the Bank's fiduciary operations and the bulking up the Nations Funds.

56.     In addition to the circumstances  referred to above, the Bank violated its fiduciary duty by *inter alia*, making investments for fiduciary accounts in the "Columbia Cash Reserves" and the Nations Funds equivalent fund, the returns of which were lower than the Bank paid to

21

depositors who walked into its retail branches "off the street" with no-pre-existing fiduciary relationship.

57.     Upon information and belief, Plaintiffs and all members of the Class suffered damages from the investment and fiduciary service-related practices of the Bank as described above in an amount which cannot presently be determined but which is capable of calculation and they are entitled to compensation therefore as well as restitution of the Defendants' unjust enrichment.

58.     Although many states, if not all, permit the investment of fiduciary funds in proprietary mutual funds, such statutory authorization is not a blanket waiver of a corporate fiduciary's over-riding duty of loyalty and prudence to its beneficiaries and its duty to put the interests of its beneficiaries paramount.  Moreover, trust instruments or other documents which establish fiduciary relationships which may not prohibit the use of mutual fund investments, proprietary or not, do not authorize a fiduciary to ignore its duties and put its interests above those of its beneficiaries, as the Bank has done with respect to its investments of fiduciary assets in the Nations Funds.

## THE COMPTROLLER OF THE CURRENCY

59.     On or about December 16, 2004, the Bank, as a result of certain of the wrongdoing described herein and otherwise, entered into a written agreement with the Office of the Comptroller of the Currency (No. AA-EC-04-35) signed by the Bank's two most senior officers, pursuant to which it agreed to cease and desist such wrongful conduct and to effectuate corrective actions to address such conduct. Notwithstanding its agreement with the Comptroller, the Bank continues to flagrantly breach its obligations thereunder (as well as to the beneficiaries in its care), including its continued wholesale purchasing of shares of Nations (now Columbia) Funds shares for its fiduciary accounts. Unless further remedial steps are taken, the Bank will

22

continue to not only flout its agreement with the Comptroller, but to breach its duties to the beneficiaries of its fiduciary accounts as described herein and otherwise.

## CLASS ACTION ALLEGATIONS

60.     Plaintiffs restate and reallege each and every allegation set forth in the paragraphs above as if stated herein.

61.     Plaintiffs Mary Ann Arnold, the Medlers. and Elsie Mahler Scharff ("Class Plaintiffs") bring this action on their own behalf respectively, and pursuant to Rule 23(b)(3) of the Federal Rules of Civil Procedure as a class action on behalf of the following Class:

> all beneficiaries, owners, beneficial owners, or principals of trusts, accounts or other entities for which the Bank or any of its parents, subsidiaries, affiliates, predecessors, successors or assigns acted as a trustee, fiduciary or agent and that were directly or indirectly invested in Nations Funds mutual funds at any time from September 8, 1998 to the present (the "Class").

This Class has already been stipulated to by each of the Defendants, their affiliates and others in connection with the settlement of certain related claims against them in *In re Mutual Funds Investment Litigation*, MDL-1586, where it was designated as a "Fiduciary Sub-Class".  None of the claims set forth in this Complaint are asserted by members of the Class who have executed valid and legally binding releases or with respect to those claims barred by the expiration of applicable statutes of limitations.

62.     The California Sub-Class consists of those members of the Class whose fiduciary accounts originated in and/or involved beneficiaries residing in California (such as Plaintiff Arnold). The Missouri Sub-Class consists of those members of the Class whose accounts originated in and/or involved beneficiaries residing in Missouri (such as Plaintiffs Scharff and the Medlers, as well as Plaintiff Kutten in her individual capacity). The Conversions Sub-Class consists of all those members of the Class who, within the Class Period, have had their fiduciary

23

accounts at the Bank subject to one or more Conversions. Such definitions are subject to modification upon completion of discovery with respect thereto.

63. *Numerosity*: The members of the Class and Conversions Sub-Class are so numerous that joinder of all members is impracticable. The exact number of members of the Class and the Conversions Sub-Class as above described is not known by Plaintiffs, but is within the sole knowledge of the Bank. Upon information and belief, there were and are at least 180,000 fiduciary accounts (comprised of trusts, estates, retirement accounts and other types of fiduciary accounts), controlled by the Bank with, collectively, more than 500,000 beneficiaries thereof, approximately 10% of which are members of the California Sub-Class and 10% of which are members of the Missouri Sub-Class. These approximations are subject to discovery and the exact numbers of Class and Sub-Class members is readily ascertainable from the Bank's records.  Upon information and belief, the members of the Class and Sub-Classes are located in most or all fifty states, and in numerous foreign countries. Similarly, members of the California and Missouri Sub-Classes are located throughout Missouri, California and in many other states. Similarly, it is estimated that there are more than 10,000 members of the Conversions Sub-Class.

64. *Commonality*:  Common questions of law and fact exist as to all Class members and predominate over any questions solely affecting individual members of the Class or Sub-Classes. This case is not about the administration of individual fiduciary accounts; rather, the implementation of an across-the-board business decision of Defendants, on a nationwide basis, to invest the Bank's  fiduciary funds in the Nations and Columbia Funds in breach of its fiduciary duties, and contrary to the rules, regulations and standards of fiduciary conduct promulgated by federal banking regulators. The common questions of fact and law, include but are not limited to:

(a)     Whether the Bank breached its fiduciary duty to Plaintiffs as a consequence of Defendants' business decision to invest assets of the Bank's fiduciary accounts in the Nations and Columbia Funds without regard to the best interests of the Class members (which the Bank had a duty to put before its own) and by Defendants' desire to generate management and investment advisory fees for themselves, their affiliates and subsidiaries, to lower the Bank's expenses of managing fiduciary assets and to generate other benefits for themselves by *inter alia*, "bulking-up" the assets invested in the Nations and Columbia Funds;

(b)     Whether the Bank breached fiduciary duties by failing to conduct its fiduciary operations in conformity with the requirements of the National Banking Act and other applicable law;

(c)     Whether the Bank breached its fiduciary duty by making fiduciary account investment decisions based upon the interests of the Defendants' and their affiliates, rather than the interests of the beneficiaries of such accounts;

(d)     Whether the Bank had a uniform policy of only investing fiduciary accounts in its proprietary funds, rather than other competitive funds in the market place;

(e)     Whether the Bank trained and employed its Portfolio Managers to routinely and systematically make investments for fiduciary accounts, either wholly or predominantly using the Nations Funds, without disclosing various conflicts of interest; and

(f)     Whether the Bank breached its contractual obligations to the Class Plaintiffs and members of the Class by failing to provide individualized investment and other fiduciary services to which such persons were entitled pursuant to the underlying

written instruments which established the fiduciary relationships which are the subject of this litigation.

65.     *Typicality*: The claims of the Class Plaintiffs are typical of the claims of the Class and respective Sub-Classes because each is a victim of the Bank's breach of fiduciary and contractual duty and from whose account the Defendants  were unjustly enriched.  The implementation by the Bank of its strategies to enhance its own income at the expense of the beneficiaries of fiduciary accounts applies to each Class Plaintiff in a manner identical to that of the remaining members of the Class and Sub-Classes. As noted above, a central allegation in this case involves*, inter alia*, the Bank's  breach of fiduciary duty by its acting in its own interests and contrary to the interests of Class Plaintiffs and members of the Class in the face of over-arching conflicts of interest between and among the Class Plaintiffs, members of the Class, and the Bank and BAC,  all of which present a mixed question of law and fact.

66.     *Adequacy*:  The Class Plaintiffs will adequately and vigorously defend the interests of the Class and respective Sub-Classes and prosecute the claims alleged herein on behalf of each of them.  Plaintiffs Scharff, the Medlers and Arnold are able to and will fairly and adequately protect the interests of the  Class and  Sub-Classes, respectively.

67.     The attorneys for the Class Plaintiffs are experienced and capable in complex litigation and will actively conduct and be responsible for the prosecution of this litigation and the expenses thereof.

68.     The relief sought is common to the entire Class including, *inter alia:*

(a)     a  judgment that the Bank violated its fiduciary duty as trustee (or other similar fiduciary role), the Consent Decree with the Comptroller of the Currency with respect to the affected fiduciary accounts and otherwise ignored and/or flouted

the rules, regulations and guidelines of federal banking regulators with respect
thereto;

(b)     payment by the Defendants of compensatory damages caused by such breaches
of fiduciary and contractual duty, as well as  punitive damages, as appropriate;

(c)     payment by the Defendants of the costs and expenses of this action, including
Plaintiffs' attorneys' fees;

(d)     an injunction preventing the Bank from opposing petitions by beneficiaries of the
affected fiduciary accounts seeking to replace the Bank as corporate fiduciary;
and

(e)     an injunction which establishes appropriate procedures and safeguards within the
Bank to ensure that the interests of beneficiaries of the Bank's fiduciary accounts
are fully protected from wrongdoing such as described herein.

## COUNT I

## COUNT I  - BREACH OF FIDUCIARY DUTY

69.    Plaintiffs repeat and reallege each and every allegation contained above as if
fully set forth herein.

70.    Upon information and belief, the Bank's decision to invest the assets of the
fiduciary accounts in its care in the Nations Funds was motivated not by the interests of
Plaintiffs and the members of the Class but by Defendants' desire to generate investment
advisory and other fees for the Bank and BAC and to reduce the Bank's operating expenses and
to generate additional revenues by other means derived from the Nations Funds.

71.    Upon information and belief, the Bank failed to consider the Nations Funds' high
expense ratios or alternative lower cost families of non-proprietary mutual funds (or deliberately
did not do so) or to maintain the *status quo* with pre-existing investments (through Common

Trust Funds or otherwise) when it invested the assets of fiduciary accounts in shares of the Nations Funds, thus putting its own interests before those of the beneficiaries of fiduciary accounts.

72.     The Bank failed to consider the best interests of the beneficiaries of the affected accounts when it invested their fiduciary assets in the Nations Funds and breached its duty of loyalty to them by putting the interests of itself and its affiliates before the interests of Plaintiffs and the members of the Class.

73.     As a result of, *inter alia*, the Bank's improper wholesale transfer of fiduciary assets held by fiduciary accounts into shares of the Nations Funds, the beneficiaries of the Trusts or other similarly situated accounts for which the Bank was a fiduciary have been damaged in an amount to be determined, but believed to be substantially in excess of $5 million.

## COUNT II - PLAINTIFFS' CLAIM FOR PUNITIVE DAMAGES

74.     The conduct of the Defendants was outrageous because of the Defendants' self-dealing in the face of obvious conflicts of interest. The Bank acted with malice and evil motive as well as reckless indifference to the rights of the Plaintiffs and all others similarly situated in implementing the Conversions and otherwise looting of fiduciary accounts in the Bank's care. The Bank:

(a)     Deliberately and knowingly breached its fiduciary duty by profiting unjustly from the fiduciary relationships and causing its fiduciary accounts to be subjected to the increased expenses they would incur as a result of the Conversions and otherwise, which expenses inured to the benefit of the Bank in flagrant violation of the Bank's duty of loyalty;

(b)     Deliberately and knowingly breached its fiduciary duty by changing the investment vehicles historically used by the Bank for investment of fiduciary assets to the Nations Funds, specifically to  "bulk up" the Nations Funds and

28

otherwise generate revenues and profits for the Defendants at the expense of the beneficiaries of the Bank's fiduciary accounts, all of which conduct was and is in flagrant violation of the Bank's duties of loyalty and prudence;

(d)     Deliberately and knowingly breached its fiduciary duty by causing the beneficiaries of fiduciary accounts to incur excessive expenses and  capital gains taxes in connection with the Conversions and/or the reorganizations of mutual funds within the Nations Funds in flagrant violation of the Bank's duties of loyalty and prudence; and

(e)     Deliberately and knowingly breached its fiduciary duty by taking advantage of conflicts of interest and engaging in self dealing transactions and failing to consider whether such conduct was in the sole interests of the beneficiaries of the Bank's fiduciary accounts to whom the Bank owed a fiduciary duty, including the duties of loyalty and prudence and instead, put their interest in generating revenues and profits for the Bank and BAC ahead of those to whom the Bank owed  fiduciary duties.

75.     As a result of the foregoing egregious conduct, Plaintiffs request that the Court award them substantial punitive damages to punish Defendants and deter them from continuing to act as described herein, which conduct is being carried out to the present.

## COUNT III  -  AIDING AND ABETTING

76.     Plaintiffs Arnold and Scharff, on behalf of themselves and others similarly situated, and Plaintiff Kutten, on behalf of herself and her daughters, repeat and reallege each and every allegation contained above as if fully set forth herein.

77.     Upon information and belief, Defendants and their senior officers, as part of a corporate business decision, caused the Bank to purchase for the fiduciary accounts of Plaintiffs

and the members of the Class shares of the Nations Funds as part of the Conversions and otherwise in order, *inter alia*, to generate investment advisory fees and other fees for its various subsidiaries and affiliates and to "bulk-up" the Nations Funds without regard to whether such investments were prudent and in the best interests of Plaintiffs and the other beneficiaries of fiduciary accounts.

78.    The foregoing Conversions of the assets of fiduciary accounts to the Nations Funds and the purchase by the Bank of such shares generally was carried out in furtherance of Defendants' corporate plan to reduce the Bank's expenses of managing fiduciary assets and increasing their overall direct and indirect profits from fiduciary operations, one of its objectives in consolidating the operations of the Acquired Banks, and from and through the Nations Funds, generally. BAC and the Bank proceeded to carry out the Conversions since they would not merely profit from the Bank's trustee and similar fiduciary fees but "double dip" by generating additional revenues through the Defendants' related asset management businesses, administrative service businesses and otherwise. Additional profit was also generated by adding the assets in the Bank's fiduciary accounts to the Nations Funds following the Conversions, thereby making them more saleable at retail to the investing public. Further, the Conversions created an opportunity for the Bank to avoid the relatively low profitability of managing the fiduciary accounts (and the expenses related thereto) which the Bank had contracted to do when it (and/or its predecessors) agreed to serve as fiduciary thereof, and substitute ever-increasing fee income directly and through its corporate subsidiaries and affiliates.

79.    The Bank's wholesale investment of the assets in most of its fiduciary accounts in  shares of the Nations Funds pursuant to the Conversions carried out around the country, was a breach of its fiduciary duty to Plaintiffs and the members of the Class, which breach was

aided, abetted and/or directed by BAC and its affiliates, including NFT and the Bank Subsidiaries as set forth herein.

80.     BAC was at all times aware that the Bank was committing a breach of fiduciary duty to its beneficiaries and participated therein as aforesaid and by purchasing shares of its proprietary mutual funds product for the fiduciary accounts in its care. "A third party who has notice that the trustee is committing a breach of trust and participates therein is liable to the beneficiary for any loss caused by the breach of trust." Restatement of Trust, Second § 326 (1957); *Massie v. Barth*, 634 S.W.2d 208 (Mo. App. E.D. 1982).

81.     As a result of BAC's aiding and abetting of Defendant Bank, the beneficiaries of its fiduciary accounts have been damaged in an amount to be determined by the Court, but believed to be substantial.

## COUNT IV  - UNJUST ENRICHMENT

82.     Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

83.     The trusts, wills and other documents pursuant to which the Bank was designated corporate fiduciary conferred a benefit on the Defendants by affording the Bank the opportunity to control vast amounts of assets and to earn fees from the stewardship thereof.     The Defendants, directly and indirectly, not only accepted fees from these accounts but unjustly exploited them as described herein. The fiduciary accounts became the Bank's primary distribution channel for the proprietary funds to allow it to siphon fees and profits from the fiduciary accounts. As set forth herein, to allow the retention of a benefit to the Bank would be unjust and inequitable. Further, as amply described herein, the Bank has been a faithless fiduciary, putting its own interests before those of Plaintiffs and members of the Class. As such, it was unjustly enriched by charging and retaining any fees for serving as a corporate fiduciary

during the Class Period, all of which fees should be returned to the affected fiduciary accounts or otherwise disgorged to Plaintiffs and members of the Class, together with all of the Bank's earnings thereupon.

84.     By causing the Bank's fiduciary assets in affected accounts to be invested in the Nations Funds, the Bank and BAC have "double dipped." The Bank and BAC have unjustly benefited from the Conversions the investment of fiduciary assets in the Nations Funds generally, and from the other acts described herein, thereby unjustly enriching themselves at the expense of Plaintiffs and the members of the Class and the members of the respective  Sub-Classes.

85.     Such "double dipping" was carried out by the Bank and BAC by, *inter alia*, imposing on the Bank's fiduciary accounts, through the Bank Subsidiaries and otherwise,  the Bank's fees for acting as a corporate fiduciary, as well as investment advisory and administrative fees, and other related charges.  These fees, when taken together with all the Nations Funds' expenses, even after so-called credits applied by the Bank, exceeded the amounts to which the Bank was entitled to for, *inter alia*, investment of the fiduciary assets and administration of the underlying fiduciary accounts for which services its trustee or similar fees were intended to cover. Such benefits to the Bank and BAC were exacerbated by the Bank's avoidance of substantial operating expenses by reason of its abdication of its individualized investment and administrative responsibilities owed contractually and otherwise to the members of the Class. The Bank enhanced its profit performance at Plaintiffs' expense by favoring the use of its own Nations Funds and investing in them to increase the Nations Funds' asset bases, and aggrandize its own stature under the guise of allegedly providing more services to participants in its so-called "Private Bank" and otherwise.

86.     The Defendants have invested the proceeds of the foregoing unjust enrichment and realized additional profits thereupon, all of which should be returned to the Trusts and other similarly affected accounts and/or their beneficiaries, as the Court shall deem appropriate (e.g., a proportionate share of the Defendants' profits during the years of misappropriation) pursuant to California Probate Code, Section 166440(a)(1) and otherwise.  Missouri statutes impose strict liability against fiduciaries such as the Bank which,  "at their sole risk" make investments that are improper such that the Bank is "absolutely liable" to Plaintiffs Scharff, the Medlers and others in the Missouri Sub-Class for their damages. (§362.550.5  R.S.Mo.).  Plaintiffs and others similarly situated are entitled to recover the Bank's ill-gotten gains and profits there from.

### COUNT V - BREACH OF CONTRACT

87.     Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

88.     By means of the acceptance by the Bank and its predecessors of the trusteeship of the Crowley, Lubbe and Scharff Trusts and each of the other fiduciary accounts affected by the Conversion, the Bank and its predecessors committed to provide to all such fiduciary accounts complete investment management services of a corporate fiduciary, and render such services on an individualized basis consistent with the goals and objectives of plaintiff Arnold's grandfather, plaintiff Scharff's father, Plaintiff Medler's grandmother and the other creators of fiduciary accounts and the needs of the beneficiaries thereof. As the Bank states: **"It is our responsibility to invest the trust assets prudently and profitably according to the grantor's wishes as outlined in the trust document."  Such promise by the Bank and its predecessors was a material implied term of each trust agreement or other document which established the underlying fiduciary relationship.**  No grantor of a fiduciary account anticipated or could

33

reasonably foresee that the Conversion would be carried out by the Bank with fiduciary assets or that the Bank would mishandle fiduciary assets as described herein or that the designated fiduciary would be the Bank in its present form. Further, as set forth in those Counts not asserted on behalf of the Class, the Bank ignored the express provisions of the Kutten Trusts with respect to the investments made for them by the Bank and otherwise.

89.     Plaintiffs and each member of the Class were and/or are beneficiaries of the Bank's contractual obligations to the creators of the Trusts and other fiduciary relationships. By abdicating its responsibilities for individual investment management services and/or through "Common Trust Funds" or "Collective Investment Funds" in favor of the wholesale Conversion of fiduciary assets as described herein that the Bank was obligated to provide to the beneficiaries of its fiduciary accounts, and by conducting itself in its present business form, the Bank breached its contractual obligations thereto.

90.     By virtue of the Bank's breach of its contractual obligations to the members of the Class and Missouri and California Sub-Classes, plaintiffs and the members thereof have suffered damages in an amount to be determined by the Court.

## COUNT VI - BREACH OF CONTRACT

91.     Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

92.     This Count is brought by plaintiffs on behalf of those members of the Class who are beneficiaries of Trusts and other fiduciary accounts originally established with the designated fiduciary being one of the banks acquired by and/or merged into the Bank or its predecessors i.e. the Acquired Banks.

93.     As with the trusts established by plaintiff Scharff's parents and the Medler's grandmother with Boatmen's Trust Company as designated corporate Trustee or by plaintiff Arnold with the Bank of Santa Monica as designated corporate Trustee, the grantors of all affected Trusts selected as Trustee institutions which promised and agreed to deliver personalized fiduciary services to the beneficiaries thereof. Implicit in the contractual fiduciary relationship between the grantors and the Acquired Banks was the provision of a full range of personalized fiduciary services, including individualized investment management.

