Gilmur R. Murray (SBN 111856)
gmurray@murrayhowardlaw.com
Derek G. Howard (SBN 118082)
dhoward@murrayhowardlaw.com
**MURRAY & HOWARD, LLP**
436 14th Street, Suite 1413
Oakland, California 94612
Telephone:      (510) 444-2660
Facsimile:      (510) 444-2522

Joseph W. Cotchett (SBN 36324)
jcotchett@cpmlegal.com
Niall P. McCarthy (SBN 160175)
nmccarthy@cpmlegal.com
Laura Schlichtmann (SBN 169699)
lschlichtmann@cpmlegal.com
**COTCHETT, PITRE & MCCARTHY**
840 Malcolm Road, Suite 200
Burlingame, California 94010
Telephone:      (650) 697-6000
Facsimile:      (650) 697-0577

*Attorneys for Plaintiffs and the Classes*

### UNITED STATES DISTRICT COURT

### NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ELLEN STOODY-BROSER , an Individual, Individually and on Behalf of All Others Similarly Situated,<br><br>                Plaintiff,<br><br>    v.<br><br>BANK OF AMERICA, N.A. and BANK OF AMERICA CORPORATION<br><br>                Defendants. | Case No. 08-cv-2705 JSW<br><br>Hon. Jeffrey S. White<br><br>**APPENDIX OF LEGAL AUTHORITIES IN SUPPORT OF PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**<br><br>Date:      October 31, 2008<br>Time:      9:00a.m.<br>Place:      Courtroom 2, 17th Floor<br><br>Complaint Filed:  May 29, 2008<br><br>Honorable Jeffrey S. White |

MURRAY & HOWARD, LLP
436 14th Street, Suite 1413
Oakland, CA 94612
Tel. (510) 444-2660
Fax (510) 444-2522

**APPENDIX OF AUTHORITIES**
Case No. 08-02705 JSW

1

## INDEX

| _**Other Authorities:**_ | _**Exhibit:**_ |
|---|---|
| Martin & Howard, "Lawsuits: From Both Sides Now Litigation Concerning Common Trust Fund Conversions and Investments in Affiliated Mutual Funds," Representing Estate and Trust Beneficiaries and Fiduciaries, ALI-ABA Course of Study (July 2008). | A |
| Rest. Trusts 3d §77 (2003) | B |
| Rest. Trusts 3d §78 (2003) | C |
| Rest. Trusts 3d §90 (2003) | D |
| Roy, Gregory & Napolitano, "Advanced Litigation Risk Management for the Corporate Fiduciary," _Trust & Estates_, May 2001. | E |
| Uniform Prudent Investor Act | F |

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**MURRAY & HOWARD, LLP**
436 14ᵗʰ Street, Suite 1413
Oakland, CA 94612
Tel. (510) 444-2660
Fax (510) 444-2522

**APPENDIX OF AUTHORITIES**
Case No. 08-02705 JSW

# Exhibit A

ALI-ABA Course of Study
**Representing Estate and Trust Beneficiaries and Fiduciaries**

July 17-18, 2008
San Francisco, California and Live Video Webcast

**Lawsuits: From Both Sides Now**
**Litigation Concerning Common Trust Fund Conversions**
**and Investments in Affiliated Mutual Funds**

**By**

**James C. Martin, Reed Smith LLP**

**And**

**Derek G. Howard, Murray & Howard LLP**

# TABLE OF CONTENTS

I.  Overview.................................................................................................................................1

    A.  Why are we here?................................................................................................1

    B.  How have the claims asserted in various cases changed over time? ......................1

    C.  What are the results so far? ................................................................................1

II.  Historical background. ........................................................................................................2

    A.  Common Trust Funds ("CTFs"). .......................................................................2

    B.  CTF conversions to mutual funds. ......................................................................2

III.  Cases against trustees concerning the CTF conversions and/or the investment of trust assets in affiliated mutual funds.................................................................................2

    A.  Early cases focusing on specific issues related to CTF conversions. .....................2

    B.  More recent cases concerning CTF conversions and/or the investment of trust assets in affiliated mutual funds.................................................................2

IV.  What are the key claims asserted in these cases? ................................................................5

    A.  State law claims. ...............................................................................................5

    B.  Federal claims. .................................................................................................5

V.  What are some of the key legal issues raised in these cases?..............................................5

    A.  Threshold legal issues. ......................................................................................5

    B.  Merits-based issues. ..........................................................................................6

VI.  Legal Authority supporting CTF conversions and investment of trust assets in affiliated mutual funds. ......................................................................................................6

    A.  Office of the Comptroller of the Currency ("OCC"). ..........................................6

    B.  State Law Regulating Investments in Affiliated Mutual Funds.............................7

    C.  Prudence Analysis:  The Prudent Investor Rule and the Uniform Prudent Investor Act ("UPIA"). .....................................................................................8

    D.  FDIC – Trust Examination Manual. .................................................................10

    E.  Uniform Trust Code ("UTC")..........................................................................10

    F.  Case Law.........................................................................................................11

VII.  Academic Debate on Trust Law.  Sole Interest vs. Best Interest.  What does the duty of loyalty require with respect to investments in affiliated mutual funds?...............13

**Lawsuits: From Both Sides Now**
**Litigation Concerning Common Trust Fund Conversions**
**and Investments in Affiliated Mutual Funds[1]**

I.    **Overview**

A.    **Why are we here?**

Since 2000, at least 19 putative class actions have been filed against trustees concerning the conversion of Common Trust Funds ("CTFs") into mutual funds and the investment of trust assets in affiliated mutual funds generally.

B.    **How have the claims asserted in various cases changed over time?**

Earlier complaints involved claims specifically related to CTF conversions. More recently, cases have focused on trustees' investment of trust assets in mutual funds that are managed and distributed by an affiliate of the trustee ("affiliate mutual funds").

The complaints predominantly have asserted state law class action claims for breach of fiduciary duty, breach of contract, and unjust enrichment. In a few cases, plaintiffs have attempted to assert private rights of action based on federal securities laws and then quickly abandoned those claims.

C.    **What are the results so far?**

Early actions concerning issues specific to certain CTF conversions were settled for substantial monetary relief following class certification. More recent actions challenging the investment of trust assets in affiliated mutual funds have been dismissed either voluntarily or based on threshold legal issues, including federal preemption under the Securities Litigation Uniform Standards Act ("SLUSA"), statutes of limitations, and the amount in controversy requirement for diversity jurisdiction. Recently, the U.S. Court of Appeals for the Eighth Circuit affirmed that SLUSA preempts state law class action claims brought by trust beneficiaries whenever those class action claims involve allegation of misstatements, omissions, or the use of a deceptive or manipulative device or scheme "in connection with" the investment of trust assets in mutual funds.

While many cases have been resolved, a few cases remain active at the trial level or on appeal, and plaintiffs' attorneys recently have filed two new putative state-law class actions against trustees concerning the investment of trust assets in both

---

[1]    The authors would like to thank Mary J. Hackett, Sharon L. Rusnak, and David J. Bird of Reed Smith LLP for their contributions to this outline. This outline builds upon a prior outline written by Ms. Hackett, Ms. Rusnak, and Jessica A. Haught for a presentation on "Delegation and Investment in Affiliated Mutual Funds," during last year's ALI-ABA course, "Representing Estate and Trust Beneficiaries and Fiduciaries" (July 19-20, 2007).

affiliated mutual funds and non-affiliated mutual funds.  In each active case, the trustee is defending itself vigorously.

II.    **Historical background.**

A.    **Common Trust Funds ("CTFs").**

A CTF is an investment vehicle created by banks to pool trust assets, diversify the investments of personal trusts, and spread the risk of loss.

Under federal law, a CTF includes a fund maintained by a bank exclusively for the collective investment and reinvestment of moneys as a trustee.  *See* 26 U.S.C. § 584(a)(1).

B.    **CTF conversions to mutual funds.**

In 1996, Congress passed legislation allowing the tax-free conversion of CTFs to mutual funds. *See* I.R.C. § 584(h).

Many states also amended their laws to permit a fiduciary to invest trust assets in affiliated mutual funds.  In cases arising out of CTF conversions and affiliated mutual fund investments, plaintiffs and defendants disagree about the scope and significance of these statutes.

III.    **Cases against trustees concerning the CTF conversions and/or the investment of trust assets in affiliated mutual funds.**

A.    **Early cases focusing on specific issues related to CTF conversions.**

1.    *Shaffer v. Bank One Corp.*, **No. 97 L 16129 (Il. Cir. Ct. Mar. 16, 2000).**

Class Certified.   Plaintiffs brought action against successor to First Chicago and others arising out of conversion of CTFs to affiliated mutual funds.  Complaint alleged assets were converted to use as a source of free capital to launch affiliated mutual funds and to charge fees not permitted under CTFs.  Conversion occurred before 1996 tax law permitted tax free conversions. Case settled in 2003 for $12 million.

2.    *Parsky v. First Union Corp.*, **51 Pa. D. & C. 4th 468 (May 8, 2001).**

Class Certified.  Plaintiffs represented a class of investors who incurred substantial capital gains due to conversion of common trust funds. Case settled for $23 million.

B.    **More recent cases concerning CTF conversions and/or the investment of trust assets in affiliated mutual funds.**

1.    *Hughes v. LaSalle Bank, N.A.*, **419 F.Supp. 2d 605 (S.D.N.Y. 2006).**

Filed in 2002. Case involved pre-1996 conversion of common trust funds. Motion to dismiss granted in March, 2006 on statute of limitations

- 2 -

grounds. The court also found that consent and ratification of the challenged investment in affiliated mutual funds barred any claim. *Hughes v. LaSalle Bank, N.A.*, No. 02 Civ. 6384 (MBM), 2006 WL 1982983 (S.D.N.Y. 2006). On appeal, the U.S. Court of Appeal for the Second Circuit raised a question about whether the case was properly removed to federal court and remanded to the district court for the limited purpose of addressing the removal jurisdiction issue. The district court issued a supplemental opinion that the case was *not* properly removed. But the case was settled while on appeal before any decision by the Second Circuit on removal jurisdiction or the dismissal of Plaintiffs' claims.

2.    ***Kutten v. Bank of America, N.A.*, No. 4:04–cv–0244–PAM,, 2006 WL 1520588 (E.D. Mo. May 26, 2006).**

Filed 2004. Dismissed in May 2006. The court ruled that plaintiffs, after two years of discovery, had failed to provide a "scintilla of evidence" of any damage to necessary to support claim of diversity jurisdiction.

3.    ***Richtenburg v. Wells Fargo Bank, N.A.*, No. 05-444516 (S.F. Cal. Sup. Ct.), *writ granted sub nom. Wells Fargo Bank, N.A. v. Superior Court of San Francisco County*, 159 Cal. App. 4th 381, 71 Cal. Rptr. 3d. 506 (Cal. App. Jan. 25, 2008).**

Filed 2005. This case challenges investments in CTFs, affiliated mutual funds, and non-affiliated third-party mutual funds. The California Court of Appeal held that state law class action claims asserted in plaintiffs' amended complaint were precluded by SLUSA because the amended complaint alleged that the defendant engaged in misrepresentations, omissions, and conduct that was "deceptive" and "manipulative" "in connection with" the purchase and sale of mutual fund shares.

The court vacated the trial court's order overruling the defendant's demurrer and remanded with instructions to enter an order granting the demurrer with leave to amend in light of SLUSA. The trial court has not yet issued that order, and the contours of permissible amendments have not yet been fully litigated by the parties or addressed by the trial court.

4.    ***Spencer v. Wachovia Bank, N.A.*, No. 05-81016 (RYSKAMP), 2006 WL 3408043 (S.D. Fla. May 10, 2006).**

Filed 2005. In May 2006, the district court dismissed plaintiffs' state law class claims with prejudice, holding that the class claims were preempted by SLUSA; the district court also dismissed plaintiffs' state law individual claims without prejudice for failure to plead a loss. Plaintiffs did not appeal the ruling on their class action claim or file an amended complaint and the case was closed by the court.

5.    ***Siepel v. Bank of America, N.A.*, 239 F.R.D. 558 (E.D. Mo. 2006), *aff'd*, --- F.3d ----, 2008 WL 2079028 (8th Cir. May 19, 2008).**

Filed 2005. The district court granted defendants' motion to dismiss based on SLUSA preemption and denied plaintiffs' request for leave to amend as

futile.  The Eighth Circuit recently affirmed the dismissal based on SLUSA.

6.  ***Kutten v. Bank of America* ("*Kutten II*"), No. 06-2007, 2007 WL 2485001 (E.D. Mo. Aug. 29, 2007), affirmed, No. 07-356, --- F.3d ----, 2008 WL 2406232 (8th Cir. June 17, 2008).**

Filed 2006.  The district court found the case indistinguishable from *Siepel* and held that SLUSA precluded plaintiffs' class action claims.  On appeal, plaintiffs argued that their case was distinguishable from *Siepel* and outside the scope of SLUSA because their amended complaint deleted express references to misrepresentations" and omissions.  The court of appeals rejected that argument and affirmed the dismissal, noting that (1) SLUSA preemption is based on the substance of conduct alleged, not the words used to describe the conduct and (2) Plaintiffs' amended complaint described alleged conduct that was misleading and deceptive.

7.  ***Brooks v. Wachovia Bank, N.A.*, No. 06-00955 (E.D. Pa.), appeal pending, No. 07-4026 (3d Cir.).**

Filed 2006. Dismissed based on the preclusive effect of the *Parsky* settlement.  Appeal pending, including SLUSA preemption as an alternate ground for affirmance

8.  ***Luleff v. Bank of America, N.A.*, Case No. 06 CV 1435 (JGK)**

Filed 2006.  After Plaintiffs filed a second amended complaint, defendants moved to dismiss based on a number of grounds, including SLUSA preemption and, in the alternative, lack of subject matter jurisdiction under the Class Action Fairness Act.  The parties recently agreed to settle the named plaintiffs' individual claims.  No ruling on defendants' motion to dismiss.

9.  ***Rabin v. JP Morgan Chase, N.A.*, No. 06-C-5452, 2007 WL 2295795 (N.D. Ill. Aug. 3, 2007).**

Filed October 2006.  The district court dismissed plaintiffs' federal securities law claims for lack of standing under the *Blue Chip Stamps* purchaser-seller and dismissed plaintiffs' state law claims based on SLUSA preemption.  Plaintiffs voluntarily dismissed their appeal.

10. ***Beary v. ING Life Ins. & Annuity Co.*, No. 3:07CV35MRK, 2007 WL 3274426 (D. Conn. Nov. 5, 2007).**

The complaint asserted Florida state law claims arising out of investments in affiliated mutual funds.  The defendant filed a motion to dismiss based on, *inter alia*, SLUSA preemption and plaintiffs' acquiescence to trust investments.  In an effort to avoid SLUSA's preemptive effect, plaintiffs' counsel narrowed the scope of his claim and requested relief and conceded that (1) plaintiff was not seeking fees that paid for the investments; (2) plaintiff would not assert that any disclosures were inadequate; (3) plaintiff was not seeking damages for investment performance; and (4) plaintiff was not alleging that the defendants steered plaintiffs to buy the investments.  Relying on plaintiffs' concessions, the court held

SLUSA inapplicable, but it also found that, because of these concessions, plaintiff's claims for breach of fiduciary duty were barred as a matter of Florida state trust law. The trustee had not breached any terms of the contract/trust instrument or plan and it had (by plaintiffs' own concession) adequately disclosed information about the trust investments.

IV.  **What are the key claims asserted in these cases?**

    A.  **State law claims.**

        1.  Primary claims

           a.  Breach of Fiduciary Duty

           b.  Breach of Contract

           c.  Unjust Enrichment

           d.  State statutory probate law violations

           e.  Fraud

    B.  **Federal claims.**

        1.  <u>Securities Act of 1933</u>.  Plaintiffs in various actions have also asserted numerous violations under the federal securities laws.  For example, allegations include purported violations of Sections 11 and 12 of the Securities Act of 1933 for misrepresentations/omissions in registrations statements/prospectus.  <u>See</u> 15 U.S.C. §77k(a); 15 U.S.C. §77l(a)(2).  Also pursuant to the Securities Act of 1933, various complaints have included allegations of "control person liability" pursuant to Section 15.  <u>See</u> 15 U.S.C. §77o.

        2.  <u>Exchange Act of 1934</u>.  Various complaints filed have also included claims pursuant to Section 10b(5) of the Exchange Act and SEC Rule 10b-5.  Section 10b(5) and Rule 10b-5 prohibit fraudulent conduct in the sale and purchase of securities.  <u>See</u> 15 U.S.C. § 78j; 17 C.F.R. § 240.10b-5.

V.  **What are some of the key legal issues raised in these cases?**

    A.  **Threshold legal issues.**

        **1.**  Trust beneficiaries' lack of standing to bring a private class action claims based on federal securities laws concerning the investment of trust assets in federally registered securities (including shares of affiliated mutual funds).

        **2.**  Federal preemption of trust beneficiaries' state law class action claims under the Securities Litigation and Uniform Standards Act ("SLUSA").

3.    Lack of subject matter jurisdiction over trust beneficiaries' claims in federal court under the Class Action Fairness Act ("CAFA").

4.    State statutes of limitations.

5.    Adequacy of trustees' disclosures to trust beneficiaries, including without limitation CTF conversions and investment of trust assets in affiliated mutual funds; trust beneficiaries' acquiescence/consent/ratification to investment transactions.

### B.    Merits-based issues.

1.    Whether a trustee has a fiduciary duty to maintain CTFs as such.

2.    Whether CTF conversions and trust investments in affiliated mutual funds are authorized by law.

3.    Whether a trustee has breached its duty to provide a beneficiary with information about the administration of trust assets with respect to CTF conversions and the investment of trust assets in affiliated.

4.    Whether a trustee has breached a duty of loyalty by investing trust assets in affiliated mutual funds.

5.    Given the transition from CTFs to affiliated mutual funds as investment vehicles for trust accounts, are investments in affiliated mutual funds a proper delegation of a trustee's fiduciary duty.

6.    Must a trustee offer CTFs; should a trustee select CTFs over mutual funds.

7.    Does investing in affiliated mutual funds alter the fundamental prudence analysis?

## VI.    Legal authority concerning CTF conversions and investment of trust assets in affiliated mutual funds.

### A.    Office of the Comptroller of the Currency ("OCC").

1.    "Unless lawfully authorized by the instrument creating the relationship, or by court order or by local law, funds held by a national bank as fiduciary shall not be invested in stock or obligations of, or property acquired from... individuals... or organizations in which there exists such an interest, as might affect the exercise of the best judgment of the bank in acquiring the property...". OCC Banking Circular 233.

2.    The OCC indicated in Interpretive Letter No. 722 that "[a] particular investment is appropriate if it is consistent with the trust instrument's requirements or the state law's 'prudent investor' standards and with the bank's other fiduciary duties." *See* OCC Interpretive Letter No. 722 (Mar. 12, 1996); OCC Interpretive Letter No. 704 (Oct. 30, 1995).

The OCC has also recognized that a corporate fiduciary may invest fiduciary assets in an affiliated mutual fund, if the bank concludes that the arrangement:

(i)    **is authorized by applicable law**;

(ii)   **is appropriate for the particular fiduciary accounts involved**;

(iii)  **is consistent with the fiduciary accounts' governing instrument; and**

(iv)   **is otherwise consistent with Regulation 9**.

3.    The Comptroller's Handbook on Conflicts of Interest states:

"Before investing, the bank should make a positive determination that the investment meets the needs of the account. The bank should also document through the annual review process that the proprietary mutual funds continues to be an appropriate investment for the account. Factors such as the performance of the mutual funds, fees charged, liquidity, and the needs of account beneficiaries should be considered and documented as part of the annual review process." *See* Comptroller's Handbook, Conflicts of Interest, June 2000.

**B.    State Law Regulating Investments in Affiliated Mutual Funds.**

1.    Federal banking law recognizes that trust law is generally governed by the States. *In re Fidelity Bank Trust Fee Litig.*, 839 F.Supp. 318, 325 (E.D. Pa. 1993), aff'd, 43 F.3d 1461 (3d Cir. 1994)) ("[T]he law of trusts is primarily an area which has been left to state law."). *See* 12 U.S.C. § 92a; 12 C.F.R. § 9.12.

2.    Most state statutes permit a trustee to invest trust assets in affiliated mutual funds and to receive compensation at the account level as well as for services provided in connection with the funds, subject to disclosure and other requirements. *See e.g.*, Oh. Rev. Code Ann. §1111.13(H); Vt. Stat. Ann. Tit. 8, §14410(a); Me. Rev. Stat. tit., 18-A §7-408(2); Md. Estates and Trusts Code Ann. §15-106(c); A.C.A. §28-71-104; Co. Rev. Stat. §11-10-107; Ga. Code Ann. §53-12-287; Haw. Rev. Stat. §412:8-400; Idaho Code §68-404A; 760 Ill. Comp. Stat. Ann. §5/5.2; Burns Ind. Code Ann. §28-1-12-3; Iowa Code §633.123A; La. Rev. Stat. Ann. §9:2086; Mo. Rev. Stat. §362.550.

3.    For example, Section 737.402(e) of the Florida Trust Code expressly provides that a corporate trustee is authorized:

(e)    To acquire an undivided interest in a trust asset, including, but not limited to, a money market mutual fund, mutual fund, or common trust fund, in which asset the trustee holds an undivided interest in any trust capacity, including any money market or other mutual fund from which the trustee, any co trustee, or any affiliate or associate of the trustee or cotrustee is entitled to receive reasonable compensation for providing necessary services as an

- 7 -

investment adviser, portfolio manager, or servicing agent. A trustee, cotrustee, or affiliate or associate of the trustee or co trustee may receive compensation for such services in addition to fees received for administering the trust, provided such compensation is fully disclosed in writing to all current income beneficiaries of the trust.

Fla. Stat. Ann. § 737.402(e)

4.    Additionally, the Florida statute permitting the corporate trustee to retain both the account level fee as well as fees for services to its affiliated mutual funds provides as follows:

**660.417 Investment of fiduciary funds into mutual fund accounts; permissible activity under certain circumstances.--**

(1)    In addition to other investments authorized by law for the investment of funds held by a fiduciary, or by the instrument governing the fiduciary relationship, and notwithstanding any other provision of law, a bank or trust company acting as a fiduciary, agent or otherwise may, in the exercise of its investment discretion or at the direction of another person authorized to direct investment of funds held by the bank as fiduciary, invest and reinvest in the securities of an open-end or closed-end management investment company or investment trust registered under the Investment Company Act of 1940, 15 U.S.C. ss. 80a-1 et seq., as amended, so long as the portfolio of such investment company or investment trust consists substantially of investments not prohibited by the governing instrument.

(2)    The fact that such bank or trust company or an affiliate of the bank or trust company provides services to the investment company or investment trust such as that of an investment adviser, custodian, transfer agent, registrar, sponsor, distributor, manager or otherwise and is receiving reasonable compensation for those services, shall not preclude such bank or trust company from investing or reinvesting in the securities of the open-end or closed-end management investment trust registered under the Investment Company Act of 1940, 15 U.S.C. ss. 80a-1 et seq., as amended. However, with respect to any funds so invested, the basis (expressed as a percentage of asset value or otherwise) upon which such compensation is calculated shall be disclosed (by prospectus, account statement or otherwise) to all persons to whom statements of such account are rendered.

Fla. Stat. Ann. § 660.417.

C.    **Prudence Analysis: The Prudent Investor Rule and the Uniform Prudent Investor Act ("UPIA").**

1.    Most of the recent cases concerning CTF conversions and mutual fund investments have been dismissed voluntarily or based on threshold legal issues, including subject matter jurisdiction, SLUSA preemption, and

- 8 -

failure to state a claim. Not surprisingly, plaintiffs and defendants also disagree about underlying merits-based issues, including without limitation whether CTF conversions and mutual fund investments may have resulted in breaches of state-law fiduciary duties of loyalty, candor, and care.

2.    The Restatement (Third) of Trust's revised standard of prudent investment is known as the "Prudent Investor Rule." *See also* Eugene F. Maloney, *The Investment Process Required by the Uniform Prudent Investment Act," Journal of Financial Planning,* November 1999. Prior to the drafting of the UPIA, state "prudent investor" statutes governed the investment process of trustees. After recognizing certain limitations and inconsistencies in these statutes, the American Law Institute ("ALI") revised trust investment law in the Restatement (Third) of Trusts in 1992.

This rule is based on Section 227 of the Restatement which provides:

**§ 227. General Standard of Prudent Investment**

**The trustee is under a duty to the beneficiaries to invest and manage the funds of the trust as a prudent investor would, in light of the purposes, terms, distribution requirements, and other circumstances of the trust.**

a)    **This standard requires the exercise of reasonable care, skill, and caution, and is to be applied to investments not in isolation but in the context of the trust portfolio and as a part of an overall investment strategy, which should incorporate risk and return objectives reasonably suitable to the trust.**

b)    **In making and implementing investment decisions, the trustee has a duty to diversify the investments of the trust unless, under the circumstances, it is prudent not to do so.**

c)    **In addition, the trustee must:**

1.    **conform to fundamental fiduciary duties of loyalty (§ 170) and impartiality (§ 183);**

2.    **act with prudence in deciding whether and how to delegate authority and in the selection and supervision of agents (§ 171); and**

3.    **incur only costs that are reasonable in amount and appropriate to the investment responsibilities of the trusteeship (§ 188).**

d)    **The trustee's duties under this Section are subject to the rule of § 228, dealing primarily with contrary investment provisions of a trust or statute.**

3.    UPIA Section 9 – Delegation of Investment & Management Functions.

A trustee may delegate investment and management functions that a prudent trustee of comparable skills could properly delegate under the circumstances.

4.  Under the "Prudent Investor Rule" enacted in various jurisdictions, a trustee may invest in any type of property in a fiduciary account. However, a trustee's investment authority may generally be restricted by the terms of the governing instrument. Under modern "Prudent Investor" standards, mutual funds may be considered "authorized" investments under trust law.

5.  Like any other discretionary power, a corporate fiduciary's exercise of its investment powers must be exercised prudently.

6.  Modern portfolio theory is embodied in §2(b) of the UPIA and refers to the process of reducing risk in a portfolio through systematic diversification across asset classes and within a particular asset class. *See Maloney* at n.7. The corporate fiduciary must effectively manage risk and balance return while meeting the settlor's objectives.

**D.  FDIC – Trust Examination Manual.**

1.  The FDIC Trust Examination Manual states:

> "Even when permitted by statute, these transactions should be made in good faith. The fact that such investments are allowed (permissive authority) does not relieve the fiduciary of its 'duty of care and skill' in the investment selection process. A failure to properly address all conflict of interest and investment prudence issues casts doubt on whether the fiduciary has satisfied the traditional fiduciary duty of undivided loyalty, and could lead to litigation and loss."

*See* Section 7, Part L.3

2.  Further, Section 8 of the FDIC Trust Examination Manual regarding Compliance/Conflicts of Interest, Self-Dealing and Contingent Liabilities provides that:

> "A fiduciary has a duty to avoid conflicts of interest and self-dealing. However, total avoidance is not always possible. Furthermore, while the terms conflicts of interest and self-dealing are somewhat self-descriptive, they should not automatically be equated with exploitation or abuse by the fiduciary. For example, the use of own-bank deposits as a trust investment is by definition a conflict of interest and self-dealing, since the bank is investing funds held as a fiduciary with itself. Yet this action, in itself, is not necessarily abusive or detrimental to the interests of account beneficiaries. Before such investments are determined to be abusive or detrimental, an analysis of the facts surrounding the investment must be made by the examiner."

**E.  Uniform Trust Code ("UTC").**

With respect to investments in affiliated mutual funds, Section 802(f) of the UTC provides:

> "An investment by a trustee in securities of an investment company or investment trust to which the trustee, or its affiliate,

- 10 -

provides services in a capacity other than as trustee is not presumed to be affected by a conflict between personal and fiduciary interests if the investment complies with the prudent investor rule of [Article] 9. In addition to its compensation for acting as trustee, the trustee may be compensated by the investment company or investment trust for providing those services out of fees charged to the trust. If the trustee receives compensation from the investment company or investment trust for providing investment advisory or investment management services, the trustee must at least annually notify the persons entitled under Section 813 to receive a copy of the trustee's annual report of the rate and method by which that compensation was determined." *See* § 802(f).

F.    **Case Law.**

1.    *In re Chase Manhattan Bank*, 813 N.Y.S.2d 855 (N.Y. Sur. Ct. 2005) The New York Surrogate's court held that the termination of common trust funds upon conversion of common trust units held for individual trusts into shares of mutual funds under corporate fiduciaries' control was *per se* permissible under New York statutory law and would not be disturbed in light of the practical advantages of mutual fund investments to underlying trusts, including enhanced portability of mutual fund shares, daily pricing of those shares, and greater liquidity, and in absence of clear legislative intent to prohibit such tax-neutral conversions, despite the loss of statutory safeguards in place for common trusts including periodic judicial accountings.

2.    *Matter of Onbank & Trust Co.*, 649 N.Y.S.2d 592 (N.Y. App. Div. 1996). The court held that investment in mutual funds by trustee of common trust fund does **not** constitute improper delegation. "Although the mutual fund assumes the responsibility of choosing the individual investments, the trustee maintains control by choosing a mutual fund that is operated according to investment objectives consistent with those of the underlying trust. Additionally, shares of the mutual fund can be redeemed almost immediately after a request from the shareholder, which also enables the trustee to maintain close control over the investment." *Id.* at 596.

The court further held that the fee charged by the mutual fund must be absorbed by the trustee of the common trust fund. Id. at 597-598. However, on appeal, this holding was reversed because the amendment to the Banking Law, which explicitly permits trustees of common trust funds, who have lawfully invested in mutual funds, to pass the mutual management fees on to the funds rather than absorb fees themselves, applied retroactively to common trust fund trustee that invested in mutual funds prior to amendment's effective date. *See Matter of Onbank & Trust Co.*, 688 N.E.2d 245 (N.Y. 1997).

3.    *O'Neill v. O'Neill*, 865 N.E.2d 917 (Ohio Ct. App. 2006). Beneficiary of trust filed complaint against trustee for breach of fiduciary duty arising out of the trustee's delegation of the management of trust assets. The court interpreted Ohio's Uniform Prudent Investor Act and recognized that a trustee may delegate investment and management functions to a reputable

- 11 -

investment firm or registered financial advisor. However, the scope of the delegation must be consistent with the purpose and terms of the trust in question. *Id.* at 920.

4.    *In re Rees' Estate*, 87 N.E. 2d 397 (Ohio App. 1947). The court held that "in all cases where a trustee is not restricted to statutory investments, but has the power to invest in stocks, … the investment by a trustee in stock of an investment company, or in participating shares issued by an investment trust, does not constitute an improper delegation of authority and power by the trustee." *Id.* at 410.

5.    *Cote v. Bank One Texas, N.A.*, No. 4:03-CV-296-A, 2004 WL 594114 (N.D. Tx. March 16, 2004). Plaintiff brought an action against the Bank as trustee for investments in affiliated mutual funds as well as high risk investments in a trust for which she served as a beneficiary. Defendants moved for summary judgment claiming that the investment decisions were authorized by the trust instrument, that Texas law permitted investments in affiliated mutual funds. The Court noted that the trust instrument specifically authorized investments in affiliated mutual funds and also provided an exculpatory clause for alleged wrongdoing. Plaintiff's claims regarding self-dealing for purchasing affiliated mutual funds were dismissed with prejudice.

6.    *Estate of Vail v. First America Trust Co.*, 309 Ill.App.3d 435 (Ill. 4th Dist. 1999). Beneficiaries of an estate challenged the investment decision of the executor (the bank) to invest assets of the estate in the bank's affiliated money market mutual fund. The controlling trust code in Illinois specifically authorized investments in mutual funds, including money market funds. Plaintiffs claimed that the transaction was "a presumptively fraudulent diversion of funds and a conflict of interest." *Id.* at 440. The Court held that the corporate executor could properly invest estate funds in affiliated mutual funds where such investment was authorized by state statute noting that the plaintiff failed to cite to any authority which held that such investments were improper.

7.    *In Re Estate of Mary Y. Kopf*, (PA Orphan's Court, December 31, 2001 and August 16, 2002). Beneficiaries of a testamentary trust filed objections to the accounting submitted by the corporate trustee, PNC Bank. The beneficiaries' objections concerned investments by the trustee in BlackRock mutual funds, the trustee's affiliated mutual funds. The beneficiaries questioned whether such investments, although permissible, constituted a breach of fiduciary duty. In its December, 2001 opinion, the Court held that the question presented was "whether the long established duty of loyalty owed by a trustee is modified … [where] trustees are given statutory permission to invest in affiliated mutual funds." *See* December Opinion, p. 3. The Court held that in light of 20 Pa. C.S. §7211 permitting a trustee to utilize mutual funds as investment vehicles in trust accounts, PNC did not breach its fiduciary duty.

The beneficiaries then filed an exception to the December adjudication claiming that PNC had administered the trust to maximize its fees and charges to the trust by investing in affiliated mutual funds. PNC defended its administration claiming that it comported with applicable fiduciary standards.

VII.    **Academic Debate on Trust Law. Sole Interest vs. Best Interest. What does the duty of loyalty require with respect to investments in affiliated mutual funds?**

1.      John Langbein[2] - Advocate for "Best Interest Rule" – a "transaction prudently undertaken to advance the best interest of the beneficiaries best serves the purpose of the duty of loyalty, even if the trustee also does or might derive some benefit." *Questioning the Trust Law Duty of Loyalty: Sole Interest or Best Interest?*, 114 Yale L.J. 929, 932 (March 2005). A transaction in which there has been a conflict or overlap of interest should be sustained if the trustee can prove that the transaction was prudently undertaken in the best interest of the beneficiaries and an inquiry into the merits is better than "no further inquiry."

    a.      In his article, Professor Langbein discusses the historical use of CTFs as investment vehicles in the trust industry to maintain and deliver trust assets. *Id.* at 972-973 (characterizing a CTF as a "sort of in-house mutual fund operated by the trustee for investing smaller trust accounts"). He further notes that in the last twenty-five years, mutual funds, due to their significant advantages[3] over CTFs, have superseded CTFs as the "pooling vehicle of choice for trust investing." *Id.* at 973-974.

---

[2]     John Langbein is a Sterling Professor of Law and Legal History at Yale University. In addition to his academic credentials and extensive publications, Professor Langbein served as the National Conference Reporter to the Uniform Law Commission regarding the drafting of the Uniform Prudent Investor Act.

[3]     Professor Langbein summarizes the advantages of mutual funds as follows:

    1)      The mutual fund allows both fiduciary and nonfiduciary accounts to be pooled in the same fund, which enables mutual funds to be larger than common trust funds, hence to enjoy greater diversification and economies of scale. Bank common trust funds are limited to fiduciary accounts.