94.     The Bank, by eliminating the personalized fiduciary services to members of the Class, including, *inter alia*, individualized investment management, materially breached the explicit and implied terms of the Indentures of Trust or similar documents which initially caused the formation of such Trusts, including, but not limited to the following:

(a)     failing to provide appropriate trained personnel to supervise and monitor the performance of the assets in their charge, including a uniform failure to invest in appropriate asset classes;

(b)     bouncing plaintiffs and others similarly situated to poorly manned and anonymous "Call Centers" with whom there was no pre-existing relationship, trust and fealty;

(c)     changing without plaintiffs' and others similarly situated consent representatives of the Bank to deal with plaintiffs who had no knowledge of plaintiffs' circumstances and others similarly situated or the purposes for which the Trusts were established; and

(d)     continuing to charge fiduciary fees when failing to perform the services the services that the Acquired Banks had agreed to perform.

95.     Because the transfer of fiduciary responsibilities from the Acquired Banks substantively and materially affected the pre-existing fiduciary relationship with the Bank, it

was obliged to give notice to Class members of, inter alia, the terms of the merger or business combination, the forthcoming material changes in the relationship and provide to them the opportunity to seek a replacement fiduciary.

96.     By virtue of the foregoing lack of appropriate notice and the material change in fiduciary services delivered by the Bank to members of the Class following the acquisition of the Acquired Banks, such notice should now be provided to affected beneficiaries which, inter alia, provides them with the opportunity to seek a replacement fiduciary.

## COUNT VII - VIOLATION OF CALIFORNIA PROBATE CODE

97.     Plaintiff Arnold repeats and realleges each and every allegation contained above as if fully set forth herein. The claims set forth herein are asserted on behalf of the California Sub-Class.

98.     Pursuant to Section 16002 of the California Probate Code, the Bank owes and owed to Plaintiff Arnold and the members of the California Sub-Class, an absolute duty of loyalty.  In exercise of that duty, the Bank has a duty to administer its fiduciary accounts solely in the interest of the beneficiaries.

99.     Pursuant to Section 16060 of the California Probate Code, the Bank owes and owed to Plaintiff Arnold and the members of the California Sub-Class a duty of loyalty.

100.    By acting as alleged herein, the Bank has violated and continues to violate the duty of loyalty  it owes and owed to plaintiff Arnold and the members of the California Sub-Class. Such violations of the Bank's duties as fiduciary constitute breach of trust pursuant to 16400 of the California Probate Code.

101.    Pursuant to Section 16004 of the California Probate Code, the Bank owes and owed to Plaintiff Arnold and the members of the California Sub-Class a duty not to use or deal with fiduciary account property for its own profit, nor to take part in any transaction in which it

has an interest adverse to the beneficiary, such as it did with respect to the accounts of Plaintiff Arnold and the members of the California Sub-Class.

102.    By acting as alleged herein, the Bank has violated and continues to violate the duty not to use or deal with fiduciary account property for its own profit, and the duty to not take part in any transaction in which it had a conflict of interest. Such violations of the Bank's duties as fiduciary constitute breach of trust pursuant to Section 16400 of the California Probate Code.

103.    Pursuant to Section 16040 of the California Probate Code, the Bank owes and owed to Plaintiff Arnold and the members of the California Sub-Class a duty of care that includes the duty to invest fiduciary account assets prudently and with regard to individualized strategy appropriate and productive pursuant to Probate Code Sections 16007 and 16009. Pursuant to Probate Code Section 16014, the Bank is required to apply fully the special skills of a corporate fiduciary, and this duty heightens the duty of care otherwise applicable to it.

104.    By acting as alleged herein, the Bank has violated and continues to violate the duties of care and productivity it owes and owed to Plaintiff Arnold and the members of the California Sub-Class. Such violations of the Bank's duties as fiduciary constitutes breach of trust pursuant to Section 16400 of the California Probate Code.

105.    Pursuant to Section 16420 of the California Probate Code, Plaintiff Arnold and the members of the California Sub-Class may maintain a cause of action against the Bank for its breaches of its duties as fiduciary and its participation in transactions in which it had or has a conflict of interest, as it does here.

106.    Pursuant to Section 16440 of the California Probate Code, the Bank is liable to Plaintiff Arnold and the members of the California Sub-Class for actual and punitive damages, attorneys' fees, interest, and such other relief as the Court may order.

## COUNT VIII - BREACH OF FIDUCIARY DUTY UNDER CALIFORNIA LAW

107.    Plaintiff Arnold repeats and realleges each and every allegation contained above as if fully set forth herein. This Count is brought on behalf of the California Sub-Class.

108.    Pursuant to Section 15002 of the Probate Code, the common law of California with respect to fiduciary and trust matters remains the law of the State of California, and Probate Code Section 16420(b) expressly preserves "any other appropriate remedy provided by statute or the common law.

109.    Pursuant to the common law of California, the Bank owes and owed to Plaintiff Arnold and each member of the California Sub-Class an absolute duty of loyalty. In exercise of that duty, the Bank has a duty to administer its fiduciary accounts solely in the best interests of the beneficiaries, i.e. the members of the California Sub-Class.

110.    Pursuant to the common law of California, the Bank owes and owed to Plaintiff Arnold a duty not to take part in a transaction in which it had a conflict of interest, as it did and does as described above

111.    By acting as alleged herein, the Bank has violated its common law fiduciary duties of absolute loyalty  owed to Plaintiff Arnold and the members of the California Sub-Class.

112.    By acting as alleged herein, the Bank has violated its common law fiduciary duty not to participate in transactions in which it had or has a conflict of interest, as it does here.

113.    By acting as alleged herein, the Bank has violated its common law fiduciary duties of care and productivity it owes or owed to Plaintiff Arnold and the members of the California Sub-Class.

114.    By acting as alleged herein, the Bank has violated its common law fiduciary duty that it owes or owed to Plaintiff Arnold and the members of the California Sub-Class to take and exercise prudent control over fiduciary assets.

115.    The Bank and its affiliates have already unlawfully extracted huge sums in the form of fees and other charges assessed against itsfiduciary accounts, and they will continue indefinitely to extract unlawful fees and other charges from Plaintiff Arnold and the members of the California Sub-Class,  all of which has caused them to incur and will cause them to incur damages in an amount which cannot be presently determined.

## COUNT IX  - VIOLATION OF CALIFORNIA BUSINESS AND PROFESSIONS CODE SECTION 17200

116.    Plaintiffs Kutten and Arnold repeat and reallege each and every allegation contained above as if fully set forth herein. Plaintiffs Kutten and Arnold assert this cause of action in their capacity as private attorneys general on behalf of the members of the general public residing within the State of California and/or whose fiduciary accounts originated in California and, in the case of Plaintiff Arnold, on behalf of the members of the California Sub-Class.

117.    The Bank has engaged in and continues to engage in unfair, unlawful and deceptive business practices, including but not limited to sending representatives from St. Louis, Missouri to meet with Plaintiff Kutten in Northern California, whereby it has conspired with BAC and its affiliates to force the Kutten Trusts and other of the Bank's fiduciary accounts to have their assets re-directed from individually managed accounts and/or so-called "Common Trust Funds" and/or other assets to proprietary mutual funds controlled by the Bank and its affiliates. Said Conversions have resulted in higher total direct and indirect fees and expenses charged to such fiduciary accounts than those historically paid to the Bank. Similarly, by forcing

assets in the Bank's fiduciary accounts to be invested in Nations Funds generally has caused the beneficiaries of such accounts to similarly be damaged by having such accounts overcharged by such fees and expenses.

118.    By acting as alleged herein, the Bank has violated its duties as a fiduciary, which constitutes breach of trust pursuant to Section 16400 of the California Probate Code.

119.    The unlawful acts and practices of the Bank as alleged herein, including violations of Section 16400 of the California Probate Code, constitute unlawful business practices within the meaning of California Business and Professions Code Section 17200, et seq.

120.    Unless the Bank is enjoined from continuing to engage in the foregoing unfair and deceptive business practices, Plaintiffs Kutten and Arnold and the other members of the general public residing within the State of California and/or whose fiduciary accounts originated in California and the members of the California Sub-Class will continue to be injured and damaged by the Bank's unfair business practices.

121.    So as not to be unjustly enriched by its own wrongful actions and conduct, the Bank should be required to disgorge and restore to Plaintiffs Kutten and Arnold and the other members of the general public residing within the State of California and/or whose fiduciary accounts originated in California and the members of the California Sub-Class all monies wrongfully obtained by it as a result of its wrongful conduct, together with interest and profits earned thereon.

## COUNT X - VIOLATION OF CALIFORNIA PRUDENT INVESTOR ACT

122.    Plaintiff Arnold repeats and realleges each and every allegation contained above as if fully set forth herein. The claims set forth herein are asserted on behalf of Plaintiff Arnold and the California Sub-Class and by Plaintiff Kutten individually.

123.    Pursuant to Section 16045 et. seq. of the California Probate Code ("the Prudent

40

Investor Act"), the Bank's duties, including investment and management of assets held in its fiduciary capacity, were and are to be handled as a prudent investor would, considering the purposes, terms, distribution requirements, and other circumstances of the beneficiaries thereof and the underlying fiduciary relationship. In order to satisfy this standard, the Bank has been required, at all relevant times, to exercise reasonable care, skill, and caution. As set forth above, the Bank has failed to do so with respect to the fiduciary accounts of Plaintiff Kutten, Plaintiff Arnold and the members of the California Sub-Class.

124.    In violation of the Prudent Investor Act, the Bank failed to make investment and management decisions prudently with respect to the individual fiduciary accounts of Plaintiff Kutten, Plaintiff Arnold and the members of the California Sub-Class within its care by, *inter alia*, making investment decisions for their respective accounts on a wholesale basis, rather than on an individual, account-by-account, basis. The Bank did so in the context of and as a part of an overall Bank-wide investment strategy which did not have the beneficiaries' individual risk and return objectives and their best interests put first and foremost.

125.    In violation of the Prudent Investor Act, the Bank failed to incur for its fiduciary accounts only those expenses that were and are appropriate and reasonable in relation to the assets, overall investment strategy, purposes, and other circumstances of the trust or other underlying fiduciary accounts. Rather the Bank allowed the Crowley Trust and other similarly affected fiduciary accounts to incur excessive expenses by virtue of its investing imprudently the assets therein in the Bank's proprietary mutual funds instead of cheaper and more economical non-proprietary mutual funds or in the Bank's own Common Trust Funds, which were free of fees and expenses.

126.    As a result of the Bank's violation of the Prudent Investor Act, Plaintiff Kutten, Plaintiff Arnold and the members of the California Sub-Class have been damaged in an amount

which cannot presently be determined.

## COUNT XI - VIOLATION OF MISSOURI PRUDENT INVESTOR ACT

127.    Plaintiffs Scharff and the Medlers repeat and reallege each and every allegation contained above as if fully set forth herein. The claims set forth in this Count are asserted on behalf of the members of the Missouri Sub-Class.

128.    Pursuant to Mo. Rev. Stat. § 469.900, et. seq. (the Missouri Prudent Investor Act), the Bank owes and owed to Plaintiff Scharff, the Medlers and the members of the Missouri Sub-Class an absolute duty of loyalty. In exercise of that duty, the Bank has a duty to administer the Trusts and other fiduciary accounts solely in the interests of the beneficiaries thereof.  While the governing instruments for the Plaintiffs' fiduciary accounts may not prohibit the use of proprietary funds, the Bank cannot, in reliance thereon, dispense with its fiduciary duty to perform in the best interests of beneficiaries rather than itself. A state law which may permit the use of proprietary funds as investments in fiduciary accounts, does not mandate that such funds be used over others that are more advantageous to the beneficiary and less advantageous to the Bank.

129.    Pursuant to the Missouri Prudent Investor Act, the Bank owes and owed to Plaintiffs Scharff, the Medlers  and the members of the Missouri Sub-Class a duty to exercise reasonable care, skill and caution in investment management decisions, to ascertain facts relevant to the investment and management of trust assets, and a duty to use the special skills and expertise it represented itself to possess when investing and managing trust assets.

130.    By acting as alleged herein, the Bank has violated and continues to violate the duty of loyalty  it owes and owed to Plaintiffs Scharff and the Medlers and the members of the Missouri Sub-Class. Such violations of the Bank's duties as fiduciary constitute breach of trust imposed by Missouri statute.

131.    Pursuant to the Missouri Prudent Investor Act and Mo. Rev. Stat 456.8-802, the Bank owes and owed to Plaintiffs Scharff and the Medlers and the members of the Missouri Sub-Class a duty not to use or deal with fiduciary assets for its own profit, not to take part in any transaction in which it has an interest adverse to the beneficiary, such as Plaintiffs Scharff, the Medlers and the members of the Missouri Sub-Class.

132.    By acting as alleged herein, the Bank has violated and continues to violate the duty not to use or deal with fiduciary assets for its own profit, and the duty to not take part in any transaction in which it had a conflict of interest. Such violations of the Bank's duties as fiduciary constitute breach of trust pursuant to Missouri statute.

133.    Pursuant to the Missouri Prudent Investor Act, the Bank owes and owed to Plaintiffs  Scharff  and the Medlers and the members of the Missouri Sub-Class a duty of care that includes the duty to invest fiduciary assets prudently with an individualized strategy appropriate to each fiduciary account and to each beneficiary thereof, and the duty to make fiduciary assets productive. Moreover, the Prudent Investor Act requires the Bank to apply fully the special skills of a corporate fiduciary, heightening the duty of care otherwise applicable to it

134.    By acting as alleged herein, the Bank has violated and continues to violate the duties and productivity it owes and owed to Plaintiffs Scharff  and the Medlers and the members of the Missouri Sub-Class. Clearly the Bank was interested in seizing new opportunities and lining its own pockets at the expense of Plaintiffs Scharff and the Medlers and those similarly situated.  Such violations of the Bank's duties as fiduciary constitutes breach of trust pursuant to Missouri law.

135.    The Bank and its affiliates have already unlawfully extracted huge sums in the form of fees and other charges assessed against fiduciary accounts and unless enjoined from doing so, they will continue indefinitely to extract unlawful fees and other charges from the

members of the Missouri Sub-Class, in an amount which cannot be presently determined in violation of §469.907.

136.    Plaintiffs Scharff  and the Medlers and the members of the Missouri Sub-Class may maintain a cause of action against the Bank for its breaches of its duties as fiduciary and its participation in transactions in which it had or has a conflict of interest, as it does here.

137    The Bank is liable to Plaintiffs  Scharff and the Medlers and the members of the Missouri Sub-Class for actual and punitive damages because the Bank acted with reckless disregard for the rights of Plaintiff  Scharff, the Medlers and others' rights, attorneys' fees, interest, and such other relief as the Court may order.

## COUNT XII  - BREACH OF FIDUCIARY DUTY UNDER MISSOURI COMMON LAW

138.    Plaintiffs Scharff and the Medlers repeat and reallege each and every allegation contained above as if fully set forth herein. This Count is asserted on behalf of the members of the Missouri Sub-Class.

139.    Pursuant to the common law of Missouri, the Bank owes and owed to Plaintiffs Scharff and the Medlers and the members of the Missouri Sub-Class an absolute duty of loyalty. In exercise of that duty, the Bank has a duty to administer the Trusts and other fiduciary accounts governed by Missouri law solely in the best interests of the beneficiaries, i.e. the members of the Missouri Sub-Class.

140.    By acting as alleged herein, the Bank has violated its fiduciary duty of absolute loyalty  owed to Plaintiffs  Scharff and the Medlers and the members of the Missouri Sub-Class.

141.    By acting as alleged herein, the Bank has violated its fiduciary duty not to participate in transactions in which it had or has a conflict of interest, as it did and does here.

44

142.    By acting as alleged herein, the Bank has violated its fiduciary duties of care and productivity it owes or owed to Plaintiffs  Scharff and the Medlers and the members of the Missouri Sub-Class.

143.    By acting as alleged herein, the Bank has violated its fiduciary duty that it owes or owed to Plaintiffs Scharff, the Medlers and the members of the Missouri Sub-Class to take and exercise control over fiduciary assets.

144.    Plaintiffs  Scharff, the Medlers and the members of the Missouri Sub-class may maintain a cause of action against the Bank for its breaches of its duties as fiduciary and its participation in transactions in which it had or has a conflict of interest as described above.

145.    The Bank is liable to Plaintiffs Scharff, the Medlers and the members of the Missouri Sub-Class for actual and punitive damages because the Bank acted with reckless disregard for the rights of Plaintiffs Scharff, the Medlers and others' rights, attorneys' fees, interest, and such other relief as the Court may order.

## COUNT XIII
## INDIVIDUAL CLAIM OF PLAINTIFF KUTTEN
## FOR BREACH OF FIDUCIARY DUTY

146.    Plaintiff Kutten repeats and realleges each and every allegation contained above as if fully set forth herein.

147.    As noted above, plaintiff Kutten's family wealth commenced with the toils of her grandfather, Charles H. Yalem, who founded the Aetna Finance Co., later sold to International Telephone and Telegraph Corporation in 1960.  Yalem, always a conservative investor, donated hundreds of thousands of dollars to St. Louis civic endeavors, including the St. Louis Zoo (the Charles H. Yalem Children's Zoo), St. Louis University, Jewish Hospital of St. Louis, Washington University, the St. Louis Symphony Orchestra and the St. Louis chapter of the

YMCA.  Yalem's experience with predecessors to the Bank commenced at least with St. Louis Union Trust which became Centerre Trust Co, which became Boatmen's Trust Co. Yalem's net worth was achieved as a result of a passion for cautious investing and he instilled in his son-in-law and daughter, Joseph and Carolyn Kutten, plaintiff Kutten's parents, the wisdom of careful and conservative investing so that future generations of the family might enjoy his good fortune. In turn, plaintiff Kutten's parents passed these virtues on to her. The Kutten family employed the St. Louis law firm of Bryan, Cave, McPheeters and McRoberts n/k/a/ Bryan Cave to draft the Kutten Trusts and represent them on estate planning matters.  The relationship of the Kutten family was not only with their trust company, it was with the individuals who represented the trust company who understood and appreciated the desires and needs of the entire family, including  plaintiff Kutten, a single mother of two children, as well as one of her brothers, a disabled person who is institutionalized and has special needs.  The Kuttens had long term personal relationships with several individuals, including Robert Hitpas and Richard Klapp. These individuals and their successors are no longer responsible for the portfolios entrusted to them.  Instead, the Bank boasts of a minimum of 450 faceless employees who answer customer inquiries at "Call Centers" established around the country.  The systemic change that occurred at the Bank when it acquired the predecessor banks and converted trust assets without the consent of plaintiff Kutten for its own gain and profit represents a classic instance of self-dealing and breach of loyalty, the antithesis of conduct expected of a fiduciary.  The Bank has breached its fiduciary duties to plaintiff Kutten and her daughters, including the duty of loyalty, and various duties highlighted by the federal regulations issued by the Office of the Comptroller of the Currency in 1996 directed to all national banks that act in a fiduciary capacity, with which the Bank failed to comply.[4]   The Bank:

---

[4] Plaintiff Kutten asserts no private cause of action thereunder.  Rather, the Bank's failure to comply with them is a

46

(a)      failed to exercise such specialized care and skill as is required of a fiduciary;

(b)      converted trust assets and their subsequent  purchase of the Bank's proprietary mutual funds, the Nations Funds;

(c)      failed to properly diversify investment portfolios of the Trusts, and acting in derogation of the settlor's expressed directions;

(d)      failed to adopt appropriate policies relevant to self-dealing and conflict of interest as required by and in violation of 12 CFR Part 9;

(e)      failed to preview the prospective account to determine if the account could be properly administered subsequent to the acquisition of Boatmen's Trust Co. by the Bank as required by and in violation of 12 CFR, part 9.6;

(f)      failed to properly invest funds waiting to be invested to obtain yields consistent with a reasonable rate of return as required by and  in violation of 12 CFR Part 9.10;

(g)      failed to assign at least two individuals to plaintiff Kutten's accounts as required by 12 CFR, part 9.13;

(h)      charged excessive fees for fiduciary compensation in violation of 12 CFR part 9.15;

(i)      failed to properly supervise personnel entrusted with the management of plaintiff Kutten's Trusts' assets to ensure implementation of the grantors' expressed directions;

(j)      failed to make appropriate trades in the equity and bond markets to enhance the achievement of the objectives of the Trusts, including failing, through neglect, to make trades of any kind for several years;

---

fundamental breach of fiduciary duty.