    2)      The vastly greater size of the mutual fund industry results in a greater array of fund types, permitting more precise asset allocation for the trust portfolio.

    3)      Open-end mutual funds are priced daily and are commonly quoted in the financial press, which promotes transparency for beneficiaries and others.

    4)      The mutual fund has a material tax advantage when the trustee makes distributions to beneficiaries. Mutual fund shares may be distributed in kind; distributions from a CTF must be liquidated when distributed, which triggers the recognition and taxation of any gains.

    5)      In some states, especially New York, CTFs are required to undergo periodic judicial accountings, a form of make-work that provides ample opportunity for the court to appoint politically well-connected guardians ad litem to litigate imaginary grievances at the expense of the fund and its underlying trust beneficiaries.

*See id.* at n. 231.

b.  Professor Langbein discusses the fundamental duty of loyalty and posits that the "sole interest rule" is unsound. He acknowledges that in some circumstances, a court will look to the overall "merits of this mode of trust investing" and will weight the "trust beneficiary's **best** interest over his or her **sole** interest." *Id.* at 972.

c.  Further, he states that a trustee must remain vigilant in its obligation to act in the "best interest" of the beneficiary when deciding to use affiliated mutual funds. *Id.* While the trustee may derive fee income from both the mutual fund and the trust, the overarching duty of cost sensitivity still mandates that the expenses be appropriate and reasonable. Likewise, the duty to monitor requires constant attention to the costs and comparative performance of competing funds. *Id.* at 974 (citing the Restatement (Third) of Trusts: Prudent Investor Rule §227 cmt. m (1992) and U.P.I.A. § 9 cmt).

d.  Accordingly, "fiduciary obligation still suffuses the use of affiliated mutual funds." *Id.*

2.  <u>Melanie B. Leslie</u>.[4] Advocate for "Sole Interest Rule" – prohibits trustee from placing himself in a position where his personal interest conflicts with interests of the beneficiary. *In Defense of the No Further Inquiry Rule: A Response to Professor John Langbein*, 47 Wm. & Mary L. Rev. 541 (November 2005).

a.  Professor Leslie is a proponent of the traditional rule of trust law which unequivocally prohibits a trustee from profiting from a transaction with a trust and which imposes harsh consequences for a trustee's self-dealing. *Id.* In her rebuttal to Professor Langbein, she opposes the paradigm shift in trust law which allows trustees to profit from purported conflicts of interest so long as the conflicted transaction is in the trust's best interest. Professor Leslie argues that the modification of the duty of loyalty in §802(f) of the UTC will only make institutional trustees more profitable with little comparable benefit for trust beneficiaries. Further, any "best interest" defense only serves to generate serious harm to future beneficiaries. *Id.* at 544.

b.  Her analysis also criticizes Professor Langbein's theory that the traditional sole interest analysis "overdeters" fiduciaries and prevents trustees from engaging in transactions that will be mutually beneficial for both the beneficiary and the trustee. She contends that this deterrence theory only promotes trustee

---

[4]  Melanie B. Leslie is a Professor at the Cardozo School of Law and author of *In Defense of the No Further Inquiry Rule: A Response to Professor John Langbein*, 47 Wm. & Mary L. Rev. 541 (November 2005) and *Trust Law in the 21st Century: Common Law, Common Sense: Fiduciary Standards and Trustee Identity*, 27 Cardozo Law Rev. 2713 (April 2006).

"opportunism" to engage in conflicted transactions. *Id.* at 550. She also discounts the fact that state laws have authorized certain "conflicted transactions," such as the investment of trust assets in affiliated mutual funds, as evidence of the banking industry's effectiveness at lobbying state legislatures. Despite changes in the legal landscape of trust law, Professor Leslie views the erosion of the "sole interest" analysis in favor of a "best interest" analysis as an opportunity only for corporate fiduciaries to profit at the trust's expense. *Id.*

c.   Recently, Professor Leslie asserted that state statutes permitting investments in affiliated mutual funds "dramatically increase beneficiaries' monitoring costs" and "remove incentives for disclosure to the beneficiaries. *Trust Law in the 21st Century: Common Law, Common Sense: Fiduciary Standards and Trustee Identity*, 27 Cardozo Law Rev. 2713, 2733 (April 2006). Professor Leslie now suggests that a "trustee need no longer subordinate its interests to those of the trust." *Id.* at 2734.

d.   With respect to delegation, Professor Leslie also noted the change in the non-delegation doctrine in recent years. *Id.* In analyzing the duties of a professional trustee, she suggests that a rule permitting delegation of the investment function should reflect the following objectives:

i.    The trustee should provide full information to settlors during the trust creation process and craft any modifications of fiduciary rules narrowly and specifically;

ii.   The trustee should provide full and fair disclosure to beneficiaries prior to deviating from the settlor's reasonable expectations; and

iii.  The trustee should perform to the highest level of professional standards consistent with the settlor's intent.

*See id.* at 2735-2736.

3.   <u>Tamar Frankel.</u>[5]  Advocate for "Sole Interest Rule." Opined that the conversion of common trust funds benefits the trustee at the expense of the beneficiaries. However, her expert report also discussed various "exceptions" to the rule including a purported ethical wall separating the various departments of a bank as corporate trustee. Also, she acknowledged that an additional exception to the rule exists where a trustee may obtain the approval and consent of the beneficiaries to engage in a transaction that purportedly involves a conflict.

---

[5]   Tamar Frankel is a Professor of Law at Boston University and served as plaintiffs' expert in *Kutten I.*

4.  <u>Robert Flannigan.</u>[6]  Advocate for "Sole Interest Rule."  In his article, *The Strict Character of Fiduciary Liability*, 2006 NZ Law Review 209 (2006), Professor Flannigan challenges Professor Langbein's position permitting a trustee to demonstrate that actions were taken in the best interest of the beneficiary.  Rather, Professor Flannigan advocates for a strict interpretation of fiduciary liability with a limited exception for consent.

---

[6]  Robert Flannigan is a Professor of Law at the University of Saskatchewan.

# Exhibit B

RESTATEMENT OF THE LAW THIRD

———

THE AMERICAN LAW INSTITUTE

———

RESTATEMENT OF THE LAW

# TRUSTS

———

Volume 3
§§ 70 to 92

*As Adopted and Promulgated*

BY

THE AMERICAN LAW INSTITUTE
AT WASHINGTON, D.C.

May 18, 1990 (Prudent Investor Rule, §§ 90–92)

AT PHILADELPHIA, PENNSYLVANIA

May 18, 2005

Tables and Index



ST. PAUL, MN
AMERICAN LAW INSTITUTE PUBLISHERS
2007

Mat #40616959

Ch. 15          SPECIFIC DUTIES OF TRUSTEESHIP          § 77

...vatorship of Pelton, 132 Cal. ...d 496, 188 Cal.Rptr. 188 (1982). ...so, on bank responsibilities un... ...modern "sweep" technology, ... ...Plotkin Clarifies Policy on ...Deposits Use for Trust Account ...ces," Amer. Bankers Ass'n, ...Letter 2 (June 1991); and Nick... ...Bank of America, NTSA, 290 ...114 (9th Cir. 2002).

...ter, 116 App. Div. 2d 580, 497 ...d 488, appeal dismissed, 67 ...d 919, 503 N.Y.S.2d 1025, 494 ...43 (1986).

...Comment d(1), above.

...ing that this rule "is appli... ...the trustee pays or con... ...beneficiary for life as in... ...or other property which ...e conveys to the bene... ...der as principal, and ...r conveys to a benefi... ...der money or other ...e should pay or con... ...ciary for life." Id., ...cuss the effects of ...ccessive assignments ...terest and, briefly, ...e rights of credi... ...s of various (dis... ...ent, and other) ...e, however, the ...ent (consistent ...th of the pres... ...arrower terms ...If the trustee ...property or ...rson who by ...entitled to it, ...to be inval... ...e trustee is ...ed to the

property, if, but only if, when he made such payment or conveyance he knew that the trust was invalid or had or should have had reasonable doubt as to its validity."

The present Comment is like recent uniform acts in abandoning the traditional doctrine that a trustee has an absolute duty not to misdeliver trust income or principal. Uniform Trust Code § 1006 (Reliance on Trust Instrument) states: "A trustee who acts in reasonable reliance on the terms of the trust as expressed in the trust instrument is not liable to a beneficiary for a breach of trust to the extent the breach resulted from the reliance." See also UTC § 602(g), stating: "A trustee who does not know that a trust has been revoked or amended is not liable to the settlor or settlor's successors in interest [sic—overlooking beneficiaries of an *amendment*] for distributions made and other actions taken on the assumption that the trust had not been amended or revoked." Cf. Uniform Prudent Investor Act § 1(b), protecting a trustee from liability to the extent the trustee acts in reasonable reliance on the trust provisions.

Some useful advice addressed primarily to continuing or successor trustees of revocable inter vivos trusts, considering the possible appli-

cability of either traditional strict-liability doctrine or somewhat softened modern principles, is offered in T. Nunan, "Trustee Liability: The Ghost of Distributions Past," 134 Trusts & Estates 9 (Nov./Dec. 1995). See also Cloud v. United States National Bank, 280 Or. 83, 570 P.2d 350 (1977), 6 A.L.R.4th 1185 (trustee of a revocable trust had no reason to doubt settlor's capacity to direct a particular distribution, but should reasonably have doubted her capacity to direct a later distribution); Wilcox v. Waldman, 154 Ariz. 532, 744 P.2d 444 (1987); and Wiglesworth v. Taylor, 391 S.E.2d 299 (Va. 1990) (re: "cotrustees' negligent post-notice [of bankruptcy] distributions"). For a case that may have gone too far in protecting a trustee of a revocable trust who made distribution despite knowledge of a major claim for which the trust estate had liability, see Arluk Med. Ctr. Ind. Group, Inc. v. Dobler, 116 Cal.App.4th 1324, 11 Cal. Rptr.3d 194 (2004) (2–1 decision); and for a case that may not have gone far enough (see dissenting opinion) in light of the specific terms of an applicable period of limitation, see National Academy of Sciences v. Cambridge Trust Co., 370 Mass. 303, 346 N.E.2d 879 (1976).

## § 77.  Duty of Prudence

(1) The trustee has a duty to administer the trust as a prudent person would, in light of the purposes, terms, and other circumstances of the trust.

(2) The duty of prudence requires the exercise of reasonable care, skill, and caution.

(3) If the trustee possesses, or procured appointment by purporting to possess, special facilities or greater skill than that of a person of ordinary prudence, the trustee has a duty to use such facilities or skill.

§ 77                         TRUSTS                         Ch. 15

**General Comment:**

   *a. Test of prudence.* In matters relating to the administration of the trust, the trustee has a duty to exercise prudence—that is, to act with care, skill, and caution (Comment *b*)—as well as a duty to adhere to the other fiduciary standards described in other Sections of this Chapter.

   The test of prudence is one of conduct not of performance. The trustee's conduct, and compliance with other fiduciary standards, is to be judged as of the time of the decision or action in question.

   Thus, the prudence of a trustee's conduct is to be judged on the basis of circumstances at the time of that conduct, not with the benefit of hindsight or by taking account of developments that occur after the time of the action or decision. Also, whether a breach of trust has occurred depends on the prudence or imprudence of the trustee's conduct, not on the eventual results of managerial or other decisions. Investment performance or other results of trustee conduct become relevant, however, when a breach of trust is found and the measure of liability is in issue.

   On prudence in the investment function, see §§ 90–92 (the "Prudent Investor Rule"). On prudence in delegation, see § 80 and also § 90, Comment *j.* On prudence and its application to a trustee's exercise of certain powers, see § 86.

**Comment on Subsections (1) and (2):**

   *b. Elements of prudence: care, skill, and caution.* The duty of prudence encompasses the duty to exercise reasonable care and skill in trust administration and the duty to act with a degree of caution suitable to the particular trust and its objectives, circumstances, and overall plan of administration.

   The duty of *care* requires the trustee to exercise reasonable effort and diligence in planning the administration of the trust, in making and implementing administrative decisions, and in monitoring the trust situation, with due attention to the trust's objectives and the interests of the beneficiaries. This will ordinarily involve investigation appropriate to the particular action under consideration, and also obtaining relevant information about such matters as the contents and resources of the trust estate and the circumstances and requirements of the trust and its beneficiaries. (More generally, cf. Comment *b(1)*.)

   As necessary or appropriate to informed decisionmaking, care may also call for obtaining and considering the advice of others on a reasonable basis (cf. § 88 on proper expenses). It is ordinarily satisfactory that information or advice be obtained from sources on which

Ch. 15

: to the administration of
prudence—that is, to act
well as a duty to adhere
n other Sections of this

not of performance. The
iduciary standards, is to
or action in question.
. is to be judged on the
uct, not with the benefit
nts that occur after the
a breach of trust has
idence of the trustee's
erial or other decisions.
rustee conduct become
und and the measure of

ee §§ 90–92 (the "Pru-
tion, see § 80 and also
lication to a trustee's

ution. The duty of
le care and skill in
egree of caution
rcumstances, and

reasonable effort
ust, in making
itoring the trust
nd the interests
ation appropri-
lso obtaining
nd resources
ents of the
1)

king, care
hers on a
y satisfac-
on which

prudent property owners or managers in the community customarily rely. (On the possible effects of trustees' reliance on the work of agents or on the advice of financial or legal counsel, see Comment *b(2)* and § 80, Comment *g*, and Reporter's Notes to those Comments.)

More is required than the exercise of reasonable care alone, for a trustee may be liable for losses that result from failure to use the *skill* of an individual of ordinary intelligence, despite use of all the skill the particular trustee possesses. A person who serves as trustee should be reasonably able to understand the basic duties of prudent trusteeship. The practical need in trust law for some objective standard in these matters means that some persons are not properly capable of serving as trustees.

The fact that some aspects of a trust's administration may require knowledge and experience greater than that of a particular individual of ordinary intelligence, however, does not normally prevent that person from serving as trustee. This just emphasizes the importance of obtaining competent guidance and assistance (supra) sufficient to meet the standards required by the combination of care and skill in a given situation. Simple, written guidelines prepared by legal counsel may be helpful for a trustee's general reference, or for presentation by an inexperienced trustee in conferring with a financial or other adviser or agent. Cf. § 80 on delegation (and id., Comment *b*, on advice and consultation). Essentially, a trustee may either possess or hire the degree and types of skill needed for a specific transaction or required more generally by the needs and strategies of the particular trust's administration. See Comment *b(1)*.

Thus, these two basic standards of trusteeship are neither excessively demanding nor monolithic, neither precluding conscientious service by friends or family members nor permitting casual, inattentive behavior by trustees who are able to meet a standard of competence and conduct higher than the ordinary. (See Comment *e*.)

In addition to the duty to use care and skill, the trustee must exercise the *caution* of a prudent person managing similar assets for similar purposes. The duty to act with caution does not, of course, mean the avoidance of all risk, but refers to a degree of caution that is reasonably appropriate or suitable to the particular trust, its purposes and circumstances, the beneficiaries' interests, and the trustee's plan for administering the trust and achieving its objectives.

On the standards of care, skill, and caution imposed on a trustee in making and monitoring investments, for which the duty of prudence has its most significant application in most trusts, see §§ 90–92. Also, see generally § 86 for illustrative applications of the requirement of

§ 77                    **TRUSTS**                    Ch. 15

prudence (and other duties) in the exercise of various powers of trustees.

*b(1). Prudent administration: relevant circumstances and considerations.* It is not possible to state all of the factors that are necessary or appropriate for a trustee to take into account in making decisions or taking action in the many diverse aspects of the investment, management, protection, and distribution of trust property. Some generalizations are nevertheless possible and useful regarding considerations that are likely to be relevant to all or many trusts and their beneficiaries and to require analysis or verification by the trustee.

Among the most obvious of the factors to be considered are the terms and purposes of the trust, the value and nature of the trust estate, the likely duration of the trust, and the amount and timing of its distribution requirements, along with potentially associated needs for liquidity, stability of income flow, and preservation of (or growth in) the purchasing power of capital. Inevitably related to some of the foregoing, insofar as relevant to the trust purposes, are the needs, independent resources, and other personal and financial circumstances and concerns or goals of the various beneficiaries. These various factors together offer illumination regarding such important considerations as the risk tolerance and tax positions of the trust and its beneficiaries, as well as other concerns that are fundamental to prudent decisions and strategies in matters ranging from investment management to discretionary distributions.

Other considerations and circumstances (at some risk of redundancy) that are likely to be important to prudent administration of a trust include: the expected returns (including both income and capital elements) or other benefits of various courses of action that might be pursued, plus their anticipated tax and cost consequences; any special value or relationship an asset or course of action may have to the purposes of the trust or to one or more of the beneficiaries; the skills and facilities of, or reasonably available to, the trustee; and general economic conditions and potential effects of inflation or deflation.

What constitutes due diligence, satisfying the duty of prudence, is inevitably affected by the nature of the transaction or activity and the market(s) involved. See Reporter's Note. Also see § 86, and the discussion of various types of investments and investment courses of action in § 90, e.g., in Comments *o* (real estate) and *p* (venture capital), and compare id., Comment *h(1)* (passive strategies) with id., Comment *h(2)* (active strategies); and see § 92, Reporter's Note to Comment *e* (on operation of a business in trust).

84

of various powers of

*rcumstances and con-*
f the factors that are
into account in making
: aspects of the invest-
ion of trust property.
: and useful regarding
all or many trusts and
r verification by the

be considered are the
d nature of the trust
amount and timing of
tially associated needs
ervation of (or growth
related to some of the
rposes, are the needs,
financial circumstances
ciaries. These various
ch important consider-
s of the trust and its
t are fundamental to
ging from investment

me risk of redun-
dministration of a
ncome and capital
on that might be
nces; any special
may have to the
aries; the skills
e, and general
or deflation.

prudence, is
ivity and the
s and the
courses of
(venture
with id.,
Note to

*b(2). Effect of advice of counsel.* The work of trusteeship, from interpreting the terms of the trust to decisionmaking in various aspects of administration, can raise questions of legal complexity. Taking the advice of legal counsel on such matters evidences prudence on the part of the trustee. Reliance on advice of counsel, however, is not a complete defense to an alleged breach of trust, because that would reward a trustee who shopped for legal advice that would support the trustee's desired course of conduct or who otherwise acted unreasonably in procuring or following legal advice. In seeking and considering advice of counsel, the trustee has a duty to act with prudence. Thus, if a trustee has selected trust counsel prudently and in good faith, and has relied on plausible advice on a matter within counsel's expertise, the trustee's conduct is significantly probative of prudence.

On the duty of a trustee (or successor trustee) regarding redress of attorney malpractice, see generally § 76, Comment *d*, and compare § 80, Comments *d(2)* and *g*.

*c. Ignorance of trust provisions.* Lack of awareness or understanding of the terms of the trust normally will not excuse a trustee from liability. Reasonable care (Comment *b*) requires that the trustee, with advice of counsel or court instructions (§ 71) as necessary, become acquainted with and acquire a reasonable understanding of the terms of the trust, the rights and interests of the beneficiaries, and the nature and circumstances of the trust property. See § 76(2)(a), and especially id., Comment *c*.

*d. Standard fixed by terms of the trust.* Because the normal duty of prudence in matters of administration is default law, the terms of the trust may modify or relax its requirements (§ 76, Comment *b(2)*), especially—but not solely—as regards the element of caution. Trust provisions fixing a standard of prudence lower than that otherwise required of trustees are strictly construed. In any event, trust terms may not altogether dispense with the fundamental requirement that trustees not behave recklessly but act in good faith, with some suitable degree of care, and in a manner consistent with the terms and purposes of the trust and the interests of the beneficiaries (cf. § 86 and § 87, and also § 50, Comments *b* and *c*).

On the effects (and limits) of exculpatory provisions in the terms of trusts, see § 96.

**Comment on Subsection (3):**

*e. Special skill or facilities and the standard of prudence.* It follows from the requirement of care, as well as from sound policy, that if the trustee actually possesses a degree of skill greater than that

85

§ 77                          TRUSTS                          Ch. 15

of an individual of ordinary intelligence (Comment *b*), the trustee has a duty to make use of that skill, and is ordinarily liable for a loss that results from failure to do so. Similarly, if a trustee, such as a corporate or professional fiduciary, procured the appointment as trustee by expressly or impliedly representing that it possessed greater skill than that of an individual of ordinary intelligence, the trustee may be liable for failure to make reasonably diligent use of that degree of skill. So also, if the trustee has or represents that it has special facilities for administering the trust, the trustee has a duty to make reasonably diligent use of those facilities, and may be held liable for failure to do so.

Even a trustee with special skills and facilities may, as a matter of reasonable care in some circumstances, have a duty to obtain guidance or assistance in carrying out responsibilities appropriate to the plan for administration of the particular trust. See, e.g., § 90 (on investment matters), especially id., Comment *j*; and more generally see § 80 (duty with regard to delegation).

On the power to incur expenses that are reasonable in amount and appropriate to the trusteeship, see § 88.

## REPORTER'S NOTES ON § 77

This Section expands upon but is consistent in principle with Restatement Second, Trusts § 174 (entitled "Duty to Exercise Reasonable Care and Skill,") although that prior Section (§ 174) applied a standard of a "man of ordinary prudence … in dealing with his own property" rather than the more modern standard (cf. § 90) looking to the terms, purposes, and other circumstances of the particular trust (often differing mainly in assumptions about what is required by the element of "caution").

See also IIA William A. Fratcher, *Scott on Trusts* §§ 174 and 174.1 (4th ed. 1987); and George G. Bogert & George T. Bogert, *The Law of Trusts and Trustees* § 541 (rev. 2d ed. 1993), entitled "General Duties—Duty to Exercise Ordinary Skill and Diligence" and discussing "Standard of Care" (at p. 167), "Comparisons With Similar Transactions" (at p. 174), "Care Required of Professional Trustees" (at p. 179), and "Is a Trustee Required to Exercise the Skill He Actually Has or Professes to Have?" (at p. 83), and also compare id. § 542 ("Exculpatory or Immunity Clauses—Required Standard of Care Reduced by Settlor").

Comment *a*:

"However loudly it may now be said that people should have foreseen, most men of that degree of prudence and caution that we call ordinary did not foresee. Wisdom after the event is not the test of responsibility." Ditmars v. Camden Trust Co., 10 N.J.Super. 306, 329, 76 A.2d 280, 291 (Ch. 1950) (discussing portfolio losses

tee in Lincoln National Bank and Trust Co. v. Shriner's Hospitals for Crippled Children, 588 N.E.2d 597 (Ind. App. 1992). A failure to obtain a fair market value appraisal and actively market shares of a closely held company, along with a loan to the buyer, contributed to the surcharge assessed in Interfirst Bank Dallas v. Risser, 739 S.W.2d 882 (Tex. App. 1987). However, in Bourne v. Lloyd, 100 Md.App. 575, 642 A.2d 270, 275 (1994) the court of appeal denied surcharge for a private sale where the executor was familiar with the property and real estate prices, had obtained an appraisal from an experienced broker, sent out information to prospective buyers, and held a private sale."

See also Rippey v. Denver United States National Bank, 273 F.Supp. 718 (D. Colo. 1967): "How does a trustee determine value? It is entirely proper for the trustee to conduct a study for the purpose of ascertaining intrinsic worth, but the trustee must recognize the limitations of such an appraisal. He must also test the market.... [¶] The courts of the United States have given full recognition to the duty to test the market: 'The trustee should do his best to secure competitive bidding and to surround the sale with such other factors as will tend to cause the property to sell to the greatest advantage.' Bogert, Trusts and Trustees 2d ed. (1960) § 745.... [¶] There may be situations in which a trustee who is authorized to sell at private sale would be justified in selling without testing the market. If, for example, there exists no likelihood that any other purchaser would be interested or the cost of a competitive sale would not be worthwhile, the trustee would not be required to go through the mo-

tions.... [¶] When as in the present case the trustee knows of other parties who might be interested in purchasing the property, the duty to test the market is compelling.... [¶] Competition is even more important in connection with a key block of stock. An appraisal of the latter type of property is even more difficult. Hence the trustee must expend even more effort in order to determine the sale price." Id. at 739–740, where the court further stated:

In the will the trustee is authorized to sell the property (1) in its sole judgment; (2) at private sale; (3) without advertisement or notice to anyone; (4) without the aid or necessity of any Court Order; (5) without consulting the beneficiaries and without regard to their opinions, desires or judgments; and (6) at such price and upon such terms as to credit or otherwise as the trustee shall determine. [¶] The trustee is not authorized to exercise unlimited or absolute discretion in making a sale of the trust property. Therefore, it cannot be said that it was intended that the trustee could operate beyond the bounds of prudent judgment or that he could act unreasonably. But even if the instrument had contained language granting absolute and uncontrolled discretion, it would not follow that the trustee could act recklessly or in willful abuse of discretion. In the instant case the action of Bank in failing to test the market or to make a move toward [another possible buyer of whom it was aware] created not a simple risk of injury and damage to the trust, but rather in our mind a high degree of probability that the interests of the beneficiaries would be damaged. Consequently even a

88

[ ] When as in the present
ustee knows of other par-
ght be interested in pur-
property, the duty to test
. is even more important
on with a key block of
opraisal of the latter type
is even more difficult.
rustee must expend even
n order to determine the
'd. at 739–740, where the
stated:

vill the trustee is autho-
ll the property (1) in its
ent; (2) at private sale;
advertisement or notice
(4) without the aid or
of any Court Order; (5)
nsulting the beneficiaries
t regard to their opin-
es or judgments; and (6)
ce and upon such terms
it or otherwise as the
all determine. [ ] The
not authorized to exer-
ted or absolute discre-
king a sale of the trust
Therefore, it cannot be
was intended that the
ld operate beyond the
prudent judgment or
ld act unreasonably. But
e instrument had con-
uage granting absolute
ntrolled discretion, it
nllow that the trustee
ecklessly or in willful
ration. In the instant
of Bank in failing to
or to make a move
possible buyer of
created not a
and damage to
in our mind a
bility that the
iciaries would
inly even a

grant of absolute discretion in the
will would not have protected the
Bank in this case. Nor can it be
said that the grant of authority to
sell at private sale increases the
authority of the Bank or excuses it
from exercising reasonable dili-
gence. The same can be said of the
authorization to sell without adver-
tisement or notice. These powers
assume that reasonable methods
will be employed.... Furthermore,
the authorization to sell without
consulting the beneficiaries does
not modify the standard of care
even though the trust regulates the
information which the trustee must
give. The trustee is not as a result
of this excused from communicat-
ing information to the beneficiary
which would permit him to enforce
his rights under the trust or to
prevent a breach of trust. Finally,
the authorization to determine the
price at which the property will be
sold does not have the effect of
allowing the trustee to sell at a
price less than the best price ob-
tainable. He must use reasonable
diligence and judgment in selling
trust property, and cannot expose
the trust to a high degree of hazard
of loss.

A listing of "prudence" consider-
ations somewhat similar to those set
out in Comment *b(2)* can be found in
the Uniform Prudent Investor Act at
§ 2(c).

On one of the vital aspects of pru-
dence in modern trust administration,
see M. Ascher, "The Fiduciary Duty
to Minimize Taxes," 20 Real Prop.,
Probate & Trust J. 663 (1985). Cf.
Sims v. Hall, 357 S.C. 288, 592 S.E.2d
315 (2003), upholding malpractice
award against an *attorney* for failing
to advise client (executor) of opportu-
nity to reduce estate taxes on the

estate by disclaiming an inheritance
right received just before decedent's
death. And (in the very next S.E.
Reporter issue) in Wachovia Bank v.
Namik, 265 Ga.App. 80, 593 S.E.2d 35
(2003), a lower court decision holding
a *trustee* liable for not warning the
settlor of a revocable trust of certain
adverse tax consequences (of an in-
vestment decision) was reversed on
appeal; but the bank in Hatleberg v.
Norwest Bank Wisconsin, 271 Wis.2d
225, 678 N.W.2d 302 (App. 2004), was
held liable for bad tax advice actually
given. See also Condon v. Bank of
California, 92 Or.App. 691, 759 P.2d
1137 (1988) (breach of duty by not
appealing excessive tax assessment
on trust property).

As an example of the special need
for care and attention in certain as-
pects of administration, see M. Boeh-
ler, "Risky Business: Managing
Closely-Held Assets in Trusts and
Estates," 127 Trusts & Estates 10
(Feb. 1998).

Also (on the special need for dili-
gence regarding matters of costs and
of care concerning potential conflicts
in seeking advice on the management
of trust funds, especially large funds)
see "Pension Consultants Face
Claims of Conflict of Interest," 8 Fi-
duciary Forum, issue 2 (Schultz Col-
lins Lawson Chambers, Inc., San
Francisco, 2004), with report and ob-
servations on early developments in
the SEC investigation (commenced
Dec. 2003) into relationships between
pension funds and investment con-
sulting firms; and see "Pension Con-
sultants Failing to Disclose Conflicts,
Says SEC," 14 Trust Regulatory
News 2 (No. 5, May 2005).

*On due-diligence challenges in
trust-owned life insurance,* see S.
Leinberg & A. Gibbons, "Performing
Due Diligence With Respect to Life

§ 77    TRUSTS    Ch. 15

Insurance Trusts is Crucial," 30 Estate Planning 748 (2003); K. Ballsun, P. Collins & D. Jurkat, "Trustee Administration of Life Insurance" (Part 1), 31 ACTEC J. 280 (2006), (Parts 2, 3, and 4), 32 ACTEC J. 66, 145, and 266 (2006); P. Collins & D. Jurkat, "The Decision to Replace Trust Owned Life Insurance Policies," The Banking Law J. 975, (Nov./Dec. 2005); and warnings in J. Mayer, "Fiduciary Duties for Trust Owned Life Insurance Under UPIA," 15 Michigan Lawyers Weekly 1 (no. 35, 2001).

*On due diligence in annuity matters*, see J. Clements, "When to Love (or Hate) Annuities," *Wall Street Journal*, "Weekly Guide to Managing Your Money" p.2 (Dec. 12, 2004); and DOL Advisory Opinion 2002–14A (Department of Labor guidelines for retirement-plan sponsors or trustees wishing to purchase annuities). Also, e.g., on tax concerns in considering a trustee's purchase of an annuity for a beneficiary, see Private Letter Ruling 200449011 (ruling favorable under the circumstances). Also see B. Tannahill, "Are Nonqualified Annuities Trust–Worthy?," 20 Probate & Property 22 (No. 4, 2006). The SEC's "Variable Annuities: What You Should Know" is available at www.sec.gov/investor/pubs/varannty.htm; and NASD's "Variable Annuities: Beyond the Hard Sell" is at http://www.nasd.com/InvestorInformation/InvestorAlerts/AnnuitiesandInsurance/VariableAnnuitiesBeyondtheHardSell/index.htm.

In addition to the various cross-references to various parts of the § 90 commentary in the present Comment's admonition that particular care is required for certain types of investments, see (regarding real estate) In re Joseph Heller Inter Vivos Trust, 161 Misc.2d 369, 613 N.Y.S.2d 809 (Sur. Ct. 1994) (citing prior Restatement § 176 and authorizing trustee to divide one trust into two in order to insulate the securities of one trust from the potential liabilities of holding an apartment building in the other); Sprowles v. Eversole, 307 Ky. 191, 210 S.W.2d 346 (1948) (trustees' duty to record recordable document for protection against possible bona fide purchasers); and (regarding derivatives and hedge funds) "Hunger for Hedge Funds Raises Challenges for Fiduciaries," 14 Trust Regulatory News 5 (Nov./Dec. 2005) (noting "cautious" use of hedge funds in defined-benefit plans, although regulators have only "indirectly commented" on their use through DOL opinion letters addressing investment in derivatives (commonly used in hedge funds) and emphasizing the greater-than-ordinary need for analysis and investment sophistication); and "Hedge Fund Investments Contribute to Trust Company's Demise," id. 1.

**Comment b(2):**

Comment *b(2)* addresses the effect of reliance on advice of counsel only in the context of a trustee's compliance with the duty of prudence. It does not specifically address the bearing advice might have on other fiduciary duties (e.g., § 76). The limited scope of the Comment, however, is not intended as a more general endorsement of sometimes unduly harsh (cf. § 95 and Chapter 19), traditional efforts to draw a distinct line between "Mistake of fact or law in the *exercise* of powers or *performance* of duties" (Restatement Second, Trusts § 201, Comment *c*) and

90

Ch. 15

sandInsurance/VariableAnnu
ndtheHardSell/index.htm.

lition to the various cross-
s to various parts of the
nmentary in the present
's admonition that particu-
required for certain types
ents, see (regarding real
re Joseph Heller Inter Vi-
, 161 Misc.2d 369, 613
'09 (Sur. Ct. 1994) (citing
itement § 176 and autho-
ee to divide one trust into
to insulate the securities
from the potential liabili-
ng an apartment building
); Sprowles v. Eversole,
. 210 S.W.2d 346 (1948)
ty to record recordable
protection against pos-
le purchasers); and (re-
atives and hedge funds)
Hedge Funds Raises
Fiduciaries," 14 Trust
ws 5 (Nov./Dec. 2005)
us" use of hedge funds
efit plans, although
only "indirectly com-
eir use through DOL
ddressing investment
(commonly used in
nd emphasizing the
inary need for analy-
ment sophistication);
d Investments Con-
Company's Demise,"

a more general en-
ometimes unduly
d Chapter 19), tra-
draw a distinct line
f fact or law in
ers or perfor-
atatement Sec-
ment c) and

"Mistake of law as to *existence of
duties and powers*" (id., Comment *b*).
(Emphasis added.) Cf. *Scott on
Trusts*, supra § 201 (defining "breach
of trust") (p. 221): "The extent of the
duties and powers of a trustee is de-
termined by the rules of law that are
applicable to the situation, and not
the rules that the trustee or his attor-
ney believes to be applicable, and by
the terms of the trust as the court
may interpret them, and not as they
may be interpreted by the trustee
himself or by his attorney"; and (at p.
225): "It would seem that where the
mistake of the trustee is ... as to
whether a particular act is within
those powers, he incurs no liability if
the mistake is not due in any way to
his fault." With the first *Scott* ex-
cerpt, compare, e.g., Dickerson v.
Camden Trust Co., 140 N.J.Eq. 34,
42, 53 A.2d 225, 231 (1947) ("Due care
and good faith cannot justify a trus-
tee who, under a mistake of law, ...
does that which is prohibited or is
beyond his powers or ... omits what
is required of him. He cannot plead
the advice of counsel"), and Laborers
National Pension Fund v. Northern
Trust Quant. Advisors, 173 F.3d 313
(5th Cir.1999), cert. denied, 528 U.S.
967, 120 S.Ct. 406, 145 L.Ed.2d 316
(1999); but see Estate of Stirling, 342
Pa. 497, 21 A.2d 72 (1941) (trustee not
surcharged when counsel improperly
advised that will authorized retention
of nonlegal investments). With this
present Comment *b(2)* and the sec-
ond of the *Scott* excerpts, above, com-
pare, e.g., Estate of Stetson, 463 Pa.
64, 80, 345 A.2d 679, 688 (1975)
("While reliance on the advice of
counsel does not provide a fiduciary
with 'a blanket immunity in all cir-
cumstances,'.... it persuasively re-
buts a claim of breach of duty when
the decision concerns a matter so de-
pendent on legal expertise as whether

to institute litigation. The trustee
was fully justified under the situation
here existing in acting upon (coun-
sel's) advice ... '."); Dardovitch v.
Haltzman, 190 F.3d 125, 151 (3d Cir.
1999) ("If [the trustee] relied on
counsel, she must have done so rea-
sonably, i.e., making a prudent choice
of counsel and taking reasonable care
to insure that counsel performed ef-
fectively. Furthermore, even if she
relied reasonably on counsel, [she]
must have acted reasonably in per-
forming her duties as a whole in or-
der to avoid liability. The District
Court reached none of these issues;
hence, we ... remand for further
proceedings"); In re Estate of Halas,
209 Ill.App.3d 333, 154 Ill.Dec. 170,
568 N.E.2d 170 (1991) (citing above
commentary from Restatement Sec-
ond, Trusts); and Mills v. Bluestin,
275 N.Y. 317, 9 N.E.2d 944 (1937).