(k)      failed to establish a written plan to engage in the sale and marketing of Nations Funds to Trusts under its fiduciary control and failed to absorb the expenses of establishing a collective investment fund, instead charging the beneficiaries, including plaintiff Kutten a fee of not less than 0.01%;

(l)      failed to consider and advise the beneficiaries of the adverse tax consequences arising from a conversion of trust assets and the subsequent purchase of Nations Funds;

(m)      failed to consider alternative investments in funds whose returns and ratings are higher than Nations Funds which has scored low on nationally respected ratings;

(n)      created a wholly owned subsidiary to serve as the sole vendor of its own product to Trusts under its fiduciary management and control;

(o)      failed to resign as Trustee when demanded to do so by plaintiff Kutten, citing its need for business income as overriding its performance as a fiduciary duty and resigning only after plaintiff Kutten's citation of the innumerable occasions when the Bank had breached its duty to plaintiff Kutten and the Kutten Trusts;

(p)      failed to observe the parameters of the instructions with regard to conversion issued by the Federal Reserve Bank of the United States in SR 97-3 (SPE), providing [i]n determining whether to convert common trust funds to mutual funds, a banking organization must address the possibility that the conversion could result in conflicts between the best interests of the organization and the fiduciary."  Further, the Federal Reserve noted the existence of potential conflicts of interest for a national bank to engage in such transactions and the need for management to demonstrate that it has determined that the governing trust instrument for each affected customer authorizes investment in mutual funds and the mutual funds are suitable investments for the particular accounts;

(q)      lost administrative control of plaintiff Kutten's accounts for an undetermined period of time in 2002 and 2003, including electronic access to the accounts and the paper files relating to same; and

(r)      failed to communicate with the plaintiff Kutten, return her phone calls and letters and failed to perform as requested by plaintiff Kutten with respect to modifying investment strategies consistent with the investment philosophy that reigned in her family for decades.

### COUNT XIV
### INDIVIDUAL CLAIM OF PLAINTIFF
### KUTTEN FOR BREACH OF FIDUCIARY DUTY

148.    Plaintiff Kutten repeats and realleges each and every allegation contained above as if fully set forth herein.

149.    On information and belief, the Bank's decision to invest the assets of the Trusts in the Nations Funds was motivated not by the interests of plaintiff Kutten and her daughters but by BAC's desire to generate investment advisory and other fees for its affiliates and, indirectly, for itself, as well as to reduce the Bank's operating expenses.

150.    On information and belief, the Bank failed to consider the Nations Funds' high expense or alternative lower cost families of mutual funds when it invested the assets of the Kutten Trusts into shares of the Nations Funds thus putting its own interests before those of the beneficiaries of fiduciary accounts maintained for the Kutten Trusts.

151.    On information and belief, the Bank failed to consider the best interests of plaintiff  Kutten and her daughters when it invested the Kutten Trusts' assets in the Nations Funds and breached its duty of loyalty to them by putting the interests of itself and its affiliates before the interests of plaintiff Kutten and her daughters.    BAC was at all times aware that the

Bank was committing a breach of fiduciary duty to its beneficiaries and participated therein as aforesaid and by offering its proprietary mutual funds product to the fiduciary accounts. "A third party who has notice that the trustee is committing a breach of trust and participates therein is liable to the beneficiary for any loss caused by the breach of trust." Restatement of Trust, Second § 326 (1957); *Massie v. Barth*, 634 S.W.2d 208 (Mo. App. E.D. 1982).

152. The Bank's wholesale investment of the assets of the Kutten Trusts in the Nations Funds was a breach of its fiduciary duty to plaintiff Kutten and her daughters, which breach was aided, abetted and/or directed by BAC and its affiliates.

153. As a result of, inter alia, the Bank's improper wholesale transfer of fiduciary assets held by fiduciary accounts the Kutten Trusts into shares of the Nations Funds, the accounts of plaintiff Kutten and her daughters for which the Bank was a fiduciary have been damaged in an amount to be determined by the Court, but believed to be substantial.

## COUNT XV
## INDIVIDUAL CLAIM OF PLAINTIFF KUTTEN FOR BREACH OF CONTRACT

154. Plaintiff Kutten repeats and realleges each and every allegation contained above as if fully set forth herein.

155. By means of the acceptance by the Bank and its predecessors of the trusteeship of the Kutten Trusts, the Bank and its predecessors committed to provide to such Trusts complete investment management services of a corporate fiduciary, and render such services on an individualized basis consistent with the goals and objectives of plaintiff Kutten's parents and the needs of the beneficiaries thereof. As the Bank states: "It is our responsibility to invest the trust assets prudently and profitably according to the grantor's wishes as outlined in the trust document." No grantor of a Trust anticipated or could reasonably foresee that the Conversion would be carried out by the Bank with Trust assets or that the designated fiduciary would be the

50

Bank in its present form. Further, as set forth in those Counts not asserted on behalf of the Class, the Bank ignored the express provisions of the Kutten Trusts with respect to investments and otherwise.

156.    Plaintiff Kutten and her daughters were beneficiaries of the Bank's contractual obligations to the creators of the Kutten Trusts and other fiduciary relationships. By abdicating its responsibilities for individual investment management services and/or through "Common Trust Funds" in favor of the wholesale Conversion of fiduciary assets that the Bank was obligated to provide to the beneficiaries of its fiduciary accounts, and by conducting itself in its present business form, the Bank breached its contractual obligations to plaintiff Kutten, her parents and daughters.

157.    By virtue of the Bank's breach of its contractual obligations to plaintiff Kutten, her parents and her daughters, plaintiff Kutten and her daughters have suffered damages in an amount to be determined by the Court.

158.    The Bank has breached its contractual obligations to plaintiff Kutten and her daughters in their individual capacities as a result of its failure to adhere to the terms of the Kutten family's engagement of the Bank and its predecessors as a fiduciary and plaintiff Kutten as well as her daughters have been damaged.

## COUNT XVI
## INDIVIDUAL CLAIM OF PLAINTFF KUTTEN FOR BREACH OF CONTRACT

159.    Plaintiff Kutten repeats and realleges each and every allegation contained above as if fully set forth herein.

160.    This Count if brought by plaintiff Kutten as a beneficiary of Trusts originally established with the Boatman's Trust Company, being one of the Banks acquired by and/or merged into the Bank.

161.   Boatmen's Trust Company, as designated corporate Trustee, promised and agreed to the settlers of the Kutten Trusts and its beneficiaries to deliver personalized fiduciary services. Implicit in the contractual fiduciary relationship between the plaintiff Kutten's parents and Boatman's Trust Company was the provision of a full range of personalized fiduciary services, including individualized investment management.

162.   The Bank, by eliminating the personalized fiduciary services to plaintiff Kutten, including, inter alia, individualized investment management, materially breached the explicit and implied terms of the Kutten Trusts, including, but not limited to the following:

(a)   failing to provide appropriate trained personnel to supervise and monitor the performance of the assets in their charge, including failing to invest in appropriate asset classes;

(b)   bouncing plaintiff Kutten to poorly manned and anonymous "Call Centers" with whom these was no pre-existing relationship, trust and fealty;

(c)   changing without plaintiff Kutten's consent representatives of the Bank to deal with plaintiff Kutten who had no knowledge of plaintiff Kutten or the purposes for which the Kutten Trusts were established; and

(d)   continuing to charge excessive fiduciary fees when failing to perform the services the services that Boatman's Trust Company had agreed to perform;

(e)   failing to follow the explicit directions of grantor Joseph Kutten in the Grandchildren's Trust by failing to "invest the assets of the trust primarily in U.S. Treasury bills, or other debt obligations backed by the full faith and credit of the United States Government" and by investing the assets of the Trust in mutual funds which was not authorized.

163.   Because the transfer of fiduciary responsibilities from Boatman's Trust Company substantively and materially affected the Kutten Trusts' pre-existing fiduciary relationship with

the Bank, it was obliged to give notice to plaintiff Kutten of, underline inter alia, the terms of the merger between it and Nations Bank, the forthcoming changes in the relationship and provide to them the opportunity to seek a replacement Trustee.

164.    Although not provided with said notice, plaintiff Kutten sought the resignation of the Bank in early October, 2003.  In response, on October 17, 2003, the Bank incredibly insisted that they be allowed to remain a trustee:

> The (Bank's) Committee decided that they would not resign from these trusts.  It was a business decision that was based on the fact that Bank of America does not want to give up your business. Bank of America, like everyone else, has felt the effects of the poor economy and has become very reluctant to voluntarily resign as trustee.

165.     The Bank continued to resist resignation until plaintiff Kutten's counsel wrote a seven page letter citing the many examples of the Bank's breach of duties in the administration of the trusts of plaintiff Kutten and her daughters.

## COUNT XVII
## INDIVIDUAL CLAIM OF PLAINTIFF KUTTEN FOR UNJUST ENRICHMENT

166.    Plaintiff  Kutten repeats and realleges each and every allegation contained above as if fully set forth herein.

167.    By reason of defendant BAC's causing the Bank's fiduciary assets in affected accounts to be invested in the Nations Funds, the Bank and BAC  have "double dipped." The defendants have profited by the Conversion and the subsequent acts described herein, thereby unjustly enriching themselves at the expense of plaintiff Kutten and her daughters.  Defendants have similarly enriched themselves, their subsidiaries and affiliates by using information regarding the plaintiff Kutten to market various goods and services including credit cards, loans and deposit accounts, from which products and services they have been unjustly enriched.

168.    Such "double dipping" was carried out by the Bank and BAC by imposing on
plaintiff Kutten's accounts the Banks' fees for acting as a corporate fiduciary as well as
investment advisory fees, and other related charges which, when taken together with all the
Nations Funds' expenses, even after so-called credits for certain Nations Funds advisory fees,
exceeded the amounts to which the Bank was entitled to payment for, inter alia, investment of
the fiduciary assets, for which services its Trustee or similar fees were intended to cover. Such
benefits to the Bank and BAC were exacerbated by the Bank's avoidance of substantial
operating expenses by reason of its abdication of its individualized investment responsibilities
owed to plaintiff Kutten and her daughters. The Bank enhanced its profit performance at
plaintiff Kutten's expense by favoring the use of its own Funds and investing in same to
increase its own asset base, and aggrandize its own stature under the guise of allegedly
providing more services to participants in its "Private Bank"  The Bank's objectives were clear
from its telling press release in July 14, 1999:

> United by the merger of Bank of America and NationsBank,
> NationsBanc Investments, Inc., and BA Investment Services, Inc.,
> became one brokerage company on July 12. The birth of Banc of
> America Investment Services, Inc., the new name for the retail
> brokerage, gives investors a powerful ally within the Bank of
> America franchise.   (For the full press release, see
> http://www.bankofamerica.com/newsroom/press/press.cfm?PressI
> D=
> press.19990714.03.htm&LOBID=1>).

169.    The defendants have invested the proceeds of the foregoing unjust enrichment
and realized additional profits thereupon, all of which should be returned to the Kutten Trusts as
the Court shall deem appropriate (e.g. a proportionate share of the defendants' profits during the
years of misappropriation).  Missouri statutes impose strict liability against fiduciaries who "at
their sole risk" make investments that are improper such that the Bank is "absolutely liable" to

plaintiff Kutten for their losses.  §362.550.5  R.S.Mo.  Plaintiff Kutten and her daughters are entitled to recover the Bank's ill-gotten gains and profits.

## COUNT XVIII
### INDIVIDUAL CLAIM OF PLAINTIFF KUTTEN
### VIOLATION OF MISSOURI PRUDENT INVESTOR ACT

170.    Plaintiff Kutten repeats and realleges each and every allegation contained above as if fully set forth herein.

171.    Pursuant to § 469.900 (formerly §456.520.2 R.S.Mo. and §456.900 *et. seq. R.S.Mo.)* ("The Prudent Investor Act")  RSMo. (2000), the Bank owes and owed to plaintiff Kutten and her daughters an absolute duty of loyalty. In exercise of that duty, the Bank has a duty to administer the Trusts and other fiduciary accounts solely in the interests of the beneficiaries thereof.

172.    Pursuant to §469.905 (formerly §456.905 R.S.Mo), the Bank owes and owed to plaintiff Kutten and her daughters an absolute duty of loyalty. In exercise of that duty, the Bank has a duty to administer the Kutten Trusts governed by the Missouri law solely in the best interests of the beneficiaries.

173.    Pursuant to the Missouri Prudent Investor Act, the Bank owes and owed to plaintiff Kutten and her daughters a duty to exercise reasonable care, skill and caution in investment management decisions, to ascertain facts relevant to the investment and management of trust assets, and a duty to use the special skills and expertise it represented itself to possess when investing and managing trust assets.

174.    By acting as alleged herein, the Bank has violated and continues to violate the duties of loyalty and candor it owes and owed to plaintiff Kutten and her daughters.  Such violations of the Bank's duties as fiduciary constitute breach of trust imposed by Missouri statute.

175.     Pursuant to the Missouri Prudent Investor Act and §456.570.2 R.S.Mo., the Bank owes and owed to plaintiff Kutten and her daughters a duty not to use or deal with fiduciary assets for its own profit, not to take part in any transaction in which it has an interest adverse to the beneficiary, such as plaintiff Kutten and her daughters.

176.     By acting as alleged herein, the Bank violated the duty not to use or deal with fiduciary assets for its own profit, and the duty to not take part in any transaction in which it had a conflict of interest. Such violations of the Bank's duties as fiduciary constitute breach of trust pursuant to Missouri statute.

177.     Pursuant to the Prudent Investor Act, the Bank owes and owed to plaintiff Kutten and her daughters  a duty of care that includes the duty to invest fiduciary assets prudently and with regard to individualized strategy appropriate to each fiduciary account and to each beneficiary thereof, and the duty to make fiduciary assets productive. Moreover, the Prudent Investor Act requires the Bank to apply fully the special skills of a corporate fiduciary, heightening the duty of care otherwise applicable to it.

178.     By acting as alleged herein, the Bank has violated the duties and productivity it owed to plaintiff Kutten and her daughters. Clearly the Bank was interested in seizing new opportunities and lining its own pockets at the expense of plaintiff Kutten and her daughters. Such violations of the Bank's duties as fiduciary constitutes breach of trust pursuant to Missouri law.

179.     Plaintiff Kutten may maintain a cause of action against the Bank for its breaches of its duties as fiduciary and its participation in transactions in which it had or has a conflict of interest, as it does here.

56

180.    The Bank is liable to plaintiff Kutten for actual and punitive damages because the Bank acted with reckless disregard for plaintiff Kutten's rights, attorneys' fees, interest, and such other relief as the Court may order.

## JURY DEMAND

Plaintiffs hereby demand a trial by jury.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs Arnold, Medler and Scharff respectfully request on their own behalf, and on behalf of all members of the Class and the Sub-Classes identified above, and Plaintiff Kutten requests on behalf of herself, and her daughters for an order:

(a)    Certifying this action as a Class Action and appointment of Class Plaintiffs and their counsel to represent the Class and the various Sub-Classes;

(b)    Entering judgment on the claims for breach of fiduciary duty in favor of Plaintiffs individually and Class Plaintiffs Arnold, Medler and Scharff as representatives of the other members of the Class and Sub-Classes and against the Defendants of their compensatory damages, treble damages as appropriate and punitive damages in favor of Plaintiffs individually and as representatives of the other members of the Class and Sub-Classes and against the Defendants in the amount of damages caused by the Defendants' breaches of fiduciary duties;

(c)    Entry of judgment on the claims for breach of contract in favor of Plaintiffs and the Class and Plaintiff Kutten in the amount of damages caused by the Bank's breach of contract;

(d)    Entry of judgment enjoining the Bank from opposing any petition filed by any member of the Class or Missouri or California Sub-Classes seeking the removal

of the Bank as corporate fiduciary and requiring the Bank to pay for all legal fees and expenses incident thereto including its own;

(e)     Entry of judgment compelling the Defendants to account for their unjust enrichment and disgorging the amount thereof (and the profits earned thereupon) to the fiduciary accounts, including the Kutten, Crowley, Lubbe and Scharff Trusts, affected by the wrongdoing described herein and/or their beneficiaries, as appropriate;

(f)     Entry of judgment compelling the Bank to fully insulate its fiduciary operations from all of its other business activities and those of BAC

(g)     Entry of judgment compelling the Bank to establish and implement procedures to fully protect the interests of the members of the Class including, _inter alia_, the appointment of an ombudsman to oversee the Bank's fiduciary operations;

(h)     Repayment to the affected Nations Funds of the damages caused to them by the Defendants' actions as described herein or failing that to the members of the Class who indirectly sustained damages;

(i)     Pre-judgment and post-judgment interest at the maximum rate allowable by law;

(j)     Reasonable attorneys' fees and reimbursement of the reasonable costs and expenses of prosecuting this litigation and distributing the recovery to  members of the Class and the various Sub-Classes; and

(k)     Such other or additional relief as this Court deems appropriate.

October 24, 2006

GREENFIELD & GOODMAN LLC
RICHARD D. GREENFIELD
7426 Tour Drive
Easton, Maryland

(410)745-4149
(410) 745-4158 (Fax)
Lead Counsel for Plaintiffs and the Class


SUMMERS, COMPTON, WELLS & HAMBURG
PROFESSIONAL CORPORATION

/s/ Steven M. Hamburg
STEVEN M. HAMBURG          #3313
HOLLY M. MCINTYRE          #112203
8909 Ladue Road
St. Louis, MO 63124
(314) 991-4999
(314) 991-2413 (Fax)

RICHARD A. LOCKRIDGE
W. JOSEPH BRUCKNER
GREGG M. FISHBEIN
LOCKRIDGE GRINDAL NAUEN PLLP
Suite 2200
100 Washington Avenue South
Minneapolis, MN 55401
(612) 339-6900
(612) 339-0981 (Fax)


GANCEDO & NIEVES LLP
Hector G. Gancedo
Amy M. Boomhouwer
144 W. Colorado Blvd.
 Pasadena, CA 91105
(626) 685-9800

COUNSEL FOR PLAINTIFFS AND THE CLASS

528685

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI

Ellen Jane Kutten, individually and on behalf of her daughters; and Mary Ann Arnold and Elsie Mahler Scharff, on behalf of themselves and all others similarly situated;

Civ. File No. 06-0937 (PAM)

                    Plaintiffs,

v.                                              **MEMORANDUM AND ORDER**

Bank of America, N.A. and Bank of America Corporation,

                    Defendants.

---

This matter is before the Court on Defendants' Motion to Dismiss.[1]  For the reasons that follow, the Court grants in part and denies in part the Motion.

## BACKGROUND

Plaintiffs are present or former beneficiaries of fiduciary accounts for which Defendant Bank of America, N.A. ("Bank") served as corporate trustee.[2]  Plaintiff Ellen Jane Kutten brings claims on behalf of herself and her two daughters.  Plaintiffs Mary Ann Arnold and Elsie Mahler Scharff bring class claims on behalf of themselves and the following class:

> All beneficiaries, owners, beneficial owners, or principals of trusts, accounts or other entities for which the Bank or any of its parents, subsidiaries, affiliates, predecessors, successors, or assigns acted as a trustee, fiduciary, or

---

[1] This Court is assigned to this case pursuant to 28 U.S.C. § 294(c).

[2] Defendant Bank of America Corporation is a financial holding company with a number of subsidiaries, including the Bank.

agent and that were directly or indirectly invested in Nations Funds mutual funds at any time from September 8, 1998 to the present.[3]

(Am. Compl. ¶ 61.)

A.      **Factual Allegations Supporting Claims**

The Amended Complaint alleges that Defendants engaged in "pervasive self-dealing" by converting trust assets to Columbia Funds (f/k/a Nations Funds), mutual funds that were controlled by the Bank's affiliates and subsidiaries. (<u>Id.</u> ¶ 2.) The conversions purportedly "allowed the Bank to funnel the assets in its captive fiduciary accounts into shares of the Nations Funds [and] were carried out on a wholesale basis without giving consideration as to whether the Conversions were prudent and in the beneficiaries' best interests." (<u>Id.</u> ¶ 31.)

The Amended Complaint alleges that the conversions negatively affected Plaintiffs in several ways. First, the conversions allowed the Bank to generate higher fees and increased expenses. (<u>Id.</u> ¶¶ 33, 38, 46, 48, 52-53, 55.) Plaintiffs acknowledge that the Bank issued notices about the fees and expenses; however, they assert that the notices were misleading so that class members "had no practical way of knowing or understanding how their individual accounts would be affected either by the conversion or the investments of the assets therein in Nations Funds or that the Bank was to receive substantial benefits therefrom." (<u>Id.</u> ¶¶ 46-47; <u>see also</u> id. ¶ 52 ("The beneficiaries were left on their own to

---

[3] The class is divided into three proposed sub-classes: (1) a sub-class consisting of members of the class whose fiduciary accounts originated in and/or involved beneficiaries residing in California (such as Arnold); (2) a sub-class consisting of members of the class whose accounts originated in and/or involved beneficiaries residing in Missouri (such as Scharff); and (3) a sub-class consisting of all class members who, within the class period, have had their fiduciary accounts subject to one or more conversions. (Am. Compl. ¶ 62.)

figure out, if they could, whether their accounts would pay more for the services related to the Nations Funds investments than they had paid pre-coversion for the pre-existing investments.").)  Plaintiffs further assert that they "have never received a 'straight' or any answers to their questions with respect thereto and have received misleading or deceptive information as to the impact of such investments upon them and their fiduciary accounts." (Id. ¶ 50.)  Thus, "it was impossible for co-fiduciaries, beneficiaries, and others . . . to understand and know the true costs of ownership of Nations Funds to the fiduciary accounts."  (Id.)