That a lawyer may sometimes owe
a duty of care to a nonclient when the
client is a trustee, guardian, executor,
or other fiduciary acting for non-
client(s), see Restatement Third, The
Law Governing Lawyers § 51 (*Duty
of Care to Certain Nonclients*). See,
e.g., Charleson v. Hardesty, 108 Nev.
878, 883, 839 P.2d 1303, 1307 (1993)
("conclud[ing] that ... [beneficiaries]
have raised a question of fact with
regard to a possible breach of [attor-
ney's] duties" as counsel for the trus-
tee, resulting in reversal and remand
on this aspect of the case). Cf. Elam
v. Hyatt Legal Services, 44 Ohio
St.3d 175, 541 N.E.2d 616 (1989) (al-
though Ohio still recognized the privi-
ty defense in estate-planning mal-
practice cases, a negligence suit by an
estate beneficiary was permitted
against an executor's attorney who
improperly recorded a certificate of
title to real estate in the name of the
life tenant only, without showing the

## § 77      TRUSTS

remainder interest of the plaintiffs); and Fickett v. Superior Court, 27 Ariz.App. 793, 558 P.2d 988 (1976) (ward's malpractice claim for negligence against lawyer for guardian). But cf., e.g., Spinner v. Nutt, 417 Mass. 549, 631 N.E.2d 542 (1994).

Consider also the California experience, beginning with a relatively easy proposition that a lawyer may be held liable to beneficiaries for participation in a breach of trust. Morales v. Field, 99 Cal.App.3d 307, 314–315, 160 Cal. Rptr. 239, 243 (1979) (citing *Scott on Trusts* § 326.4 (1967)). And then see Schick v. Bach, 193 Cal.App.3d 1321, 238 Cal.Rptr. 902 (1987), concluding that a trustee's counsel assumes a duty of care to beneficiaries, although the implications of the relationships were somewhat confusingly stated in Goldberg v. Frye, 217 Cal.App.3d 1258, 1269, 266 Cal.Rptr. 483, 489–490 (1990): "[P]articularly in the case of services rendered for the fiduciary of a decedent's estate, we would apprehend great danger in finding stray duties in favor of beneficiaries. . . . The very purpose of the fiduciary is to serve the interests of the estate, not to promote the objectives of one group of legatees over the interests of conflicting claimants. The fiduciary's attorney, as his legal adviser, is faced with the same task of disposition of conflicts. It is of course the purpose and obligation of both the fiduciary and his attorney to serve the estate. . . . The beneficiaries are entitled to even-handed and fair administration by the fiduciary. They are not owed a duty directly by the fiduciary's attorney. . . ." More recently, Borissoff v. Taylor & Faust, 33 Cal.4th 523, 15 Cal.Rptr.3d 735, 93 P.3d 337 (2004) (although remanding for consideration of possible application of a statute of limitations), held

that a successor personal representative (PR) had standing (under Prob. Code § 9822, on rights of successor PRs) to sue the prior PR's attorneys for alleged malpractice in their failure to preserve a right to claim a tax refund; the successor was also a beneficiary but could not, in that capacity, have brought suit against the attorneys under California law.

ACTEC Commentaries on the Model Rules of Professional Conduct 3–6 (Amer. Col. of Trust & Estate Counsel Foundation, 3d ed. 1999) states:

Under the majority view, a lawyer who represents a fiduciary generally with respect to a fiduciary estate stands in a lawyer–client relationship with the fiduciary and not with respect to the fiduciary estate or the beneficiaries. In this connection, note that a distinction should be drawn between the duties of a lawyer who represents a fiduciary in the fiduciary's representative capacity (a "general" representation) and the duties of a lawyer who represents the fiduciary individually (i.e., not in a representative capacity). . . .

*Duties to Beneficiaries.* The lawyer who represents a fiduciary generally [i.e., in the fiduciary's representative capacity] is not considered also to represent the beneficiaries. However, most courts have concluded that the lawyer owes some duty to them. Some courts subject the lawyer to these duties because the beneficiaries are characterized as the lawyer's "joint", "derivative" or "secondary" clients. Others do so because the lawyer stands in a fiduciary relationship with respect to the fiduciary who, in turn, owes fiduciary

a successor personal representa-
(PR) had standing (under Cal.
. Code § 9822, on rights of suc-
r PRs) to sue the prior PR's
leys for alleged malpractice for
failure to preserve a right to
a tax refund; the successor PR
lso a beneficiary but could not,
it capacity, have brought suit
t the attorneys under Califor-
v.

EC Commentaries on the
Rules of Professional Conduct
mer. Col. of Trust & Estate
l Foundation, 3d ed. 1999)

der the majority view, a law-
ho represents a fiduciary ...
respect to a fiduciary estate
s in a lawyer–client relation-
vith the fiduciary and not with
t to the fiduciary estate or
neficiaries. In this connection
hat a distinction should be
between the duties of a law-
ho represents a fiduciary in
luciary's representative ca-
(a "general" representation)
le duties of a lawyer who
nts the fiduciary individual-
not in a representative ca-
...

s to Beneficiaries. The law-
o represents a fiduciary
ly [i.e., in the fiduciary's
ntative capacity] is not con-
also to represent the bene-
. However, most courts
ncluded that the lawyer
me duty to them. Some
ubject the lawyer to the
ecause the beneficiaries are
rized as the lawyer's
derivative" or "secondary"
Others do so because the
tands in a fiduciary rela-
with respect to the fiducia-
in turn, owes fiduciary

duties to the beneficiaries....
*General Nature of Duties....* [I]n
exceptional cases the lawyer for a
fiduciary may be subject to the
duties of the fiduciary....

The lawyer ... is required to act
in good faith and with fairness to-
ward the beneficiaries [and] should
advise the fiduciary to act impar-
tially with respect to [them] and to
provide [them] with information re-
garding matters affecting their in-
terest in the fiduciary estate....
[T]he lawyer may not deliberately
misinform or mislead the beneficia-
ries or withhold information from
them....

*Affirmative Duties to Beneficia-
ries* ... [¶] The existence of such

affirmative duties [to the beneficia-
ries] is implicit in the nature of the
representation, which involves the
lawyer advising the fiduciary in a
representative and not a personal
capacity. Recognition of such duties
is also supported by the fact that
the fiduciary estate is almost invar-
iably created by a testator or trus-
tor for the exclusive benefit of the
beneficiaries. In addition, the fidu-
ciary and the lawyer are both com-
pensated by the fiduciary estate.
Finally, recognition of some affir-
mative duties is also appropriate
because the lawyer for a fiduciary
is typically in a superior position
relative to the beneficiaries, who
may repose trust and confidence in
the lawyer....

**Comment e:**

The Restatement Second, supra,
§ 174, stated that "if the trustee has
or procures his appointment as trus-
tee by representing that he has
greater skill than that of a man of
ordinary prudence, he is under a duty
to exercise such skill." Cf. M. Leslie,
"Common Law, Common Sense: Fi-
duciary Standards and Trustee Iden-
tity," 27 Cardozo L. Rev. 2713 (2006).

The above-quoted Restatement
Second Section is cited, e.g., in Mat-
ter of Wood, 177 App. Div. 2d 161,
581 N.Y.S.2d 405 (1992), and in Ste-
vens v. National City Bank, 45 Ohio
St.3d 276, 544 N.E.2d 612 (1989).

See also Robertson v. Central Jer-
sey Bank & Trust Co., 47 F.3d 1268
(3d Cir. 1995); Republic National
Bank v. Araujo, 697 So.2d 164 (Fla.
App. 1997) (failure to monitor foreign
investments per trustee's own inter-
nal policies); Estate of Maxedon, 24
Kan.App.2d 427, 946 P.2d 104 (1997);
Fortune v. First Union National
Bank, 87 N.C.App. 1, 359 S.E.2d 801
(1987), rev'd on other grounds, 323
N.C. 146, 371 S.E.2d 483 (1988), not-
ed 67 North Carolina L. Rev. 1495
(1989); and L. Ipsen, "Trends in the
Liability of Corporate Fiduciaries,"
24 Idaho L. Rev. 443 (1988).

## § 78. Duty of Loyalty

(1) **Except as otherwise provided in the terms of the
trust, a trustee has a duty to administer the trust solely in
the interest of the beneficiaries, or solely in furtherance
of its charitable purpose.**

(2) **Except in discrete circumstances, the trustee is
strictly prohibited from engaging in transactions that**

# Exhibit C

RESTATEMENT OF THE LAW THIRD

THE AMERICAN LAW INSTITUTE

# RESTATEMENT OF THE LAW

# TRUSTS

Volume 3
§§ 70 to 92

*As Adopted and Promulgated*
BY
THE AMERICAN LAW INSTITUTE
AT WASHINGTON, D.C.

May 18, 1990 (Prudent Investor Rule, §§ 90–92)

AT PHILADELPHIA, PENNSYLVANIA

May 18, 2005

Tables and Index



ST. PAUL, MN
AMERICAN LAW INSTITUTE PUBLISHERS
2007

Mat #40616959

a successor personal representa-
(PR) had standing (under Cal.
. Code § 9822, on rights of suc-
r PRs) to sue the prior PR's
neys for alleged malpractice for
failure to preserve a right to
a tax refund; the successor PR
lso a beneficiary but could not,
at capacity, have brought suit
st the attorneys under Califor-
v.

TEC Commentaries on the
 Rules of Professional Conduct
mer. Col. of Trust & Estate
el Foundation, 3d ed. 1999)

nder the majority view, a law-
who represents a fiduciary . . .
 respect to a fiduciary estate
is in a lawyer–client relation-
with the fiduciary and not with
ct to the fiduciary estate or
eneficiaries. In this connection
that a distinction should be
i between the duties of a law-
ho represents a fiduciary in a
iduciary's representative ca-
 (a "general" representation)
he duties of a lawyer who
ents the fiduciary individual-
, not in a representative ca-
. . .

es to Beneficiaries. The law-
ho represents a fiduciary
lly [i.e., in the fiduciary's
ntative capacity] is not con-
 also to represent the bene-
. However, most courts
oncluded that the lawyer
ome duty to them. Some
subject the lawyer to the
ecause the beneficiaries are
rized as the lawyer's
"derivative" or "secondary"
Others do so because the
stands in a fiduciary rela-
with respect to the fiducia-
in turn, owes fiduciary

---

duties to the beneficiaries. . . .
*General Nature of Duties. . . .* [I]n
exceptional cases the lawyer for a
fiduciary may be subject to the
duties of the fiduciary. . . .

The lawyer . . . is required to act
in good faith and with fairness to-
ward the beneficiaries [and] should
advise the fiduciary to act impar-
tially with respect to [them] and to
provide [them] with information re-
garding matters affecting their in-
terest in the fiduciary estate. . . .
[T]he lawyer may not deliberately
misinform or mislead the beneficia-
ries or withhold information from
them. . . .

*Affirmative Duties to Beneficia-
ries* . . . [¶] The existence of such

affirmative duties [to the beneficia-
ries] is implicit in the nature of the
representation, which involves the
lawyer advising the fiduciary in a
representative and not a personal
capacity. Recognition of such duties
is also supported by the fact that
the fiduciary estate is almost invar-
iably created by a testator or trus-
tor for the exclusive benefit of the
beneficiaries. In addition, the fidu-
ciary and the lawyer are both com-
pensated by the fiduciary estate.
Finally, recognition of some affir-
mative duties is also appropriate
because the lawyer for a fiduciary
is typically in a superior position
relative to the beneficiaries, who
may repose trust and confidence in
the lawyer. . . .

**Comment e:**

The Restatement Second, supra,
§ 174, stated that "if the trustee has
or procures his appointment as trus-
tee by representing that he has
greater skill than that of a man of
ordinary prudence, he is under a duty
to exercise such skill." Cf. M. Leslie,
"Common Law, Common Sense: Fi-
duciary Standards and Trustee Iden-
tity," 27 Cardozo L. Rev. 2713 (2006).

The above-quoted Restatement
Second Section is cited, e.g., in Mat-
ter of Wood, 177 App. Div. 2d 161,
581 N.Y.S.2d 405 (1992), and in Ste-
vens v. National City Bank, 45 Ohio
St.3d 276, 544 N.E.2d 612 (1989).

See also Robertson v. Central Jer-
sey Bank & Trust Co., 47 F.3d 1268
(3d Cir. 1995); Republic National
Bank v. Araujo, 697 So.2d 164 (Fla.
App. 1997) (failure to monitor foreign
investments per trustee's own inter-
nal policies); Estate of Maxedon, 24
Kan.App.2d 427, 946 P.2d 104 (1997);
Fortune v. First Union National
Bank, 87 N.C.App. 1, 359 S.E.2d 801
(1987), rev'd on other grounds, 323
N.C. 146, 371 S.E.2d 483 (1988), not-
ed 67 North Carolina L. Rev. 1495
(1989); and L. Ipsen, "Trends in the
Liability of Corporate Fiduciaries,"
24 Idaho L. Rev. 443 (1988).

## § 78.  Duty of Loyalty

(1) **Except as otherwise provided in the terms of the
trust, a trustee has a duty to administer the trust solely in
the interest of the beneficiaries, or solely in furtherance
of its charitable purpose.**

(2) **Except in discrete circumstances, the trustee is
strictly prohibited from engaging in transactions that**

involve self-dealing or that otherwise involve or create a conflict between the trustee's fiduciary duties and personal interests.

(3) Whether acting in a fiduciary or personal capacity, a trustee has a duty in dealing with a beneficiary to deal fairly and to communicate to the beneficiary all material facts the trustee knows or should know in connection with the matter.

### General Comment:

*a. The trustee and the trust relationship.* It follows from the nature of the trust relationship (§ 2) that the trustee stands in a fiduciary relationship with respect to the beneficiaries as to all matters within the scope of the trust relationship, that is, all matters involving the administration of the trust and its property. The duty of loyalty is, for trustees, particularly strict even by comparison to the standards of other fiduciary relationships.

Although the commentary hereafter often refers only to trust "beneficiaries," this Section and commentary apply to *charitable* as well as private trusts, with the power to avoid transactions or to seek other relief residing in the appropriate attorney general or others having standing to enforce the trust (§ 94).

Subsection (1) states the trust law's fundamental principle of undivided loyalty. The breadth of this principle is exemplified in Comment *f* (acts serving interest of third parties or nontrust objectives); and cf. Comments *e(1)* and *e(2)*.

With limited exceptions (see Comments *c* and *c(4)-c(8)*, below), the rule of Subsection (2) strictly prohibits the trustee from entering into transactions involving the trust property, or affecting its investment or management, if the transaction is for the trustee's personal account (self-dealing) or otherwise involves or creates a conflict between the fiduciary duties and personal interests of the trustee (see Comment *d*), unless authorized: by a proper court (Comment *c(1)*); expressly or impliedly by the terms of the trust (Comment *c(2)*); or by all of the beneficiaries (Comments *c(3)* and *g*, and cf. § 97 on the effect of consent by less than all beneficiaries). This rule also prohibits the trustee personally from engaging in transactions that, though not involving trust property, place the trustee in a position in which it is reasonably foreseeable that a conflict of fiduciary and personal interests may arise in the future. See Comment *e*.

The rule of Subsection (3) is not so strict, although it is similar to basic loyalty concepts in some other fiduciary relationships. In addition to dealings in the trustee's fiduciary capacity with trust beneficiaries

(including obtaining trustee's personal tra but that nevertheless relationship the tru beneficiaries during ment *h*) for as long a beneficiary or benef Thus, in any transac that does not involve the trust relationshi trustee establish tha full disclosure and w

Transactions in or (3) are not void b ries, except as the r 22). Remedies for br 19.

### Comment on Subse

*b. Undivided* Subsection (2) flatl Comment *a*), unless also exceptional sit most obviously forb subtle, but broader trustees act solely in administration. Furt ciary or personal c which it is reasonal conduct might be i interests of the bene

In transactions under the so-called the trustee may be in good faith, that t profit resulted to th of trust by purchasi public auction; othe would create a tem best efforts and bus whether sale is appr terms from others dealing, see Comm conflict-of-interest

Ch. 15

...ve or create a
...es and person-

...rsonal capaci-
...beneficiary to
...neficiary all
...now in con-

...follows from the
...ee stands in a
...s to all matters
...atters involving
...ity of loyalty is,
...he standards of

...only to trust
...charitable as
...ons or to seek
...al or others

...principle of
...emplified in
...trust objec-

...(3), below),
...m entering
...ts invest-
...personal
...onflict be-
...stee (see
...ent c(1));
...2)); or by
...he effect
...ibits the
...gh not
...ch it is
...inter-

...lar to
...dition
...aries

(including obtaining consent from them), this rule also applies to a trustee's personal transactions that fall outside Subsections (1) and (2) but that nevertheless may be affected by the broader confidential relationship the trustee ordinarily has with respect to the trust beneficiaries during the existence of the trust, and thereafter (Comment *h*) for as long as the trustee retains significant influence over the beneficiary or beneficiaries involved in the transaction in question. Thus, in any transaction between a trustee and beneficiary, even one that does not involve the trust property and is not within the scope of the trust relationship, the duty in Subsection (3) requires that the trustee establish that the consent or other transaction was based on full disclosure and was otherwise fair to the beneficiary.

Transactions in violation of the duties stated in Subsection (1), (2), or (3) are not void but may be affirmed or set aside by the beneficiaries, except as the rights of bona fide purchasers intervene (Chapter 22). Remedies for breach of trust are more fully discussed in Chapter 19.

**Comment on Subsections (1) and (2):**

*b.   Undivided loyalty: prohibitions and rationale.* The rule of Subsection (2) flatly prohibits certain transactions by trustees (see Comment *a*), unless authorized as stated in Comments *c(1)-c(3)*. See also exceptional situations in Comments *c(4)-c(8)*. This prohibition most obviously forbids most self-dealing by trustees. Perhaps more subtle, but broader in application, is the general requirement that trustees act solely in the interest of the beneficiary in matters of trust administration. Furthermore, a trustee must refrain, whether in fiduciary or personal dealings with third parties, from transactions in which it is reasonably foreseeable that the trustee's future fiduciary conduct might be influenced by considerations other than the best interests of the beneficiaries.

In transactions that violate the trustee's duty of undivided loyalty, under the so-called "no further inquiry" principle it is immaterial that the trustee may be able to show that the action in question was taken in good faith, that the terms of the transaction were fair, and that no profit resulted to the trustee. A trustee, therefore, commits a breach of trust by purchasing trust property, even as the highest bidder at a public auction; otherwise the possibility of purchase by the trustee would create a temptation for the exercise of less than the trustee's best efforts and business judgment on behalf of the trust to determine whether sale is appropriate and to obtain the most favorable price and terms from others for the trust property. Further on cases of self-dealing, see Comments *d* and *d(1)*. The principle applies as well to conflict-of-interest situations that do not involve self-dealing. See

§ 78                          TRUSTS                          Ch. 15

Comments *e-e(2)*. For example, normal assurances concerning proper fiduciary behavior would be undermined (especially regarding the trustee's future conduct) if a bank were allowed to purchase its own shares for a trust it is administering, even though the shares were purchased from third persons at a market price and would be a prudent investment for the trust.

The fiduciary duty of undivided loyalty in the trust context, as stated in Subsection (1) and amplified in Subsection (2), is particularly intense so that, in most circumstances, its prohibitions are absolute for prophylactic reasons. The rationale begins with a recognition that it may be difficult for a trustee to resist temptation when personal interests conflict with fiduciary duty. In such situations, for reasons peculiar to typical trust relationships, the policy of the trust law is to prefer (as a matter of default law) to remove altogether the occasions of temptation rather than to monitor fiduciary behavior and attempt to uncover and punish abuses when a trustee has actually succumbed to temptation. This policy of strict prohibition also provides a reasonable circumstantial assurance (except as waived by the settlor or an affected beneficiary) that beneficiaries will not be deprived of a trustee's disinterested and objective judgment.

The inherent subjectivity and impracticability of second-guessing a trustee's application of business judgment or exercise of fiduciary discretion are aggravated by the opportunities and relative ease of concealing misconduct—or at least by the absence of timely information and the likely disappearance of relevant evidence—that result from the trustee's day-to-day, usually long-term, management of the trust property and control over the trust records. Viewed from the beneficiaries' perspective, especially that of remainder beneficiaries, efforts to prevent or detect actual improprieties can be expected to be inefficient if not ineffective. Such efforts are likely to be wastefully expensive and to suffer from time lag and inadequacies of information, from a lack of relevant experience and understanding, and perhaps from want of resources to monitor trustee behavior and ultimately to litigate and expose actual instances of fiduciary misconduct.

Also, unlike many other fiduciary situations, trust beneficiaries are neither readily able to dispose of their interests nor able to fire or vote out their fiduciaries.

For reasons of this type, it has often been said that the requirement of undivided loyalty and its mandates are so fundamental to trust fiduciary law that they are unyielding and not to be eroded by exceptions. These statements, however, fail to capture either the experience or the true policy of American trust law in this area. Therefore, before examining particular applications (Comments *d-f*) of

96

Ch. 15

nces concerning proper
pecially regarding the
ed to purchase its own
nough the shares were
price and would be a

n the trust context, as
:tion (2), is particularly
bitions are absolute for
n a recognition that it
itation when personal
situations, for reasons
of the trust law is to
together the occasions
havior and attempt to
actually succumbed to
provides a reasonable
e settlor or an affect-
prived of a trustee's

y of second-guessing
exercise of fiduciary
and relative ease of
e of timely informa-
vidence—that result
management of the
s. Viewed from the
ainder beneficiaries,
n be expected to be
ly to be wastefully
acies of information,
nding, and perhaps
r and ultimately to
conduct.

trust beneficiaries
s nor able to fire or

d that the require-
ndamental to trust
to be eroded by
apture either the
law in this area.
(Comments d-f) of

Ch. 15      SPECIFIC DUTIES OF TRUSTEESHIP      § 78

the general prohibitions described above, the commentary immediately below (under Comment c) reviews, initially, three qualifications that condition these prohibitions and several types of transactions for which exceptions have evolved over the years, either through judicially accepted practices or through widespread legislation.

    *c.   Qualifications and specific exceptions.* Strict prohibitions against transactions that involve conflicting fiduciary and personal interests, or that are likely to give rise to such conflicts in the future, do not apply to the extent transactions of this type are authorized by court order (Comment *c(1)*) or, expressly or impliedly, by the terms of the trust (Comment *c(2)*). The latter include the terms of a trust as modified by the consent of all beneficiaries pursuant to § 65. The strict prohibition also does not apply if all beneficiaries consent to a particular transaction in a manner that is not intended as a continuing modification of the trust under § 65; but if one or more but less than all of the beneficiaries consent to a prohibited transaction, the transaction constitutes a breach of trust, although one for which the trustee is not liable to any beneficiary from whom (or on whose behalf) consent has been properly obtained (Comment *c(3)*).

    Even without authorization in the terms of the trust, or by the court or beneficiaries, certain types of transactions do not fall within the strict conflict-of-interest prohibitions generally applicable to trustees. For these exceptional situations, although conflicting-interest temptations *do* exist for the trustee, generalized considerations of efficiency and beneficiary interest, as well as the minimal or manageable degrees of risk involved, justify departure from the trust law's strict, prophylactic approach to issues of fiduciary loyalty. The exceptions described in Comments *c(4)-c(7)* are recognized here as matters of common law (although often codified as well), while Comment *c(8)* describes an exception that has been adopted by (and is dependent upon) legislation enacted in most American jurisdictions.

    While relieving a trustee of the otherwise strict prohibition against conduct involving divided loyalty, these qualifications or exceptions do not eliminate the trustee's duty to act fairly, in good faith, and in the interest of the beneficiaries, as well as with prudence.

    *c(1). Approval of court.* A transaction that would otherwise be prohibited under the rules of Subsections (1) and (2) may be undertaken by a trustee with court authorization. Thus, a trustee can properly purchase trust property with the approval of the court.

    The court will permit a transaction of this type only if it determines that it is in the interest of the beneficiaries to do so. Ordinarily, for example, the court will not permit a trustee to purchase trust property if there are other available purchasers willing to pay the

§ 78　　　　　　　　　　TRUSTS　　　　　　　　Ch. 15

same price the trustee is willing to pay. In a proceeding of this type, the trustee has an affirmative duty to disclose material information. Cf. §§ 82 and 83.

In many situations involving a conflict of a trustee's fiduciary duties and personal interests, especially in significant matters involving complexity and business judgment, the interests of sound administration may be better served if the court were to appoint a trustee ad litem (see Reporter's Note) to reach a decision on the matter in question and then, if appropriate, to arrange the terms of the transaction and its implementation.

**Illustrations:**

　　1.　S devised her estate to her brother B and T Co., as co-trustees, for the benefit of her three minor children. B and T Co. have petitioned the appropriate court for authority to sell certain property of the trust to B for a particular price. The court approved the proposed sale to B based on its finding (i) that the evidence, including testimony by T Co. and others, showed that the trustees' decision to sell the property was sound for reasons of diversification and overall investment strategy, and (ii) that, after qualified appraisals and prudent efforts over a reasonable period of time, the trustees justifiably concluded that it was not reasonably foreseeable that another buyer could be found who would match B's offer. On this basis, the trustees may proceed with the proposed sale to B.

　　2.　A few years ago S devised his residuary estate, which included shares constituting a controlling interest in C Co., to his friend T, as trustee for S's children and their families. T had served for some years, and continues to serve, as a director and vice president of C Co. T has just received from several minority shareholders and others an offer to buy the C Co. shares held in the trust. (On a trustee's duty to inform beneficiaries of major transactions under consideration, see § 82, Comment *d*.) Upon petition by T or a beneficiary, it would be appropriate for the court to appoint a trustee ad litem to consider this offer and other possible courses of action, rather than allowing T to propose a course of action to the court (or allowing T to take action on the basis of what may well be an implied authorization under Comment *c(2)*, immediately below, to handle on behalf of the trust more or less routine matters involving C Co., despite some potentially conflicting interests of T).

*c(2). Authorization in terms of trust.* A trustee may be authorized by the terms of the trust, expressly or by implication, to engage in transactions that would otherwise be prohibited by the rules of undi-

98

USTS                          Ch. 15

:o pay. In a proceeding of this type,
ity to disclose material information.

; a conflict of a trustee's fiduciary
ecially in significant matters involv-
nent, the interests of sound adminis-
e court were to appoint a trustee ad
reach a decision on the matter in
to arrange the terms of the transac-

to her brother B and T Co., as co-
r three minor children. B and T Co.
te court for authority to sell certain
for a particular price. The court
o B based on its finding (i) that the
' by T Co. and others, showed that
ne property was sound for reasons of
estment strategy, and (ii) that, after
ent efforts over a reasonable period
ly concluded that it was not reason-
r buyer could be found who would
, the trustees may proceed with the

devised his residuary estate, which
i controlling interest in C Co., to his
children and their families. T had
ontinues to serve, as a director and
just received from several minority
ffer to buy the C Co. shares held in
ty to inform beneficiaries of major
tion, see § 82, Comment d.) Upon
ry, it would be appropriate for the
item to consider this offer and other
ather than allowing T to propose a
(or allowing T to take action on the
i implied authorization under Com-
v, to handle on behalf of the trust
rs involving C Co., despite some
s of T).

*f trust.* A trustee may be authorized
ssly or by implication, to engage in
be prohibited by the rules of undi-

98

vided loyalty stated in Subsections (1) and (2). For example, the terms
of a trust may permit the trustee personally to purchase trust proper-
ty or borrow trust funds, or to sell or lend the trustee's own property
or funds to the trust.

Even an express authorization of this type, however, would not
completely dispense with the trustee's underlying fiduciary obligations
to act in the interest of the beneficiaries and to exercise prudence in
administering the trust. Accordingly, no matter how broad the provi-
sions of a trust may be in conferring power to engage in self-dealing or
other transactions involving a conflict of fiduciary and personal inter-
ests, a trustee violates the duty of loyalty to the beneficiaries by acting
in bad faith or unfairly.

Whether and to what extent a trustee may be impliedly autho-
rized to engage in self-dealing, or in other transactions that present
loyalty issues, is inevitably a matter of interpretation. See, e.g.,
discussion in Comment *e(2)*, below, and § 92, Comment *d*; also com-
pare § 37, Comment *f(1)*, and § 34, Comment *f(1)*, on settlor designa-
tion or court appointment of trustees with potential conflicts between
their fiduciary and personal interests.

As this Comment illustrates, even the vital fiduciary duty of
loyalty is a *default rule* that may be modified by the terms of the
trust. This is so at least to the degree of allowing the settlor to
eliminate strict prohibitions, such as that against self-dealing (dis-
cussed in Comment *d*). The second paragraph above, however, recog-
nizes that to some extent the duty of loyalty involves (as do other
duties) more than default law—that is, that there are limits to the
settlor's freedom, thereby protecting the fundamental fiduciary char-
acter of trust relationships recognized by the law. On the other hand,
even the statement (concluding that paragraph and reflecting typical
judicial and treatise language) about not allowing a trustee to act
"unfairly" requires a recognition that, in this context, fairness itself
depends on trust provisions and purposes and on benefits the settlor
may have intended to confer on the trustee personally, either as a
designated beneficiary or as inferred from the terms of the self-
dealing authorization. For example, the authorization may allow the
trustee to purchase certain trust property at a stated or formula price
that amounts to a beneficial (i.e., potentially favorable) option price.
Such a purchase would not be "unfair" even though for less than a
fair-market consideration.

For further discussion of the limits of the power of settlors to
modify default fiduciary law in analogous contexts, see § 76, Comment
*b(1)*, and § 87, Comment *d*; and cf. § 50, Comment *c*, on the limits of

99

§ 78                          TRUSTS                        Ch. 15

trustee discretion (e.g., "absolute" discretion) regarding discretionary
distributions to beneficiaries.

The common situation in which one or more of a trust's beneficia-
ries are selected or authorized by the settlor to serve as trustee or co-
trustee inevitably presents an array of conflicts between the trustee's
interests as a beneficiary and the interests of other beneficiaries; the
problems presented by these (usually) implicitly authorized conflicts
are most appropriately dealt with as questions of impartiality under
§ 79 (even if the settlor's designation of the beneficiary-trustee may,
as a matter of interpretation, suggest a "tilt" in favor of the beneficia-
ry-trustee in the balancing of divergent interests; see id. Comment
*b(1)* and more generally id., Comments *b* and *c*).

*c(3). Consent of beneficiaries.* A particular transaction that would
otherwise violate a trustee's duty of loyalty may be authorized by
consent properly obtained from or on behalf of all of the trust
beneficiaries (as defined and prescribed in § 65, Comment *b*), even
though the consent is not intended to modify the terms of the trust
within the meaning of § 65 and of Comment *c(2)*, above. If, however,
consent to a prohibited transaction is obtained from or on behalf of one
or more of the trust beneficiaries, a trustee who engages in the
prohibited transaction nevertheless commits a breach of trust but is
not liable to any beneficiary whose consent has been properly ob-
tained. On the duty of the trustee in obtaining the consent of a
beneficiary, see Subsection (3) and Comment *g*; more generally on the
effect and requirements of proper consent, see § 97.

*c(4). Exception for trustee's compensation.* The strict prohibitions
against transactions by trustees involving conflicts between their
fiduciary duties and personal interests do not apply to the trustee's
taking of reasonable compensation for services rendered as trustee. On
reasonable compensation generally, see § 38. On the trustee's duty of
disclosure regarding compensation, see §§ 82 and 83. On dealings
between a trustee and one or more of the beneficiaries relating to the
trustee's compensation, see Subsection (3) and Comment *g*.

*c(5). Exception for certain self-employment.* Although under Sub-
section (2) self-hiring by a trustee is generally prohibited as a form of
self-dealing (see Comment *d*), in some circumstances a trustee may
provide to the trust, and receive additional compensation for, special
services that—while not required of trustees generally—are necessary
or appropriate to prudent administration of the trust. It is reasonable
to expect that a trustee who possesses special skills and facilities that
are useful in trust administration will use those skills and facilities in
administering the trust, and also to expect that the trustee's familiari-
ty with the purposes and affairs of the trust will result in efficiency

100

ng discretionary

trust's beneficia-
as trustee or co-
een the trustee's
beneficiaries; the
horized conflicts
npartiality under
iary-trustee may,
· of the beneficia-
see id. Comment

saction that would
be authorized by
all of the trust
Comment b), even
erms of the trust
bove. If, however,
or on behalf of one
o engages in the
ch of trust but is
been properly ob-
the consent of a
re generally on the

e strict prohibitions
icts between their
ply to the trustee's
ered as trustee. On
he trustee's duty of
nd 83. On dealings
aries relating to the
nment g.

Although under Sub-
ohibited as a form of
ances a trustee may
ensation for, special
rally—are necessary
rust. It is reasonable
ills and facilities that
skills and facilities in
he trustee's familiari-
ll result in efficiency

and cost advantages to the trust. Cf. Comment *c(2)*. Also cf. § 77(3) and § 77, Comment *e*, on the duty of trustees to make use of their special skills and facilities, and § 88 on the duty of trustees to be cost-conscious in trust administration. See further § 38, Comment *c(1)*, on factors to be considered in determining trustees' "reasonable compensation," and id., Comment *d*, indicating that a trustee may receive additional compensation for "special services ... , for example as attorney or real-estate agent, ... when it is advantageous to the trust that the trustee rather than another perform those services" (noting that this may be "particularly relevant under a statutory fee schedule").