Second, the conversions purportedly allowed the Bank to use its own proprietary funds rather than less expensive and well-proven competitive funds.  (Id. ¶¶ 38-41, 54.)  In addition, Defendants purportedly failed to follow government guidelines on avoiding a breach of fiduciary duties when using proprietary mutual funds.  (Id.  ¶¶ 36-40.)  Plaintiffs allege that Defendants falsely touted "the so-called 'benefits' of the conversions" and "coerced" the authorization of the conversion.  (Id. ¶¶ 42-44.)

Third, the conversions purportedly curtailed the individualized service previously provided to the fiduciary accounts.  (Id. ¶¶ 22, 33.)  As a consequence, "the 'customized recommendations' and 'wealth management expertise' promised by the Bank in its advertisements are fictions and have been fictions since" the Bank acquired numerous other financial institutions throughout the United States.  (Id. ¶ 24.)  Despite the lack of individual service, the Bank assessed numerous fees.  (Id. ¶ 55.)

> Finally, the Amended Complaint alleges:
>
> In connection with the transfer of fiduciary responsibilities, and in violation of its fiduciary duty, the Bank did not disclose all material facts, including that the transfer would have a material adverse effect on such interested parties . . . that they had a right to object to the transfer and, inter alia, obtain a replacement fiduciary. . . . Plaintiffs believe and therefore allege that the Bank failed to provide such notice in each of the other instances where the fiduciary responsibilities of an Acquired Bank were taken over by the Bank or one of its predecessors. As such, all similarly affected beneficiaries were wrongly denied notice and the right to object to a transfer of fiduciary responsibilities to the Bank.

(Id. ¶¶ 27-28.)

## B.    Counts in the Amended Complaint

Counts 1 through 3 of the Amended Complaint assert claims for breach of fiduciary duty and for punitive damages. Specifically, Count 1 alleges that the Bank failed to consider the best interests of fiduciary account beneficiaries when it transferred fiduciary account assets to Nations Funds. Instead, the Bank purportedly was motivated by its own desire to generate fees and reduce operating expenses. Thus, the Bank allegedly breached its duty of loyalty to Plaintiffs. (Id. ¶¶ 70-73.) Count 2 asserts a claim for punitive damages based on Defendants "deliberately and knowingly" breaching fiduciary duties by "self-dealing in the face of obvious conflicts of interest." (Id. ¶ 74.) Count 3 asserts that Defendants and their affiliates devised a corporate plan to reduce operating expenses and increase profits by converting fiduciary account assets to Nations Funds "without regard to whether such investments were prudent and in the best interests of Plaintiffs and other beneficiaries of fiduciary accounts." (Id. ¶¶ 77-79.)

4

Count 4 alleges that Defendants were unjustly enriched by receiving fees and profits from the fiduciary accounts at the expense of the fiduciary account beneficiaries "under guise of allegedly providing more services." (Id. ¶¶ 83-85.)  Counts 5 and 6 assert breach of contract claims based on alleged promises to provide individualized investment management services to the fiduciary accounts. (Id. ¶¶ 88-89, 93.)  Count 6 also alleges that Defendants failed to give the fiduciary account beneficiaries notice that the acquisition of predecessor banks would materially change the relationship or provide the beneficiaries with the opportunity to seek a replacement fiduciary. (Id. ¶ 95.)

Counts 7 through 10 assert violations of various California state laws.  In Counts 7 and 8, Arnold seeks relief on behalf of the California sub-class under the California Probate Code for alleged self-dealing in violation of the fiduciary duties of loyalty and trust. (Id. ¶¶ 97-115.)  In Count 9, Kutten and Arnold assert violations of the California Business and Professions Code based on alleged deceptive business practices the Bank employed in self-dealing transactions. (Id. ¶¶ 116-19.)  In Count 10, Arnold and Kutten allege that the Bank violated Section 16045 of the California Probate Code by failing to exercise reasonable care. (Id. ¶¶ 122-23.)  In particular, they contend that the Bank failed to make prudent investment and management decisions with respect to the fiduciary accounts by failing to make individualized determinations and by causing the accounts to incur excessive expenses. (Id. ¶¶ 124-25.)

In Counts 11 and 12, Scharff asserts a claim on behalf of the Missouri sub-class for violations of the Missouri Prudent Investor Act, as well as Missouri common law. (Id. ¶¶ 127-28, 138-39.)  Specifically, she alleges that the Bank breached its duty of loyalty and

5

its duty to exercise reasonable care in investment management decisions by engaging in self-dealing transactions.  (Id. ¶¶ 128-36, 139-44.)

In Counts 13 through 18, Kutten asserts individual claims for breach of fiduciary duty, breach of contract, unjust enrichment, and violations of the Missouri Prudent Investor Act. (Id. ¶¶ 146-78.)

**DISCUSSION**

**A.    Standard of Review**

A complaint must include "enough facts to state a claim to relief that is plausible on its face."  Bell Atl. Corp. v. Twombly, 127 S. Ct. 1955, 1974 (2007).  When deciding a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the Court accepts all factual allegations as true and liberally construes the complaint in the light most favorable to the plaintiff.  See id. at 1964-65.

**B.    Class Claims**

Defendants argue that the Securities Litigation Uniform Standards Act of 1998 (SLUSA) preempts the state-law class claims in the Amended Complaint.  SLUSA requires preemption and dismissal of certain class actions that allege false statements or omissions of material fact made in connection with the purchase or sale of certain securities.  15 U.S.C. § 78bb(f)(1); Dudek v. Prudential Sec., Inc., 295 F.3d 875, 879 (8th Cir. 2002).  Dismissal of an action is appropriate when: (1) the action is a "covered class action" under SLUSA; (2) the action purports to be based on state law; (3) the defendant is alleged to have misrepresented or omitted a material fact; and (4) the defendant's alleged misrepresentation or omission of a material fact was made "in connection with the purchase or sale of a covered

security." Dudek, 295 F.3d at 879. The parties agree that this action constitutes a "covered class action" and alleges state law claims. Thus, only the third and fourth elements are at issue.

> 1. Misrepresentations or Omissions

Defendants argue that the essence of the Amended Complaint is based on misrepresentations and omissions made to Plaintiffs in connection with the purchase or sale of a covered security. Plaintiffs respond that the allegations of misrepresentations and omissions are merely ancillary to their state law claims.

SLUSA is "an express exception to the well-pleaded complaint rule." Rowinski v. Salomon Smith Barney, Inc., 398 F.3d 294, 304 (3d Cir. 2005). Even where plaintiffs attempt to conceal claims based on the misrepresentation or omission of material facts with state law labels, courts disregard such labels and dismiss the claims as preempted by SLUSA. See, e.g., Prof'l Mgmt. Assocs., Inc. Employees' Profit Sharing Plan v. KPMG LLP, 335 F.3d 800, 803 (8th Cir. 2003) (negligence claim preempted by SLUSA because it was "essentially a securities fraud claim"); Dudek, 295 F.3d at 879 (breach of fiduciary duty and unjust enrichment claims preempted by SLUSA because essence of complaint was that defendants misstated or omitted material facts in connection with a security's purchase and sale). Thus, the Court must focus on the substance of the allegations and be wary of efforts to circumvent SLUSA through artful pleading. See Dudek, 295 F.3d at 879-80; see also Rowinski, 398 F.3d at 304-05 (determining whether a reasonable reading of the complaint reveals allegations within SLUSA's purview); In re Salomon Smith Barney Mut. Fund Fees Litig., 441 F. Supp. 2d 579, 602 (S.D.N.Y. 2006) (dismissing breach of fiduciary duty claims

and finding plaintiffs' attempt to evade SLUSA unavailing); Felton v. Morgan Stanley Dean

Witter & Co., 429 F. Supp. 2d 684, 692 (S.D.N.Y. 2006) (looking "beyond the face of the

complaint to analyze the substance of the allegations made").  When the gravamen of the

complaint involves an untrue statement or substantive omission of a material fact, and when

that conduct coincides with a transaction involving a covered security, SLUSA mandates

dismissal.  Dudek, 295 F.3d at 879-80; see also Prof'l Mgmt. Assocs., Inc. Employees' Profit

Sharing Plan, 335 F.3d at 802 (applying SLUSA preemption to implicit allegations of

misrepresentations and omissions in connection with securities purchases).

     In this case, the class claims are framed as breach of fiduciary duty, unjust enrichment,

breach of contract, and violations of state statutes.  Nonetheless, the crux of the Amended

Complaint is that Defendants engaged in self-dealing transactions and misrepresented or

omitted material facts relating to those transactions.  (See, e.g., Am. Compl. ¶¶ 24, 27-28, 42-

44, 46-47, 50, 52.)  Indeed, Plaintiffs emphasize that "the breach of the fiduciary duty to

disclose diversion of trust assets or facts relevant to whether the bank has committed multiple

breaches of duty is what is at issue in this case."  (Pls.' Mem. Opp'n Mot. Dismiss at 11.)

Moreover, at the hearing on this Motion, Plaintiffs made clear that this action challenges

Defendants' failure to disclose:

> The Bank [transferred fiduciary account assets to Nations Funds] under the
> guise of providing individual and customized management of assets, but in fact
> were a cloak for self-dealing and engaging in conflict of interest transactions.
> . . . And we can't lose sight of the fact that that's what this case is all about.
> It's a breach of fiduciary duty case, and that duty includes disclosing to
> beneficiaries certain information.
>
> . . .

And certainly one of the components is . . . a duty to disclose, a duty to be candid, a duty to be honest with your beneficiaries, to let your beneficiaries have the straight scoop with respect to the handling of their assets. It's a very, very high duty. And we allege that . . . they have a duty under state common law, a fiduciary duty, to be candid with their beneficiaries, to disclose to their beneficiaries.

. . .

And our complaint I think clearly indicates that what they did to breach it in this case was engage in self-dealing. They did—they were not candid with us. They did not tell us that, you know, we can get you from common trust funds into mutual funds but you're going to be paying more or it's going to cost you more. Okay, we're going to be making money at your expense. That I think is something that a fiduciary should tell a beneficiary. And we're talking about billions of dollars being managed by this bank and failing to tell people we're going to convert common trust funds in the billions of dollars . . . and it's going to affect your income. It's going to affect your yield. Why wouldn't a fiduciary have the responsibility to disclose that to a beneficiary? . . . That's the failing to disclose. That's the failing to be candid. That's the failing to be honest. That's what we allege the bank failed to do repeatedly in the context of its wholesale conversion of common trust funds into their own mutual funds, and it's what the bank did when they streamlined the provision of fiduciary services to their customers.

(Aug. 1, 2007 Hr'g Tr. 25-26, 36-39.)

Thus, Plaintiffs' effort to distinguish this case from Siepel et al. v. Bank of America et al., 239 F.R.D. 558 (E.D. Mo. 2006) is unavailing. Siepel is nearly identical to this case. As in this case, current and former trust beneficiaries asserted various state law claims based on the same purportedly wrongful conduct: the transfer of fiduciary account assets into proprietary mutual funds without considering other alternatives, the failure to disclose the conflict of interest and the resulting fees, and misrepresentations that the defendant provided individualized account services. Id. at 560. Because the essence of the Siepel complaint was that the defendants made misrepresentations and omissions of material facts regarding the

transfer of fiduciary account assets to the proprietary mutual fund, the Court held that SLUSA preempted the state law claims.  Id. at 567-68.

Likewise, this case is similar to Felton; Spencer v. Wachovia Bank, N.A., No. 05-81016, 2006 WL 348043 (S.D. Fla. May 10, 2006); Beckett v. Mellon Investor Services, LLC, No. 06-5245, 2006 WL 3249189, at *3 (W.D. Wash. Nov. 8, 2006);  Broadhead Limited Partnership v. Goldman, Sachs & Co., No. 06-009, 2007 WL 951623 (E.D. Tex. Mar. 26, 2007);  Dommert v. Raymond James Financial Services et al., No. 06-102, 2007 WL 1018234 (E.D. Tex. Mar. 29, 2007); and Rabin v. JPMorgan Chase Bank, N.A., No. 06-5454, 2007 WL 2295795 (N.D. Ill. Aug. 3, 2007).  In all these cases, the plaintiffs alleged breaches of fiduciary duties, breaches of contract, unjust enrichment, and state statutory violations based on alleged failures to disclose.  Nonetheless, the courts uniformly held that SLUSA preempted the state law claims.

In Felton, the plaintiffs alleged that two agreements required the defendant to abide by the rules and customs of the National Association of Securities Dealers, New York Stock Exchange, and other self-regulatory organizations.  429 F. Supp. 2d at 687.  They further claimed that the defendant breached the agreements by failing to provide objective research and recommendations and instead provided self-serving, biased information.  Id. at 687-88.  Although the complaint alleged only a breach of contract claim, the court held that SLUSA preemption applied:

> I conclude without difficulty that Plaintiffs' claim is a securities fraud wolf dressed up in a breach of contract sheep's clothing. The gravamen of the Amended Complaint . . .  is that conflicts of interest were created . . . , conflicts "which were undisclosed to Plaintiffs and the class members. . . . While Morgan Stanley customers believed that they were paying for and

10

receiving informed and objective investment advice, they actually received recommendations based on Morgan Stanley's existing or desired investment banking deals." Plaintiffs describe this conduct as a breach by Morgan Stanley "of the standardized contracts with the Plaintiffs and Class members," and so it may have been, but it is also a quintessential example of a fraudulent omission of a material fact under the federal securities laws.

Id. at 693.

In Spencer, the plaintiff alleged that the defendant engaged in self-dealing by investing trust assets in affiliated mutual funds without disclosing that the funds were affiliated with the defendant and by charging undisclosed advisory and management fees against the trust assets. 2006 WL 348043, at *1. Attempting to avoid SLUSA preemption, the plaintiff argued that her claim was for breach of fiduciary duty and was not predicated on misrepresentations or omissions. In rejecting the argument, the Spencer court noted that the complaint was rife with claims of misrepresentations and dismissed the action based on SLUSA preemption. Id. at *4.

In Beckett, the plaintiff learned that the defendant had assessed fees for a requested stock sale and sued for breach of contract, breach of fiduciary duties, unjust enrichment, and state consumer protection law violations. 2006 WL 3249189, at *1. Notably, the complaint contained "no explicit reference to any fraudulent activity such as a misrepresentation or omission of material fact." Id. at *3. Nonetheless, the court ruled:

> Any reasonable reading of [the] complaint evidences allegations of misrepresentation or omission of material facts in connection of the purchase or sale of securities. The allegation of charging of undisclosed fees and paying Plaintiff share proceeds below prevailing market prices is an allegation of a misrepresentation or omission of material fact concerning the terms of the sale of stocks.

Id. at *4. Thus, the court ruled that SLUSA preempted the state law class claims.

11

In <u>Broadhead</u>, the plaintiff alleged that the defendant breached fiduciary duties by failing to disclose all fees and expenses charged to investors.  2007 WL 951623, at *1.  As in this case, the defendant had discretionary authority over the plaintiff's account and had a fiduciary duty to disclose fees earned in connection with the plaintiff's transactions.  <u>Id.</u>  The plaintiff asserted various state law claims, including breach of fiduciary duty, breach of contract, and unjust enrichment.  <u>Id.</u> at *2.  Nonetheless, the court disregarded the "labels assigned to the causes of action" and determined that complained-of conduct was the failure to disclose fees associated with bond purchases.  <u>Id.</u> at *5.  SLUSA preemption therefore applied.  <u>Id.</u>

<u>Dommert</u> also involved a defendant who had complete discretionary authority over the plaintiff's funds.  2007 WL 1018234, at *2.  The plaintiff alleged that the defendant breached an investment management service agreement and its fiduciary duties by failing to act in her best interest and by failing to disclose material information about fees assessed against her.  <u>Id.</u> at *2-*3.  Recognizing that courts must look at the allegations as a whole, the court noted that the complaint made "specific references to omissions and failures to disclose" and ruled that the claims were "clearly based upon alleged fraudulent omissions." <u>Id.</u> at *7-*8.  It further explained:

> The core basis of her claims is that the Defendants failed to disclose important information to the Plaintiffs, including material details about fees and financial gain retained by Defendant to the Plaintiffs, luring investors into paying excessive fees. . . .  Whether these alleged failures to disclose are couched in the terms of a fiduciary duty or claims of fraud, they are, in their simplest form, allegations that the Defendants "omitted" important information from their disclosures to Plaintiffs under the Agreement. . . . No matter how she legally characterizes her claims, material misrepresentations and omissions serve as the factual predicate for Plaintiff's state law claims.

<u>Id.</u> at *8.

In <u>Rabin</u>, the plaintiffs were beneficiaries of a trust maintained by the defendant. 2007 WL 2295795, at *1. As in this case, the plaintiffs alleged that the defendant unilaterally invested fiduciary account assets into its proprietary mutual fund without regard to whether such investments were in the best interests of the beneficiaries. <u>Id.</u> The plaintiffs further contended that the defendant generated undue profits by charging excessive fees. <u>Id.</u> They maintained that the breach of fiduciary duty and unjust enrichment claims were "merely ancillary to and not predicated upon" material misrepresentations and omissions. <u>Id.</u> at *6. The court rejected that argument, reasoning that attempts to disguise securities fraud claims as breach of fiduciary duty claims are "not enough to evade preclusion of those claims under SLUSA." <u>Id.</u> (citing <u>Potter v. Janus Inv.</u>, 483 F. Supp. 2d 692, 702 (N.D. Ill. 2007). Thus, the court analyzed the substance of the allegations and found that misrepresentations and omissions of material facts relating to the purchase of mutual fund shares were "the heart of the Amended Complaint." <u>Id.</u>

The analyses in all these cases apply in this action. Plaintiffs purposefully distance themselves from any fraud claims and cast their claims as various state law claims. Nonetheless, as Plaintiffs' counsel recognized at oral argument, the essence of the Amended Complaint is that Defendants misrepresented and omitted material facts relating to the transfer of assets to Nations Funds, such as conflicts of interest and expenses related to the transfer. These allegations are incorporated into the state law claims by reference. <u>See</u> <u>Prof'l Mgmt. Assocs., Inc.</u>, 335 F.3d at 803; <u>Rowinski</u>, 398 F.3d at 300. Moreover, each state law claim hinges on harm caused by Defendants' misrepresentations and omissions of material

facts regarding the purchase of Nations Funds.  Thus, the attempt to cast their allegations as state law claims is unavailing.

> 2.  "In Connection with the Purchase or Sale of a Covered Security"

Both parties are well aware of how this Court has interpreted the "in connection with" requirement in light of Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Dabit, 547 U.S. 71 (2006).  See Siepel, 239 F.R.D. at 568-69.  Thus, the Court will add only that several recent cases have paralleled the analysis in Siepel.  See U.S. Mortgage, Inc. v. Saxton, ___ F.3d ___, 2007 WL 2027370, at *5-*8 (9th Cir. July 13, 2007) (rejecting the argument that SLUSA was inapplicable because the plaintiffs did not purchase any security in response to the misrepresentation and therefore did not allege a fraud in connection with the purchase or sale of a security); Disher v. Citigroup Global Mkts., Inc., 487 F. Supp. 2d 1009, 1018 (S.D. Ill. 2007) (finding that the plaintiffs lacked standing to sue under federal securities law did not take the claims out of the scope of SLUSA preemption); Fisher v. Kanas, 487 F. Supp. 2d 270, 277 (E.D.N.Y. 2007) (noting that Dabit instructs courts to interpret SLUSA broadly to include "any misrepresentation touching upon the purchase or sale of securities"); Rubery v. Radian Group, Inc., No. 07-1068, 2007 WL 1575211, at *2 (E.D. Pa. May 31, 2007) (refusing to permit "manipulative tactics" to avoid SLUSA preemption through artful pleading and holding that an exchange as part of a merger was sufficient to satisfy the "in connection with" requirement); Dommert, 2007 WL 1018234, at *9-*12 (noting that the purpose of the agreement was to manage the plaintiff's assets, which encompassed the purchase and sale of stock and therefore met the "in connection with" requirement); Rabin, 2007 WL 2295795, at *7 (finding the "in connection with" requirement met even though the

plaintiffs did not purchase, sell, or hold shares because the plaintiffs alleged that defendant engaged in a scheme to invest proceeds from the beneficiaries' accounts into a proprietary mutual fund).

Plaintiffs allege that Defendants misled fiduciary account beneficiaries about Nations Funds and the fees associated with transferring fiduciary account assets to the funds. The alleged deception was premised on the purchase of Nations Funds, and Plaintiffs' alleged injury was linked directly to the forced purchase of Nations Funds with fiduciary account assets. Thus, SLUSA preempts the state law class action claims. The Court grants the Motion to Dismiss on all class claims.