Although the duty of loyalty does not strictly prohibit the trustee from providing this type of compensated services for which the trustee has a special competence, the trustee is not relieved of the normal duty to act with prudence and in the interest of the beneficiaries in determining whether the services are reasonably necessary and by whom they may best be provided. Thus, the risks inherent in sacrificing independence and objectivity of judgment in deciding these matters must be justifiable in terms of the expected benefits to the trust through greater efficiency and reduced time and expense in allowing the trustee to render the services. Furthermore, the trustee has a duty to disclose to the beneficiaries the special services performed and the additional time and compensation involved (see § 82, Comment *d*, and § 83, Comment *c*). Although the special compensation need not be approved by a court, trustee compensation may be challenged in court, and a trustee who is found to have taken excessive compensation will be ordered to refund it.

With this Comment, contrast Comment *d(1)* on outside compensation (but also compare the more lenient observations in that Comment on the matter of trustees voting to elect themselves to corporate officer or director positions).

The exception in this Comment does not apply to conflict-of-interest transactions prohibited under Comment *e*, such as employing family members of the trustee to handle trust transactions (Comment *e(1)*).

*c(6). Exceptions for certain loans to the trust and for deposits of trust money.* The strict prohibition against transactions that involve a conflict between the fiduciary and personal interests of a trustee does not apply to advances of a trustee's personal funds for proper expenses of administration or for the protection of the trust estate. These are advances for which the trustee is entitled to reimbursement without interest. (See, on a trustee's right of indemnification, § 38, Comment *b*.) Nor does the prohibition apply to loans by a trustee

§ 78                          TRUSTS                          Ch. 15

personally, with reasonable interest, when borrowing is necessary for proper needs of administration because (and for as long as) funds for this purpose are not reasonably available from other sources on equally favorable or better terms.

The strict prohibition against self-dealing ordinarily prevents a trustee from borrowing money held in the trust estate, but the prohibition does not preclude the deposit of trust funds in a regulated financial-services institution operated or controlled by, or affiliated with, the trustee. The trustee, however, must be able to show that the amount, duration, and other terms of the deposit (including any provision for interest) fully conform to the trustee's duty of prudence (§ 77) as applied generally to the deposits of trust money awaiting investment, distribution, or payment of expenses (§ 76, Comment *d*), as well as the requirements of any statute or regulation applicable to the deposit. (See, e.g., Comptroller of the Currency Regulation 9, "Fiduciary Funds Awaiting Investment or Distribution," especially 12 C.F.R. §§ 9.10(b) and 9.5(e), as revised in 1997.)

*c(7). Exception for transactions with other trusts or fiduciary estates.* The duty of loyalty does not preclude trustees in their fiduciary capacity from dealing with other trusts or with decedents' or conservatorship estates, including trusts and estates of which the trustee is a fiduciary. Any such sale, exchange, loan, or other transaction, however, must be consistent with the purposes of each fiduciary relationship and for a consideration that is fair to the beneficiaries of the relationships. Even the fair-consideration requirement does not necessarily apply if the arrangement is appropriate to the terms or beneficial interests of those relationships and to the applicable requirements of impartiality (§ 79).

On this last point, and more generally on a trustee's dealings directly with one or more of the beneficiaries of a trust, compare Subsection (3) and Comment *g*.

*c(8). Statutory exception for proprietary mutual funds.* Under statutes enacted in most of the states, a trustee is not precluded from investing trust funds in the securities of an investment company or investment trust to which the trustee or an affiliate provides services in a capacity other than as trustee, even though the trustee (or an affiliate) is compensated for those services by the investment trust or company out of fees charged to the trust or investment, provided the investment is prudent (§ 77 and § 90, particularly id., Comment *m*). These statutes require the trustee to satisfy certain requirements set out in the statute concerning information the trustee must report to beneficiaries about the rate of compensation and the method by which the compensation was determined. (See Reporter's Note, with excerpt

102

Ch. 15

ing is necessary for
s long as) funds for
 other sources on

dinarily prevents a
ıst estate, but the
'unds in a regulated
ed by, or affiliated
ole to show that the
osit (including any
's duty of prudence
ıst money awaiting
:§ 76, Comment d),
ılation applicable to
ency Regulation 9,
ıtion," especially 12

*trusts or fiduciary*
    trustees in their
· with decedents' or
:ates of which the
n, or other transac-
:s of each fiduciary
the beneficiaries of
juirement does not
te to the terms or
 applicable require-

 trustee's dealings
f a trust, compare

*tual funds.* Under
not precluded from
tment company or
e provides services
the trustee (or an
nvestment trust or
ment, provided the
 id., Comment *m*).
ı requirements set
tee must report to
e method by which
Note, with excerpt

from the comparable Uniform Trust Code provision, including discussion and rationale in the UTC comment excerpt.)

It is essential to note that this statutory exception for corporate trustees' participation in what are generally called "proprietary mutual funds" does not relieve the trustee of its normal duty to exercise prudence (§ 77, including compliance with the prudent investor rule of §§ 90–92). Nor does it dispense with the trustee's fundamental duty to act in the interest of the beneficiaries, its duty of impartiality, or the other fiduciary duties of trusteeship. For example, the trustee cannot properly confine its investments to the proprietary-mutual-fund offerings if this would impair the trustee's ability to manage both uncompensated and compensated risk through proper diversification and through asset allocation appropriate to the particular trust (§ 90); and the trustee must be sufficiently aware of overall costs associated with other mutual-fund alternatives to enable the trustee to fulfill its important responsibility to be cost conscious in managing the trust's investment program (see § 90(c)(3) and more generally § 88). Furthermore, the use of proprietary mutual funds for a trust's investment program must not result in the trustee receiving more than the reasonable overall compensation (§ 38) appropriate to its services to the trust, taking account of the trustee's mutual-fund duties and compensation. Further see Reporter's Note.

**Comment on Subsection (2):**

d. *Self-dealing: sales, loans, and other transactions between trust and trustee personally.* Except as stated in Comments *c-c(3)* or in Comments *c(4)-c(6)* or *c(8)*, the duty of loyalty prohibits a trustee from engaging on behalf of the trust in transactions with the trustee personally. Thus, it is a breach of trust for the trustee personally to buy property held in the trust, or to sell the trustee's own property to the trust; nor may the trustee personally borrow money from, lend funds to, or exchange property with the trust. Also, except as described in *c(5)*, a trustee, acting in a fiduciary capacity, cannot properly hire the trustee personally to perform services for the trust.

In prohibited self-dealing transactions, under the no-further-inquiry rule, it is immaterial to the question of breach of trust (as distinguished perhaps from the appropriate remedy) that the trustee has acted in good faith and for a fair consideration. It is immaterial whether the property has a market price, whether the trustee makes a profit from the transaction, and whether a sale of trust property is made privately or at auction, or even that the trustee does not actually make the sale. For example, except as provided in Comments *c(1)-c(3)*, if a trustee were personally to purchase trust property at a foreclosure or tax sale, or at a sale on execution of judgment, this would be a

103

§ 78                          TRUSTS                          Ch. 15

breach of trust, with no further inquiry to allow the trustee an opportunity to argue and attempt to show that all reasonable steps had been taken to prevent the sale and to maximize the number and enthusiasm of the bidders.

Self-dealing occurs also when the trustee personally has a financial interest in the transaction of such a nature that it might affect the trustee's judgment. Illustrative would be a sale to or purchase from a firm of which the trustee is a member or a corporation in which the trustee has a controlling or substantial interest. Also, a sale to a third person violates the trustee's duty of loyalty if made with an understanding that the third person is to hold the property for or transfer it to the trustee personally.

Similarly, a corporate trustee violates its duty of loyalty if it enters into a transaction with one of its departments, such as when the trustee purchases property from or sells property to its securities or banking department. Self-dealing is involved because the various departments are not separate persons. Nor may a corporate trustee engage in transactions on behalf of the trust with a subsidiary corporation or affiliate (see Reporter's Note) in which it has the entire or a controlling interest or an interest of such a substantial nature that there would be a temptation to consider its own financial advantage in the transaction rather than acting solely in the interest of the trust beneficiaries. The rule is the same when the shares of the purchasing or selling corporation are owned by the shareholders of the corporate trustee.

*d(1). Outside compensation for acts performed as trustee.* A trustee engages in self-dealing and therefore normally violates the duty of loyalty by personally accepting from a third person any fee, commission, or other compensation for an act done by the trustee in connection with the administration of the trust. But see Comment *c(8)* on proprietary funds, and cf. Comment *c(5)* on self-employment.

Accordingly, if the trustee sells trust property and accepts (and retains) a bonus from the purchaser for making the sale, the trustee commits a breach of trust. So also, if the trustee is employed by an insurance company with which the trustee insures trust property and from which the trustee receives a commission for placing the insurance, the trustee is at least accountable to the trust for the commission (cf. Comment *c(5)*). The same rule applies if a trustee's fiduciary dealings with a third party are subsequently "rewarded" (even by more-than-trivial expression of appreciation) by the third party, and therefore the reward must be accounted for to the trust; even an informal prearrangement, practice, or expectation that the trustee would be so rewarded could render the dealings a breach of trust.

104

Ch. 15

low the trustee an
all reasonable steps
ize the number and

sonally has a finan-
t it might affect the
or purchase from a
ration in which the
so, a sale to a third
ide with an under-
ty for or transfer it

ity of loyalty if it
s, such as when the
to its securities or
cause the various
. corporate trustee
with a subsidiary
:h it has the entire
stantial nature that
ncial advantage in
.erest of the trust
of the purchasing
s of the corporate

ed as trustee. A
nally violates the
d person any fee,
by the trustee in
see Comment c(8)
self-employment.

and accepts (and
sale, the trustee
employed by an
ust property and
lacing the insur-
r the commission
ustee's fiduciary
arded" (even by
third party, and
trust; even an
hat the trustee
breach of trust.

If a trustee were allowed to keep any form of compensation from a third person for acts performed in the administration of the trust, a temptation would exist that would deprive the beneficiaries of the circumstantial assurance of independent and objective fiduciary judgment that the trust law seeks to provide (see Comment b).

A special situation arises when a trust holds stock or other interests in an enterprise and the voting power or influence of those shares or interests is used to procure a trustee's election to a position such as director, officer, or manager of the enterprise. Although technically a form of self-dealing results, there is no breach of trust if the trustee's position is procured to serve the interests of the trust and its beneficiaries, provided that the salary is not greater than warranted by the services the trustee performs in the position with the enterprise, or that it is contemplated that the trustee will be accountable to the trust for any excess. (An appropriate arrangement for the situation would be for the trustee to account to the trust for all of the compensation, with the reasonable compensation (or special compensation) as trustee to include the value of the special services rendered in the trustee's role with the corporation or other enterprise.) Compare generally Comment c(5). As in other exceptional situations, the trustee's duty of loyalty continues to apply so that subsequently, for example, in exercising the trust's voting or other rights in the enterprise or in deciding whether to sell (or acquire additional) shares or interests in the enterprise, the trustee has a duty to act in the interest of the trust beneficiaries. A decision on behalf of the trust to have a trustee assume a role in the corporation or other enterprise, however, necessarily carries with it an acceptance on behalf of the trust that the trustee's duties to it will be subordinated to any legal duties to which the trustee is subject when acting in the role of director, officer, manager, or the like. A trustee's election to a role of this type is a matter of which beneficiaries should ordinarily be informed under § 82(1)(c). That duties of prudence, loyalty, impartiality (including re: income productivity), and other fiduciary duties apply to the trustee's decisions and conduct in, e.g., incorporating business or investment activities of the trust, see § 86, Comment e.

For purposes of this Comment (and Comment d more generally), a trustee's action or decision that is motivated by and taken in the best interest of the beneficiaries does not violate the rule of Subsection (1) or (2) merely because there may be an incidental benefit to the trustee.

**Comment on Subsection (1):**

e. *Other conflicting interests or loyalties: dealings with third persons.* Except as provided in Comments c-c(3), the duty of loyalty

105

§ 78                         TRUSTS                         Ch. 15

prohibits the trustee from engaging in transactions, as trustee, with persons with whom the trustee is closely related or associated.

The prohibition also applies to transactions by a trustee, acting in either a fiduciary or personal capacity, with third persons if the transaction would create a reasonably foreseeable risk of future conflict between the trustee's fiduciary duties and personal interests. Although not involving self-dealing (Comment *d*), transactions of this type could expose trustees to the temptation of considering interests other than those of trust beneficiaries.

The duty of loyalty therefore prohibits transactions (including employment transactions, see Comment *e(1)*, below) between the trustee, as trustee, and family members, because these are people for whom the trustee could be expected to have a natural, personal concern. For this purpose, the reference to "family members" includes the trustee's spouse and parents, the trustee's descendants and their spouses, and other individuals who are natural objects of the trustee's bounty (see definition in § 9, Comment *b*). This prohibition, however, does not apply to a trustee's fiduciary dealings with family members who are trust beneficiaries as long as those dealings are consistent with benefits authorized for the beneficiaries by the provisions of the trust (e.g., see § 50, Comment *d(6)*) and with the trustee's duty of impartiality (§ 79). On a trustee's dealings with beneficiaries more generally, see Comment *g*.

Any fiduciary transaction with a personal agent or personal attorney of the trustee is *presumed* to be affected by a conflict between the fiduciary and personal interests of the trustee.

Neither strict prohibition nor a presumption of divided loyalty applies to transactions with more remote relatives or with personal or business acquaintances of the trustee. A breach of trust may nevertheless be established by a beneficiary or successor trustee by showing that the trustee was improperly influenced by relationship to, friendship for, or expectations of reciprocity from the other party to a transaction that was disadvantageous to the trust. Compare Comment *f*.

Similarly, a corporate trustee cannot properly engage in a purchase, sale, or other transaction with one of its officers or directors. Although not involving self-dealing (as would occur in the case of affiliates, as mentioned in Comment *d*), these transactions involve individuals closely associated with a corporate trustee in a manner comparable to family members of an individual trustee.

The prohibition in this Comment also applies to a trustee's *personal* dealings with unrelated third parties when there would be a conflict between the trustee's fiduciary duties and personal interests.

106

ns, as trustee, with
associated.

a trustee, acting in
iird persons if the
risk of future con-
personal interests.
transactions of this
onsidering interests

nsactions (including
elow) between the
these are people for
a natural, personal
members" includes
scendants and their
ects of the trustee's
rohibition, however,
ith family members
lings are consistent
he provisions of the
ie trustee's duty of
beneficiaries more

agent or personal
ected by a conflict
trustee.

n of divided loyalty
or with personal or
trust may neverthe-
trustee by showing
ationship to, friend-
e other party to a
Compare Comment

y engage in a pur-
fficers or directors.
ccur in the case of
ransactions involve
rustee in a manner
stee.

lies to a trustee's
en there would be a
l personal interests.

Thus, for example, even though no direct dealings with the trust are involved, a trustee must not personally acquire (or establish) a business that competes with the business activities of the trust; nor may a trustee take personal advantage of an opportunity that properly belongs to the trust. (Cf. ALI Principles of Corporate Governance: Analysis and Recommendations § 5.05(b); Restatement Third, Agency § 8.02, Comment *d*.)

Furthermore, the prohibition extends to (i) a trustee's *personal* transactions with third parties that would place the trustee in a position in which conflict-of-interest temptations foreseeably may arise in the future, as well as to (ii) a trustee's *fiduciary* transactions with third parties that create such a risk of future conflicts between the trustee's fiduciary and personal interests. Thus, for example, a trustee must not acquire, for the trustee's personal account, a lease or encumbrance held by another on trust property.

Similarly, a trustee cannot properly purchase interests in a business association both for the trust estate and for the trustee personally at the same time, or purchase in either the trustee's fiduciary or its personal capacity an interest of a third party in a business association in which the trustee already holds an interest in the other capacity, if in any of these cases the interest is of such a substantial nature that, at the time of purchase or in the future, there would be a temptation to consider the trustee's own advantage rather than solely the interest of the trust beneficiaries. Temptation might arise, for example, in the exercise of voting rights, in later decisions to sell or retain the interest held either in the trust or by the trustee personally, and in situations in which the trustee might consider making further equity or debt investment in the enterprise.

**Illustrations:**

3. T purchases for the trust she is administering 100 shares of the common stock of General Motors Corporation, in which T already owns 200 common shares personally. Because neither holding represents a significant portion of the corporation's stock, T's purchase of these shares for the trust does not violate the principle stated in the preceding paragraph.

4. T purchases (for the trust) from the estate of a deceased individual 20 percent of the common stock of Genial Motors Corporation, an automobile dealership of which T already holds 20 percent personally. Unless authorized pursuant to Comments *c(1)-c(3)*, T's purchase of the shares constitutes a breach of trust under the principles of this Comment, even if the shares were a prudent investment under the terms and circumstances of the trust. (Cf. § 90, Comment *p*.)

§ 78                         TRUSTS                      Ch. 15

*e(1). Undivided loyalty: employing trustee's family members.* A trustee cannot properly hire his or her own family members (see definition in Comment *c*) in the administration of the trust, except as the family member may be a beneficiary of the trust and the employment is consistent with the trust's purposes and beneficial interests, and also with the trustee's duty of impartiality (§ 79). Thus, for example, it would ordinarily be a breach of trust for the trustee to hire his or her spouse or son or daughter to provide legal services for the trust, to manage trust property, or to handle transactions involving the sale or purchase of securities or other property for the trust.

An arrangement of this type would create a temptation for the trustee to consider the interests of others rather than to act solely in the interests of the beneficiaries. It would also deprive the beneficiaries of the circumstantial assurance that the trustee will exercise an independent and objective judgment (Comment *b*) not only in the selection of persons to provide trust services but also in establishing the duties, compensation, and other terms of the employment, in supervising or monitoring the employee, and in exercising business judgment about whether or with what frequency to engage in sales, purchases, or other transactions involving the trust estate.

**Illustration:**

> 5.  T, as trustee of a trust for the benefit of B and B's issue, has engaged and regularly uses D (a securities broker who is T's daughter-in-law) to handle sales and purchases of stocks and bonds for the trust estate. T's conduct in doing so constitutes a breach of trust—even with no showing that T acted in bad faith or that lower brokerage commissions (or greater discounts) would otherwise be available; and note the impracticability and undesirability of having to evaluate business judgments in an effort to protect against the risk of excessive transactions (or "churning") in the management of a trust portfolio.

*e(2). Corporate trustee's own shares as trust investment.* Ordinarily, a bank or trust company cannot properly purchase its own stock for the trust estate, even if the shares are purchased from third persons and thus involve no self-dealing. This is so even though a purchase of similar shares of another bank would be a suitable investment for the particular trust. Similarly, it is ordinarily improper for a corporate trustee to retain shares of its own stock received as an original investment on the death of the settlor of a testamentary trust or received as successor to the settlor or another as trustee of an inter vivos trust. (On the duty to sell, see § 92, Comment *c*.)

In either of the foregoing cases, however, the purchase or retention is proper if expressly or impliedly authorized by the terms of the

108

Ch. 15

*tee's family members.* A
wn family members (see
on of the trust, except as
he trust and the employ-
and beneficial interests,
tiality (§ 79). Thus, for
ust for the trustee to hire
ide legal services for the
transactions involving the
y for the trust.

ate a temptation for the
ther than to act solely in
so deprive the beneficia-
trustee will exercise an
nent *b*) not only in the
but also in establishing
of the employment, in
d in exercising business
ency to engage in sales,
trust estate.

enefit of B and B's issue,
urities broker who is T's
urchases of stocks and
n doing so constitutes a
at T acted in bad faith or
reater discounts) would
acticability and undesira-
lgments in an effort to
nsactions (or "churning")

*trust investment.* Ordi-
perly purchase its own
re purchased from third
is is so even though a
k would be a suitable
it is ordinarily improper
wn stock received as an
of a testamentary trust
er as trustee of an inter
ment *c*.)

, the purchase or reten-
zed by the terms of the

---

§ 78

Ch. 15    SPECIFIC DUTIES OF TRUSTEESHIP

trust (Comment *c(2)*) or if authorized by the consent of all beneficia-
ries (Comment *c(3)*). Also, the retention of a trustee's own stock is
sometimes authorized by statute. In addition, it would normally be
permissible for a relatively modest portion of the trustee's stock to be
held indirectly through an appropriate holding of shares in a mutual
fund or other pooled-investment vehicle.

In any event, in such matters as voting the shares or deciding
whether to sell or keep them, an authorization to acquire or retain
shares of the trustee does not relieve the trustee of its duties to act
with prudence and solely in the interest of the trust beneficiaries.

Whether a trustee is impliedly authorized to retain its own stock
as an inception asset is a matter of interpretation. Often trust provi-
sions or statutes do not expressly state that a corporate trustee may
retain its own shares in trust, but merely provide general authoriza-
tion to retain investments received from the settlor. In situations of
this type, the question of implied authorization is one of interpreting
the terms of the trust or statute. On this matter generally, see § 92,
Comments *c* and *d*, and particularly the third paragraph of the latter
Comment.

*f. Actions serving the interests of third persons or non-trust
objectives.* In administering a trust the trustee has a duty to the
beneficiaries not to be influenced by the interest of any third person or
by motives other than the accomplishment of the purposes of the trust.
Thus, it is improper for the trustee to sell property of the trust or
purchase property for the trust, or to engage an agent or advisor for
the trust, either for the purpose of benefiting a third person (whether
or not a party to the transaction) rather than the trust estate or for
the purpose of advancing an objective other than the purposes of the
trust. See further § 90, Comment *c*; also compare § 87, Comments *c*
and *d*.

**Comment on Subsection (3):**

*g. Dealings with beneficiaries.* Under the rule of Subsection (3)
there is no strict prohibition that precludes a trustee, either in a
personal capacity or in administering the trust, from dealing with one
or more of the beneficiaries. The trustee, however (except for *personal*
dealings in limited circumstances, below), must be able to show that
the dealings were fair and that all relevant and material information
that was known, or that should have been known (cf. § 72, Comment
*c*), by the trustee was communicated to the beneficiary or beneficiaries
involved. Also, such transactions undertaken as trustee must not
violate other fiduciary duties, such as the duty of prudence (§ 77) or
impartiality (§ 79), and must not conflict with a trust purpose or

109

§ 78                         TRUSTS                         Ch. 15

violate a spendthrift restraint (§§ 58 and 59) or other provision of the
trust (see § 76 on the trustee's duty to comply with the terms of the
trust).

Illustrative of a trustee's *fiduciary* dealings with beneficiaries are:
seeking and obtaining beneficiary consent to what would or might
otherwise be a breach of trust (see Comment *c(3)* and more generally
§ 97); sales of trust property to a beneficiary or purchase of a
beneficiary's property for the trust; lending money to or borrowing
money from the beneficiary; leases involving property of the trust or
of a beneficiary; and transactions involving the trust's acquisition of a
part or all of the equitable interest (or a lien on the interest) of a
beneficiary. In all such transactions, in addition to complying with the
requirement of full disclosure and with other fiduciary duties of
trusteeship (possibly most pointedly, the duty of impartiality among
beneficiaries), the transaction must be *fair* to the beneficiary and the
trust—normally meaning, in this context, either that the transaction is
for a fair and adequate consideration or that it is consistent with the
beneficial interests of the beneficiary or beneficiaries in question, such
as by making a no-or low-interest loan to a beneficiary as a discretion-
ary benefit under § 50, Comment *d(6)*.

Even though not within the fiduciary relation inherent in trust
administration, the trustee's *personal* dealings with beneficiaries of the
trust may involve a confidential relationship that is sufficiently natural
to the parties' roles in the trust relationship to be recognized by the
trust law as an incident or extension of the intense duty of loyalty
applicable to trustees. (On fiduciary and confidential relationships,
compare § 2, Comments *b* and *b(1)*.) A confidential relationship is not
presumed to exist, however, with regard to beneficiaries whose inter-
ests in the trust are remote and whose interactions with the trustee as
fiduciary are insignificant. In other circumstances, a beneficiary in-
volved in a transaction of this type may set aside the transaction
except as the trustee is able to establish that it was based on
appropriate disclosure (supra) and was otherwise fair to the beneficia-
ry. (But the latter requirement does not preclude a "natural" disposi-
tion that is wholly or partially donative, e.g., by a mother-beneficiary
to a son or daughter, even though the son or daughter serves as
trustee under the father's will.)

That the rule of Subsection (3) may apply to a former trustee
while that person retains significant influence over a beneficiary, see
Comment *h*.

**Additional General Comment:**

*h.  Pre- and post-trusteeship transactions.* The rules of this
Section do not render voidable those transactions or agreements that

Ch. 15

ther provision of the
ith the terms of the

ith beneficiaries are:
hat would or might
and more generally
or purchase of a
ley to or borrowing
perty of the trust or
ust's acquisition of a
n the interest) of a
complying with the
fiduciary duties of
impartiality among
beneficiary and the
at the transaction is
consistent with the
es in question, such
iary as a discretion-

n inherent in trust
beneficiaries of the
sufficiently natural
recognized by the
ise duty of loyalty
ntial relationships,
relationship is not
ciaries whose inter-
with the trustee as
, a beneficiary in-
de the transaction
it was based on
ir to the beneficia-
"natural" disposi-
mother-beneficiary
aughter serves as

a former trustee
a beneficiary, see

he rules of this
agreements that

SPECIFIC DUTIES OF TRUSTEESHIP    § 78

were entered into or claims that were acquired by a person before being appointed trustee or contemplating appointment (cf. Comment *e*, on creating potential for future conflicts) as trustee. After becoming trustee, however, with a responsibility for protecting the trust estate (§ 76, Comment *d*), the handling of even a preexisting claim of this type will involve conflicting interests, requiring at least disclosure to beneficiaries and that the trustee act in good faith and in the interest of the beneficiaries. If the transaction or conflict is significant, a trustee ad litem may have to be appointed (see Reporter's Note to Comments *c(1)-c(3)*). Furthermore, unless the conflict was disclosed or known at the time of the appointment, and thus at least impliedly approved, it may provide a ground for the trustee's removal (§ 37, Comment *f(1)*). In any event, the conflict calls for close scrutiny of potentially affected conduct.

Similarly, the prohibitions against self-dealing and other forms of divided loyalty do not apply to transactions by a former trustee after termination of the trust, or after the person has otherwise ceased to serve as trustee, provided the person obtains no improper advantage as a result of information, influence, or confidence acquired as trustee.

*i. Associated duty of confidentiality.* Incident to the duty of loyalty, but necessarily more flexible in its application, is the trustee's duty to preserve the confidentiality and privacy of trust information from disclosure to third persons, except as required by law (e.g., rules of regulatory, supervisory, or taxing authorities) or as necessary or appropriate to proper administration of the trust. Thus, the trustee's duty of loyalty carries with it a related duty to avoid unwarranted disclosure of information acquired as trustee whenever the trustee should know that the effect of disclosure would be detrimental to possible transactions involving the trust estate or otherwise to the interests of the beneficiaries.

This duty of confidentiality ordinarily does not apply to the disclosure of trust information to beneficiaries or their authorized representatives (see duties to inform and report, §§ 82 and 83) or, in the interest of one or more trust beneficiaries, to the trustees of other trusts or the fiduciaries of fiduciary estates in which a beneficiary has an interest. Even in providing information to or on behalf of beneficiaries, however, the trustee has a duty to act with sensitivity and, insofar as practical, with due regard for considerations of relevancy and sound administration, and for the personal concerns and privacy of the trust beneficiaries. See § 82, Comment *f*.

111

§ 78                               TRUSTS                               Ch. 15

## REPORTER'S NOTES ON § 78

Subsection (1) of this Section is generally comparable to the material in Restatement Second, Trusts § 170(1), and Subsection (3) of this Section is similar to Restatement Second, Trusts § 170(2).

See also IIA William F. Fratcher, *Scott on Trusts* §§ 170–170.25 (4th ed. 1987); and George G. Bogert &

George T. Bogert, *The Law of Trusts and Trustees* §§ 543–543(V) (rev. 2d ed. 1993), containing coverage similar to that in Subsection (1) of the present Section, and id. § 544 ("Duty of Trustee to Show Good Faith and Fair Play in Direct Dealing With Beneficiary"), which is similar to Subsection (3).

**Comment *a*:**

See generally J. Kartiganer & R. Young, "The [Uniform Trust Code]: Help for Beneficiaries and Their Attorneys," 17 Probate & Property 18, 20 (no. 2, March/April 2003): "The beneficiaries' chief protection is the trustee's duty of loyalty, which is the duty to administer the trust solely in the interest of the beneficiary. UTC § 802(a). The beneficiary has a right to set aside any transaction entered into by the trustee for the trustee's own personal account or that is otherwise affected by a conflict between the trustee's fiduciary and personal interests (other than corporate trustees' use of proprietary mutual funds [on which see Comment *c(8)*, infra]), unless the transaction was authorized by the terms of the trust, approved by the court, or otherwise protected by lapse of time or by release. UTC § 802(b). [¶] Beneficiaries are given the right to set aside a transaction between the trustee and the beneficiary, even if it does not concern trust property, if it occurs during the existence of the trust … and from which the trustee obtains an advantage, unless the trustee establishes that the transaction was fair to the beneficiary. UTC § 802(d)."

Of the grounds of relief and severity of remedies available to the beneficiaries when a trustee violates the

duty of loyalty, Charles E. Rounds, Jr., *Loring: A Trustee's Handbook* § 6.1.3 (8th ed. 2006), states (at p. 261): "It is obvious that the trustee should scrupulously avoid the assumption of so serious a risk; no intelligent person desires to become an insurer against loss under such circumstances. The trustee's invariable rule should be to avoid dealing with the trust property in this way."

The remedial distinction in trust law between void and voidable was applied to the attorney–client relationship in BGJ Assoc., LLC v. Wilson, 113 Cal.App.4th 1217, 7 Cal. Rptr.3d 140 (2003).

The leading English case establishing the proposition that a trustee must not profit by virtue of a fiduciary position ("the rule of *Keech v. Sandford*") is Keech v. Sandford (1726) Sel. Cas. Ch. 61, 2 Eq. Cas. Abr. 741, which involved the trustee of a trust to which a lease of the profits of a market had been devised. When that lease expired, the lessor refused to renew the lease for the trust because its beneficiary was an infant; the trustee then took the lease for his personal benefit, resulting in a profit for him. In requiring the trustee to hold the lease on constructive trust, with a duty to account for prof-

Ch. 15

rt, *The Law of Trusts* § 543–543(V) (rev. 2d ining coverage similar ection (1) of the pres- d id. § 544 ("Duty of v Good Faith and Fair Dealing With Benefi- : similar to Subsection

, Charles E. Rounds, *Trustee's Handbook* . 2006), states (at p. iously that the trustee ous avoid the as- serious a risk; no in- desires to become an loss under such cir- e trustee's invariable to avoid dealing with ty in this way."

l distinction in trust oid and voidable was attorney–client rela- Assoc., LLC v. Wil- pp.4th 1217, 7 Cal. 3).

English case establish- sition that a trustee by virtue of a fiducia- he rule of *Keech v.* Keech v. Sandford Ch. 61, 2 Eq. Cas. involved the trustee which a lease of the ket had been devised. e expired, the lessor ew the lease for the s beneficiary was an ee then took the lease benefit, resulting in a n requiring the trus- lease on constructive y to account for prof-

its received, Lord King (L.C.) stated that "if a trustee, on refusal to renew, might have a lease to himself, few trust estates would be renewed to *cestui que use*. . . . [A trustee] should [allow the lease to] run out [rather than take] the lease to himself. This may seem hard, that the trustee is the only person of all mankind who might not have the lease; but it is very proper that the rule should be strictly pursued, and not in the least relaxed. . . ."

For a controversial extension of this doctrine to a solicitor for trus- tees, see Boardman v. Phipps, [1967] 2 A.C. 46 (H.L.); reviewed (G. Jones), 84 Law Quarterly Rev. 472 (1968). The trust had a substantial minority holding of shares in a company that the solicitor (Boardman) believed was badly managed. He sought to per- suade the managing trustee to ac- quire a majority holding in the com- pany; upon failing to do so and having made inquiries ostensibly on behalf of the trust, thereby obtaining confiden- tial information about the company,

Boardman (with one of the beneficia- ries) proceeded to obtain control of the company and to carry out a plan of reorganization, including selling off its least productive assets. These ef- forts led to substantial profits for Boardman as well as for the trust, the trustees of which had expressed disinterest in, and apparently also lacked funds for, the undertaking— which would have been a breach of trust in any event unless the trustees had been able to obtain court approv- al for it. The House of Lords, by a 3– 2 majority (affirming Phipps v. Boardman, [1965] Ch. 992), required Boardman to account to the trust for his profits but, in recognition of his efforts and good faith, allowed him generous remuneration (quantum me- ruit) for his valuable services. (Under Comment *e*, conduct like Boardman's could be viewed as involving usurpa- tion of a trust opportunity or, more likely in these facts, as creating a future risk of conflicting interests (cf. id., Illustration 4).)

#### Comment *b*:

"The trustee owes a duty to the beneficiary to administer the affairs of the trust solely in the interests of the beneficiaries, and to exclude from consideration his own advantages and the welfare of third persons. This is called the duty of loyalty. [¶] If the trustee engages in a disloyal transac- tion, the beneficiary may secure the aid of equity in avoiding the act of the trustee or obtaining other appropri- ate relief, regardless of the good faith of the trustee or the effect of the trustee's conduct on the beneficiary or benefit to the trustee. [¶] In en- forcing the duty of loyalty the court is primarily interested in improving trust administration by deterring

trustees from getting into positions of conflict of interest, and only second- arily in preventing loss to particular beneficiaries or unjust enrichment of the trustee." George T. Bogert, *Trusts* § 95 (Hornbook, 6th ed. 1987). Following the black letter just quot- ed, the explanatory text explains (at p. 343):

Whether the trustee acted in good faith and with honest inten- tions is not relevant, nor is it important that the transaction at- tacked was fair and for an ade- quate consideration so that the beneficiary has suffered no loss as a result of the disloyal act. It is not material that the trustee

113

§ 78                             TRUSTS                        Ch. 15

himself made no profit from the disloyal act, although in most cases he has benefitted. Thus if a trustee employs an agent and permits him to enter into transactions beneficial to the agent while he is engaged in the trust work, the trustee may be held liable for the amount of the agent's gain even though the trustee did not share in it.