## C.    Kutten's Individual Claims

Kutten argues that her individual state law claims remain despite dismissal of the class action claims. She relies on diversity jurisdiction under 28 U.S.C. § 1332(a). Defendants advance three arguments in favor of dismissing Kutten's individual claims: (1) SLUSA requires dismissal of the individual claims; (2) Kutten is collaterally estopped from arguing that she meets the amount-in-controversy requirement under § 1332(a); and (3) Kutten has failed to present sufficient evidence to meet the amount-in-controversy requirement.

### 1.    SLUSA Preemption

Defendants argue that SLUSA preemption requires dismissal of Kutten's individual claims. SLUSA mandates dismissal of an entire class action when at least one of the class action claims is preempted. See 15 U.S.C. § 78bb(f)(1); see also In re Lord Abbett Mut. Funds Fee Litig., 463 F. Supp. 2d 505, 511-15 (D. N.J. 2006). However, SLUSA preemption applies only to class actions. This case is unusual because it includes both class action claims

and individual claims. SLUSA preempts the state law class action claims, but the individual claims survive.

> 2.    Collateral Estoppel

Defendants argue that Kutten is collaterally estopped from asserting that her individual claims meet the amount-in-controversy requirement under § 1332(a). Kutten argues that collateral estoppel does not apply because the issue of whether her damages exceed the amount-in-controversy requirement was not an issue of ultimate fact previously determined by a valid and final judgment.

"The underlying goal of issue preclusion, also known as collateral estoppel, is to promote judicial economy and finality in litigation." Allstate Ins. Co. v. Blount, 491 F.3d 903, 909 (8th Cir. 2007) (citation omitted). To determine whether to apply collateral estoppel, the Court considers the following four factors:

> (1) whether the issue decided in the prior adjudication was identical to the issue presented in the present action; (2) whether the prior adjudication resulted in a judgment on the merits; (3) whether the party against whom estoppel is asserted was a party or was in privity with a party to the prior adjudication; and (4) whether the party against whom collateral estoppel is asserted had a full and fair opportunity to litigate the issue in the prior suit.

Id. (citation omitted). Although dismissal without prejudice does not result in claim preclusion, "an issue actually decided in a non-merits dismissal is given preclusive effect in a subsequent action between the same parties." Pohlmann v. Bil-Jax, Inc., 176 F.3d 1110, 1112 (8th Cir. 1999). Thus, courts have barred parties from re-litigating the issue of subject matter jurisdiction, even where the previous action was dismissed without prejudice. Id. (citing Healy v. Atchison, Topeka & Santa Fe R.R., 287 S.W.2d 813, 815 (Mo. 1956); see

16

also Oglala Sioux Tribe of Pine Ridge Indian Reservation v. Homestake Mining Co., 722

F.2d 1407, 1411 (8th Cir. 1983) ("Dismissal of a suit for lack of federal subject matter

jurisdiction precludes re-litigation of the same issue of subject matter jurisdiction in a second

federal suit on the same claim."); Sexton v. Jenkins & Assocs., Inc., 152 S.W.3d 270, 273

(Mo. 2004) (although dismissal of first action was without prejudice, the first action

adjudicated the issue of subject matter jurisdiction; thus, the second action was precluded by

the first action, pursuant to collateral estoppel).

　　　　Nonetheless, the Court finds that collateral estoppel should not apply in the unusual

circumstances of this case.  Kutten previously asserted individual claims against Defendants

in Kutten et al. v. Bank of America, N.A. et al., No. 04-0244 (Kutten I).[4]  In May 2006, the

Court found that Kutten failed "to submit a scintilla of evidence" required to establish

diversity jurisdiction under § 1332(a).  Kutten I, 2006 WL 1520588, at *2 (E.D. Mo. May

26, 2006).  The Court further noted that none of the documents on which Plaintiffs relied was

included in the record. Id.  The Court does not condone the inefficiency and ineffectiveness

of Plaintiffs' counsel relating to this issue.   If Kutten had the proof to meet the amount-in-

controversy requirement in Kutten I, she should have presented it then.  Nonetheless, the

Court dismissed the action without prejudice to allow Plaintiffs to cure the jurisdictional

---

[4]  Kutten commenced Kutten I on behalf of herself and her daughters, as well as on behalf
of the putative class and a Missouri sub-class.  As in this case, she asserted that Defendants
had breached various fiduciary and contractual duties with respect to the administration of
trust accounts.  Thereafter, the complaint was amended to add Plaintiffs Mary Ann Arnold
and Elsie Mahler Scharff and to drop Ellen Jane Kutten as a class representative.  The
amended complaint asserted fifteen claims, including breach of fiduciary duty, breach of
contract, unjust enrichment, and violations of various California and Missouri statutes.

deficiencies in <u>Kutten I</u> and to name additional plaintiffs.[5]  Thus, the Court finds that collateral estoppel does not apply here because the Court provided Kutten another opportunity to establish subject matter jurisdiction.[6]

    3.    <u>Sufficiency of the Evidence</u>

Defendants also argue that Kutten fails to present sufficient evidence to meet the amount-in-controversy requirement.  When determining the amount in controversy, "a complaint that alleges the jurisdictional amount in good faith will suffice to confer jurisdiction, but the complaint will be dismissed if it appears to a legal certainty that the claim is really for less than the jurisdictional amount."  <u>Capitol Indem. Corp. v. 1405 Assocs., Inc.</u>, 340 F.3d 547, 549 (8th Cir. 2003) (citation omitted).  Because Defendants challenge the allegations as to the amount of controversy, Kutten must establish by a preponderance of the evidence that she satisfies the amount-in-controversy requirement.  <u>Rasmussen v. State Farm Mut. Auto. Ins. Co.</u>, 410 F.3d 1029, 1031 (8th Cir. 2005) (citation omitted).

---

[5] The additional named plaintiffs were Michael R. Medler, Jeffrey P. Medler, and John F. Medler, Jr.  In May 2007, the Court dismissed all claims by the Medlers based on a joint stipulation.

[6] The Court dismissed the action without prejudice because Plaintiffs claimed they could establish subject matter jurisdiction by asserting federal law claims.  The initial Complaint asserted six federal securities law claims, as well as claims of breach of fiduciary duty, aiding and abetting, unjust enrichment, and violations of various California and Missouri statutes. In response to a motion to dismiss, the plaintiffs filed the Amended Complaint, which withdrew the federal securities law claims and added other state law claims. Jurisdiction was based on the Class Action Fairness Act of 2005, <u>see</u> 28 U.S.C. § 1332(d), and supplemental jurisdiction under 28 U.S.C. § 1367.  (Am. Compl. ¶ 13.)  However, the Amended Complaint also alleges "Kutten has sustained damages in excess of $75,000," thereby implicitly invoking diversity jurisdiction under 28 U.S.C. § 1332(a).  (<u>Id.</u>)

First, it is noteworthy that Kutten attempts to bear her burden in a terse footnote, merely proclaiming that her damages exceed the amount-in-controversy requirement. (Pls.' Mem. Opp'n Mot. Dismiss at 33 n.14.) Nowhere does Kutten specifically identify the total amount she seeks in damages. Second, much of her declaration and exhibits have no bearing on the amount in controversy. For example, the first sixteen paragraphs and approximately twenty exhibits relate to her dissatisfaction with Defendants' conduct but have no bearing on the amount-in-controversy requirement. (Kutten Decl. ¶¶ 1-16, Exs. A-L, N-O.)

Paragraph 17 of her declaration, as well as exhibits attached, appear to support her damages claim. However, there are several flaws and inconsistencies in this evidence. For example, in Paragraph 17(a), Kutten explains that she incurred $6,600 in attorneys' fees (see id. ¶ 17(a), Ex. P.) but does not explain why she is statutorily entitled to those fees. As the Court explained in Kutten I, "only statutory attorney fees count toward the jurisdictional minimum calculation." 2006 WL 1520588, at *4 (citing Rasmussen, 410 F.3d at 1031). Likewise, the Court already ruled that Kutten failed to meet the standard for punitive damages, see id. at *2-*3, which Kutten relies on in Paragraph 17(o). (Kutten Decl. ¶ 17(o).)

In Paragraph 17(b), Kutten calculates fees paid to the Bank during certain periods, but the underlying exhibit does not support her calculation. (Id. ¶ 17(b), Ex. Q.) Kutten also relies on a morass of account statements but does not pinpoint any specific area of reference. (Id. Ex. EE.) The Court will not sift through the record to locate evidence to support her position. See Rodgers v. City of Des Moines, 435 F.3d 904, 908 (8th Cir.2006) ("Without some guidance, we will not mine a summary judgment record searching for nuggets of factual disputes to gild a party's arguments"); Nw. Nat'l Ins. Co. v. Baltes, 15 F.3d 660, 662-

19

63 (7th Cir.1994) ("District judges are not archaeologists."); <u>United States v. Dunkel</u>, 927 F.2d 955, 956 (7th Cir.1991) ("Judges are not like pigs, hunting for truffles buried in briefs"); <u>Nicholas Acoustics & Specialty Co. v. H & M Constr. Co., Inc.</u>, 695 F.2d 839, 846-47 (5th Cir.1983) ("Judges are not ferrets!").

In Paragraphs 17(d) and 17(e), Kutten claims to have suffered losses in 2003 but again cites to a mass of account statements dated 1999 through 2000—not 2003. (Kutten Decl. ¶ 17(d)-(e), Ex. EE.) In Paragraphs 17(f) through 17(h), she complains of losses in a Charles Schwab brokerage account, which has no connection to the conduct alleged in the Amended Complaint. (<u>Id.</u> ¶¶ 17(f)-(h), Exs. U-W.) In Paragraphs 17(i) and 17(k), she claims that the Kutten trust accounts lost money due to Defendants' misconduct, but the document supporting the claim shows that the accounts increased in value. (<u>Id.</u> ¶¶ 17(i), (k), Ex. X.) Similarly, in Paragraph 17(m), she claims that the investment in Nations Funds caused the trust accounts to decline in value. (<u>Id.</u> ¶ 17(m).) However, the document on which she relies shows that Nations Funds provided a gain—not a loss. (<u>Id.</u> Ex. EE.)

However, some evidence supports a finding that the amount-in-controversy requirement is met. First, Kutten explains that the Kutten trust accounts lost approximately $9,343 from October 17, 2003 to November 26, 2003, the period the Bank refused to sell Nations Funds. (<u>Id.</u> ¶ 17(c), Ex. R.) Defendants present no evidence to refute this statement. Second, Kutten calculates that the Bank charged her and her daughters more than $150,000 in fees, "none of which were earned by the Bank and all of which are recoverable as damages." (<u>Id.</u> ¶ 17(l); Ex. BB.) Defendants contend that account statements show that one of Kutten's daughters paid only $10,000—not $50,000 as claimed. However, Defendants

do not challenge the remaining $100,000 in fees assessed. Finally, Kutten calculates that the Kutten trust accounts paid $14,555 in fees relating to the investment in Nations Funds. (Id. ¶ 17(j), Ex. Z.) Defendants do not challenge this calculation either.[7] Based on this evidence, the Court cannot conclude with legal certainty that Kutten fails to meet the amount-in-controversy requirement under § 1332(a).[8] The individual claims survive the Motion to Dismiss.

**CONCLUSION**

SLUSA preempts all state law class claims asserted in this action. However, Kutten has established diversity jurisdiction over her individual claims. Accordingly, **IT IS HEREBY ORDERED** that:

1. Defendants' Motion to Dismiss the Amended Complaint (Docket No. 41) is **GRANTED in part** and **DENIED in part**; and

2. Counts 1-12 of the Amended Complaint are **DISMISSED with prejudice**.

Dated: August 29, 2007

s/ Paul A. Magnuson
Paul A. Magnuson
United States District Court Judge

---

[7] Defendants also argue that the Court should disregard Kutten's declaration altogether, contending that it contradicts her prior deposition testimony. However, Kutten previously testified that she was unable to determine the damages she suffered and deferred to her expert witness. Through the declaration, Kutten shows that she now has determined her damages. Thus, her declaration is not inherently inconsistent with her prior deposition testimony.

[8] There is no dispute that Kutten meets the diversity-of-citizenship requirement under 28 U.S.C. § 1332(a)(1).

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | | |
|---|---|---|
| ELLEN JANE KUTTEN, individually, and on behalf of her daughters, | ) ) ) | |
| | ) | |
| and | ) ) | |
| MARY ANN ARNOLD, ELSIE MAHLER SCHARFF, JOHN F. MEDLER, JR., MICHAEL R. MEDLER, and JEFFREY P. MEDLER, on behalf of themselves, and all others similarly situated, | ) ) ) ) ) ) ) ) | Case No. 4:06 CIV 0937 (PAM) |
| Plaintiffs, | ) ) ) | |
| v. | ) ) | |
| BANK OF AMERICA, N.A. | ) ) | |
| and | ) ) | |
| BANK OF AMERICA CORPORATION, | ) ) | |
| Defendants. | ) ) ) | |

**DEFENDANTS BANK OF AMERICA, N.A. AND BANK OF AMERICA**
**CORPORATION'S MEMORANDUM OF LAW IN SUPPORT OF**
**MOTION TO CONTINUE STAY OF DISCOVERY**

Defendants, Bank of America N.A. and Bank of America Corporation ("Defendants"), move to continue the automatic and mandatory stay of discovery under Federal law. As set forth herein, any attempt by Plaintiffs to press discovery prior to this Court's ruling on the legal sufficiency of Plaintiffs' claims is premature and barred by the automatic stay provisions of the Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. §§ 77z-1(b)(1), 78u-4(b)(3)(B).

## BACKGROUND

Plaintiffs initiated the action at this case number on June 16, 2006, less than one month after this Court dismissed Kutten et al. v. Bank of America, N.A. et al., No. 04-0244 (PAM) (E.D. Mo. May 26, 2006) ("*Kutten I*") for lack of subject matter jurisdiction.  In the "new" initial complaint,[1] Plaintiffs added numerous securities claims based on the same underlying allegations of *Kutten I*.  Counts I through III of the complaint allege violations of various sections of the Securities Act of 1933.  Counts IV and V assert violations of the Exchange Act of 1934 and Count VI alleges violations of the Investment Advisers Act of 1940.  Counts VII through XV are state law claims, which are subject to preemption under the Securities Litigation Uniform Standards Act of 1998 ("SLUSA") because they are based upon allegations of an untrue statement or omission of a material fact made in connection with the purchase or sale of a covered security.

On September 14, 2006, Defendants moved for the dismissal of the complaint noting the numerous deficiencies and the reasons why Plaintiffs' claims lacked merit or were preempted under federal law.  (Docket Entry No. 18).

Pursuant to stipulation, Plaintiffs' Response was due on or before October 24, 2006, with Defendants' Reply due on or before November 14, 2006.  On October 24, 2006 – the final day for filing of Plaintiffs' Response – Plaintiffs filed an Amended Complaint.  (See Docket Entry No. 23).  The Amended Complaint represents Plaintiff Kutten's **sixth** complaint filed against the Defendants containing substantially similar allegations.  No opposition was filed to the Motion to Dismiss.

As in the Siepel action, Plaintiffs' purported Amended Complaint attempts to withdraw all of the federal securities claims asserted in the original complaint and sets forth various state law claims including, *inter alia*, breach of fiduciary duty, breach of contract, unjust enrichment

---

1    In the *Kutten I* action, Plaintiffs set forth an original and three amended complaints.  The initial complaint in this matter, therefore, represents Plaintiff Kutten's **fifth** complaint against the Defendants containing substantially similar allegations.

and claims under Missouri and California law.  The Amended Complaint baldly states that "[T]his Complaint is not pre-empted by the Securities Litigation Uniform Standards Act (SLUSA) in that the claims asserted herein are not state law claims made 'in connection with the purchase, sale or holding of a security.'"  See Amended Complaint ¶ 3.

The purported Amended Complaint suffers from many of the same defects as the original complaint as well as numerous others.  Should the Court permit Plaintiffs' amendment, Defendants intend to, once again, move to dismiss this filing.

## ARGUMENT

Congress enacted the PSLRA in an attempt to reform federal securities class actions and to curb abusive and meritless securities litigation.  H.R. Conf. Rep. 104-369, at 31 (1995).  The PSLRA imposes heightened pleading requirements for class actions alleging fraud in the sale of national securities and also provides for a mandatory stay of discovery to allow district courts, prior to discovery, to determine the legal sufficiency of claims brought in securities class actions.  Riley v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 292 F. 3d 1334, 1340-41 (11th Cir. 2002).  The procedural and substantive restrictions on private securities suits in federal court imposed by the PSLRA include heightened pleading requirements and more rigorous standards for class representation.  Spencer v. Wachovia Bank, N.A., No. 05-81016, 2006 U.S. Dist. LEXIS 52374 at *5 (S.D. Fla. May 10, 2006).

In furtherance of the intent to curb abusive and meritless securities litigation, in class actions involving the sale or purchase of securities, all discovery is stayed pursuant to the PSLRA during the pendency of a motion to dismiss.  Section 27(b)(1) of the Securities Act of 1933 and Section 21D(b)(3)(B) of the Exchange Act of 1934 provide for essentially identical discovery stays.  The relevant provision provides:

> In any private action arising under this subchapter, **all discovery and other proceedings shall be stayed during the pendency of any motion to dismiss,** unless the court finds, upon the motion of any party, that particularized discovery is necessary to preserve evidence or to prevent undue prejudice to that party.

15 U.S.C. §§ 77z-1(b)(1), 78u-4(b)(3)(B)(emphasis added).

As an integral part of its overall reform efforts, Congress incorporated this provision of the PSLRA to serve as a check on baseless suits by stemming the costs of unnecessary discovery and meritless "fishing expeditions."  See S. Rep. 104-98, at 14 (1995) ("the Committee has determined that discovery should be permitted in securities class actions only **after** the court has sustained the legal sufficiency of the complaint.") (emphasis added).  Recognizing the Congressional intent and purpose of the PSLRA, Courts have interpreted the provision as creating "a strong presumption that *no* discovery should take place until a court has affirmatively decided that a complaint *does* state a claim under the securities laws, by denying a motion to dismiss."  Podany v. Robertson Stephens, Inc., 350 F.Supp.2d 375 (S.D.N.Y. 2004) (emphasis in original).[2]

To lift the automatic and mandatory stay of discovery, the plaintiff bears a heavy burden of petitioning the court to pursue discovery.  In re Fannie Mae Sec. Litig., 362 F.Supp.2d 37, 39 (D.D.C. 2005) (denying plaintiffs' motion for partial lift of PSLRA discovery stay to pursue limited discovery).  Pursuant to the PSLRA's stay provision, the automatic stay of discovery will be lifted only in exceptional circumstances required to "preserve evidence" or to prevent "undue prejudice."  See 15 U.S.C. §§ 77z-1(b)(1), 78u-4(b)(3)(B); see, e.g., In re Northwestern Corp. Sec. Litig., 329 F.Supp.2d 1105 (D.S.D. 2004) (automatic stay of discovery imposed by the PSLRA would not be lifted to allow securities fraud plaintiffs to obtain discovery from defendants' corporate employees); In re Carnegie Int'l Corp. Sec. Litig., 107 F. Supp. 2d 676, 684 (D. Md. 2000) (PSLRA provision, automatically staying discovery in any private action arising under federal securities laws during pendency of motion to dismiss, precluded service of subpoena duces tecum).

In this instance, it is clear that the automatic and mandatory stay provisions have been triggered and that a stay of all discovery should be continued.  Indeed, Plaintiffs' allegations of

---

2       The Eighth Circuit has recognized that even in an ordinary lawsuit "[d]iscovery should follow the filing of a well-pleaded complaint" and "it is not a device to enable a plaintiff to make a case when his complaint has failed to state a claim."  Kaylor v. Fields, 661 F.2d 1177, 1184 (8th Cir. 1981).

securities violations in the original complaint clearly invoke the PSLRA and its automatic stay. And, courts have held accordingly concluding that a stay of discovery is warranted in proposed class actions where the complaint includes allegations of securities fraud such as violations of the Exchange Act of 1934, including one court that recently examined a proposed securities fraud complaint alleging violations of Section 10(b) and Rule 10b-5 of the Exchange Act of 1934, various provisions of the Investment Company Act of 1940 as well as claims for unjust enrichment and upheld the automatic stay of discovery under the PSLRA.  See In re Smith Barney Transfer Agent Litig., No. 05-Civ-7583, 2006 U.S. Dist. LEXIS 42646 at *1 (S.D.N.Y. June 26, 2006).  See also In re Fannie Mae Secs. Litig., 362 F. Supp.2d at 39; Podany, 350 F.Supp.2d at 375.

Moreover, the purpose and intent of the PSLRA is effectuated here, where as set forth fully in the Motion to Dismiss the original complaint, Plaintiffs' securities claims suffer numerous fundamental deficiencies.  These include, among others, Plaintiffs' failure to meet the stringent pleading requirements of the PSLRA with respect to their claims under the Exchange Act of 1934.