In applying the loyalty rule the court of equity is not ... working out the equities of the parties in the individual case, although it does consider that problem in framing its decree. It is principally desirous of procuring a result that will keep all trustees out of temptation and thus conduce to the ethical and efficient administration of trusts.

On the strictness and rationale of the duty of loyalty, see R. Hallgring, "The Uniform Trustees' Powers Act and the Basic Principles of Fiduciary Responsibility," 41 Washington L. Rev. 801, 808–811 (1966): "The 'uncompromising rigidity' of the rule requiring undivided loyalty is not an arid formalism. The courts have consistently held that this inflexibility is essential to its effective operation. [¶] In refusing to make ready exceptions to the rule, courts have recognized three principal considerations. I will discuss these briefly, in the belief that the reasons which gave rise to the present state of the law go far to commend its retention. [¶] First, the courts have acknowledged that it is difficult, if not impossible for a person to act impartially in a matter in which he has an interest.... Just as no one may be a judge in his own cause, so a trustee can not be expected to utilize his best, most objective and disinterested judgment in situations where that judgment may run counter to his own interest. This observation, as earlier suggested, seems to be something of a constant in human affairs.... [¶] [T]he stricture against conflicting interest does not rest upon an imputation of dishonesty. That the most conscientious and judicious of men cannot be unmoved by the obtrusion of his own interest has long been recognized. It should, if anything, be more obvious in our own time in view of our increasing understanding of the importance of subconscious factors in human motivation. [Even] if the intrusion of personal advantage does not tip the scales of judgment ... , it [may], by causing him to 'lean over backwards' ... distort his objectivity.... [¶] Secondly, the courts have realized that fiduciary relationships lend themselves to exploitation. This is especially true in the case of the trust, in which the fiduciary aspect is peculiarly 'intense.' The trustee ... has a large advantage over the beneficiary with respect to any matter in which their interests conflict. Normally, the trustee's position gives him superior knowledge of all the facts and circumstances.... Furthermore, the main purpose of this appointment is often to relieve the beneficiary of the cares of management, and to confer upon him the benefit of the trustee's superior skill and judgment. For these reasons, the success of the trust relationship will depend on the ability of the beneficiary to trust the trustee.... [¶] Finally, the courts have made much of the fact that disloyal conduct is hard to detect.... [¶] The reasons why disloyalty will often go undetected are plain enough.... Even a court ... cannot expect to match the trustee's knowledge. Furthermore, many decisions of a trustee are matters of refined judgment.... As to these decisions of the trustee,

114

erest. This observation, as suggested, seems to be some- a constant in human af-

[¶] [T]he stricture against ing interest does not rest upon ation of dishonesty. That the nscientious and judicious of not be unmoved by the ob- of his own interest has long cognized. It should, if any- more obvious in our own iew of our increasing under- of the importance of subcon- ctors in human motivation. f the intrusion of personal e does not tip the scales of ; . . . , it [may], by causing an over backwards' . . . dis- bjectivity. . . . [¶] Secondly, s have realized that fiduciary ips lend themselves to ex- . This is especially true in of the trust, in which the aspect is peculiarly 'in- ne trustee . . . has a large over the beneficiary with any matter in which their conflict. Normally, the trus- ition gives him superior e of all the facts and circum- . Furthermore, the main f this appointment is often the beneficiary of the cares ement, and to confer upon enefit of the trustee's supe- and judgment. For these ne success of the trust rela- ll depend on the ability of iciary to trust the trus- ] Finally, the courts have h of the fact that disloyal hard to detect. . . . [¶] The hy disloyalty will often go are plain enough. . . . urt . . . cannot expect to trustee's knowledge. Fur- many decisions of a trustee s of refined judgment. . . . e decisions of the trustee,

undivided loyalty can be guaranteed only by removing all factors which might give rise to a contrary motiva- tion. This, of course, will not ensure that the trustee's judgments are in- fallible or even that they are the best of which he is capable; but it will ensure that they are not influenced by motives adverse to the interest of the beneficiary."

Footnote 6 to the first sentence of the Hallgring excerpt (above) states: "I shall not be the first to depart from tradition by failing to quote Judge Cardozo's classic, if florid, statement of the principle of fiduciary loyalty in Meinhard v. Salmon, 249 N.Y. 458, 464, 164 N.E. 545, 546 (1928): 'Many forms of conduct per- missible in a workaday world for those acting at arm's length are for- bidden to those bound by fiduciary ties. A trustee [here used in the ge- neric sense to include fiduciaries more generally] is held to something stricter than the morals of the mar- ket place. Not honesty alone, but the punctilio of an honor most sensitive, is then the standard of behavior. As to this there has developed a tradi- tion that is unbending and inveterate. Uncompromising rigidity has been the attitude of courts of equity when petitioned to undermine the rule of undivided loyalty by the "disintegrat- ing erosion" of particular exceptions. Only thus has the level of conduct for fiduciaries been kept at a level higher than that trodden by the crowd. It will not be consciously lowered by this court.'" (But see Comments c- c(8) of this Section.)

Compare G. Alexander, "A Cogni- tive Theory of Fiduciary Relation- ships," 85 Cornell L. Rev. 767, 774– 778 (2000) (noting at 777 that "diffi- culty with discovering abuse high- lights the need for more stringent

standards"); E. Hoover, "The Princi- ples Underlying the Duty of Loyal- ty," 5 Cleveland–Marshall L. Rev. 7 (1956); E. Weinrib, "The Fiduciary Obligation," 25 U. of Toronto L.J. 1, 7 (1975); and, in discussing an aspect of the Revised Model Nonprofit Corpo- ration Act, R. Chester, "The Lawyer as Charitable Fiduciary: Public Trust or Private Gain?," 25 Pacific L.J. 1353 (1994), observes (at 1378): "Since in- creased effectiveness of sanctions on charitable fiduciaries can be more cheaply purchased by strengthening the duties themselves than by adding huge numbers of enforcement per- sonnel, commentators have argued that the trustee standard for the duty of loyalty [rejected in the Act] . . . should be applied to all forms of char- ity. Such a standard prohibits self- dealing and would have 'an enor- mously salutary effect' [quoting H. Hansmann, "Reforming Nonprofit Corporation Law," 129 U. of Pa. L. Rev. 497, 570 (1981)]."

Compare also: "Because the brain cannot see itself fooling itself, the only reliable method for avoiding bias is to avoid the situations that produce it." Daniel Gilbert (professor of psy- chology, Harvard) in "I'm OK, You're Biased," *The New York Times* sec. 4, p. 12 (Apr. 16, 2006) (concluding his review of others' recent studies).

In Stegemeier v. Magness, 728 A.2d 557 (Del. 1999) (reversing the chancery court for equating the trus- tee's standard of duty to that of a corporate director), the opinion (at 565) "decline[d] to extend the less strict corporate fiduciary principles to the law of trusts."

In R. Sitkoff, "An Agency Costs Theory of Trust Law," 89 Cornell L. Rev. 621, 679–680 (2004), the author states: "Some beneficiaries lack a suf- ficient stake to reckon the costs and

115

TRUSTS

benefits of bringing suit.... [¶] A separate objection [might be] that beneficiaries are often unsuited to monitor the trustee, perhaps because they are unborn, incapacitated, or simply irresponsible.... [T]rust fiduciary law, especially the duty of loyalty, is stricter and more prophylactic than the fiduciary law of other organizational forms. [Hence,] as Fischel and Langbein have suggested ['ERISA's Fundamental Contradiction: The Exclusive Benefit Rule,' 55 U. Chicago L. Rev. 1105, 1114–1115, 1118–1119 (1988)], many of trust law's fiduciary duties can be understood as 'substitutes for monitoring by the directly interested parties.' Moreover, the modern trend is towards further expansion of the duty to furnish beneficiaries with relevant information regarding the management of the trust."

J. Langbein, "The Contractarian Basis of the Law of Trusts," 105 Yale L.J. 625, 657 (1995), reminds us that "compliance with trust fiduciary law is ordinarily not onerous" and adds: "The duty of loyalty ... is ... easy

enough to obey in ordinary cases. It says to the trustee. 'You are left with the entire universe of investment possibilities as outlets for your entrepreneurial impulses; you are required only to stay away from the trust assets when you seek your own fortune.' "

See also City Bank Farmers Trust Co. v. Cannon, 291 N.Y. 125, 51 N.E.2d 674 (1943), 157 A.L.R. 1424, rehearing denied, 293 N.Y. 858, 59 N.E.2d 445 (1944), quoted in the Reporter's Note to Comment c(2).

Recent articles on the "no-further-inquiry rule" include J. Langbein, "Questioning the Trust Law Duty of Loyalty: Sole Interest or Best Interest?," 114 Yale L.J. 929 (2005), and M. Leslie, "In Defense of the No–Further Inquiry Rule: A Response to Professor Langbein," 47 William & Mary L. Rev. 541 (2005). Compare R. Flannigan, "The Strict Character of Fiduciary Liability," [2006] New Zealand L. Rev. 209 (defending the "conventional position").

biguous trust tlor's conduct.

For a case i to grant a tru authorization t action, see In Inman v. Tren N.W.2d 514 (2

That, if the representation er consent of otherwise imp tion can bind or unborn be tion to § 65, Lange, 75 N (1978), and § 304.

*Trustee ad* litem concept *c(1),* see (in a Note below Comment *g,* thereto. In e is appointed removing or trustee) to co dle a specifi tion(s) when the trustee t litem has (e fied by the duties of th propriate to duties would the normal §§ 82 and 8 only to the the court a N.Y. SCPA which "spe were appoin (6–24–04) N (for decision primary tru man, 196 N 175 (Sur. C regular tru

## Comments c(1)-c(3):

See Dick v. Peoples Mid–Illinois Corp., 242 Ill.App.3d 297, 182 Ill.Dec. 463, 609 N.E.2d 997, 1002 (Ill. App. 1993): "This rule [of undivided loyalty] is not, however, without exception. It is well established that a trustee may occupy conflicting positions in handling the trust where the trust instrument contemplates, creates, or sanctions the conflict of interest. The creator of the trust can waive the rule of undivided loyalty by expressly conferring upon the trustee the power to act in a dual capacity, or he can waive the rule by implication where he knowingly places the trustee in a position which might conflict with the

interest of the beneficiaries.... [¶] Where a conflict of interest is approved or created by the testator, the fiduciary will not be held liable for his conduct unless the fiduciary has acted dishonestly or in bad faith, or has abused his discretion. Further, where the will approves the conflict of interest, the burden of proof remains on the party challenging the fiduciary's conduct as there is no presumption against the fiduciary despite the divided loyalty." And in Jochec v. Clayburne, 863 S.W.2d 516 (Tex. App. 1993), the court found that the trustee's duty of fidelity was impliedly modified by a combination of an am-

ordinary cases. It
You are left with
of investment pos-
or your entrepre-
ou are required
om the trust as-
k your own for-

k Farmers Trust
1 N.Y. 125, 51
157 A.L.R. 1424,
93 N.Y. 858, 59
uoted in the Re-
ment e(2).

the "no-further-
de J. Langbein,
ust Law Duty of
st or Best Inter-
. 929 (2005), and
ense of the No–
le: A Response to
," 47 William &
005). Compare R.
rict Character of
[2006] New Zea-
fending the "con-

eficiaries.... [¶]
f interest is ap-
the testator, the
held liable for his
duciary has acted
ad faith, or has
n. Further, where
e conflict of inter-
roof remains on
g the fiduciary's
no presumption
y despite the di-
n Jochec v. Clay-
516 (Tex. App.
nd that the trus-
y was impliedly
nation of an am-

biguous trust provision and the set-tlor's conduct.

For a case in which a court refused to grant a trustee's petition seeking authorization for a self-dealing trans-action, see In re Trust Created by Inman v. Tremaine, 269 Neb. 376, 693 N.W.2d 514 (2005).

That, if the requirements of virtual representation are satisfied, the prop-er consent of some beneficiaries to an otherwise impermissible fiduciary ac-tion can bind similarly situated minor or unborn beneficiaries, see (in addi-tion to § 65, Comment b) Estate of Lange, 75 N.J. 464, 383 A.2d 1130 (1978), and Uniform Trust Code § 304.

*Trustee ad litem.* On the trustee ad litem concept, mentioned in Comment *c(1),* see (in addition to the Reporter's Note below on Illustration 2) § 37, Comment *g,* and Reporter's Note thereto. In essence, a trustee ad litem is appointed by the court (without removing or otherwise displacing the trustee) to consider and perhaps han-dle a specific controversy or transac-tion(s) when it is inappropriate for the trustee to do so. The trustee ad litem has (except as limited or modi-fied by the court) such powers and duties of the trusteeship as are ap-propriate to the matters involved; the duties would ordinarily also include the normal duties of a trustee under §§ 82 and 83 to inform and report not only to the beneficiaries but also to the court and the trustee. Also see N.Y. SCPA 702(8) and (g), under which "special purpose" trustees were appointed in In re Richardson (6–24–04) NYLJ at 27 (Sur. Ct. 2004) (for decision on sale or retention of a primary trust asset), and In re Gold-man, 196 Misc.2d 968, 764 N.Y.S.2d 175 (Sur. Ct. 2003) (tax concern if regular trustees were to exercise a

trustee power granted by the instru-ment).

*Illustration 2:* In Getty v. Getty, 205 Cal.App.3d 134, 252 Cal.Rptr. 342 (Cal. App. 1988), the court begins by noting that the "purpose of removing a trustee is not to inflict a penalty for past action, but to preserve the trust assets" and that, "assuming the exis-tence of some legally proper ground for his removal, there need be no evidence of actual past wrongdoing by the trustee to justify his removal." Id. at 139–140, 252 Cal.Rptr. at 345. Nevertheless, not believing that re-moval was justified by the facts, but because of the prospect of a serious conflict of interest, the court conclud-ed that the "appointment of a trustee ad litem was a proper exercise of the [lower] court's general equity juris-diction. Since the court has the power to remove a trustee entirely ... re-moval from the existing trustee [merely] of his power to conduct cer-tain law suits and appointment of a trustee ad litem ... are also an exer-cise of that general equity jurisdic-tion.... [A]ppointment of a trustee ad litem with limited powers to con-duct certain litigation is an intrinsi-cally included exercise of the court's inherent equity power within its greater power to remove and replace the trustee.... [¶] While a trustee ad litem may be novel in California, other jurisdictions have appointed them under certain circumstances." Id. at 141–142, 252 Cal.Rptr. at 347.

*Cross-reference to § 79* (last para-graph of Comment *c(2)* here). Appro-priate to the loyalty issues of this § 78 is In re Estate of Reichert, 2001 WL 1398579 (Del. Ch. 2001) (no A.2d report), in which a will named an executor and expressly granted him a power to disclaim, which he exercised to disclaim the estate's right to prop-

erty from another source, which the court held improper and a violation of fiduciary duty because the result was to deprive the sole beneficiary of the estate of property in a manner that would benefit the executor and his siblings under the terms of the source instrument.

**Comment c(4):**

An exception similar to that in the Comment is generally recognized, and is stated in Uniform Trust Code § 802(h)(2), providing that the duty of loyalty does not preclude, if "fair" to the beneficiaries, "payment of reasonable compensation to the trustee."

In Matter of Nathan Trust, 618 N.E.2d 1343 (Ind. App. 1993), opinion vacated (result undisturbed), 638 N.E.2d 789 (1994), the court allowed the trustees, on termination of a trust and over objection by a remainder beneficiary, to exercise their power to sell land held in the trust for the purpose of paying expenses and costs of administration, which included compensation and reimbursement for the trustees.

On excessive charges and the duty of loyalty, see Nickel v. Bank of America, NTSA, 290 F.3d 1134 (9th Cir. 2002).

**Comment c(5):**

"With respect to the attorney serving in dual capacities—as fiduciary and as counsel (either himself or his firm) to the estate or trust—the Survey responses [from ACTEC Fellows across the country] indicate that the practice is generally accepted. The advantages from the client's point of view are that one person or one law firm may be able to provide better service at less cost combined than would be incurred if two firms or entities were involved. [¶] Despite its acceptance, the practice of serving in dual capacities raises fundamental questions about conflicts of interest and self-dealing under long-established principles of fiduciary law.... [T]he trustee may be in a position of conflict of interest when called upon to determine whether the cost of his or his firm's services is fair and reasonable, especially where the value of legal services in general and in any particular case is so difficult to establish in the first place. [¶] In this setting the whole question of compensation is an especially thorny one as fees are subjected to close scrutiny, if not downright suspicion, by the courts when they are called upon to review, or take upon themselves to review, the separate and combined compensation of an attorney serving in dual capacities. [¶] Despite the emerging pitfalls, the writer believes that the trend of judicial decisions will—and, indeed, should—be to continue to permit the practice of attorneys accepting fiduciary appointments and serving in dual capacities. As previously mentioned, the primary considerations are cost and a practical realization that, in the absence of an actual dispute, the settlement of an estate or the administration of a trust differs in many respects from the handling of a lawsuit." M. Heckscher, "The Special Problems Which Arise When an Attorney Serves as Fiduciary," 17 ACTEC Notes 137, 138 (1991). The author continues (at 145–148) to discuss the various problems of lawyers serving

SPECIFIC DUTIES OF TRUSTEESHIP      § 78

property in a manner that 1efit the executor and his der the terms of the source

objection by a remainder , to exercise their power to 1eld in the trust for the paying expenses and costs stration, which included on and reimbursement for .

sive charges and the duty see Nickel v. Bank of TSA, 290 F.3d 1134 (9th

especially thorny one as jected to close scrutiny, if ght suspicion, by the they are called upon to ake upon themselves to separate and combined n of an attorney serving acities. [¶] Despite the falls, the writer believes nd of judicial decisions deed, should—be to con- nit the practice of attor- ing fiduciary appoint- rving in dual capacities. mentioned, the primary s are cost and a prac- n that, in the absence of oute, the settlement of the administration of a n many respects from of a lawsuit." M. The Special Problems When an Attorney duciary," 17 ACTEC 38 (1991). The author .45–148) to discuss the ms of lawyers serving

in dual capacities, observing: "At this time, with the practice apparently on the increase, no state flatly prohibits an attorney from wearing both hats. However, prudent counsel seeking to serve in dual capacities in an unfamil- iar venue should check to determine whether the jurisdiction in question imposes any special requirements on such conduct," and the article contin- ues by reviewing different ap- proaches to compensation in various states and offering some practical recommendations.

See also Dardovitch v. Haltzman, 190 F.3d 125, 138 (n.10) (3d Cir. 1999) ("A trustee's choice to use his own special [legal] services—beyond those usually rendered by a trustee—where the trust requires them, ordinarily does not violate the prohibition against self-dealing . . . [within limits] of good faith and reasonable care.") (citing Restatement Second, Trusts § 242).

A cautious statement with warn- ings is contained in Charles E. Rounds, Jr., *Loring: A Trustee's Handbook*, § 6.1.3.3 (8th ed. 2006): "A grey area has developed in the law, namely the selling by the trustee of legal, brokerage, and consulting services to the trust. Again, as with the sale of goods, such transactions fall within the strict definition of *self- dealing* in that economic benefit is accruing to the trustee from the trust estate over and above the trustee fees. In England the practice is for-

bidden, but in most American juris- dictions it is not. . . . [¶] [The prac- tice] is, nonetheless, troubling. . . . The trustee is on both sides of the service contract. . . . At the very least such transactions put great stress on the trustee's independent judgment. Thus, to avoid even the appearance of impropriety, the trustee should not charge for routine legal or consulting tasks and should turn over to the trust any routine brokerage commis- sions that are generated. . . . Ex- traordinary legal, consulting, and bro- kerage services should be purchased from the trust at arm's length from independent third parties. [¶] . . . [T]he beneficiaries are deprived of the benefit of the checks and balances inherent in arm's-length contractual relationships. When the trustee, for example, acts also as attorney, it must fall to the court or to the benefi- ciaries to monitor the quality of the legal work, the commitment to the expeditious resolution of the legal matter, and the reasonableness of le- gal fees. Because court oversight is inefficient and beneficiary oversight often illusory, neither alternative is particularly satisfactory."

For a more favorable perspective, but also with a discussion of some of the difficult aspects involved, see A. Hook & T. Begley, Jr., "Should an Elder Law Attorney Serve as a Trus- tee?," 30 Estate Planning 202, 204– 207 (2003).

**Comment *c(6)*:**

The court in Miller v. Miller, 50 Mass. App. Ct. 73, 734 N.E.2d 738 (2000), reversed the lower court's rul- ing (which had disallowed interest on a loan to the estate by the executor and had ordered him to repay the

amount of the interest to the estate) because the loan was properly made at a low rate of interest to pay estate taxes for the benefit of the estate, which had insufficient liquid assets at the time.

119

§ 78                                TRUSTS                            Ch. 15

**Comment c(7):**

The sale of certain trust assets to one of the beneficiaries of the trust was improper, as a violation of the duty of impartiality to others, when the price and other terms were unduly favorable. Giagnorio v. Emmett C. Torkelson Trust, 292 Ill.App.3d 318, 226 Ill.Dec. 693, 686 N.E.2d 42 (1997).

**Comment c(8):**

Uniform Trust Code § 802(f) states that a trustee's investment in proprietary mutual funds "is not presumed to be affected by a conflict between personal and fiduciary interests if the investment complies with the prudent investor rule" and allows the investment trust or company to compensate the trustee for its services "if the trustee at least annually notifies the persons entitled under Section 813 to receive a copy of the trustee's annual report [of the] rate and method by which the compensation was determined." The comment to subsection (f) describes the advantages of mutual funds, but those mentioned are not peculiar to proprietary mutual funds—nor are *some* of the trusteeship problems. That comment states:

Subsection (f) creates an exception [that] applies even though the mutual fund company pays the ... trustee a fee for providing investment advice and other services, such as custody, transfer agent, and distribution, that would otherwise be provided by agents of the fund. Mutual funds offer several advantages for fiduciary investing. By comparison with common trust funds [see § 90, Comment *m*, infra, on this earlier form of pooled investing by banks], mutual fund shares may be distributed in-kind when trusts interests terminate, avoiding liquidation and the associated recognition of gain for tax purposes. Mutual funds commonly offer daily pricing, which gives trustees and beneficiaries better information about performance. Because mutual funds can combine fiduciary and nonfiduciary accounts, they can achieve larger size, which can enhance diversification and produce economies of scale that can lower investment costs.

Mutual fund investment also has a number of potential disadvantages. It adds another layer of expense to the trust, and it causes the trustee to lose control over the nature and timing of transactions in the fund. Trustee investment in [proprietary] mutual funds ... has given rise to litigation implicating the trustee's duty of loyalty, the duty to invest with prudence, and the right to receive only reasonable compensation. Because financial institution trustees ordinarily provide advisory services to and receive compensation from the very funds in which they invest trust assets, the contention is made that investing the assets of individual trusts in these funds is imprudent and motivated by the effort to generate additional fee income. Because the financial institution trustee often will also charge its regular fee for administering the trust, the contention is made that the financial institution trustee's total compensation, both direct and indirect, is excessive.

Ch. 15

Subsect the advar while at clear tha subject to sponsibilit States hav rizing tru from whi rive addi tions of s these s makes cl ment-fee tomatical conflict b sonal an subsectic waive or obligatio ing whet fund, mu ests ahe ries. The also com diction's To obta by subs disclose benefici copy of the rate additior mined. of a mu delegat tee's fu accoun ting th sation. Investc ments: Trusts § 227 (1992).

Sub: the se

other terms were undu-
Giagnorio v. Emmett C.
rust, 292 Ill.App.3d 318,
93, 686 N.E.2d 42 (1997).


pricing, which gives
d beneficiaries better in-
about performance. Be-
ual funds can combine
and nonfiduciary ac-
ey can achieve larger
can enhance diversifica-
oduce economies of scale
ver investment costs.

und investment also has
of potential disadvan-
ids another layer of ex-
he trust, and it causes
to lose control over the
timing of transactions
. Trustee investment in
y] mutual funds ... has
to litigation implicating
's duty of loyalty, the
rest with prudence, and
receive only reasonable
on. Because financial in-
stees ordinarily provide
rvices to and receive
n from the very funds
ney invest trust assets,
ion is made that invest-
ts of individual trusts in
is imprudent and moti-
e effort to generate ad-
income. Because the fi-
itution trustee often will
its regular fee for ad-
the trust, the conten-
that the financial insti-
e's total compensation,
and indirect, is exces-

Subsection (f) attempts to retain
the advantages of mutual funds
while at the same time making
clear that such investments are
subject to traditional fiduciary re-
sponsibilities. Nearly all of the
States have enacted statutes autho-
rizing trustees to invest in funds
from which the trustee might de-
rive additional compensation. Por-
tions of subsection (f) are based on
these statutes. Subsection (f)
makes clear that such dual invest-
ment-fee arrangements are not au-
tomatically presumed to involve a
conflict between the trustee's per-
sonal and fiduciary interests, but
subsection (f) does not otherwise
waive or lessen a trustee's fiduciary
obligations. The trustee, in decid-
ing whether to invest in a mutual
fund, must not place its own inter-
ests ahead of those of the beneficia-
ries. The investment decision must
also comply with the enacting juris-
diction's prudent investment rule.
To obtain the protection afforded
by subsection (f), the trustee must
disclose at least annually to the
beneficiaries entitled to receive a
copy of the trustee's annual report
the rate and method by which the
additional compensation was deter-
mined. Furthermore, the selection
of a mutual fund, and the resulting
delegation of certain of the trus-
tee's functions, may be taken into
account under Section 708 in set-
ting the trustee's regular compen-
sation. *See also* Uniform Prudent
Investor Act §§ 7 and 9 and Com-
ments: Restatement (Third) of
Trusts: Prudent Investor Rule
§ 227 [now § 90, infra] cmt. m
(1992).

Subsection (f) applies whether
the services to the fund are provid-

ed directly by the trustee or by an
affiliate.... The term ["affiliate"
is] used [and defined] in the regula-
tion under ERISA.... *See* 29
C.F.R. § 2510.3–21(e) [summarized
below under Reporter's Note to
Comment *d*].

In approving a bank's fiduciary in-
vestment in a proprietary mutual
fund, the court in McMillen v. First
of America Trust Co., 309 Ill.App.3d
435, 242 Ill.Dec. 759, 722 N.E.2d 248
(1999), emphasized that the bank's
actions were expressly authorized by
statute and that the investment satis-
fied the prudent-investor-rule stan-
dard as required by the statute.

The Office of the Comptroller of
the Currency, in Interpretive Letter
No. 519 (Oct. 1990), advised that, un-
der 12 C.F.R. § 9.12(a), in the ab-
sence of (i.e., prior to) a proprietary-
fund statute or authorization in the
trust instrument, the investment of
fiduciary funds in a mutual fund from
which the bank receives "credits" cre-
ates a risk that its judgment may be
compromised by the potential receipt
of collateral benefits and that mere
disclosure of the mutual-fund ar-
rangement to beneficiaries would not
cure the potential conflict of interest.
(An amendment to 12 C.F.R. § 9 is
comparable to Comment *c(8)*, and see
O.C.C. Interpretive Letter No. 704
(Feb. 1996).) Compare "No Conflict If
Fees Offset Plan Expenses, Says
DOL," 14 Trust Regulatory News 3
(No.5, May 2005) (" ... fiduciaries of
ERISA-governed plans must offset
... mutual fund fees they receive
against plan expenses. In Advisory
Letter 2005–10A, the DOL clarifies
that this same logic holds for IRA
fiduciaries").

§ 78                        TRUSTS                    Ch. 15

**Comment d:**

Hosey v. Burgess, 319 Ark. 183, 890 S.W.2d 262 (1995), is a classic self-dealing case in which the trustees personally rented real property held in the trust, resulting in a breach of trust despite the trustees' broad authority; innocence would be no defense, so the trustees were liable for attorney's fees and prejudgment interest as well as the difference between the rent paid to the trust and the amount for which the trustees were later able to sublet the property to others. And see trustees' self-dealing by lending trust funds to themselves in Feinberg v. Adolph K. Feinberg Trust, 922 S.W.2d 21 (Mo. App. 1996) (impermissible despite broad investment discretion).

Nor did language authorizing a testamentary trustee to acquire such investments "as may be selected by him, irrespective of any limitation prescribed by law or custom," have the effect of "expressly" authorizing the trustee (as would have been required by applicable statute) to make loans to himself. Office of Disciplinary Counsel v. Kurtz, 82 Ohio St.3d 55, 693 N.E.2d 1080 (1998). Cf. earlier Ohio case finding an executor guilty of self-dealing in borrowing estate funds (plus other matters of mismanagement) in Whitaker v. Estate of Whitaker, 105 Ohio App.3d 46, 663 N.E.2d 681 (1995). But an executor was not required to repay interest received from the estate for a loan to pay estate taxes when the estate had insufficient liquid assets to pay the taxes (see Comment c(6)) in Miller v. Miller, 50 Mass.App. 73, 734 N.E.2d 738 (2000).

Another prototypical case of self-dealing, with a twist (see Comment h), is Quinn v. Central, 104 F.2d 450 (9th Cir. 1939), the essence of which

is summarized in the following excerpt from the court's opinion: "Her intent prior to that time was one to create a trust sometime in the future and therefore no trust was created. The National Bank ["Central"] cannot be held liable for the violation of a trust duty which did not exist. [¶] As to the bonds purchased after the execution of the trust instrument, a different rule applies. It is a breach of the duty of loyalty for a trustee to sell his individual property to the trust estate. Therefore, the National Bank violated its duty in purchasing the $13,000 of bonds [for the trust] from itself. . . . [¶] Appellant was entitled to hold the National Bank liable for any profit received by it on the transactions, and for any loss she suffered on resale of the property." Id. at 453 (citations omitted).

*"Affiliate."* No attempt is made in the Comment to define the term "affiliate" because its meaning and content will vary from purpose to purpose and, in any event, can be expected to evolve over time, as this Restatement ages without the ready means of amendment that exists in the case of statutes and regulations. For current purposes, an appropriate definition is found in the ERISA regulations (29 C.F.R. § 2510.3–21(e)), under which an affiliate of a fiduciary would include: (i) any person who directly or indirectly (i.e., through one or more intermediaries) controls, is controlled by, or is under common control with the fiduciary; (ii) any officer, director, partner, employee or relative of the fiduciary; and (iii) any corporation or partnership of which the fiduciary is an officer, director, or partner. (Note, as illustrative of evolving relationships, and of the need for a statement of common

Ch. 15

l in the following ex-
e court's opinion: "Her
that time was one to
sometime in the future
no trust was created.
Bank ["Central"] can-
ble for the violation of
hich did not exist. [¶]
ls purchased after the
ıe trust instrument, a
applies. It is a breach
loyalty for a trustee to
dual property to the
herefore, the National
its duty in purchasing
bonds [for the trust]
[¶] Appellant was en-
ıe National Bank liable
received by it on the
ıd for any loss he suf-
 of the property." Id.
i omitted).

lo attempt is made in
to define the term
use its meaning and
ary from purpose to
n any event, can be
volve over time, as
nt ages without the
f amendment that ex-
 of statutes and reg-
current purposes, an
finition is found in
gulations (29 C.F.R.
 under which an af-
ıciary would include:
who directly or indi-
ough one or more in-
ontrols, is controlled
ler common control
ary; (ii) any officer,
r, employee or rela-
ıciary; and (iii) any
partnership of which
 an officer, director,
te, as illustrative of
nships, and of the
atement of common

law to remain flexible, the regula-
tion's lack of recognition of LLCs.)

### Comment d(1):

"The trial court determined that
[trustee] did not act in bad faith when
voting a salary to herself. Such action
does not appear to have been disad-
vantageous to the trust estate. Clear-
ly, it is within her right to vote the
1,900 shares of stock at the meeting
of company as she deemed for the
best interest of the estate as well as
for the company.... [T]here is noth-
ing of record which would indicate
that the corporation has not pros-
pered under [her] management ...
and nothing to indicate that in any
prior year when [settlor's brother
(and joint manager previously with
settlor)] was managing the company,
it was managed in a more efficient
way than it has since the stockholders
meeting of 1953...." Estate of Koos,
269 Wis. 478, 493, 69 N.W.2d 598, 606
(1955) (affirming).

*Incidental benefit.* The point in the
brief paragraph at the end of this
Comment is articulated by Friendly,
J., in Donovan v. Bierwirth, 680 F.2d
263, 271 (2d Cir. 1982) (ERISA case),
as follows: "Appellants do not con-
tend that these provisions
[§§ 407(a)(3), 408(c)(3)] relieve corpo-

rate officers or directors who are
trustees of a plan of the duties im-
posed by § 404(a) [to act "solely in
the interest of the participants and
beneficiaries" and "for the exclusive
purpose" of providing benefits to
them].... They argue rather that,
despite the words 'sole' and 'exclu-
sive', such officers or directors do not
violate their duties by following a
course of action ... which benefits
the corporation as well as the benefi-
ciaries. [¶]We accept the argument
but not the conclusion which appel-
lants seem to think follows from it.
Although officers of a corporation
who are trustees of its pension plan
do not violate their duties as trustees
by taking action which, after careful
and impartial investigation, they rea-
sonably conclude best to promote the
interests of participants and benefi-
ciaries simply because it incidentally
benefits the corporation or, indeed,
themselves, their decisions must be
made with an eye single to the inter-
ests of the participants and beneficia-
ries. Restatement of Trusts 2d § 170
(1959)."

### Comments e and e(1):

See generally IIA William F.
Fratcher, *Scott on Trusts* §§ 170.6,
170.10, 170.11, 170.21–170.23 (4th ed.
1987).

See also Lincoln National Bank &
Trust Co. v. Shriner's Hospitals, 588
N.E.2d 597 (Ind. App. 1992) (breach
of trust for selling real estate "to a
company owned by [trustee bank's]
advisory director").

With material in these Comments,
compare Uniform Trust Code
§ 802(c) and (e).

With *Illustration 4,* compare the
investment by the trustees of the
Bishop Estate (prior to its notorious
litigation) discussed in Samuel P.
King & Randall W. Roth, *Broken
Trust* 244 (2006): "One prominent ex-
ample of the trustees' investments
was McKenzie Methane, a [closely

§ 78                    TRUSTS                    Ch. 15

held] company that had leases and drilling rights to 150 coal-bed methane gas wells." The trustees' initial investment in McKenzie was $12 million. "Individual trustees also invested millions of their own money in [McKenzie. Later,] more money was needed to prevent a total loss, and then more still. [Before long], the trustees had pumped in additional trust funds totaling $85 million. Eventually the deal was declared a complete loss . . . ."