And, despite Plaintiffs' attempt to "remove" the securities claims by filing an Amended Complaint, the allegations of the Amended Complaint plainly involve the sale or purchase of a security; thus, also invoking the PSLRA.  Plaintiffs' attempt to remove the securities law claims does not change the fact that securities – the purchase and sale of shares of mutual funds – is what is at issue in this case.  Nor does the removal of such claims change the fact that SLUSA preempts the state law claims, thereby triggering the automatic stay provision.

Further, no exceptional circumstances have been or can be raised by Plaintiffs necessitating a lift of this mandatory stay.  Thus, pursuant to the PSLRA, all discovery should remain stayed in this matter pending an evaluation of Plaintiffs' claims by the Court.

To the extent that there is opposition to the continuation of the automatic stay, it is anticipated that three grounds will be raised:  (1) that the state law claims are not subject to the automatic stay; (2) that the "removal" of the federal securities claims so as to purportedly leave

only state law claims exempts this case from the automatic stay; or, (3) that at the present time, with the filing of the Amended Complaint, no motion to dismiss is of record to invoke the PSLRA. Each of these contentions is incorrect.

**First**, as to the contention that state law claims are not subject to a stay under the PSLRA, recent decisions clearly indicate that a plaintiff cannot circumvent the stay and vitiate the PSLRA's requirements by including non-securities claims in a complaint. See In re Smith Barney Transfer Agent Litig., No. 05-Civ-7583, 2006 U.S. Dist. LEXIS 42646 *3-4 (S.D.N.Y. June 26, 2006) (denying plaintiffs' assertion that discovery may proceed with respect to their state common law claims recognizing that Congress could not possibly have intended for the PSLRA to be so easily marginalized) (citations omitted). Thus, all discovery remains stayed, including discovery on the state law claims.

**Second**, Plaintiffs' "removal" of their claims under the federal securities laws through the filing of an Amended Complaint containing only state law claims does not escape application of an automatic stay here. Indeed, along with the PSLRA, SLUSA warrants dismissal with respect to the claims couched under state law and the Court must focus on the substance of those allegations and be wary of efforts to circumvent SLUSA through artful pleading in both the original complaint and the purported Amended Complaint. As outlined below, the Congressional intent and purpose of the automatic stay provision of the PSLRA was designed for precisely this type of meritless action.[3]

In fact, Congress did not end its efforts to reform the pervasive abuse of federal securities litigation with the PSLRA. In an attempt to circumvent the PSLRA, plaintiffs began filing class

---

[3]   Plaintiffs have been in search of a claim for nearly four years and have filed **eight** actions against Defendants regarding the administration of individual trust accounts. As noted by this Court in *Kutten I*, after years of extensive discovery, Plaintiffs could not set forth a "scintilla of evidence" of any damage to prove the requisite amount in controversy. In an attempt to cure the many defects of *Kutten I*, Plaintiffs filed yet another complaint here alleging newly-minted securities claims with the hope of conducting even more burdensome discovery. Plaintiffs' counsel's tactics in this and related litigation provide an example of what Congress sought to curtail when it enacted the PSLRA and SLUSA – the filing of meritless federal securities class actions with the hopes that burdensome and costly discovery would perpetuate baseless claims or compel a settlement.

actions in state courts and asserting their claims under state statutory and common law.  Pub. L.

No. 105-353 § 2 (1998).  To prevent this end run around the PSLRA, Congress enacted SLUSA

to ensure that national, federal standards would be applied to challenges involving publicly-

traded securities.  See Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Dabit, 126 S.Ct. 1503,

1511 (2006); Dudek v. Prudential Sec., Inc., 295 F.3d 875, 877 (8th Cir. 2002).  Thus, "SLUSA

provides for the immediate dismissal of certain putative class actions based on state law alleging

an untrue statement or omission of a material fact made in connection with the purchase or sale

of a covered security."  Vohs v. Miller, 323 F. Supp.2d 965, 973 (D. Minn. 2004) (citing Dudek,

295 F.3d at 877 n.1).

Like the PSLRA, SLUSA imposes additional limitations on discovery.  In re DPL Sec.

Litig., 247 F. Supp. 2d 946, 947 (D. Ohio 2003).  Congress recognized the continuing efforts of

plaintiffs to obtain discovery in state courts and SLUSA gives federal courts the power to stay

such discovery proceedings in state courts.  See 15 U.S.C. §§ 77z-1(b), 78u-4(b)(3).  SLUSA

also amended the Securities Act of 1933 and the Exchange Act of 1934 by adding the following

provision:

> CIRCUMVENTION OF STAY OF DISCOVERY  -- Upon a proper
> showing, a court may stay discovery proceedings in any private action in a
> State court as necessary in aid of its jurisdiction, or to protect or effectuate
> its judgments, in an action subject to a stay of discovery pursuant to this
> subsection.

15 U.S.C. §§ 77z-1(b), 78u-4(b)(3).  Accordingly, both the PSLRA and SLUSA

demonstrate a Congressional intent to require plaintiffs to state a claim under the

heightened pleading requirements of the PSLRA before being allowed to proceed with

discovery in an alleged securities fraud putative class action.

Application of these statutes is exemplified by the decision of the court in Spencer v.

Wachovia Bank, N.A., 2006 U.S. Dist. LEXIS 52374 at *4-8.  There, the plaintiff, **raising only

state law claims**, asserted that Wachovia, the trustee, engaged in self-dealing in breach of its

duty of loyalty to trust beneficiaries by investing trust assets in affiliated mutual funds without

disclosing that such funds were affiliated with Wachovia, and by charging undisclosed advisory

and management fees against the trust assets in relation to these funds.  Id. at *3.  Upon request and indicative of the proper application of the stay provisions of the PSLRA and SLUSA, the Spencer court stayed all discovery in the case pending a ruling on defendants' motion to dismiss because the allegations in the complaint implicated federal securities claims.  See Order Granting Motion to Stay Discovery attached as Exhibit A.  According to the court, this was necessary to prevent a "waste of litigant and judicial resources."  See Exhibit A.  Thereafter, the court ruled on the motion to dismiss and held that the state law claims in plaintiff's complaint were preempted by SLUSA.  Spencer, 2006 U.S. Dist. LEXIS 52374 at *26.

The same should occur here.  Plaintiffs' allegations and state law claims substantially mimic those before the court in Spencer and trigger an automatic stay of all discovery.  And, as set forth in Defendants' Motion to Dismiss, Plaintiffs' claims, just like those in Spencer, are preempted by SLUSA.

**Third**, with respect to the application of the automatic stay to the procedural posture of this case, it is clear that the automatic stay should either remain in effect because of the pending Motion to Dismiss or because of Defendants' intention to move this Court for dismissal again if the Amended Complaint is accepted in this case.  Until the Court rules on the legal sufficiency of Plaintiffs' claims asserted in either of the two complaints, the discovery stay should remain in effect.

In interpreting whether the stay is in effect "during the pendency of a motion to dismiss," several courts have held that the automatic stay provision of the PSLRA is indeed "triggered by the mere indication by defense of its intention to file a motion to dismiss."  Carnegie, 107 F. Supp. 2d at 684; see also, In re Trump Hotel Shareholder Derivative Litigation, No. 98CIV7820 (DAB), 1997 U.S. Dist. LEXIS 11353 at *2 (S.D.N.Y. Aug. 5, 1997) (holding the stay provision of the PSLRA applied where the defense had represented its intent to file a motion for dismissal)[4].  Thus, although a motion to dismiss may not yet be pending but the defendant has

---

[4]    The court specifically noted that "although plaintiffs are correct that no dismissal motion has yet been filed, this appears to be solely the result of the schedule to which the parties have agreed."  In re Trump Hotel Shareholder Derivative Litigation, 1997 U.S. Dist. LEXIS 11353 at
Continued on following page

expressed an intent to file such a motion, the automatic stay of the PSLRA should remain in effect "until the defendants have the opportunity to test the sufficiency of the complaint under the orderly procedures provided by the rules and court orders."  Carnegie, 107 F. Supp. 2d at 684 (rejecting plaintiffs' argument that the automatic stay provision of the PSLRA does not apply where the defense has not yet filed its motion to dismiss).  The Court in Carnegie recognized that the intent of the PSLRA is best served by maintaining the stay of discovery where the defense expressed an intent to file a motion to dismiss because "[A]ny other interpretation would encourage unseemly gamesmanship, i.e., a race to serve subpoenas for discovery before a defendant had the opportunity to test the sufficiency of the complaint."  Id.[5]  To effectuate the purpose of the PSLRA, this Court should maintain the automatic stay of discovery here until the Court rules on the legal sufficiency of Plaintiffs' claims as asserted in either the original complaint or the Amended Complaint.

In sum, the intent and effect of the PSLRA and SLUSA are clear – a stay is in effect until a case implicating such claims passes muster before the Court.  This case does not.  And, appropriately, until this Court renders a decision in that regard, a stay must continue to be in effect.

---

Continued from previous page

*2.  Indeed, the parties here have entered into such a Stipulation for Extension of Time whereby Defendants shall have 30 days from the date of the Court's decision with respect to the Amended Complaint to answer, move, or otherwise respond to this amendment.  (See Docket Entry No. 26).

5      This Court should adopt such reasoning and maintain the stay of discovery in light of the continued "gamesmanship" exhibited here, including the eleventh hour filing of the Amended Complaint.  Indeed, "the Federal Rules provide for the orderly and ordered consideration of the merits of legal disputes -- not a prize to the swiftest."  Carnegie, 107 F. Supp. 2d at 684.  The mandatory stay provision of the PSLRA is in effect "until the deadline for filing a motion to dismiss passes, or the defendants otherwise waive their rights to file a motion, or the Court rules on a motion to dismiss."  Id.

## **CONCLUSION**

For the reasons set forth herein, this Court should continue the stay of discovery pursuant to the PSLRA until the Court rules on the legal sufficiency of Plaintiffs' claims.

DATED:  November 3, 2006                    Respectfully submitted,

                                            BRYAN CAVE LLP

                                    By:     /s/ Jeffrey S. Russell_____
                                            Jeffrey S. Russell #4232
                                            Darci F. Madden #95927
                                            One Metropolitan Square
                                            211 N. Broadway, Suite 3600
                                            St. Louis, MO  63102
                                            Telephone:  314.259.2000
                                            Facsimile:  314.259.2020

                                            Gregory B. Jordan
                                            Mary J. Hackett
                                            Christopher J. Soller
                                            Sharon L. Rusnak
                                            REED SMITH LLP
                                            435 Sixth Avenue
                                            Pittsburgh, PA  15219
                                            Telephone:  412.288.3131
                                            Facsimile:  412.288.3063

                                            Attorneys for Defendants Bank of America,
                                            N.A. and Bank of America Corporation

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing was served this 3rd day of

November, 2006 upon the following counsel of record by the Court's electronic filing system:

Steven M. Hamburg, Esq.
Holly M. McIntyre, Esq.
Summers, Compton, Wells & Hamburg, P.C.
8909 Ladue Road
St. Louis, MO  63124

Richard D. Greenfield, Esq.
Greenfield & Goodman LLC
7426 Tour Drive
Easton, MD  21601

Gregg Fishbein, Esq.
Lockridge, Grindal Nauen PLLP
Suite 2200
100 Washington Avenue, South
Minneapolis, MN  55401


/s/ Jeffrey S. Russell
Counsel for Defendants Bank of America,
N.A. and Bank of America Corporation



**AM-CInt**

Comptroller of the Currency
Administrator of National Banks

# Conflicts of Interest

Comptroller's Handbook

June 2000



AM

Asset Management

# Conflicts of Interest                   Table of Contents

## Introduction

Types of Conflicts of Interest . . . . . . . . . . . . . . . . . . . . . . 2
    Dealings Involving Insiders . . . . . . . . . . . . . . . . . . . 2
    Inappropriate Financial Benefit . . . . . . . . . . . . . . . . 3
    Conflicting Roles and Responsibilities . . . . . . . . . . . 4
    Employees' Unethical Conduct . . . . . . . . . . . . . . . 4
Authorization of Otherwise Impermissible Activities . . . 5
Risks and Controls . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
    Compliance Risk . . . . . . . . . . . . . . . . . . . . . . . . . 7
    Reputation Risk . . . . . . . . . . . . . . . . . . . . . . . . . 8
    Strategic Risk . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
    Internal Controls . . . . . . . . . . . . . . . . . . . . . . . . . 9

## Examination Procedures

General Procedures . . . . . . . . . . . . . . . . . . . . . . . . . . 11
Quantity of Risk . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14
Quality of Risk Management . . . . . . . . . . . . . . . . . . . 17
Conclusions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

## Appendixes

A.   Use of Material Nonpublic Information . . . . . . . 30
B.   Transactions between the Bank and Related Interests . . . 32
C.   Trust Brokerage Allocation and Securities Trading . . . 39
D.   Soft Dollars and Directed Commission Arrangements . . . 42
E.   Use of Mutual Funds as Fiduciary Investments . . . 46
F.   Unique Situations Posing Potential Conflicts . . . 50
G.   Reasonable Compensation . . . . . . . . . . . . . . . . 53
H.   Fee Concessions on Fiduciary Accounts . . . . . . . 57

## References . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58

## Conflicts of Interest                            Introduction

A bank that provides asset management services for clients may be required to manage a variety of actual or potential conflicts of interest. Conflicts of interest and self-dealing transactions normally arise whenever the bank's ability to act exclusively in the best interest of account beneficiaries or clients is impaired. A fiduciary is required by a long history of case law to put the interests of account beneficiaries before the interests of the bank. The fiduciary owes its beneficiaries undivided loyalty and must administer each trust for the exclusive benefit of account beneficiaries and the purposes for which the account was created.

Conflicts of interest are not limited to instances in which the bank is acting as a fiduciary. In fact, as the trust business increasingly becomes an asset management business, the opportunities for a bank to find itself in a conflict of interest increase. Asset management — the management of third-party assets for a fee or commission — includes fiduciary services (personal, employee benefits, and corporate), investment advisory services, the retail sales of nondeposit investment products, and agency arrangements including custody of assets. When a national bank provides these services, the best interests of the client and the bank are not always the same.

This booklet provides guidance to examiners evaluating the risk management practices banks have in place to control conflicts of interest and self-dealing. The booklet's introduction provides an overview of risks and controls associated with conflicts of interest. The appendix contains a more in-depth discussion of certain transactions that may result in conflicts of interest or self-dealing. The procedures are designed to be used in large banks and, as needed, in community banks. In community banks, the procedures supplement the *Comptroller's Handbook* booklet "Community Bank Fiduciary Activities Supervision." For additional information, see this booklet's "References" page.

The Employee Retirement Income Security Act of 1974 (ERISA) views certain transactions as conflicts of interest and self-dealing. This booklet does not discuss those conflicts of interest in depth. Rather, it clarifies selected topics. The planned *Comptroller's Handbook* booklet "Retirement Plan Services" will contain a comprehensive discussion of conflicts of interest and self-dealing activities in accounts subject to ERISA. In the interim, examiners with

questions concerning potential conflicts of interest in accounts subject to ERISA should consult with their district lead fiduciary experts or the Asset Management Division.

## Types of Conflicts of Interest

Increasingly complex financial services, products, corporate organizations, affiliations, and arrangements with service providers may give rise to relationships that can result in conflicts of interest. Conflicts of interest and self-dealing activities may result from dealings involving insiders, the bank benefiting inappropriately, the bank's conflicting roles with a client, or an employee's unethical conduct.

National bank regulations identify certain activities involving a fiduciary that are generally not permissible. For example, 12 CFR 9.12, Self-Dealing and Conflicts of Interest, specifies certain investment, lending, and sales practices that are not generally permissible. 12 CFR 9.5(b), Policies and Procedures, requires banks to adopt and follow procedures adequate to ensure that fiduciary officers and employees do not misuse material nonpublic information. In addition, 12 CFR 12.7(a) requires banks to adopt certain securities trading policies and procedures.

In addition to these regulations, national banks may be subject to a variety of other laws, including applicable state law, rules and regulations of other federal regulators, and applicable interpretations issued by regulatory agencies. In particular, banks offering asset management activities may be subject to the rules and regulations of the Securities and Exchange Commission (SEC), Department of Labor (DOL), and the National Association of Securities Dealers, Inc. (NASD). The appendices to this booklet discuss some of these applicable laws, rules, and regulations in more detail.

## Dealings Involving Insiders

Dealings with persons or entities connected with the bank in a way that might affect its judgment represent a potential conflict of interest or self-dealing activity. Such dealings may include investing in stock held by insiders (including bank officers, directors, and employees) or their related interests, assuming their obligations, acquiring their property, buying their trust property or accepting its transfer, or lending trust funds to them (12 USC 92a(h)). The

bank should develop policies and procedures to ensure that such dealings are monitored and restricted. Although some of these activities may be authorized by applicable state law or governing documents, policies and procedures often prohibit these potential conflicts or establish ways for the bank to avoid them. (See Appendix B, "Transactions between the Bank and Related Interests," for a more detailed discussion.)

## Inappropriate Financial Benefit

Transactions with insiders may result in additional compensation, financial benefits, or goods and services for the bank as trustee. Particularly when these benefits are not properly authorized and disclosed, they represent improper conflicts of interest and self-dealing. Management must develop a process to identify all potentially inappropriate transactions; the process must ensure that conflicts are either avoided or properly authorized and disclosed.
A bank may gain an inappropriate financial benefit if it generates additional fee-based business for itself or an affiliate in one of the following ways: by using an affiliated company's income-producing services, by charging undisclosed fees to accounts for security transactions, or by receiving payment for other services that are normally included in fiduciary administration fees. If a bank fiduciary obtains financial benefits (including goods and services) from a service provider (whether affiliated or not), the benefits must be authorized and must not be provided in exchange for using that provider.

For more detailed discussions, see appendix A, "Use of Material Nonpublic Information"; appendix B, "Transactions between the Bank and Related Interests"; appendix C, "Trust Brokerage Allocation and Securities Trading"; appendix D, "Soft Dollars and Directed Commission Arrangements"; appendix G, "Reasonable Compensation"; and appendix H, "Fee Concessions."

## Conflicting Roles and Responsibilities

Banks can serve in many different, and potentially conflicting, roles for their fiduciary clients. A bank's responsibilities as lender, credit enhancer, or security underwriter may run counter to its duties as fiduciary. Banks must identify and monitor conflicting responsibilities and communicate guidelines

for preventing self-dealing and conflicts of interest. When a bank fiduciary has failed to prevent self-dealing or conflicts of interest and is not certain about what remedial action it should take, it should consult with legal counsel.

For more detailed discussions, see appendix E, "Use of Mutual Funds as Fiduciary Investments," and appendix F, "Unique Situations Posing Potential Conflicts."

## Employees' Unethical Conduct

Employees' unethical conduct can undermine the fiduciary's ability to fulfill its duty of loyalty to account beneficiaries. A bank that promulgates a code of ethics for employees that clearly communicates the bank's expectations may reduce the risk of unethical conduct.

Bank management should have monitoring systems in place to detect employee conduct that conflicts with the bank's responsibilities as a fiduciary. Systems should be sufficient to alert the bank when a bank employee serves as co-fiduciary with the bank for a fee, competes with the bank, receives loans from fiduciary clients, accepts gifts or bequests from fiduciary clients, receives goods and services from vendors, or executes personal securities transactions that are counter to the best interests of account beneficiaries.

For a more detailed discussion, see appendix A, "Use of Material Nonpublic Information."

## Authorization of Otherwise Impermissible Activities

In 12 CFR 9.12, several activities that would normally constitute conflicts of interest are deemed permissible if authorized by applicable law. Applicable law is defined in 12 CFR 9.2(b) as the law of a state or other jurisdiction governing a national bank's fiduciary relationships, any applicable federal law, the terms of the governing instrument, or any court order pertaining to the relationship.

State and local statutes and interpretations may authorize transactions that would otherwise be prohibited as conflicts of interest or self-dealing. A corporate trustee should not rely on a general authorization to conduct an otherwise impermissible transaction, unless the general authorization has been interpreted specifically to permit such a transaction in the courts of the state in which the trustee is located.

Specific provisions of the trust agreement may authorize or direct the bank fiduciary to transact types of business at its own discretion that would otherwise be impermissible. Broad general investment language commonly found in trust agreements is not sufficient to authorize an investment that results in a conflict of interest or self-dealing by the fiduciary. The trust agreement must specifically authorize the type of transaction or investment. However, a general power of authority to hold original investments has been widely held to permit retention of investments which otherwise create a conflict of interest.

A court order may protect a fiduciary from liability by authorizing a conflict of interest or self-dealing. When seeking a court order, a national bank must fully and accurately disclose to the court all pertinent facts about the conflict of interest or self-dealing. Only when the court has those facts can it render an informed decision. Such authorizations may not be effective in the absence of full disclosure and proper notice to all beneficiaries. A specific court order applies only to the detailed circumstances as presented to the court. It may not insulate a bank from liability for a breach of trust committed subsequent to the court action.