With *Illustration 5* and dangers of "churning," compare "Pension Consultants Failing to Disclose Conflicts,

Says SEC," 15 Trust Regulatory News 2 (No. 5, May 2005). Compare the duty of a trustee or other fund manager regarding a broker-dealer's "duty of best net-price execution" in Harvey E. Bines & Steve Thel, *Investment Management Law and Regulation* ch. 9 (2d ed. 2004, with 2006 cum. supp.), stating (§ 9.01) that proper executions "can mean the difference between mediocre and superior returns" (at 499) and (at 502) that the duty regarding "best execution actually includes elements of the duty of reasonable care and, [sometimes,] the duty of loyalty."

## Comment e(2):

The leading case of City Bank Farmers Trust Co. v. Cannon, 291 N.Y. 125, 131–132, 51 N.E.2d 674, 675–676 (1943), 157 A.L.R. 1424, reh'g denied, 293 N.Y. 858, 59 N.E.2d 445 (1944), stated: "The standard of loyalty in trust relations does not permit a trustee to create or occupy a position in which he has interests to serve other than the interests of the trust estate. Undivided loyalty is the supreme test. . . . Undivided loyalty [no longer existed in this situation] after affiliation of the trustee ['Trust Company'] and the Bank because of the ownership by the trust of the shares of the Bank. The officers of the trustee responsible for the administration of the trust were under a duty with unremitting loyalty to serve both the interest of the Trust Company and the interest of the trust estate. These were conflicting interests insofar as the trust investment in the . . . Bank shares required decisions whether to hold or to sell the shares in a falling market. The sale of this number of shares might have seriously affected the interests of the Trust Company by depressing the value of these

shares in a rapidly deteriorating market. Consequently the trustee had conflicting interests to serve in deciding to sell or not to sell. We do not for a moment suggest that the trustee did not act in the utmost good faith. Both courts below so found. But that is not enough for, when the trustee has a selfish interest which may be served, the law does not stop to inquire whether the trustee's action or failure to act has been unfairly influenced. It stops the inquiry when the relation is disclosed and sets aside the transaction or refuses to enforce it, and in a proper case, surcharges the trustee for an unauthorized investment. It is only by rigid adherence to these principles that all temptation can be removed from one acting as a fiduciary to serve his own interest when in conflict with the obligations of the trust. . . . The rule is designed to obliterate all divided loyalties which may creep into a fiduciary relationship and utterly destroy their effect by making voidable any transaction in which they appear." (Nevertheless, the court concluded that the trustee could not be held

124

Ch. 15

**SPECIFIC DUTIES OF TRUSTEESHIP**    **§ 78**

Ch. 15

Trust Regulatory
[...]ay 2005). Compare
[...]stee or other fund
[...]g a broker-dealer's
[...]-price execution" in
[...] & Steve Thel, *In-*
*[...]ment Law and Reg-*
[...]ed. 2004, with 2006
[...]ting (§ 9.01) that
[...] "can mean the dif-
[...]nediocre and superi-
[...]9) and (at 502) that
[...]ng "best execution
[...]lements of the duty
[...]e and, [sometimes,]
[...]."

[...] deteriorating mar-
[...]y the trustee had
[...]ts to serve in decid-
[...] to sell. We do not
[...]gest that the trus-
[...]n the utmost good
[...]below so found. But
[...] for, when the trus-
[...]interest which may
[...]v does not stop to
[...]he trustee's action
[...] has been unfairly
[...]s the inquiry when
[...]lisclosed and sets
[...]tion or refuses to
[...] a proper case, sur-
[...]ee for an unautho-
[...]It is only by rigid
[...]e principles that all
[...]removed from one
[...]ry to serve his own
[...]nflict with the obli-
[...]st.... The rule is
[...]ate all divided loy-
[...]reep into a fiducia-
[...]nd utterly destroy
[...]aking voidable any
[...]ich they appear."
[...]e court concluded
[...]could not be held

liable for the loss that followed be-
cause the trust was revocable and the
settlor's personal approval of the
stock after the affiliation "estopped"
all beneficiaries from recovering dam-
ages; the court placed no emphasis on
the trust's rather routine language
authorizing retention of securities "so
long as [the trustee] may deem prop-
er.")

### Comment f:

The court in *Rippey v. Denver
United States National Bank*, 273
F.Supp. 718 (D. Colo. 1967), in hold-
ing the trustee bank liable for dam-
ages resulting from its sale of a block
of newspaper stock at considerably
below the price it might have ob-
tained through more diligent efforts
(but not allowing the sale to be set
aside because of the likely bonafide
status of one of the purchasers), ob-
served: "[I]t does not appear that the
factor of personal friendships (of di-
rectors) was the prevailing element.
It seems more likely that the person-
ality of [a purchaser] who has been
an important and benevolent figure
on the Denver scene together with
reluctance to disturb the status quo
explains the unreasonable Bank ac-
tions. [¶] It is, of course, obvious that
a fiduciary cannot allow personal mo-
tives to interfere with the discharge
of its fiduciary duties. It cannot favor
the interests of third persons and
subordinate the interests of its bene-
ficiaries as it did here.... [¶] In
summary, the reasons advanced for
preferring the [purchasing] group are
not convincing and appear to be in
the nature of afterthought."

The comment to Uniform Prudent
Investor Act § 5 ("Loyalty") is analo-
gous and relevant here. It states:

The duty of loyalty is not limited
to settings entailing self-dealing or

On narrow interpretation of a gen-
eral authorization in a statute or trust
provision, see bank trustee's improp-
er, underdiversified retention of its
own shares in Wood v. U.S. Bank, 160
Ohio App.3d 831, 828 N.E.2d 1072
(2005) (quoting, at 839–840, N.E.2d at
1078, Trusts 3d § 229 [now § 92],
Comment *d*).

conflict of interest in which the
trustee would benefit personally
from the trust....

No form of so-called "social in-
vesting" is consistent with the duty
of loyalty if the investment activity
entails sacrificing the interests of
trust beneficiaries—for example,
by accepting below-market re-
turns—in favor of the interests of
persons supposedly benefited by
pursuing the particular social
cause. [Citations omitted.] Com-
mentators supporting social invest-
ing tend to concede the overriding
force of the duty of loyalty. They
argue instead that particular
schemes of social investing may not
result in below-market returns. [Ci-
tation omitted.] In 1994 the De-
partment of Labor issued an Inter-
pretive Bulletin reviewing its prior
analysis of social investing ques-
tions and reiterating that pension
trust fiduciaries may invest only in
conformity with the prudence and
loyalty standards of ERISA
§§ 403–404. Interpretive Bulletin
94–1, 59 Fed. Regis. 32606 (June
22, 1994), to be codified as 29 CFR
§ 2509.94–1. The Bulletin reminds
fiduciary investors that they are
prohibited from "subordinat[ing]
the interests of participants and
beneficiaries in their retirement in-
come to unrelated objectives."

125

§ 78                            TRUSTS                            Ch. 15

On this subject, see discussion in § 90, Comment c, cross-referenced at the end of the text of Comment f, and also authorities and sources in § 90, Reporter's Note to Comment c.

Not surprisingly, considerable disagreement continues about what loyalty should require in this context. E.g., compare E. Adams & K. Knutsen, "A Charitable Corporate Giving Justification for the Socially Responsible Investment of Pension Funds: A Populist Argument for the Public Use of Private Wealth," 80 Iowa L. Rev. 211 (1995), with John H. Langbein & Bruce A. Wolk, *Pension and Employee Benefit Law* 841–852 (3d ed. 2000). And cases from elsewhere in the common-law world are also not altogether easy to interpret. Cowan v. Scargill [1984] 2 All E.R. 750, standing alone seemed clear enough; National Union of Mineworkers members of the board of trustees of a pension fund sought to limit investments in non-UK corporations and in industries that were directly in competition with coal, but the court noted the overriding duties of trustees to benefit the beneficiaries of the fund, the accompanying duty to take advantage of the full range of authorized investments, and the duty to disregard their own sincerely held social or political reasons for opposing particular investments that might be financially more beneficial to the pension fund. But in Bishop of Oxford v. Church Comm'rs. [1992] 1 W.L.R. 1241, the Commissioners' policy of excluding investments in companies whose business activities were likely to offend, on moral grounds, some members of the Church of England was permissible because of the breadth of alternative investments, although the Commissioners properly refused to adopt a more restrictive policy that would take account of non-financial considerations to such an extent as to cause a significant financial detriment. Compare dictum in Martin v. City of Edinburgh, [1988] S.L.T. 329 (Scotland), opining that the individual trustee must do his best to exercise fair and impartial judgments on the merits of issues arising in the administration of the trust, but in doing so need not ignore his political beliefs and moral, religious, or other conscientiously held principles.

**Comment g:**

Longstanding doctrine was recently quoted with approval in BGJ Assocs., LLC v. Wilson, 113 Cal.App.4th 1217, 1229, 7 Cal.Rptr.3d 140, 149 (2003): " '[I]f a contract is entered into between a trustee and his beneficiary through which the former gains an inequitable advantage, either by reason of inadequacy of consideration or otherwise, the latter is entitled to rescind the contract, subject to the limitations imposed by the law governing the application of this remedy. Such contract, however, is not void, but is voidable at the election of the beneficiary.' (*Estate of Berry* (1925) 195 Cal. 354, 362, 233 P. 330.)"

Matter of Saxton, 274 App. Div. 2d 110, 712 N.Y.S.2d 225 (2000), involved a testamentary trust funded entirely by IBM stock and an agreement sent by the trustee to certain beneficiaries, who signed and thereby acknowledged their desire for the stock to be retained in the trust and that they would hold the bank harmless should the stock decrease in value; in affirming the Surrogate's refusal to give effect to the agreement, the court observed (at 119, N.Y.S.2d at

126

full range of autho-
ts, and the duty to
own sincerely held so-
reasons for opposing
tments that might be
beneficial to the pen-
n Bishop of Oxford v.
rs, [1992] 1 W.L.R.
issioners' policy of ex-
nents in companies
activities were likely
noral grounds, some
e Church of England
le because of the
rnative investments,
mmissioners properly
t a more restrictive
l take account of non-
rations to such an ex-
a significant financial
bare dictum in Martin
burgh, [1988] S.L.T.
ipping that the indi-
must do his best to
l impartial judgments
issues arising in the
of the trust, but in
ot ignore his political
l, religious, or other
held principles.

*tate of Berry* (1925)
, 233 P. 330.)"

ton, 274 App. Div. 2d
d 225 (2000), involved
rust funded entirely
d an agreement sent
to certain beneficia-
d and thereby ac-
desire for the stock
n the trust and that
the bank harmless
decrease in value; in
rrogate's refusal to
he agreement, the
at 119, N.Y.S.2d at

231): "Prior to the instrument being prepared and its subsequent distribution to the [beneficiaries], not a scintilla of evidence indicates that the [trustee fully informed the beneficiaries] of the effects that their execution of the [agreement] would have on their legal rights or how [the retention of the] stock would fall far short of what would have been required of a prudent corporate trustee."

"[U]ndue influence will not be presumed; and [a] presumption of fraud does not arise from the [fiduciary] relationship itself. We note, however,

'that [the principle] is somewhat relaxed in cases where a fiduciary relation exists … and where one has a dominant and controlling force or influence over the other. In such cases, if the superior party obtains a possible benefit, equity raises a presumption against the validity of the transaction or contract, and casts upon such party the burden of proving fairness, honesty, and integrity in the transaction or contract.' " Murphy v. Wakelee, 247 Conn. 396, 405, 721 A.2d 1181, 1186 (1998) (citations omitted).

## § 79.  Duty of Impartiality; Income Productivity

(1) A trustee has a duty to administer the trust in a manner that is impartial with respect to the various beneficiaries of the trust, requiring that:

(a) in investing, protecting, and distributing the trust estate, and in other administrative functions, the trustee must act impartially and with due regard for the diverse beneficial interests created by the terms of the trust; and

(b) in consulting and otherwise communicating with beneficiaries, the trustee must proceed in a manner that fairly reflects the diversity of their concerns and beneficial interests.

(2) If a trust is created for two or more beneficiaries or purposes in succession and if the rights of any beneficiary or the expenditures for a charitable purpose are defined with reference to trust income, the trustee's duty of impartiality includes a duty to so invest and administer the trust, or to so account for principal and income, that the trust estate will produce income that is reasonably appropriate to the purposes of the trust and to the diverse present and future interests of its beneficiaries.

### General Comment:

*a.  Scope of Section and duty.* The rules stated in this Section apply whenever a trust has two or more beneficiaries or purposes, whether the purposes of the trust are private, charitable, or mixed. The duty of impartiality applies whether the beneficiaries' interests or

# Exhibit D

RESTATEMENT OF THE LAW THIRD

———

THE AMERICAN LAW INSTITUTE

———

RESTATEMENT OF THE LAW

# TRUSTS

———

Volume 3
§§ 70 to 92

*As Adopted and Promulgated*

BY

THE AMERICAN LAW INSTITUTE
AT WASHINGTON, D.C.

May 18, 1990 (Prudent Investor Rule, §§ 90–92)

AT PHILADELPHIA, PENNSYLVANIA

May 18, 2005

Tables and Index



ST. PAUL, MN
AMERICAN LAW INSTITUTE PUBLISHERS
2007

Mat #40616959

(5) The last of the above-stated principles of prudence recognizes that, with proper attention to cost concerns, prudent investing may require or at least benefit from expert assistance in investment matters. Thus, the prudent investor rule views delegation from a positive perspective. Nonetheless, the terms and manner of delegation, the competence of agents, and the supervision or monitoring of agents' activities all remain critical aspects of prudence. The need for delegation may be most readily apparent when complicated or challenging investment strategies are pursued by trustees managing large, diverse portfolios. In quite different ways, however, delegation is also likely to be important to nonexpert investors who nevertheless may be well situated and qualified to serve as trustees, as will often be the case with family members or friends. Accordingly, the rule stated in § 90 [1992 § 227] recognizes broad authority to delegate in the prudently exercised discretion of the trustee.

*Significant cross-references.* On powers of trustees in general, see § 85. On prudence generally, see § 77; also cf. § 86. On the trustee's duties of loyalty and impartiality, see respectively § 78 and § 79. On the trustee's general rights and duties with respect to costs, see § 88. On delegation, see § 80, and cf. § 81 (on co-trusteeship).

On the trustee's duty to comply with trust terms and applicable law, see § 76, and cf. § 87 on the effects of instrument language granting "discretion" in the exercise of a trustee's powers.

## § 90 [1992 § 227]. General Standard of Prudent Investment

The trustee has a duty to the beneficiaries to invest and manage the funds of the trust as a prudent investor would, in light of the purposes, terms, distribution requirements, and other circumstances of the trust.

(a) This standard requires the exercise of reasonable care, skill, and caution, and is to be applied to investments not in isolation but in the context of the trust portfolio and as a part of an overall investment strategy, which should incorporate risk and return objectives reasonably suitable to the trust.

(b) In making and implementing investment decisions, the trustee has a duty to diversify the investments of the trust unless, under the circumstances, it is prudent not to do so.

(c) In addition, the trustee must:

(1) conform to fundamental fiduciary duties of loyalty (§ 78) and impartiality (§ 79);

292

f prudence recognizes rudent investing may stance in investment vs delegation from a manner of delegation, monitoring of agents' The need for delega-licated or challenging anaging large, diverse gation is also likely to rtheless may be well vill often be the case ie rule stated in § 90 gate in the prudently

ustees in general, see § 86. On the trustee's ly § 78 and § 79. On ect to costs, see § 88. eship).

terms and applicable instrument language powers.

**lent Investment**

**iaries to invest rudent investor distribution re-e trust.**

**e of reasonable plied to invest-xt of the trust tment strategy, objectives rea-**

**vestment deci-he investments es, it is prudent**

**ciary duties of**

**(2) act with prudence in deciding whether and how to delegate authority and in the selection and supervision of agents (§ 80); and**

**(3) incur only costs that are reasonable in amount and appropriate to the investment responsibilities of the trusteeship (§ 88).**

**(d) The trustee's duties under this Section are subject to the rule of § 91, dealing primarily with contrary investment provisions of a trust or statute.**

**General Comment:**

*a. Scope of the rule.* Except as otherwise provided by the terms of the trust (see §§ 4 and 91), the trustee has a duty to preserve the trust property (see § 76, Comment *d*) and to make it productive (see § 76, Comment *e*). In doing so the trustee must exercise reasonable care, skill, and caution (§ 77) and must act with undivided loyalty to the beneficiaries (§ 78) and with impartiality among them (§ 79). This Chapter deals with the trustee's performance of these duties in making and reviewing investments.

The prudent investor rule stated in this Section is an extension and clarification of the traditional, so-called "prudent man rule" originally articulated by the Massachusetts Supreme Judicial Court and followed by most states in the recent past. The prudent investor rule or an earlier but comparable rule has been adopted by statute in nearly all jurisdictions. (See Forenote to this Chapter.) In several states, the investment authority of trustees remains or may remain somewhat more restricted, at least for some trustees. See § 91.

Several bodies of state and federal legislation dealing with various types of charitable, pension, or public funds have for several decades incorporated rules more or less similar to the prudent investor rule. See § 91. The principles of this Section are generally appropriate to those statutory rules, both by analogy and when those rules incorporate general principles of trust law. Specific provisions and special circumstances or relationships involved in the application of those statutory rules, however, may present different considerations. See, e.g., discussion of the ERISA statute in the Reporter's General Note.

In the absence of a contrary statutory provision, a trustee may generally invest in such properties and in such manner as expressly or impliedly authorized by the terms of the trust. Assuming no contrary trust provision, however, the rule of this Section describes the nature of the investment authority and duties normally to be implied.

§ 90                         TRUSTS                         Ch. 17

Illustrations:

     1.  The will of S left her residuary estate to T and T's successors, in trust, "to hold, manage, sell, invest and reinvest and to pay all of the net income, plus such amounts of principal as the trustee shall deem appropriate, to L for life, with the remainder at L's death to be distributed to those of my issue who are then living, such issue to take by right of representation." No investment provisions or powers are included in the will. Under this will, T's duties and authority with respect to trust investments are those prescribed by the prudent investor rule of this Section.

     2.  The same facts as in Illustration 1, except that the trust provision of S's residuary clause contains the following additional language: " ... by right of representation; provided, however, that the trustee shall not invest any portion of the trust estate in real property." Subject to this expressed restriction on T's investment authority, which T must obey in the absence of extraordinary circumstances (see § 66), T's remaining duties and authority in investing the funds of this trust are those of the prudent investor rule set out in this Section.

The Comments that follow in this Section describe how the trustee's general fiduciary duties apply to the investment function (Comments b through e), then explain the trustee's specific responsibilities in regard to risk, diversification, impartiality, and delegation (Comments f through j), and finally discuss principles and legally relevant considerations applicable to specific types of investments and courses of action (Comments k through p). The significance and effects of particular investment provisions that may appear in legislation or in the terms of a trust are considered in § 91. The influence an existing portfolio of investments may have on the trustee's duties, especially at the start of administration, is discussed in § 92.

The Reporter's General Note on this Section (§ 90), Comments e through h, briefly discusses investment principles that may be helpful in understanding the legal principles in the rules and commentary. That discussion attempts to provide an introduction to investment concepts and strategies and to the nature and significance of such concepts as risk, diversification, and capital-market efficiency.

**Comment on Basic Duties of the Prudent Investor:**

    *b.  Duty to conform to fiduciary standards.* Trustees have a general fiduciary duty to comply with the terms of their trusts. See § 91, and more generally § 76. The nature and extent of a trustee's duties and powers are primarily determined by the terms of the trust. See §§ 70 and 85. The phrase "terms of the trust" is broadly defined

estate to T and T's
nvest and reinvest and
nts of principal as the
e, with the remainder
ny issue who are then
sentation." No invest-
 the will. Under this
 trust investments are
 rule of this Section.

, except that the trust
ne following additional
n; provided, however,
 of the trust estate in
striction on T's invest-
 absence of extraordi-
g duties and authority
those of the prudent

on describe how the
e investment function
e's specific responsibil-
iality, and delegation
orinciples and legally
es of investments and
ignificance and effects
ear in legislation or in
 influence an existing
's duties, especially at

n (§ 90), Comments *e*
s that may be helpful
les and commentary.
uction to investment
 significance of such
t efficiency.

stor:

*ds.* Trustees have a
s of their trusts. See
 extent of a trustee's
he terms of the trust.
st" is broadly defined

to include intentions of the settlor manifested in any way that admits of proof in a judicial proceeding. See generally § 4. Thus, the trust terms, expressed and implied, may be derived from written or spoken words, circumstances surrounding the establishment of the trust, and sometimes statutory language that is automatically imported into trusts or by which some trusts are established. Id., Comments *a* and *g*. The terms may also be affected by subsequent modifications and by limitations imposed by applicable law. See § 76, Comment *b(1)*.

In managing investments, as in other matters relating to the administration of the trust, the trustee must adhere to fundamental fiduciary standards. See generally the basic standards referred to in §§ 70 and 86 and set out in Chapter 15 (§§ 76 through 84); and that cost-conscious management is fundamental to prudence in the investment function, see Introductory Note to this Chapter ("*Principles of Prudence,*" item (3)), Reporter's General Note (and also Additional Notes) on Comments *e* through *h*, Reporter's Note on Comment *m*, and, more generally § 88. The trustee's duties apply not only in making investments but also in monitoring and reviewing investments, which is to be done in a manner that is reasonable and appropriate to the particular investments, courses of action, and strategies involved.

The trustee's compliance with these fiduciary standards is to be judged as of the time the investment decision in question was made, not with the benefit of hindsight or by taking account of developments that occurred after the time of a decision to make, retain, or sell an investment. The question of whether a breach of trust has occurred turns on the prudence and propriety of the trustee's conduct, not on the eventual results of investment decisions. The trustee is not a guarantor of the trust's investment performance. See § 77 and more generally Chapter 19.

**Illustrations:**

    3.  Under the same facts as in Illustration 1, above, T invests the funds of the trust with the required degree of care, skill, and caution in short-term and intermediate-term Treasury securities and in several mutual funds holding corporate stocks. The combination is suitable to the circumstances and purposes of the trust. As a result of general market and economic conditions, the value of all of the mutual-fund shares declines suddenly during the second year of the trust. T is not liable for the losses sustained by the trust, even though some trustees and many other investors suffered lesser or no net losses as a result of the same market events during the same period.

    4.  Under the same set of facts as in Illustration 3, the sudden initial decline in the value of the shares is followed by an

§ 90                              TRUSTS                          Ch. 17

eight-month period of a generally declining market that continues to have adverse overall effects on the value of the trust estate. Early in this period and at various times during the period, many investors (including many other trustees) sell their holdings in investments similar to the mutual-fund holdings retained by T, investing instead in short-term debt instruments. These investors thereby avoid much of the loss sustained by S's testamentary trust. T, however, reasonably concludes that it is wise to retain the mutual-fund shares in which substantial losses of value are eventually sustained. T is not liable for the losses that followed from these reasonable judgments that, in retrospect, prove disadvantageous.

5. The same facts as in Illustration 2, above (a simple residuary trust with a special prohibition against investing in real estate). T invests some of the funds of the trust in carefully selected real-estate investments. T was advised that these investments had a good, established record of earnings, represented an excellent investment opportunity, and would contribute to meeting the trust's needs for diversification and a long-term hedge against inflation (see Comment o, below). This advice came from experienced, competent sources of investment advice. T conscientiously considered and understood and carefully examined this advice and the available investment alternatives before deciding that the investments would serve the best interests of the trust and its beneficiaries. There are no circumstances present that would have justified a court order authorizing deviation from the terms of the trust under § 66. (See Comment e of § 91.) T is liable for any resulting loss from the investment, because T committed a breach of trust in not respecting the trust provision expressly limiting her investment authority. This is so even though the causes of the loss were not foreseeable and even though T acted in a manner that would have been reasonable but for the express prohibition in the trust terms. See § 91(b).

On the effects of legal and other advice concerning a trustee's investment powers and duties and advice concerning the exercise of those powers and the performance of those duties, see § 77, Comment b(2), and compare § 93.

On the meaning of "loss" resulting to the trust estate when a trustee has committed a breach of trust, see Chapter 19.

c. *General requirements of loyalty and impartiality.* Under the prudent investor rule, the trustee must act with undivided loyalty and solely in the interests of the beneficiaries. See § 78. It is therefore a breach of duty, for example, to make a trust investment by purchasing

296

; market that continues
ue of the trust estate.
uring the period, many
sell their holdings in
oldings retained by T,
ments. These investors
l by S's testamentary
lat it is wise to retain
ial losses of value are
ie losses that followed
etrospect, prove disad-

1 2, above (a simple
rainst investing in real
the trust in carefully
ised that these invest-
nings, represented an
contribute to meeting
ng-term hedge against
ice came from experi-
rice. T conscientiously
mined this advice and
re deciding that the
of the trust and its
esent that would have
from the terms of the
.) T is liable for any
T committed a breach
on expressly limiting
ugh the causes of the
T acted in a manner
express prohibition in

ncerning a trustee's
ning the exercise of
, see § 77, Comment

trust estate when a
ter 19.

artiality. Under the
ndivided loyalty and
78. It is therefore a
ment by purchasing

property owned by the trustee individually. As to the associated general duty to earmark investments made as trustee, see § 84.

The strict duty of loyalty in the trust law ordinarily prohibits the trustee from investing or managing trust investments in a manner that will give rise to a personal conflict of interest. See, e.g., § 78, Comments d-e(2). The prohibition also applies to investing in a manner that is intended to serve interests other than those of the beneficiaries or the purposes of the settlor. Id., Comment f.

Thus, for example, in managing the investments of a trust, the trustee's decisions ordinarily must not be motivated by a purpose of advancing or expressing the trustee's personal views concerning social or political issues or causes. Such considerations, however, may properly influence the investment decisions of a trustee to the extent permitted by the terms of the trust or by consent of the beneficiaries. (On the latter, see §§ 65 and 97; also compare (on the duty of impartiality) Comment i, below, and § 79.) In addition, social considerations may be taken into account in investing the funds of charitable trusts to the extent the charitable purposes would justify an expenditure of trust funds for the social issue or cause in question or to the extent the investment decision can be justified on grounds of advancing, financially or operationally, a charitable activity conducted by the trust. See Reporter's Note. See also § 78, Reporter's Note to Comment f.

Unlike the financial and other personal interests of the trustee, the divergent economic interests of trust beneficiaries give rise to conflicts of types that cannot simply be prohibited or avoided in the investment decisions of typical trusts. These problems regularly present the trustee with problems of conflicting obligations to diverse beneficiaries. (See generally § 79 on the duty of impartiality.) The interests of a life-income beneficiary, for example, are almost inherently in competition with those of the remainder beneficiaries, especially in light of the risks of inflation; and the different tax circumstances of the various beneficiaries frequently create competing investment preferences, among concurrent as well as successive beneficiaries (id., Comment a).

These conflicting fiduciary obligations result in a necessarily flexible and somewhat indefinite duty of impartiality. The duty therefore requires the trustee to balance the competing interests of differently situated beneficiaries in a fair and reasonable manner. See § 79, Comment b. With respect to the trust investment function, see id., Comments c-i, and particularly the discussion and Illustrations (infra) in Comment i of this Section.

§ 90 TRUSTS Ch. 17

Ch. 17

**Illustrations:**

6. T is trustee of a trust that is to pay its net income to L for life and to distribute the remainder on L's death to R or R's then living issue by right of representation. Some trust funds are available for short-term investment pending a forthcoming distribution to L. T, in good faith, concludes that the most efficient and rewarding temporary investment of these funds is a loan to herself personally, for which T (who is an excellent risk) is prepared to pay a higher rate of interest than normally available on a short-term basis. This is an improper investment for the trust, because it violates T's duty of undivided loyalty. T is therefore liable to the trust for any personal profits derived from the use of these funds, and for any losses suffered by the trust estate as a result of this loan investment.

7. T is trustee of a trust to pay income to A for life, remainder to B if then living and if not then by right of representation to B's issue who are then living. T invests the trust funds in investments of a type that, despite the broad range of yields that might be appropriate to particular trusts (see Comment *i*, below), appear unduly to favor A's interest in receiving a high income at the expense of the B family's interest in having corpus protected against loss of purchasing power. This constitutes a breach of T's duty of impartiality (see Comment *i*, below) in the absence of satisfactory explanation.

Such an explanation might be based, for example, on the terms and purposes of the trust, including A's needs as they may properly relate to those purposes. See generally § 79, Comments *b* and *g-g(2)*. Even with such a justification, the trustee should recognize that in inflationary times a high-yield and low-growth (or no-growth) investment strategy, adhered to over a long period, would pose a risk not only to principal interests but also with respect to a life beneficiary's future security; the effects of such a strategy would be comparable to a regular practice of invading principal. See also the possibility of a different investment strategy accompanied by an equitable (or statutory) adjustment as described in Comment *i* of § 79.

**Illustration:**

8. Under a trust similar to that in Illustration 7, above, T invests the trust funds in a manner that appears unduly to favor growth of principal at the expense of the life beneficiary's interest in income. This is a breach of T's duty of impartiality (see Comment *i*, below) in the absence of satisfactory explanation (see generally § 79, Comments *b* and *g-g(1)*), possibly accompanied by equitable (or statutory) adjustment (see id., Comment *i*).

298

*d. General requirements of care and skill.* The duty of care requires the trustee to exercise reasonable effort and diligence in making and monitoring investments for the trust, with attention to the trust's objectives. The trustee has a related duty of care in keeping informed of rights and opportunities associated with those investments.

The trustee must give reasonably careful consideration to both the formulation and the implementation of an appropriate investment strategy, with investments to be selected and reviewed in a manner reasonably appropriate to that strategy. Ordinarily this involves obtaining relevant information about such matters as the circumstances and requirements of the trust and its beneficiaries, the contents and resources of the trust estate, and the nature and characteristics of available investment alternatives. To the extent necessary or appropriate to the making of informed investment judgments by the particular trustee, care also involves securing and considering the advice of others on a reasonable basis. It is ordinarily satisfactory that this information and advice be obtained from sources on which prudent investors in the community customarily rely. See generally § 77.

The exercise of care alone is not sufficient, however, because a trustee is liable for losses resulting from failure to use the skill of an individual of ordinary intelligence (§ 77). This is so despite the careful use of all the skill of which the particular trustee is capable. On the duty therefore (as an aspect of prudence) to seek necessary assistance, through delegation or by obtaining advice, see infra this Comment and also § 77, Comment b.

On the other hand, it follows from the requirement of care as well as from sound policy that, if the trustee possesses a degree of skill greater than that of an individual of ordinary intelligence, the trustee is liable for a loss that results from failure to make reasonably diligent use of that skill. So also, if a trustee, such as a corporate or professional fiduciary, procured appointment as trustee by expressly or impliedly representing that it possessed greater skill than that of an individual of ordinary intelligence, or if the trustee has or represents that it has special facilities for investment management, the trustee is liable for a loss that results from failure to make reasonably diligent use of that skill or of those special facilities. See § 77(3) and id., Comment e.

The duty to exercise both care and skill in investment management may require knowledge and experience greater than that of an individual of ordinary intelligence, depending on the investment strategy to be employed. This does not prevent an ordinarily intelligent person from serving as a trustee. In that role, however, such a person

299

§ 90                    TRUSTS                    Ch. 17

may have to take reasonable steps to obtain sufficient competent advice, guidance, and assistance in order to meet the standards of this Section and to formulate and implement a prudent investment strategy for the particular trust. (Also, see Comments *h* and *m*, below, on the use of mutual funds and other investment pools.) In addition, a person who serves as trustee should be capable of reasonably understanding the basic duties of prudent trusteeship. Simple, written guidelines prepared by legal counsel may be helpful for reference or presentation by an inexperienced trustee when conferring with an investment adviser.

The standards of trusteeship are neither excessively demanding nor monolithic. They should neither effectively preclude service by conscientious family members and friends nor permit casual, inattentive behavior by trustees who can, because of their expertise, meet a higher than ordinary standard of conduct and competence. Thus, the applicable requirements of care and skill allow responsible individuals of ordinary intelligence to serve as trustees and to adopt reasonable investment strategies of types that are appropriate to their skills. Yet the standards require fiduciaries possessing special facilities and skills to make those advantages available to the trust and its beneficiaries.

Beyond this, the prudent investor rule, with its adaptable requirements of care and skill and its flexible standard of caution (Comment *c*, below), does not prevent trustees from prudently pursuing an expectedly rewarding investment strategy merely because that strategy is highly demanding, provided it is appropriate both to the purposes and circumstances of the trust and to the skills possessed by or available to the trustee. In the implementation of a permissible investment strategy, the trustee has the power and may have a duty to delegate authority to others, as a prudent investor would in the circumstances. See particularly Comment *j*, below. In so delegating, the trustee must exercise appropriate care and skill in selecting, instructing, and supervising or monitoring agents and in determining the degree and terms of the delegation. See generally § 80.

**Illustration:**

9.   A portion of A's residuary estate was left in trust to help provide for the widow and children of A's deceased son, S, until the youngest child of S reaches age 24. At that time, the trust estate is to be distributed by right of representation to S's then living descendants. The will names A's other son, T, as trustee. T is a successful young chemist with a pharmaceutical company and is well acquainted with and trusted by the beneficiaries, but he has no experience with investment matters. It appears that T is

300

§ ...

Ch. 17

to obtain sufficient competen-
er to meet the standards of this
nt a prudent investment strat-
Comments h and m, below, on
vestment pools.) In addition
e capable of reasonably unde-
t trusteeship. Simple, written
may be helpful for reference or
stee when conferring with an

neither excessively demanding
effectively preclude service by
nds nor permit casual, inatten-
cause of their expertise, meet
luct and competence. Thus, the
ill allow responsible individual
ustees and to adopt reasonable
e appropriate to their skills. Yet
ssing special facilities and skill
the trust and its beneficiaries.

rule, with its adaptable require-
standard of caution (Comment
s from prudently pursuing an
egy merely because that strat-
s appropriate both to the par-
nd to the skills possessed by
plementation of a permissible
e power and may have a duty to
prudent investor would in the
ent j, below. In so delegating
te care and skill in selecting
ring agents and in determining
. See generally § 80.

y estate was left in trust to ben-
en of A's deceased son, S, until
age 24. At that time, the trust
ht of representation to S's heir
s A's other son, T, as trustee.
a pharmaceutical company and
ed by the beneficiaries, but
nt matters. It appears that T

---

Ch. 17

## INVESTMENT OF TRUST FUNDS § 90

qualified to serve as trustee; the facts do not suggest that he lacks the skill to which he will be held in that capacity.