In certain circumstances, a trustee is permitted to enter into a transaction posing an otherwise impermissible conflict. Such a transaction must be fair and executed in the beneficiaries' best interest. Proper consent of all beneficiaries is required. To obtain proper consent, the bank must fully and completely disclose the facts about the conflict.

Obtaining the consent of all beneficiaries may be difficult, because more than one class of remaindermen may exist. If beneficiaries are minors, unborn, or otherwise unable to give informed consent, a guardian *ad litem* must be appointed for them to represent their interests in court, and an order approving the transaction must be obtained from the appropriate court.

---

In some circumstances, applicable law may be silent or appear ambiguous. In such cases, a bank may elect to obtain an opinion from its attorney. Although the opinion may help the bank understand an ambiguous law, the bank should avoid relying on an opinion of counsel as specific authorization for a questionable transaction. Before acting on such an opinion, the bank should evaluate fully the risks involved in the questionable transaction.

A grantor who reserves the power to modify or revoke a trust instrument is usually considered the absolute owner of the trust property. The grantor of a revocable trust can direct the fiduciary to conduct otherwise impermissible transactions, unless the activity is illegal. If the grantor requests a transaction that would normally violate the rule of undivided loyalty, the bank should require that the trust agreement be amended to authorize the transaction or require the grantor to authorize each transaction in writing. Trust agreements that include provisions that relieve a fiduciary of responsibility for breaches of fiduciary duty have generally been held by local courts to be void.

The bank may seek guidance from an attorney to resolve a conflict of interest or self-dealing. In other circumstances, legal counsel may recommend that a bank cure a contingent or potential liability by making a sale or transfer that amounts to a conflict of interest or self-dealing. In such a case, the board of directors may formally approve the action and provide that the bank fully reimburse each account in cash for any losses from the transaction.

## Risks and Controls

The *Comptroller's Handbook* booklet "Large Bank Supervision" established a framework for supervising banks by risk. Under the framework, examiners assess a bank's risk management system, including its effectiveness in identifying, measuring, controlling, and monitoring risk.

Risk is the potential that events, expected or unexpected, may have an adverse impact on the bank's earnings or capital. The OCC has defined nine categories of risk for bank supervision purposes. These risks, which are defined in the "Bank Supervision Process" and "Large Bank Supervision" booklets, are credit, interest rate, liquidity, price, foreign exchange, transaction, compliance, strategic, and reputation. These risks are not mutually exclusive; any product or

service may expose the bank to multiple risks. For analysis and discussion, however, the OCC identifies and assesses the risks separately.

A bank that does not properly manage conflicts of interest and self-dealing may be exposed to heightened *compliance, reputation,* and *strategic* risk.

## Compliance Risk

Compliance risk is the risk to earnings or capital arising from violations or nonconformance with laws, rules, regulations, prescribed practices, or ethical standards. The risk also arises in situations where the laws or rules governing certain bank products or activities of the bank's clients may be ambiguous or untested. Compliance risk exposes the institution to fines, civil money penalties, payment of damages, and the voiding of contracts. Compliance risk can lead to a diminished reputation, reduced franchise value, limited business opportunities, lessened expansion potential, and lack of contract enforceability.

The rules, regulations, and laws governing fiduciary activities are voluminous and complex. To minimize the risk of noncompliance, banks must create strong risk management systems to avoid even the appearance of conflicts of interest. Conflicts of interest or self-dealing may result in costly, highly publicized litigation. Regardless of its outcome, a long legal battle can jeopardize a bank's present and future earnings. Fines, judgments, and settlements to avoid litigation can further deplete earnings.

## Reputation Risk

Reputation risk is the risk to earnings or capital arising from negative public opinion. This affects the institution's ability to establish new relationships or services, or continue servicing existing relationships. This risk can expose the institution to litigation, financial loss, or damage to its reputation. Reputation risk exposure is present throughout the organization and is why banks have the responsibility to exercise an abundance of caution in dealing with their customers and community. This risk is present in such activities as asset management and agency transactions.

Actual or implied conflicts of interest and self-dealing transactions can affect a bank's reputation negatively by jeopardizing a client's trust. Loss of client trust

because of a bank's questionable loyalty may threaten to erode its customer base. Deposit accounts, loan relationships, corporate clients, and other banking relationships may be lost as a result.

## Strategic Risk

Strategic risk is the risk to earnings or capital arising from adverse business decisions or improper implementation of those decisions. This risk is a function of the compatibility between an organization's strategic goals, the business strategies developed to achieve those goals, the resources deployed against these goals, and the quality of implementation. The resources needed to carry out business strategies are both tangible and intangible. They include communication channels, operating systems, delivery networks, and managerial capacities and capabilities.

Banks are relying increasingly on fee-based activities as a stable, consistent source of revenue. If a bank is unable to realize its fiduciary goals, its overall strategic plan and direction may be affected negatively. A bank's ability to realize its strategic goals may depend upon its success in cultivating and maintaining a satisfied, loyal customer base. A bank, because of unauthorized conflicts of interest and self-dealing, may threaten the stability of its fiduciary client base and be unable to fund businesses or attain growth projections and goals.

## Internal Controls

Asset management clients, both institutional and individual, expect an asset manager to be honest and ethical. To meet industry standards, many banks implement stringent controls. When evaluating internal controls, examiners consider the control environment; risk assessment systems; control activities; accounting, information, and communication processes; and self-assessment and monitoring systems.

To manage the risks associated with conflicts of interest and self-dealing, the bank must have systems in place that first identify actual or potential conflicts. Policies reflecting the bank's willingness to accept the associated risks should be established and followed. Because of the importance of a sound reputation in the asset management business, many banks take steps to prevent actual

conflicts of interest and also to minimize the appearance of conflicts of interests.  Some common controls include:

- Assessment of business lines and activities to identify all potential conflicts of interest and self-dealing.

- Identification of all insiders and their related interests.

- Development of written policies and procedures appropriate to the size and complexity of the bank's business.  Policies and procedures should establish an ethics policy, identify prohibited activities, and offer guidelines for avoiding or managing conflicts of interest and self-dealing.

- Dissemination of information on conflicts of interest and self-dealing to enable supervisory committees and officers to:
  - Identify existing or potential problems when an account is considered for acceptance as well as when one already on the books is reviewed.
  - Recognize the legality of certain conflicts or potential conflicts.
  - Monitor potential conflicts of interest and self-dealing.
  - Evaluate the level of risk to the bank.

- A risk control process, including audit, compliance, and training programs, that emphasizes the importance of avoiding conflicts of interest and self-dealing.

Refer to the *Comptroller's Handbook* booklet "Internal Controls" for a more thorough discussion.

# Conflicts of Interest                    Appendix E

## Use of Mutual Funds as Fiduciary Investments

The investment of fiduciary assets in mutual funds should be evaluated as any other investment vehicle under applicable law, including the Prudent Investor Rule or Prudent Man Rule, and the terms of the governing instrument of the trust. Two circumstances give rise to a conflict of interest: a bank's investment of fiduciary assets in proprietary mutual funds and the bank's receipt of fees from an investment company in return for investing fiduciary assets in a mutual fund.

### Proprietary Mutual Funds

A bank that invests fiduciary assets in proprietary mutual funds must first consider the legality of the investment. Bank counsel should determine that applicable law allows such an investment. Once the legality of the investment is established, the bank must keep in mind its obligation to act solely in the best interests of account beneficiaries.

Before investing, the bank should make a positive determination that the investment meets the needs of the account. The bank should also document through the annual review process that the proprietary mutual fund continues to be an appropriate investment for the account. Factors such as the performance of the mutual fund, fees charged, liquidity, and the needs of account beneficiaries should be considered and documented as part of the annual review process.

The same level of scrutiny should be applied to mutual funds that are not proprietary when the bank receives compensation for providing services to the mutual funds and the bank has invested fiduciary assets in the funds.

### Receipt of Fees from Mutual Funds

Some mutual funds pay fees to third parties to defray the cost of shareholder servicing and administrative services. Such services may include placing orders, processing purchases, processing dividend and distribution payments, and responding to customer inquiries.

A national bank may invest trust assets in mutual funds that pay such fees without correspondingly reducing the bank's trust account compensation, if authorized by applicable law. If applicable law does not allow the trustee to retain fees authorized by rule 12b-1 of the Investment Company Act of 1940, the conflict may be corrected by passing the fees to the accounts that have their assets invested in the fund. National banks are encouraged to disclose 12b-1 fees received from mutual funds to fiduciary accounts. The bank should consider whether to obtain an attorney's opinion to support its interpretation of applicable law. The investment must be prudent and appropriate for the account and otherwise consistent with applicable law.

**Accounts Subject to ERISA**

Mutual funds occasionally pay fees to employee benefit plans' third-party service providers to offset the cost of shareholder servicing and administrative services. Fiduciaries providing such services and accepting these "secondary service" fees must be in compliance with DOL guidelines governing the prohibited transaction standards of ERISA.

In addition, mutual funds may also pay 12b-1 fees to third parties for services performed in connection with the promotion and distribution of fund shares. The DOL has two advisory opinions in this area that provide guidance for employee benefit plans that are subject to the rules of ERISA.

In Pension and Welfare Benefits Administration Opinion Letter 97-16A, the DOL opined that a record keeper that is not a fiduciary under ERISA could receive 12b-1 fees from an outside mutual fund when plan participants direct the investments. The DOL said further that such an arrangement would not violate section 406(b)(3) of ERISA.

According to DOL Pension and Welfare Benefits Administration Opinion Letter 97-15A, if a bank as directed trustee were directed, in accordance

with section 403(a)(1) or 404 of ERISA, to invest in a mutual fund that pays the bank a fee for investing with it, the investment would not be considered a conflict of interest. That is, the trustee would not be dealing with the assets of the plan for its own interest or for its own account in violation of 406(b)(1). The advisory opinion goes on to state that in such a case the "mere receipt by the trustee of a fee or other compensation from the mutual fund in connection with such investment would not in and of itself violate section 406(b)(3)."

In essence, Opinion Letter 97-15A provides that the DOL would not object to plan structures where any 12b-1 or subtransfer agent fees attributable to the plan's investment in mutual funds are used to benefit the plan, either as a dollar-for-dollar offset against the fees paid to the bank in its capacity as trustee or as amounts credited directly to the plan. In such a case, the DOL has opined there would be no violation of ERISA sections 406(b)(1) or (b)(3).

To date, the DOL has not issued a written interpretation expressly focused upon the receipt of 12b-1 fees by proprietary mutual funds. However, litigation initiated by the DOL in 1998 to restrict such activity is consistent with previous DOL guidance in this area. DOL has also stated in Opinion Letter 97-15A that a trustee that advises a plan in which the assets are invested in mutual funds that pay additional fees to the advising trustee would generally violate the prohibitions of ERISA section 406(b)(1).

A national bank receiving 12b-1 or subtransfer agent fees should not rely solely on the DOL Advisory Opinions for guidance, as they are limited to the specific facts conveyed in the letters. Instead, the bank should consult with counsel to determine whether the bank's receipt of fees violates the requirements of ERISA.

(The companion "Retirement Plan Services" booklet of the *Comptroller's Handbook,* which has yet to be published as of this booklet's publication date, discusses this topic in more detail.)



BOARD OF GOVERNORS
OF THE
FEDERAL RESERVE SYSTEM

WASHINGTON, D. C.  20551

DIVISION OF BANKING
SUPERVISION AND
REGULATION
**SR 99-7 (SPE)**
**March 26, 1999**

**TO THE OFFICER IN CHARGE OF SUPERVISION AND APPROPRIATE
SUPERVISORY AND EXAMINATION STAFF AT EACH FEDERAL
RESERVE BANK AND TO EACH DOMESTIC AND FOREIGN
BANKING ORGANIZATION SUPERVISED BY THE
FEDERAL RESERVE**

SUBJECT: **Supervisory Guidance Regarding the Investment of
Fiduciary Assets in Mutual Funds and Potential Conflicts of
Interest**

## Summary

Increasingly, banks and trust institutions are encountering various direct or indirect financial incentives to place trust assets with particular mutual funds.  These incentives range from payments structured as reimbursements for services or for transferring business to an unaffiliated fund family, to the financial benefits arising from the use of mutual funds that are managed by the institution or an affiliate.  In some cases, such as service fees for administrative and record-keeping functions performed by the trust institution, the permissibility of such payments may be specifically addressed under state law.  In the case of other financial incentives, guidance under applicable law may be less clear.  In all cases, however, decisions to place fiduciary assets in particular investments must be consistent with the underlying trust documents and must be undertaken in the best interest of the trust beneficiary.

The primary supervisory concern is that an institution may fail to act in the best interest of beneficiaries if it stands to benefit independently from a particular investment.  As a result, an institution may expose itself to an increased risk of legal action by account beneficiaries, as well as to potential violations of law or regulation.  The Federal Reserve is issuing this guidance to help institutions minimize these risks and to help ensure that their activities meet fiduciary standards.

## Background

Certain mutual fund providers offer compensation in the form of "service" fees to institutions that invest fiduciary assets in particular mutual funds.  These fees, referred to variously as shareholder, sub-accounting or administrative service fees, are structured as payments to reimburse the institution for performing standard recordkeeping and accounting functions for the institution's fiduciary accounts, such as maintaining shareholder subaccounts and records, transmitting mutual fund communications as necessary, and arranging mutual fund transactions.  These fees are typically based on a percentage or basis point amount of the dollar value of assets invested, or on transaction volume.

In recent years, nearly every state legislature has modified its laws explicitly to allow the acceptance of such fees by fiduciaries under certain conditions. These conditions often include compliance with standards of prudence, quality and appropriateness for the account, and a determination of the "reasonableness" of the fees received by the institution. The Office of the Comptroller of the Currency (OCC) has also adopted these general standards for national banks.[1] However, the Employee Retirement Income Security Act of 1974 (ERISA) generally prohibits fee arrangements between fiduciaries and third parties, such as mutual fund providers, with limited exceptions.[2] ERISA requirements supersede state laws and guidelines put forth by the bank regulatory agencies.

While there has been no comprehensive review of the extent to which these types of incentive payments are presently being offered by mutual fund providers, the practice appears to have become more common in recent years. In addition to the service fees cited above, another form of compensation reportedly offered by some mutual fund providers is a lump-sum payment based on assets transferred into a mutual fund.

Similar conflict of interest concerns are raised by the investment of fiduciary account assets in mutual funds for which the institution or an affiliate acts as investment adviser (referred to as "proprietary" funds). In this case, the institution receives a financial benefit from management fees generated by the mutual fund investments. This activity can be expected to become more prevalent as banking organizations become more active in offering proprietary mutual funds.[3]

## Supervisory Guidance

Although many state laws now explicitly authorize certain fee arrangements in conjunction with the investment of trust assets in mutual funds, institutions nonetheless face heightened legal and compliance risks from activities in which a conflict of interest exists, particularly if proper fiduciary standards are not observed and documented. Even in the case of investments where the institution does not exercise investment discretion, disclosure or other requirements may apply. Therefore, institutions should ensure that they perform and document an appropriate level of due diligence before entering into any fee arrangements similar to those described above or placing fiduciary assets in proprietary mutual funds. The following measures should be included in this process:

- Reasoned Legal Opinion - The institution should obtain a reasoned opinion of counsel that addresses the conflict of interest inherent in the receipt of fees or other forms of compensation from mutual fund providers in connection with the investment of fiduciary assets. The opinion should address the permissibility of the investment and compensation under applicable state or federal laws, trust instrument, or court order, as well as any applicable disclosure requirements or "reasonableness" standard for fees set forth in the law.

- Establishment of Policies and Procedures - The institution should establish written policies and procedures governing the acceptance of fees or other compensation from mutual fund providers as well as the use of proprietary mutual funds. The policies must be reviewed and approved by the institution's board of directors or its designated committee. Policies and procedures should, at a minimum, address the following issues: (1) designation of decision-making authority; (2) analysis and

documentation of investment decisions; (3) compliance with applicable laws, regulations and sound fiduciary principles, including any disclosure requirements or "reasonableness" standards for fees; and (4) staff training and methods for monitoring compliance with policies and procedures by internal or external audit staff.

- Analysis and Documentation of Investment Decisions - Where fees or other compensation are received in connection with fiduciary account investments over which the institution has investment discretion or where such investments are made in the institution's proprietary mutual funds, the institution should fully document its analysis supporting the investment decision. This analysis should be performed on a regular, ongoing basis and would typically include factors such as historical performance comparisons to similar mutual funds, management fees and expense ratios, and ratings by recognized mutual fund rating services. The institution should also document its assessment that the investment is, and continues to be, appropriate for the individual account, in the best interest of account beneficiaries, and in compliance with the provisions of the Prudent Investor or Prudent Man Rules, as appropriate.

Please distribute this letter to the appropriate supervision staff, particularly all examiners of fiduciary and securities activities, and to all domestic and foreign banking organizations with fiduciary activities supervised by the Federal Reserve. A suggested transmittal letter is attached. To the extent that examiners identify issues and concerns pertaining to the acceptance of fees from mutual fund providers or investments in proprietary mutual funds, please forward such information to the Manager, Specialized Activities Section, Mail Stop 182, at the Federal Reserve Board. Any matters of significant concern should be noted in examination reports and corrective action pursued as appropriate.

Questions concerning this letter may be addressed to Michael G. Martinson, Deputy Associate Director, at (202) 452-3640 or Heidi Richards, Manager, at (202) 452-2598.

Richard Spillenkothen
Director

Attachment

Supersedes: "TRUST SERVICES - Extra Fees in Connection with 12b-1 Funds or Cash Sweep Systems," FRRS 3-1596

---

**Notes:**

1. In general, national banks may make these investments and receive such fees if the practice is authorized by applicable law and if the investment is prudent and appropriate for fiduciary accounts and consistent with established state law fiduciary requirements. This includes a "reasonableness" test for any fees received by the institution. OCC Interpretive Letter No. 704,

February 1996.  Return to text

2.  ERISA section 406(b)(3); Department of Labor, Pension Welfare and Benefits
Administration Advisory Opinion 97-15A and Advisory Opinion 97-16A.  Return to text

3.  A Board interpretation of Federal Reserve Regulation Y addresses investment of fiduciary
account assets in mutual funds for which the trustee bank's holding company acts as investment
adviser.  In general, such investments are prohibited unless specifically authorized by the trust
instrument, court order, or state law.  FRRS 4-177.  Return to text

---

**Attachment**

**Suggested Transmittal Letter**

**TO THE CHIEF EXECUTIVE OFFICER AT DOMESTIC AND FOREIGN**
**BANKING ORGANIZATIONS SUPERVISED BY THE**
**FEDERAL RESERVE**

**SUBJECT:**   Supervisory Guidance Regarding the Investment of Fiduciary Assets in Mutual
Funds and Potential Conflicts of Interest

Increasingly, banks and trust institutions are encountering various direct or indirect
financial incentives to place trust assets with particular mutual funds, including fees for use of
nonaffiliated fund families as well as incentives to use their proprietary mutual funds.  The
primary supervisory concern is that an institution may fail to act in the best interest of
beneficiaries if it stands to benefit independently from a particular investment.  As a result, an
institution may expose itself to an increased risk of legal action by account beneficiaries, as well
as to potential violations of law or regulation.  The Federal Reserve is issuing the attached
supervisory guidance to help institutions minimize these risks and to help ensure that their
activities meet fiduciary standards.

Institutions should ensure that they perform and document an appropriate level of
due diligence before entering into any compensation arrangements with mutual fund providers
or placing fiduciary assets in their proprietary mutual funds.  The enclosed supervisory guidance
discusses the type of measures that should be included in this process, including a reasoned
legal opinion addressing the activity, appropriate policies and procedures, and documented
analysis and ongoing review of investment decisions.

Questions regarding this matter may be addressed to [INSERT NAME OF
RESERVE BANK CONTACT].