In the above Illustration, T may need instruction and guidance from responsible legal and financial advisers on the nature of his investment duties (as well as other fiduciary duties) and on the performance of these duties. He should become reasonably aware of such matters as the importance of diversification, the meaning of caution in risk taking and investment strategy, the need for attention and relevant information in making investment decisions, and the possibilities of assistance through delegation (see Comment j, below, and § 80). The cost of advice in these matters, as reasonably necessary to T's needs as trustee, may be paid or reimbursed from the trust estate. See § 88, Comment c. On the effects of relying on agents, see § 80(2) and especially id., Comment g.

Illustration:

10. The same facts as in Illustration 9, except that, instead of son T, a trust company was named as trustee. This trustee has a duty to make use of facilities and to exercise a degree of skill consistent with the facilities and skills possessed, or those actually or impliedly represented to be possessed, by the trust company. This would include both professional sensitivity to the duty of caution and professional sophistication in establishing and implementing an appropriate investment strategy for the trust for the benefit of S's family.

If both son T and a trust company or professional fiduciary had been appointed as co-trustees of the trust in Illustrations 9 and 10, differing standards of skill would be imposed so that the applicable standard would be that appropriate to each co-trustee. On the exercise of fiduciary powers by multiple trustees, see § 39; on the duty of each to participate in the administration of the trust and to prevent (or to compel redress of) a breach of trust by a co-trustee, see § 81; and on delegation between or among co-trustees, see Comment c(1) of § 81. The authority and responsibilities of co-trustees may be divided or otherwise modified by the terms of the trust. See § 81, Comment b. Questions of fault, liability, contribution, and indemnity among co-trustees are discussed in Chapter 19.

e. General requirement of caution. In addition to the duty to use care and skill, the trustee must exercise the caution of a prudent investor managing similar funds, in similar circumstances, for similar purposes. See § 77, Comment b. And see discussion in the Reporter's Note to this Comment e. In the absence of contrary provisions in the terms of the trust, this requirement of caution requires the trustee to

301

invest with a view both to safety of the capital and to securing a reasonable return. See generally § 79 on the duty of impartiality.

"Safety" of capital includes not only the objective of protecting the trust property from the risk of loss of nominal value but, ordinarily, also a goal of preserving its real value—that is, seeking to avoid or reduce loss of the trust estate's purchasing power as a result of inflation. This objective will also normally tend to protect the purchasing power of the income flow in the future.

Reasonable "return" refers to total return, including capital appreciation and gain as well as trust-accounting income. Thus, return objectives and safety of capital are at least partially interrelated. The capital-growth element of these return objectives, however, is not necessarily confined to the preservation of purchasing power, but may extend to growth in the real value of principal in appropriate cases.

In balancing the return objectives between flow of income and growth of principal, the investment emphasis depends not only on the purposes and distribution requirements of the trust but also on its other circumstances and specific terms, such as the beneficiaries' tax positions and whether the trustee has power to invade principal. On income productivity generally and on the duty of impartiality, see Comment *i*, below, and § 79(2) and id., Comments *e-i*.

It is virtually inevitable that in some periods the trustee will be unable to succeed in the effort to preserve purchasing power. It is also to be expected that the pursuit of this objective carries with it some increase in risk.

*e(1). Risk management.* All investments, even the nominally excepted short-term U.S. Treasury securities, and all investment strategies involve some risk in the comprehensive sense of possible loss of real, inflation-adjusted value. Therefore, the duty of caution does not call for avoidance of risk by trustees but for their prudent management of risk. For these purposes, risk management is concerned with more than failure of collection and loss of dollar value. It takes account of all hazards that may follow from inflation, volatility of price and yield, lack of liquidity, and the like.

Insofar as the term "risk" is used (as it commonly is in economic literature) to refer to volatility of return, risk management by a trustee requires that careful attention be given to the particular trust's risk tolerance, that is, to its tolerance for volatility. Risk tolerance largely depends on a combination of the regular distribution requirements of the trust and any irregular distributions that may in fact become necessary or appropriate. These obligations in turn are likely, depending on the terms of the trust, to be affected by the needs of one or more of the beneficiaries. Thus, these various distribution require-

Ch. 17  INVESTMENT OF TRUST FUNDS  § 90

ments facing the trustee effectively serve to define the consequences of the volatility risk with respect to a particular trust.

In understanding a trustee's duties with respect to the management of risk, it is useful to distinguish between diversifiable (or "uncompensated") risk and market (or nondiversifiable) risk that is, in effect, compensated through pricing in the marketplace. The distinction is useful in considering fiduciary responsibilities both in setting risk-level objectives and in diversification of the trust portfolio.

In the absence of contrary statute or trust provision, the requirement of caution ordinarily imposes a duty to use reasonable care and skill in an effort to minimize or at least reduce diversifiable risks. Often called nonmarket risk, or somewhat less precisely "specific" or "unique" risk, these are risks that can be reduced through proper diversification of a portfolio. Because market pricing cannot be expected to recognize and reward a particular investor's failure to diversify, a trustee's acceptance of this type of risk cannot, without more, be justified on grounds of enhancing expected return. What has come to be called "modern portfolio theory" offers an instructive conceptual framework for understanding and attempting to cope with nonmarket risk. The trustee's normal duty to diversify in a reasonable manner, however, is not derived from or legally defined by the principles of any particular theory. See Reporter's General Note on Comments *e* through *h* for discussions of asset pricing, types of risk, and the advantages of diversification.

Another aspect of risk management deals with market risk, often called "systemic" or "systematic" risk, or more descriptively for present purposes, simply nondiversifiable or compensated risk. The trustee's duties and objectives with respect to this second category of risk are not as distinct as those with respect to diversifiable risks. They involve quite subjective judgments that are essentially unavoidable in the process of asset management, addressing the appropriate degree of risk to be undertaken in pursuit of a higher or lower level of expected return from the trust portfolio. In this respect the trustee must take account of the element of conservatism that is ordinarily implicit in the prudent investor rule's duty of caution. Opportunities for gain, however, normally bear a direct relationship to the degree of compensated risk. Thus, although an inferred, general duty to invest conservatively is a traditional and accepted feature of trust law, that duty is necessarily imprecise in its requirements and is applied with considerable flexibility. (Despite the flexibility of the trustee's duty in this respect, it is often possible to obtain useful and, in a sense, objective information about degrees of risk associated with a stock or bond or with a portfolio of securities. See Reporter's Notes.)

303

§ 90                              TRUSTS                              Ch. 17

Ch. 17

For purposes of understanding and applying the fiduciary duty of prudent investing, it is essential to recognize that compensated risk is not inherently bad. Therefore, no objective, general legal standard can be set for a degree of risk that is or is not prudent under the rule of this Section. Beneficiaries can be disserved by undue conservatism as well as by excessive risk-taking. Decisions concerning a prudent or suitable level of market risk for a particular trust can be reached only after thoughtful consideration of its purposes and all of the relevant trust and beneficiary circumstances. This process includes, for example, balancing the trust's return requirements with its tolerance for volatility. See Reporter's General Note on Comments *e* through *h*.

If a trust cannot tolerate adverse outcomes in the short run, the trustee should not adopt a high risk-reward strategy. The principal reason for flexible application of the duty of caution is that trusts differ considerably in their risk-bearing capacities, as well as in their purposes. Risk tolerances also vary from time to time during the life of most trusts, especially private trusts, shifting with the likelihood and proximity of having to liquidate holdings in order to meet major (certain or uncertain) trust obligations.

Normally, in investing the funds of a trust, the trustee's strategy must make preservation of the trust estate (including its purchasing power) a significant consideration. In most trust situations (see Comment *i*, below, and also § 79), the amount and stability of income (again, normally including its purchasing power) must also be given serious consideration.

As a result of the duty of caution and a duty to be cost-conscious (§ 88), the typical trustee's asset-management program generally emphasizes long-term investment. Changes in a company's circumstances, adaptation to trust- and capital-market developments, fine-tuning, and the like may, of course, justify the selling and buying of properties as an aspect of a prudent plan of asset allocation and diversification (see Comment *g*, below). This is consistent with the trustee's ongoing duty to monitor investments and to make portfolio adjustments if and as appropriate, with attention to all relevant considerations, including tax consequences and other costs associated with such transactions.

The usual emphasis on long-term investing, however, does not prevent the use of active management strategies. Nor does it necessarily preclude a trust investment strategy that makes competent use of investments or techniques that are often characterized as risky or "speculative." Such investments (for example, real estate and venture capital) or techniques (for example, borrowing and options or futures transactions) are not prohibited as long as they are employed in a manner that is prudently designed to reduce the overall risk of the

304

Ch. 17

the fiduciary duty of
compensated risk is
l legal standard can
t under the rule of
ue conservatism as
ning a prudent or
n be reached only
ll of the relevant
cludes, for exam-
its tolerance for
ts *e* through *h*.

ie short run, the
y. The principal
n is that trusts
well as in their
uring the life of
likelihood and
o meet major

tee's strategy
s purchasing
ns (see Com-
y of income
lso be given

st-conscious
nerally em-
umstances,
uning, and
perties as
ation (see
oing duty
if and as
ding tax
s.

loes not
ecessar-
use of
isky or
renture
utures
l in a
of the

Ch. 17          INVESTMENT OF TRUST FUNDS          § 90

trust portfolio or to allow the trust, in appropriate circumstances, to achieve a higher return expectation without a disproportionate increase in the overall level of portfolio risk. Furthermore, although it is ordinarily helpful in justifying the reasonableness of a trustee's conduct to show that an investment or strategy is widely used by trustees in comparable trust situations, the absence of such use does not render imprudent the informed, careful use of unconventional assets or techniques.

In short, the prudent investor rule, despite its requirement of caution, does not classify specific investments or courses of action as prudent or imprudent in the abstract. The rule recognizes that what may be underproductive of trust accounting income or risky—or even characterized as speculative—in isolation, or in a different context, may play a role in an investment strategy that contributes to the trustee's compliance with the requirement of caution. See Reporter's Notes and Comment *g*, below.

Although a general requirement of conservatism in investing is normally inferred from the duty to use caution, the degree of conservatism required and thus the degree of risk permitted for a particular trust is ultimately a matter for interpretation and judgment. This requires that a trustee make reasonable efforts to ascertain the purposes of the trust and to understand the types of investments suitable to those purposes in light of all the relevant circumstances. These investment judgments may also be affected by the fact that a special type of trust is involved, such as certain pension funds and charitable trusts.

Unfortunately, it is much easier to acknowledge the importance of trust purposes than it is to identify them with a specificity that would provide clear guidance in setting trust investment objectives. As a result, especially but not solely with regard to private trusts, the degree-of-risk question sometimes has to be dealt with rather abstractly. It is, however, generally approached with a conservative bias.

Despite variations and flexibility in all of these matters, one pervasive generalization prevails concerning the prudent investor's duty of caution: reasonably sound diversification is fundamental to the management of risk, regardless of the level of conservatism or risk appropriate to the trust in question. Therefore, trustees ordinarily have a duty to diversify investments. See Comment *g*, below. The purpose of diversification (apart from the role it may play in discharging the trustee's duty of impartiality) is not only to moderate risks that are inherent in investing but also to reduce risks that are not justified by some prospect of gain.

305

# Exhibit E

Advanced litigation risk management for the corporate fiduciary
Case 3:08-cv-02705-JSW    Document 40-8    Filed 09/05/2008    Page 2 of 8
Page 1 of 7



Print page | Close window

# Publications

## Advanced litigation risk management for the corporate fiduciary

**Trusts & Estates**

**Publication Date: May 01, 2001**

**Author: Arnold, Roy W.**

**Author: Jordan, Gregory B.**

**Author: Napolitano, Perry A.**

HEADNOTE

While they should not become overly cautious in this litigious society, corporate fiduciaries can effectively manage the litigation risks as a part of their overall quality management efforts and training. In so doing, the delicate balance needed to achieve "profitable fee income" can be more readily achieved with sensitivity to the potential litigation risks.

ABSTRACT

One of the most dramatic changes affecting corporate fiduciaries that has evolved over recent years relates to their increased level of sophistication with respect to pooled investment vehicles, particularly affiliated mutual funds. Measures to take to reduce litigation risks are discussed. While they should not become overly cautious in this litigious society, corporate fiduciaries can effectively manage the litigation risks as part of their overall quality management efforts and training. In doing so, the delicate balance needed to achieve "profitable fee income" can become more readily achieved with sensitivity to the potential litigation risks.

**BODY**

In a June 1, 1996 essay entitled "Incorporating Profitability into the Bank Trust Department," the commentator begins with a seemingly innocuous observation: "It has become increasingly important to go beyond mere fee income in the trust area - profitable fee income is now key."' The author then argues for the proposition that a bank's fee schedules, in a rapidly developing and sophisticated investment market, must be reviewed to "appropriately compensate the bank for its work." According to him, bank management must educate its trust staff "about which types of accounts are most profitable," and the sales staff "should sell what is most profitable to the bank not what is the easiest to sell." He concludes:

In order to meet the profitability levels bank management set for trust groups, we have to effectively manage all of these issues.We must price our products and services profitably and not be concerned about charging fairly for the services we provide.

For every corporate fiduciary enticed by the invitation to "price [your] products and services profitably and [don't] be concerned about charging fairly for the services," be warned: the courts and bank regulatory agencies will evaluate today's approach to investment services pursuant fiduciary standards developed years ago, which, the courts will remind you, are "higher than the morals of the marketplace."2

One of the most dramatic changes affecting corporate fiduciaries that has evolved over recent years relates to their increased level of sophistication with respect to pooled investment vehicles. Affiliated mutual funds, rather than traditional common trust funds, have emerged as the pooled investment vehicle of choice. Indeed, by recent count, 13 of the top 20 banks in the United States by discretionary assets had reportedly converted or were considering conversion of their common trust funds to affiliated mutual funds.

Today, in this era of financial supermarkets and rapid industry consolidation, there is no better opportunity to discuss effective litigation risk management than with respect to a corporate trustee's use of affiliated mutual funds, particularly in connection the conversion of common trust funds.

Now, since we are trial lawyers, we are not offering the roadmap for compliance with the maze of fee, disclosure and tax statutes which may be triggered by common trust fund conversions. For that, you should consult with our trust law colleagues.

We have been asked to address the means by which prudent fiduciaries faced with a desire to provide the benefits of mutual funds can reduce the risk that they will find themselves defending a class action complaint and, if they are sued, some measures that may increase the likelihood of a favorable outcome at the earliest possible stage of the litigation. Unfortunately, fiduciary compensation and other trust law issues may be decided by a court that lacks experience and expertise in the field, magnifying litigation risks. Corporate fiduciaries must be proactive in guarding against challenges by creative plaintiff attorneys who seek to have the wrong court decide such important cases.

**Case Study: Conversion of Common Trust Funds to Mutual Funds**

Several plaintiffs' class-action lawyers already have filed highly publicized complaints against First National Bank of Chicago ("First Chicago") in Illinois and First Union in Pennsylvania. Claims have ranged from breach of fiduciary duty to breach of contract to consumer fraud. They seek disgorgement of fees, compensatory damages for allegedly wrongful capital gains tax liability, rescissory relief and attorneys' fees.

In the first case, which was filed in Illinois state court, the complaint alleges that in early 1995 First Chicago converted plaintiffs' trust assets from common trust funds to mutual funds. The conversion allegedly involved $1.3 billion in assets. Plaintiffs claim that the bank was improperly motivated by its desire to use common trust fund assets as "seed money" to launch a family of proprietary mutual funds. They claim to have suffered damages in the form of capital gains taxes triggered by the conversion and by the assessment of higher fees.

In the second case, the plaintiffs sued First Union in state court in Philadelphia County, Pennsylvania - a burgeoning hotbed of plaintiffs' class action filings. The complaint alleges that in late 1997 and early 1998 First Union acquired Signet Bank and Corestates becoming the trustee of 21 common trust funds. Plaintiffs claim that the notices sent out by First Union in connection with a conversion promised that the conversion would be accomplished without any federal income tax liability.

Notwithstanding vigorous challenges to these complaints, the actions have survived dismissal and are heading toward battles over class certification.

Separately, a recent press report suggests that the son of a famed diamond jeweler in New York has hired David Boies, who represented the government in its antitrust case against Microsoft, to pursue a class action against Bankers Trust in connection with an alleged practice of liquidating equities and transferring the proceeds into higher fee, proprietary mutual funds. By seeking class-action status, plaintiffs hope to turn what might be a small dispute into a case potentially involving millions of dollars.

In recent years, bank trust departments have often determined that they desire to improve service and results for their clients by capturing the advantages of mutual funds over common trust funds. In doing so, the bank has a legitimate and proper interests in serving the interests of the beneficiaries, providing the beneficiaries with the benefits of mutual funds and in obtaining appropriate compensation. Typically, the bank serves as a fiduciary for the common trust funds and, accordingly, must discharge its common-law fiduciary duties.

In all but two states, statutory exceptions to the strict common law duty of loyalty have been enacted which permit fiduciary investment in affiliated mutual funds. While such statutes may vary widely, each typically permits fiduciary funds to be invested in an affiliated mutual fund if the compensation received by the trustee or other fiduciary from the mutual fund is "reasonable" and the fiduciary makes adequate disclosure to the beneficiaries.

This authorization, however, should not be viewed as a blanket waiver of a fiduciary's duty of loyalty in this context, but rather as a relaxation of the common law's traditional

per se ban on such investments. In evaluating the prudence of such investments, the corporate fiduciary should consider the appropriateness of mutual funds as an investment and the advantages of proprietary funds over third-party funds. The touchstone issue is the best interests of the beneficiaries.

Assuming that associated fees are reasonable, which will be briefly discussed below, affiliated mutual funds provide significant benefits to fiduciary accounts and beneficiaries. Such benefits include, but are not necessarily limited to: 1) low-cost diversification, 2) economies of scale, 3) daily public pricing, and 4) specialized management, and unlike common trust funds, 5) greater availability of information, including performance data, and 6) the ability to distribute such investments in kind to the beneficiaries.

So, if you are a corporate fiduciary considering a conversion or a similar decision, what can you do to reduce the risk that the bank will be sued?

**Anticipate the Attack**

Experienced corporate fiduciaries likely can anticipate and plan to counter the hindsight allegations of plaintiffs' lawyers. However, the fiduciary must develop a process for addressing the various considerations and to do so in a manner that is credible and believable. The corporate fiduciary should adopt a policy for investment in mutual funds with the guidance of experienced counsel.

The minutes of meetings of pertinent committees should document the nature and extent of services provided, the expertise of the relevant personnel, the cost of providing the services, comparable fees charged by fiduciaries and non-fiduciaries for money management services and other relevant factors.

Where possible, the governing instruments should include provisions specifically authorizing investments in affiliated mutual funds and the institution's receipt of related fee income. To demonstrate the continued propriety of investing fiduciary accounts in affiliated mutual funds, the trust department should periodically compare performance and expenses charged by its funds with those of other available mutual funds, and review such performance and expenses in a manner consistent with its review of other investments held by or available to fiduciary accounts generally.

**Carefully Document Decision-Making**

In the real world as opposed to the world alleged by plaintiffs' classaction lawyers, decisions are almost always multi-faceted. They involve practical business and service issues. When a decision includes consideration of the potential for increasing profitability, a skilled plaintiff lawyer will likely characterize the outcome as entirely profit-driven, even when the outcome is a win-win for the institution and the customer or beneficiary.

Management and staff must be made aware that most documentation and internal communications (with the exception of advice from counsel) will be turned over to opposing counsel during litigation, as required by the rules of civil procedure governing discovery. Since the standard for determining whether a document is "discoverable" is

lenient, most documents will be turned over to the other side during the course of a lawsuit. Therefore, every internal memo, trust account file, electronic mail message, phone message and note must be created and maintained with an eye toward this possibility. A corporate fiduciary must "speak" at all times in a voice that acknowledges its legal obligations to its trust beneficiaries, and in a voice that is not easily distorted by those who would challenge it.

Under present law, reasonable trustee compensation is determined primarily by an analysis of the labor and services rendered and the responsibility assumed by the trustee. Additionally, courts may consider evidence of prevailing competitive rates. Courts have been reluctant to state that any particular percentage is per se reasonable.

The successful defense of an alleged class action may turn on the bank's ability to effectively marshal evidence showing the individualized nature of the reasonableness of compensation at the trust level. Such fact-specific inquiries may include the gross income of the trust estate, the success or failure of the administration and the results obtained, the unusual skill or experience of the trustee, the time expended by the trustee and the complexity and character of the work performed. The corporate fiduciary also must document costs, including both fixed and incremental costs.

In the end, to support the reasonableness of the fees received, it is critical that the nature of these services and their value be documented. And, such documentation should preferably be performed in a manner that evidences the variations across trust accounts.

**Disclose, Disclose, Disclose**

Litigation often involves the adequacy of disclosure. Were important facts disclosed? Did the trustee misstate important facts? Was the beneficiary told about certain fees? When the disclosures are clear and conspicuous, receipt of the disclosures is acknowledged, preferably in writing, and there are multiple layers of disclosure, through periodic updating, institutions have a much better opportunity to defeat the claims at an earlier, less costly stage. Moreover, the existence of superior disclosure documents improves dramatically the opportunities to defeat a plaintiffs request that the case be treated as a class action.

Fee income from affiliated mutual funds should be clearly disclosed. Recommended steps to ensure proper disclosure include: 1) the distribution of prospectuses to all interested parties upon the initial investment of each fiduciary account in an affiliated mutual fund; and 2) the disclosure of all fees to be received through the mutual funds and the basis on which such fees are calculated in such prospectuses, on the corporate fiduciary's fee schedule, as well as on periodic statements rendered to interested parties of each fiduciary account invested in the mutual funds. Such disclosures should also be updated on a timely basis if there are any material changes in the information disclosed.

**Cross-Examine Internal Practices**

Review internal training materials and compliance manuals to verify that they

Case 3:08-cv-02705-JSW    Document 40-8    Filed 09/05/2008    Page 7 of 8

appropriately instruct personnel to make the requisite disclosures. While training may necessarily involve sales methods, including the notion of cross-selling, such training should not minimize compliance obligations or the need to communicate important disclosures effectively. The corporate fiduciary should implement training sessions so that the trust department personnel are familiar with the advantages and disadvantages of mutual fund investing and the related fiduciary issues.

**Review and Organize Records**

Maintain and enforce a document retention policy, including policies concerning electronic mail and personal files. Organize and maintain key records, such as agreements, disclosures, account statements and correspondence. Additionally, financial institutions and insurance companies must comply with various emerging obligations pertaining to the privacy of personal information.

**Respond to Customer Complaints**

Manage customer complaints effectively and directly, even if they involve relatively minor customer service issues. Numerous putative class actions have been initiated by individuals dissatisfied with the handling of customer service complaints.

**Handle Ex-Employees With Care**

When dealing with former employees, particularly disgruntled ex-employees, be sensitive to the possibility that they may testify adversely and recall events selectively. Maintain policies prohibiting disclosure of confidential or privileged information. Adopt and enforce policies prohibiting employees from discussing business information in Internet chat rooms, particularly if and to the extent that they are identifiable as an employee. Some groups have posted "help wanted" advertisements seeking to recruit trust professionals to assist them as trust litigation consultants or expert witnesses.

**Use Counsel Effectively**

The corporate fiduciary should obtain an opinion of counsel addressing the relevant legal considerations regarding receipt of fee income from affiliated mutual funds in each state in which the fiduciary operates. The opinion should be shared with and considered by appropriate trust committees. Additionally, the corporate fiduciary should be sensitive to the need to involve counsel in the review process and to preserve applicable privileges.

**Conclusion: Wariness, Not Paralysis**

Obviously, one cannot function as an efficient, profitable business entity if thoughts of litigation loom foremost in the minds of management and staff. We do not advocate placing an undue emphasis on the fear of some hypothetical future lawsuit. Instead, corporate fiduciaries can effectively manage the litigation risks as a part of their overall quality management efforts and training. In so doing, the delicate balance needed to achieve "profitable fee income" can be more readily achieved with sensitivity to the potential litigation risks.

ENDNOTES

1. Incorporating Profitability into the Bank Trust Department, Trusts & Estates June 1,1996.

2. Meinhard v. Salmon, 249 MY 458, 464 (1928).


Gregory B. Jordan (gjordan@reedsmith.com) is the managing partner of Reed Smith LLP, one of the nation's largest law firms with more than 670 lawyers. His practice has encompassed a broad array of financial services and trust litigation.

Perry A. Napolitano (pnapolitano@reedsmith.com) is a partner in the Pittsburgh office of Reed Smith LLP whose practice focuses on financial services litigation, including complex trust and fiduciary litigation. ;

Roy W Arnold (rarnold@reedsmith.com) is a senior associate in the Pittsburgh office of Reed Smith LLP whose practice includes financial services litigation and class action defense.

The authors gratefully acknowledge the assistance and contributions of their colleagues, Mark Bookman and Daniel M. Miller.

---

Attorney Advertising. This Web site may be considered advertising under the rules of some states. Prior results described on this site cannot and do not guarantee or predict a similar outcome with respect to any future matter that we or any lawyer may be retained to handle.

In Hong Kong, Richards Butler in Association with Reed Smith LLP.

Pending name change approval by Chinese Regulatory Authorities in Beijing, Richards Butler LLP.

© Copyright 2008 Reed Smith. All rights reserved.

# Exhibit F

# UNIFORM PRUDENT INVESTOR ACT

Drafted by the

## NATIONAL CONFERENCE OF COMMISSIONERS
## ON UNIFORM STATE LAWS

and by it

## APPROVED AND RECOMMENDED FOR ENACTMENT
## IN ALL THE STATES

at its

## ANNUAL CONFERENCE
## MEETING IN ITS ONE-HUNDRED-AND-THIRD YEAR
## IN CHICAGO, ILLINOIS
## JULY 29 - AUGUST 5, 1994

*WITH PREFATORY NOTE AND COMMENTS*

Approved by the American Bar Association
Miami, Florida, February 14, 1995

4/18/95

# UNIFORM PRUDENT INVESTOR ACT

**The Committee that acted for the National Conference of Commissioners on Uniform State Laws in preparing the Uniform Prudent Investor Act was as follows:**

RICHARD V. WELLMAN, University of Georgia, School of Law, Athens, GA  30602, *Chair*

CLARKE A. GRAVEL, P.O. Box 369, 76 St. Paul Street, Burlington, VT  05402

JOHN H. LANGBEIN, Yale Law School, P.O. Box 208215, New Haven, CT  06520, *National Conference Reporter*

ROBERT A. STEIN, American Bar Association, 750 North Lake Shore Drive, Chicago, IL  60611

## EX OFFICIO

RICHARD C. HITE, 200 West Douglas Avenue, Suite 630, Wichita, KS  67202, *President*

JOHN H. LANGBEIN, Yale Law School, P.O. Box 208215, New Haven, CT  06520, *Chair, Division D*

## EXECUTIVE DIRECTOR

FRED H. MILLER, University of Oklahoma, College of Law, 300 Timberdell Road, Norman, OK  73019, *Executive Director*

WILLIAM J. PIERCE, 1505 Roxbury Road, Ann Arbor, MI  48104, *Executive Director Emeritus*

## REVIEW COMMITTEE

EDWARD F. LOWRY, JR., Suite 1040, 6900 East Camelback Road, Scottsdale, AZ  85251, *Chair*

H. REESE HANSEN, Brigham Young University, J. Reuben Clark Law School, 348-A JRCB, Provo, UT  84602

MILDRED W. ROBINSON, University of Virginia, School of Law, 580 Massie Road, Charlottesville, VA  22903

## ADVISOR TO DRAFTING COMMITTEE

JOSEPH KARTIGANER, *American Bar Association*

Copies of this Act may be obtained from:

NATIONAL CONFERENCE OF COMMISSIONERS ON UNIFORM STATE LAWS
676 North St. Clair Street, Suite 1700
Chicago, Illinois  60611
312/915-0195

# UNIFORM PRUDENT INVESTOR ACT

## PREFATORY NOTE

Over the quarter century from the late 1960's the investment practices of fiduciaries experienced significant change. The Uniform Prudent Investor Act (UPIA) undertakes to update trust investment law in recognition of the alterations that have occurred in investment practice. These changes have occurred under the influence of a large and broadly accepted body of empirical and theoretical knowledge about the behavior of capital markets, often described as "modern portfolio theory."

This Act draws upon the revised standards for prudent trust investment promulgated by the American Law Institute in its Restatement (Third) of Trusts: Prudent Investor Rule (1992) [hereinafter Restatement of Trusts 3d: Prudent Investor Rule; also referred to as 1992 Restatement].

**Objectives of the Act.** UPIA makes five fundamental alterations in the former criteria for prudent investing. All are to be found in the Restatement of Trusts 3d: Prudent Investor Rule.

(1) The standard of prudence is applied to any investment as part of the total portfolio, rather than to individual investments. In the trust setting the term "portfolio" embraces all the trust's assets. UPIA § 2(b).

(2) The tradeoff in all investing between risk and return is identified as the fiduciary's central consideration. UPIA § 2(b).

(3) All categoric restrictions on types of investments have been abrogated; the trustee can invest in anything that plays an appropriate role in achieving the risk/return objectives of the trust and that meets the other requirements of prudent investing. UPIA § 2(e).

(4) The long familiar requirement that fiduciaries diversify their investments has been integrated into the definition of prudent investing. UPIA § 3.

(5) The much criticized former rule of trust law forbidding the trustee to delegate investment and management functions has been reversed. Delegation is now permitted, subject to safeguards. UPIA § 9.

1

**Literature**. These changes in trust investment law have been presaged in an extensive body of practical and scholarly writing. See especially the discussion and reporter's notes by Edward C. Halbach, Jr., in Restatement of Trusts 3d: Prudent Investor Rule (1992); see also Edward C. Halbach, Jr., Trust Investment Law in the Third Restatement, 27 Real Property, Probate & Trust J. 407 (1992); Bevis Longstreth, Modern Investment Management and the Prudent Man Rule (1986); Jeffrey N. Gordon, The Puzzling Persistence of the Constrained Prudent Man Rule, 62 N.Y.U.L. Rev. 52 (1987); John H. Langbein & Richard A. Posner, The Revolution in Trust Investment Law, 62 A.B.A.J. 887 (1976); Note, The Regulation of Risky Investments, 83 Harvard L. Rev. 603 (1970). A succinct account of the main findings of modern portfolio theory, written for lawyers, is Jonathan R. Macey, An Introduction to Modern Financial Theory (1991) (American College of Trust & Estate Counsel Foundation). A leading introductory text on modern portfolio theory is R.A. Brealey, An Introduction to Risk and Return from Common Stocks (2d ed. 1983).

**Legislation**. Most states have legislation governing trust-investment law. This Act promotes uniformity of state law on the basis of the new consensus reflected in the Restatement of Trusts 3d: Prudent Investor Rule. Some states have already acted. California, Delaware, Georgia, Minnesota, Tennessee, and Washington revised their prudent investor legislation to emphasize the total-portfolio standard of care in advance of the 1992 Restatement. These statutes are extracted and discussed in Restatement of Trusts 3d: Prudent Investor Rule § 227, reporter's note, at 60-66 (1992).

Drafters in Illinois in 1991 worked from the April 1990 "Proposed Final Draft" of the Restatement of Trusts 3d: Prudent Investor Rule and enacted legislation that is closely modeled on the new Restatement. 760 ILCS § 5/5 (prudent investing); and § 5/5.1 (delegation) (1992). As the Comments to this Uniform Prudent Investor Act reflect, the Act draws upon the Illinois statute in several sections. Virginia revised its prudent investor act in a similar vein in 1992. Virginia Code § 26-45.1 (prudent investing) (1992). Florida revised its statute in 1993. Florida Laws, ch. 93-257, amending Florida Statutes § 518.11 (prudent investing) and creating § 518.112 (delegation). New York legislation drawing on the new Restatement and on a preliminary version of this Uniform Prudent Investor Act was enacted in 1994. N.Y. Assembly Bill 11683-B, Ch. 609 (1994), adding Estates, Powers and Trusts Law § 11-2.3 (Prudent Investor Act).

**Remedies.** This Act does not undertake to address issues of remedy law or the computation of damages in trust matters. Remedies are the subject of a reasonably distinct body of doctrine. See generally Restatement (Second) of Trusts §§ 197-226A (1959) [hereinafter cited as Restatement of Trusts 2d; also referred to as 1959 Restatement].

2

**Implications for charitable and pension trusts**. This Act is centrally concerned with the investment responsibilities arising under the private gratuitous trust, which is the common vehicle for conditioned wealth transfer within the family. Nevertheless, the prudent investor rule also bears on charitable and pension trusts, among others. "In making investments of trust funds the trustee of a charitable trust is under a duty similar to that of the trustee of a private trust." Restatement of Trusts 2d § 389 (1959). The Employee Retirement Income Security Act (ERISA), the federal regulatory scheme for pension trusts enacted in 1974, absorbs trust-investment law through the prudence standard of ERISA § 404(a)(1)(B), 29 U.S.C. § 1104(a). The Supreme Court has said: "ERISA's legislative history confirms that the Act's fiduciary responsibility provisions 'codif[y] and mak[e] applicable to [ERISA] fiduciaries certain principles developed in the evolution of the law of trusts.'" *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 110-11 (1989) (footnote omitted).

**Other fiduciary relationships**. The Uniform Prudent Investor Act regulates the investment responsibilities of trustees. Other fiduciaries – such as executors, conservators, and guardians of the property – sometimes have responsibilities over assets that are governed by the standards of prudent investment. It will often be appropriate for states to adapt the law governing investment by trustees under this Act to these other fiduciary regimes, taking account of such changed circumstances as the relatively short duration of most executorships and the intensity of court supervision of conservators and guardians in some jurisdictions. The present Act does not undertake to adjust trust-investment law to the special circumstances of the state schemes for administering decedents' estates or conducting the affairs of protected persons.

Although the Uniform Prudent Investor Act by its terms applies to trusts and not to charitable corporations, the standards of the Act can be expected to inform the investment responsibilities of directors and officers of charitable corporations. As the 1992 Restatement observes, "the duties of the members of the governing board of a charitable corporation are generally similar to the duties of the trustee of a charitable trust." Restatement of Trusts 3d: Prudent Investor Rule § 379, Comment *b*, at 190 (1992). See also id. § 389, Comment *b*, at 190-91 (absent contrary statute or other provision, prudent investor rule applies to investment of funds held for charitable corporations).

3

# UNIFORM PRUDENT INVESTOR ACT

## SECTION 1. PRUDENT INVESTOR RULE.

(a) Except as otherwise provided in subsection (b), a trustee who invests and manages trust assets owes a duty to the beneficiaries of the trust to comply with the prudent investor rule set forth in this [Act].

(b) The prudent investor rule, a default rule, may be expanded, restricted, eliminated, or otherwise altered by the provisions of a trust. A trustee is not liable to a beneficiary to the extent that the trustee acted in reasonable reliance on the provisions of the trust.