Enclosure

SR letters | 1999

Home > Regulation & Examinations > Bank Examinations >Trust Examination Manual

# Trust Examination Manual

## Section 7- Compliance- Pooled Investment Vehicles

Table of Contents

A.  Introduction to pooled investments

B.  Common and collective funds (CIF's)

    1.  General Information on CIF's

    2.  Common Trust Fund and Employee Benefit Collective Fund

    3.  Importance of Tax-Exempt Status

    4.  Importance of Securities Law exemptions

    5.  "Bona Fide Fiduciary" Rule

    6.  OCC Regulation 9.18 Requirements

    7.  Basic Terms and Accounting Concepts

    8.  Benefits and Limitations of CIF's to Fund Participants and To The Bank

    9.  Typical Fund Categories

C.  CIF tax-exempt status - IRC section 584 and IRS revenue ruling 81-100

    1.  Internal Revenue Code Section 584

    2.  IRS Revenue Ruling 81-100

D.  Registration under securities acts

    1.  Securities Act of 1933

    2.  Investment Company Act of 1940

E.  OCC regulation 9.18

    1.  Section 9.18  Applicability to State Nonmember Banks

    2.  1997 Revision of Section 9.18

    3.  Section 9.18(a)(1)

    4.  Section 9.18(a)(2)

5. Section 9.18(b)(1)  The Written Plan

6. Section 9.18(b)(2)  Fund Management

7. Section 9.18(b)(4)  Valuation

8. Section 9.18(b)(5)  Admission and Withdrawal

9. Section 9.18(b)(6)(i)  Annual Audit

10. Section 9.18(b)(6)(ii)  Financial Report

11. Section 9.18(b)(7)  Advertising of Collective Investment Funds

12. Section 9.18(b)(8)  Self-Dealing and Conflicts of Interest

13. Section 9.18(b)(9)  Management Fees

14. Section 9.18(b)(10)  Expenses

15. Section 9.18(b)(11) and (12)  Prohibition Against Certificates / Good Faith Mistakes

16. Section 9.18(c)  Other Collective Investments

F. Investment management issues

1. Use of Outside Investment Advisors

2. Specialty CIF's

G. ERISA implications on CIF operations

1. ERISA 408(b)(8) Exemption

2. DOL PTE 91-38 Exemption

H. Other participant limitations

1. Charitable Trusts Usage of Collective Investment Funds

2. Keogh Account Usage of Collective Investment Funds

3. Government Plan Usage of Collective Investment Funds

I. Investing in CIF's of other institutions

1. Affiliated Institutions

2. Non-Affiliated Institutions

J. CIF's investing in CIF's within the same department

K. Proprietary mutual funds

    1. Considerations When Engaging in Mutual Fund Activity

    2. Structure of Bank Financial Activities Under the Gramm-Leach-Bliley Act of 1999

    3. Investment Company Act of 1940

L. Conversion of CIF's to mutual funds

    1. General Overview

    2. Tax Considerations

    3. Supervisory Concerns

    4. ERISA Considerations

M. Mutual fund and CIF merger rules

    1. SEC Rule 17a-8

N. Other pooled investment vehicles

    1. Master Deposit Accounts

    2. Wrap Accounts, Also Known as Asset Allocation Programs

    3. Private Equity Fund of Funds

    4. Bank Managed "Pooled Income Funds" Organized by Outside Organizations

    5. Regulation D Exempted Securities Offerings

O. Bank as investment adviser to CIF's and mutual funds

    1. Interagency Policy Statement

P. Overview of federal laws

    1. Federal Securities Law

        a. Securities Act of 1933 (1933 Act)

        b. SEC Rule 180 (Sophisticated Investor Rule) under the 1933 Act

        c. Regulation D under the 1933 Act

        d. Securities and Exchange Act of 1934

        e. Investment Company Act of 1940

        f. Investment Advisors Act of 1940

    2. Federal Banking Law

### I.2. Non-Affiliated Institutions

Examiners may also encounter situations where banks wish to invest fiduciary funds in CIF's of non-affiliated banks. In the past, the OCC permitted employee benefit CIF's (Section 9.18(a)(2) funds) maintained by a trustee in accordance with RR 81-100 to be invested in a CIF maintained by an unrelated trustee. However, the OCC staff indicated that personal trust CIF's (Section 9.18(a)(1) funds) deriving tax-exemptions pursuant to IRC 584 cannot accept participations from non-affiliated institutions.

Although the OCC has permitted the investment of fiduciary funds in non-affiliated institution CIF's, the SEC declined to issue a No-Action Letter to Northern Trust Corporation on this same issue. Northern Trust Corporation had been seeking permission for non-affiliated CIF's to invest in CIF's operated by Northern Trust Company (a subsidiary bank). Northern Trust Corporation had previously applied for and obtained OCC approval to conduct this activity. However, the SEC did not concur that the activity would be permissible without registering the Northern Trust CIF's as securities. The 1989 SEC No-Action letters to Northern Trust Corporation (Northern Trust I and Northern Trust II) are located in Appendix G.

Consequently, even where permissible under local law and the governing document, banks should not invest customer funds in non-affiliated bank CIF's or accept investments from non-affiliated bank CIF's. Banks wishing to do so should be advised to first seek an SEC No-Action ruling on the proposed activity. Failure to obtain such a ruling could result in an SEC enforcement action, fines, and losses to the participating accounts, which would inevitably be borne by the bank.

## J. CIF's investing in CIF's within the same department

The OCC has permitted CIF's to be invested in other CIF's operated by the same department. Investing equity or fixed income fund cash awaiting permanent investment in a short term investment fund (STIF) would be a practical use of this provision. This is not the only application, and there is no limitation on which funds can take advantage of the provision.

## K. Proprietary Mutual Funds

### K.1. Considerations When Engaging in Mutual Fund Activity

There are numerous regulatory and costly administrative burdens associated with the operation of a proprietary mutual fund. The operation of a mutual fund requires knowledge of SEC and IRC rules and regulations. Furthermore, banks have the added burden of complying with applicable banking laws. Strong management oversight is required. Since a large volume of activity is required to effectively operate a fund and there is the potential for the receipt of lucrative fees, banks operating proprietary mutual funds must address a number of potentially abusive conflicts of interest.

Examples of the general considerations involved in operating a mutual fund:

- Mutual funds must be registered with the SEC, as both a security under the Securities Act of 1933, and as a mutual fund (mutual funds are investment companies under Federal securities laws) under the Investment Company Act of 1940.

- To operate on a tax-exempt basis and pass all income and capital gains through to investors, mutual funds must also comply with various tax laws, including Subchapter M of the Internal Revenue Code.

- The mutual fund would be organized under a trust and the bank (or related organization) would be trustee.

- State law would govern the establishment of trust.

- To be economically viable, a mutual fund must obtain a critical mass of assets to realize the necessary economies of scale.

- To profitably offer such products, the mutual fund sponsors must be compensated through a sufficient volume of business (generally portfolio size rather than number of investors).

Banks may act in a number of capacities for any mutual fund, including:  custodian, transfer agent, and, investment adviser or investment manager.  Each of these activities has its own unique risks and may expose the bank to different conflicts of interest.   Also, the Gramm-Leach-Bliley Act (GLBA) of 1999 permits banks to engage in previously prohibited securities related activities, such as underwriting.  A greater range of potential activities also increases the potential for conflicts of interest.

Refer to Appendix D discussion of Applicability of Federal Securities Laws to Banks and Bank Sponsored Securities Activities for specific requirements that would be applicable to proprietary mutual fund activities.  Specific subsections include Bank as Investment Advisor, Bank as Investment Company, and Collective Trust Funds.  Non-bank subsidiaries must, however, register with the SEC, if they engage in any of these activities.

State law may require registration as a custodian, investment advisor, or any other securities activities.  FDIC regulated banks acting as mutual fund transfer agents must register and comply with Part 341 of the FDIC's Rules and Regulations.

## K.2. Structure of Bank Financial Activities Under the Gramm-Leach-Bliley Act of 1999 (GLBA)

Effective March 12, 2000, the GLBA repealed Section 20 of the Banking Act of 1933.  Banks may now underwrite and distribute proprietary and third-party mutual funds.  This activity must be done through one of the following entities:

- Financial Holding Company (FHC).  A FHC may engage in any activity and may acquire and retain shares of any company engaged in any activity that is determined by the Federal Reserve Board to be "financial in nature" or "incidental" to such financial activity.  Or, a FHC may engage in an activity that is complementary to a financial activity and does not pose a substantial risk to the soundness of the financial institution.  Activities that are financial in nature include providing financial, investment and economic advisory services, including advising an investment company. It also includes underwriting, dealing in, or making a market in securities (Section 4(k)(4) of the Bank Holding Company Act of 1956).

  A FHC that acquires any company or commences any of the above activities shall provide to the Federal Reserve Board written notice describing the activity conducted by the FHC.  Notice must be provided not later than 30 calendar days after commencing the activity.

  A "bank holding company" is also allowed to engage in the "expanded financial activities" of a FHC.  However, there are minimum capital, management, and community reinvestment standards that must be met.  Also, this requires pre-notification to the Federal Reserve Board. Specific details are found in Section 4(l) of the Bank Holding Company Act.  The entire Bank Holding Company Act text is located in the FDIC's Laws, Regulations and Related Acts.

- Financial Subsidiary.  The activities that may be conducted by a subsidiary of a national bank have also been revised.  A national bank may control a "financial

subsidiary", or hold an interest in one, only if the subsidiary engages in activities that are financial in nature or incidental to a financial activity. Activities that are financial in nature include those described in the FHC subheading, above.

The GLBA added Section 46 to the Federal Deposit Insurance Act (FDI Act) to govern financial subsidiaries of state banks. Under the final rule, the FDIC adopted a streamlined certification process for insured state nonmember banks to follow before they may conduct activities as principal through a financial subsidiary. State nonmember banks self-certify that they meet the requirements for carrying out these activities. The self-certification process allows banks to conduct the new activities immediately. There is be no delay for administrative approval or review, although the FDIC continues to evaluate these activities as part of the normal supervisory process.

To commence financial subsidiary activities under Section 46(a), the insured state nonmember bank must certify that it is well-managed; that it and all of its insured depository institution affiliates are well-capitalized; and that the insured state nonmember bank is in compliance with the capital deduction requirement. In addition, an insured state nonmember bank may not commence any new activity under Section 46(a), or directly or indirectly acquire control of a company engaged in any such activity, if the bank or any of its insured depository institution affiliates received a rating of less than satisfactory in its most recent CRA examination. Any insured state nonmember bank controlling or holding an interest in a financial subsidiary also must comply with Sections 23A and 23B of the Federal Reserve Act, as amended by the GLBA and meet the financial and operational safeguards required by Section 5136A(d) of the Revised Statutes of the United States (12 U.S.C. 24a(d)), unless otherwise determined by the FDIC.

If the financial subsidiary of the insured state nonmember bank engages in the public sale, distribution or underwriting of stocks, bonds, debentures, notes, or other securities activity of a type permissible for a national bank solely through a financial subsidiary, the state nonmember bank and the financial subsidiary must comply with certain provisions requiring the separation of the financial subsidiary from the bank. These provisions require that the financial subsidiary be physically separate and distinct in its operations from the operations of the bank; that the financial subsidiary conduct its securities business pursuant to independent policies and procedures designed to inform customers and prospective customers of the financial subsidiary that the financial subsidiary is a separate organization from the insured state nonmember bank and that the insured state nonmember bank is not responsible for and does not guarantee the obligations of the financial subsidiary. In addition, the bank must adopt policies and procedures, including appropriate limits on exposure, to govern its participation in financing transactions underwritten by its financial subsidiary. Further, the bank may not express an opinion on the value or the advisability of the purchase or sale of securities underwritten or dealt in by its financial subsidiary, unless the bank notifies the customer that the entity underwriting, making a market, distributing or dealing in the securities is a financial subsidiary of the bank.

The mutual fund, as a registered investment company under the Investment Company Act of 1940, would be under the supervision of the SEC. The SEC is required to share its supervisory findings with Federal banking agencies, upon request, and does not limit the FDIC's examining authority of affiliates as outline in Section 10(b)(4) of the Federal Deposit Insurance Act.

## K.3. Investment Company Act of 1940
The Investment Company Act of 1940 (1940 Act) governs the activities of companies principally engaged in the business of investing, reinvesting, and trading securities, and whose own securities are held by the public. Mutual funds and other registered investment companies are subject to SEC operational regulations designed to protect the interests of investors and the public. The Act prohibits such companies from changing the nature of their business, or their investment policies, without the approval of their

shareholders.

**Among the most significant sections of the Investment Company Act of 1940 are the following:**

- Section 9 bars persons convicted of securities fraud within the past 10 years from serving as officers or directors;

- Section 10 prevents underwriters, investment bankers or brokers from constituting more than a minority of such companies' board of directors;

- Section 13 prohibits such companies from changing the nature of their business or their investment policies without the approval of holders of a majority of their voting securities;

- Section 15 requires that management contracts (and material changes thereto) be approved by a majority of the holders of outstanding voting securities of such registered company;

- Section 17 prohibits transactions between such registered companies and their directors, officers, affiliated companies, principal underwriters, and promoters, except where the SEC grants an exemption based on a finding of the fairness of such transactions and no overreaching by the parties. It also identifies a bank as one of the acceptable custodians for a registered investment company. The GLBA amended Section 17(a) to allow loans from affiliates to mutual funds (effective May 12, 2001). The amendment is especially important to banks offering proprietary mutual funds. The original Section 17(a) prohibited affiliates from selling, purchasing, or borrowing money or property from mutual funds, but did not cover loans from affiliates to mutual funds. In addition, the SEC interpreted Section 18(f) of the 1940 Act to prohibit mutual funds from borrowing money except from a bank. The borrowing limit is one-third of the assets of the fund. Under the current regulations this could pose potential problems for banks offering proprietary mutual funds. The GLBA amended Section 17(f), custody of securities, to allow for a bank or its affiliates to serve as a custodian for proprietary mutual funds (registered investment companies).

- Section 18 prohibits registered "closed-end" investment companies from issuing senior securities, except under conditions and terms specified in that Section; and

- Section 20 prohibits "circular ownership" of such investment companies and "cross-ownership" of their securities under the terms listed in Section 20(c).

- Included among other provisions of the Investment Company Act are sections involving sales and repurchases of securities issued by investment companies (Section 22), periodic payment plans (Section 27), and face-amount certificate companies (Section 28). Also, the GLBA allows a bank or its affiliate to serve as a custodian for a proprietary "unit investment trust" (Section 26).

## L. Conversion of CIF's to Mutual Funds

### L.1. General Overview

Competitive pressures and changing securities laws contribute to banks converting CIF's into proprietary mutual funds. The banking industry has long taken the position that mutual funds offer greater advantages to both the bank and trust beneficiaries. But there are also risks, such as abusive conflicts of interest and increased reputational risk.

- One of the **incentives for converting** a CIF to a proprietary mutual fund is purely

financial. There is a lucrative array of fees available under a mutual fund arrangement that is not available from bank sponsored CIF's. However, the desire for increased revenue must not take precedence over the fiduciary responsibility of the bank. Such a conflict must be resolved in favor of the account beneficiaries. If the desire for financial reward is dominant, the conflict could become abusive.

- One of the **potential disadvantages** to a bank is the public availability of the proprietary mutual fund's performance - a factor not generally confronted with CIF's. If a proprietary mutual fund performs poorly over an extended period of time, the bank's reputation may be harmed, especially if the poor performance continues without appropriate corrective action.

Conversions of existing CIF's to mutual funds typically take one of two forms. In both cases, the CIF terminates activity and is replaced by the mutual fund operation. The first type involves the liquidation-to-cash of a CIF's assets, with a simultaneous rollover of the cash proceeds into a mutual fund. The second type involves a one-time "in-kind" transfer of assets at market value from a CIF to a mutual fund.

Mutual funds may be sponsored by a non-bank affiliate of a state nonmember bank. However, they are currently predominantly sponsored by a non-affiliated third party institution (including mutual fund companies and brokerage houses). In either case, the bank usually provides investment advisory, custodial, transfer agent, and other fee related services to the fund.

## L.2. Tax Considerations of Conversion

### L.2.a. Common Trust Fund Conversions
Prior to 1996, the conversion of common trust funds established for personal trust accounts was treated as a taxable transaction under the IRC. Years of lobbying Congress to enable a tax-free "in-kind" transfer were finally successful in August 1996, when IRC Section 584 was amended by Section 1805 of the "Small Business Job Protection Act of 1996". This legislation added new paragraph IRC Section 584(h), which permits tax-free conversions of Personal Trust CIF's (A-1 Funds). The conversion can be into one or more mutual funds. The basis of the mutual fund shares distributed to participant trusts must be equal to the basis of the common trust fund interests exchanged. In the event that the conversion involves more than one mutual fund, the basis of the common trust fund interests exchanged should be allocated proportionately to the mutual fund shares received. The amendment was effective for transfers after December 31, 1995.

This amendment makes the conversion tax-free for Federal taxation purposes only. Therefore, there may be remaining state income tax consequences. There are also accounting and other tax issues related to the rebating of fees, the amortization of bond premiums, and capital gain distributions, to name a few, that must be considered in conjunction with the conversion decision.

A copy of the 1996 amendment to IRC Section 584 is located in Appendix G.

### L.2.b. Collective Investment Fund Conversion
Conversions of collective investment funds maintained for employee benefit accounts subject to ERISA do not face the same tax problems as those faced by common trust funds. Tax relief is granted because, although conversion is a taxable event, the participants can only be tax-exempt entities and, therefore, no tax liability is incurred.

**L.3. Supervisory Concerns of Conversion**
The board of directors should specifically authorize or ratify the conversion of a CIF to a mutual fund. The advice of qualified legal counsel experienced in securities laws and fiduciary matters should be obtained to ensure that the conversion complies with all applicable laws and fiduciary obligations. The qualifications of the firms and individuals providing legal counsel should be documented and retained to support the adequacy of the decision-making process. At a minimum, the conversion decision-making process should address the following issues:

**Fiduciary issues:**

a. The board's due diligence process should include a review of (1) customers' needs and how the conversion meets these needs, (2) any potential legal and other risks, (3) a stated reason to support the conversion, and (4) a method for obtaining customer approval (see points (c) and (d) below).

b. The bank should address all related fiduciary issues in its written policies, including conflict of interest issues concerning the need for, and prudence of, converting CIF's into mutual funds, and the reasonableness of the ongoing investment.

Internal policy should require investments in proprietary funds to be evaluated on the same basis as any other investment product and proprietary funds should meet a bank's own minimum investment selection standards.

There is an additional concern when banks operate both proprietary mutual funds and CIF's. The investment of trust accounts in proprietary mutual funds that under perform own bank CIF's is troubling, since banks that operate proprietary mutual funds have additional monetary incentives (which are unavailable in CIF's) to invest trust accounts in the funds. In such cases, the fiduciary should document the rationale for investing trust accounts in proprietary mutual funds when CIF's with similar or identical investment objectives and strategies are available.

Even when permitted by statute, these transactions should be made in good faith. The fact that such investments are allowed (permissive authority) does not relieve the fiduciary of its "duty of care and skill" in the investment selection process. A failure to properly address all conflict of interest and investment prudence issues casts doubt on whether the fiduciary has satisfied the traditional fiduciary duty of undivided loyalty, and could lead to litigation and loss.

c. When necessary under local law or the governing instrument, banks should obtain the consent of CIF participants to convert their CIF units into mutual funds. Under IRC Section 584(h), "substantially all" (which was undefined at the time of this writing) CIF assets must be transferred into the mutual fund.

d. Accounts not participating in the conversion due to customer non-consent, prohibition within governing instruments, or prohibition under local law, should be provided reasonable investment alternatives consistent with the governing account instrument.

e. Investment in the mutual fund should also meet the tests of loyalty

and prudent investment management.

One such test is to compare the consistency of the mutual fund's investment objectives with the governing instruments of the accounts converted. When converting from a CIF to a mutual fund the investment objective could change, and what was once a suitable investment for an account may become inappropriate. Another consideration is when a proprietary mutual fund's performance lags comparable, but unaffiliated, alternative investments.

Refer to Subsection F.4.a of Section 3 for additional guidance regarding proprietary mutual fund investments.

**Regulatory issues:**

a.  Where required, the bank should: (1) obtain the consent of its State regulatory supervisor to convert CIF's into mutual funds, and/or (2) provide it formal pre-conversion notification. At the time of this writing, institutions supervised by the FDIC, FRB, and OCC were not required to obtain the consent of state authorities or notify state authorities of planned CIF conversions.

b.  The bank should comply with all securities law requirements, including the registration of the mutual fund. If a bank subsidiary is involved in operating a mutual fund, it should also register as an investment adviser and, as needed, as a broker/dealer, in addition to the mutual fund registration.

c.  The bank should determine whether it is permitted to receive both fiduciary fees and proprietary mutual fund servicing fees under local law and the governing instruments. Fiduciary fees and mutual fund servicing fees should be reasonable, and consistent with local law and the governing instrument.

One of the more complex issues involving the operation of proprietary mutual funds is the charging of fees. Virtually all states have enacted statutes expressly authorizing a bank fiduciary to invest trust assets in the shares of a mutual fund for which the bank, or affiliate, performs services and receives reasonable compensation. Some states require that the fiduciary offset its mutual fund fee or its trust administration fees by an amount that corresponds to the bank's compensation for performing investment advisory and/or other services for the mutual fund. If permitted to receive fees for both trust fiduciary services and for the services performed for the proprietary mutual fund, all fees should be reasonable and disclosed to the customer, especially upon the conversion of a common trust fund to a mutual fund. There may also be other state requirements regarding disclosures, as well as investment restrictions.

d.  The bank should provide participating accounts an initial prospectus of the mutual fund, and all necessary disclosures under Federal and State securities and banking laws. Participating accounts should continue to receive any prospectus and other disclosures required under these laws.

**L.4. ERISA Considerations of Conversion**