### Comment

This section imposes the obligation of prudence in the conduct of investment functions and identifies further sections of the Act that specify the attributes of prudent conduct.

**Origins.** The prudence standard for trust investing traces back to *Harvard College v. Amory*, 26 Mass. (9 Pick.) 446 (1830). Trustees should "observe how men of prudence, discretion and intelligence manage their own affairs, not in regard to speculation, but in regard to the permanent disposition of their funds, considering the probable income, as well as the probable safety of the capital to be invested." Id. at 461.

**Prior legislation.** The Model Prudent Man Rule Statute (1942), sponsored by the American Bankers Association, undertook to codify the language of the *Amory* case. See Mayo A. Shattuck, The Development of the Prudent Man Rule for Fiduciary Investment in the United States in the Twentieth Century, 12 Ohio State L.J. 491, at 501 (1951); for the text of the model act, which inspired many state statutes, see id. at 508-09. Another prominent codification of the *Amory* standard is Uniform Probate Code § 7-302 (1969), which provides that "the trustee shall observe the standards in dealing with the trust assets that would be observed by a prudent man dealing with the property of another . . . ."

Congress has imposed a comparable prudence standard for the administration of pension and employee benefit trusts in the Employee Retirement Income Security Act (ERISA), enacted in 1974. ERISA § 404(a)(1)(B), 29 U.S.C. § 1104(a), provides that "a fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and . . . with the care, skill, prudence, and diligence under the circumstances then prevailing that a

4

prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims . . . ."

**Prior Restatement.** The Restatement of Trusts 2d (1959) also tracked the language of the *Amory* case: "In making investments of trust funds the trustee is under a duty to the beneficiary . . . to make such investments and only such investments as a prudent man would make of his own property having in view the preservation of the estate and the amount and regularity of the income to be derived . . . ." Restatement of Trusts 2d § 227 (1959).

**Objective standard.** The concept of prudence in the judicial opinions and legislation is essentially relational or comparative. It resembles in this respect the "reasonable person" rule of tort law. A prudent trustee behaves as other trustees similarly situated would behave. The standard is, therefore, objective rather than subjective. Sections 2 through 9 of this Act identify the main factors that bear on prudent investment behavior.

**Variation.** Almost all of the rules of trust law are default rules, that is, rules that the settlor may alter or abrogate. Subsection (b) carries forward this traditional attribute of trust law. Traditional trust law also allows the beneficiaries of the trust to excuse its performance, when they are all capable and not misinformed. Restatement of Trusts 2d § 216 (1959).

## SECTION 2. STANDARD OF CARE; PORTFOLIO STRATEGY; RISK AND RETURN OBJECTIVES.

(a) A trustee shall invest and manage trust assets as a prudent investor would, by considering the purposes, terms, distribution requirements, and other circumstances of the trust. In satisfying this standard, the trustee shall exercise reasonable care, skill, and caution.

(b) A trustee's investment and management decisions respecting individual assets must be evaluated not in isolation but in the context of the trust portfolio as a whole and as a part of an overall investment strategy having risk and return objectives reasonably suited to the trust.

(c) Among circumstances that a trustee shall consider in investing and managing trust assets are such of the following as are relevant to the trust or its beneficiaries:

(1) general economic conditions;

5

(2) the possible effect of inflation or deflation;

(3) the expected tax consequences of investment decisions or strategies;

(4) the role that each investment or course of action plays within the overall trust portfolio, which may include financial assets, interests in closely held enterprises, tangible and intangible personal property, and real property;

(5) the expected total return from income and the appreciation of capital;

(6) other resources of the beneficiaries;

(7) needs for liquidity, regularity of income, and preservation or appreciation of capital; and

(8) an asset's special relationship or special value, if any, to the purposes of the trust or to one or more of the beneficiaries.

(d) A trustee shall make a reasonable effort to verify facts relevant to the investment and management of trust assets.

(e) A trustee may invest in any kind of property or type of investment consistent with the standards of this [Act].

(f) A trustee who has special skills or expertise, or is named trustee in reliance upon the trustee's representation that the trustee has special skills or expertise, has a duty to use those special skills or expertise.

## Comment

Section 2 is the heart of the Act. Subsections (a), (b), and (c) are patterned loosely on the language of the Restatement of Trusts 3d: Prudent Investor Rule § 227 (1992), and on the 1991 Illinois statute, 760 § ILCS 5/5a (1992). Subsection (f) is derived from Uniform Probate Code § 7-302 (1969).

**Objective standard.** Subsection (a) of this Act carries forward the relational and objective standard made familiar in the *Amory* case, in earlier prudent investor legislation, and in the Restatements. Early formulations of the prudent person rule were sometimes troubled by the effort to distinguish between the standard of a prudent person investing for another and investing on his or her own account. The language of subsection (a), by relating the trustee's duty to "the purposes, terms, distribution requirements, and other circumstances of the trust,"

6

should put such questions to rest. The standard is the standard of the prudent investor similarly situated.

**Portfolio standard.** Subsection (b) emphasizes the consolidated portfolio standard for evaluating investment decisions. An investment that might be imprudent standing alone can become prudent if undertaken in sensible relation to other trust assets, or to other nontrust assets. In the trust setting the term "portfolio" embraces the entire trust estate.

**Risk and return.** Subsection (b) also sounds the main theme of modern investment practice, sensitivity to the risk/return curve. See generally the works cited in the Prefatory Note to this Act, under "Literature." Returns correlate strongly with risk, but tolerance for risk varies greatly with the financial and other circumstances of the investor, or in the case of a trust, with the purposes of the trust and the relevant circumstances of the beneficiaries. A trust whose main purpose is to support an elderly widow of modest means will have a lower risk tolerance than a trust to accumulate for a young scion of great wealth.

Subsection (b) of this Act follows Restatement of Trusts 3d: Prudent Investor Rule § 227(a), which provides that the standard of prudent investing "requires the exercise of reasonable care, skill, and caution, and is to be applied to investments not in isolation but in the context of the trust portfolio and as a part of an overall investment strategy, which should incorporate risk and return objectives reasonably suitable to the trust."

**Factors affecting investment.** Subsection (c) points to certain of the factors that commonly bear on risk/return preferences in fiduciary investing. This listing is nonexclusive. Tax considerations, such as preserving the stepped up basis on death under Internal Revenue Code § 1014 for low-basis assets, have traditionally been exceptionally important in estate planning for affluent persons. Under the present recognition rules of the federal income tax, taxable investors, including trust beneficiaries, are in general best served by an investment strategy that minimizes the taxation incident to portfolio turnover. See generally Robert H. Jeffrey & Robert D. Arnott, Is Your Alpha Big Enough to Cover Its Taxes?, Journal of Portfolio Management 15 (Spring 1993).

Another familiar example of how tax considerations bear upon trust investing: In a regime of pass-through taxation, it may be prudent for the trust to buy lower yielding tax-exempt securities for high-bracket taxpayers, whereas it would ordinarily be imprudent for the trustees of a charitable trust, whose income is tax exempt, to accept the lowered yields associated with tax-exempt securities.

7

When tax considerations affect beneficiaries differently, the trustee's duty of impartiality requires attention to the competing interests of each of them.

Subsection (c)(8), allowing the trustee to take into account any preferences of the beneficiaries respecting heirlooms or other prized assets, derives from the Illinois act, 760 ILCS § 5/5(a)(4) (1992).

**Duty to monitor.** Subsections (a) through (d) apply both to investing and managing trust assets. "Managing" embraces monitoring, that is, the trustee's continuing responsibility for oversight of the suitability of investments already made as well as the trustee's decisions respecting new investments.

**Duty to investigate.** Subsection (d) carries forward the traditional responsibility of the fiduciary investor to examine information likely to bear importantly on the value or the security of an investment – for example, audit reports or records of title. E.g., *Estate of Collins*, 72 Cal. App. 3d 663, 139 Cal. Rptr. 644 (1977) (trustees lent on a junior mortgage on unimproved real estate, failed to have land appraised, and accepted an unaudited financial statement; held liable for losses).

**Abrogating categoric restrictions.** Subsection 2(e) clarifies that no particular kind of property or type of investment is inherently imprudent. Traditional trust law was encumbered with a variety of categoric exclusions, such as prohibitions on junior mortgages or new ventures. In some states legislation created so-called "legal lists" of approved trust investments. The universe of investment products changes incessantly. Investments that were at one time thought too risky, such as equities, or more recently, futures, are now used in fiduciary portfolios. By contrast, the investment that was at one time thought ideal for trusts, the long-term bond, has been discovered to import a level of risk and volatility – in this case, inflation risk – that had not been anticipated. Accordingly, section 2(e) of this Act follows Restatement of Trusts 3d: Prudent Investor Rule in abrogating categoric restrictions. The Restatement says: "Specific investments or techniques are not per se prudent or imprudent. The riskiness of a specific property, and thus the propriety of its inclusion in the trust estate, is not judged in the abstract but in terms of its anticipated effect on the particular trust's portfolio." Restatement of Trusts 3d: Prudent Investor Rule § 227, Comment f, at 24 (1992). The premise of subsection 2(e) is that trust beneficiaries are better protected by the Act's emphasis on close attention to risk/return objectives as prescribed in subsection 2(b) than in attempts to identify categories of investment that are per se prudent or imprudent.

The Act impliedly disavows the emphasis in older law on avoiding "speculative" or "risky" investments. Low levels of risk may be appropriate in

8

some trust settings but inappropriate in others. It is the trustee's task to invest at a risk level that is suitable to the purposes of the trust.

The abolition of categoric restrictions against types of investment in no way alters the trustee's conventional duty of loyalty, which is reiterated for the purposes of this Act in Section 5. For example, were the trustee to invest in a second mortgage on a piece of real property owned by the trustee, the investment would be wrongful on account of the trustee's breach of the duty to abstain from self-dealing, even though the investment would no longer automatically offend the former categoric restriction against fiduciary investments in junior mortgages.

**Professional fiduciaries.** The distinction taken in subsection (f) between amateur and professional trustees is familiar law. The prudent investor standard applies to a range of fiduciaries, from the most sophisticated professional investment management firms and corporate fiduciaries, to family members of minimal experience. Because the standard of prudence is relational, it follows that the standard for professional trustees is the standard of prudent professionals; for amateurs, it is the standard of prudent amateurs. Restatement of Trusts 2d § 174 (1959) provides: "The trustee is under a duty to the beneficiary in administering the trust to exercise such care and skill as a man of ordinary prudence would exercise in dealing with his own property; and if the trustee has or procures his appointment as trustee by representing that he has greater skill than that of a man of ordinary prudence, he is under a duty to exercise such skill." Case law strongly supports the concept of the higher standard of care for the trustee representing itself to be expert or professional. See Annot., Standard of Care Required of Trustee Representing Itself to Have Expert Knowledge or Skill, 91 A.L.R. 3d 904 (1979) & 1992 Supp. at 48-49.

The Drafting Committee declined the suggestion that the Act should create an exception to the prudent investor rule (or to the diversification requirement of Section 3) in the case of smaller trusts. The Committee believes that subsections (b) and (c) of the Act emphasize factors that are sensitive to the traits of small trusts; and that subsection (f) adjusts helpfully for the distinction between professional and amateur trusteeship. Furthermore, it is always open to the settlor of a trust under Section 1(b) of the Act to reduce the trustee's standard of care if the settlor deems such a step appropriate. The official comments to the 1992 Restatement observe that pooled investments, such as mutual funds and bank common trust funds, are especially suitable for small trusts. Restatement of Trusts 3d: Prudent Investor Rule § 227, Comments *h*, *m*, at 28, 51; reporter's note to Comment *g*, id. at 83.

**Matters of proof.** Although virtually all express trusts are created by written instrument, oral trusts are known, and accordingly, this Act presupposes no

9

formal requirement that trust terms be in writing. When there is a written trust instrument, modern authority strongly favors allowing evidence extrinsic to the instrument to be consulted for the purpose of ascertaining the settlor's intent. See Uniform Probate Code § 2-601 (1990), Comment; Restatement (Third) of Property: Donative Transfers (Preliminary Draft No. 2, ch. 11, Sept. 11, 1992).

**SECTION 3. DIVERSIFICATION.** A trustee shall diversify the investments of the trust unless the trustee reasonably determines that, because of special circumstances, the purposes of the trust are better served without diversifying.

### Comment

The language of this section derives from Restatement of Trusts 2d § 228 (1959). ERISA insists upon a comparable rule for pension trusts. ERISA § 404(a)(1)(C), 29 U.S.C. § 1104(a)(1)(C). Case law overwhelmingly supports the duty to diversify. See Annot., Duty of Trustee to Diversify Investments, and Liability for Failure to Do So, 24 A.L.R. 3d 730 (1969) & 1992 Supp. at 78-79.

The 1992 Restatement of Trusts takes the significant step of integrating the diversification requirement into the concept of prudent investing. Section 227(b) of the 1992 Restatement treats diversification as one of the fundamental elements of prudent investing, replacing the separate section 228 of the Restatement of Trusts 2d. The message of the 1992 Restatement, carried forward in Section 3 of this Act, is that prudent investing ordinarily requires diversification.

Circumstances can, however, overcome the duty to diversify. For example, if a tax-sensitive trust owns an underdiversified block of low-basis securities, the tax costs of recognizing the gain may outweigh the advantages of diversifying the holding. The wish to retain a family business is another situation in which the purposes of the trust sometimes override the conventional duty to diversify.

**Rationale for diversification.** "Diversification reduces risk . . . [because] stock price movements are not uniform. They are imperfectly correlated. This means that if one holds a well diversified portfolio, the gains in one investment will cancel out the losses in another." Jonathan R. Macey, An Introduction to Modern Financial Theory 20 (American College of Trust and Estate Counsel Foundation, 1991). For example, during the Arab oil embargo of 1973, international oil stocks suffered declines, but the shares of domestic oil producers and coal companies benefitted. Holding a broad enough portfolio allowed the investor to set off, to some extent, the losses associated with the embargo.

Modern portfolio theory divides risk into the categories of "compensated" and "uncompensated" risk. The risk of owning shares in a mature and well-managed company in a settled industry is less than the risk of owning shares in a start-up high-technology venture. The investor requires a higher expected return to induce the investor to bear the greater risk of disappointment associated with the start-up firm. This is compensated risk – the firm pays the investor for bearing the risk. By contrast, nobody pays the investor for owning too few stocks. The investor who owned only international oils in 1973 was running a risk that could have been reduced by having configured the portfolio differently – to include investments in different industries. This is uncompensated risk – nobody pays the investor for owning shares in too few industries and too few companies. Risk that can be eliminated by adding different stocks (or bonds) is uncompensated risk. The object of diversification is to minimize this uncompensated risk of having too few investments. "As long as stock prices do not move exactly together, the risk of a diversified portfolio will be less than the average risk of the separate holdings." R.A. Brealey, An Introduction to Risk and Return from Common Stocks 103 (2d ed. 1983).

There is no automatic rule for identifying how much diversification is enough. The 1992 Restatement says: "Significant diversification advantages can be achieved with a small number of well-selected securities representing different industries . . . . Broader diversification is usually to be preferred in trust investing," and pooled investment vehicles "make thorough diversification practical for most trustees." Restatement of Trusts 3d: Prudent Investor Rule § 227, General Note on Comments *e-h*, at 77 (1992). See also Macey, supra, at 23-24; Brealey, supra, at 111-13.

**Diversifying by pooling.** It is difficult for a small trust fund to diversify thoroughly by constructing its own portfolio of individually selected investments. Transaction costs such as the round-lot (100 share) trading economies make it relatively expensive for a small investor to assemble a broad enough portfolio to minimize uncompensated risk. For this reason, pooled investment vehicles have become the main mechanism for facilitating diversification for the investment needs of smaller trusts.

Most states have legislation authorizing common trust funds; see 3 Austin W. Scott & William F. Fratcher, The Law of Trusts § 227.9, at 463-65 n.26 (4th ed. 1988) (collecting citations to state statutes). As of 1992, 35 states and the District of Columbia had enacted the Uniform Common Trust Fund Act (UCTFA) (1938), overcoming the rule against commingling trust assets and expressly enabling banks and trust companies to establish common trust funds. 7 Uniform Laws Ann. 1992 Supp. at 130 (schedule of adopting states). The Prefatory Note to the UCTFA explains: "The purposes of such a common or joint investment fund are to diversify

11

the investment of the several trusts and thus spread the risk of loss, and to make it easy to invest any amount of trust funds quickly and with a small amount of trouble." 7 Uniform Laws Ann. 402 (1985).

**Fiduciary investing in mutual funds.** Trusts can also achieve diversification by investing in mutual funds. See Restatement of Trusts 3d: Prudent Investor Rule, § 227, Comment *m*, at 99-100 (1992) (endorsing trust investment in mutual funds). ERISA § 401(b)(1), 29 U.S.C. § 1101(b)(1), expressly authorizes pension trusts to invest in mutual funds, identified as securities "issued by an investment company registered under the Investment Company Act of 1940 . . . ."

**SECTION 4. DUTIES AT INCEPTION OF TRUSTEESHIP.** Within a reasonable time after accepting a trusteeship or receiving trust assets, a trustee shall review the trust assets and make and implement decisions concerning the retention and disposition of assets, in order to bring the trust portfolio into compliance with the purposes, terms, distribution requirements, and other circumstances of the trust, and with the requirements of this [Act].

**Comment**

Section 4, requiring the trustee to dispose of unsuitable assets within a reasonable time, is old law, codified in Restatement of Trusts 3d: Prudent Investor Rule § 229 (1992), lightly revising Restatement of Trusts 2d § 230 (1959). The duty extends as well to investments that were proper when purchased but subsequently become improper. Restatement of Trusts 2d § 231 (1959). The same standards apply to successor trustees, see Restatement of Trusts 2d § 196 (1959).

The question of what period of time is reasonable turns on the totality of factors affecting the asset and the trust. The 1959 Restatement took the view that "[o]rdinarily any time within a year is reasonable, but under some circumstances a year may be too long a time and under other circumstances a trustee is not liable although he fails to effect the conversion for more than a year." Restatement of Trusts 2d § 230, comment *b* (1959). The 1992 Restatement retreated from this rule of thumb, saying, "No positive rule can be stated with respect to what constitutes a reasonable time for the sale or exchange of securities." Restatement of Trusts 3d: Prudent Investor Rule § 229, comment *b* (1992).

The criteria and circumstances identified in Section 2 of this Act as bearing upon the prudence of decisions to invest and manage trust assets also pertain to the prudence of decisions to retain or dispose of inception assets under this section.

12

**SECTION 5. LOYALTY.** A trustee shall invest and manage the trust assets solely in the interest of the beneficiaries.

### Comment

The duty of loyalty is perhaps the most characteristic rule of trust law, requiring the trustee to act exclusively for the beneficiaries, as opposed to acting for the trustee's own interest or that of third parties. The language of Section 4 of this Act derives from Restatement of Trusts 3d: Prudent Investor Rule § 170 (1992), which makes minute changes in Restatement of Trusts 2d § 170 (1959).

The concept that the duty of prudence in trust administration, especially in investing and managing trust assets, entails adherence to the duty of loyalty is familiar. ERISA § 404(a)(1)(B), 29 U.S.C. § 1104(a)(1)(B), extracted in the Comment to Section 1 of this Act, effectively merges the requirements of prudence and loyalty. A fiduciary cannot be prudent in the conduct of investment functions if the fiduciary is sacrificing the interests of the beneficiaries.

The duty of loyalty is not limited to settings entailing self-dealing or conflict of interest in which the trustee would benefit personally from the trust. "The trustee is under a duty to the beneficiary in administering the trust not to be guided by the interest of any third person. Thus, it is improper for the trustee to sell trust property to a third person for the purpose of benefitting the third person rather than the trust." Restatement of Trusts 2d § 170, comment *q*, at 371 (1959).

No form of so-called "social investing" is consistent with the duty of loyalty if the investment activity entails sacrificing the interests of trust beneficiaries – for example, by accepting below-market returns – in favor of the interests of the persons supposedly benefitted by pursuing the particular social cause. See, e.g., John H. Langbein & Richard Posner, Social Investing and the Law of Trusts, 79 Michigan L. Rev. 72, 96-97 (1980) (collecting authority). For pension trust assets, see generally Ian D. Lanoff, The Social Investment of Private Pension Plan Assets: May it Be Done Lawfully under ERISA?, 31 Labor L.J. 387 (1980). Commentators supporting social investing tend to concede the overriding force of the duty of loyalty. They argue instead that particular schemes of social investing may not result in below-market returns. See, e.g., Marcia O'Brien Hylton, "Socially Responsible" Investing: Doing Good Versus Doing Well in an Inefficient Market, 42 American U.L. Rev. 1 (1992). In 1994 the Department of Labor issued an Interpretive Bulletin reviewing its prior analysis of social investing questions and reiterating that pension trust fiduciaries may invest only in conformity with the prudence and loyalty standards of ERISA §§ 403-404. Interpretive Bulletin 94-1, 59 Fed. Regis. 32606 (Jun. 22, 1994), to be codified as 29 CFR § 2509.94-1. The Bulletin reminds fiduciary investors that they are prohibited from "subordinat[ing]

13

the interests of participants and beneficiaries in their retirement income to unrelated objectives."

**SECTION 6.  IMPARTIALITY.**  If a trust has two or more beneficiaries, the trustee shall act impartially in investing and managing the trust assets, taking into account any differing interests of the beneficiaries.

### Comment

The duty of impartiality derives from the duty of loyalty.  When the trustee owes duties to more than one beneficiary, loyalty requires the trustee to respect the interests of all the beneficiaries.  Prudence in investing and administration requires the trustee to take account of the interests of all the beneficiaries for whom the trustee is acting, especially the conflicts between the interests of beneficiaries interested in income and those interested in principal.

The language of Section 6 derives from Restatement of Trusts 2d § 183 (1959); see also id., § 232.  Multiple beneficiaries may be beneficiaries in succession (such as life and remainder interests) or beneficiaries with simultaneous interests (as when the income interest in a trust is being divided among several beneficiaries).

The trustee's duty of impartiality commonly affects the conduct of investment and management functions in the sphere of principal and income allocations.  This Act prescribes no regime for allocating receipts and  expenses. The details of such allocations are commonly handled under specialized legislation, such as the Revised Uniform Principal and Income Act (1962) (which is presently under study by the Uniform Law Commission with a view toward further revision).

**SECTION 7.  INVESTMENT COSTS.**  In investing and managing trust assets, a trustee may only incur costs that are appropriate and reasonable in relation to the assets, the purposes of the trust, and the skills of the trustee.

### Comment

Wasting beneficiaries' money is imprudent.  In devising and implementing strategies for the investment and management of trust assets, trustees are obliged to minimize costs.

The language of Section 7 derives from Restatement of Trusts 2d § 188 (1959).  The Restatement of Trusts 3d says: "Concerns over compensation and

14

other charges are not an obstacle to a reasonable course of action using mutual funds and other pooling arrangements, but they do require special attention by a trustee. . . . [I]t is important for trustees to make careful cost comparisons, particularly among similar products of a specific type being considered for a trust portfolio." Restatement of Trusts 3d: Prudent Investor Rule § 227, comment *m*, at 58 (1992).

**SECTION 8.  REVIEWING COMPLIANCE.**  Compliance with the prudent investor rule is determined in light of the facts and circumstances existing at the time of a trustee's decision or action and not by hindsight.

**Comment**

This section derives from the 1991 Illinois act, 760 ILCS 5/5(a)(2) (1992), which draws upon Restatement of Trusts 3d: Prudent Investor Rule § 227, comment *b*, at 11 (1992).  Trustees are not insurers.  Not every investment or management decision will turn out in the light of hindsight to have been successful.  Hindsight is not the relevant standard.  In the language of law and economics, the standard is ex ante, not ex post.

**SECTION 9.  DELEGATION OF INVESTMENT AND MANAGEMENT FUNCTIONS.**

(a)  A trustee may delegate investment and management functions that a prudent trustee of comparable skills could properly delegate under the circumstances.  The trustee shall exercise reasonable care, skill, and caution in:

(1) selecting an agent;

(2) establishing the scope and terms of the delegation, consistent with the purposes and terms of the trust; and

(3) periodically reviewing the agent's actions in order to monitor the agent's performance and compliance with the terms of the delegation.

(b)  In performing a delegated function, an agent owes a duty to the trust to exercise reasonable care to comply with the terms of the delegation.

(c)  A trustee who complies with the requirements of subsection (a) is not liable to the beneficiaries or to the trust for the decisions or actions of the agent to whom the function was delegated.

15

(d) By accepting the delegation of a trust function from the trustee of a trust that is subject to the law of this State, an agent submits to the jurisdiction of the courts of this State.

<p style="text-align:center;"><strong>Comment</strong></p>

This section of the Act reverses the much-criticized rule that forbad trustees to delegate investment and management functions. The language of this section is derived from Restatement of Trusts 3d: Prudent Investor Rule § 171 (1992), discussed infra, and from the 1991 Illinois act, 760 ILCS § 5/5.1(b), (c) (1992).

**Former law.** The former nondelegation rule survived into the 1959 Restatement: "The trustee is under a duty to the beneficiary not to delegate to others the doing of acts which the trustee can reasonably be required personally to perform." The rule put a premium on the frequently arbitrary task of distinguishing discretionary functions that were thought to be nondelegable from supposedly ministerial functions that the trustee was allowed to delegate. Restatement of Trusts 2d § 171 (1959).

The Restatement of Trusts 2d admitted in a comment that "There is not a clear-cut line dividing the acts which a trustee can properly delegate from those which he cannot properly delegate." Instead, the comment directed attention to a list of factors that "may be of importance: (1) the amount of discretion involved; (2) the value and character of the property involved; (3) whether the property is principal or income; (4) the proximity or remoteness of the subject matter of the trust; (5) the character of the act as one involving professional skill or facilities possessed or not possessed by the trustee himself." Restatement of Trusts 2d § 171, comment *d* (1959). The 1959 Restatement further said: "A trustee cannot properly delegate to another power to select investments." Restatement of Trusts 2d § 171, comment *h* (1959).

For discussion and criticism of the former rule see William L. Cary & Craig B. Bright, The Delegation of Investment Responsibility for Endowment Funds, 74 Columbia L. Rev. 207 (1974); John H. Langbein & Richard A. Posner, Market Funds and Trust-Investment Law, 1976 American Bar Foundation Research J. 1, 18-24.

**The modern trend to favor delegation.** The trend of subsequent legislation, culminating in the Restatement of Trusts 3d: Prudent Investor Rule, has been strongly hostile to the nondelegation rule. See John H. Langbein, Reversing the Nondelegation Rule of Trust-Investment Law, 59 Missouri L. Rev. 105 (1994).

<p style="text-align:center;">16</p>

**The delegation rule of the Uniform Trustee Powers Act.** The Uniform Trustee Powers Act (1964) effectively abrogates the nondelegation rule. It authorizes trustees "to employ persons, including attorneys, auditors, investment advisors, or agents, even if they are associated with the trustee, to advise or assist the trustee in the performance of his administrative duties; to act without independent investigation upon their recommendations; and instead of acting personally, to employ one or more agents to perform any act of administration, whether or not discretionary . . . ." Uniform Trustee Powers Act § 3(24), 7B Uniform Laws Ann. 743 (1985). The Act has been enacted in 16 states, see "Record of Passage of Uniform and Model Acts as of September 30, 1993," 1993-94 Reference Book of Uniform Law Commissioners (unpaginated, following page 111) (1993).

**UMIFA's delegation rule.** The Uniform Management of Institutional Funds Act (1972) (UMIFA), authorizes the governing boards of eleemosynary institutions, who are trustee-like fiduciaries, to delegate investment matters either to a committee of the board or to outside investment advisors, investment counsel, managers, banks, or trust companies. UMIFA § 5, 7A Uniform Laws Ann. 705 (1985). UMIFA has been enacted in 38 states, see "Record of Passage of Uniform and Model Acts as of September 30, 1993," 1993-94 Reference Book of Uniform Law Commissioners (unpaginated, following page 111) (1993).

**ERISA's delegation rule.** The Employee Retirement Income Security Act of 1974, the federal statute that prescribes fiduciary standards for investing the assets of pension and employee benefit plans, allows a pension or employee benefit plan to provide that "authority to manage, acquire or dispose of assets of the plan is delegated to one or more investment managers . . . ." ERISA § 403(a)(2), 29 U.S.C. § 1103(a)(2). Commentators have explained the rationale for ERISA's encouragement of delegation:

> ERISA . . . invites the dissolution of unitary trusteeship. . . . ERISA's fractionation of traditional trusteeship reflects the complexity of the modern pension trust. Because millions, even billions of dollars can be involved, great care is required in investing and safekeeping plan assets. Administering such plans–computing and honoring benefit entitlements across decades of employment and retirement–is also a complex business. . . . Since, however, neither the sponsor nor any other single entity has a comparative advantage in performing all these functions, the tendency has been for pension plans to use a variety of specialized providers. A consulting actuary, a plan administration firm, or an insurance company may oversee the design of a plan and arrange for processing benefit claims. Investment industry professionals manage the portfolio (the largest plans spread their pension investments among dozens of money management firms).

17

John H. Langbein & Bruce A. Wolk, Pension and Employee Benefit Law 496 (1990).

**The delegation rule of the 1992 Restatement.** The Restatement of Trusts 3d: Prudent Investor Rule (1992) repeals the nondelegation rule of Restatement of Trusts 2d § 171 (1959), extracted supra, and replaces it with substitute text that reads:

> § 171.  Duty with Respect to Delegation.  A trustee has a duty personally to perform the responsibilities of trusteeship except as a prudent person might delegate those responsibilities to others.  In deciding whether, to whom, and in what manner to delegate fiduciary authority in the administration of a trust, and thereafter in supervising agents, the trustee is under a duty to the beneficiaries to exercise fiduciary discretion and to act as a prudent person would act in similar circumstances.

Restatement of Trusts 3d: Prudent Investor Rule § 171 (1992).  The 1992 Restatement integrates this delegation standard into the prudent investor rule of section 227, providing that "the trustee must . . . act with prudence in deciding whether and how to delegate to others . . . ."  Restatement of Trusts 3d: Prudent Investor Rule § 227(c) (1992).

**Protecting the beneficiary against unreasonable delegation.**  There is an intrinsic tension in trust law between granting trustees broad powers that facilitate flexible and efficient trust administration, on the one hand, and protecting trust beneficiaries from the misuse of such powers on the other hand.  A broad set of trustees' powers, such as those found in most lawyer-drafted instruments and exemplified in the Uniform Trustees' Powers Act, permits the trustee to act vigorously and expeditiously to maximize the interests of the beneficiaries in a variety of transactions and administrative settings.  Trust law relies upon the duties of loyalty and prudent administration, and upon procedural safeguards such as periodic accounting and the availability of judicial oversight, to prevent the misuse of these powers.  Delegation, which is a species of trustee power, raises the same tension.  If the trustee delegates effectively, the beneficiaries obtain the advantage of the agent's specialized investment skills or whatever other attributes induced the trustee to delegate.  But if the trustee delegates to a knave or an incompetent, the delegation can work harm upon the beneficiaries.

Section 9 of the Uniform Prudent Investor Act is designed to strike the appropriate balance between the advantages and the hazards of delegation.  Section 9 authorizes delegation under the limitations of subsections (a) and (b).  Section 9(a) imposes duties of care, skill, and caution on the trustee in selecting the agent, in establishing the terms of the delegation, and in reviewing the agent's compliance.

18

The trustee's duties of care, skill, and caution in framing the terms of the delegation should protect the beneficiary against overbroad delegation. For example, a trustee could not prudently agree to an investment management agreement containing an exculpation clause that leaves the trust without recourse against reckless mismanagement. Leaving one's beneficiaries remediless against willful wrongdoing is inconsistent with the duty to use care and caution in formulating the terms of the delegation. This sense that it is imprudent to expose beneficiaries to broad exculpation clauses underlies both federal and state legislation restricting exculpation clauses, e.g., ERISA §§ 404(a)(1)(D), 410(a), 29 U.S.C. §§ 1104(a)(1)(D), 1110(a); New York Est. Powers Trusts Law § 11-1.7 (McKinney 1967).

Although subsection (c) of the Act exonerates the trustee from personal responsibility for the agent's conduct when the delegation satisfies the standards of subsection 9(a), subsection 9(b) makes the agent responsible to the trust. The beneficiaries of the trust can, therefore, rely upon the trustee to enforce the terms of the delegation.

**Costs.** The duty to minimize costs that is articulated in Section 7 of this Act applies to delegation as well as to other aspects of fiduciary investing. In deciding whether to delegate, the trustee must balance the projected benefits against the likely costs. Similarly, in deciding how to delegate, the trustee must take costs into account. The trustee must be alert to protect the beneficiary from "double dipping." If, for example, the trustee's regular compensation schedule presupposes that the trustee will conduct the investment management function, it should ordinarily follow that the trustee will lower its fee when delegating the investment function to an outside manager.

**SECTION 10.  LANGUAGE INVOKING STANDARD OF [ACT].** The following terms or comparable language in the provisions of a trust, unless otherwise limited or modified, authorizes any investment or strategy permitted under this [Act]: "investments permissible by law for investment of trust funds," "legal investments," "authorized investments," "using the judgment and care under the circumstances then prevailing that persons of prudence, discretion, and intelligence exercise in the management of their own affairs, not in regard to speculation but in regard to the permanent disposition of their funds, considering the probable income as well as the probable safety of their capital," "prudent man rule," "prudent trustee rule," "prudent person rule," and "prudent investor rule."

19

**Comment**

This provision is taken from the Illinois act, 760 ILCS § 5/5(d) (1992), and is meant to facilitate incorporation of the Act by means of the formulaic language commonly used in trust instruments.

**SECTION 11. APPLICATION TO EXISTING TRUSTS.** This [Act] applies to trusts existing on and created after its effective date. As applied to trusts existing on its effective date, this [Act] governs only decisions or actions occurring after that date.

**SECTION 12. UNIFORMITY OF APPLICATION AND CONSTRUCTION.** This [Act] shall be applied and construed to effectuate its general purpose to make uniform the law with respect to the subject of this [Act] among the States enacting it.

**SECTION 13. SHORT TITLE.** This [Act] may be cited as the "[Name of Enacting State] Uniform Prudent Investor Act."

**SECTION 14. SEVERABILITY.** If any provision of this [Act] or its application to any person or circumstance is held invalid, the invalidity does not affect other provisions or applications of this [Act] which can be given effect without the invalid provision or application, and to this end the provisions of this [Act] are severable.

**SECTION 15. EFFECTIVE DATE.** This [Act] takes effect . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

**SECTION 16. REPEALS.** The following acts and parts of acts are repealed:

    (1)

    (2)

    (3)